No. 13-1690

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

ANNIE TUMMINO, et al.,
Plaintiffs-Appellees,

v.

MARGARET HAMBURG, Commissioner of Food and Drugs, et al.,
Defendants-Appellants.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————

**ADDENDUM TO MOTION FOR STAY PENDING APPEAL**
———————

LORETTA E. LYNCH
  *United States Attorney*

F. Franklin Amanant
  *Assistant United States Attorney*

DAVID J. HOROWITZ
  *Deputy General Counsel*

ELIZABETH H. DICKENSEN
  *Chief Counsel, Food and Drug Division*

ANNAMARIE KEMPIC
  *Deputy Chief Counsel, Food and Drug Division*

SCOTT A. KAPLAN
  *Assistant Chief Counsel, Food and Drug Division*
  *U.S. Department of Health and Human Services*

STUART F. DELERY
  *Acting Assistant Attorney General*

BETH S. BRINKMANN
  *Deputy Assistant Attorney General*

MARK B. STERN

ADAM C. JED
  (202) 514-8280
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7240*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

# ADDENDUM TABLE OF CONTENTS

**Statutes**                                                                    **Page**

Citizen Petition ..........................................................................................Add-1

Fifth Amended Complaint ........................................................................ Add-60

Second Amended Supplemental Complaint ............................................ Add-104

Memorandum and Order ("Order") (April 5, 2013)................................ Add-125

Judgment (April 10, 2013) ...................................................................... Add-184

Notice of Appeal (May 1, 2013) ............................................................. Add-186

Declaration of Janet Woodcock, M.D., and attachments .................................. Add-189

Memorandum and Order ("May Order") (May 10, 2013) ................................... Add-204

# C · R · L · P

THE CENTER FOR REPRODUCTIVE LAW AND POLICY

2672  '02 FEB 14 A9 :03

120 WALL STREET

NEW YORK

NEW YORK 10005

USA

917/637-3600

917/637-3666 *fax*

1146 19TH STREET, NW

WASHINGTON, DC 20036

USA

202/530-2975

202/530-2976 *fax*

HTTP://WWW.CRLP.ORG

February 14,200 1

Dockets Management Branch
Food and Drug Administration
Department of Health and Human Services
Room 10-61
5630 Fishers Lane
Rockville MD 20857

To Whom it May Concern:

Enclosed for filing, please find the original and three copies of a Citizen's Petition filed on behalf of the American Public Health Association, the American Medical Women's Association, the Association of Reproductive Health Professionals, the National Asian Women's Health Organizations, the National Black Women's Health Project, the National Family Planning and Reproductive Health Association, the Planned Parenthood Federation of America, the Reproductive Health Technologies Project and 58 other organizations listed therein.

Thank you for your attention to this matter.

Daniel Yuhas



OIP-0075                Add-1                CP1

ORIGINAL

February 14, 2001

### CITIZEN'S PETITION

The American Public Health Association, the American Medical Women's Association, the Association of Reproductive Health Professionals, the National Asian Women's Health Organizations, the National Black Women's Health Project, the National Family Planning and Reproductive Health Association, the Planned Parenthood Federation of America, the Reproductive Health Technologies Project and 58 other organizations listed below, by their counsel, the Center for Reproductive Law & Policy, submit this petition pursuant to 21 C.F.R. § 10.30 (1999), to request that the Food and Drug Administration (FDA) switch from prescription to over-the-counter (OTC) status two FDA-approved emergency contraceptive drugs, *Preven™* and *Plan B®*, and any new drug eligible for filing an abbreviated new drug application because of its equivalence to *Preven™* or *Plan B®* (hereinafter these drugs will be collectively referred to as EC). Such a switch is authorized under 21 U.S.C. § 353(b)(3) and 21 C.F.R. § 310.200(b) because, as set forth below and in the supporting Declaration of David Grimes, M.D ("Grimes Dec."), EC is safe and effective for OTC use. Accordingly, the FDA should grant this Petition and exempt EC from prescription dispensing limitations.

Dockets Management Branch
Food and Drug Administration
Department of Health and Human Services
Room 10-6 1
5630 Fishers Lane
Rockville MD 20857

## ACTION REQUESTED

Petitioners request that the FDA exempt from prescription-dispensing requirements, pursuant to 21 U.S.C. § 353(b)(3) and 21 C.F.R. § 310.200(b), *Preven™, Plan B®*, and any new drug eligible for filing an abbreviated new drug application because of its equivalence to *Preven™* or *Plan B®*.

## STATEMENT OF GROUNDS

Under the Food, Drug and Cosmetic Act and FDA regulations, "[a]ny drug limited to prescription use . . . shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling." 21 C.F.R. § 310.200(b); see *also 21 U.S.C.* § 353(b)(3) ("The Secretary may by regulation remove drugs subject to sections 352(d) and 355 of this title from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health."). FDA regulations also explicitly authorize the use of a citizen's petition to seek a switch from prescription to OTC status: "A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b)(l)(C) of the act may be initiated by . . . any interested person . . . . fil[ing] a petition . . . pursuant to Part 10 of this chapter. . . ." 21 C.F.R. § 310.200(b).

Limiting EC to prescription use is not necessary for the protection of public health. As set forth in greater detail in the accompanying Declaration of Dr. Crimes, EC meets all the criteria for OTC availability. In general, an approved drug is suitable for OTC use when: (1) the drug is safe for self-medication, 21 C.F.R. § 310.200(b)(1999); 21 C.F.R. § 330.10(a)(4)(i) (1999); Tamar Nordenberg, *Now Available* Without *a Prescription,* FDA Consumer 7, 9 (Nov. 6,

1996); Marian Segal, RX *to OTC: The Switch is* On, www.fda.gov/bbs/topics/consumer/ CN00012c.html (March 1991); R. William Soller, *"OTCness", 32* Drug Information Journal 555, 556-58 (1998); Debra L. Bowen, *Making the Switch to OTC,* III Cosmetics & Toiletries 102 (May 1996); Nancy L. Buc, *The Switch from Prescription* to *Over the Counter, in* The Pill: From Prescription to Over the Counter 237, 238-39 (eds. Samuels & Smith 1994); (2) the drug is effective when self-administered, 21 C.F.R. § 3 10.200(b)(1999); 21 C.F.R. § 330.1 0(a)(4)(ii)( 1999); Soller, *supra* at 556, 558-59; Bowen, *supra;* Buc, *supra;* Nordenberg, *supra* at 7; (3) the condition to be treated is self-diagnosable, *Segal, supra;* Bowen, *supra,* Buc, *supra;* and (4) the drug's labeling is tailored to self-administration, 21 C.F.R. § 3 10.200(b)( *1999); 2* 1 C.F.R. § 330.1 0(a)(4)(v)( 1999); Soller, *supra,* at 559-60; Segal, *supra;* Bowen, *supra;* Buc, *supra;* Nordenberg, *supra* at 7-8, 9, 11.

First, EC is safe for self-medication because it is not toxic to the woman (or to the embryo or fetus if a pregnancy had been previously established in the woman); it has a low risk of abuse or overdose; overdose is unlikely to lead to serious consequences; and its side effects are well known and minor. Crimes Dec. ¶¶ 8A, B, C, F. Second, EC is effective when self-administered. Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between EC and other drugs would be nonfatal and unlikely to seriously affect EC's efficacy.  Crimes Dec. ¶ 81.  Third, the condition EC treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman, and EC has no contraindications that would pose a danger to the patient. Crimes Dec. ¶ 8D. Fourth, the existing patient labeling for *Preven™ and Plan B®* is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow. Grimes Dec. ¶ 8H. Finally, switching EC to

OTC status will promote public health because EC is only effective for a short time after unprotected sex, and it works most effectively 'if used within twenty-four hours of unprotected sex. Because contacting a physician and obtaining and filling a prescription hinder women from obtaining EC in a timely fashion, making EC available OTC will allow more women to use the treatment, and enable more women to prevent unwanted pregnancies, to the benefit of public health. Grimes Dec. ¶¶ 5, 6, 7. Accordingly, both the American Medical Association and the American College of Obstetricians and Gynecologists have publicly supported efforts to move EC to OTC status. See Dec. 5, 2000 Statement of American Medical Association, http:/www.ama-assn.org/ama/pub/article/1617-3547.html (copy attached hereto); February 14, 2001 Statement of the American College of Obstetricians & Gynecologists Supporting the Availability of Over-the-Counter Contraception (filed herewith).

Because limiting EC to prescription dispensing is not necessary for the protection of public health, the FDA should exempt it from that limitation. 2 1 C.F.R. § 3 10.200(b) (a drug "shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health").

## ENVIRONMENTAL IMPACT

The proposed action is exempt from the requirement of an environmental impact statement under 21 C.F.R. §§ 25.24(a)(8) and (c)(6).

## ECONOMIC IMPACT

No information is required at this time.

## CERTIFICATION

The Center for Reproductive Law & Policy, counsel for petitioners certifies that, to the best of its knowledge and belief, this petition includes all information and views on which the petition relies. The petitioners know of no data unfavorable to the petition.

Bonnie Scott Jones
Simon Heller
The Center for Reproductive
  Law & Policy
Attorneys for Petitioners
120 Wall Street, 14th floor
New York NY 10005
(917) 637-3600

Counsel for Petitioners

Helene T. Krasno ff
Planned Parenthood Federation of America
1780 Massachusetts Avenue, NW
Washington, DC 20036
(202) 973-4890

Of-Counsel for Petitioner Planned Parenthood Federation of America

## PETITIONERS

Advocates for Youth

The Alaska Emergency Contraceptive Project

American Association of University Women

American Academy of Pediatrics

American College of Nurse-Midwives

Americans for Democratic Action

American Medical Women's Association

The American Nurses Association

American Public Health Association

American Society for Emergency Contraception

American Society for Reproductive Medicine

Arizona Family Planning Council

Association of Reproductive Health Professionals

Beaverhead Family Planning Clinic

Center for Entrepreneurship in International Health and Development, School of Public Health,
    University of California, Berkeley

Center for Women's Policy Studies

Choice USA

The Compton Foundation

The Consortium for Emergency Contraception

Family Health Care, Inc.

Family Health International

Family Planning Association of Northern Ohio, Inc.

Family Planning Council

Family Planning Councils of America

Family Planning Council of Iowa

Family Planning Association of Maine

Family Tree Clinic

Fargo Cass Public Health

6

Health Care of Southeast Massachusetts

Health Quarters

Ipas

Lake County Family Planning

Medical and Health Research Association of New York City, Inc

National Abortion Federation

National Abortion and Reproductive Rights Action League

 California Abortion and Reproductive Rights Action League

 Massachusetts Abortion and Reproductive Rights Action League

 Minnesota Abortion and Reproductive Rights Action League

 New York Abortion and Reproductive Rights Action League

National Asian Women's Health Organization

National Association of Nurse Practitioners in Women's Health

National Black Women's Health Project

National Coalition Against Domestic Violence

National Consumers League

National Family Planning and Reproductive Health Association

The National Organization for Women Legal Defense and Education Fund

The National Organization on Adolescent Pregnancy, Parenting & Prevention

National Partnership for Women and Families

Okanogan Family Planning

Oops- Emergency Contraception Hotline

Pacific Institute for Women's Health

Pathfinder International

Physicians for Reproductive Choice and Health

Planned Parenthood Federation of America and all Planned Parenthood Affiliates Nationwide

 Planned Parenthood of Central Washington

 Planned Parenthood Chicago Area

 Planned Parenthood of Connecticut

 Planned Parenthood Heart of Illinois

 Planned Parenthood of Houston and Southeast Texas, Inc

7

Add-8

Planned Parenthood Association of Lubbock

Planned Parenthood of Nassau County

Planned Parenthood of the Saint Louis Region

Planned Parenthood of Southern Arizona

Planned Parenthood of Stark County

Planned Parenthood of the Texas Capital Region

Planned Parenthood of Western Washington

The Population Council

Population Services International, U.S. Programs

Pro Choice Resource Center

Program for Appropriate Technology in Health

The Reproductive Health Technologies Project

The Sexuality Information and Education Council of the United States

Texas Family Planning Association

Tri City Health Center

Voters for Choice

Women's Health Center of West Virginia

# American Medical Association
Physicians dedicated to the health of America

HOME    JOIN / RENEW    CONTACT US    SITEMAP    privacy statement    web guidelines

Search our site    Find

AMA Home>News and Events>News from the AMA>For the media> >Statements

## Statements

print story | bookmark page

⊛ AMA terms Aetna's decision to drop all-products clauses an important victory for patients and physicians

⊛ AMA welcomes President-elect Bush and the new Congress and looks forward to progress on key health issues

⊛ AMA on access to emergency contraception

⊛ AMA: GAO Report confirms National Practitioner Data Bank is seriously flawed

⊛ AMA says media reports mischaracterize new business venture

⊛ AMA applauds defeat of Maine assisted suicide referendum

⊛ AMA condemns price gouging by distributors of influenza vaccine

⊛ 4.5% Medicare physician payment update: Good for America's seniors and the physicians who care for them

⊛ U.S. House and Senate now have a clear majority to pass a real patients' bill of rights

⊛ AMA welcomes new yardstick to measure Medicare quality successes

more articles ⊛ ⊛

## AMA on access to emergency contraception

**For immediate release
December 5, 2000**

Statement attributable to:
Edward J. Hill, M D
AMA trustee

"The AMA today approved recommendations regarding greater access to emergency contraception pills (**ECPs**). **Two** brand names for emergency contraceptive pills are Preven and Plan B.

"**In** addition to reaffirming current AMA policy that holds that no physician or other professional personnel should be required to perform an act that violates personally held moral principles, the AMA passed new policies to encourage physicians to play a more active role in providing education about access to **ECPs**. The new policies also direct the AMA to intensify efforts to improve awareness and understanding about the drugs and to enhance efforts to expand access to them, including making them more available through hospitals, clinics, emergency rooms, acute care centers, and physicians' offices.

"In order to expand access to **ECPs**, the AMA also decided to support and monitor the application process of manufacturers filing for over-the-counter approval of emergency contraception pills with the Food and Drug Administration (FDA). If the FDA determines that **ECPs** are safe for **over-the-** counter use, the AMA would support that increased access."

### ###

Last updated: Dec 05, 2000

Content Provided By: AMA Media Relations

Read Another Article

  t a t e m e n t s

© Copyright 1995-2001 American Medical Association. All rights reserved.

THE AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS

# ACOG News Release

OFFICE OF
COMMUNICATIONS
PO Box 96920
Washington DC
20090-6920

T: 202.484.3321  F: 202.479.6826  email: communications@acog.org

## Statement of
## The American College Of Obstetricians and Gynecologists
## Supporting the Availability of
## Over-the-Counter Emergency Contraception

### February 14, 2001

The American College of Obstetricians and Gynecologists (ACOG) supports making emergency oral contraception available to women over the counter in a designated product.

The time has come for women to have access to a product that they need. Almost' half of the 6.3 million annual pregnancies in the US are unintended. Emergency contraception holds the potential to cut this figure in half. This in turn could substantially reduce the US abortion rate of about 1 in every 4 pregnancies.

The US Food and Drug Administration has declared emergency contraceptive pills to be safe and effective in preventing pregnancy. Yet substantial barriers exist to women obtaining this fallback contraceptive method that must be used within 72 hours after unprotected intercourse. We believe that emergency oral contraception can meet the FDA criteria for over-the-counter availability. Then, at last, women would have access to an important method of preventing pregnancy.

### # # #

*The American College of Obstetricians and Gynecologists is the national medical organization representing over 40,000 physicians who provide health care for women.*



11. Trussell J, Ellertson C, Stewart F, Koenig J, Raymond EG. Emergency contraception: a cost effective approach to preventing unintended pregnancy. Woman Health Primary Care 1998;1:52-69.

12. Ellertson C, Koenig J, Trussell J, Bull J. How many U.S. women need emergency contraception? Contemp Ob Gyn 1997;42: 102-28.

13. Trussell J, Stewart F, Guest F, Hatcher RA. Emergency contraceptive pills: a simple proposal to reduce unintended pregnancies. Fam Plann Perspect 1992;24:269-73.

14. Ellertson C, Trussell J, Stewart FH, Winikoff B. Should emergency contraceptive pills be available without prescription? J Am Med Womens Assoc 1998;53:226-9, 232.

15. Grimes DA. Emergency contraceptives over the counter. Allowing easy access is important [published erratum appears in West J Med 2000 May; 172(5):340]. West J Med 2000; 172: 148-9.

16. Jacobs LR. Prescription to over-the-counter drug reclassification. Am Fam Physician 1998;57:2209-14.

17. Grimes DA. The safety of oral contraceptives: epidemiologic insights from the first 30 years. Am J Obstet Gynecol 1992; 166: 1950-4.

18. Lake SR, Vernon SA. Emergency contraception and retinal vein thrombosis. Br J Ophthalmol 1999$3:630-l.

19. U. S. Department of Health and Human Services. Vital statistics of the United States 1992, Volume II Mortality Part A. Hyattsville, Maryland: National Center for Health Statistics, 1996.

20. Efficacy and side effects of immediate postcoital levonorgestrel used repeatedly for contraception. United Nations Development Programme/ United Nations Population Fund/World Health Organization/World Bank Special Programme of Research, Development and Research Training in Human Reproduction, Task Force on Post-Ovulatory Methods of Fertility Regulation. Contraception 2000;61:303-8.

21. Raman-Wilms L, Tseng AL, Wighardt S, Einarson TR, Koren G. Fetal genital effects of first-trimester sex hormone exposure: a meta- analysis. Obstet Gynecol 1995;85: 141-9.

22. ACOG practice patterns. Emergency oral contraception. Number 3, December 1996. American College of Obstetricians and Gynecologists. Int J Gynaecol Obstet 1997;56:290-7.

23. Consortium for emergency contraception. Expanding global access to emergency contraception. Seattle, WA: Program for Appropriate Technology in Health, 2000.

24. Goldzieher JW. Pharmacokinetics and metabolism of ethynyl estrogens. In: Goldzieher JW, Fotherby K, eds. Pharmacology of the Contraceptive Steroids. New York: Raven Press, 1994.



25. Obach RS. Inhibition of human cytochrome P450 enzymes by constituents of St. John's Wort, an herbal preparation used in the treatment of depression. J Pharmacol Exp Ther 2000;294:88-95.

26. Guerts TBP, Goorissen EM, Sitsen JMA. Summary of drug interactions with oral contraceptives. Camforth, England: Parthenon Publishing Group, Ltd., 1993.

27. Webb A. Deregulating emergency contraception. The alternative may be unwanted pregnancies. BMJ 1994;308:135.

Table 1. Side effects associated with two ECP regimens

| | % with symptom (95% CI) | |
| --- | --- | --- |
| | Yuzpe (n=979) | Levonorgestrel (n=977) |
| Nausea | 50.5 (47.3 − 53.6) | 23.1 (20.5 − 25.9) |
| Vomiting | 18.8 (16.4-21.4) | 5.6 (4.3 − 7.3) |
| Dizziness | 16.7 (14.4 − 19.1) | 11.2 (9.3 − 13.3) |
| Fatigue | 28.5 (25.7 − 31.4) | 16.9 (14.6 − 19.4) |
| Headache | 20.2 (17.8 − 22.9) | 16.8 (14.5 − 19.3) |
| Breast tenderness | 12.1 (10.1 − 14.3) | 10.8 (8.9 − 12.9) |
| Low abdominal pain | 20.9 (18.4 − 23.6) | 17.6 (15.3 − 20.1) |
| All other adverse effects* | 16.7 (14.4 − 19.1) | 13.5 (11.4 − 15.8) |

*Mostly diarrhea and some irregular bleeding or spotting.

From: Task Force on Postovulatory Methods of Fertility Regulation. Randomised controlled trial of levonorgestrel versus the Yuzpe regimen of combined oral contraceptives for emergency contraception. Lancet 1998;352:428-33.



Table 2.  Contraindications listed on FDA approved labeling of two approved ECP products

| *Preven*[TM] | *Plan B*[®] |
|---|---|
| Combination oral contraceptive pills [including *Preven*[TM]] should not be used by women who have: | *Plan B*[®] should not be used by women who have: |

Combination oral contraceptive pills [including *Preven*[TM]] should not be used by women who have:
- pregnancy
- history of blood clots in deep veins of legs
- history of heart attack
- history of stroke
- valvular heart disease with complications
- severe high blood pressure
- diabetes with blood vessel involvement
- severe headaches
- liver tumors
- active liver disease
- heavy smoking and older than 35 years
- allergy to any components of the product

"May not be advisable to use ECPs" if you have had:
- heart attack or stroke
- blood clots in legs, lungs, or eyes
- breast, endometrial, cervical, or vaginal cancer
- unexplained vaginal bleeding
- jaundice during pregnancy or OCP use
- liver tumor

*Plan B*[®] should not be used by women who have:
- pregnancy
- unexplained vaginal bleeding
- allergy to any ingredient in the product



PREVEN™

How to use the PREVEN™
Emergency Contraceptive Kit

BEFORE YOU BEGIN,
Please Read This Instruction Book Carefully

## INTRODUCTION

This book is to help teach you how to use the PREVEN™ Emergency Contraceptive Kit correctly. When used according to the directions, only 2 out of 100 women might become pregnant after a single act of intercourse. If no method of contraception is used, about 8 out of 100 might become pregnant.

Like all oral contraceptives, emergency contraceptive pills do not protect against infection with HIV (the virus that causes AIDS) and other sexually transmitted diseases. For more detailed information, please refer to the Detailed Patient Labeling included in this kit. If you still have questions or do not fully understand how to use the kit after reading this book, you should talk to your healthcare professional.

1

Your healthcare professional has prescribed the PREVEN™ Emergency Contraceptive Kit for you in the event you may be at risk for an unintended pregnancy after unprotected sex. Unprotected sex is when you know or suspect that your birth control failed (for instance, a condom broke during sex) or you may have had sex without using birth control.

The pills in the PREVEN™ Emergency Contraceptive Kit will reduce the risk of unintended pregnancy if you start taking them as soon as possible but within **72 hours** of having unprotected sex. They will **not** work if you are already pregnant.

2

## What are Emergency Contraceptive Pills **(ECPs)?**

The PREVEN™ Emergency Contraceptive Kit pills contain hormones similar to those found in daily, combination birth control pills (COCs): an estrogen (ethinyl estradiol) and a progestin (levonorgestrel). The difference is that daily combination birth control pills are taken one pill each day for 21 per cycle to prevent pregnancy, whereas emergency contraceptive pills are taken as two pills in two doses to prevent pregnancy.  The first dose of two pills is taken as soon as possible but **within 72 hours** after unprotected sex, and the second dose of two pills is taken **12 hours** later. **The pills in the PREVEN™ Emergency Contraceptive Kit are meant for emergency use only and should not be used as your regular method of birth control.**

3

## What does the kit contain?

The PREVEN™ Emergency Contraceptive Kit contains:

- this Patient Information Book and Detailed Patient Information;
- a pregnancy test;
- four light blue emergency contraceptive pills.

4

## How do the pills in the PREVEN″ Emergency Contraceptive Kit prevent pregnancy?

The hormones contained in the emergency contraceptive pills prevent pregnancy in the same way that daily birth control pills do.

- they delay or prevent ovulation (the process of maturation and the release of an egg from the ovary);
- they may make it difficult for sperm to fertilize an egg if one has been released from the ovary;
- they may produce changes in the lining of the womb (uterus).

5

Add-17

### Diagram of the Female Reproductive System



fallopian tubes — fallopian tubes — uterus — ovary — ovary — cervix

If you are already pregnant, emergency contraceptive pills cannot end the pregnancy. Instead, the pills prevent a pregnancy from beginning.

6

## Who should not use PREVEN″ Emergency Contraceptive Kit pills?

Do not use the pills in the PREVEN™ Emergency Contraceptive Kit if you are already pregnant as a result of a previous intercourse (not the intercourse within the last 72 hours).

Emergency contraceptive pills may not be right for all women. It may not be advisable to use ECPs if you have had:

- a heart attack, or a stroke;
- blood clots in your legs, lungs, or eyes;
- breast cancer or cancer of the lining of the uterus, cervix, or vagina;

7

- unexplained vaginal bleeding;
- jaundice (yellowing of the whites of the eyes or skin) during a prior pregnancy or during previous daily use of the combination birth control pill;
- a liver tumor.

Be sure to tell your healthcare professional if you have ever had any of these conditions.

8

## How to use the PREVEN″ Emergency Contraceptive Kit

**Step 1.** Please finish reading this patient book in full before using the **Kit.**

**Step 2.** Use the pregnancy test.

The pregnancy test is provided to help you determine if you are already pregnant from sex earlier in the month or in previous months.  It will not tell you if you are pregnant from sex which took place within the previous 72 hours. The test detects pregnancy by showing if a hormone called human chorionic gonadotropin or (hCG) (made by cells which are a part of the pregnancy) is present in your urine.

9

**How to use the pregnancy test:**

- Perform the test while sitting on the toilet.
- Remove the test from the foil wrapper by tearing at the notches on the package. Throw away the freshness packet (drying agent) inside the wrapper.
- Take off the protective cap covering the absorbent tip. 
- Hold the test stick with the absorbent tip pointing downward and place the tip into your urine stream for **at least five seconds**. The entire tip should get wet. **Do not urinate** on the windows of the test stick.
- Remove the test stick from the urine stream. It is not necessary to replace the cap over the tip.

10

- Lay the test stick on a flat surface with the windows facing up. As the test begins to work, you will notice a pink/purple color moving across the windows. Don't be alarmed—this is the normal 'development' process.

## How to read the pregnancy test:

- You should wait at least three minutes after exposure to your urine for the results, but not longer than 20 minutes. You can tell the test is ready to be read when you see a pink/purple line in the SQUARE control window. All tests which have been performed correctly will show a pink/purple line in the SQUARE control window. You must see a line in this SQUARE control window in order

11

for the test to be valid. Contact your healthcare professional if you do not see the pink/purple line in the SQUARE control window.

- If a pink/purple line appears in the ROUND result window, you are pregnant.

**IMPORTANT:** If you get a positive pregnancy result, do not take any of the pills in the PREVEN™ Emergency Contraceptive Kit. Contact your healthcare professional.

2 lines-
Pregnant

1 line-
Not pregnant

12

- The lines can be any shade of pink, as long as you can see two clear and distinct lines as shown.
- The test may show you are pregnant when you are not if you have had a miscarriage or have given birth within the past 8 weeks. You should ask your healthcare professional for help in interpreting the result of your pregnancy test if you have recently been pregnant.

**NOTE:** It doesn't matter which line is darker. As long as there is a line in the SQUARE control window to indicate the test is meaningful, the presence of a line in the ROUND result window indicates you are pregnant.

- If the test is negative–meaning **no** pink/purple line appears in the ROUND result window–continue on to step 3.

**IMPORTANT:** If the pregnancy test shows that you are already pregnant, do **not** take the pills in the PREVEN™ Emergency Contraceptive Kit. The pills will **not** work.

13

## Step 3. Take the **PREVEN™** Emergency Contraceptive Kit Pills.

Each kit contains four light blue pills, which are taken in two doses of two pills per dose.

- Take the first dose of two pills as soon as possible but **within 72 hours** of having unprotected sex.
- Take the second dose of two pills **12 hours** after the first dose. For example, if you take the first two pills at 8 a.m., you must take the second dose of two pills at 8 p.m.

**TIP:** Try to take the first dose at a time that will make it convenient to take the second dose 12 hours later. However, remember that the first dose must be taken as soon as possible but within 72 hours after unprotected sex.

- Do not take any extra pills unless recommended by your healthcare professional.



14

## Side Effects

Some women who use the pills in the PREVEN™ Emergency Contraceptive Kit will experience side effects.

The most common side effect is nausea (being sick to your stomach). It is usually mild, and goes away within a few hours, but may last one to two days. Taking the pills with food may reduce the chance of nausea.

Some women who take the pills in the PREVEN™ Emergency Contraceptive Kit may also vomit. If vomiting occurs within an hour after you take either dose of emergency contraceptive pills, call your healthcare professional to discuss whether to repeat the dose or to take antinausea medication.

15

Your next menstrual period may arrive a few days earlier or later than you expect. Menstrual blood flow may also be heavier or lighter than usual. If bleeding lasts longer than your period normally does, or if your period doesn't arrive within 21 days of taking emergency contraceptive pills, contact your healthcare professional.

16

## WARNING  SIGNALS

**If you experience any of the following ill effects during or shortly after taking emergency contraceptive pills, contact your healthcare professional immediately:**

- chest pain, coughing up of blood, or sudden shortness of breath;
- severe pain in the calf;
- sudden severe headache, dizziness, weakness, numbness, or faintness;
- sudden difficulty seeing or speaking;
- severe pain or tenderness in the stomach area;
- jaundice (yellowing of the skin or eyeballs).

17

# COMMONLY  ASKED  QUESTIONS  AND  ANSWERS

### How do I know if the **PREVEN**™ Emergency Contraceptive Kit pills have worked?

Within 21 days, you should get your menstrual period.  If you don't, see your healthcare professional.

### After using PREVEN″ Emergency Contraceptive Kit pills, when can I have sex again?

You can have sex again right away, but you should use a regular form of birth control to protect yourself from pregnancy. You may want to contact your healthcare professional to discuss your contraception.

18

### Will PREVEN″ Emergency Contraceptive Kit pills taken now prevent me from pregnancy if I have sex without birth control in the future?

No, they will not. ECPs will also not protect you from sexually transmitted diseases.

### How often can I use PREVEN″ Emergency Contraceptive Kit pills?

ECPs are meant for one-time emergency protection.  ECPs are not as effective as some forms of regular birth control. If you have unprotected sex more than once per menstrual cycle and have already taken the emergency contraceptive pills for that cycle, you are advised to consult with your healthcare professional.

19

### Can I still use PREVEN″ Emergency Contraceptive Kit pills if my healthcare professional has told me that I should not take combination oral contraceptives?

You and your healthcare professional should discuss the risks and benefits of the PREVEN™ Emergency Contraceptive Kit pills and agree on the best course of action for you.

20

### What happens if **I don't** perform the pregnancy test correctly, and it says I'm not pregnant when I really am? Will taking the PREVEN″ Emergency Contraceptive Kit pills harm my baby?

The pills in the PREVEN™ Emergency Contraceptive Kit contain the same or similar hormones as found in combination oral contraceptive pills. Scientific studies do not suggest that use of combination oral contraceptives is associated with an increased risk of harm to the fetus, when taken inadvertently during early pregnancy.

21

## Will taking PREVEN™ Emergency Contraceptive Kit pills cause changes in my menstrual cycle?

You may find that your next menstrual period comes a few days earlier or later than expected. Your menstrual blood flow may also be heavier or lighter than usual.  If menstrual bleeding lasts longer than your normal period or if your period does not arrive within 21 days of taking the emergency contraceptive pills, contact your healthcare professional.

22

## FOR  MORE  INFORMATION

If you have additional questions about the use of the PREVEN™ Emergency Contraceptive Kit, please consult the package insert. Information is also available at our website at www.PREVEN.com and our toll free line 1-888-PREVEN2.

23

## Gynétics Inc.

P.O. Box-8509,
Somerville, NJ 08876

Issued: October, 1998
Print Code: 0891-098
PREVEN™ Emergency Contraceptive Kit is made in the USA
Printed in USA
© 1998 Gynétics Inc.

24

### INTRODUCTION

**Any woman who considers using** *Plan B* **should understand the benefits and risks. The following information should help your understanding, but it is not meant to replace a discussion between you and your health care provider.**

### WHAT IS PLAN B?

*Plan B* is intended to prevent pregnancy after unprotected sex (if a contraceptive fails or if no contraception was used). It contains levonorgestrel, which is a synthetic hormone (progestin) commonly used in birth control pills. *Plan B* is for emergency use, and should not be used in place of regular contraception since it is not as effective as regular contraceptives.

*Plan B* does not protect against HIV (the virus causing AIDS), or any other sexually transmitted disease.

### HOW EFFECTIVE IS PLAN B?

*Plan B* reduces the risk of pregnancy following a single act of unprotected sex from about 8% down to 1%. This represents an 89% reduction in risk of pregnancy for this single act of unprotected sex.

Plan *B* is more effective the sooner treatment is started following unprotected sex.

### WHO SHOULD NOT TAKE PLAN B?

*Plan B* should not be taken if you are already pregnant or if you have an allergy to any ingredient in *Plan B*. Do not use *Plan B* if you have unexplained vaginal bleeding,

### WHAT IF I AM ALREADY PREGNANT AND TAKE PLAN B?

*Plan B* is not appropriate if you are already pregnant; it will nor work. However, if you take *Plan B* and are already pregnant, it is unlikely that this would affect the pregnancy. Several studies involving the long-term use of progestin hormone-containing contraceptives have not shown any effects on the fetus.




Take the second tablet 12 hours after you take the first tablet.

**OVERDOSAGE: Taking too much Plan B may cause nausea or vomiting. You should contact your health care provider if you take too much Plan B.**

OTHER INFORMATION: **Plan B has been prescribed specifically for you; do not give it to others.**

Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
Distributed by women's Capitol Corporation
5400 Carilion Point
Kirkland WA. 98033
Phone: 1-800-330-1271
Fax: 1-877-407-3801

*WHAT ARE THE RISKS AND SIDE EFFECTS OF TAKING PLAN B?* Menstrual bleeding is sometimes heavier and sometimes lighter than usual after women take *Plan B*. After taking *Plan B*, most women (87%) get their next period within one week of when it is expected. If your period is more than one week late, you should check with your health care provider to see if you are pregnant.

Progestin contraceptive pills used for routine daily contraception can increase your risk for a tubal (ectopic) pregnancy. *Plan B* contains progestin. It is unknown if two doses of *Plan B* would increase the risk of tubal pregnancy. You should contact your health care provider if you develop severe abdominal pain, since this can be a warning sign of a tubal pregnancy.

The most common side effects include nausea (23% of users), abdominal pain (18%), tiredness (17%), and headache (17%). Dizziness and breast tenderness occur in about 10% of patients, and 5–6% of patients experience either vomiting or diarrhea.

HOW SUPPLIED: Each *Plan B* tablet contains 0.75 mg of the active ingredient levonorgestrel,18,19-Dinorpregn-4-en-20-yn-3-one-13-ethyl-17-hydroxy-, (17α)-(-)-, a totally synthetic progestin. The inactive ingredients present are colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, and lactose monohydrate.

*Plan B* tablets are supplied in packages of two tablets each. The tablet is white, round, and marked: INOR.

Store at 25°C (77°F). Excursions permitted to 15–30°C (59–86°F). See USP Controlled Room Temperature.

CAUTION: Rx Only.

Curricula
Vitae

January, 200 1

## CURRICULUM VITAE

## DAVID A. GRIMES, M.D.

**BORN:** February 18, 1947
Waterbury, Connecticut

**PERSONAL:**

Wife: Katherine
Children (name and birth year): Robin, (1970) and Heather (1973)

**EDUCATION:**

| | |
|---|---|
| 19651969 | Harvard University, 1969, B.A. cum laude |
| 1969-1973 | University of North Carolina |
| | School of Medicine, 1973, M.D. |
| 1973-1975 | Resident, Obstetrics and Gynecology, |
| 1977-1979 | N.C. Memorial Hospital, Chapel Hill |

**MILITARY SERVICE:**

| | |
|---|---|
| 19751977 | Surgeon (04) |
| 1979-1980 | Surgeon (04) |
| 1981-1986 | Senior Surgeon (05) |

U.S. Public Health Service
Centers for Disease Control

**HONORS:**
- Harvard National Scholar 1965
- Morehead Scholar 1965
- Morehead Fellow in Medicine 1969
- Isaac Hall Manning Award 197 1
- Whitehead Society First Award, Student Research Day, 1971 and 1973
- North Carolina Obstetrical and Gynecological Society
- Student Aptitude Award, 1972
- Alpha Omega Alpha 1972
- William deB. MacNider Award 1973
- Alumni Loyalty Merit Award 1973
- Lange Book Award 1973
- Second Prize Paper: Presented at the District IV Meeting, American College of Obstetricians and Gynecologists, Junior Fellow Research Awards, 1976
- Prize Paper: Presented at the District IV Meeting, American College of Obstetricians and Gynecologists, Junior Fellow Research Awards, 1980
- Honorary Member of the Graduating Class, Emory University School of Medicine, 198 1
- Commendation Medal, U.S. Public Health Service, 1982

Add-26

- Ortho Prize Paper: Presented at the 21st Annual Scientific Meeting of the Association of Planned Parenthood Professionals, 1983
- DSA Medical Services Prize Paper: Presented at the Eighth Annual Meeting, National Abortion Federation, 1984
- Christopher Tietze Humanitarian Award, National Abortion Federation, 1987
- Kaiser Permanente Award for Excellence in Teaching in the Clinical Sciences, USC School of Medicine, 1989
- Lester T. Hibbard Teaching Award, Department of Obstetrics and Gynecology, USC School of Medicine, 1989
- Carl Schultz Award, Population and Family Planning Section, American Public Health Association 1990
- Max Bulian Memorial Lecturer, Beth Israel Hospital, Boston, 199 1
- Fundamental Right of Reproductive Freedom Award, American Civil Liberties Union of Southern California, 1992
- Bitterman Distinguished Lecturer, Beth Israel Medical Center, New York,        1992
- Eliot L. Silbar Memorial Lecturer, Northwestern University School of
- Medicine, 1992
- Outstanding Academic Faculty, Department of Obstetrics, Gynecology and Reproductive Sciences, UCSF, 1993
- Paul C. Weinberg Memorial Lecturer, American Society for Psychosomatic Obstetrics and Gynecology, 1994
- ACOG Issue of the Year Award, 1994
- Distinction in Teaching Award, Academic Senate, University of California,
- San Francisco, 1994
- Alan Guttmacher Lectureship, Association of Reproductive Health        Professionals, 1994
- Frank R. Lock Lecturer, Bowman Gray School of Medicine, 1994
- Clinical Faculty Teaching Award, University of California, San Francisco, 1995
- Visiting Professor, Alpha Omega Alpha, UCSF, 1995
- Outstanding Lecture Award, 1995-96, UCSF Class of 1999
- C. Houston Alexander Lecturer, St. Joseph Hospital, Denver, 1996
- Rumbolz Visiting Professor, University of Nebraska Medical Center, 1996
- Rubovits Memorial Lecturer, University of Illinois at Chicago, 1996
- John Figgis Jewett Lecturer, Massachusetts Medical Society, 1996
- Edith Potter Memorial Lecturer, American College of Obstetricians and Gynecologists, 1996
- Alvin F. Goldfarb, M.D. Lecturer, North American Society for Pediatrics and Adolescent Gynecology, 1996
- Catherine L. Dobson Visiting Professor, University of Chicago, 1997 and 1999
- Rudolph Holmes Memorial Lecturer, Chicago Gynecological Society, 1997
- Clinical Faculty Teaching Award, University of California, San Francisco, 1997
- Distinguished Service Award, American College of Obstetricians and Gynecologists, 1997
- Presidential Speaker, North Carolina Obstetrical and Gynecological Society, 1997
- Gallagher Lecturer, Society for Adolescent Medicine, 1997
- Duncan Reid Lecturer, Harvard Medical School, 1997
- Julian Wells Memorial Lecturer, Baylor University Medical Center, 1997
- Atlee Memorial Lecturer, Dalhousie University School of Medicine,

Halifax, Nova Scotia, 1997
- Frank Kaltreider Memorial Lecturer, Johns Hopkins University School of Medicine, 1997
- Keynote Speaker, Kenya Obstetrical and Gynaecological Society, 1999
- Frederick Zuspan Scholar and Allan Barnes Memorial Lecturer, Ohio State University College of Medicine, 1999
- R. T. Weaver Lecturer, McMaster University School of Medicine, 1999
- Outstanding Scientific Achievement Award, The National Family Planning and Reproductive Health Association, Inc., 2000
- Distinguished Technical Communication, Society for Technical Communication, NY Metro Chapter, 1999-2000
- Bradford W. Kincheloe Lecturer, University of Tennessee, Memphis, 2000
- Honorable Mention, Special Service Award, National Association for Women's Health, **2000**

## BOARD CERTIFICATION:

| | |
|---|---|
| 1981 | American Board of Obstetrics and Gynecology<br>Recertified, 199 1 |
| 1986 | American Board of Preventive Medicine |

## FACULTY APPOINTMENTS:

| | |
|---|---|
| 1979-1982 | Clinical Assistant Professor,<br>Department of Gynecology and Obstetrics,<br>Emory University School of Medicine |
| 1981-1985 | Clinical Assistant Professor,<br>Department of Community Health,<br>Emory University School of Medicine |
| 1983-1986 | Clinical Associate Professor,<br>Department of Gynecology and Obstetrics,<br>Emory University School of Medicine |
| 1985-1986 | Clinical Associate Professor,<br>Department of Community Health,<br>Emory University School of Medicine |
| 1986-1992 | Professor, Department of Obstetrics and<br>Gynecology, University of Southern' California<br>School of Medicine |
| 1986-1992 | Professor, Department of Preventive Medicine,<br>University of Southern California<br>School of Medicine |
| 1993-1997 | Professor and Vice Chairman<br>Department of Obstetrics, Gynecology and<br>Reproductive Sciences<br>University of California, San Francisco |

| | |
|---|---|
| 1993-1997 | Professor, Department of Epidemiology and Biostatistics<br>University of California, San Francisco |
| 1998- | Clinical Professor, Department of Obstetrics and Gynecology<br>University of North Carolina School of Medicine |
| 2000- | Fellow, Cecil G. Sheps Center for Health Services Research<br>University of North Carolina |

## GOVERNMENT POSITIONS:

| | |
|---|---|
| 1975-1977 | Epidemic Intelligence Service Officer,<br>Centers for Disease Control |
| 1979-1982 | Assistant Chief,<br>Abortion Surveillance Branch,<br>Centers for Disease Control |
| 1982-1983 | Chief, Abortion Surveillance Branch,<br>Centers for Disease Control |
| 1983-1984 | Medical Epidemiologist,<br>Pregnancy Epidemiology Branch,<br>Centers for Disease Control |
| 1984-1986 | Clinical Research Investigator,<br>Division of Sexually Transmitted Diseases,<br>Centers for Disease Control |

## HOSPITAL POSITIONS:

| | |
|---|---|
| 1987-1992 | Chief, Ambulatory Care Services<br>Women's Hospital, Los Angeles |
| 1987-1992 | Vice Chairman, Infection Control Committee,<br>Women's Hospital, Los Angeles |
| 1987-1992 | Chairman, Quality Assurance Committee,<br>Women's Hospital, Los Angeles |
| 1993-1997 | Chief, Department of Obstetrics, Gynecology and Reproductive Sciences<br>San Francisco General Hospital |
| 1993-1997 | Clinical Service Chiefs Committee<br>Strategic Planning Committee<br>Library Committee<br>Research Committee<br>Executive Staff Committee<br>Clinical Provider Group<br>Emergency Department Advisory Committee |



36. Grimes DA, Hulka JF, McCutchen ME: Midtrimester abortion by dilatation and evacuation versus intraamniotic instillation ofprostaglandin F2a: A randomized clinical trial. Am J Obstet Gynecol 1980;137:785-790

37. Grimes DA: Routine circumcision reconsidered. Am J Nurs 1980;80:108-109

3 8. Grimes DA, Cates W Jr: Fatal myocarditis associated with abortion in early pregnancy.   South Med J 1980;73:236-238

39. Grimes DA, Schulz KF, Cates W Jr, Tyler CW Jr: Local versus general anesthesia: Which is safer for performing suction curettage abortions? Am J Obstet Gynecol 1979;135:1030-1035

40. Grimes DA, Fowler WC Jr: Adenosquamous carcinoma of the cecum arising in endometriosis. Gynecol Oncol 1980;9:254-255

41. Grimes DA, Hulka JF: Midtrimester dilatation and evacuation abortion. South Med J 1980; 73:448-451

42. Grimes DA, Ekbladh LE, McCartney WH: 'Cortical blindness in preeclampsia.  Int J Gynaecol Obstet   1 9 8 0 ;   17:601-603

43. Grimes DA, Cates W Jr, Selik RM: Abortion facilities and the risk of death. Fam Plann Perspect 1981;13:30-32

44. Grimes DA, Cates W Jr, Selik RM: Fatal septic abortion in the United States, 1975-1977. Obstet Gynecol 1981;57:739-744

45. Grimes DA, Geary FH Jr, Hatcher RA: Rh immunoglobulin utilization after ectopic pregnancy. Am J Obstet Gynecol 1981;140:246-249

46. Grimes DA, Gross GK: Pregnancy outcomes in black women aged 35 and older. Obstet Gynecol 1981;58:614-620

47. Guidotti RJ, Grimes DA, Cates W Jr: Fatal amniotic fluid embolism during legally induced abortion, United States, 1972-1978. Am J Obstet Gynecol 1981;141:257-261

48. Cates W Jr, Grimes DA: Deaths from second-trimester abortion by dilatation and evacuation: Causes, prevention, facilities, Obstet Gynecol 1981;58:401-408

49. Peterson HB, Grimes DA, Cates W Jr, Rubin GL:  Comparative risk of death from induced abortion at < 12 weeks' gestation performed with local versus general anesthesia. Am J Obstet Gynecol 1981; 141:763-768

50. Atrash HK, Peterson HB, Cates W Jr, Grimes DA: The risk of death from combined abortion-sterilization procedures: Can hysterotomy or hysterectomy be justified? Am J Obstet Gynecol 1982; 142:269-276

5 1. Grimes DA: Diagnostic dilation and curettage: A reappraisal. Am J Obstet Gynecol. 1982; 142: l-6

52. Grimes DA, Peterson HB:  Should dilation and curettage be performed routinely at the time of laparoscopy? J Reprod Med 1982; 27:213-216

53. Grimes DA, Peterson HB, Rosenberg MJ, Fishburne JI Jr, Rochat RW, Khan AR, Islam R: Sterilization-attributable deaths in Bangladesh. Int J Gynaecol Obstet 1982; 20:149-154

54. Lebolt SA, Grimes DA, Cates W Jr: Mortality from abortion and childbirth. Are the populations comparable? JAMA 1982; 248:188-191

55. Cates W Jr, Smith JC, Rochat RW, Grimes DA: Mortality from abortion and childbirth. Are the statistics biased? JAMA 1982; 248:192-196

56. Cates W Jr, Schulz KF, Grimes DA, Horowitz AJ, Lyon FA, Kravitz FH, Frisch MJ: D&E procedures and second trimester abortions: The role of physician skill and hospital setting. JAMA 1982;248:559-563

57. Grimes DA, Satterthwaite AP, Rochat RW, Akhter N: Deaths from contraceptive sterilization in Bangladesh: Rates, causes, and prevention. Obstet Gynecol 1982; 60:635-640

58. Schulz KF, Cates W Jr, Grimes DA, Selik RM, Tyler CW Jr: Reducing classification errors in cohort studies: The approach and practical application. Stat Med 1983; 2:25-3 1

59. Spitz AM, Lee NC, Grimes DA, Schoenbucher AK, Lavoie M: Third-trimester induced abortion in Georgia, 1979 and 1980. Am J Public Health 1983; 73:594-595

60. Suarez RA, Grimes DA, Majmudar B, Benigno BB: Diagnostic endometrial aspiration with Karman cannula. J Reprod Med 1983; 28:41-44

6 1. Schutterman EB, Grimes DA: Comparative safety of the low transverse versus the low vertical uterine incision for cesarean delivery of breech infants. Obstet Gynecol 1983;61:593-597

62. Grimes DA, Steele AO, Hatcher RA: Rh immunoglobulin utilization with placenta previa and abruptio placentae. South Med J 1983; 76:743-749

63. Dorfman SF, Grimes DA, Cates W Jr: Maternal deaths associated with antepartum fetal death in utero, United States, 1972-1978. South Med J 1983; 76:838-843

64. Grimes DA, Kafrissen ME, O'Reilly KR, Binkin NJ: Fatal hemorrhage from legal abortion in the United States. Surg Gynecol Obstet 1983;157:46 l-466

65. Easterday CL, Grimes DA, Riggs JA: Hysterectomy in the United States. Obstet Gynecol 1983; 62:203-212

66. Binkin NJ, Schulz KF, Grimes DA, Cates W Jr: Urea-prostaglandin versus hypertonic saline for instillation abortion. Am J Obstet Gynecol 1983;146:947-952

67. Kafrissen ME, Barke MW, Workman P, Schulz KF, Grimes DA: Coagulopathy and induced abortion methods: Rates and relative risks. Am J Obstet Gynecol 1983;147:344-345

68. Cates W Jr, Schulz KF, Grimes DA: The risks associated with teenage abortion. N Engl J Med 1983; 3 09:62 l-624

69. Richards FO Jr, Grimes DA, Wilson M: The question of a helminthic cause of preeclampsia. JAMA 1983;250:2970-2972

70. Cates W Jr, Schulz KF, Grimes DA, Ezzard NV: Teenage abortion in the United States. Public Health Rev 1983; 11:291-3 10

71. Kafrissen ME, Schulz KF, Grimes DA, Cates W Jr: Midtrimester abortion. Intra-amniotic instillation of hyperosmolar urea and prostaglandin F2a versus dilatation and evacuation. JAMA 1984;251:916-919

72. Grimes DA, Flock ML, Schulz KF, Cates W Jr: Hysterectomy as treatment for complications of legal abortion. Obstet Gynecol 1984;63:457-462

73. Grimes DA, Schulz KF, Cates W Jr: Prevention of uterine perforation during curettage abortion. JAMA 1984;251:2108-2111

74. Grimes DA, Techman T: Legal abortion and placenta previa. Am J Obstet Gynecol 1984; 149:501-504

75. Kaunitz AM, Spence C, Danielson TS, Rochat RW, Grimes DA: Perinatal and maternal mortality in a religious group avoiding obstetric care. Am J Obstet Gynecol 1984; 150:826-83 1

76. Dorfman SF, Grimes DA, Cates W Jr, Binkin NJ, Kafrissen ME, O'Reilly KR: Ectopic pregnancy mortality, United States, 1979-80: Clinical aspects. Obstet Gynecol 1984; 64:386-390

77. Grimes DA, Schulz KF, Cates W Jr: Prophylactic antibiotics for curettage abortion Am J Obstet Gynecol 1984;150:689-694

78. Grimes DA: Second-trimester abortions in the United States. Fam Plann Perspect 1984;16:260-266

79. Kaunitz AM, Grimes DA, Hughes JM, Smith JC, Hogue CJR: Maternal deaths in the United States by size of hospital. Obstet Gynecol 1984; 64:3 1 l-3 14

80. Grimes DA: The epidemiology of gestational trophoblastic disease. Am J Obstet Gynecol 1984; 150:309-318

8 1. Kaunitz AM, Hughes JM, Grimes DA, Smith JC, Rochat RW, Kafrissen ME: Causes of maternal mortality in the United States. Obstet Gynecol 1985;65:605-612

82. Park TK, Flock M, Schulz KF, Grimes DA: Preventing febrile complications of suction curettage abortion. Am J Obstet Gynecol 1985;152:252-255

83. Grimes DA, Schulz KF: The morbidity and mortality of second-trimester abortions. J Reprod Med 1985;30:505-5 14

84. Berman SM, MacKay HT, Grimes DA, Binkin NJ: Deaths from spontaneous abortion in the United States. JAMA 1985; 253:3119-3123

85. Grimes DA, LeBolt SA, Grimes KR, Wingo PA: Systemic lupus erythematosus and reproductive function: A case-control study. Am J Obstet Gynecol 1985; 153: 179-186

86. Buehler JW, Schulz KF, Grimes DA, Hogue CJR: The risk of serious complications from induced abortion: Do personal characteristics make a difference? Am J Obstet Gynecol 1985;153:14-20

87. Kaunitz AM, Rovira EZ, Grimes DA, Schulz KF: Abortions that fail. Obstet Gynecol 1985; 66:533-537

88. MacKay HT, Schulz KF, Grimes DA: Safety of local versus general anesthesia for second trimester dilatation and evacuation abortion. Obstet Gynecol 1985; 66:66 l-665

89. Grimes DA: Reversible contraception for the 1980s. JAMA 1986; 255:69-75; Reprinted in JAMA Southeast Asia 1986;2:37-44

90. Grimes DA: Unplanned pregnancies in the United States. Obstet Gynecol 1986;67:438-442

9 1. Grimes DA: Deaths from sexually transmitted diseases: The forgotten component of reproductive mortality. JAMA 1986; 255:1727-1729; Reprinted in Japanese JAMA, 1986 October 10, pp 74-79

92. Atrash HK, Hogue CJR, Grimes DA: Epidemiology of hydatidiform mole during early gestation. Am J Obstet Gynecol 1986;154:906-909

93. Stone KM, Grimes DA, Magder LS: Primary prevention of sexually transmitted diseases: A primer for clinicians. JAMA 1986; 255:1763-1766

94. Grimes DA: Declining surgical case-load of the obstetrician-gynecologist. Obstet Gynecol 1986; 67:760-762

95. Grimes DA: How can we translate good science into good perinatal care? Birth 1986;13:83-90

96. Stone KM, Grimes DA, Magder LS: Personal protection against sexually transmitted diseases. Am J Obstet Gynecol 1986;155:180-188

97. Kafrissen ME, Grimes DA, Hogue CJR, Sacks JJ: Cluster of abortion deaths at a single facility. Obstet Gynecol1986; 68:387-389

98. Grimes DA, Blount JH, Patrick J, Washington AE: Antibiotic treatment of pelvic inflammatory disease: trends among private physicians in the United States, 1966-1983. JAMA 1986; 256:3223-3226 ; Reprinted in Japanese JAMA 1987 May 5, pp 56-60

99. Roongpisuthipong A, Grimes DA, Hadgu A: Is the Papanicolaou smear useful for diagnosing sexually transmitted diseases? Obstet Gynecol 1987;69:820-824

100.    Grimes DA, Ray IG, Middleton CJ: Lamicel vs. laminaria for cervical dilation before early midtrimester abortion: a randomized clinical trial. Obstet Gynecol 1987; 69:887-890

101.    Grimes DA: Reversible contraception for women at high risk of fetal anomalies. J Am Acad Dermatol 1987; 17:148-155

102.    Grimes DA: Intrauterine devices and pelvic inflammatory disease: recent developments. Contraception 1987; 36:97-109. Reprinted in Infectious and Medical Disease Letters for Obstetrics and Gynecology 1989; XI(3):72-77, and in Perez-Palacios G, Garza-Flores J, Rowe PJ (eds).

119.    Grimes DA. Evaluating triphasic oral contraceptives: The rationale for a randomized trial. Am J Obstet Gynecol 1989;161:1390-1392

120.    Koonings PP, Moyer DL, Grimes DA: A randomized clinical trial comparing Pipelle and Tis-U-Trap for endometrial biopsy. Obstet Gynecol 1990;75:293-295

121.    Koonings PP, Grimes DA, Campbell K, Sommerville M: Bilateral ovarian neoplasms and the risk of malignancy. Am J Obstet Gynecol 1990;162:167-169

122.    Griffith CS, Grimes DA: The validity of the postcoital test. Am J Obstet Gynecol 1990; 162:615-620

123.    Grimes DA, Bernstein L, Lacarra M, Shoupe D, Mishell DR Jr: Predictors of failed attempted abortion with the antiprogestin mifepristone (RU 486). Am J Obstet Gynecol 1990;162:910-917

124.    Grimes DA: New therapies for genital warts. West J Med 1990;152:410-411

125.    Stein AL, Koonings PP, Schlaerth JB, Grimes DA, d'Ablaing G III: Relative frequency of malignant par-ovarian tumors: should parovarian tumors be aspirated? Obstet Gynecol 1990; 75:1029-1031

126.    Sinei SKA, Schulz KF, Lamptey PR, Grimes DA, Mati JKG, Rosenthal SM, Rosenberg MJ, Riara G, Njage PN, Bhullar VB, Ogembo HV. Preventing IUCD-related pelvic infection: The efficacy of prophylactic doxycycline at insertion. Br J Obstet Gynaecol 1990;97:412-419

127.    Levin JH, Lacarra M, d'Ablaing G, Grimes DA, Vermesh M: Mifepristone (RU 486) failure in an ovarian heterotopic pregnancy. Am J Obstet Gynecol 1990; 163:543-544

128.    Lee NC, Rubin GL, Grimes DA: Measures of sexual behavior and the risk of pelvic inflammatory disease. Obstet Gynecol 1991;77:425-430

129.    Sommerville M, Grimes DA, Koonings PP, Campbell K: Ovarian neoplasms and the risk of adnexal torsion. Am J Obstet Gynecol 1991;164:577-578

130.    Expert Committee on Pelvic Inflammatory Disease: Pelvic inflammatory disease. Research directions in the 1990s. Sex Transm Dis 1991;18:46-64

131.    Grimes DA: Editorial re: "An epidemiologic study of contraception and preeclampsia." Obstet Gynecol Surv 1991;46:350-351

132.    Yu J, Grimes DA: Ascites and pleural effusions associated with endometriosis. Obstet Gynecol 1991;78:533-534

133.    Grimes DA: Randomized clinical trials: "It ain't necessarily so." Obstet Gynecol 199 1; 78:703-704

134.    MacMillan MC, Grimes DA: The limited usefulness of urine and blood cultures in treating pyelonephritis in pregnancy. Obstet Gynecol 1991;78:745-748

135.    Aghajanian A, Grimes DA: Routine prothrombin time determination before elective gynecologic operations. Obstet Gynecol 1991;78:837-839

136.    Washington AE, Aral SO, Wolner-Hanssen P, Grimes DA, Holmes KK: Assessing risk for pelvic inflammatory disease and its sequelae. JAMA 1991; 266:2581-2586

137.    Grimes DA, Forrest JD, Kirkman AL, Radford B: An epidemic of anti-abortion violence in the United States. Am J Obstet Gynecol 1991; 165:1263-1268

138.    Grimes DA: Neoplastic effects of oral contraceptives. Int J Fertil 1991; 36(suppl):19-24

139.    Grimes DA, Schulz KF: Randomized controlled trials of home uterine activity monitoring. A review and critique.  Obstet Gynecol 1992; 79: 13 7- 142

140.    Grimes DA: Progestins, breast cancer, and the limitations of epidemiology. Fertil Steril 1992; 57:492-494

141.    Romo MS, Grimes DA, Strassle PO:  Infarction of the uterus from subacute incomplete inversion. Am J Obstet Gynecol 1992; 166:878-879

142.    Grimes DA: Frontiers of operative laparoscopy: A review and critique of the evidence. Am J Obstet Gynecol 1992; 166: 1062- 107 1  Reprinted in Transactions of the American Gynecological and Obstetrical Society 1992; X:202-211

143.    Grimes DA: RU 486 (Mifepristone). West J Med 1992; 156:648

144.    Grimes DA: Safety of oral contraceptives: Epidemiologic insights from the first thirty years. Am J Obstet Gynecol 1992; 166:1950-1954

145.    Grimes DA, Mishell DR Jr, David HP: A randomized clinical trial of mifepristone (RU486) for induction of delayed menses: Efficacy and acceptability. Contraception 1992; 46:1-10

146.    Grimes DA: Other health benefits of oral contraceptives. Advances in Contraception 1991; 7(suppl 1):39-48

147.    Grimes DA: Clinicians who provide abortions: The thinning ranks. Obstet Gynecol 1992; 80:719-723

148.    Grimes DA, Cook R: Mifepristone (RU486): an abortifacient to prevent abortion?  N Engl J Med 1992; 327:1088-1089

149.    Grimes DA: The intrauterine device, pelvic inflammatory disease, and infertility: The confusion between hypothesis and knowledge. Fertil Steril 1992; 58:670-673

150.    Grimes DA: The case for confidence intervals. Obstet Gynecol 1992; 80:865-866

151.    Karamardian LM, Grimes DA: Luteal phase defect: The effect of treatment on pregnancy rates. Am J Obstet Gynecol 1992; 167:1391-1398

152.    Cook RJ, Grimes DA: Antiprogestin drugs: Ethical, legal and medical issues. Law, Medicine and Health Care 1992; 20:149-153

153.    US. Preventive Services Task Force: Screening for adolescent idiopathic scoliosis. Review article. JAMA 1993; 269:2667-2672

154.    U.S. Preventive Services Task Force: Screening for adolescent idiopathic scoliosis. Policy statement. JAMA 1993; 269:2664-2666

155.    Grimes, DA: Technology follies. The uncritical acceptance of medical innovation. JAMA 1993; 269:3030-3033

156.    Speroff L, DeCherney A, and the Advisory Board for the New Progestins: Evaluation of a new generation of oral contraceptives. Obstet Gynecol 1993; 81:1034-1047

157.    Grimes DA, Mishell DR Jr, Speroff L: Introduction. Am J Obstet Gynecol 1993; 168: 1979

158.    U.S. Preventive Services Task Force: Home uterine activity monitoring for preterm labor. Policy statement. JAMA 1993; 270:369-370

159.    U.S. Preventive Services Task Force: Home uterine activity monitoring for preterm labor. Review article. JAMA 1993; 270:371-376

160.    Grimes DA: Over-the-counter oral contraceptives-an immodest proposal? Am J Public Health 1993; 83:1092-1094

161.    Fraser EJ, Grimes DA, Schulz KF. Immunization as therapy for recurrent spontaneous abortion: a review and meta-analysis. Obstet Gynecol 1993; 82:854-859

162.    Grimes DA: Mifepristone (RU 486) for induced abortion. Women's Health Issues 1993; 3: 171-175

163.    U.S. Preventive Services Task Force: Routine iron supplementation during pregnancy. Policy statement. JAMA 1993; 270:2846-2848

164.    U.S. Preventive Services Task Force: Routine iron supplementation during pregnancy. Review article. JAMA 1993; 270:2848-2854

165.    Grimes DA: Primary prevention of ovarian cancer. JAMA 1993; 270:2855-2856

166.    Grimes DA, Godwin AJ, Rubin A, Smith JA, Lacarra M: Ovulation and follicular development associated with three low-dose oral contraceptives: a randomized controlled trial. Obstet Gynecol 1994; 83:29-34

167.    Aghajanian A, Bernstein L, Grimes DA: Bartholin's duct abscess and cysts: a casecontrol study. South Med J 1994; 87:26-29

168.    Grimes DA: The morbidity and mortality of pregnancy: still risky business. Am J Obstet Gynecol 1994; 170:1489-1494

169.    Peipert JF, Grimes DA: The case-control study: A primer for the obstetrician-gynecologist. Obstet Gynecol 1994; 84:140-145



170.  Schulz KF, Chalmers I, Grimes DA, Altman DG: Assessing the quality of randomization from reports of controlled trials published in obstetrics and gynecology journals. JAMA 1994;272:125-128

171.  Stubblefield PG, Grimes DA: Septic abortion. N Engl J Med 1994;331:310-314

172.  U.S. Preventive Services Task Force: Screening for prostate cancer: a commentary on the prostate cancer screening recommendations of the Canadian Task Force on the Periodic Health Examination. Am J Prev Med 1994;10:187-193.

173.  Walsh TL, Bernstein GS, Grimes DA, Frezieres R, Bernstein L, Coulson AH, and the IUD Study Group: Effect of prophylactic antibiotics on morbidity associated with IUD insertion: a pilot randomized controlled trial. Contraception 1994;50:3 19-327

174.  Grimes DA: Shifting indications for hysterectomy: nature, nurture, or neither? Lancet 1994;344:1652-1653

17.5.  Grimes DA, Economy KE. Primary prevention of gynecologic cancers. Am J Obstet Gynecol 1995;172:227-235

176.  NIH Consensus Development Committee. Effect of corticosteroids for fetal maturation on perinatal outcomes. JAMA 1995;273:413-418; Reprinted in Am J Obstet Gynecol 1995;173:246-252

177.  Slaughter JL, Grimes DA: Methotrexate therapy: non-surgical management of ectopic pregnancy. West J Med 1995;16:225-228

178.  Adolph C, Ramos DE, Linton KLP, Grimes DA: Pregnancy among Hispanic teenagers: is good parental communication a deterrent? Contraception 1995;51:303-306

179.  Grimes DA: Over-the-counter oral contraceptives: an idea whose time has not quite come! Obstet Gynecol Surv 1995;50:411-412

180.  Arona AJ, Al-Marayati L, Grimes DA, Ballard CA: Early secondary repair of third- and fourth-degree perineal lacerations after outpatient wound preparation. Obstet Gynecol 1995;86:294-296

181.  Grimes DA: Introducing evidence-based medicine into a department of obstetrics and gynecology. Obstet Gynecol 1995;86:451-457

182.  Cates W Jr, Grimes DA, Hogue LL: Justice Blackmun and legal abortion: a besieged legacy to women's reproductive health. Am J Public Health 1995;85:1204- 1206

183.  Rosenberg MJ, Burnhill MS, Waugh MS, Grimes DA, Hillard PJA: Compliance and oral contraceptives: a review. Contraception 1995;52: 137-141

184.  Millar LK, Wing DA, Paul RH, Grimes DA: Outpatient treatment of pyelonephritis in pregnancy: a randomized controlled trial. Obstet Gynecol 1995;86:560-564

185.  Schulz KF, Chalmers I, Altman DG, Grimes DA, Dore CJ: The methodologic quality of randomization as assessed from reports of trials in specialist and general medical journals. Online Journal of Current Clinical Trials 1995; No. 197

Add-37

186.    Grimes DA: Clinical research in ancient Babylon: methodologic insights from the Book of Daniel. Obstet Gynecol 1995;86:1031-1034

187.    Chatwani A, Martens M, Grimes DA, Chatterjee M, Noah M, Stamp-Cole MM, Perry KT, and the Cefmetazole Study Group: A singleblind, prospective, randomized study of cefmetazole and cefoxitin in the treatment of post-cesarean section endometritis. Infectious Diseases in Obstetrics and Gynecol 1995;3:28-33

188.    Schulz KF, Grimes DA, Altman DG, Hayes RJ: Blinding and exclusions after allocation in randomized controlled trials in obstetrics and gynecology. BMJ 1996;312:742-744

189.    Sawaya GF, Grady D, Kerlikowske IS, Grimes DA: Antibiotics at the time of induced abortion: the case for universal prophylaxis based on meta-analysis. Obstet Gynecol 1996;87:884-890;

190.    Grimes DA: Discussion of the risk of pregnancy after tubal sterilization: findings from the U.S. Collaborative Review of Sterilization. Am J Obstet Gynecol 1996; 174: 1168-1 169

191.    Grimes DA, Schulz KF: Methodology references and the quality of randomized controlled trials in obstetrics and gynecology. Am J Obstet Gynecol 1996;174:1312-1315

192.    Grimes DA: Spontaneous perforation of the gallbladder from cholecystitis with acute appendicitis in pregnancy. J Reprod Med 1996;41:450-452

193.    Grimes DA: Stress, work, and pregnancy complications. Epidemiology 1996;7:337-338

194.    Grimes DA: A 17-year-old mother seeking contraception. JAMA 1996; 276: 1163-1170

195.    Waetjen LE, Grimes DA: Oral contraceptives and primary liver cancer: temporal trends in three countries. Obstet Gynecol 1996; 88:945-9

196.    Grimes DA, Learman LA: .Evidence-based medicine: theory into practice within a department. Bailliere's Clin Obstet Gynaecol 1996; 10:697-714

197.    Grimes DA: Medical abortion in early pregnancy: A review of the evidence. Obstet Gynecol 1997;89:790-796

198.    Grimes DA: Emergency contraception: effect on abortion rates and cost-effectiveness. J Reprod Med (Beijing) 1996;5(suppl1):79-8 1

199.    Rosenberg L, Palmer JR, Sands MI, Grimes DA, Bergman U, Daling J, Mills A. Modern oral contraceptives and cardiovascular disease. Am J Obstet Gynecol 1997; 177:707-715

200.    Learman LA, Grimes DA: Rapid hospital discharge following laparoscopy for ectopic pregnancy: a promise unfulfilled? West J Med 1997;167:145-148

201.    Grimes DA: Emergency contraception - expanding opportunities for primary prevention. N Engl J Med 1997;337:1078-1079

202.    Grullon KE, Grimes DA: The safety of early postpartum discharge: a review and critique. Obstet Gynecol 1997; 90:860-865

xxi

Add-38



203. Amersi S, Grimes DA: The case against using ordinal numbers for gestational age. Obstet Gynecol 1998;91:623-625

204. Walsh T, Grimes DA, Frezieres R, Nelson A, Bernstein L, Coulson A, Bernstein G, for the IUD Study Group: Randomised controlled trial of prophylactic antibiotics before insertion of intrauterine devices. Lancet 1998;351:1005-1008

205. Grimes DA: Discussion of impaired growth and risk of fetal death: is the tenth percentile the appropriate standard? Am J Obstet Gynecol 1998; 178:667-668

206. Task Force on Postovulatory Methods of Fertility Regulation: Randomised controlled trial of levonorgestrel versus the Yuzpe regimen of combined oral contraceptives for emergency contraception. Lancet 1998;352:428-433

207. Grimes DA: The continuing need for late abortions. JAMA 1998;280:747-750

208. Grimes DA, Bachicha JA, Learman LA: Teaching critical appraisal to medical students in obstetrics and gynecology. Obstet Gynecol 1998;92:877-882

209. Bartholomew L, Grimes DA: The alleged association between induced abortion and breast cancer: biology or bias? Obstet Gynecol Surv 1998;53:708-714

210. Grimes DA, Hubacher D: IUDs: time for a renaissance. Am Fam Phys 1998;58:1963-1964

211. The Population Council: Medical methods of early abortion in developing countries. Consensus statement. Contraception 1999;58:257-259

212. Stanback J, Grimes D: Can intrauterine device removals for bleeding or pain be predicted at a one month follow-up visit? A multivariate analysis. Contraception 1999;58:357-360

213. WHO Task Force on Postovulatory Methods of Fertility Regulation. Comparison of three single doses of mifepristone as emergency contraception: a randomised trial. Lancet 1999;353:697-702

214. Piaggio G, von Hertzen H, Grimes DA, Van Look PFA, on behalf of the Task Force on Postovulatory Methods of Fertility Regulation: Timing of emergency contraception with levonorgestrel or the Yuzpe regimen. Lancet 1999;353:721

215. Grimes DA, Snively GR: Patients' understanding of medical risks: Implications for genetic counseling. Obstet Gynecol 1999;93:9 1 O-9 14

216. Sawaya GF, Grimes DA: New technologies in cervical cytology screening: a word of caution. Obstet Gynecol 1999;94:307-3 10

217. Grimes DA, Raymond EG: Bundling a pregnancy test with the Yuzpe regimen of emergency contraception. Obstet Gynecol 1999;94:47 1-473

218. Grimes DA: A 26-year-old woman seeking an abortion. JAMA 1999;282: 1169-75

219. Grimes DA, Schulz KF: Antibiotic prophylaxis for intrauterine contraceptive device insertion. Cochrane Database Syst Rev 2000;2:CD00 1327

220.  Rivera R, Yacobson I, Grimes D. The mechanism of action of hormonal contraceptives and intrauterine contraceptive devices. Am J Obstet Gynecol 1999;181:1263-1269

221.  Grimes DA, Schulz KF: Prophylactic antibiotics for intrauterine device insertion: a metaanalysis of the randomized controlled trials. Contraception 1999;60:57-63

222.  Grimes DA: Emergency contraceptives over the counter. West J Med 2000;172: 148-9

223.  WHO Task Force on Post-ovulatory Methods of Fertility Regulation. Comparison of two doses of mifepristone in combination with misoprostol for early medical abortion: a randomised trial. Br J Obstet Gynaecol 2000;107:524-30

224.  Grimes D, Schulz K, Stanwood N. Immediate post-abortal insertion of intrauterine devices. Cochrane Database Syst Rev 2000;2:CD 00 1777

225.  Cates W Jr, Grimes DA, Schulz KF: Abortion surveillance at CDC: creating public health light out of political heat. Am J Prev Medicine 2000;19(1S):12-17

226.  Grimes DA: Medical abortion: public health and private lives. Am J Obstet Gynecol 2000; 183 : S 1-S2

227.  World Health Organization Task Force on Post-Ovulatory Methods for Fertility Regulation: Efficacy and side effects of immediate postcoital levonorgestrel used repeatedly for contraception. Contraception 2000;61:303-308

228.  Grimes DA: Intrauterine device and upper-genital-tract infection. Lancet 2000;3 56: 10 13 - 19

229.  Grimes DA, Schulz KF, Droegemueller W, Munsick RA, Lisanti L. A faculty development course in obstetrics and gynecology. Am J Obstet Gynecol 2000;183:1041-4

**PUBLICATIONS IN PRESS:**

1.  Grimes DA: Commentary. Evidence Based Obstetrics and Gynecology

2.  Grimes DA: Evidence-based family planning: the paradigm for the third millennium. Eur J Contracept Reprod Health Care


**PUBLICATIONS:** (Non-Peer Review Journals)

1.  Center for Disease Control: Surveillance summary: Abortion - United States, 1974. Morbidity Mortality Weekly Rep 1976; 25:179-180

2.  Center for Disease Control: Comparative risks of three methods of midtrimester abortion. Morbidity Mortality Weekly Rep 1976; 25:370-375

3.  Center for Disease Control: Abortion surveillance - United States, 1975. Morbidity Mortality Weekly Rep 1977; July 29

4. Center for Disease Control: Fatal ectopic pregnancy after sterilization or abortion - New York, California. Morbidity Mortality Weekly Rep 1977;26:75

5. Grimes DA: Should your newborn son be circumcised? Mother's Manual 1978;14(6):17-23

6. Grimes DA, Cates W Jr: The brief for hypertonic saline. Contemp OB/GYN 1980; 15(6):29-38

7. Grimes DA: Nongonococcal pelvic inflammatory disease. Clin Obstet Gynecol 1981; 24:1227-1243

8. Grimes DA: Assessing risks of tampon use. Contemp OB/GYN 1981;18(Suppl):91-96

9. Grimes DA: Discussion of hormone therapy for endometrial hyperplasia. Bulletin of the Department of Gynecology and Obstetrics of Emory University School of Medicine 1981; 3:137-138

10. Grimes DA: Life after the (population) bomb. Medical Alumni Bulletin, University of North Carolina 1982;28:6-8

11. Grimes DA: Birth control pills: A reappraisal of the pros and cons. Med Asp Hum Sexual 1982; 16:32J-32Y

12. Grimes DA: Screening tests: what they are and what they aren't. Contemp OB/GYN 1982; 20:69-80

13. Schulz KF, Grimes DA, Cates W Jr: Measures to prevent cervical injury during suction curettage abortion. Lancet 1983; 1:1 182-1184

14. Grimes DA: Cause and effect - or coincidence? Contemp OB/GYN 1984; 23: 109-1 15

15. Grimes DA: Common mistakes patients make regarding contraception. Med Asp Hum Sexual 1984; 18(6):154-168

16. Kaunitz AM, Grimes DA: Childbirth without OB care: The bad old days revisited. Contemp OB/GYN 1985; 26(1):165-171

17. Schulz KF, Grimes DA, Christensen DD: Vasopressin reduces blood loss from second-trimester dilatation and evacuation abortion. Lancet 1985;2:353-356

18. Grimes DA: Diagnostic office curettage: heresy no longer. Contemp OB/GYN 1986; 27(1):96-103

19. Speroff L, Grimes DA, Mishell DR Jr, Quagliarello J: Prescribing OCs for safety (Symposium). Contemp OB/GYN 1986; 27(3):128-148

20. Kaunitz AM, Grimes DA: Good news about contraceptives and PID. Contemp OB/GYN 1986; 27(3):153-158

2 1. Grimes DA: How to offer advice on avoiding STDs. Contemp OB/GYN 1987; 29:25-36

22. Grimes DA: The safety of mid-trimester abortion. Medical Digest, Planned Parenthood Federation of America Summer, 1987, pp l-3

23. Report of a WHO Scientific Group: Mechanism of Action, Safety and Efficacy of Intrauterine Devices. Technical Report Series 753. Geneva, World Health Organization, 1987

24. Johnson J, Grimes D, Minkoff HL, Repke J: AIDS in women: The latest findings (forum). Female Patient 1987; 12(10):68-79

25. Grimes DA: The preventive role of contraceptives in STDs. Clinical Advances in the Treatment of Infections 1987; 1(2):6-7

26. Grimes DA: An incidental finding. Female Patient 1988; 13:8

27. Grimes DA: Ectopic pregnancy. Masters in Obstetrics and Gynecology 1988; 4( 1): 17-20

28. Kaunitz AM, Grimes DA: Endometrial sampling in older women. Contemp Ob/Gyn 1988; 31:85-97

29. Grimes DA: Multiphasic oral contraceptives and functional ovarian cysts. Contemp Ob/Gyn 1988; 32:103-112

30. Grimes DA: IUD insertion: a clinical refresher. Female Patient 1989; 14:51-54

3 1. Grimes DA: Whither the intrauterine device? Clin Obstet Gynecol 1989; 32:369-376

32. Grimes DA: Foreword. Clin Obstet Gynecol 1989; 32:305-6

33. Connell EB, Grimes DA, Tatum HJ, Tyrer LB: Contraceptive advances: Part I: Hormonal methods. (Symposium) The Female Patient 1989; 14(12):29-36

34. Grimes DA: Mifepristone (RU 486) for early abortion. Obstetrics/Gynecology Report 1990; 2(1):91-95

35. Connell EB, Grimes DA, Tatum HJ, Tyrer LB: Contraceptive advances: Part II: IUDs and barrier methods. (Symposium). The Female Patient 1990; 15(1): 14-28

36. Grimes DA: Oral contraceptives: Trial by media. Fertility News 1990; 24(2): 10

37. Grimes DA: The sperm penetration assay. A biologic phenomenon in search of a clinical use. Obstetrics/Gynecology Report 1990; 2(4):4 13 -424

38. Grimes DA: An introduction to classifying the scientific literature. Key Obstetrics and Gynecology 1991; 4(1):25-35

39. Chez RA, Grimes DA, Tatum H: IUDs: Underused and misunderstood. (Symposium) Contemp Ob/Gyn 1991; 36(10):73-92

40. Grimes DA: Biases: The saboteurs of science. Key Obstetrics and Gynecology 1991; 4(2): preface

41. Grimes DA: Sample size and power: How big is big enough? Key Obstetrics and Gynecology 1991; 4(3): preface. Reprinted in Sheld HH: Obstetrics and Gynecology Review 1995. New York, McGraw-Hill, 1995: l-2

42. Grimes DA: Making sense of research findings. Key Obstetrics and Gynecology 199 1; 4(4): preface

43. Grimes DA: Risky business: measuring associations in clinical research. Key Obstetrics and Gynecology 1993; 6( 1): preface

44. Grimes DA: Meta-analysis: mega-trend or mega-silliness? Key Obstetrics and Gynecology 1993; 6(2):preface

45. Grimes DA: Randomized controlled trials: truth in advertising? Key Obstetrics and Gynecology 1993; 6(3): ii-iii

46. Grimes DA: The confidence game: hypothesis testing vs. confidence intervals. Key Obstetrics and Gynecology 1993; 6(4):ii-iii

47. Creinin MD, Grimes DA: Medical options for early abortion. Contemp Ob/Gyn 1994; 39(4):85-90

48. Sawaya GF, Grimes DA: Preventing postabortal infection. Contemp Ob/Gyn 1994; 39: 53-60

49. Grimes DA: Evidence-based medicine: the new clinical wave. Talbert Journal of Health Care 1996;1:37-41

50. Grimes DA, Schulz KF: Determining sample size and power in clinical trials: the forgotten essential. Sem Reprod Endocrinol 1996;14:125-131

5 1. Chez RA, Grimes DA, Stewart F, Trussell J, Zinberg S: Emergency contraception: practical considerations. OBG Management 1997;October:23-26

52. Grimes DA, Atkins D: The U.S. Preventive Services Task Force: putting evidence-based medicine to work. Clin Obstet Gynecol 1998;41:332-342

53. Grimes DA: Evidence-based medicine: keeping your practice from getting stale. Contemp Ob/Gyn 1999, January: 41-54

54. Grimes DA: On the road. Lancet 1999;354:962

55. Grimes DA: Role of the cervix in sexual response: evidence for and against. Clin Obstet Gynecol 1999;42:972-978

56. Grimes DA: Commentary: Increased monitoring of women at risk for preterm labour did not decrease the rate of preterm birth. Evidence-based Obstetrics and Gynecology 1999;1:106.

57. Grimes DA: Understanding screening tests: the key to avoiding pitfalls in interpretation. Contemp Ob/Gyn 2000, June: 46-68

**ABSTRACTS:**

1. Grimes DA, Romm FJ: Fertility and family planning among white teenagers in metropolitan Atlanta. Pediatrics Digest 1975; 17(10):28

2. Grimes DA, Cates W Jr: Deaths from paracervical anesthesia used for first-trimester abortion, 1972-1975. Surv Ophthalmol 1977; 22:149-150

3. Grimes DA, Schulz KF, Cates W Jr, Tyler CW Jr: Midtrimester abortion by dilatation and evacuation. Ob/Gyn Digest, 1978 April, pp 33 -34

4. Grimes DA, et al: Maternal death at term as late sequela of failed attempted abortion. Medilex Digest Ob-Gyn, 1980 December, p 111

5. Grimes DA, Geary FH Jr, Hatcher RA: Rh immunoglobulin utilization after ectopic pregnancy. OB/GYN Digest, 1981 December, p 4

6. Grimes DA: Diagnostic dilatation and curettage. OB/GYN Digest, 1982, p 9

7. Koonings PP, Grimes DA: Adnexal torsion in postmenopausal women. Ob/Gyn Digest 1989; 5:25

8. Griffith CS, Grimes DA: The validity of the postcoital test. Fertility Digest 1990; 2:28-29

9. Grimes DA: A simplified device for intraoperative autotransfusion. In: Miller RD, Kirby RR, Ostheimer GW, et al, eds. The Year Book of Anesthesia. St. Louis, Mosby Year Book, 1990:280-281

10. Grimes DA: Prophylactic antibiotics at IUD insertion. Contraception 1992; 45:283

11. Grimes DA: The prevention of gynecological cancer by contraception. Adv Contraception 1995;1 l:l-2

## LETTERS TO EDITOR:

1. Grimes DA: Use of Lomotil. Obstet Gynecol 1975; 45:115

2. Cates W Jr, Grimes DA: Maternal mortality and abortions, Hospital Practice 1975; 10( 10): 19

3. Cates W Jr, Grimes DA: The IUD revisited. Fam Plann Perspect 1975; 7(6):244-245

4. Cates W Jr, Grimes DA: On seeking abortion counseling. Am J Public Health 1977; 67:780-781

5. Grimes DA, Cates W Jr: Risks of paracervical anesthesia. N Engl J Med 1977; 296:760

6. Cates W Jr, Grimes DA: And the poor get buried Fam Plann Perspect 1977; 9(1):2

7. Grimes DA, Schulz KF, Cates W Jr, Tyler CW Jr: Midtrimester abortions. N Engl J Med 1977; 297:511-512

8. Cates W Jr, Grimes DA, Smith JC, Tyler CW Jr: Safety of abortion. JAMA 1977; 237:2601-2602

9. Grimes DA, Cates W Jr, Schulz KF: Midtrimester abortion by dilatation and evacuation. Am J Obstet Gynecol 1978; 13 1:23 1

10. Cates W Jr, Schulz KF, Grimes DA: Effect of liberalized abortion on maternal mortality rates. Am J Obstet Gynecol 1978;130:372-374

31.  Grimes DA: The CDC and abortion in HIV-positive women. JAMA 1988; 259:2 17-2 18

32.  Grimes DA: D&C discussed. Contemp Ob/Gyn 1986; 27(4): 18

33.  Grimes DA, Mishell DR, Jr: Congenital limb reduction deformities and oral contraceptives. Am J Obstet Gynecol 1988; 158:439

34.  Settlage RH, Grimes DA: The HIV clade. Am J Public Health 1988; 78:1367-1368.

35.  Kaunitz AM, Grimes DA, Kaunitz KK: A physician's guide to adoption. JAMA 1988; 259:2405

36.  Grimes DA: Reversible contraception for women at high risk of fetal anomalies. J Am Acad Dermatol 1988; 18:150

37.  Grimes DA, Mishell DR Jr: Bad rap for IUDs? Contemp Ob/Gyn 1990; 35(2): 14

38.  Mao C, Grimes DA: Value of hamster egg penetration assay. Am J Obstet Gynecol 1990; 162:865

39.  Grimes DA, Mishell DR Jr: Oral contraceptives and infection rates. Am J Obstet Gynecol 1990; 162:1121-l 122

40.  Grimes DA: Support for the abortion pill. Issues in Science and Technology 1990; 7:13-14

41.  Koonings PP, Grimes DA, Schlaerth JB: Acronym-associated illness (Letter) Crit Care Med 1990; 18:1187

42.  Grimes DA, Griffith CS: The importance of the postcoital test. Am J Obstet Gynecol 1991; 164:932-933

43.  Grimes DA, Schulz KF: Randomized controlled trials of home uterine activity monitoring: A review and critique. Obstet Gynecol 1992; 79: 1053

44.  Grimes DA: Reply to Dr. Willke. Am J Obstet Gynecol 1992; 167:1485

45.  Grimes DA: Clinicians who provide abortions: The thinning ranks. Obstet Gynecol 1993; 81:3 19-320

46.  Grimes DA, Cook RJ: Mifepristone (RU 486)-An abortifacient to prevent abortion? N Engl J Med 1993; 328:354-355

47.  Grimes DA: Laparoscopic surgery: experiment or expedient? Am J Obstet Gynecol 1993; 168:1333-1334

48.  Grimes DA: "Technology follies": curtain call. JAMA 1993; 270:2299

49.  Grimes DA, Karamardian LM: Corpus luteum dysfunction-is the treatment really ineffective? Am J Obstet Gynecol 1994; 170:958-959



50.    Grimes DA, Fraser EJ, Schulz KF: Immunization as therapy for recurrent spontaneous abortion: a review and meta-analysis.  Obstet Gynecol 1994; 83:637-638

51.    Grimes DA: Implantable hormonal contraceptives: emerging controversy. Obstet Gynecol 1995;85:641-642

52.    Grimes DA: Validity of thepostcoital test. Am J Obstet Gynecol 1995;172:1327

53.    Schulz KF, Altman DG, Grimes DA: Restricted randomization in randomized controlled trials. JAMA 1995;274:1835-1836

54.    Grimes DA: Clinical research in ancient Babylon: methodologic insights from the Book of Daniel. Obstet Gynecol 1996;87:157-158

55.    Grimes DA: Introducing evidence-based medicine into a department of obstetrics and gynecology. Obstet Gynecol 1996;87: 160

56.    Johannisson E for the International Committee for Research in Reproduction:  Safety of modern oral contraceptives. Lancet 1996;347:258.

57.    Rosenberg L, Begaud B, Bergman U, Brown B, Buist AS, Cramer D, Daling J, Grimes D, Kemper F, Mills A: What are the risks of third-generation oral contraceptives? Hum Reprod 1996;11:687-688

58.    Grimes DA, Schulz KF: A "randomized" controlled trial without randomization. Am J Obstet Gynecol 1996;175:240-241

59.    Grimes DA: Stress, work and pregnancy complications. Epidemiology 1997; 8:113-114

60.    Grimes DA: The best measure of uncertainty - hypothesis tests or tests of estimation? Fertil Steril 1997;68:177-8

61.    Grimes DA: The law, the AMA, and partial-birth abortion. JAMA 1999;282:26

62.    Grimes DA: Abortion and unplanned pregnancy. JAMA 2000;283: 1566-7

63.    Grimes DA: Pregnancy saves lives: author's response. West J Med 2000;173: 12-13

CHAPTERS:

1.    Kumarasamy T, Brenner WE, Hulka JF, Mercer JP, Fishburne JI, Dingfelder JR, Omran KF, Grimes DA, Hendricks CH, Staurovsky LG: Research programs in sterilization and post conceptive regulation. Proceedings of Seminar on Voluntary Sterilization and Post Conceptive Regulation, 1974 pp 79-85, (Bangkok, Thailand)

2.    Staurovsky LG, Brenner WE, Dingfelder JR, Kumarasamy T, Grimes DA, Ogburn P: The effect of meperidine analgesia in PGF2a induced midtrimester abortions.  Proceedings of the VIIIth World Congress on Fertility and Sterility, 1974 (Buenos Aires)

3.  Grimes DA, Schulz KF, Cates W Jr, Tyler CW Jr: The Joint Program for the Study of Abortion/CDC: A preliminary report. In: Abortion in the Seventies. (Hern W, Andrikopoulos B, Eds.). New York, National Abortion Federation, 1977

4.  Cates W Jr, Grimes DA, Smith JC: Surveillance of abortion mortality in the United States. In: Abortion in the Seventies. (Hern W, Andrikopoulos B, Eds.). New York, National Abortion Federation, 1977

5.  Tyler CW Jr, Cates W Jr, Grimes DA: The benefits, risks, and controversies in pregnancy termination: An overview. In: Risks, Benefits, and Controversies in Fertility Control. (Sciarra JJ, Zatuchni GI, Speidel JJ Eds.). Hagerstown, Maryland, Harper and Row, 1978, pp 390-400

6.  Cates W Jr, Schulz KF, Grimes DA, Tyler CW Jr: Short-term complications of uterine evacuation techniques for abortion at 12 weeks' gestation or earlier. In: Pregnancy Termination. Procedures, Safety, and New Developments. (Zatuchni GI, Sciarra JJ, Speidel JJ, Eds.). Hagerstown, Maryland, Harper and Row, 1979, pp 127-135

7.  Grimes DA: Premature rupture of membranes: antenatal steroid therapy to increase fetal pulmonary maturity; and induction of labor. In: Obstetric Technology. (Randall HW Jr, Ed). Atlanta, Emory University School of Medicine, 1980

8.  Grimes DA, Schulz KF, Cates W Jr, Tyler CW Jr: The safety of midtrimester abortion. In: The Safety of Fertility Control. (Keith LG, Kent DR, Berger GS, Brittain JR. Eds.). New York, Springer Publishing Company, 1980, pp 198-210

9.  Grimes DA, Cates W Jr: Abortion: Methods and complications. In: Human Reproduction: Conception and Contraception. (Hafez ESE, Ed.). New York, Harper and Row, 1980, pp 796-813

10. Gray MJ, Grimes DA: Birth control, abortion, and sterilization. In: Gynecology and Obstetrics. The Health Care of Women. 2nd Ed. (Romney SL, Gray MJ, Little AB, et al., Eds.). New York, McGraw-Hill Book Company, 1980

11. Cates W Jr, Grimes DA: Morbidity and mortality of abortion in the United States. In: Abortion and Sterilization. Medical and Social Aspects. (Hodgson JE, Ed.). New York, Grune and Stratton, 1981, pp 155-180

12. Grimes DA, Cates W Jr: Midtrimester abortion by dilatation and evacuation. In: Second Trimester Abortion. Perspectives after a Decade of Experience. (Berger GS, Brenner WE, Keith L, Eds.). Littleton, Massachusetts, PSG Publishing Company, Inc., 198 1

13. Cates W Jr, Grimes DA: Morbidity and mortality. In: Second Trimester Abortion.. Perspectives after a Decade of Experience. (Berger GS, Brenner WE, Keith L, Eds.). Littleton, Massachusetts, PSG Publishing Company, Inc., 1981

14. Grimes DA, Cates W Jr: Instrumental abortion in the second trimester: An overview. In: Second Trimester Pregnancy Termination. (Keirse MJNC, et al, Eds.). The Hague, University of Leiden Press, 1982, pp 65-79

15. Cates W Jr, Grimes DA: The trimester threshold for pregnancy termination: Myth or truth? In: Second Trimester Pregnancy Termination, (Keirse MJNC, et al, Eds.). The Hague, University of Leiden Press, 1982, pp 41-51

16. Grimes DA, Cates W Jr, Selik RM: Abortion facilities and the risk of death. In: Proceedings of the Third International Seminar on Maternal and Perinatal Mortality, Pregnancy Termination, and Sterilization. (Hingorani V, Pandit RD, Bhargava VL, Eds.). New Delhi, Federation of Obstetrics and Gynaecological Societies of India, 1982, pp 610-614

17. Grimes DA, Tyler CW Jr: Controversies concerning midtrimester dilatation and evacuation abortion. In: Reid's Controversies in Obstetrics and Gynecology. (Zuspan FP, Christian CD, Eds.). New York, WB Saunders, 1983, pp 386-392

18. Kafrissen ME, Binkin NJ, Grimes DA, Cates W Jr: Abortion incidence, mortality, and morbidity. In: Perspectives on Abortion. (Sachdev P, Ed.). Metuchen, New Jersey. Scarecrow Press, 1984, pp 130-140

19. Grimes DA: Surgical management of abortion. In: TeLinde's Operative Gynecology, 6th Ed. (Mattingly RF, Thompson JD, Eds.). Philadelphia, Lippincott, 1985, pp 5 13-539

20. Kaunitz AM, Grimes DA: First-trimester abortion technology. In: Fertility Control. (Corson SL, Derman RJ, Tyrer LB, Eds.) Boston, Little Brown and Co, 1985, pp 64-76

21. Grimes DA, Schulz KF: The comparative safety of second-trimester abortion methods. In: Abortion: Medical Progress and Social Implications. (Porter R, O'Connor M, Eds.). London, Pitman Books Ltd., 1985, pp 83-96

22. Grimes DA: The provision of abortion services in the United States. In: Abortion: Medical Progress and Social Implications. (Porter R, O'Connor M, Eds.). London, Pitman Books Ltd, 1985, pp 26-3 1

23. Grimes DA: Non-contraceptive benefits of oral contraceptives--Good news for a change. In: Medical Education in the Field of Primary Maternal Child Health Care. (Fayad MM, Abdalla MI, Eds.). Proceedings of International Conference, Cairo Egypt, 1986, pp 85-91

24. Grimes DA: The epidemiology of gestational trophoblastic disease: A global view. In: Medical Education in the Field of Primary Maternal Child Health Care. (Fayad MM, Abdalla MI, Eds.). Proceedings of International Conference, Cairo, Egypt, 1986, pp 340-344

25. Grimes DA, Kafrissen ME: Hematologic aspects of contraception, abortion, and sterilization. In: Hematologic Problems in Pregnancy (Kitay DZ, Ed) Oradell, New Jersey, Medical Economics Books, 1987, pp 386401

26. Grimes DA: Genital herpes infections. In: Management of Common Problems in Obstetrics and Gynecology. (Mishell DR, Jr, Brenner PF, Eds.) Oradell, New Jersey, Medical Economics Books, 1988, pp 295-299

27. Grimes DA: Human immunodeficiency virus infections in women. In: Management of Common Problems in Obstetrics and Gynecology. (Mishell DR, Jr, Brenner PF, Eds.) Oradell, New Jersey, Medical Economics Books, 1988, pp 291-294

28. Grimes DA: Sexually transmitted diseases. In Wallace HM, Ryan G Jr, Oglesby AC (eds): Maternal and Child Health Practices, 3rd ed. Oakland, Third Party Publishing Co., 1988; pp 347-355

29. Grimes DA, Cates W Jr: Family planning and sexually transmitted diseases. In Holmes KK, Mardh P-A, Sparling PF, Wiesner PJ (eds). Sexually Transmitted Diseases, 2nd edition. New York, McGraw-Hill Book Company, 1990, pp 1087-1094

30. Grimes DA Breast cancer, the pill, and the press. In Mann RD (ed): Oral contraceptives and breast cancer. Carnforth, England, Parthenon Publishing Group, 1990; pp 309-322

3 1. Grimes DA: Surgical management of abortion. In: TeLinde's Operative Gynecology, 7th Ed. (Thompson JD, Rock J, Eds). Philadelphia, J.B. Lippincott, Co. 1991; pp 3 17-342

32. Grimes DA: Safety and efficacy of the IUD. In: Contraception. (Shoupe D, Haseltine FP, Eds). New York, Springer-Verlag 1993; pp 123-130

33. Grimes DA: Comments on Session II. In: Clinical applications of mifepristone RU 486 and other antiprogestins. (Donaldson MS, Dorflinger L, Brown SS, and Benet L, Eds). Washington, D.C., National Academy Press, 1993; pp 183-188

34. Grimes DA: Genital Herpes. In: Management of Common Problems in Obstetrics and Gynecology. (Mishell DR, Jr, Brenner PF, Eds), 3rd edition. Boston, Blackwell Scientific Publications, 1994; pp 386-390

35. Grimes DA: Human Immunodeficiency Virus Infection. In: Management of Common Problems in Obstetrics and Gynecology. (Mishell DR, Jr, Brenner PF, Eds), 3rd edition. Boston, Blackwell Scientific Publications, 1994; pp 3 8 l-3 85

36. Grimes DA, Schulz KF: Prophylactic antibiotics at IUD insertion. In: Bardin CW, Mishell DR Jr (eds): Proceedings from the Fourth International Conference on IUDs. Boston, Butterworth-Heinemann, 1994; pp 164- 170

37. Stubblefield PG, Grimes DA: Septic abortion: epidemiology and complications. In: Sciarra JJ (ed): Gynecology & Obstetrics, 6th ed. Chicago, J.B. Lippincott, 1995; pp l-8

38. Grimes DA: Sequelae of abortion. In: Baird DT, Grimes DA, Van Look PFA (eds): Modern methods of inducing abortion. Oxford, Blackwell Science, 1995; pp 95-l 11

39. Grimes DA: Family planning through reversible contraception. In: Woolf, Jonas and Lawrence, eds. Health Promotion and Disease Prevention in Clinical Practice. Baltimore, Williams and Wilkins, 1996; pp 258-272

40. Grimes DA: Risks and benefits of oral contraceptives. In: Li JJ, Li SA, Gustafsson J-A, et al., eds. Hormonal Carcinogenesis II. New York, Springer, 1996; pp 3 12-320

41. Grimes DA: Management of abortion. In: Rock JA, Thompson JD, eds. Te Linde's Operative Gynecology, 8th ed. Philadelphia, Lippincott-Raven, 1996; pp 477-500

42. Grimes DA, The application of evidence-based medicine to the care of the breast. In: Hindle WH, ed. Breast care. A clinical guidebook for women's primary health care providers. New York: Springer, 1998; pp 20-27



43. Lichtenberg ES, Grimes DA, Paul M: Abortion complications. Prevention and management. In: Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG, eds. A clinician's guide to medical and surgical abortion. New York: Churchill Livingstone, 1999; pp 197-Z 16

44. Grimes DA: Communicating research: working with the media. In: O'Brien PMS, Pipkin FB, eds. Introduction to research methodology for specialists and trainees. London: Royal College of Obstetricians and Gynaecologists, 1999; pp 210-217


**BOOKS:**

1. Withington AM, Grimes DA, Hatcher RA: Teenage Sexual Health. New York, Irvington Publishers, 1983

2. Brautigam HH, Grimes DA: Arztliche Aspekte des Legalen Schwangerschaftsabbruchs. Stuttgart, Ferdinand Enke Verlag, 1984

3. Baird DT, Grimes DA, Van Look PFA (eds). Modern Methods of Inducing Abortion, Oxford, Blackwell Science, 1995

4. U.S. Preventive Services Task Force. Guide to Clinical Preventive Services, 2nd ed. Baltimore, Williams & Wilkins, 1995

5. Grimes DA, Wallach M, Chaney EJ, Connell EB, Emans SJ, Goldzieher JW, Hillard PJA, Mastroianni L, Jr. Modern Contraception. Updates from the Contraception Report, Totowa, NJ, Emron, 1997

6. Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG, eds. A Clinician's Guide to Medical and Surgical Abortion. New York: Churchill Livingstone, 1999

7. Knijff SCM, Goorissen EM, Velthuis-te Wierik EJM, Korver T, Grimes DA: Summary of contraindications to oral contraceptives, New York: Parthenon Publishing, 2000

8. Wallach M, Grimes DA, Chaney EJ, Connell EB, Creinin MD, Emans SJ, Goldzieher JW, Hillard PJA, Mastroianni L Jr. Modern Oral Contraception. Updates from the Contraception Report. Totowa, NJ, Emron, 2000


**MISCELLANY:**

1. Grimes DA: Oral contraceptives. Published by University of North Carolina, 1974. Revised 1977

2. Grimes DA: Intrauterine contraceptive devices. Published by University of North Carolina, 1974. Revised 1977

3. Grimes DA: A contraceptive potpourri. Published by University of North Carolina, 1974. Revised 1977

4. Grimes DA: Permanent female sterilization. Published by University of North Carolina, 1974. Revised 1977

5. Center for Disease Control: Abortion Surveillance: 1974, issued 1976 April

6. Cates W Jr, Grimes DA: The comparative safety of intraamniotic prostaglandin F2a and saline for abortion. In "Special Question," Sexual Medicine Today, 1977 April, p.33

7. Center for Disease Control: Abortion Surveillance: 1975, issued 1977 April

8. Grimes DA: D + E for abortions in: Q + A patient problems. Sexual Medicine Today 1978 October P 24

9. Grimes DA: Amount of blood shed in menses. Med Asp Hum Sexual 198014(3):143

10. Grimes DA: Discussion in: Bishop EH: Three Women with Suspected Gonorrhea. Clinical Simulations in Ob-Gyn, Series 4, Number two. Pleasantville, N.Y., Docent Corporation, 1978

11. Grimes DA, Brenner WE: Methods of midtrimester abortion. ACOG Technical Bulletin #56, 1979 December

12. Grimes DA: Toxicshockandcoitus. Med Asp Hum Sexual 1981; 15(11):114

13. Centers for Disease Control: Ectopic Pregnancy Surveillance 1970-1978, issued 1982 July

14. Report of a WHO Scientific Group: Gestational Trophoblastic Diseases. Technical Report Series 692. Geneva, World Health Organization, 1983

15. Grimes DA: What percentage of women who have a tubal sterilization nonetheless conceive? (Q&A) Med Asp Hum Sexual 1984;18(7):95

16. Grimes DA: Gonorrhea and Chlamydial Infections. ACOG Technical Bulletin No. 89, 1985 November

17. Grimes DA: Can donor insemination cause toxic shock syndrome? International Correspondence Society of Obstetricians and Gynecologists Collected Letters 1986; 27(7):7

18. Grimes DA: Sexually transmitted diseases. Precis III. Washington, D.C., American College of Obstetricians and Gynecologists, 1986

19. Grimes DA, Becker TM: Herpes Simplex virus infections. ACOG Technical Bulletin No.102, 1987 March

20. Grimes DA: Introduction. In : Fertility Regulation and the Public Health: Selected Papers of Christopher Tietze, M.D. (Tietze SL, Lincoln R, Eds.) New York, Springer-Verlag, 1987, pp 137-138

21. Grimes DA: Contraceptive choices for teenagers. Questions and Answers JAMA 1987; 257:3419

22. Grimes DA, Becker TM: Genital human papillomavirus infections, ACOG Technical Bulletin No. 105, 1987 June

23. Grimes DA: Editorial note. Contraception 1987; 36:IV

24. Report of a WHO Scientific Group: Mechanism of Action, Safety and Efficacy of Intrauterine Devices. Technical Report Series 753. Geneva, World Health Association, 1987

25. Grimes DA: What are the main benefits (other than contraception) of OCs in disease prevention? (Q&A) Med Asp Hum Sexual 1989;23(5):21

26. Grimes DA: A device for transfusing autologous blood. Contemp Ob/Gyn 1989; 31:51-55

27. Grimes DA: Sexually transmitted diseases. Precis VI. Washington, D.C., American College of Obstetricians and Gynecologists, 1990

28. Grimes DA et al. Who will provide abortions? Ensuring the availability of qualified practitioners. Washington, D.C., National Abortion Federation, 199 1

29. Grimes DA: Preinsertion antibiotics help prevent IUD complications. Med Asp Hum Sexual 1991; 25(11):12

30. PROLOG Task Force: Patient Management in the office. Washington, D.C. American College of Obstetricians and Gynecologists, 199 1

3 1. Darney PD, Grimes DA, Speroff L: Long acting contraception. ACOG Update 1992;17(7):1-10

32. National Commission on America without Roe: Facing a future without choice. A report on reproductive liberty in America. Washington, D.C., National Abortion Rights Action League, 1992

33. Grimes DA: Gonorrhea and chlamydial infections. ACOG Technical Bulletin No. 190, 1994 March

34. Shulman LP, Grimes DA, Stubblefield PG: Abortion. ACOG UPDATE 1996, volume 22, number 7

35. Grimes DA: Foreword. In Hulka JF, Reich H, eds. Textbook of Laparoscopy, Third Edition New York, WB Saunders, 1997

36. Grimes DA: Sense and sensuality: contraceptives. Audio-Digest Obstetrics/Gynecology 1997, 44, number 2

3 7. Report of a WHO Scientific Group. Medical methods for termination of pregnancy. Technical Report Series 871. Geneva, World Health Organization, 1997.

38. Grimes DA: Foreword. In: Hulka JF, Reich H. Textbook of laparoscopy. Third ed. Philadelphia: W. B. Saunders Co., 1998:xiii-xiv

39. Family Health International: Mechanisms of the contraceptive action of hormonal methods and intrauterine devices. Research Triangle Park, NC: Family Health International, 1998

40.    Grimes DA: Epidemiologic insights: The safety of oral contraceptives. Consults in Oral Contraception 1998;1(3):1-12.

41.    Grimes DA: Commentary on: Use of the intrauterine device by inner-city women JAMA Women's Health Web Site, Contraception Information Center, May 4, 1998.

42.    Grimes D: A research agenda emphasizing clinical outcomes in OB/GYN. In: Gabbe S, Mueller-Heubach E, eds. Blueprint for academic obstetrics and gynecology. A consensus conference convened by the Council of University Chairs of Obstetrics and Gynecology (CUCOG). Washington, DC: CUCOG, 1997.

43.    Grimes D: DMPA good choice for women with sickle cell. Network 1999;19(2):1 O-l 1.

44.    Grimes D: Hormonal methods may affect headaches. Network 1999;19(2):1l-13.

# ELIZABETH GRAY RAYMOND

**OFFICE**

Clinical Research Division
Family Health International
P. 0. Box 13950
Research Triangle Park, NC 27709
Phone: (919) 544-7040
Fax: (208) 2756440
Email: eraymond@fhi.org

**RESIDENCE**

7301 Caliber Park, #206
Durham, NC 27701
Phone: (919) 489-0462

## CURRENT POSITIONS

**Associate Medical Director** *February 1994-present*
**Family** *Health International,* Research *Triangle Park, NC*

Responsible for the design, overall management, and analysis of clinical trials and other research studies. Represent FHI in the Consortium for Emergency Contraception. Served as Acting Division Director, Clinical Trials Division, for 6 months in 1996. Recent projects have included:

- **Efficacy** Trial of Spermicidal Agents. Randomized clinical trial comparing the efficacy, safety, and acceptability of five spermicides. Ongoing since June, 1998. Will enroll 1,800 participants at 12 domestic research centers. Funded by NICHD.
- Provision of ECPs to Spermicide Users in Ghana. Cohort study of ECP and spermicide use among women intending to use spermicides who are also provided with ECPs. Enrolled 211 participants at four at family planning clinics in Ghana. Funded by USAID.
- Comparative Clinical Evaluation of VCF and Conceptrol. Randomized clinical trial comparing the efficacy, safety, and acceptability of two spermicides. Enrolled 765 participants at 8 research centers in Africa and North, Central, and South America. Funded by USAID.
- Effectiveness of Meclizine for Prevention of Nausea Associated with Emergency Contraceptive Pills. Randomized clinical trial to determine whether meclizine is effective for preventing nausea from the Yuzpe regimen. Enrolled 342 participants at 2 domestic research centers. Funded by USAID, Kaiser Family Foundation, Rockefeller Foundation.
- Effect of Emergency Contraceptive Pills on Uterine Receptivity. Enrolled 19 participants at 1 research center. Funded by Mellon Foundation and USAID.

**Staff Physician** *July 1996-present*
*Planned Parenthood of the Capital and Coast, Raleigh NC*

General outpatient gynecology practice, one afternoon each week.

**Assistant Consulting Professor** *1994-present*
*Obstetrics and Gynecology Department, Duke University Medical Center, Durham, NC*

## PREVIOUS POSITIONS

**Aug. 1994–Jun. 1996 Staff physician**
*Department of Surgery*
*Veterans Administration Medical Center, Durham, NC*
General outpatient gynecology practice, one half day per week

**Jul. 1991–Jan. 1994 Senior Staff Fellow**
*Division of Epidemiology, Statistics, and Prevention Research*
*National Institute of Child Health and Human Development, National*
*institutes of Health*
- Project Officer, Prostaglandins in Preeclampsia Study
- Assistant Project Officer, Trial of Calcium for Preeclampsia Prevention
- Co-Investigator, Study of Perinatal Health Services in the District of Columbia
- Co-Investigator, Maternal and Child Health Study of Assiut, Egypt

**Jul. 1988–Jun. 1990 Obstetrician-gynecologist**
**Tuba** *City Indian Medical Center, Tuba City, AZ*


## EDUCATION

1991    Master of Public Health, Johns Hopkins School of Hygiene and Public Health, Baltimore, MD. Course work concentrated in epidemiology, statistics, and population dynamics.

1988    Residency, Obstetrics and Gynecology, Duke University Medical Center, Durham, NC

1984    Doctor of Medicine, Columbia University College of Physicians and Surgeons, New York, NY

1980    Bachelor of Arts with Distinction, Swarthmore College, Swarthmore, PA. Major in Biology.


## MEDICAL CERTIFICATION

North Carolina Medical License number 30084
North Carolina Medical Registration Certificate number 13596
Diplomate, American Board of Obstetrics and Gynecology, 1990-2000


## AWARDS AND HONORS

Public Health Service Quality Increase, 1989
Phi Beta Kappa, Swarthmore College, 1980
Sigma Xi, Swarthmore College, 1980

EGR-CV:10/19/2000

EGR-CV:10/19/2000

## PUBLICATIONS

1. Kane AB, Stanton RP, Raymond EG, et al. Dissociation of intracellular lysosomal rupture from the cell death caused by silica. J Cell Biol 1980; 87:643-651.

2. Hunter V, Raymond EG, et al. Efficacy of the metastatic survey in the staging of gestational trophoblastic disease. Cancer 1990; 651647-I 650.

3. Raymond E, Clemens JD. Prospective risk of stillbirth [letter]. Obstet Gynecol 1992; 80:473-4.

4. Levine RJ, Raymond E, DerSimonian R, Clemens J. Preeclampsia prevention with calcium supplementation. Clin Applied Nutrit 1992; 2:30-38.

5. Raymond EG, Mills JL. Placental abruption: risk factors and associated fetal conditions. Acta Obstet Gynecol Scand 1992; 72:633-639.

6. Mills JL, Raymond E. Effects of recent research on recommendations for periconceptional folate supplement use. Ann N Y Acad Sci 1993; 678:137-145.

7. Raymond EG, Cnattingius S, Kiely JL. Effects of maternal age, parity, and smoking on the risk of stillbirth. British J Obstet Gynaecol 1994; 101:301-306.

8. Raymond EG, Tafari N, Troendle J, Clemens JD. Development of a practical screening tool to identify preterm, low birthweight neonates in Ethiopia. Lancet 1994; 344:520-523.

9. Levine RJ, Esterlitz JR, Raymond EG, et al. The trial of calcium for preeclampsia prevention (CPEP): rationale, design, and methods. Controlled Clinical Trials 1996; 17:442-469.

10. Raymond EG, Singh M, Archer DF, Saxena BB, Baker J, Cole D. Contraceptive efficacy, pharmacokinetics, and safety of Annuelle® biodegradable norethindrone pellet implants. Fertil Steril 1996; 66:954-61.

11. Olson BR, Forman MR, Lanza E, et al. Relation between sodium balance and menstrual cycle symptoms in normal women. Ann Intern Med 1996; 125:564-567.

12. Levine RJ, Hauth JC, Curet LB et al. Trial of calcium to prevent preeclampsia. New Engl J Med 1997; 337:69-76.

13. Cates W, Raymond EG. Emergency contraception – parsimony and prevention in the medicine cabinet. Am J Public Health 1997; 87:909-910.

14. Cates W, Raymond EG. Vaginal Spermicides. In: Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Guest F, Kowal D.et al., eds. Contraceptive Technology. 17th edition. New York: Irvington Publishers, Inc., 1998: 357-370.

15. Trussell J, Ellertson C, Stewart F, Koenig J, Raymond EG. Emergency contraception: a cost effective approach to preventing unintended pregnancy. Women Health Primary Care 1998; 1:52-69.

EGR-CV:10/19/2000

Add-57

16. Fortney JA, Feldblum PJ, Raymond EG. Intrauterine devices: the optimal long-term contraceptive method? J Reprod Med 1999; 44:269-274.

17. Trussell J, Raymond EG. Statistical evidence about the mechanism of action of the Yuzpe regimen of emergency contraception. Obstet and Gynecol 1999; 93:872-876.

18. Grimes DA, Raymond EG. Bundling a pregnancy test with the Yuzpe regimen of emergency contraception. Obstet Gynecol 1999; 94:471-473.

19. Raymond EG, Dominik R, Spermicide Trial Group. Contraceptive efficacy of two spermicides: a randomized trial. Obstet Gynecol 1999;93:896-903.

20. Raymond E, Alvarado G, Ledesma L, Diaz S, Bassol S, Morales E, Femandez V, Carlos G. Acceptability of two spermicides in five countries. Contraception, 1999;60:45-50.

21. Steiner MJ, Hertz-Picciotto I, Raymond E, Trussell J, Wheeless A, Schoenbach V, Influence of cycle variability and coital frequency on the risk of pregnancy. Contraception 1999;60:137-43.

22. Mills JL, DerSimonian R, Raymond E, Morrow JD, Roberts LJ 2nd, Clemens JD, et al. Prostacyclin and thromboxane changes predating clinical onset of preeclampsia: a multicenter prospective study. JAMA 1999;282:356-362.

23. Steiner MJ, Raymond E, Attafuah JD, Hays M. Provider knowledge about emergency contraception in Ghana. J Biosoc Sci 2000;32:99-106.

24. Raymond EG, Creinin MD, Barnhart KT, Lovvorn AE, Rountree RW, Trussell J. Meclizine for prevention of nausea associated with emergency contraceptive pills: a randomized trial. Obstet Gynecol 2000;95:271-277.

25. Lovvorn A, Nerquaye-Tetteh J, Glover EK, Amankwah-Poku A, Hays M, Raymond E. Provision of emergency contraceptive pills to spermicide users in Ghana. Contraception. 2000;61:287-93.

26. Raymond EG, Lovely LP, Chen-Mok M, Seppälä M, Kurman RJ, Lessey BA. Effect of the Yuzpe Regimen of Emergency Contraception on Markers of Endometrial Receptivity. Hum Reprod 2000;15:2351-5

EGR-CV:10/19/2000



Align top of FedEx PowerShip Label or Astra Label here.

PRISCILLA SMITH
CRLP
126 WALL STREET          NV 10005
NEW YORK
(9171637-3600

SHIP DATE: 13FEB01
ACC# 158450739

ACTUAL WGT:    4 LBS HAN W

TO: Dockets Management Branch          (301)827-6860
FDA Dep't of Health & Human Svcs
Room10-61
5630 Fiskers Lane
Rockville          MD 20857

4654 4388 9833          FedEx.

4654 4388 9833

REF: 236

PRIORI TY OVERNI GHT    WED

CAD# 0633934 13FEB01

TRK#  4654 4388 9833   Form 0201

Deliver by:
14FEB01

IAD

20857 -MD-US   19GAIA  --

*d On Time*®

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ANNIE TUMMINO, in her individual capacity, as Vice-Chair
of the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
ERIN T. MAHONEY, in her individual capacity, as Chair of
the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
CAROL GIARDINA, in her individual capacity, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
KELLY MANGAN, in her individual capacity, as President of
the University of Florida Campus Chapter of the National
Organization for Women, as Coordinator of the Morning-
After Pill Conspiracy, and on behalf of women who need
Emergency Contraception; STEPHANIE SEGUIN, in her
individual capacity, as Chair of the Florida National
Organization for Women Young Feminist Task Force, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
LORI TINNEY, in her individual capacity, as President of the
Gainesville Chapter of the National Organization for
Women, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; JENNIFER BROWN, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; CANDACE CHURCHILL, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; and FRANCIE HUNT, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; ASSOCIATION OF REPRODUCTIVE HEALTH
PROFESSIONALS, on its own behalf and on behalf of its
members and women who need Emergency Contraception;
and NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE

CV-05-0366 (ERK/VVP)
CV-12-0763 (ERK/VVP)

HEALTH, on its own behalf and on behalf of women who
need Emergency Contraception; ROBERT JAFFE; AURORA
DEMARCO; ANGELICA JAFFE; CATHERINE LEDERER-
PLASKETT; ALIZA LEDERER-PLASKETT; JONATHAN MARKS;
GABRIELLE MARKS,

               Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
acting commissioner of the Food and Drug Administration,

               Defendant.

------------------------------------------------------------------------X

## **FIFTH AMENDED COMPLAINT**

      Plaintiffs, by and through their undersigned attorneys, bring this complaint against the

defendant, his agents and successors in office, and in support thereof aver the following:

      1.  This is a challenge under the Administrative Procedures Act (APA) and the United

States Constitution to the denial by the Food and Drug Administration (FDA) of a Supplemental

New Drug Application (SNDA) and a citizen petition ("citizen petition") seeking to switch the

emergency contraception ("EC") drug Plan B from prescription-only availability to unrestricted

over-the-counter status[1] ("OTC switch") and to the establishment by the FDA of an age-

restricted, behind-the-pharmacy-counter, dual prescription/nonprescription regime for Plan B

("BTC regime").  Plaintiffs claim that the BTC regime and the denial of the OTC switch violate

their rights and the rights of women who need Plan B to privacy and equal protection under the

Fifth Amendment, and that the BTC regime and the denial of the OTC switch violate their rights

---

[1] Plaintiffs will use the term "unrestricted OTC status" to mean over-the-counter availability without a requirement
that the drug be kept behind the pharmacist's counter, without a restriction on the types of venues where the product
may be distributed, and without an age restriction.  In other words, "unrestricted status" is used to mean the status of
numerous other drugs and devices, such as aspirin, condoms, dextromethorphan, ibuprofen, acetaminophen, etc.

Add-61

and the rights of women who need Plan B because it exceeds the statutory authority of the FDA and is arbitrary and capricious. Plaintiffs seek injunctive relief requiring the defendant to approve the OTC switch for women of all ages, or such other equitable relief as the Court may deem appropriate, and a declaratory judgment that the FDA's denial violates the APA and violates the constitutional rights of women who need Plan B.

**I.      Jurisdiction and Venue**

2.   This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

3.   Venue is proper in this district under 28 U.S.C. § 1391(d) because one of the plaintiffs resides in this district and the defendant is an officer of the United States acting in his official capacity.

**II.     The Parties**

**A.      Plaintiffs**

4.   Plaintiff Annie Tummino is a resident of Brooklyn, New York. She sues on her own behalf, in her individual capacity as Vice-Chair of the Women's Liberation Birth Control Project and as Coordinator of the Morning-After Pill Conspiracy ("MAP Conspiracy"), and on behalf of women who need Plan B.

5.   Plaintiff Erin T. Mahoney is a resident of New York, New York. She sues on her own behalf, in her individual capacity as Chair of the Women's Liberation Birth Control Project and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

Add-62

6.  Plaintiff Carol Giardina is a resident of New York, New York.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

7.  Plaintiff Kelly Mangan is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the University of Florida Campus Chapter of the National Organization for Women, as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

8.  Plaintiff Stephanie Seguin is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Chair of the Florida National Organization for Women Young Feminist Task Force and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

9.  Plaintiff Lori Tinney is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the Gainesville Chapter of the National Organization for Women, Gainesville, FL and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

10. Plaintiff Jennifer Brown is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

11. Plaintiff Candace Churchill is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

12. Plaintiff Francie Hunt is a resident of Nashville, Tennessee.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

13. The MAP Conspiracy is a coalition of feminist organizations leading the grassroots movement to make the Morning-After Pill an over-the-counter drug by raising public consciousness about the ways that women have to conspire to obtain it.  Since February 2004, the MAP Conspiracy has organized speak-outs where women publicly testify from their own experience about their need for the Morning-After Pill and the obstacles they face obtaining it.  Members of the MAP Conspiracy also testified at the December 2003 FDA public hearings on the Barr application for approval of over-the-counter status for Plan B.

14. Each of the individual plaintiffs listed in paragraphs 4-13 above has access to one or more doses of Plan B, and each of them intends, plans, and has pledged to provide Plan B to friends or other women of any age -- including women under the age of 18 and women over 18 who lack government issued identification or who lack timely access to a pharmacy or health clinic -- whom they learn need Plan B to prevent pregnancy.  None of the individual plaintiffs listed in paragraphs 4-13 above is licensed or authorized by law in any state to prescribe or dispense drugs.  Consequently, unless unrestricted OTC status for Plan B is implemented, each of the individual plaintiffs listed in paragraphs 4-13 above risks violating federal and state criminal statutes if she carries through on her plan to provide Plan B to women of all ages who need it to prevent pregnancy.  *See*, *e.g.*, 21 U.S.C. §§ 353(b)(1), 333(a), 333(b) (2005);  § 465.015, Fla. Stat. (2004).

15. Each of the individual plaintiffs listed in paragraphs 4-13 above objects to the requirement contained in the BTC regime that she must disclose her name, address and age to a

pharmacist and/or pharmacy employee in order to obtain Plan B.  In addition, each individual plaintiff listed in paragraphs 4-13 above objects to the disclosure of information to third parties about her personal sexual activity that will occur because, in order to obtain Plan B without a prescription, she is required to present identification to a pharmacist or pharmacy employee.

16. Plaintiff Association of Reproductive Health Professionals (ARHP) is a non-profit membership association composed of experts in reproductive health. These professionals include physicians, advanced practice clinicians (nurse practitioners, nurse midwives, physician assistants), researchers, educators, pharmacists, and other professionals in reproductive health, some of whom have authority to prescribe drugs and some of whom do not.  ARHP and its members provide reproductive health services and education, conduct reproductive health research, and influence reproductive health policy.  Specifically, ARHP works to improve the reproductive health of women by reducing the number of unintended pregnancies among women.   ARHP, along with Princeton University's Office of Population Research (OPR), manages the *Emergency Contraception Hotline* (1-888-Not-2-Late) and *Website* (www.not-2-late.com), which aim to prevent unintended pregnancy by providing women of all ages and their partners information about, and rapid access to, emergency contraception.  Both the *Hotline* and *Website* are highly utilized tools, currently receiving an average of 60,000 calls and 650,000 unique website visits per year.  These calls and visits include calls and visits by women under the age of 18, women over 18 who lack government issued identification, and women who lack timely access to a pharmacy or health clinic.  The *Hotline* is an automated, toll-free, 24-hour, confidential service available in both English and Spanish that gives callers general emergency contraception information and a list of the five emergency contraception providers nearest to them (including a list of pharmacists in states where pharmacists are permitted by state law to

dispense Plan B to those who require a prescription). It is available from any phone in the United States, Puerto Rico, U.S. Virgin Islands, British Columbia, and the Yukon Territory. The *Website*, available in English, French, Spanish, and Arabic, is the most comprehensive emergency contraception clearinghouse in the world available to anyone via the World Wide Web. It features frequently asked questions about emergency contraception, a publications bibliography, a Plan B materials database, and a searchable database of Plan B providers across the country, Puerto Rico, Guam, U.S. Virgin Islands, and British Columbia. The full directory of providers can be searched by city, state, area code, and zip code. The NOT-2-LATE database also lists pharmacists in Alaska, California, Washington State, New Mexico, and British Columbia. ARHP and OPR work closely with local pharmaceutical associations to sign up pharmacists who dispense Plan B behind the counter. Vermont has recently become the ninth state—joining Alaska, California, Hawaii, Maine, Massachusetts, New Hampshire, New Mexico, and Washington—to allow direct dispensation of Plan B by pharmacists. FDA admitted on June 9, 2006 that it had denied ARHP's petition to the FDA to switch Plan B to OTC status for women of all ages. The BTC regime and the denial of unrestricted OTC status interfere with ARHP's ability to educate health care providers and the public about emergency contraception, interfere with ARHP's efforts to reduce the number of unintended pregnancies and its efforts to use the *Emergency Contraception Hotline* and *Website* to achieve that goal, and interfere with its members' ability to accomplish the goal of improving the reproductive health of women. ARHP sues on its own behalf, on behalf of its members who lack prescribing authority and their patients and clients who seek Plan B who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to

showing identification in order to obtain Plan B, and on behalf of the women who utilize the Hotline and Website to obtain access to Plan B.

17. Plaintiff National Latina Institute for Reproductive Health (NLIRH) is a non-profit organization formed under section 501(c)(3) of the Internal Revenue Code. NLIRH conducts a Plan B education and outreach project which seeks to educate providers of Plan B and potential users of Plan B about what Plan B is, how to use it, and how to obtain it and, for providers, how to incorporate it into their practice. NLIRH has conducted such an education and outreach project in the Bronx, and plans additional such projects at several locations in Brooklyn and the Bronx through June of 2005. NLIRH's Plan B education outreach projects are impeded by the age-restricted behind-the-counter dual prescription/nonprescription status for Plan B. If Plan B is switched to OTC for women of all ages, NLIRH will be able to improve access to Plan B by enhancing its Plan B educational programs for both the health care providers and the public participants involved in those projects. NLIRH sues on its own behalf and on behalf of the women participants in its Plan B projects who are of childbearing age, including women who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to showing identification in order to obtain Plan B.

18. Plaintiff Robert Jaffe is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Angelica Jaffe. He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

19. Plaintiff Aurora DeMarco is a resident of Brooklyn, New York and is the mother of a 13-year-old daughter, Angelica Jaffe. She sues on behalf of herself and her daughter because she

wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

20. Plaintiff Angelica Jaffe is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

21. Plaintiff Catherine Lederer-Plaskett is a resident of Hartsdale, New York and is the mother of a 16-year-old daughter, Aliza Lederer-Plaskett. She sues on behalf of herself and her daughter because she wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

22. Plaintiff Aliza Lederer-Plaskett is a resident of Hartsdale, New York and is a 16-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

23. Plaintiff Jonathan Marks is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Gabrielle Marks. He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

24. Plaintiff Gabrielle Marks is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B

9

without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

25. Each woman who is (1) under 18 years of age and needs Plan B; (2) over 18 but lacks adequate proof of age to obtain Plan B without a prescription; (3) over 18 but lacks timely access to a pharmacy or health clinic so as to maximize the effectiveness of Plan B; or (4) must present identification including proof of age to a pharmacist or health clinic and thereby disclose at least her name and possibly her address to third-parties to obtain Plan B, is irreparably injured as a direct result of the FDA's age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B. Each of the Plaintiffs listed in paragraphs 4-13, 16, and 17 above wants to and intends to try to make Plan B available to women in each of these categories, and asserts third-party standing to assert their interests.

26. Each of the plaintiffs is aggrieved on a continuing and ongoing basis by the FDA's rejection of the OTC switch of Plan B for women of all ages.

27. Each of the plaintiffs is injured on a continuing and ongoing basis by the FDA's rejection of the OTC switch for women of all ages, and the FDA's rejection is the cause of that injury.

28. The relief sought in this complaint will redress the injury suffered by each of the plaintiffs that is caused by the FDA's rejection of unrestricted OTC status for Plan B.

**B.     Defendant**

29. Andrew C. von Eschenbach is the acting commissioner of the FDA. Von Eschenbach is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation. He is also responsible for advancing the public

health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and helping the public get the accurate, science-based information they need to use medicines and foods to improve their health.  He is sued in his official capacity.

### III.    Statutory and Regulatory Background

30. Under FDA regulations, "[a]ny drug limited to prescription use . . . shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling."  21 C.F.R. § 310.200(b) (2005); *see also* 21 U.S.C. § 353(b)(3) (2005) ("The Secretary may by regulation remove drugs subject to sections 352(d) and 355 of this title from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.").

31. The FDA views OTC status as the "default" status for drugs.  *See* http://www.fda. gov/cder/Offices/OTC/FDA-CHPA%20seminar%20Oct%202/tsld013.htm (attached as Exhibit U).

32. An approved drug is suitable for OTC use when: (1) the drug is safe for self-medication, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(i); (2) the drug is effective when self-administered, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(ii); (3) the condition to be treated is self-diagnosable; and (4) the drug's labeling is tailored to self-administration, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(v).

33. The FDA has developed its own internal criteria for assessing OTC switch applications, known as the "Peck criteria" after former CDER Director Carl Peck.  These criteria

are: 1.) Does the product have an acceptable margin of safety based on prior prescription marketing experience; 2.) Does the product have low misuse and abuse potential; 3.) Can the condition be adequately self-recognized and successfully self-treated with minimal health care provider intervention; 4.) Do the benefits from the switch to non-prescription status clearly outweigh the risks; and 5.) Is the self-treatment product safe and effective during consumer use. Plan B meets each of these criteria.

34. By statute, the manufacturer of a prescription drug may file a supplemental new drug application with the FDA seeking to switch the drug to OTC status. 21 U.S.C. § 355(b). Such an application must be acted upon by the FDA within 180 days of its filing. 21 U.S.C. § 355(c).

35. In addition, FDA regulations explicitly authorize the use of a citizen's petition to seek a switch from prescription to OTC status: "A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b)(1)(C) of the act may be initiated by . . . any interested person . . . fil[ing] a petition . . . pursuant to Part 10 of this chapter . . . ." 21 C.F.R. § 310.200(b). Once a citizen's petition has been filed, the FDA is required by its regulations to either approve the petition, deny the petition, or "[p]rovide a tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information." 21 C.F.R. § 10.30(e)(2).

36. During the process of considering an application for an OTC switch, the FDA typically receives the advice of the FDA's OTC advisory committee meeting together with the FDA's advisory committee that has specific expertise in the product under consideration. In the case of Plan B, the latter committee is the Advisory Committee for Reproductive Health Drugs. These advisory committees are authorized by, *inter alia*, 21 U.S.C. § 355(n) (2005).

37. The FDA lacks the statutory authority to restrict the types of businesses that can sell OTC drugs.

38. Dispensing a prescription drug other than by prescription is an act of "misbranding" under federal law. 21 U.S.C. § 353(b)(1). Introducing a misbranded drug into interstate commerce is a "prohibited act," 21 U.S.C. § 331(a), punishable by not more than one year imprisonment or a fine of up to $1000 or both. 21 U.S.C. § 333(a)(1).

**IV.    Factual Allegations**

**A.    Making Plan B Available OTC to Women of All Ages Would Improve the Public Health and Enable Women to Reduce their Risk of Unplanned Pregnancies.**

39. Unintended pregnancy is a significant public health problem in the United States. The United States has one of the highest rates of unintended pregnancy compared to other developed countries. The rate of teen pregnancy in the United States is also one of the highest among developed countries. Wider access to Plan B will reduce unintended pregnancies, including among teenagers.

40. The risks of pregnancy and childbirth, including maternal death, can be serious and far exceed the risks associated with Plan B.

41. Plan B is a drug used only by women, and every woman of childbearing age is a potential user of Plan B.

42. Plan B (Levonorgestrel) is an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed.

43. When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex. As the interval

between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases. Plan B does not interfere with an established pregnancy.

44. Switching Plan B to OTC status for women of all ages will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex. Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to use the treatment, and enable more women to prevent unwanted pregnancies, to the benefit of public health.

45. Limiting Plan B to prescription use is not necessary for the protection of public health.

46. Plan B is safe for self-medication because it is not toxic to the woman (or to the embryo or fetus if a pregnancy had been previously established in the woman).

47. Plan B has a low risk of abuse or overdose, and if overdose occurs is unlikely to lead to serious consequences.

48. Plan B's side effects are well-known and minor.

49. Plan B is effective when self-administered. Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to seriously affect Plan B's efficacy.

50. The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman.

51. Plan B has no contraindications that would pose a danger to the patient.

52. The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow.

53. The American Medical Association and the American College of Obstetricians and Gynecologists both support switching Plan B to OTC status for women of all ages. *See* Dec. 5, 2000 Statement of American Medical Association; February 14, 2001 Statement of the American College of Obstetricians & Gynecologists. In addition, the American Academy of Pediatrics supports switching Plan B to OTC status for women of all ages. (Attached hereto as Exhibit T).

**B. Public Health Organizations Filed Two Citizen Petitions with the FDA Seeking to Increase Access to Emergency Contraception.**

54. On November 23, 1994, the Center for Reproductive Law and Policy (now the Center for Reproductive Rights) submitted a Citizen Petition (Docket No. 94P-0427) on behalf of the American Women's Health Association, the American Public Health Association, and Planned Parenthood of New York City, asking the FDA to require two drug manufacturers to amend the labeling and package inserts of certain of their oral contraceptive products to include information regarding the use of these products as emergency contraception. On May 22, 1995, the FDA issued an "interim response" indicating that the request was "still under consideration" and that the agency required more time to "thoroughly evaluate[] the issues raised" in the petition and to finalize its decision. (Letter of Janet Woodcock, M.D., Director, CDER, dated May 22, 1995 (attached hereto as Exhibit A).)

55. On May 9, 1996, the FDA issued a letter denying the 1994 Citizen Petition because "[a]lthough FDA agrees in principle that it has discretion to require that certain conditions of use be included in a product's labeling . . . we decline to exercise our discretion to require the relabeling of these products in the manner you suggest." (Letter of Janet Woodcock, M.D., Director, CDER, dated May 9, 1996 (attached hereto as Exhibit B).) However, the agency

determined "that it would be appropriate to discuss the issue of the safety and effectiveness of oral contraceptives for postcoital emergency use with the Reproductive Health Drugs Advisory Committee at its June 28, 1996 meeting. [The Center for Reproductive Law and Policy] will be invited to present [its] views at that meeting." *See id.*

56. On February 24, 1997, the Center for Reproductive Law and Policy received notice from FDA Deputy Commissioner Mary K. Pendergast that "today the Food and Drug Administration placed on public display a Federal Register notice concluding that certain combined oral contraceptives . . . are safe and effective for use as postcoital emergency contraception. The notice requests submission of new drug applications for this use . . . ." (Letter of Mary K. Pendergast, Deputy Commissioner, Senior Advisor to the Commissioner, FDA, dated February 24, 1997 (attached hereto as Exhibit C); *see also* Prescription Drug Products; Certain Combined Oral Contraceptives for Use as Postcoital Emergency Contraception (Docket No. 96N-0492) (attached hereto as Exhibit D).)

57. FDA Federal Register Notice stated that "[t]his notice is intended to encourage manufacturers to make this additional contraceptive option available." Ex. D at 1. The agency agreed with the unanimous conclusion of the Advisory Committee, which met on June 28, 1996 to consider this issue, that several regimens of oral contraception were safe and effective for postcoital emergency contraception. *Id.* at 3. The agency concluded that "[b]ecause of the publicly available safety and effectiveness data documenting the drugs' use, the safety and effectiveness requirements of § 314.50 may be met by citing the published literature listed in the references in section III. of this document." *Id.* at 8.

58. In 1999, the FDA approved Plan B as a prescription drug. Since that date, Plan B has been prescribed many thousands of times.

59. On February 14, 2001, a group of citizen organizations, including Plaintiff ARHP, filed a petition ("the Citizen Petition") with FDA asking the agency to switch Plan B (and another drug, Preven, that has since been removed from the market for reasons unrelated to safety and effectiveness) to OTC status for women of all ages.

60. The FDA's consideration of the Citizen Petition was inextricably intertwined with its consideration of the application by the manufacturer of Plan B to switch Plan B to OTC status, described below.

61. On June 9, 2006, the FDA issued a letter directly prompted by this lawsuit in which it acknowledges that it has denied the Citizen Petition. (*See* Exhibit V.)

62. In that letter, the FDA alleges: "Soon after [the] petition was filed, [FDA] made a preliminary determination that your petition and its supporting information did not provide sufficient data to satisfy the statutory requirements to approve an OTC switch for emergency contraceptives, as documented in memoranda dated February 28, 2001 and April 12, 2001." (*See* Exhibit V at 1.) However, this determination was not communicated to the petitioners until June 9, 2006. Rather, the FDA gave a tentative response to the Citizen Petition on September 6, 2001, stating the FDA "has not yet resolved the issues raised in your Citizen Petition because it raises significant issues requiring extensive review and analysis by Agency officials."

**C.  Barr Laboratories Filed a Supplemental New Drug Application Seeking OTC Status for Plan B, Which Was Not Approved by the FDA Contrary to the Overwhelming Consensus of the Review Staff and Advisory Committee in Support of Approving the Application.**

63. On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA. The SNDA

contains no scientific data whatsoever on the safety or effectiveness of Plan B for any medically approved use for men.

64. On April 21, 2003, FDA Commissioner McClellan held a teleconference with Jay Lefkowitz, Deputy Assistant to the President for Domestic Policy at the White House, regarding WCC's submissions to the FDA on Plan B. Commissioner McClellan continued to have periodic discussions with White House staff regarding the Plan B SNDA.

65. Prior to the submission of the manufacturer's OTC switch application, but after the FDA became aware of the manufacturer's intent to file such an application, three new members were appointed to the Advisory Committee for Reproductive Health Drugs at the insistence of the FDA Commissioner's Office and despite strongly voiced concerns from FDA's career scientists about their qualifications. In addition, despite the usual practice by which members of the advisory committees are proposed by career scientists with relevant expertise, these three members were proposed by political appointees. Each of the three voted contrary to the majority vote of the Committee on one or more votes taken regarding Plan B.

66. On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC status for Plan B.

67. The advisory committees, comprised of 28 members, voted as follows:

(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?

Yes – 27      No – 1

(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?

Yes – 27      No – 1

(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?

Yes – 0          No – 28

(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?

Yes – 28          No – 0

68. According to the Manual of Policies and Procedures (MAPP) of the FDA's Center for Drug Evaluation and Research (CDER), the authority to approve a product for initial OTC marketing and for initial Rx-to-OTC switch for the first in a class of products is delegated to the office director level.  MaPP 6020.5 at 13 (MaPP 6020.5 is attached hereto as Exhibit S).  The authority to not approve an OTC switch for a drug is the responsibility of the "Specific Subject Matter Review Division" that approved it as a prescription drug.  MaPP 6020.5 at 15.  The FDA violated these policies in its actions regarding the Plan B SNDA and the Citizen Petition.

69. The composition of the Joint Advisory Committee was likewise determined in a manner that departed from the normal process because nominations to the Committee were made by FDA political appointees rather than FDA career scientists.

70. During late December of 2003 or early January of 2004, Drs. Janet Woodcock (Director of CDER and acting Deputy Commissioner of the FDA) and Steven Galson (acting Director of CDER) informed Drs. John Jenkins and Sandra Kweder (Director and Deputy Director of CDER's Office of New Drugs) that Commissioner McClellan had made a determination that the Plan B SNDA would not be approved.  This decision also constructively denied the Citizen Petition.

71. The FDA decided by January 2004 at the latest to require an age restriction in any possible nonprescription approval for Plan B.

72. The determination by the Commissioner described in ¶ 70 that the Plan B SNDA would not be approved was made by the Commissioner (1) without attending the Joint Advisory Committee meeting; (2) before scientific reviews of the Plan B SNDA were completed by the FDA's scientific review staff; and (3) without any direct discussions with the FDA's scientific review staff conducting the review of the Plan B SNDA.

73. On January 15, 2004, Dr. Galson informed FDA scientists conducting the agency's review of the Plan B SNDA that the Commissioner's position was that the application could not be approved.  At this same meeting Dr. Galson conveyed that one option that might lead to approval was an age restriction on Plan B that would keep it as a prescription drug for women under 18, even though he only invoked alleged deficiencies in data for women under 16.  This option was proposed before scientific reviews of data submitted with the Plan B SNDA were complete.

74. On or about January 16, 2004, Dr. Woodcock informed the Director of the Office of Drug Evaluation III that the non-approval action directed by Commissioner McClellan was the only course of action that would appease the Presidential administration's constituents and that might lead eventually to approval.

75. On February 19, 2004 Dr. Janet Woodcock stated at a meeting that both she and the Commissioner were concerned about the possibility of OTC Plan B acquiring 'urban legend' status and leading to extreme promiscuous behaviors, such as the development of sex based cults centered around the use of Plan B.  At that meeting, Dr. Galson indicated that he shared Dr. Woodcock's concerns.

76. All but one scientific staff member below the Center Director level within CDER who reviewed the OTC switch application expressed the view based on scientific and medical

data that the OTC switch should be approved for women of all ages. The one staff member who disagreed believed the application was "approvable."

77. By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, Dr. John Jenkins wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for Plan B (attached hereto as Ex. E) ("the Jenkins memorandum"). This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case." (Ex. E at 30898.) After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription." (*Id.* at 30899.)

78. The Jenkins memorandum further states that "[o]ther senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson), have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription. These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies." (*Id.* at 30897.)

79. Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that some may have regarding non-prescription access to Plan B by adolescents," (*Id.* at 30898), he stated that "[p]roducts that are indicated for uses related to sexual activity in adolescents raise concerns

for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents. These concerns derive from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents." (*Id*. at 30898-99.) He concluded: "While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." (*Id*. at 30899.)

80. On May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter (attached hereto as Ex. F) ("the Galson letter") to Barr rejecting the OTC switch for Plan B. That action also constructively denied the Citizen Petition.

81. The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug." (Ex. F at 10796.) This assertion is not supported by the agency record.

82. In November of 2004, FDA's Office of Counter-Terrorism and Pediatric Drug Development concluded that the data submitted by the manufacturer reflected the age distribution, including among younger adolescents, of actual prescription users of the product.

83. In about January 2005, Steven Galson was prepared to approve Plan B for OTC status for women ages 17 and over, but his authority to do so was removed by the Commissioner of the FDA. Indeed, Dr. Galson had asked the Director of the Office of New Drugs to draft approval letters for him.

84. At least one of the FDA scientists who supported OTC status for Plan B fears retaliation from the Agency for her truthful testimony in this lawsuit.

85. Dr. Galson was concerned that if he did not implement or disagreed with the decision of the Office of the Commissioner to reject unrestricted OTC status for Plan B, his career at the FDA would be jeopardized.

**D.    Barr Laboratories Filed an Amended Supplemental New Drug Application Seeking Age-Restricted OTC Status for Plan B, Which Also Was Not Approved, Contrary to the Overwhelming Consensus among Agency Reviewers in Favor of Approving the Application.**

86. On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for women aged 16 and higher.  By statute, the defendant was required to act on Barr's amended SNDA within 180 days after it was filed.  *See* 21 U.S.C. § 355(c)(1).  On January 21, 2005, the FDA announced a delay of its decision on Barr's application beyond this statutory time limit.

87. The reviewing divisions and offices of FDA reviewed Barr's amended application and examined the concerns raised by senior officials to support their decision to issue a non-approvable letter for OTC use of Plan B, but found that scientific evidence did not support these concerns.  (Excerpts from Mem. of Donna J. Griebel, M.D., dated January 12, 2005 (attached hereto as Exhibit G) at 31033.)

88. In its review of Barr's amended SNDA, the FDA review staff unanimously agreed that despite Barr's application for limited OTC status for Plan B for women 16 and older, that the drug was suitable for -- and thus should be approved for -- full OTC access for women of all ages.  (Review of Complete Response by Daniel Davis, M.D., dated January 12, 2005 (attached hereto as Exhibit H) at 1; Mem. Add. of Curtis J. Rosebraugh, M.D., dated January 12, 2005 (attached hereto as Exhibit I) at 2; Ex. G at 31031-33; Mem. of John Jenkins, M.D., dated

January 14, 2005 (attached hereto as Exhibit J) at 31096-98; *see also* Mem. of Steven Galson, M.D., dated August 26, 2005 (attached hereto as Exhibit K) at 1.)

89. The Director and Deputy Director of the Division of OTC Drug Products and the Director of the Office of Drug Evaluation V stated that Plan B meets the criteria for unrestricted OTC access, that data to the contrary was lacking, and that because of the strength of the data before the agency, it is "unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future." (Ex. I at 205.) Under the FDA's own policies, these FDA employees would ordinarily have made the final decision to approve the OTC switch.

90. FDA documents indicate that prior to January 21, 2005, the review staff at FDA were actively reviewing Barr's application for split-label access to Plan B. FDA has disclosed approximately sixteen documents that were placed in the Plan B docket during the month of January 2005. After January 21, 2005 and prior to August 2005, only two additional documents were submitted.

91. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured United States Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter of M. O. Leavitt, dated July 13, 2005 (attached hereto as Exhibit L).) Counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action. . . ." (Def.'s Letter to the Court, dated July 25, 2005 (attached hereto as Exhibit M), at 2.)

92. Instead of the promised action, on August 26, 2005, FDA Commissioner Lester Crawford issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA . . . ." (*See* Letter of Lester Crawford, M.D., dated August 26, 2005 (attached hereto as Exhibit N) at 5.) The letter indicated that "[t]he Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older." (*Id.*) In this letter, FDA further stated that age-restricted OTC access would not be available for Plan B before the agency reaches a decision on "unresolved issues" regarding the feasibility of approving split-label access. (*Id.*)

93. At or around the time of the August 26, 2005, Crawford decision, Deputy Commissioner Woodcock expressed her concern that the agency's handling of Plan B had the potential to damage her professional credibility.

94. United States Senator Enzi wrote to Commissioner Crawford after Crawford's August 26, 2005, letter, stating that he was "deeply disappointed that your announcement did not comport with the agreed-upon deadline for a decision."

95. FDA sought public comment on "whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product." (Ex. N at 2.)

96. The FDA made the unusual decision to outsource to a private contractor the task of collecting and reviewing comments submitted to the FDA regarding Plan B.

97. On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health announced that she was resigning from her post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled." *See* Marc Kaufman, *FDA Official Quits Over Delay on Plan B*, WASH. POST., Sept. 1, 2005, at A08 (attached hereto as Exhibit O) at 1 (quoting Susan F. Wood).

98. On September 27, Dr. Wood appeared on the ABC television news program *Nightline* to discuss the failure of the agency to act in accordance with the scientific consensus in favor of approving Plan B for OTC use. *See* ABC News transcript, dated September 27, 2005 (attached hereto as Exhibit P) at 4-6 (citing "consensus . . . amongst the scientists and health professionals there that it should be approved," and the fact that "all of the scientific and professional staff who normally are the part of the decision-making at the agency . . . were cut out of the decision.").

99. Dr. Wood also stated that she was concerned about the lengthy delay that she anticipated as a result of the upcoming rule-making:

> Dr. Wood: . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned. Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.
>
> Ted Koppel: (Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.
>
> Dr. Wood: Probably not.
>
> Ted Koppel: (Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

<u>Dr. Wood</u>: Right. The mechanism is a rather bureaucratic one to potentially open it up to rulemaking. Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See* Ex. P at 6-7.)

100.     Dr. Frank Davidoff, a member of the Advisory Committee for Reproductive Health Drugs, which considered the OTC switch application for Plan B, resigned from the advisory committee due to the FDA's lack of "rational science-based decision-making." He is the only person ever to resign from an FDA advisory committee in protest of an agency action.

**E.     The Government Accountability Office Investigated FDA's May 2004 Decision Not to Approve Plan B for Full OTC Status and Found that the FDA's Review Process Regarding Plan B Was "Unusual."**

101.     The Government Accountability Office commenced an investigation for the United States Congress into why the FDA rejected the OTC switch on May 6, 2004.

102.     On November 14, 2005, the Government Accountability Office issued a report to members of Congress examining the FDA's May 6, 2004 issuance of a "non-approvable" letter with regard to Barr Laboratory's SNDA request that Plan B be made available over-the-counter. (attached hereto as Exhibit Q, also available at http://www.gao.gov/new.items/d06109.pdf).

103.     The report, titled "Food and Drug Administration Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual," found that FDA's review process was "unusual" in four aspects:

> ***First***, the Directors of the Offices of Drug Evaluation III and V, who would normally have been responsible for signing the Plan B action letter, disagreed with the decision and did not sign the not-approvable letter for Plan B. The Director of the Office of New Drugs also disagreed and did not sign the letter. ***Second***, FDA's high-level management was more involved in the review of Plan B than in those of other OTC switch applications. … ***Third***, … there are conflicting accounts of whether the decision to not approve the application was made before the reviews were completed. ***Fourth***, the rationale for the Acting Director of CDER's decision was novel and did not follow FDA's traditional

practices. Specifically, the Acting Director was concerned about the potential impact that the OTC marketing of Plan B would have on the propensity for younger adolescents to engage in unsafe sexual behaviors because of their lack of cognitive maturity compared to older adolescents. He also stated that it was invalid to extrapolate data from older to younger adolescents in this case. FDA review officials noted that the agency has not considered behavioral implications due to differences in cognitive development in prior OTC switch decisions and that the agency has considered it scientifically appropriate to extrapolate data from older to younger adolescents. [Emphasis added]

(Ex. Q at 5.)

104.    In summary, the GAO found that the decision-making process was "not typical," was unlike all of the 67 other OTC switch applications filed between 1994 and 2004, and that the Plan B OTC switch application was the only one during that 10 year time period that "was not approved after the joint committee voted to recommend approval of the application." *Id.* The GAO Report concludes that the FDA's decision-making process was unusual and that high-level officials were reported to be involved in the decision-making process.

105.    Former FDA Commissioner Mark McClellan provided only an evasive and non-responsive written statement to detailed written questions submitted by the GAO regarding the decision to issue a non-approvable letter to Barr in May 2004 (questions and non-response attached as Exhibit W).

106.    Former FDA Commissioner Mark McClellan improperly deleted electronic correspondence related to the OTC application for Plan B. *See* Letter of United States Congressman Henry Waxman, dated November 15, 2005 (attached hereto as Exhibit R).

107.    Former FDA Commissioner Lester Crawford also declined to be interviewed by the GAO in conjunction with their report.

**F. Government Documents Confirm the Findings of the GAO Report that Upper Level Management Were Unusually Active in the Decision-Making Process Regarding the OTC Switch Application for Plan B, and that Upper Level Management Overrode the Recommendations of the Review Staff.**

108. The administrative record compiled by the agency confirms that as early as January 15, 2004, upper level management at FDA had decided that the OTC switch for Plan B would not be approved, and that this decision was made before the scientific review of the OTC switch application was complete.

109. The administrative record compiled by the agency confirms that the Office of the Commissioner was involved in the agency's review of the OTC switch application for Plan B since at least December 10, 2003, and that the concerns about adolescent use of Plan B expressed by Dr. Galson in his May 2004 non-approvable letter, as well as the concerns about adolescent use of Plan B expressed by Dr. Galson in his August 26, 2005 memorandum, echo and reflect the concerns of the Office of the Commissioner expressed in January of 2004.

110. Documents show that both the Commissioner of the FDA and the Deputy Commissioner of Operations played an unusually active role in the decision to issue a non-approvable letter, as well as in subsequent agency action on Plan B. The Directors of the Offices of Drug Evaluation III and V told GAO investigators that they were asked by high level management to draft and sign a non-approvable letter for Plan B, but that they declined to do so because they did not agree with that action. The Director of the Office of New Drugs was then asked to review the Plan B application. Involving the Director of the Office of New Drugs in issuing such a letter is very rare and, according to FDA policy and procedure manuals, is limited to situations where there is disagreement between the two reviewing offices. (Ex. Q at 20). The Director of the Office of New Drugs also declined to sign a non-approvable letter based on his disagreement with the decision. *Id.*

111.    The FDA's Deputy Director of the Office of Drug Evaluation V stated in a memorandum that the issues raised by FDA political appointees concerning adolescents' access to Plan B "spuriously raise the review standard for approval of this product and indeed any contraceptive product," and are not supported by the data nor the medical literature.

112.    In the past ten years, except in the case of Plan B and certain nicotine-related drugs, the FDA has never requested additional data regarding adolescents to be submitted by manufacturers seeking OTC switches.

113.    The non-approvable letter in May 2004 and the August 26, 2005 decision to further withhold approval of Plan B for OTC use were opposed by the scientific review staff that would normally be responsible for making decisions approving drugs for OTC use.  CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the-Counter Drug Products, the Deputy Directors of the Offices of Drug Evaluation III and V, and the Director of the Office of New drugs all recommended that Plan B should be switched OTC for women of all ages.

**G.    Barr Laboratories Was Asked to File Another Amended Supplemental New Drug Application Seeking Further Arbitrary Age-Restricted OTC Status for Plan B, which Resulted in Plan B Remaining Behind-the-Counter and Available Without a Prescription Only For Some Persons 18 and Older.**

114.    On July 31, 2006, the day before Dr. Andrew von Eschenbach's Senate confirmation hearing, the FDA announced that it would work with Barr Pharmaceuticals to allow for OTC sales to persons 18 and older, hoping to "wrap[] up the process in a matter of weeks." (FDA Statement, dated July 31, 2006, http://www.fda.gov/bbs/topics/NEWS/2006/ NEW01421.html).

115.    Also on July 31, 2006, von Eschenbach wrote to Barr Pharmaceuticals and stated that while he would not approve Barr's request for OTC sales for those 16 and over, he would

reconsider allowing nonprescription sale of Plan B to persons 18 and older if the company met certain restrictions. This letter offered no explanation for the scientific or policy reasoning to support the line being drawn at the age of 18. (Letter from Andrew von Eschenbach M.D. to Joseph A. Carrado, dated July 31, 2006, http://www.fda.gov/oc/planb/duramed073106.html).

116.    On August 8, 2006, personnel from the Center for Drug Evaluation and Research met with Barr to discuss the restrictions outlined in von Eschenbach's July 31 letter, specifically with regard to nonprescription packaging for purchasers 18 and over.

117.    On August, 17, 18 and 23, 2006, Barr amended its application to reflect changes in compliance with von Eschenbach's proposed restrictions, specifically with regard to labeling and the Convenient Access Responsible Education (CARE) Program.

118.    In light of Barr's revised SNDA, the FDA again reviewed Plan B and again its medical reviewers confirmed that an age restriction for Plan B as an OTC drug is medically and scientifically unsupported.

119.    On August 22, 2006, Julie Beitz, M.D., Acting Director of the Center for Drug Evaluation and Research, stated: "This memo documents my view that there are sufficient data on the safety and effectiveness of Plan B to approve its use in the OTC setting without age-restriction. In the absence of new data to support an age-restriction, my conclusions as stated in my previous memos, dated April 2, 2004, and January 12, 2005, remain unchanged."

120.    On August 22, 2006, Charles J. Ganley, M.D., Director of the Office of Nonprescription Products (ONP), stated: "Previous reviews from the Division of Over-the-Counter Drug Products (DOTCDP) and Office of Drug Evaluation V (ODE V), signed by Dr. Rosebraugh and Dr. Bull, recommended the sale of Plan B over-the-counter without restrictions. DOTCDP and ODEV have evolved into the ONP. No new data was provided to suggest the

restriction based on age is necessary. Based on the previous findings . . . ONP continues to believe that restriction on access is not necessary."

121.    On August 22, 2006, John K. Jenkins, M.D., Director of the Office of New Drugs, stated: "As documented in my reviews dated April 28, 2004, and January 18, 2005, I believe the available data are adequate to support a conclusion that Plan B can be safely and effectively marketed as a nonprescription product for all women of child-bearing potential . . . I am not aware of any new data that supports an age restriction for OTC marketing of Plan B . . . I continue to recommend that Plan B be approved for OTC marketing without an age restriction."

122.    On August 23, 2006, von Eschenbach issued a memorandum that outlined his conclusions regarding the appropriateness of 18 as a cut-off age for OTC usage of Plan B.

123.    The August 23, 2006 von Eschenbach memorandum begins by stating that Barr Pharmaceuticals amended its SNDA to make the OTC switch applicable only to those 18 and older.

124.    The August 23, 2006 von Eschenbach memorandum states that in response to "the difficulty of enforcing an age-based restriction . . . I have concluded that 18 (rather than 17) is the more appropriate cutoff point . . ."

125.    There are no scientific or health related reasons for choosing 18 as a cutoff age. The only asserted basis for choosing 18 is because dispensers of Plan B " . . . (as well as society as a whole) are more familiar with 18 as a cutoff age."

126.    The August 23, 2006 memorandum purports to justify the 18 year old age cutoff by analogy to tobacco products. Tobacco products have proven and severe harmful health effects, including hundreds of thousands of deaths annually, on persons of all ages. There is no

Add-91

scientific evidence that Plan B has any serious side effects whatsoever, nor is any such evidence cited in this or any other FDA memorandum.

127.    The August 23, 2006 memorandum also purports to justify the 18 year old age cutoff by analogy to products containing pseudoephedrine. Such products have a demonstrated record of abuse, specifically as a compound used by illegal drug traffickers to manufacture methamphetamines, which are controlled substances. There is no evidence or even plausible scientific basis to believe that Plan B can be or is used to manufacture controlled substances, or that Plan B is abused in any way by any women, nor is any such evidence cited in this or any other FDA memorandum.

128.    On August 24, 2006, Steven Galson issued an approval letter to Barr, granting limited approval for nonprescription sales of Plan B to those who could provide government issued proof that they are 18 years of age or older, and adopting von Eschenbach's stated rationale for the age 18 cutoff.

129.    The FDA has therefore at long last admitted that it has rejected OTC status for Plan B.

130.    In March 1991, the FDA stated: "Some health professional organizations have petitioned FDA to establish a third class of drugs that would be available without prescription, but only through a pharmacist. Pharmacists would advise consumers about proper use of the drug and serve to identify problems that might arise. In 1974, in connection with an FDA monograph on OTC antacids, some pharmacy organizations commented that such a third class of drugs should be created. Others, including the Department of Justice, objected to a third class of drugs, stating that it would restrain competition, inconvenience the consumer, depart from U.S. economic policy, and cause price increases for the consumer with no attending benefit. FDA

33

concluded that 'no controlled studies or other adequate research data have been supplied to support the position that any class of OTC drugs must be dispensed only by pharmacists in order to ensure their safe use. . . . There is at this time no public health concern that would justify the creation of a third class of drugs to be dispensed only by a pharmacist or in a pharmacy." *See* "Rx to OTC: The Switch Is On," http://www.fda.gov/bbs/topics/CONSUMER/CN00012c.html.

131.    In its review of Barr's amended SNDA for limited OTC status for Plan B for women 16 and older, the FDA review staff, in addition to finding that the scientific data supported full OTC access for women of all ages, expressed strong concern over the regulatory precedent that approval of a dual prescription/nonprescription regime for Plan B would set and the possible unintended consequences of such a regime.  (Ex. I at 31026-27; Ex. G at 31031-32; Mem. of Julie Beitz, M.D., dated January 12, 2005 (attached hereto as Exhibit X) at 31085-31087; Ex. J at 31096-98).

132.    Plan B is the only nonprescription drug required by the FDA to be kept behind the pharmacy counter.  Prior to August 24, 2006, "behind-the-counter" status was not mandated by the FDA for any drug.  Thus, Plan B is the first nonprescription drug the FDA has ever mandated to be kept behind the counter.

133.    In Canada, where levonorgestrel is available behind-the-counter from pharmacists, some pharmacists exploited the behind-the-counter status of the drug to ask women invasive questions about their sexual activity before providing the drug.

134.    Numerous over-the-counter drugs available off the shelf in gas stations, convenience stores, drug stores, supermarkets and other points of sale have established records of misuse, abuse (including use as a means of committing suicide by overdose), and serious side effects.  In no case does the FDA mandate age-restricted sales or proof of age.

135.    Nicotine-replacement products are restricted as nonprescription products to persons over the age of 18, yet even these products, with proven harmful effects and serious side effects for certain high-risk populations, are not kept behind the pharmacy counter.

136.    Contrary to the stated policy concerns regarding enforceability of an age cutoff, the requisite labeling included in a package of Plan B, which states the actual scientific findings of the FDA, makes clear that there is no data evidencing a danger of overdosage or drug dependence with regard to Plan B.  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

137.    The labeling for Plan B states:  "Pediatric Use: Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older.  Use of Plan B & emergency contraception before menarche is not indicated."  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

**H.     FDA's Failure to Approve Plan B for Full OTC Use Constitutes Bad Faith and Improper Agency Action, and Treats Plan B Differently than Other Drugs Without Any Medical or Scientific Basis for that Differential Treatment.**

138.    The FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs.

139.    In the past ten years, Plan B is the only drug as to which the FDA has rejected advisory committee recommendations in favor of approving a drug for OTC status.

140.    In the past ten years, Plan B is the only drug as to which the FDA has requested additional data regarding adolescents.

141.    In the past five years, the FDA has approved several OTC switch applications without any label comprehension studies or actual use studies that included adolescents.

142.    There is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch for women of all ages.

143.    The FDA's failure to approve Plan B for OTC use by women of all ages is based in part on outmoded stereotypes of women and girls.

144.    For example, the FDA routinely extrapolates from data from one age group to draw conclusions about another age group.  Indeed, prior to the manufacturer's 2003 submission of its OTC switch application, FDA informed the manufacturer that it would not obtain an extension of its patent for Plan B by conducting extra pediatric studies, for such studies were rendered unnecessary because information about adolescents could be extrapolated from data for adults.  But Galson and his supervisors refused to implement this routine method as to Plan B.

145.    In addition, the FDA rejected the manufacturer's pediatric exclusivity for Plan B, specifically informing the manufacturer in April of 2002 that it could conduct its "proposed trials [of Plan B] in the adult population and the results extrapolated to the postmenarcheal pediatric population."  The FDA's subsequent rejection of extrapolation from studies in adult populations constitutes improper and bad faith agency action.

146.    The FDA's application of a different and higher standard to Plan B's OTC switch was the result of factors that fall outside the FDA's statutory mandate, including impermissible ideological factors, such as appeasement of the President's constituents.

147.    The FDA's rejection of the OTC switch for women of all ages is not supported by medical or scientific evidence and not supported by the agency record.

148.    The fact that upper-level management at FDA removed the decision of whether to approve Plan B's OTC application from the hands of the professional review staff, that upper-level management dictated the outcome of the review process, and that upper-level management

Add-95

deviated from the standard practices and policies set forth in their own manuals and handbooks, suggests that the FDA impermissibly held the Plan B OTC switch application to a higher standard than other drugs, and that doing so constitutes bad faith and improper agency action.

149.    Where upper level agency management made decisions regarding the status of the Plan B application before the scientific review process has been completed, such premature decision-making constitutes bad faith and improper action by an agency dedicated to promoting and protecting public health.

150.    The former FDA Commissioner Mark McClellan's destruction of email correspondence and refusal to cooperate with the GAO's investigation constitute bad faith and improper agency action.

151.    The record indicates that Barr's application was not actively reviewed after January of 2005, causing the seven month delay between the conclusion of the scientific review and any further agency action.  This was unreasonable and constituted bad faith and improper agency action.

152.    The fact that the Secretary of Health and Human Services (HHS) submitted a letter to the Senate assuring Senators that FDA would act on the OTC application for Plan B by September 1, 2005, but that the only action subsequently taken by the agency was to invite public comment on a proposed rulemaking proceeding, constitutes bad faith and improper agency action.

153.    The FDA's June 9, 2006 letter denying the Citizen Petition is evidence of bad faith and improper agency behavior.  First, it asserts that the FDA made a determination in 2001 that the Citizen Petition could not be approved, but this determination was never communicated to the petitioners.  Second, it asserts that the Citizen Petition filers cannot use evidence submitted

by Barr to support their Petition, but then relies on the Barr submissions extensively. Third, the letter contradicts statements made to the Court in December of 2005 by counsel for the Defendant to the effect that the Citizen Petition was still under active consideration by the FDA. Fourth, the letter is on its face a litigation document issued in direct response to this lawsuit rather than agency action taken in the ordinary course of agency business. For these and other reasons, the June 9, 2006, letter admitting denial of the Citizen Petition is evidence of improper and bad faith agency action.

154. The FDA's decision imposing "behind-the-counter" status for Plan B and controlling the point of sale of Plan B is unprecedented and discriminates against Plan B because it is a contraceptive drug and because it is used only by women without serving any compelling, significant, or even legitimate governmental interest. Indeed, by comparison to numerous OTC drugs available off the shelf and without any point-of-sale restriction, the FDA's restrictions on Plan B are invidious and contrary to public health. The selective imposition of a behind-the-counter regime for Plan B demonstrates improper agency action and bad faith.

155. The assertion by the Defendant that the FDA was adopting the "infrastructure" used by states to regulate tobacco products and applying it to Plan B demonstrates improper agency action and bad faith both because this adoption lacks any scientific or medical basis, and because the FDA's restrictions on Plan B have nothing other than the age of 18 in common with the infrastructure of state regulation of tobacco products.

156. The FDA's requirement of a prescription for Plan B for women aged 17 demonstrates improper agency action and bad faith because it lacks any scientific or medical basis and contradicts prior public statements by the FDA acknowledging the safety of Plan B as an OTC drug for women 17 and over.

157.    The FDA's August 24, 2006, action rejecting OTC status for Plan B and instead

imposing the BTC regime for Plan B specifically permits men 18 and over to buy Plan B without

a prescription even though there is no FDA-approved use of Plan B for men, and no scientific

data whatsoever about actual use or label comprehension by men is contained in the agency

record.  Permitting men 18 and over to buy Plan B without a prescription, even though there is

no medical evidence supporting any use by men of Plan B, while denying nonprescription status

for women under 18 despite extensive supporting scientific data, demonstrates that the FDA's

August 24, 2006 decision is based on stereotypes of young women and is utterly irrational.  It

also demonstrates that the FDA's recent action establishing an age-restricted behind-the-counter

dual prescription/nonprescription regime for Plan B is improper and was done in bad faith.

158.    The behind-the-counter regime is demeaning to and discriminates

invidiously against women of all ages because it poses unique barriers to access for a very safe

drug that can be used safely and effectively without a prescription by all women of childbearing

age while numerous other over-the-counter drugs are not subject to any such barriers, including

many for which use without a prescription is discouraged for persons below a certain age

because safe over-the-counter use by such younger age groups has never been established.

159.    No drug used only by men and no drug used by both sexes is subject to the same

behind-the-counter regime as Plan B.

160.    The timing of the FDA's August 24, 2006 age-restricted behind-the-counter dual

prescription/nonprescription regime for Plan B to coincide with the Senate confirmation hearing

of the acting commissioner of the FDA evinces improper and bad faith agency action.

161.    At his Senate confirmation hearing on August 1, 2006, the Defendant

demonstrated improper agency behavior and bad faith by misleading the Senate Committee on

Health, Education, Labor and Pensions in testifying that the age 18 cutoff he was requiring for Plan B was based on inadequate data about OTC use of Plan B for 17-year-olds and based on public comments submitted in response to the advanced notice of proposed rulemaking. His August 23, 2006 memorandum and a review of the comments submitted contradict these bases for the age 18 cutoff.

## V.    Causes of Action

### FIRST CAUSE OF ACTION: ARBITRARY AND CAPRICIOUS

162.    Plaintiffs hereby incorporate by reference ¶¶ 1-161 above.

163.    FDA's denial of the OTC switch for women of all ages and imposition of the BTC regime are arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(a) (2005) in that the FDA required evidence of safety and efficacy beyond that required for approval of any other drugs and was improperly motivated by factors other than medicine and science, and because the evidence of safety and efficacy before the FDA demonstrates that it should be made available without prescription without any further restriction.

### SECOND CAUSE OF ACTION: EXCEEDS STATUTORY AUTHORITY

164.    Plaintiffs hereby incorporate by reference ¶¶ 1-163 above.

165.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime exceed its statutory authority in violation of 5 U.S.C. § 706(2)(c) in that they were improperly motivated by factors other than medicine and science and in that the FDA lacks authority to control the point of sale of nonprescription drug products.

**THIRD CAUSE OF ACTION: RIGHT TO PRIVACY**

166.    Plaintiffs hereby incorporate by reference ¶¶ 1-165 above.

167.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it infringes the right to privacy of women who need Plan B without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

**FOURTH CAUSE OF ACTION: EQUAL PROTECTION**

168.    Plaintiffs hereby incorporate by reference ¶¶ 1-167 above.

169.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of sex without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

170.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of the exercise of the fundamental right to privacy to obtain contraception and to keep certain personal information private without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

**FIFTH CAUSE OF ACTION: INFORMATIONAL PRIVACY**

171.    Plaintiffs hereby incorporate by reference ¶¶ 1-170 above.

172.     FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the right to informational privacy for women who are required by the government to disclose their name, age, and address to private parties in order to obtain Plan B. This requirement does not serve and is not tailored to serve any compelling, significant, or legitimate governmental interest.

## VI.     Prayer for Relief

WHEREFORE, Plaintiffs ask this Court:

A.  To issue an injunction ordering Defendant to approve Plan B as an over-the-counter drug without age or point of sale restriction for women of all ages;

B.  To enter judgment declaring the denial of OTC status of Plan B to women of all ages in violation of the United States Constitution and 5 U.S.C. § 706; and

C.  To grant such other and further relief as this Court should find just and proper, including attorneys' fees and costs.

Dated: October 10, 2006.                    Respectfully submitted,

/s Simon Heller_____
SIMON HELLER (SH-8760)
NAN STRAUSS (NS-3501)
VIVIEN LABATON (VL-1747)
SANFORD COHEN (SC-6601)
Center for Reproductive Rights
120 Wall Street, 14th Fl.
New York, NY 10005
Telephone: (917) 637-3600
Facsimile: (917) 637-3666

ATTORNEYS FOR ALL PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

Add-102

## CERTIFICATE OF SERVICE

I, Simon Heller, hereby certify that on October 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification via electronic mail to F. Franklin Amanat.

Dated: October 10, 2006.

Respectfully submitted,

/s Simon Heller
SIMON HELLER (SH-8760)
NAN E. STRAUSS (NS-3501)
VIVIEN LABATON (VL-1747)
SANFORD COHEN (SC-6601)
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

ATTORNEYS FOR ALL PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel, Inc.
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

ANNIE TUMMINO, in her individual capacity, as an
organizer with National Women's Liberation, and on
behalf of women who need Emergency Contraception;
ERIN T. MAHONEY, in her individual capacity, as an
organizer with National Women's Liberation, and on
behalf of women who need Emergency Contraception;
CAROL GIARDINA, in her individual capacity, as an
organizer with National Women's Liberation, and on
behalf of women who need Emergency Contraception;
KELLY MANGAN, in her individual capacity, as an organizer
with National Women's Liberation, and on behalf of
women who need Emergency Contraception; STEPHANIE
SEGUIN, in her individual capacity, as an organizer with
National Women's Liberation, and on behalf of women
who need Emergency Contraception; LORI TINNEY, in her          CV-12-0763 (ERK/VVP)
individual capacity, as an organizer with National
Women's Liberation, and on behalf of women who need
Emergency Contraception; JENNIFER BROWN, in her
individual capacity, as an organizer with National
Women's Liberation, and on behalf of women who need
Emergency Contraception; CANDACE CHURCHILL, in her
individual capacity, as an organizer with National
Women's Liberation, and on behalf of women who need
Emergency Contraception; and FRANCIE HUNT, as an
organizer with National Women's Liberation, and on
behalf of women who need Emergency Contraception;
ASSOCIATION OF REPRODUCTIVE HEALTH PROFESSIONALS,
on its own behalf and on behalf of its members and women
who need Emergency Contraception; and NATIONAL
LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, on its own
behalf and on behalf of women who need Emergency
Contraception; ROBERT JAFFE; AURORA DEMARCO;
ANGELICA JAFFE; CATHERINE LEDERER-PLASKETT; ALIZA
LEDERER-PLASKETT; JONATHAN MARKS; GABRIELLE
MARKS; TRACY GAFFIN; ANAYA KELLY by and through her
next friend AMBER KELLY,

                              Plaintiffs,

v.

Add-104

Margaret Hamburg, in her official capacity as
Commissioner of Food and Drugs; Kathleen Sebelius, in
her official capacity as Secretary of the Department of
Health and Human Services,

Defendants.

-----------------------------------------------------------------------X

## SECOND AMENDED SUPPLEMENTAL COMPLAINT

Plaintiffs, by and through their undersigned attorneys, hereby further supplement their
Fifth Amended Complaint, and in support thereof aver the following:

1. Plaintiffs file this supplemental complaint to set forth events that have occurred since
this Court issued its March 2009 Order granting summary judgment in Plaintiffs' favor, and to
challenge Defendants' actions on remand following that Order as arbitrary and capricious in
violation of 5 U.S.C. § 706(2)(A).

2. The FDA's treatment of requests for over-the-counter access to emergency
contraception, both before and after this Court's March 2009 Order, is a tale of unwarranted
delays, denials, and departures from normal procedures.  It is also a quintessential example of
continuing to move the goalposts so that the desired goal—unrestricted over-the-counter access
to a safe and effective emergency contraception product—can never be attained.

3. The evidence of safety and efficacy of emergency contraception, which has been
before the FDA for more than a decade, demonstrates that it should be made available without
prescription, or other restrictions, to all women.

4. In its March 2009 Order, this Court granted Plaintiffs' motion for summary judgment
and vacated the FDA's denial of a Citizen Petition seeking over-the-counter access to emergency
contraception on the basis that the agency had acted in bad faith and in an arbitrary and

2

capricious manner. Since then, Defendants have engaged in similar—and in some instances exactly the same—behavior that caused this Court to remand the matter in the first place.

5. Defendants' bad faith actions, including their establishment and maintenance of an age-restricted, behind-the-pharmacy-counter, dual prescription/nonprescription regime for emergency contraception, have caused and continue to cause significant harm to Plaintiffs and the public.

6. Plaintiffs seek: (a) immediate and permanent injunctive relief requiring Defendants to permit all levonorgestrel-based emergency contraception products to be made available to women of all ages without a prescription; (b) a declaratory judgment that the FDA's actions on remand with respect to the Citizen Petition and the Plan B One-Step supplemental new drug application, including but not limited to the denial of both, violated the Administrative Procedures Act; and (c) such other equitable relief as the Court may deem appropriate.

## I. Parties

### A. Plaintiffs

7. Plaintiffs Tummino, Mahoney, Giardina, Mangan, Seguin, Tinney, Brown, Churchill and Hunt were previously Coordinators with The Morning-After Pill (MAP) Conspiracy. From February 2004 until around early 2009, the MAP Conspiracy was a coalition of feminist organizations leading the grassroots movement to make the Morning-After Pill an over-the-counter drug by raising public consciousness about the ways that women have to conspire to obtain it. The MAP Conspiracy organized speak-outs where women publicly testify from their own experience about their need for the Morning-After Pill and the obstacles they face obtaining it. Members of the MAP Conspiracy also testified at the December 2003 FDA public hearings on the Barr application for approval of over-the-counter status for Plan B.

3

8.   After 2009, The MAP Conspiracy was folded into National Women's Liberation (NWL).  NWL is a national feminist group with several priority areas that include the fight for unrestricted access to birth control and abortion for all women regardless of age. Since 2009, Plaintiffs Tummino, Mahoney, Giardina, Mangan, Seguin, Tinney, Brown, Churchill and Hunt have continued their feminist organizing to lead the grassroots movement to make the Morning-After Pill an over-the-counter drug through their work as organizers in National Women's Liberation (NWL).  Plaintiffs' organizing, through NWL, with regard to the Morning-After Pill consists of, *inter alia*, raising public consciousness about why women need the Morning-After Pill, organizing speak-outs where women publicly testify from their own experience about their need for the Morning-After Pill and the obstacles they face obtaining it and petitioning the FDA and HHS to make all forms of emergency contraception available OTC without any restrictions.

9.   Plaintiff Tracy Gaffin is a resident of Miami, Florida, and is the mother of two daughters aged 14- and 12-years-old, respectively, and a son aged 9-years-old.   She sues on behalf of herself and her children under the age of 17 because she wants her children, in particular her daughters, to be able to obtain emergency contraception without prescription and without any restriction on its point of sale so as to maximize the likelihood they will avoid unwanted pregnancy.

10. Plaintiff Anaya Kelly is a resident of Gainesville, Florida and is 14-year old young woman.  She sues on behalf of herself through her next friend and mother, Amber Kelly, because she wants to be able to obtain emergency contraception without prescriptions and without any restriction on its point of sale so as to maximize the likelihood that she, and all other women, will avoid unwanted pregnancy.

### B. Defendants

11. Margaret A. Hamburg, M.D. is the Commissioner of Food and Drugs, top official of the Food and Drug Administration (FDA). (Andrew C. von Eschenbach is no longer acting commissioner). Hamburg is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation. She is also responsible for advancing the public health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and helping the public get the accurate, science-based information they need to use medicines and foods to improve their health. She is sued in her official capacity.

12. Kathleen Sebelius is the Secretary of the Department of Health and Human Services ("HHS"). Secretary Sebelius has asserted that she, as the person "responsible for executing" the Federal Food, Drug, and Comestic Act, has authority to overrule FDA drug approval decisions and to make final decisions regarding the over-the-counter availability of emergency contraception. She participated in and directed FDA actions that Plaintiffs claim were arbitrary and capricious. She is sued in her official capacity.

## II. Factual Allegations

### A. Background

13. In 2001, Plaintiff Association of Reproductive Health Professionals and sixty-five other organizations filed a Citizen Petition asking the FDA, in relevant part, to switch Plan B, a levonorgestrel-based emergency contraception product, and all and any new drug eligible for filing an abbreviated new drug application because of its equivalence to Plan B, from prescription-only to over-the-counter ("OTC") status.

14. During the same period, the manufacturer of Plan B submitted a series of supplemental new drug applications ("SNDAs") in an attempt to have that drug switched to OTC status.

15. As far back as 2001, the FDA noted that the Citizen Petition met the criteria for unrestricted OTC availability and was supported by scientific data.

16. Numerous studies, including label comprehension and actual use studies, provided more than enough data to support the conclusion that all women, regardless of age, could understand the Plan B label and use the product safely and effectively without consultation with a practitioner.

17. The FDA, however, denied the Citizen Petition in 2006, claiming, *inter alia*, that it did not contain sufficient data to show that Plan B could be used safely and effectively by women under the age of 17. The FDA also denied two SNDAs from the drug sponsor requesting an OTC switch, claiming that there was insufficient data regarding adolescents.

18. The FDA eventually granted an SNDA in 2006, partially approving Plan B for OTC status, but with an unprecedented regime that required women under 18 to obtain a prescription for the product, Plan B to be sold only in pharmacies and health clinics, the drug to be kept behind the counter, and consumers to present government-issued identification to obtain the product (the "BTC regime").

19. In 2005, Plaintiffs filed this lawsuit, challenging, *inter alia*, the FDA's arbitrary and capricious actions and seeking to end the agency's refusal to follow the scientific evidence showing that OTC status is appropriate for Plan B.

**B.      This Court's March 2009 Order and Subsequent FDA Actions in Response**

20. On March 23, 2009, this Court granted summary judgment in Plaintiffs' favor (the "Order"), holding that the FDA's denial of the Citizen Petition's request for unrestricted OTC status for emergency contraception and its denials of successive applications from the Plan B drug sponsor violated the Administrative Procedures Act because these decisions were made in bad faith and were arbitrary and capricious. *Tummino v. Torti*, 603 F. Supp. 2d 519, 542, 544-49 (2009).

21. This Court found that the FDA's decision on Plan B was not the result of good faith decision making, took political considerations into account, had implausible justifications, and departed in significant ways from the agency's normal procedures for requested OTC switches.

22. Some of the departures from normal agency procedures the Court noted were: FDA upper management wresting control over the decision-making process from staff that normally would issue the final decision; the FDA denying full OTC access without age restriction against the recommendation of the scientific review staff; FDA staff discussing the OTC switch with the White House; and, the FDA insisting on additional data for adolescents even though data on adolescents already existed and the FDA had a long history of extrapolating data from adults to adolescents, particularly with respect to contraception.

23. The Court found that the FDA's stated concerns about the inadequacy of data available for young adolescents and its focus on adolescent cognitive development in its evaluation of Plan B as an OTC drug, which resulted in a decision to approve OTC use of Plan B with an age restriction stemmed from political pressure rather than permissible health and safety concerns.

7

24. Based on these findings, the Court ordered the FDA to permit the Plan B drug sponsor to make Plan B available to 17 year olds without a prescription, under the same conditions that Plan B was then available to women over the age of 18.  It further vacated the FDA's denial of the Citizen Petition and remanded the matter for reconsideration of the Citizen Petition and consideration of whether to approve Plan B for OTC status without age or point-of-sale restrictions.

25. The FDA complied with the portion of the Order requiring it to change the age cutoff from 18 to 17 within 30 days.  It refused, however, to comply with the remainder of the Order.

26. Indeed, following remand from this Court, Defendants have continued to engage in arbitrary and capricious actions; Defendants  have ignored science and allowed politics to control the decision making regarding emergency contraception.

**C.      The FDA's Plan for Complying with the Court Order to Reconsider the Citizen Petition Was Arbitrary and Capricious**

27. For over two and a half years, the FDA refused to take any steps to reconsider the Citizen Petition.   It argued that it could comply with the Court's Order by waiting indefinitely for and ruling on a drug application for a related levonorgestrel-based emergency contraception product (Plan B One-Step), while at the same time refusing to apply the data from that application to the Citizen Petition.

28. This plan was made in bad faith, depriving Plaintiffs of a fair and honest consideration of the Citizen Petition.

29. Even if approval of the Plan B One-Step SNDA had been assured at the time the FDA made this plan, such action would still have deprived Plaintiffs of fair and honest consideration of the Citizen Petition.

30. Ruling on the Citizen Petition would have paved the way for full OTC status not only of Plan B, but of two levonorgestrel-based emergency contraception generic products currently marketed, as well as any new generics.

31. In contrast, approval of the Plan B One-Step SNDA would permit full OTC status only for Plan B One-Step, and prohibit other emergency contraception products from being available OTC for three years.

32. The FDA's admission that it planned to indefinitely ignore the Court's Order to reconsider the Citizen Petition prompted Plaintiffs to move for contempt.

### D. The FDA's Denial of the Plan B One-Step SNDA Was Arbitrary and Capricious

33. In February of 2011, the Plan B One-Step sponsor submitted an SNDA, including supporting studies, seeking to make One-Step OTC for all ages.

34. In communications that began years before this submission, the FDA informed the drug sponsor that it must include new adolescent-specific data with its SNDA.

35. The Plan B One-Step's drug sponsor bowed to the FDA's demands, worked closely with the FDA in devising studies, and conducted studies in which 680 adolescents participated. The studies included a sample of subjects that allowed the researchers to conclude that the target population of the SNDA is able to correctly use emergency contraception in an OTC setting.

36. The data that was submitted to the FDA in support of the Plan B One-Step SNDA confirms what the previous studies regarding Plan B showed—that emergency contraception is safe and effective for women of all ages when self-administered. In particular, the actual use study on Plan B One-Step found that teens of all ages are capable of understanding the indications for emergency contraception and using it correctly.

37. On December 7, 2011, Dr. Margaret Hamburg, Commissioner of Food and Drugs, issued a statement in which she announced that the FDA's Center for Drug Evaluation and Research ("CDER") had completed its review of the Plan B One-Step SNDA. The statement set forth key conclusions that had been reached based on the data submitted, including that adolescent females could use Plan B One-Step properly without the intervention of a healthcare provider. She explained that CDER experts agreed that Plan B One-Step had met the OTC standards and should be approved for all women of child-bearing potential, and that her independent review confirmed that Plan B One-Step should be approved for OTC use without age restrictions.

38. On the same day, for apparently what is the first time, the Secretary of Health and Human Services, Defendant Kathleen Sebelius, asserted authority to overrule an FDA drug approval decision. She directed the FDA to deny Plan B One-Step's SNDA, stating that she "carefully considered FDA's Division Director Summary Review of Regulatory Action,," and, that based on that review, she "concluded that the data submitted for this product do not establish that prescription dispensing requirements should be eliminated for all ages."

39. In a public statement, Defendant Sebelius stated that the studies submitted with the SNDA "did not contain data for all ages for which this product would be available for use." She noted that "it is commonly understood that there are significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age, which I believe are relevant to making this determination." Defendant Sebelius specifically noted that 10% of girls start menstruating at age 11.

40. Prior to Defendant Sebelius issuing her directive, there were communications between the White House Staff and her or her staff about the potential OTC switch for Plan B One-Step.

41. The actions and reasoning leading to the ultimate denial of the Plan B One-Step SNDA mirror the actions and reasoning that led to the denials of the earlier switch applications for Plan B that prompted this Court to rule that the agency's actions were arbitrary and capricious and taken in bad faith.

42. Actual use studies consider the way that the target population of a particular product will use that product. The actual use studies for Plan B One-Step did not include any 11 and 12 year olds because so few 11 and 12 year olds ever use emergency contraception. Even if the studies had included the rare 11 year old who seeks emergency contraception, no conclusions could be drawn about 11 year olds as a group given the incredibly small number of users that age.

43. The FDA typically does not require subjects of any particular age to be included in actual use studies. Indeed, it is unusual for actual use and label comprehension studies to include persons under 18. In fact, the FDA has a long history of extrapolating findings from clinical trials in older patients to adolescents.

44. A determination of whether a switch to OTC of a drug like Plan B is appropriate is normally handled at the Office Director level within the FDA and would not require approval or sign-off by a higher level official such as the Commissioner of Food and Drugs or the Secretary of Health and Human Services.

45. Decisions regarding OTC switches are not normally discussed with the White House.

Add-114

46. When the agency has not been confident of the applicability of manufacturers' studies in OTC switches to younger consumers, it has required a label warning, rather than an age restriction or outright denial.

47. There is no justification for why the review of the Plan B One-Step SNDA differed in so many significant ways from the review of other switch applications.

**E. The Second Denial of the Citizen Petition Was Arbitrary and Capricious**

48. Although the FDA had previously indicated to the Court that it would indefinitely defer reconsidering or ruling on the Citizen Petition because it believed a decision on Plan B One-Step SNDA would satisfy the Court's Order, it issued a denial of the Citizen Petition hours before argument on Plaintiffs' motion for contempt.

49. In remanding to the FDA to reconsider its decision on the Citizen Petition, this Court expressed trust that the newly appointed FDA leadership would "conduct a fair assessment of the scientific evidence." But the FDA chose to do no assessment whatsoever of the data related to the Citizen Petition and Plan B.

50. Rather, it drew conclusions about and denied the Citizen Petition regarding Plan B based on its review of the Plan B One-Step SNDA. According to the FDA: "[a]s a scientific matter, if additional data regarding the OTC use by younger women were needed for Plan B One-Step, that type of data would also be needed for Plan B, but those Plan B One-Step studies would not be transferable to Plan B. Instead, there would need to be new studies conducted using Plan B and its labeling, because it has more complicated directions for use." The FDA concluded that the One-Step data was indeed necessary, and therefore that such additional data would be necessary to grant the Citizen Petition.

51. Years before the Plan B One-Step SNDA was submitted, however, the FDA had already concluded that additional data were necessary for the SNDA and communicated that conclusion to the Plan B One-Step sponsor.

52. Thus, the FDA's chosen course of action reveals a preordained determination that the FDA would not grant the Citizen Petition. Before the Plan B One-Step SNDA was even filed, the FDA had already determined that eventually it would: (a) deem the Plan B One-Step adolescent-specific data to be necessary; and (b) use that determination to conclude that the data supporting the Citizen Petition was insufficient.

53. The FDA further based its second denial on the vacated first denial, specifically the 2005 determination that the Citizen Petition/Plan B files could not support an OTC switch because of insufficient data on adolescents. These were the very findings that the Court had found to be infiltrated with politics, taken in bad faith, and arbitrary and capricious.

54. The FDA failed to give the Citizen Petition fair and honest consideration and departed from normal agency procedures by: (a) refusing to review the existing Citizen Petition/Plan B files to determine, *inter alia*, if sufficient data exists to support an OTC switch for all age groups; (b) denying the petition on the basis of determinations made regarding another product; and, (c) insisting on additional teen-specific data in support of the requested OTC switch.

55. There is no justification for such departures.

56. Moreover, the FDA's reasoning for denying the Citizen Petition for lack of additional, teen-specific data focusing on the two-pill nature of Plan B is simply implausible.

57. That the FDA deems a difference in dosage from one pill to two so "complicated" as to necessitate additional studies is simply not credible.

58. There are no specific documents or information that must be submitted with an OTC switch request. Actual use and label comprehension studies are not always required, particularly if a drug has previously been approved for OTC use, like levonorgestrel-based EC has been—in two-pill form—since 2006.

59. Moreover, the FDA has had sufficient evidence, including actual use and label comprehension studies that contained data on adolescents, to make emergency contraception available OTC for women of all ages since it began consideration of the matter. The data shows that there is no scientific basis for a distinction between adults and adolescents. This information is further supported by research on the oral contraceptive pill, which is arguably the most extensively studied medication in the history of pharmaceuticals.

### F. The Stark Contrast Between the FDA's Treatment of Emergency Contraception and Other OTC Switch Requests

60. Despite the abundance of evidence supporting OTC status for emergency contraception for women of all ages, the FDA has repeatedly stated that it does not believe sufficient evidence exists.

61. In contrast, it is rare for label comprehension and actual use studies to contain data on adolescents *at all*, and the FDA has granted OTC status to numerous drugs without such studies and with studies that do not contain data on adolescents.

62. The FDA has also approved OTC switches for numerous prescription drugs and classes of prescription drugs that could cause more severe side effects, even when they are used according to approved directions, than could the correct, or even incorrect, use of Plan B. Many of those unrestricted OTC drugs pose special risks for certain populations, including certain age groups.

Add-117

63. Moreover, the FDA has approved full OTC switches for numerous prescription drugs and classes of prescription drugs whose directions for approved use are far more complicated than the directions for Plan B.

64. Ten years of delays, bad faith, political calculations and implausible reasoning demonstrates that efforts to make emergency contraception available OTC and unrestricted have not and will never be considered by the FDA in a fair, scientifically-based manner.

### G. Harms Perpetuated by the FDA's Unprecedented Actions and Continuation of BTC Regime

65. All three levonorgestrel-based emergency contraception products currently marketed in the United States are governed by the unprecedented FDA-imposed BTC regime. Two of them are generic equivalents to Plan B: Next Choice and a product made by Perrigo R and D. Each of these products consists of two pills of 0.75 mg of levonorgestrel each, which the drugs' label directs women to take twelve hours apart. The manufacturer of Plan B no longer markets Plan B; since 2009, it has marketed Plan B One-Step, which is a single pill with 1.5 mg of levonorgestrel.

66. The FDA-mandated BTC regime imposes significant barriers and harms on consumers of emergency contraception, even those consumers who should be able to purchase it OTC. The FDA's delays and repeated arbitrary and capricious actions with respect to emergency contraception have perpetuated those harms. For example, permitting the product to be available only at pharmacies and health clinics imposes practical obstacles to access. Some consumers do not live near such businesses. Moreover, because pharmacies usually have limited hours, consumers who attempt to buy emergency contraception at certain times can face significant delay.

Add-118

67. The requirement that consumers show government-issued identification also creates a potentially insurmountable barrier for the many consumers who do not have such identification. It also has the effect of requiring consumers to reveal their identity in order to purchase a product, implicating privacy concerns.

68. In addition, the BTC regime is complicated and unique, and many pharmacists implement it incorrectly in ways that block consumers' access. A recent study found that a 17-year-old attempting to buy EC faces an approximately one-in-five chance of being given the incorrect information that she cannot obtain the drug without a prescription because of her age. And pharmacists are more likely to misinform young women about the age cutoff in low-income neighborhoods, perpetuating a pattern of poor access to health care for low-income populations.

69. The cumulative effect of the barriers erected by the BTC regime undoubtedly prevents some women from accessing the drug in the short time window in which it is effective, thereby exposing them to an increased risk of unwanted pregnancy and frustrating the very purpose of OTC access. As a public health issue, the adverse effect of the dual-label status in limiting access to emergency contraception is more detrimental to adults than younger patients because the vast majority of women who need emergency contraception are adults.

70. Plaintiffs face irreparable harm if they are not afforded immediate injunctive relief permitting drug sponsors to make levonorgestrel-based emergency contraception available OTC without restrictions.

71. The public interest weighs in favor of immediate injunctive relief.

72. Neither the FDA, nor the public, benefits from keeping in place barriers to women trying to access a safe method of birth control that must be taken as soon as possible to prevent an unwanted pregnancy.

III.    **Causes of Action**

## FIRST CAUSE OF ACTION: ARBITRARY AND CAPRICIOUS

73. Plaintiffs hereby incorporate by reference ¶¶ 1-70 above and Plaintiffs' Fifth Amended Complaint.

74. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).  Among other violations, Defendants:

   a)  acted in bad faith;

   b)  were improperly motivated by factors other than medicine and science;

   c)   repeated the same departures from its normal procedures that this Court previously found arbitrary and capricious;

   d)  required evidence of safety and efficacy for emergency contraception beyond that required for approval of any other drugs;

   e)  offered explanations for its decisions that run counter to the evidence before it;

   f)  offered explanations so implausible that it could not be ascribed to a difference in view or the product of agency expertise; and,

   g)  failed to provide a fair and honest consideration of the Citizen Petition.

## SECOND CAUSE OF ACTION: EXCEEDS STATUTORY AUTHORITY

75. Plaintiffs hereby incorporate by reference ¶¶ 1-72 above and Plaintiffs' Fifth Amended Complaint.

76. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition, exceed the FDA's statutory authority in violation of 5 U.S.C. § 706(2)(C) in that they were improperly motivated by factors other than medicine and science and in that the FDA lacks authority to control the point of sale of nonprescription drug products.

## THIRD CAUSE OF ACTION: RIGHT TO PRIVACY

77. Plaintiffs hereby incorporate by reference ¶¶ 1-74 above and Plaintiffs' Fifth Amended Complaint.

78. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition, violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(B) in that these actions infringe on the right to privacy of Plaintiffs and women who need emergency contraception without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

## FOURTH CAUSE OF ACTION: EQUAL PROTECTION

79. Plaintiffs hereby incorporate by reference ¶¶ 1-76 above and Plaintiffs' Fifth Amended Complaint.

80. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition, violate the Fifth Amendment to the United States

Constitution and 5 U.S.C. § 706(2)(B) in that these actions discriminate on the basis of sex without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

81. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition, violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that these actions discriminate on the basis of the exercise of the fundamental right to privacy to obtain contraception and to keep certain personal information private without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

**FIFTH CAUSE OF ACTION: INFORMATIONAL PRIVACY**

82. Plaintiffs hereby incorporate by reference ¶¶ 1-79 above and Plaintiffs' Fifth Amended Complaint.

83. Defendants' actions upon remand, including the plan for complying with this Court's Order requiring it to reconsider the Citizen Petition by reviewing the Plan B One-Step SNDA, the execution of that plan (consideration and denial of the Plan B One-Step SNDA), and the 2011 denial of the Citizen Petition, violate the right to informational privacy for Plaintiffs and women who are required by the government to disclose their name, age, and address to private parties in order to obtain Plan B.  This requirement does not serve and is not tailored to serve any compelling, significant, or legitimate governmental interest.

**IV.  Prayer for Relief**

WHEREFORE, Plaintiffs ask this Court:

19

84. To enter judgment declaring the FDA's actions on remand with respect to the Citizen Petition and the Plan B One-Step SNDA, including but not limited to the denial of both, in violation of 5 U.S.C. § 706;

85. To issue both a preliminary injunction and permanent injunction ordering Defendants to permit, within 30 days, the drug sponsors of Plan B One-Step, Plan B, Next Choice, Perrigo R and D's Levonorgestrel Tablets, and any drug eligible for filing an abbreviated new drug application because of its equivalence to Plan B or Plan B One-Step, to make the above-referenced products available over-the-counter without age or point of sale restrictions; and,

86. To grant such other and further relief as this Court should find just and proper, including attorneys' fees and costs.

Dated: May 23, 2012

Respectfully submitted,

/s/ Suzanne Novak

**SUZANNE NOVAK**
**JANET CREPPS***
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

*Attorneys for all Plaintiffs*

**ANDREA COSTELLO***∞
Partnership for Civil Justice Fund
617 Florida Avenue, NW
Washington, D.C. 20001
(202) 232-1180 (phone)
(202) 747-7747 (fax)
ac@justiceonline.org

**KIRSTEN CLANTON***
Southern Legal Counsel, Inc.
1229 NW 12th Ave.

20

Gainesville, FL 32601
(352) 271-8890

*Attorneys for Plaintiffs Tummino, Mahoney,*
*Giardina, Mangan, Seguin, Tinney, Brown*
*Churchill, Hunt and Kelly*

**JANICE MAC AVOY**
**RACHEL G. KRAVITZ**
**SONYA TIEN**
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
(212) 859-8000

*Of Counsel*

\*Admitted *pro hac vice*
∞Admission to D.C. Bar pending. Member of the
Bars of Florida and New York. Practicing under
supervision of a member of the District of Columbia
Bar.

21

Add-124

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANNIE TUMMINO, *et al.*,

                 Plaintiffs,                        **<u>MEMORANDUM & ORDER</u>**

            - against -                       No. 12-CV-763 (ERK)(VVP)

MARGARET HAMBURG, Commissioner
of Food and Drugs, *et al.*

                 Defendants.

----------------------------------------------------------------X

KORMAN, J.:

## I. OVERVIEW

      Plan B and Plan B One-Step are emergency contraceptives that can be taken to reduce the risk of pregnancy after unprotected intercourse. In 1999, Plan B became the first emergency contraceptive drug approved for prescription-only use in the United States. In 2006, the Food and Drug Administration ("FDA") approved non-prescription access to Plan B for women 18 and older, and with a prescription to adolescents under the age of 18. Subsequently, the FDA was ordered to make it available without a prescription to adolescents aged 17. *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009). Even for women 17 and older, Plan B can only be purchased at a pharmacy and requires government-issued proof of age. Plan B One-Step was approved by the FDA in 2009 and is available without a prescription subject to the same restrictions. Though Plan B itself is no longer marketed, generic versions are available.

      Both contraceptives contain the same total dose of levonorgestrel, a synthetic hormone similar to the naturally occurring hormone progesterone; Plan B consists of two pills containing 0.75 mg each of levonorgestrel that are to be taken 12 hours apart, while Plan B One-Step

1

consists of one pill containing 1.5 mg of levonorgestrel. Studies have shown that combining the two 0.75 mg doses of the hormone into one pill does not decrease its effectiveness; indeed, the two Plan B pills may be taken simultaneously, fewer than 12 hours apart, or up to 24 hours apart, without any adverse consequences. Both Plan B and Plan B One-Step are most effective when taken immediately after intercourse and preferably no later than 24 hours later, though they may retain some effectiveness if taken within 72 hours. Neither drug has any known serious or long-term side effects, though they may have some mild short-term side effects, such as nausea, fatigue, and headache.

Levonorgestrel-based emergency contraception "interferes with prefertilization events. It reduces the number of sperm cells in the uterine cavity, immobilizes sperm, and impedes further passage of sperm cells into the uterine cavity. In addition, levonorgestrel has the capacity to delay or prevent ovulation from occurring." U.S. Gov't Accountability Office, GAO-06-109, *Food and Drug Administration: Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual* at 12 (November 2005), Case No. 05-cv-366, Doc. No. 68-2 (hereinafter "GAO Report").[1] These contraceptives "have not been shown to cause a postfertilization event—a change in the uterus that could interfere with implantation of a fertilized egg." *Id.* at 13. Indeed, Diana Blithe, the biochemist who supervises research on contraception at the National Institutes of Health ("NIH"), opined that the possibility of levonorgestrel-based emergency contraceptives having an effect on implantation of fertilized eggs should "definitely" be taken off the labels for those drugs. Pam

---

[1] Citing H.B. Croxatto et al., *Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: A Review of the Literature*, 63 Contraception, 111 (2001); H.B. Croxatto et al., *Pituitary-Ovarian Function Following the Standard Levonorgestrel Emergency Contraceptive Dose or a Single 0.75-mg Dose Given on the Days Preceding Ovulation*, 70 Contraception 442 (2004); A.L. Muller et al., *Postcoital Treatment with Levonorgestrel Does Not Disrupt Postfertilization Events in the Rat*, 67 Contraception 415 (2003); H.B. Croxatto et al., *Mechanisms of Action of Emergency Contraception*, 68 Steroids 1095 (2003).

2

Belluck, *Abortion Qualms on Morning-After Pill May Be Unfounded*, N.Y. Times, June 6, 2012, at A1.  Consistent with this position, the NIH removed statements regarding emergency contraception's possible effect on implantation from its website.  *Id.*  Nevertheless, because it would be "unethical and logistically difficult to conduct the necessary research" to conclusively establish that levonorgestrel-based contraceptives do not interfere with implantation, "the possibility of a postfertilization event cannot be ruled out."  GAO Report at 13.  Presumably for this reason, the FDA-approved label for Plan B and its generic equivalents still suggests, without affirmative evidence, that "Plan B may also work by preventing fertilization of an egg . . . or by preventing attachment (implantation) to the uterus (womb)."

Plaintiffs in this case—organizations and individuals concerned with women's health, as well as minors and their parents—seek to expand the availability of Plan B and all emergency contraceptives.  This action was originally brought in January 2005 to challenge the FDA's denial of a Citizen Petition seeking over-the-counter ("OTC") access to Plan B for women of all ages.  The complaint asserted that the FDA's denial of the Citizen Petition, which it considered along with a number of proposals regarding over-the-counter access to emergency contraception submitted by Plan B's sponsor,[2] was arbitrary and capricious because it was not the result of reasoned and good faith agency decision-making.  In a prior opinion, I concluded that the plaintiffs were right.  *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009).[3]  In light of the overwhelming evidence of political pressure underlying the agency's actions, I vacated the

---

[2] Plan B was originally manufactured by Women's Capital Corporation, who later sold its right to market Plan B to Barr Pharmaceuticals, Inc.  Barr was acquired by Teva Pharmaceuticals in 2008; Teva then took over the marketing of Plan B and developed the marketing for Plan B One-Step, which was approved by the FDA in 2009.  For clarity I refer to these companies collectively as "Plan B's manufacturer," "the Plan B sponsor," or "the Plan B One-Step sponsor" although, as noted above, Plan B itself is no longer marketed.

[3] I also addressed and rejected the argument of the defendants that plaintiffs lacked standing.  *Tummino*, 603 F. Supp. 2d at 539-542.  I rejected this argument again when I denied the defendants' motion to dismiss in a hearing on April 27, 2012.  Subsequently, the plaintiffs filed the current amended complaint, which adds as parties adolescents who are currently under 17 in place of those who aged out while the FDA dragged its heels in deciding the petition.  I have nothing to add to my earlier discussion of this issue.

3

Add-127

FDA's denial of the Citizen Petition and remanded for the agency to exercise its discretion without impermissible political intrusion. I also directed the FDA to make Plan B available to 17-year-old women without a prescription, because the same evidence relied on by the agency to support over-the-counter access to the drug by 18-year-olds applied equally to 17-year-olds—a holding which the FDA ultimately conceded was "consistent with the scientific findings [the FDA] made in 2005." FDA Statement, *Updated FDA Action on Plan B (levonorgestrel) Tablets* (Apr. 22, 2009).

The plaintiffs argued that the ultimate relief they sought—over-the-counter access regardless of age—should have been granted without a remand because "the agency has acted so improperly and in such bad faith that it cannot be trusted to conduct a fair assessment of the scientific evidence." Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 9, Case No. 05-cv-366, Doc. No. 257. I rejected this argument, although I agreed with the plaintiffs that the FDA bowed to political pressure emanating from the White House and departed from agency policy. I declined to grant the relief plaintiffs requested for two principal reasons. First, the Commissioner of the FDA had resigned and his replacement, as well as a new Deputy Commissioner, had been nominated by the newly elected President. This change in leadership suggested that the FDA could be "trusted to conduct a fair assessment of the scientific evidence." *Id.* Second, it was my view that the decision whether to make Plan B available without a prescription regardless of age was one that should be made by the FDA, to which Congress had entrusted the responsibility, and not by a federal district judge.

The FDA did not rule on the remanded Citizen Petition for almost three years. During this time, the agency again considered a proposal—referred to as a supplemental new drug application ("SNDA")—from Plan B's manufacturer; this proposal would have allowed over-

4

Add-128

the-counter access to Plan B One-Step, the one-pill emergency contraceptive product, for all ages. The FDA agreed to approve this SNDA. FDA Commissioner Margaret Hamburg explained the process by which the FDA had reached its conclusion, with particular emphasis on the scientific evidence:

> The Center for Drug Evaluation and Research (CDER) completed its review of the Plan B One-Step application and laid out its scientific determination. CDER carefully considered whether younger females were able to understand how to use Plan B One-Step. Based on the information submitted to the agency, CDER determined that the product was safe and effective in adolescent females, that adolescent females understood the product was not for routine use, and that the product would not protect them against sexually transmitted diseases. Additionally, the data supported a finding that adolescent females could use Plan B One-Step properly without the intervention of a healthcare provider.
>
> It is our responsibility at FDA to approve drugs that are safe and effective for their intended use based on the scientific evidence. The review process used by CDER to analyze the data applied a risk/benefit assessment consistent with its standard drug review process. Our decision-making reflects a body of scientific findings, input from external scientific advisory committees, and data contained in the application that included studies designed specifically to address the regulatory standards for nonprescription drugs. CDER experts, including obstetrician/gynecologists and pediatricians, reviewed the totality of the data and agreed that it met the regulatory standard for a nonprescription drug and that Plan B One-Step should be approved for all females of child-bearing potential.

Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-2. Commissioner Hamburg then observed that she had "reviewed and thoughtfully considered the data, clinical information, and analysis provided by CDER," and she expressly agreed that "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential." *Id.*

Nevertheless, she explained that Kathleen Sebelius, the Secretary of Health and Human Services, "invoking her authority under the Federal Food, Drug, and Cosmetic Act to execute its provisions," disagreed with the agency's decision "to allow the marketing of Plan B One-Step

5

Add-129

nonprescription for all females of child-bearing potential" and ordered Commissioner Hamburg to deny the Plan B One-Step SNDA. Secretary Sebelius explained that she had concluded "that the data submitted for this product do not establish that prescription dispensing requirements should be eliminated for all ages." Memorandum from Kathleen Sebelius, Sec'y Health and Human Servs., to Margaret Hamburg, Comm'r of Food and Drugs (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-1 (hereinafter "Sebelius Mem."). More specifically, she observed:

> The label comprehension and actual use studies submitted to FDA do not include data on all ages for which the drug would be approved and available over-the-counter. Yet, it is commonly understood that there are significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age, which I believe are relevant to making this determination as to non-prescription availability of this product for all ages. Although the average age of the onset of menses for girls in the United States is 12.4 years of age, about ten percent of girls reach menarche by 11.1 years of age. If the application is approved, the product would be available, without a prescription or other point-of-sale restrictions, even to the youngest girls of reproductive age.

*Id.* (citation omitted). The President endorsed this decision, explaining that "the reason [Secretary Sebelius] made this decision was she could not be confident that a 10-year-old or an 11-year-old go into a drugstore, should be able—alongside bubble gum or batteries—be able to buy a medication that potentially, if not used properly, could end up having an adverse effect." Statement by the President (Dec. 8, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/12/08/statement-president. The reader will observe that Secretary Sebelius did not say that, "if not used properly," levonorgestrel-based emergency contraception could have an "adverse effect" on the youngest girls of reproductive age, nor did she include within that group girls as young as 10. Indeed, the drug is currently available to the youngest girls of reproductive age with a prescription.

This case is not about the potential misuse of Plan B by 11-year-olds. These emergency contraceptives would be among the safest drugs sold over-the-counter, the number of 11-year-

6

olds using these drugs is likely to be miniscule, the FDA permits drugs that it has found to be unsafe for the pediatric population to be sold over-the-counter subject only to labeling restrictions, and its point-of-sale restriction on this safe drug is likewise inconsistent with its policy and the Food, Drug, and Cosmetic Act as it has been construed. Instead, the invocation of the adverse effect of Plan B on 11-year-olds is an excuse to deprive the overwhelming majority of women of their right to obtain contraceptives without unjustified and burdensome restrictions.

Some of those burdens are detailed in a research letter published in the Journal of the American Medical Association in January 2012, which described the results of a study that investigated the ability of 17-year-old women to access emergency contraception. Tracey A. Wilkinson et al., *Research Letter: Access to Emergency Contraception for Adolescents*, 307 J. Am. Med. Ass'n 362 (January 25, 2012). In Dr. Wilkinson's study, "female research assistants posing as [17-year-old] adolescents who recently had unprotected intercourse were randomly assigned to call every commercial pharmacy" in five geographically diverse cities and ask about emergency contraception. *Id.* "The study revealed that approximately 20% of pharmacies did not have emergency contraception available on the same day that the patient called the pharmacy." Wilkinson Decl. ¶ 7, Case No. 12-cv-763, Doc. No. 6. In addition, "in 19% of the calls, the caller was incorrectly told she could not access emergency contraception at all because of her age, despite the fact that the FDA regime allows over-the-counter access by 17-year-olds." *Id.* ¶ 8. Dr. Wilkinson expressed her shock that "close to 1 in 5 calls made by adolescents resulted in them being told they could not access emergency contraception at all." *Id.* "[T]he rate of misinformation," Dr. Wilkinson explained, "was statistically significantly worse in low-income neighborhoods." *Id.* In addition, Dr. Wilkinson's study showed that "of the 943 pharmacies called, only 4.7% of them were open 24 hours." *Id.* ¶ 9.

7

Add-131

All of these barriers, not to speak of the need for adolescents under 17 to find a doctor and obtain a prescription, "are created or exacerbated by the FDA's unusual treatment of emergency contraception [and] can have the cumulative effect of preventing some women from accessing the drug within the short time frame during which it will be effective, thereby exposing them to increased risk of unwanted pregnancy and making the product's limited OTC status useless. Unfortunately, this risk is especially great for young women and low-income women, two groups that could significantly benefit from timely access to and use of the product." *Id.* ¶ 10.

I pause to add these brief words before I begin the discussion of the legal issues. This case has proven to be particularly controversial because it involves access to emergency contraception for adolescents who should not be engaging in conduct that necessitates the use of such drugs and because of the scientifically unsupported speculation that the drug could interfere with implantation of fertilized eggs. Nevertheless, the issue in this case involves the interpretation of a general statutory and regulatory scheme relating to the approval of drugs for over-the-counter sale. The standards are the same for aspirin and for contraceptives. While the FDA properly recognizes that cognitive and behavioral differences undermine "the ability of adolescents to make reasoned decisions about engaging in sexual intercourse," the standard for determining whether contraceptives or any other drug should be available over-the-counter turns solely on the ability of the consumer to understand how to use the particular drug "safely and effectively." Ex. A-4 to Pls.' 2007 Mot. for Summ. J. at T-31097, Case No. 05-cv-366, Doc. No. 235-5. I decide this case based only on my understanding of the applicable standard.

## II. DISCUSSION

### A. *Procedural Posture*

Secretary Sebelius's directive to the FDA to reject the Plan B One-Step SNDA forced the agency to ride roughshod over the policies and practices that it has consistently applied in considering applications for switches in drug status to over-the-counter availability. Before reviewing these unexplained and unjustified departures, a brief discussion of the procedural posture of the case is necessary, although I pass over much of its complicated history. The directive of the Secretary did not directly apply to the Citizen Petition, the denial of which I have subject matter jurisdiction to review. Nevertheless, the denial of the Citizen Petition was inevitable after the Secretary ordered the FDA to reject the SNDA for Plan B One-Step because the Secretary concluded that the sponsor's "label comprehension and actual use studies . . . do not include data on all ages for which the drug would be approved and available over-the-counter." Sebelius Mem. This pronouncement made it impossible as a practical matter for the FDA to approve the Citizen Petition, because it likewise did not include such data. Indeed, the Citizen Petition denial came only five days later, although the FDA had sat on the Citizen Petition for three years.

The plaintiffs have moved for a preliminary injunction and summary judgment. In essence, they ask that the Citizen Petition be granted and that FDA be required to make all levonorgestrel-based emergency contraception, including Plan B, available for over-the-counter sales without age or point of sale restrictions. The defendants have cross-moved for summary judgment. While they incorporate, in one sentence, arguments that they made earlier in this proceeding, their motion centers on the argument that the FDA has no set policy of extrapolating data from adults to pediatric populations.

9

## B.  Deviations from Policy

In *INS v. Yang*, 519 U.S. 26 (1996), the Supreme Court held: "Though the agency's decision is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act."  *Id.* at 32; *see also Office of Commc'n of the Church of Christ v. FCC*, 560 F.2d 529, 532 (2d Cir. 1977) ("Here the Commission is seeking to change its policy, and . . . such changes in policy must be rationally and explicitly justified in order to assure that the standard is being changed and not ignored, and . . . that (the agency) is faithful and not indifferent to the rule of law.  Although an agency must be given flexibility to reexamine and reinterpret its previous holdings, it must clearly indicate and explain its action so as to enable completion of the task of judicial review.") (internal quotation omitted).  The denial of the SNDA and the Citizen Petition was accomplished by unexplained departures from a number of established policies and practices followed by the FDA.

### 1.  The Unprecedented Intervention of the Secretary

Perhaps the most significant departure from agency practice was the intervention of the Secretary of Health and Human Services.  She overruled the FDA in an area which Congress entrusted primarily to the FDA, 21 U.S.C. § 393(d)(2), and which fell within the scope of the authority that the Secretary expressly delegated to the Commissioner.  *See* Delegations of Authority to the Commissioner of Food and Drugs, *republished in* FDA Staff Manual Guide § 1410.10.  In doing so, she failed to take cognizance of a host of FDA policies that the agency would be forced to override in order to comply with her directive.

10

In my 2009 opinion, I traced the evidence demonstrating that the conduct of the FDA was influenced by the Bush White House, acting through the Office of the Commissioner of the FDA, and I held that this kind of political interference called into serious question the legitimacy of the FDA's decision. In the present circumstances, the political interference came directly from the Secretary of Health and Human Services, a member of the President's Cabinet. Of course, the Secretary herself is the best source of information on her state of mind, and she has not seen fit to file an affidavit in this case, even though her motives are in issue. *See, e.g.*, First Am. Supp. Compl. ¶ 38, Case No. 12-cv-763, Doc. No. 14; *cf. Campbell v. United States*, 365 U.S. 85, 96 (1961) ("[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.")

Nevertheless, we have been cautioned that, as judges, we "cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [and women]." *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879) (No. 6546); *see also Watts v. Indiana*, 338 U.S. 49, 52 (1949) (Frankfurter, J.) ("[T]here comes a point where this Court should not be ignorant as judges of what we know as men [and women]."). The motivation for the Secretary's action was obviously political. "It was the first time a cabinet member had ever publicly countermanded a determination by the F.D.A., the agency charged with ensuring the safety of foods and medicines." Gardiner Harris, *White House and the FDA Often at Odds*, N.Y. Times, Apr. 3, 2012 at A1. And it was an election-year decision that "many public health experts saw as a politically motivated effort to avoid riling religious groups and others opposed to making birth control available to girls." *Id.* Thus, three distinguished scientists, including the Editor-in-Chief of the New England Journal of Medicine, wrote:

11

Add-135

> In our opinion, the secretary's decision to retain behind-the-counter status for Plan B One-Step was based on politics rather than science. It cannot be based on issues of safety, since a 12-year-old can purchase a lethal dose of acetaminophen in any pharmacy for about $11, no questions asked. The only documented adverse effects of a $50 dose of levonorgestrel are nausea and delay of menses by several days. Any objective review makes it clear that Plan B is more dangerous to politicians than to adolescent girls.

*The Politics of Emergency Contraception*, 366 New Eng. J. Med. 101, 102 (Jan 12, 2012).

Nevertheless, even with eyes shut to the motivation for the Secretary's decision, the reasons she provided are so unpersuasive as to call into question her good faith. While the Secretary has strung together three factual statements in her memorandum to Commissioner Hamburg, she has failed to offer a coherent justification for denying the over-the-counter sale of levonorgestrel-based emergency contraceptives to the overwhelming majority of women of all ages who may have need for those drugs and who are capable of understanding their correct use. I proceed to deconstruct her explanation sentence by sentence.

a. The First Sentence

The Secretary says that "[t]he label comprehension and actual use studies submitted to FDA do not include data on all ages for which the drug would be approved and available over-the-counter." Sebelius Mem. This statement ignores the fact that the FDA waived the requirement that included a minimum number of enrollees between the ages of 11 and 13 in the drug sponsor's studies. Defs.' Resp. to Mar. 4, 2013 Order at 2, Case No. 12-cv-763, Doc. No. 79; *see also* Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 775 (2012), Case No. 12-cv-762, Doc. No. 26-1. In effect, the Secretary ordered the FDA to deny the application of the Plan B One-Step sponsor because it lacked data that the FDA itself had told the sponsor it did not have to provide. This the Secretary does not deny. The excuse offered by

12

the minyan of attorneys representing her is that the Secretary was "not present" at the meeting where the FDA agreed to waive this data and that she disagreed. Defs.' Resp. to March 4, 2013 Order at 2, Case No. 12-cv-763, Doc. No. 79. They are careful to avoid saying she did not have knowledge of the waiver. Moreover, as discussed below, the Secretary may not issue administrative edicts simply because she disagrees with the decisions of the FDA.

> b. <u>The Second Sentence</u>

The Secretary also observed that there are "significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age," which she believes "are relevant to making this determination as to non-prescription availability of this product for all ages." Sebelius Mem. She fails to explain why. The issue of the cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age to which the Secretary alluded was raised in the FDA's review of the first SNDA for Plan B. In response, Dr. John Jenkins, Director of the Office of New Drugs at the FDA, explained that such concerns are beyond the scope of the FDA's review because they are "more applicable to the ability of adolescents to make reasoned decisions about engaging in sexual intercourse, not their ability to understand how to use Plan B safely and effectively as an emergency contraceptive should they engage in unprotected sexual intercourse." Ex. A-4 to Pls.' 2007 Mot. for Summ. J. at T-31097, Case No. 05-cv-366, Doc. No. 235-5. While recognizing that "OTC access to Plan B for adolescents may be controversial from a societal perspective," Dr. Jenkins could not "think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." *Id.* at T-31098. Indeed, slightly over half of teenage mothers obtain a high school diploma by age 22, compared to 89 percent of women who didn't have a teen birth. The National Campaign to Prevent Teen and Unplanned Pregnancy, *Why it Matters:*

Add-137

*Teen Childbearing, Education, and Economic Wellbeing* at 1 (July 2012). "Another study found that less than two percent of young teen mothers attain a college degree by age 30 . . . . Between 2009 and 2010, roughly 48 percent of all mothers age 15 to 19 lived below the poverty line . . . . As their children grow older, their likelihood of living in poverty increases."[4] *Id.* at 1-3.

On the other hand, as seems clear from the Secretary's explanation, if the "cognitive differences" to which she referred affected the ability of the youngest adolescents to understand the label and use the drug appropriately, then it would be impossible for any drug to be approved for over-the-counter sales without a prescription. This would thwart the intent of Congress to "relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician." S. Rep. No. 82-946 (1951), *reprinted in* 1951 U.S.C.C.A.N. 2454, 2454.

Specifically, census statistics demonstrate that there are fewer than two million 11-year-old girls in the United States. U.S. Census Bureau, *Age and Sex Composition in the United States: 2011*, *available at* http://www.census.gov/population/age/data/2011comp.html. As the Secretary noted, "about ten percent of girls reach menarche by 11.1 years of age"; thus, there are fewer than 200,000 11-year-old girls of reproductive age in the country. Moreover, fewer than 3% of girls under the age of 13 are sexually active. Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 779 (2012), Case No. 12-cv-762, Doc. No. 26-1. Thus, the potential population about whom the Secretary is concerned is infinitesimal, even if all of these young adolescents are unable to read a relatively simple emergency contraception label and use the drug

---

[4] These disturbing statistics underscore the President's own concern with the problems caused by teen pregnancy. As one commentator has observed, the President "has invested many millions of dollars to battle teenage pregnancy and fought to include contraception in his health plan. Contraception, study after study shows, plays a central and inescapable role in pushing down the number of pregnant teenagers." Michael Powell, *Bloomberg's Shame-and-Blame Tactic on Teenage Pregnancy*, N.Y. Times, Mar. 12, 2013, at A17.

appropriately.  By contrast, 12% of the total population of the United States over the age of 16 are deemed to have "below basic" document literacy, a term defined by the National Center for Education Statistics as "the knowledge and skills . . . needed to search, comprehend, and use information from noncontinuous texts in various formats, such as . . . prescription labels." National Center for Education Statistics, *Fast Facts: Adult Literacy*, *available at* http://nces.ed.gov/fastfacts/display.asp?id=69.  Obviously, if consumers cannot read and understand a drug label, they are likely to use the drug incorrectly without medical supervision, yet the Secretary has never demanded "data . . . [that] conclusively establish" that 100% of the potential users of a drug can understand the label.[5]  Nor has she or the FDA precluded the over-the-counter sale of drugs for that reason.

    c.  The Third Sentence

The Secretary finally observed that, if the SNDA were granted, Plan B One-Step would be available "without a prescription or other point-of-sale restrictions, even to the youngest girls of reproductive age," including the ten percent of girls who "reach menarche by 11.1 years of age."  Sebelius Mem.  Nevertheless, the Secretary does not define any harm that could result from the use of levonorgestrel-based emergency contraceptives by this population.  Again, levonorgestrel-based contraceptives would be probably among the safest drugs approved for over-the-counter sale for the pediatric population.  Indeed, the FDA approves drugs for over-the-counter sale which have either not been shown to be safe for use by the pediatric population or have been shown to be unsafe for such use.  The policy of the FDA is to rely on labeling.  As Dr. Jenkins testified, age-based labeling restrictions have "been [the FDA's] long-standing way of [] instructing consumers whether they should or should not use a product in a young age group, and

---

[5] This quote is not from Secretary Sebelius's memorandum to Commissioner Hamburg, but her news release of the same date.  *A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius* (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-1.

[the Plan B marketing regime is] a substantial deviation from that practice." Jenkins Dep. at 113:7-16, Case No. 05-cv-366, Doc. No. 235-9. Indeed, as Dr. Andrea Leonard-Segal, Director of the FDA's Division of Nonprescription Clinical Evaluation, wrote, "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review for Regulatory Action at 28 (Nov. 30, 2011), Case No. 12-cv-763, Doc. No. 83-1 (hereinafter "Summary Review").

Thus, a diet drug, Alli, "was approved [for over-the-counter sales] for weight loss in 2007 only for adults 18 and older," although it could be purchased by teenagers—a group that may still be "in an active growth phase with continued bone and other organ, maturation and where nutritional requirements are different from those of adults." Defs.' Mem. in Support of Mot. for Summ. J. at 5, Case No. 12-cv-763, Doc. No. 71 (quoting NDA 21-887, Office Director's Decisional Memorandum at 3-4 (Feb. 6, 2007)). The FDA observed that "the balance between active weight loss, while still continuing to have adequate nutritional requirements, would best be achieved [] with active health care provider interaction." *Id.* Consequently, the FDA decided to make the drug available for over-the-counter sales with a warning that it was not intended for use by the pediatric population. The Secretary's edict to the FDA simply reflects the fact of her lack of familiarity with, or her willingness to ignore, the policy of the FDA in dealing with these concerns.

Moreover, the likelihood of unsafe use or misuse with respect to levonorgestrel-based emergency contraceptives is extremely low, and much lower than the dangers of misuse of common over-the-counter medications that are known to be abused by minors and adults, even

16

Add-140

though these drugs cause hundreds of deaths every year in the United States. In an internal FDA memorandum regarding the first Plan B SNDA in 2004, Dr. Curtis Rosebraugh, FDA Deputy Director of the Division of OTC Drugs, explained the significant inconsistency between the agency's proposed treatment of Plan B and its treatment of other over-the-counter drugs: "A decision by the Agency to withhold OTC marketing of Plan B for reasons of theoretical abuse by a very small segment of the population despite the great benefit that could be derived from easier access could have ramifications for how we regulate other OTC drugs . . . a natural progression of this line of regulatory reasoning *would require that the Agency remove OTC marketing status for many drugs with known abuses* including dextromethorphan because of reports of adolescent abuse, laxatives because of abuse by people suffering from bulimia, analgesics because of abuse with subsequent health ramifications, or acetaminophen because of its use in suicides." Ex. A to Pls.' 2007 Mot. for Summ. J. at T-30757-58, Case No. 05-cv-366, Doc No. 235-3 (emphasis added). Dextromethorphan, to which Dr. Rosebraugh referred, is a cough suppressant contained in cold medicines that are widely abused by teenagers and sold over-the-counter. An overdose of dextromethorphan can cause "inebriation . . . [a]n altered state of consciousness [and] [m]ind and body dissociation or an 'out-of-body' experience," as well as "blurred vision, body itching, rash, sweating, fever, hypertension, shallow respiration, diarrhea, toxic psychosis, [and] coma." National Drug Intelligence Center, *Intelligence Bulletin: DXM (Dextromethorphan)*, October 2004, *available at* http://www.justice.gov/archive/ndic/pubs11/11563/index.htm. Dextromethorphan abusers "can obtain the drug at almost any pharmacy or supermarket" for only a few dollars. *Id.*

2. *The Failure to Make Plan B Available to Older Adolescents*

The Secretary did not question the adequacy of the evidence regarding the ability of older adolescents, between the ages of 13 and 16, to understand Plan B One-Step's label and use the drug correctly. Indeed, despite the ample evidence that this age group was able to do so, the Secretary never explained why Plan B One-Step should not be made available to them, nor was the Assistant U.S. Attorney representing the FDA willing to answer the specific question that I posed to him at an early stage in this proceeding of "whether the actual use and labeling comprehension studies conducted by Teva with respect to Plan B One-Step are inadequate with respect to all women under the age of 17 or whether they are inadequate only with respect to those under the age of twelve." Dec. 13, 2011 Order, Case No. 05-cv-366. "[T]he Commissioner of the FDA isn't in a position to be able to answer the question," he said, because the decision to deny the SNDA was made by Secretary Sebelius, not the Commissioner. Dec. 13, 2011 Hr'g Tr. at 5:1-8, Case No. 05-cv-366, Doc. No. 342. The Secretary's lawyers have now come up with the excuse that the Plan B One-Step SNDA "did not seek OTC availability for a specific subset of younger women." Defs.' Resp. to Mar. 4, 2013 Order at 3, Case No. 12-cv-763, Doc. No. 79. Instead, it sought to eliminate all point-of-sale and age restrictions.

The Food, Drug, and Cosmetic Act ("FDCA") does not preclude the Secretary or the Commissioner from granting relief less extensive than that sought by an applicant. Nor does it preclude the Commissioner of the FDA, who clearly had the authority, from doing so. Indeed, 21 C.F.R. § 310.200(b) expressly provides that the Commissioner may initiate, *sua sponte*, a proposal to exempt a drug from prescription-dispensing requirements "when the Commissioner finds such requirements are not necessary for the protection of the public health." Thus, when it became clear in the earlier Plan B process that the FDA would not allow over-the-counter sales

18

without age restriction, the FDA invited the Plan B sponsor to submit a revised SNDA seeking over-the-counter access only for women over 18. Ex. 2 to Defs.' 2007 Mot. to Dismiss at T-11094-95, Case No. 05-cv-366, Doc. No. 248-4. Moreover, in response to my 2009 order in which the FDA acquiesced, it similarly invited the Plan B sponsor to submit a new application revising the age limit downwards to 17, although such relief had not been requested in the Citizen Petition or by the Plan B sponsor. Thus, it is clear that the FDA's options in responding to over-the-counter switch applications are not as limited as they represent.

The Secretary's failure to limit the scope of her decision to girls under the age of 13 suffers from the same defect as the FDA's original order approving over-the-counter access to Plan B for women over the age of 18, notwithstanding the fact that the same evidence that supported over-the-counter access for 18-year-olds applied equally to 17-year-olds. Nevertheless, I make this point only to highlight the arbitrariness of the Secretary's action and not to suggest that a comparable remedy, which would lower the age of availability to adolescents 14 and over, is a viable or appropriate one. The obstructions in the path of those adolescents in obtaining levonorgestrel-based emergency contraceptives under the current behind-the-counter regime have the practical effect of making the contraceptives unavailable without a doctor's prescription. The basic fact is that most younger adolescents, including "many poor or disadvantaged women," "will be denied access because they do not have a driver's license, passport, or other form of identification with which to verify their age." *The Politics of Emergency Contraception*, 366 New Eng. J. Med. 101-02 (Jan. 12, 2012).

    *3. Extrapolation*

Extrapolation is the use of studies in one age group to support approval of a drug in another age group. The FDA's failure to extrapolate involves the next and perhaps the most

19

Add-143

significant unexplained deviation from FDA practice ordered by the Secretary.  Adopting the strategy that the best defense is a good offense, the defendants have cross-moved for summary judgment focusing on this issue.  The problem is that their offense is not very good.  The defendants have not submitted any affidavits or other competent evidence regarding the policy of the FDA in support of their motion for summary judgment.  Instead, they rely solely on a 2011 article in which they claim "FDA scientists reviewed the use of extrapolation in 166 drug products submitted for pediatric approval between 1998 and 2008.  The authors concluded that FDA did *not* extrapolate efficacy data for 29 products (17.5%), partially extrapolated for 113 products (68%), and fully extrapolated for 24 products (14.5%)."  Defs.' Mot. for Summ. J. at 3, Case No.12-cv-763, Doc. No. 71; Julia Dunne et al., *Extrapolation of Adult Data and Other Data in Pediatric Drug-Development Programs*, 128 Pediatrics e1242, e1245 tbl. 1 (Nov. 1, 2011).

The foregoing study addressed only the issue of extrapolation as it related to the efficacy of a particular drug.  "Efficacy" within the meaning of the FDCA is established when an applicant proves that a particular drug "will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested."  21 U.S.C. § 355(d).  There is no dispute in this case related to the efficacy or safety of levonorgestrel-based emergency contraceptives.  *See* Apr. 27, 2012 Hr'g Tr. at 84:24-85:2, Case No. 12-cv-763, Doc. No. 84. Indeed, the FDA observed in its Citizen Petition Denial Letter that Plan B "is already approved as a prescription product, and thus the safety and efficacy in the pediatric population have been established."  Letter from Janet Woodcock, Center for Drug Evaluation and Research, FDA, to Bonnie Scott Jones, Center for Reproductive Rights at 9 (Dec. 12, 2011), Case No. 05-cv-366, Doc. No. 341-1 (hereinafter "Citizen Petition Denial Letter").  Moreover, as the authors of the

Add-144

extrapolation study explained, "[e]xtrapolation of efficacy from adult data occurred in 82.5% of the drug products," and it concluded that "[e]xtrapolating efficacy from adult data or other data to the pediatric population can streamline pediatric drug development and help to increase the number of approvals for pediatric use." Dunne et al. at e1242.

The most striking feature of the defendants' motion for summary judgment is its failure to discuss any of the evidence of extrapolation contained in the record. This evidence is discussed at length in my 2009 opinion, and I briefly summarize it here. As early as April 2002, the FDA informed the Plan B sponsor that results from trials in the adult population could be extrapolated to the postmenarcheal pediatric population. Ex. F–1 to Pls.' 2007 Mot. for Summ. J. at T–30100, Case No. 05-cv-366, Doc. No. 239. Indeed, the FDA assured the Plan B manufacturer that the actual use study it was planning to submit with its anticipated SNDA "appear[ed] to be adequate for filing," even though the study would not include data on all ages to which the drug would be made available over-the-counter. Ex. 3 to Defs.' 2007 Mot. to Dismiss at T-30254, Case No. 05-cv-366, Doc. No. 248-5. In addition, FDA review staff observed that "the body of evidence available" to the FDA in its consideration of adolescent use of emergency contraception was "tremendously augmented" by other behavioral studies involving adult use of emergency contraception; these studies were considered by FDA reviewers in their internal conclusions that Plan B should be available over-the-counter. Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T-30868, Case No. 05-cv-366, Doc. No. 235-4.

On December 16, 2003, the Advisory Committee of outside experts, empaneled by the FDA Center for Drug Evaluation and Research to provide a recommendation on the Plan B SNDA, voted 23 to 4 in favor of the recommendation to approve Plan B for over-the-counter status without age or point-of-sale restrictions; it voted unanimously that Plan B is safe for use in

21

Add-145

a non-prescription setting, and *voted 27 to 1 that the actual use study data submitted by the Plan B sponsor could be generalized to the overall population of potential non-prescription users of Plan B, i.e., data from older age groups could be extrapolated to younger ones*.  Ex. 2 to Defs.' 2007 Mot. to Dismiss at T-10749, T–10754, Case No. 05-cv-366, Doc. No. 248-3.[6]

Moreover, responding directly to concerns that the label comprehension and actual use studies enrolled too few young adolescents, the Director of the Office of New Drugs, Dr. John K. Jenkins, noted:

> While it is true that the number of adolescents enrolled in the sponsor's studies was relatively small, these studies did not exclude adolescent women from enrollment and were *conducted in settings that would be expected to capture a representative population of women who currently seek emergency contraception. Therefore, it is likely that the percentage of patients enrolled in these studies is an accurate reflection of the potential users of Plan B in an OTC setting*.

Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T–30897–98, Case No. 05-cv-366, Doc. No. 235-4 (emphasis added); *see also* Ex. A–1 at T–10949 (Acting Director of the Division of Pediatric Drug Development concurring that number of adolescents enrolled in study reflected their actual use of Plan B and waiving pediatric study because of the minimal number of individuals of that age using Plan B).  Indeed, Dr. Jenkins wrote, "the Agency has a long history of extrapolating findings from clinical trials in older patients to adolescents in both prescription and non-prescription approvals, and this practice was recently incorporated into the Pediatric Research and Equity Act (PREA)." Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T–30898; *see also* 21 U.S.C. § 355c(a)(2)(B)(ii) ("A study may not be needed in each pediatric age group if data from one age group can be extrapolated to another age group.").

---

[6] The politically motivated rejection of this recommendation was the first time in ten years that the FDA had failed to follow an advisory committee recommendation regarding over-the-counter switch applications.  *See* GAO Report at 29.  This time around, the FDA found it unnecessary to convene an advisory committee because "Plan B and Plan B One-Step are exceedingly similar drug products and no controversial data emerged" from the Plan B One-Step SNDA "to generate the need for another advisory committee meeting."  Summary Review at 26.

There was other evidence in the record that the FDA routinely extrapolated such data when considering new drug applications or switch applications seeking over-the-counter status for contraceptives. The draft minutes from an internal FDA meeting held in May 2004 contain the following comment regarding the decision not to extrapolate for Plan B: The failure of the FDA "to extrapolate adolescent safety and effectiveness for <14 year old females is not consistent with how CDER handles approval and distribution of prescription oral contraceptives, OTC male contraceptives such as condoms and spermacides or OTC female contraceptives such as gels and sponges." T–1213. This was contained in an initial draft of the minutes, although it was subsequently deleted for reasons which are unclear. Nevertheless, it was an accurate reflection of FDA policy. Indeed, the Government Accountability Office ("GAO"), which conducted an investigation into the FDA's Plan B decision at the behest of several members of Congress, stated that the FDA personnel that it interviewed "noted that the agency has not considered behavioral implications due to differences in cognitive development in prior OTC switch decisions and that the agency has considered it scientifically appropriate to extrapolate data from older to younger adolescents." GAO Report at 5.

More significantly, the FDA did engage in extrapolation in considering the Plan B One-Step SNDA; otherwise, it would not have announced its intention to approve that SNDA and expand access to Plan B One-Step to all women of childbearing age. As Dr. Cynthia Harper, who was one of the investigators on the Plan B One-Step actual use study, submitted by the Plan B One-Step sponsor in support of its SNDA, and the leading author on the related publication, explained:

> An actual use study considers the way that *the target population* of a particular product will use that product. Since only rare 11 year olds might need to use emergency contraception, we would be hard-pressed to find them and include them in the actual use study.

Add-147

Moreover, even if it were possible, using herculean and unprecedented efforts to find the very rare 11 year olds seeking emergency contraception and include them in the study, the information gathered would not be particularly useful. No conclusions about 11 year olds as a group could be drawn given the incredibly small number of 11 year olds who are users of emergency contraception.

Harper Decl. ¶¶ 13-14, Case No. 12-cv-763, Doc. No. 3. The FDA agreed.

In an April 2012 article on the Plan B One-Step actual use study, Dr. Harper and others explained that: "Considering that approximately 3% of teens initiate sexual activity before age 13 years, and that only a fraction (fewer than 3%) of visits for any reason to the study clinics during the study period were by teens 13 years and younger, the ages of those who ultimately participated in this study represent the population at risk who might need emergency contraception." Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 779 (2012), Case No. 12-cv-762, Doc. No. 26-1. As Dr. Lisa Mathis, Associate Director of the Office of New Drugs at the FDA, commented in her review of the data submitted in support of the Plan B One-Step SNDA, the low number of adolescents between the ages of 11 to 13 is consistent with the known use of these products in that age group. Summary Review at 15. Specifically, she observed that "[t]he condition and the response to therapy in patients in this age group is expected to be sufficiently similar to patients in the 14-year-old age group and thus data from that age group can be used to support the ability of younger patients to use the medication appropriately." *Id.* Thus, the FDA advised the Plan B One-Step sponsor that "it appears that you have provided adequate information to justify removing the quota for enrollment of 11 to 13-

year-olds as currently specified in your actual use study protocol."[7] Defs.' Resp. to Mar. 4, 2013

Order at 2, Case No. 12-cv-763, Doc. No. 79 (quoting Admin. R. 595).

A similar conclusion to that of Dr. Harper was reached in the label comprehension study

conducted by Dr. Elizabeth Raymond. While that study included 54 to 59 subjects between the

ages of 12 and 17, Dr. Raymond observed that "[p]eople aged 11 and younger are not the target

population for this drug, and indeed I believe that the number of users who are that young is

miniscule." Raymond Decl. ¶ 37, Case No. 12-cv-763, Doc. No. 5. This is borne out by the

actual use "study experience over the course of a 2-year period and information from published

literature showing that very low numbers of females aged 11-13 years present to reproductive

health clinics requesting emergency contraception." Tina R. Raine et al., *An Over-the-Counter

Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics

& Gynecology 772, 775 (2012), Case No. 12-cv-762, Doc. No. 26-1.

Moreover, the label comprehension study, half of whose participants were between the

ages of 12 and 14, demonstrated "that female adolescents 17 years old and younger can obtain

sufficient information from the prototype label to enable safe and effective use of emergency

contraception over the counter." Raymond Decl. ¶ 35. So too did a label comprehension study

in the same adolescent age group focusing on a two-pill emergency contraception product. M.

Cremer et al., *Adolescent Comprehension of Emergency Contraception in New York City*, 113

Obstetrics and Gynecology 840 (2009).

In sum, the defendants' motion for summary judgment does not provide any evidence to

contradict a record which shows that the FDA has engaged in extrapolation at the very least from

---

[7] The FDA's waiver of study data for this age group is also consistent with the authority delegated to the
Commissioner to waive pediatric studies if "the necessary studies are impossible or highly impracticable (because,
for example, the number of patients is so small or the patients are geographically dispersed)." 21 U.S.C.
§ 355c(a)(4)(A)(i) & 355c(a)(4)(B)(i); Delegations of Authority to the Commissioner of Food and Drugs,
*republished in* FDA Staff Manual Guide § 1410.10.

older to younger adolescents with respect to the issues of actual use and label comprehension. Under these circumstances, the defendants' motion for summary judgment with respect to the issue of extrapolation is denied.

### 4. *Deviations Where Extrapolation Is Not Possible Because Safety Not Established*

In the course of their motion for summary judgment, the defendants themselves identified a significant related departure from agency practice. Specifically, when the FDA has declined to extrapolate because of safety concerns, it used labeling to indicate that the drug was not to be made available to children. Again, as Dr. Jenkins testified, age-based labeling restrictions have "been [the FDA's] long-standing way of handling instructing consumers whether they should or should not use a product in a young age group, and [the Plan B marketing regime is] a substantial deviation from that practice." Jenkins Dep. at 113:7-16, Case No. 05-cv-366, Doc. No. 235-9; *see also* Julia Dunne et al., *Extrapolation of Adult Data and Other Data in Pediatric Drug Development Programs*, 128 Pediatrics e1242, e1246 (Nov. 1, 2011) (observing that, when safety in the pediatric population could not be established, "the pediatric safety data were included in the product label"). Indeed, in the Summary Review for Regulatory Action, Dr. Leonard-Segal wrote that "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review at 28.

Consistent with this "tenet," the *defendants* expressly cite two examples in which the FDA allowed drugs to be sold over-the-counter that it *did not consider safe* for use in the pediatric population. Defs.' Mem. in Support of Mot. for Summ. J. at 4-5, Case No. 12-cv-763, Doc. No. 71. Thus, they observe:

26

Add-150

Prilosec OTC was approved for frequent heartburn in 2003 for adults 18 and older. It was not approved for use by those under 18," and they include the following explanation from their internal records: "There are 2% of total prescriptions in the 11 to 20y old age group and children have—in general—not been included in clinical trials; [Prilosec] is not approved for prescription use in adolescents (patients under 18y of age). There were only 100 OTC study subjects under age 18 (17% of whom exceeded the 10-day limit) and a total of 39 cases in SafeTNet. From this information, the Medical Officer concluded that *safety in adolescents has not been established* because: a) age-related responses have not been studied; and b) age-related toxicities cannot be ruled out.

*Id.* at 5 (emphasis added). Nevertheless, the FDA permitted Prilosec OTC to be sold over-the-counter and without point of sale restrictions with simply a warning on the label that it was not approved for use by children or adolescents.

Similarly, as earlier observed, "Alli was approved [for over-the-counter sales] for weight loss in 2007 only for adults 18 and older." *Id.* The defendants quote the following relevant language from the FDA review:

Treatment of obesity with the intent of weight loss in 12 to 17 year olds is complicated by the factor that this age group includes individuals that may still be in an active growth phase with continued bone and other organ, maturation and where nutritional requirements are different from those of adults. Therefore, the balance between active weight loss, while still continuing to have adequate nutritional requirements, would best be achieved in my judgment with active health care provider interaction. *As such, I do not feel that this age group should be included in an over-the-counter label.*

*Id.* (emphasis added).

While some over-the-counter drugs, such as Prilosec OTC, probably would not be purchased by adolescent consumers without the advice of a doctor, the same cannot be said for drugs such as Alli, a weight-loss drug that is likely to attract teenage purchasers concerned about their physical appearance rather than medical necessity. Nor can it be said of cough syrup containing dextromethorphan, which is regularly abused by teenagers. The FDA's willingness to rely on labeling to make these drugs available for sale over-the-counter without any age or point-

27

Add-151

of-sale restrictions, even though they are unsafe for unsupervised use by young adolescents, stands in stark contrast to its refusal to make equally available concededly safe and time-sensitive levonorgestrel-based emergency contraceptives.

### 5. Point-of-Sale Departure from Policy

While I have focused on the numerous policy departures as they relate to the age-based restriction to the over-the-counter sale of levonorgestrel-based emergency contraception, an equally significant part of the current regime is its restriction on where these products can be purchased.  The validity of this restriction was not addressed in my 2009 opinion.  The regime, which the Secretary forced the FDA to retain, requires that the product be sold only at pharmacies and health clinics and that it be kept behind the counter at pharmacies.  This point-of-sale restriction not only limits young adolescents' access to Plan B, it limits the access of individuals 17 and older to the product.

In their memorandum of law in support of their motion for summary judgment that preceded my 2009 opinion, plaintiffs invoked *Am. Pharm. Ass'n. v. Weinberger*, 377 F. Supp. 824 (D.D.C. 1974), *aff'd on the opinion below sub nom. Am. Pharm. Ass'n v. Mathews*, 530 F.2d 1054 (D.C. Cir. 1976) (per curiam), for the proposition that the FDCA does not authorize the FDA to limit the sale of approved drugs to particular businesses, such as certain pharmacies and health care clinics.  Pls.' Mem. in Supp. of 2007 Mot. for Summ. J. at 110-11, Case 05-cv-663, Doc. No. 236.

Pursuant to 21 U.S.C. § 355(d), the FDA may refuse new drug application approval where the data submitted does not show that the "drug is *safe* for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof."  *Am. Pharm. Ass'n*, 377 F. Supp. at 828 (emphasis added).  Because the FDA "conclud[ed] that [methadone was]

Add-152

inappropriate for regular [new drug application] approval," it permitted its dispensation only at "certain specified outlets," such as approved hospital pharmacies.  *Id.* at 825, 827.  In so doing, it created "a unique classification for methadone" that was more restrictive than the regular prescription drug dispensing regime.  *Id.* at 827.

In *American Pharmaceutical Ass'n*, the FDA interpreted "safe" to mean that the drug is "secure from possible misuse," and justified the challenged regulation on the grounds that methadone had a high risk of misuse and abuse.  *Id*. at 828.  The District Court for the District of Columbia, whose opinion was adopted by the D.C. Circuit, rejected this interpretation and held that "safe" within the meaning of the FDCA "was intended to include *only the inherent safety of the drug when used in the manner intended.*"  *Id*. (emphasis added).  Consequently, the FDA did not have the authority under the FDCA to further limit sales of methadone to specific pharmacies once it had been found safe for its intended use as a prescription drug.[8]

The FDA argued in the earlier proceedings before the 2009 remand that *American Pharmaceutical Ass'n* was distinguishable because the FDA did not mandate marketing limitations for Plan B; instead, it approved marketing limitations that were proposed by the Plan B sponsor.  *See* Defs.' Reply Mem. at 42, Case No. 05-cv-366, Doc. No. 265.  The Plan B sponsor was clearly allowed to regulate its own point of sale, the FDA argued, and if the sponsor disagreed with the FDA's advice, it had options, such as pursuing administrative and judicial review of the agency's rejection of its original SNDA.  *Id.*

Although it is technically true that the Plan B sponsor submitted a revised SNDA asking for this "intermediate class" of drug distribution, it is clear that the sponsor revised its SNDA

---

[8] Since *Am. Pharm. Ass'n* was decided, it took an act of Congress (rather than FDA regulation) to impose a controlled marketing regime on cold medicines containing pseudoephedrine.  Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, Title VII, 120 Stat. 192, 256.  The legislation required those medicines to be kept in a secure location and required consumers to present photo identification before purchasing them.

only after the FDA informed it that upper management had raised concerns which made it highly unlikely that the OTC switch would be approved for all ages. Indeed, the revised SNDA, filed in March 2004, noted that:

> Although [the sponsor] believes and maintains that Plan B is safe and effective for true OTC use and should be approved as such, we understand that FDA is concerned about adolescent use. Therefore [we are] willing to consider circumstances in which Plan B would be approved for OTC use by women age sixteen and older, while maintaining prescription status for women under age sixteen.

Letter from Barr Research, Inc. to Daniel Shames, M.D., Center for Drug Evaluation and Research, FDA at 1 (Mar. 11, 2004), Case No. 05-cv-366, Doc. No. 248-8. The sponsor recognized that adoption of "such an age restriction" would require, "as a practical matter, [that] the product [] be sold only in stores that have a licensed pharmacy and thus would be available only when the pharmacy is open . . . [and that] the product must be stored behind the counter." *Id*. at 4.

These restrictions, which were adopted by the Plan B sponsor and which were crucial to the FDA's ultimate approval of nonprescription access for women 18 and older, were not adopted voluntarily by the drug company. Thus, the FDA's attempt to distinguish *American Pharmaceutical Ass'n* on this ground fails. The central holding of *American Pharmaceutical Ass'n* is that the FDA's authority over nonprescription drugs does not extend to restricting the point-of-sale distribution of drugs that have been found to be safe "when used in the manner intended." *Am. Pharm. Ass'n,* 377 F. Supp. at 828. The FDA did not challenge, much less address, this holding. Indeed, rather than rely on § 355(d), it argued that FDA regulations, specifically 21 C.F.R. § 314.520, expressly authorized it to restrict distribution of Plan B to select pharmacies and health clinics. Defs.' Reply Mem. at 42-45, Case 05-cv-366, Doc. No.

Add-154

265.  In support of this authority, the FDA lists several drugs that are available only under restricted marketing regimes for safety reasons.  *Id.*

This argument is unconvincing.  As an initial matter, the FDA admitted that it did not rely on 21 C.F.R. § 314.520 in approving the Plan B SNDA even though it was promulgated in 1992, more than 10 years before the first Plan B SNDA was submitted.  *Id.* at 42.  Moreover, 21 C.F.R. § 314.520 applies only to drugs "treating serious or life-threatening illnesses."  21 C.F.R. § 314.500.  The FDA amended 21 C.F.R. § 314, in part, to permit approval of such drugs "at the earliest possible point at which safety and efficacy can reasonably be established under existing law."  57 Fed. Reg. 13234, 13234 (Apr. 15, 1992).  To obtain accelerated approval the drug manufacturer or sponsor is required to conduct "postmarketing stud[ies] to elaborate on the evidence of effectiveness."  *Id.*  The FDA also adopted procedures for approving, with restrictions on distribution, certain "highly toxic drugs" which could "not [be] shown to be safe under" 21 U.S.C. § 355 "[w]ithout the restriction specified in the approval."  57 Fed. Reg. at 13237.  The FDA "emphasized that these restrictions will be considered necessary only rarely and in extraordinary cases.  FDA believes that the safe use of most prescription drugs will continue to be ensured through traditional patient management by health professionals and through necessary safety warnings on the drug's labeling."  *Id.*

The FDA did not attempt to reconcile the underlying purpose of § 314—to achieve the expedited or accelerated approval of certain drugs—with the long and tortured approval process of the Plan B dual marketing regime.  Nor did it argue that Plan B is "highly toxic" or that it is used to treat "a serious or life-threatening illness."  Whether an illness is "serious or life-threatening" "is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more

Add-155

serious one." 57 Fed. Reg. at 13235; *see also* 52 Fed. Reg. 19466, 19467 (May 22, 1987) (listing examples of serious or life-threatening diseases).

Plan B does not fit within the class of drugs § 314.520 was designed to restrict. This is made clear by the examples the FDA offered of "several other FDA-approved drugs that are distributed under restricting marketing plans pursuant to 21 C.F.R. § 314.520." Defs.' Reply Mem. at 44, Case No. 05-cv-366, Doc. No. 265. Each of the drugs the FDA mentioned is highly toxic and/or has serious health risks associated with its use: Accutane, which is used to treat severe acne, "may cause birth defects if ingested while pregnant"; Trovan, which treats infections, "can cause serious liver disease"; Xyrem, which treats narcolepsy, "had serious side effects [including some events that resulted in death] and had been [designated a Schedule III Controlled Substance because it was] abused as a recreational drug"; and Mifeprex (known as RU-486 in Europe), which is used to end early pregnancy, causes vaginal bleeding which, in some cases, can only be stopped by surgical procedure. *Id.* at 44-45. There is no serious health risk associated with use of Plan B as prescribed and intended, much less one that would make "restrictions on distribution . . . necessary for [its] safe use." 57 Fed. Reg. 58942, 58942 (Dec. 11, 1992). Indeed, the FDA did not identify any health concerns associated with adult or pediatric use of Plan B, and has admitted that Plan B's "safety and efficacy in the pediatric population have been established." Citizen Petition Denial Letter at 9.

Perhaps more significant is the FDA's consideration of its authority to require post-marketing restrictions on nonprescription drugs which it had found safe. In 1984, more than 20 years before the Plan B sponsor submitted the initial SNDA, the FDA denied a citizen petition urging it to establish a class of non-prescription drugs products to be sold only by a pharmacist. Relying in part on *American Pharmaceutical Ass'n*, the FDA Commissioner at the time wrote:

> [T]he agency believes it is questionable whether the distribution of lawfully marketed OTC drugs can be restricted [to a pharmacist-only class] under current statutory provisions. *Under the [FDCA] there is no provision for an intermediate class of drugs between OTC and prescription products.* The statutory requirement that a drug either be limited to prescription dispensing or available OTC with adequate directions for use seems to preclude the agency from establishing a class of drugs whose labeling would need to be supplemented by a pharmacist's instructions.

Ex. E to Pls.' 2007 Mot. for Summ. J. at E-022, Case No. 05-cv-366, Doc. No. 235-10 (emphasis added).

Consistent with this policy, the FDA has voiced concerns in this proceeding about its authority to impose an age-restricted marketing regime on an approved drug. Thus, in 2005, it decided to ask for public comments on whether it needed to resort to rulemaking to impose such a dual marketing regime. *See Tummino*, 603 F. Supp. 2d at 535. The FDA received approximately 47,000 public comments and hired an outside company to review and summarize them. *Id.* That review was completed six months later, at which point the FDA ultimately concluded that it was not necessary to engage in rulemaking before instituting an age-restricted point-of-sale marketing regime. *Id.* While this was going on, the FDA's attorney stated at a 2006 hearing that the FDCA "does not provide the agency—at least it does not clearly provide the agency with the statutory authority to make that kind of age based distinction." July 26, 2006 Hr'g Tr. at 19:11-14, Case No. 05-cv-366, Doc. No. 185. He further explained that "[t]here is no behind the counter option available under federal law," because "*[u]nder the [FDCA], a product is either Rx only or non-prescription.*" *Id.* at 20:14-20. Nevertheless, consistent with its practice of applying its policies based on political expediency, the FDA announced a few days later that over-the-counter sales could be approved for women 18 and older "in a matter of weeks." Stephanie Saul, *F.D.A. Shifts View on Next-Day Pill*, N.Y. Times, Aug. 1, 2006, at A1. This announcement was made one day before the Senate committee hearing on Dr. Andrew von

33

Add-157

Eschenbach's confirmation as Commissioner of the FDA, when it was obvious that he would not otherwise be confirmed. *See Tummino*, 603 F. Supp. 2d at 535-36. No other explanation was offered for the departure from the policy unequivocally articulated by the United States Attorney that "[u]nder the [FDCA], a product is either Rx only or non-prescription."

I agree that the FDA did not have the authority to mandate point-of-sale restrictions on drugs approved for nonprescription sale that it found to be safe and effective for all women of childbearing age. Nevertheless, even if it had such authority, it clearly deviated from the policy here. This is demonstrated not only by the drugs that were either not shown to be safe or were unsafe for the pediatric population such as Prilosec and Alli, which were dealt with through labeling, not point-of-sale restrictions, but also by the recent express acquiescence of the FDA in a college's provision of Plan B One-Step to its students through a vending machine. *FDA OK with college's Plan B contraceptive vending machine*, MSN News, Jan. 29, 2013, *available at* http://news.msn.com/us/fda-ok-with-colleges-plan-b-contraceptive-vending-machine. The only condition on access to the vending machine was that students swipe their college ID; the school had previously verified that all of its students were age 17 or over. *Vending machine dispenses emergency contraception*, CNN News, Feb. 8, 2012, *available at* http://www.cnn.com/2012/02/08/us/plan-b-vending-machine.

## C. Standard of Review

I have discussed at some length the Secretary's ukase to the FDA to deny the application to make Plan B One-Step available over-the-counter. The Plan B One-Step sponsor has not taken an appeal to the Court of Appeals for the District of Columbia, which would have jurisdiction to review it. *See* 21 U.S.C. § 355(h). The only decision subject to review here is the denial of the Citizen Petition; I do not have any authority to review the denial of the Plan B One-

34

Step SNDA for the purpose of granting relief.  Nevertheless, as observed earlier, the two were

clearly linked together for two reasons.  First, once the Secretary directed the FDA to deny the

Plan B One-Step SNDA, the FDA had no possible basis on which to approve the Citizen

Petition.  The same lack of data that the Secretary said caused her to deny the Plan B One-Step

SNDA also doomed the Citizen Petition because it lacked the same data, which were, as the FDA

acknowledged, impossible to provide.  I discuss this issue in full below.  Second, it is not

possible to exercise meaningful judicial review over the denial of the Citizen Petition without

considering the propriety of the Secretary's actions regarding the Plan B One-Step SNDA.

Indeed, the FDA's own justification for its Citizen Petition action indicates a substantial reliance

on the Plan B One-Step SNDA process.  The FDA spent a considerable portion of the Citizen

Petition Denial Letter discussing the Plan B One-Step SNDA and the various studies submitted

in its support.  More significantly, the very reason the FDA claimed it denied the Citizen Petition

was the lack of age-specific data, *as compared to* that submitted with the Plan B One-Step

SNDA.

    The applicable standard of review is prescribed by the Administrative Procedure Act

("APA"), which provides that a district court may set aside an agency's findings, conclusions of

law or action only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).  An agency decision may be deemed arbitrary and

capricious:

> [I]f the agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the problem, offered an
> explanation for its decision that runs counter to the evidence before the agency, or
> is so implausible that it could not be ascribed to a difference in view or the
> product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006). Moreover, as I have previously observed, if an agency adopts a general policy by which its discretion is exercised, "an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the [APA]." *INS v. Yang*, 519 U.S. 26, 32 (1996). Similarly, "proof of subjective bad faith by [agency decision-makers], depriving a [petitioner] of fair and honest consideration of its proposal, generally constitutes arbitrary and capricious action." *Latecoere Int'l, Inc. v. U.S. Dept. of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (Bad faith is "material to determining whether the Government acted arbitrarily."). Moreover, the standard of review is somewhat less deferential when considering an agency order "that arrives at substantially the same conclusion as an order previously remanded by the same court." *Greyhound Corp. v. Interstate Commerce Comm'n*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

Because the arbitrary and capricious standard of review is deferential, the defendants have sought to recast the Secretary's decision as that of the FDA in order to confer upon the Secretary the deference to which the FDA is due as a result of its specialized experience and judgment. This argument fails for a number of reasons. First, there was only one "ultimate decision-maker on the SNDA," and that was the Secretary. Letter from the United States Attorney at 2 (Mar. 14, 2013), Case No. 12-cv-763, Doc. No. 80. Second, the Secretary was obviously unaware of the policies followed by the FDA in deciding applications to switch a drug's prescription status, or she consciously ignored them. Third, while the rationale for deferring to an agency's decision-making is "particularly strong when the [agency] is evaluating

36

Add-160

scientific data within its technical expertise," *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992), normally the Secretary of Health and Human Services has no specialized technical expertise in this area. Indeed, it is safe to say that most of those who hold that position are not qualified to serve as Commissioner of the FDA.

This explains why Congress expressly delegated to the FDA, among other responsibilities, the decision whether to allow drugs to be sold without a prescription. Indeed, the language of the FDCA specifically provides that "the Secretary, *through the Commissioner*, shall be responsible for executing" the FDCA—language which deprived the Secretary of the authority to deny either the SNDA or the Citizen Petition on her own. 21 U.S.C. § 393(d)(2) (emphasis added). Just as the Secretary could not, on her own, deny either of the two petitions at issue here, she should not be able to overrule the decision of the FDA without good reason.

> The FDA is an expert scientific agency charged with making scientific and medical decisions within the boundaries set by the FDCA. Nothing in that statute suggests that scientific decisions may bend to political winds. There are more than a dozen scientific areas of expertise that are brought into account when making a decision on a NDA or Supplemental NDA—e.g., clinical medicine (here obstetrics and gynecology), pediatrics, toxicology, clinical pharmacology, and statistics, among many others. NDAs and Supplemental NDAs are lengthy, complex, highly sophisticated applications that must comply with a myriad of FDA regulations which in turn are concordant with international standards.

Pendergast Decl. ¶ 33, Case No. 12-cv-763; Doc. No. 4. *See also* Hamburg Statement, Case No. 05-cv-366, Doc. No. 339-2 ("Our decision-making reflects a body of scientific findings, input from external scientific advisory committees, and data contained in the application that included studies designed specifically to address the regulatory standards for nonprescription drugs.").

In apparent recognition of the complexity of this process, the Secretary has delegated to the Commissioner of Food and Drugs, with the authority to re-delegate, "[f]unctions vested in the Secretary under the [FDCA] (21 U.S.C. 301 et seq.)." Delegations of Authority to the

Commissioner of Food and Drugs, *republished in* FDA Staff Manual Guide § 1410.10. This necessarily includes the authority, if any, of the Secretary to make decisions on drug approvals pursuant to 21 U.S.C. § 355.[9] This delegation is consistent with language Congress used in the legislation that made the Commissioner of the FDA a presidential appointee subject to Senate confirmation.

The change in the status of the Commissioner was based on a finding that "the independence and integrity of the Food and Drug Administration need to be enhanced in order to ensure the continuing protection of the public health." Food and Drug Administration Act of 1988, Pub. L. No. 100-607, § 502, 102 Stat. 3048, 3120. One consequence of this change was that the Commissioner was no longer a subordinate of the Secretary. She does not serve at the pleasure of the Secretary, and she cannot be removed from office by the Secretary. Only the President has the power to do so. In this case, if Commissioner Hamburg had refused to follow the directive of Secretary Sebelius, the President would have been faced with the unpalatable choice of either dismissing the Commissioner or overruling the Secretary.

Moreover, even in the run-of-the-mill case under the APA, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" *Nat'l Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)). Thus, even if the Secretary is entitled to the benefit of the same deference to which the FDA would be entitled, that deference does not entitle her opinion to a judicial rubber-stamp. If anything, the unprecedented nature of her interference with the administration of Chapter 9 of the FDCA, her lack of scientific expertise, and her failure to

---

[9] The Delegation of Authority includes a reservation of the Secretary's right to approve FDA regulations in some circumstances. *Id.* § 2(A). There is, however, no reservation of any right to intervene in over-the-counter product approvals. See Decl. of Mary Pendergast, J.D., L.L.M., ¶ 34, which I treat as the equivalent of an amicus brief.

38

acknowledge, much less explain, the deviations from FDA policy occasioned by her order to the FDA suggest that an even more careful examination of her action is warranted. So too does the fact that this case involves the constitutional right to obtain and use contraceptives. The restriction on the sale of time-sensitive levonorgestrel-based contraceptives to pharmacies and health clinics, which affects all women, implicates this right. Indeed, in considering a challenge to a New York statute that prohibited the sale of any form of contraceptive to a minor under the age of 16 and prohibited anyone other than a licensed pharmacist from distributing contraceptives to persons 16 or over, the Supreme Court framed the right in question as the right to make one's own decision in matters of childbearing—including the right of access to contraception—rather than the right of individuals to obtain contraceptives from individuals other than licensed pharmacists. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 685-689 (1977); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 69 (1983) (striking down restrictions on advertising for contraceptives not only because such advertising implicates public interest in the free flow of commercial information, but also "relates to activity which is protected from unwarranted state interference").

While the FDA complied with Secretary Sebelius's order, it is clear that the decision to deny the SNDA was not that of an agency to which "Congress has entrusted the responsibility of making the necessary scientific assessment . . . [and which] must have the latitude to make that decision properly." Letter from United States Attorney at 2 (Aug. 13, 2010), Case No. 05-cv-366, Doc. No. 307-4. The decision that the agency was forced to make, contrary to its own policies and judgment, is not entitled to any deference. Indeed, it is hardly clear that the Secretary had the power to issue the order, and if she did have that authority, her decision was arbitrary, capricious, and unreasonable.

### D.  Citizen Petition Denial

        The FDA denied the Citizen Petition almost immediately after it rejected the Plan B One-Step SNDA in December 2011.  The FDA's decision was compelled by the reason underlying the Secretary's order to reject the Plan B One-Step SNDA.  Again, the Secretary concluded that "[t]he label comprehension and actual use studies submitted to FDA [by the Plan B One-Step sponsor] do not include data on all ages for which the drug would be approved and available over-the-counter."  Sebelius Mem., Case No. 05-cv-366, Doc. No. 339-1.  The Citizen Petition had to be denied because it suffered from exactly the same defect.  Thus, there was no way in which the FDA could have approved the Citizen Petition.  Indeed, the United States Attorney's most recent letter does not dispute the fact that the Secretary's denial precluded the FDA from granting the Citizen Petition to the extent that it sought a complete over-the-counter switch for all ages.  Letter from the United States Attorney at 4 (March 22, 2013), Case No. 12-cv-763, Doc. No. 83.  Instead, she suggests that "if the data in the Citizen Petition docket hypothetically supported lowering the age cut-off for non-prescription sales of that drug from the current 17 to some intermediate age, then FDA could theoretically have initiated a notice-and-comment rulemaking proceeding to consider lowering the cut-off age for Plan B . . . notwithstanding the Secretary's determination with respect to the all-or-nothing SNDA for Plan B One-Step."  *Id.* This is not the relief that the Citizen Petition requests and, for the reasons already stated, it would be a pointless remedy.

        The fact that the Secretary's order mandated the denial of the Citizen Petition as well as the SNDA could have been explained in one page, if not one sentence.  Instead, the FDA produced a ten page document composed mainly of filler that was designed to create the illusion

that it was engaging in some independent exercise of agency discretion. The bizarre nature of the Citizen Petition denial letter is highlighted by the following paragraph:

> Actual use and labeling comprehension data would be needed to determine, among other things, whether women under 17 can understand that they would need to take two pills twelve hours apart, and whether they actually would do so correctly. *The data submitted by Teva in its SNDA for Plan B One-Step included a labeling comprehension study and an actual use study that CDER scientists concluded were necessary and addressed the deficiencies in the original data that led to the earlier bifurcated approval status.* This type of data, i.e., actual use and labeling comprehension studies conducted with adequate numbers of younger subjects, has not been presented to the agency with respect to Plan B. Thus, FDA reconfirms its conclusion that neither the information contained in the administrative record for the citizen petition, nor the data and information in the Plan B SNDAs, were adequate to support OTC use in women under age 17.
>
> Therefore, upon reconsideration and following a re-analysis, we conclude that FDA needs additional data to support a switch of Plan B for women younger than 17 years of age.

Citizen Petition Denial Letter at 10 (emphasis added).

In essence, the FDA was telling the plaintiffs that the Plan B One-Step sponsor had submitted adequate labeling and actual use studies sufficient to support an over-the-counter switch with no age or point-of-sale restrictions and that the Citizen Petition could not be approved unless they submitted the same data. Of course, had they been able to provide such data, the FDA would still have been forced to deny their petition on the grounds articulated by the Secretary. Thus, the suggestion that the plaintiffs need to provide "additional data" comparable to that in the Plan B One-Step application "to support a switch of Plan B for women younger than 17 years of age" is simply a complete pretext—another example of the bad faith that has permeated the FDA's consideration of the Citizen Petition from beginning to end.

Moreover, even considered on its own terms, the Citizen Petition Denial Letter is unsound. Perhaps most significantly, it failed to offer any explanation as to why Plan B should be treated differently from other drugs so as to require numerous deviations from agency policies

41

Add-165

and practices. The most significant example is its failure to acknowledge the FDA's own policy and precedent in extrapolating data from older adolescents to younger, particularly with respect to contraceptives, much less explain why the FDA failed to adhere to that precedent. The flawed and failed summary judgment motion on this issue, unaccompanied by any affidavit containing such an explanation, is insufficient.

Even if the failure to extrapolate could somehow be justified, the Citizen Petition Denial Letter also failed to acknowledge the FDA's own policy and precedent of approving drugs for over-the-counter sale even where there is real concern about their safety. No explanation is given as to why, if the data regarding the proper use of Plan B by young adolescents were indeed insufficient, that could not be addressed through a labeling restriction rather than age and point-of-sale restrictions. Nor does the FDA justify the creation and maintenance of a new and unprecedented point-of-sale marketing program—the behind-the-counter regime restricting emergency contraceptives to pharmacies and health clinics—for a drug whose safety and efficacy is unquestioned, and which certainly poses a lesser risk to health than many other drugs sold over-the-counter.

While these unexplained departures from precedent alone render the denial arbitrary, capricious, and unreasonable, they are not the only reasons for reversing the denial of the Citizen Petition. The Citizen Petition Denial Letter claimed that no new data had been submitted by the plaintiffs or any other sources "to satisfy the statutory requirements for FDA to remove the Rx requirements for Plan B for women under the age of 17" since the 2009 remand. Citizen Petition Denial Letter at 10. In addition, the FDA wrote that it did "not have any data from other sources that would be sufficient to support such a switch." *Id.* The latter statement was untrue because the agency did have data from at least two sources.

42

Add-166

First, the FDA had available the actual use and label comprehension studies submitted by the Plan B sponsor in support of its SNDAs seeking expanded over-the-counter access to Plan B and Plan B One-Step. Specifically, the label comprehension study submitted with the Plan B One-Step SNDA tested participants' understanding of six key concepts, developed with the FDA's input:

> (1) The product is used to prevent pregnancy after unprotected sex;
> (2) It should be taken as soon as possible after sex;
> (3) It does not prevent sexually transmitted disease or HIV/AIDS;
> (4) It should not be used instead of regular contraception;
> (5) It should be taken within 72 hours after sex; and
> (6) It should not be used by women who are already pregnant.

Raymond Decl. ¶ 33, Case No. 12-cv-763, Doc. No. 5. These six key concepts were understood by 83-96% of all subjects. Raymond et al., *Comprehension of a prototype emergency contraception package label by female adolescents*, 79 Contraception 199, 203 (2009), Case No. 12-cv-763, Doc. No. 27-1. As the article publishing the study states:

> Lower literacy was significantly associated with lower likelihood of understanding of each of the six key concepts. . . . Younger subjects were significantly less likely than older subjects to understand four of the key concepts, although the difference in understanding between 12- to 14-year-olds and 15- to 17-year-olds was no more than 10 percentage points for any one concept.

*Id.* at 203.

While the label comprehension study submitted with the Plan B One-Step SNDA tested instructions for a one-pill product, "[a]ll six key concepts that were tested in [the] second label comprehension study apply equally well to both one-pill and two-pill products." Raymond Decl. ¶ 36. The Plan B One-Step study "did not test the instruction that in two-pill products, the two pills should be taken 12 hours apart." *Id.* Nevertheless, "substantial data indicate that this interval is irrelevant to efficacy, which is the same whether the two pills are taken 0, 12, or 24 hours apart," and is also irrelevant to safety, as "the pills are equally safe no matter what the

43

interval." *Id.*; *see also* Medical Officer's Safety Rev. of SNDA at T-30799 (March 25, 2004), Case No. 05-cv-366, Doc. No. 235-3. As the published article on the study states, "[t]he prototype label that we tested was similar in format and content to that of the currently marketed Plan B product." Raymond et al. at 199.[10]

Second, the FDA concedes that, in its independent literature review, it considered the label comprehension study conducted by Dr. Miriam Cremer. Defs.' Resp. to Mar. 4, 2013 Order at 1-2, Case No. 12-cv-763, Doc. No. 79; *see also* M. Cremer et al., *Adolescent Comprehension of Emergency Contraception in New York City*, 113 Obstetrics and Gynecology 840 (2009); Cremer Decl., Case No. 12-cv-763, Doc. No. 29. Dr. Cremer and her team tested the comprehension of over 1,000 adolescents between the ages of 12 and 17 who were provided with "a six-page copy of an actual two-pill levonorgestrel-based package insert that individuals receive when purchasing [emergency contraception]." Cremer Decl. ¶ 4. The results of the study indicated that adolescents "understood the concepts necessary for safe and effective use" of emergency contraception "as well as adults do." *Id.* ¶ 5. "Overall, adolescents demonstrated high comprehension of the key points of EC: 1) that it is a method of preventing pregnancy after unprotected sex (92%); 2) that it has to be taken within the first seventy-two hours after unprotected intercourse (83%); 3) that if you are already pregnant EC will not be effective (87%); 4) that EC will not protect against HIV/AIDS (95%); and 5) that EC should not be used as a method of long-term birth control (85%)." *Id.*

Indeed, the FDA itself acknowledged the "overlapping elements of labeling between Plan B One-Step and the other levonorgestrel [emergency contraception] products. Examples of these

---

[10] The Plan B sponsor had submitted a similar label comprehension study with its initial SNDA. That study included "656 subjects from 12 to 50 years old, of whom 580 were 17 years and older." Summary Review at 12. "The 2001 study was of similar design" to the Plan B One-Step label comprehension study, "and 13 questions in both studies overlapped. The proportions of subjects who answered correctly were similar for 11 of 13 questions." *Id.*

elements include the indication for the product, the appropriate time to take the product (as soon as possible but within 72 hours), and the warnings that the product should not be used as regular birth control and will not protect from sexually transmitted diseases.  In addition, safety data generated by these trials for levonorgestrel used as emergency contraception may be applicable to both products.  Therefore, some data generated by these studies may be applicable to the other levonorgestrel [emergency contraceptives]."  Letter from Andrea Leonard-Segal, M.D., Center for Drug Evaluation and Research, FDA, to Duramed Pharmaceuticals at 2 (Dec. 17, 2010), Case No. 12-cv-763, Doc. No. 23-3.

In its letter explaining its reasons for rejecting the Citizen Petition, the FDA provided additional insight into the process by which it found Plan B One-Step to be appropriate for over-the-counter access by all ages.  The letter observed that, because "[t]his product is already approved as a prescription product . . . the safety and efficacy in the pediatric population have been established."  Citizen Petition Denial Letter at 9 (quoting a memorandum of Lisa Mathis, Associate Director of the Office of New Drugs at the FDA).  Under these circumstances, additional data were needed only to show "that the benefits and risks would be the same if the product was available OTC without a learned intermediary."  *Id.*  The FDA official quoted in the letter goes to conclude that "[t]he studies provide data to demonstrate that women of child bearing potential of all ages can appropriately self-diagnose and administer Plan B One-Step in an OTC setting . . . The safety and efficacy of OTC Plan B One-Step in this application is supported by the totality of the data submitted to support the application."  *Id.*

Nevertheless, the FDA insisted that the Plan B One-Step actual use study could not be used to support over-the-counter access to Plan B because Plan B involves two pills taken 12 hours apart instead of one pill.  Specifically, the FDA said:

45

Add-169

[T]he two drugs are not the same product, and all of the data supporting one application cannot automatically be used for the other. In particular, because Plan B One-Step consists of a single tablet, the dosing data for Plan B One-Step could not provide support for an OTC switch of Plan B as that data would not adequately address the ability of subjects to correctly follow the directions related to the timing of a second dose that is required for proper use of Plan B.

Thus, as a scientific matter, if additional data regarding the OTC use by younger women were needed for Plan B One-Step, that type of data would also be needed for Plan B, but those Plan B One-Step studies would not be transferable to Plan B. Instead, there would need to be new studies conducted using Plan B and its labeling, because it has more complicated directions for use, raising additional questions as to label comprehension and actual use.

*Id.* at 2.

The approval of Plan B One-Step by the FDA demonstrates its recognition that there would be no adverse consequences or decrease in effectiveness if the two pills were taken at the same time or less than 12 hours apart. The only consequence that the defendants were able to identify from a failure to follow the label instructions is that "if you miss the timing of the second dose, it reduces effectiveness and that can have unfortunate consequences for someone who is taking the drug to avoid becoming pregnant." Apr. 27, 2012 Hr'g Tr. at 84:9-12, Case No. 12-cv-763, Doc. No. 84. This is the argument of a lawyer, not a scientist. Scientific evidence in the record establishes that "[t]he most important factor concerning timing of dosing and effectiveness is the interval between the first dose and unprotected intercourse," and that "[i]t is [] unlikely that the effectiveness of Plan B will be reduced if the second tablet is taken 6 to 18 hours, instead of exactly 12 hours, after the first dose." Medical Officer's Safety Rev. of SNDA at T-30799 (March 25, 2004), Case No. 05-cv-366, Doc. No. 235-3; *see also* Raymond Decl. ¶ 36. Yet the regime currently in place affects the most significant factor in terms of effectiveness of the product because it increases the delay between sexual intercourse and the first dose (the only dose in the case of Plan B One-Step).

46

Moreover, the two-pill actual use study submitted with the original Plan B SNDA demonstrated that "[t]here was excellent compliance with the labeled dosing regimen among subjects < 18 yr. of age. Compliance was at least as good as that in the subjects 18 yr. and older." Medical Officer's Safety Rev. of SNDA at T-30800 (March 25, 2004), Case No. 05-cv-366, Doc. No. 235-3. Although it is clear that the second pill need not be taken exactly 12 hours after the first in order for the drug to remain effective, compliance with this direction was nonetheless high. "Evaluation of the adolescents who did not take their second dose at exactly 12 hours revealed that nearly all took it within minutes of the 12 hour time point. There was one outlier that took the second dose 2 hours late." Deputy Div. Dir. Summ. Rev. of New Drug Application at T-30840, Case No. 05-cv-366, Doc. No. 235-4. Indeed, an FDA medical reviewer, in describing the results of the Plan B actual use study, concluded that "the timing of 1st and 2nd dose in the [actual use study] did not vary based on age." Addendum to Div. Dir. Memo at T-30749, Case No. 05-cv-366, Doc. No. 235-3. Nor did the actual use study support the argument that intervention by a health care provider, such as a pharmacist or doctor, impacts the timing of the second dose. Deputy Div. Dir. Summ. Rev. at T-30840-41, Case No. 05-cv-366, Doc. No. 235-4.[11]

In sum, the Citizen Petition denial was inevitable after the Secretary ordered Commissioner Hamburg to deny the Plan B One-Step SNDA. Because the Secretary's action was politically motivated, scientifically unjustified, and contrary to agency precedent, it cannot provide a basis to sustain the denial of the Citizen Petition. The Citizen Petition Denial Letter, which came five days after the denial of the Plan B One-Step SNDA, was clearly prompted by

---

[11] The results of these studies are not surprising, since, as Dr. Leonard-Segal observed, "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review at 28.

47

the Secretary's action, despite the FDA's fanciful effort to make it appear that it undertook an independent review of the Citizen Petition. Nevertheless, even considering the Citizen Petition Denial Letter in isolation, the agency's decision cannot withstand any degree of scrutiny, not only because of its unexplained failure to follow the FDA policies discussed above but also because of its disregard for the scientific evidence that the FDA had before it. Because the defendants argue that I cannot rely on the studies discussed above in reviewing the denial of the Citizen Petition, I now turn to that issue.

### E. Proper Record on Review

#### 1. The Actual Use and Label Comprehension Studies

The defendants argue that the actual use and label comprehension studies submitted with the Plan B One-Step switch application could not have been considered by the FDA in its review of the Citizen Petition and may not be considered here in my review of the Citizen Petition denial. They make this argument even though the very reason the FDA gave for denying the Citizen Petition was the lack of age-specific data, *as compared to* that submitted with the Plan B One-Step SNDA. Indeed, the FDA expressly acknowledged that it delayed consideration of the Citizen Petition for three years because it anticipated that the Plan B One-Step studies would be relevant to its reconsideration of the Citizen Petition. Thus, it wrote that "[w]hether actual use and label comprehension data were needed for approval of the nonprescription use of Plan B One-Step is *directly relevant* to whether those data were needed for the same approval for Plan B *because of the similarities between the products* and [because of] the data that the sponsor had developed to support the OTC approval of the products." Citizen Petition Denial Letter at 2 (emphasis added).

48

While it is difficult to understand why the Citizen Petition was not judged on the basis of the materials submitted in support of it instead of being compared to those materials submitted in support of a separate application by the Plan B One-Step sponsor that was denied, the FDA's consideration of these studies in evaluating the Citizen Petition is the beginning and the end of the argument that those studies cannot be considered.   An even more significant fact, which the defendants ignore, is that the Administrative Record filed in this case does in fact contain a detailed PowerPoint summary of the most compelling details on the actual use study submitted in support of the Plan B One-Step application.  Admin. R. at 598-619.

This leaves the FDA with an argument that the use of the studies submitted by the Plan B One-Step sponsor, Teva Women's Health, Inc. ("Teva"), would deprive Teva of the right to three years of exclusive marketing of Plan B One-Step, to which it would have been entitled under the FDCA.  *See* 21 U.S.C. § 355(c)(3)(E)(iv) & 355(j)(5)(F)(iv).  This exclusivity could only have followed if Teva's application for over-the-counter access had been granted by the FDA based on a finding by the FDA that those studies were "essential" to the approval.  Defs.' Resp. to Order to Show Cause at 24, Case No. 12-cv-763, Doc. No. 23.  The purpose underlying this exclusivity provision, according to both the FDA and Teva, is "to encourage and reward drug manufacturers who devote the time and expense to clinical trials necessary to approve changes to a drug product."  *Id.*; Teva's Proposed Mem. Of Law in Resp. to Order to Show Cause at 11, Case No. 12-cv-763, Doc. No. 22-2.

The FDA conceded that the actual use and label studies submitted by Teva were sufficient to justify a complete over-the-counter switch, although it suggested that the label comprehension study was not essential.  Thus, the Citizen Petition Denial Letter stated that, "[a]s part of the anticipated approval, FDA was prepared to determine that the clinical [actual use]

Add-173

study that Teva submitted for Plan B One-Step was essential to any approval of non-prescription marketing of the product and thus grant 3-years of exclusivity." Citizen Petition Denial Letter at 9. Nevertheless, Teva was not granted exclusivity because, as the Citizen Petition Denial Letter explained, the "FDA's final determination on exclusivity was not made because FDA determines whether to grant exclusivity *after product approval*." *Id.* at 9 n.4 (emphasis added). Because Teva's application was denied, it does not enjoy any exclusivity. Thus, the policy justification underlying the exclusivity provisions of the FDCA does not apply here. Teva has chosen not to appeal the denial of the Plan B One-Step SNDA; rather, it claims to be involved in "active dialogue with the FDA right now," and it has acquiesced in the suggestion that it could still appeal if the FDA should adhere to its position. Apr. 27, 2012 Hr'g Tr. at 22:9-10, Case No. 12-cv-763, Doc. No. 84. Nor is Teva currently marketing Plan B One-Step for universal over-the-counter access. Under these circumstances, Teva's position will not be affected whether the case is decided in favor of the FDA or the plaintiffs—in either case, it will not enjoy exclusivity. There is simply no reason in law or policy why the studies submitted by Teva should not be considered in my review of the Citizen Petition denial.

The defendants' final arrow in their effort to invoke Teva's commercial interests to prevent reliance on the Plan B One-Step studies turns on the fact that Teva has never given its permission for the Citizen Petition proponents to use its studies. Specifically, the defendants argue that "a sponsor's clinical studies cannot be applied to support the approval of another manufacturer's drug product unless the drug sponsor grants a 'right of reference' to those studies." Defs.' Mem. in Opp. to Summ. J. at 34 n.9, Case No. 12-cv-763, Doc. No. 37. They cite one statute, 21 U.S.C. § 355, and one regulation, 21 C.F.R. § 314.3. I decline to consider this argument, upon which even Teva itself does not rely, because it was advanced in a single

Add-174

footnote, it relied on a 20,000+ word statutory section with numerous parts and subparts without any pincite to the relevant language, and the footnote did not in any way develop the legal argument to which the defendants allude. Nor did the regulation on which they rely. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). It is not my job, in a case in which numerous briefs and motions have been filed, to "scour[] through footnotes in search of some possibly meritorious point that counsel did not consider of sufficient importance to [develop or] include as part of the argument." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).

### 2. The Declarations Submitted in Support of Plaintiffs' Summary Judgment Motion

In an effort to restrict my consideration of declarations submitted by the plaintiffs in the current proceeding, the defendants invoke a rule which they claim precluded their own consideration of materials that were not part of the Citizen Petition docket. The only regulation cited by the defendants is 21 C.F.R. § 10.20(c), which provides that "[i]nformation referred to or relied upon in a submission is to be included in full and may not be incorporated by reference, unless previously submitted in the same proceeding." This is no more than a stylistic rule which says that any material explicitly relied on in a submission must be included in full. It does not address the issue of what information may be considered by the agency. Indeed, in the Citizen Petition Denial Letter, the FDA itself considered the studies submitted in support of the Plan B One-Step SNDA, although they were not part of the Citizen Petition docket. Moreover, after advising the Citizen Petition proponents that "[n]either your petition nor any of the public comments to the docket contain sufficient data to satisfy the statutory requirements for FDA to remove the Rx requirements for Plan B for women under the age of 17," it observed that, "[i]n addition, FDA does not have any data from other sources that would be sufficient to support such

51

Add-175

a switch." Citizen Petition Denial Letter at 10. This clearly indicates that the FDA did have the discretion to consider evidence outside the Citizen Petition docket.

A brief discussion of the declarations demonstrates the extent to which the FDA abused its discretion when it failed to consider evidence to which it had access even though it was not in the Citizen Petition docket. The plaintiffs submitted five declarations. Of these, two were by scientists who participated in the studies submitted in support of the Plan B One-Step SNDA. These declarations contain summaries of the studies of which the FDA was aware and which the FDA concluded were sufficient to support "the safe and effective [over-the-counter] use of Plan B One-Step in women under age 17," the details of one of which were included in the Administrative Record. Citizen Petition Denial Letter at 9-10. This consideration aside, at least one of the declarations exposed evidence of the agency's bad faith. Specifically, those declarations disclosed the fact that the FDA itself had excused the necessity for study data on women under the age of 13. Notwithstanding the lengthy discussion of the SNDA review process contained in the Citizen Petition Denial Letter, neither I nor the petitioners would have known that the Secretary had, in effect, directed the FDA to deny the Plan B One-Step SNDA because it lacked information that the FDA told the sponsor did not have to be included.

The third declaration was by Dr. Miriam Cremer. The declaration called my attention to a highly significant label comprehension study involving girls between the ages of 12 and 17 and a prototype two-pill emergency contraceptive label. Moreover, it too disclosed evidence of bad faith. Specifically, the declaration alleged that the FDA had asked for a copy of Dr. Cremer's study and that she had provided it. It was only after I asked whether that statement was true that the defendants admitted that the FDA had itself discovered that study as part of a literature review and had considered it during the SNDA review process. Again, although the Citizen

52

Add-176

Petition Denial Letter discussed the studies submitted with the Plan B One-Step SNDA, it omitted any mention of Dr. Cremer's study, which was as compelling as the label comprehension study submitted with the Plan B One-Step SNDA.

The fourth declaration is that of Mary Pendergast, a lawyer who was formerly employed as an FDA official and who was intimately familiar with the manner in which the agency operated. Only because of that declaration did I learn that the Secretary of Health and Human Services had delegated all of her authority to the Commissioner of the FDA under 21 U.S.C. § 301 *et seq.*, which includes the relevant statutes relating to new drug applications and switch applications to over-the-counter status, subject to two minor exceptions not relevant here. This delegation of authority is highly relevant to the discussion of the power of the Secretary and the scope of review. Nevertheless, the defendants failed to disclose it. Moreover, although Ms. Pendergast's submission is in the form of a declaration, it is more easily characterized as an amicus brief, and I treat it as such; I rely on it only for the information to which it drew my attention and of which I could take judicial notice in any event.

The fifth declaration is that of Dr. Tracey Wilkinson, who described the practical difficulties faced by adolescents seeking contraceptives from pharmacies. The declaration does not affect my decision in this case. I merely discuss her research to illustrate the obstructions to obtaining emergency contraception under the current regime. My decision, however, would be the same even without reference to the real-life consequences of the Secretary's conduct. Her decision with respect to the Plan B One-Step SNDA, which dictated the denial of the Citizen Petition, was arbitrary, capricious, and unreasonable for the reasons I have already outlined and do not repeat.

Add-177

### 3. Administrative Record Rule

The last rule the FDA relies on to preclude consideration of documents unhelpful to its position is the rule that a reviewing court must judge the propriety of administrative agency action "by the grounds invoked by the agency." *Secs. Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Fla. Power*, 470 U.S. at 743-44). The rationale behind the "record rule" is that a reviewing court, "in dealing with a determination or judgment which an administrative agency alone is authorized to make," *Chenery*, 332 U.S. at 196, should not conduct a *de novo* trial, review materials not before the agency when the decision was made, or substitute its opinion for that of the agency.

Nevertheless, the law is clear that a reviewing court may consider extra-record materials in certain circumstances. *See Nat'l Audubon*, 132 F.3d at 14-15. Indeed, "a strong showing of bad faith or improper behavior" may justify supplementing the record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). Thus, when the agency action cannot be adequately explained in the record it compiled, the court's consideration of evidence outside the agency's "administrative record" is not only warranted, *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), but necessary to a meaningful judicial review of the agency's action. *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (Agency record may be supplemented when

54

additional information "fully explicate[s] . . . [the agency']s course of conduct or grounds of decision.").

When this issue arose in prior proceedings in this case, I observed in my 2009 opinion that:

> None of the dangers the record rule is designed to prevent are implicated by consideration of the materials in the administrative record for the SNDAs submitted by the Plan B sponsor because these materials were "before the agency when the decision was made" and because the FDA itself relied on those materials when it denied the Citizen Petition. Indeed, from the very beginning, FDA staff acknowledged that the Plan B sponsor would work with the FDA to address any concerns raised by the Citizen Petition. Def.'s Ex. 3, Case No. 05-cv-366, Doc. No. 248-5 at T-30023. Moreover, no meaningful review of the denial of the Citizen Petition would be possible without a review of the administrative record for the SNDAs because the FDA understood the issues presented by the SNDAs and Citizen Petition to be one and the same.

*Tummino*, 603 F. Supp. 2d at 543.

In sum, I held in 2009 that the complete "record" for the FDA's decision regarding the Citizen Petition included its own administrative record for both the Citizen Petition and the SNDAs. Moreover, to the extent that this was not by itself a sufficient basis to do so, I also concluded that there was a "showing of bad faith or improper behavior" that justified supplementing the record, and that consideration of evidence outside the agency's administrative record was necessary to meaningful judicial review of the agency's actions. Then, based on the entire record before me, I vacated the FDA's denial of the Citizen Petition and ordered it to make Plan B available to 17-year-olds because the same evidence relied on by the agency to make the drug available to 18-year-olds applied equally to 17-year-olds, and I remanded for reconsideration the denial of the application to make Plan B available to younger adolescents. The FDA acquiesced in that ruling.

The same reasons that justified my consideration of materials outside the administrative record in 2009 apply equally here, including a strong showing of bad faith and improper political influence. I have already discussed the declarations and the studies in the preceding sections, and I do not repeat that discussion here. Thus, even absent a showing of bad faith, the materials were relevant for the limited reasons I relied on them and because they came within the exceptions to the record rule I have already discussed. Indeed, the defendants have included documents from the Plan B One-Step SNDA review process in the Administrative Record for the Citizen Petition, conceding to some extent the relevance of the SNDA proceeding. Again, one of the most significant of those documents was a presentation containing details of the actual use study submitted in support of the SDNA.

The only document I have not yet discussed is the Summary Review for Regulatory Action, which Secretary Sebelius said she reviewed prior to issuing her directive to the FDA to reject the Plan B One-Step SNDA. This document is properly considered here because the Secretary's decision dictated the denial of the Citizen Petition, notwithstanding the smoke and mirrors in the Citizen Petition Denial Letter, and I cannot effectively review the Citizen Petition denial without reviewing the Secretary's decision. In any event, I have only relied on the parts of this document that describe the policies and practices of the FDA, which are necessary to a meaningful judicial review of the agency's action.

### III. CONCLUSION

The decisions of the Secretary with respect to Plan B One-Step and that of the FDA with respect to the Citizen Petition, which it had no choice but to deny, were arbitrary, capricious, and unreasonable. I decline to direct a remedy comparable to that which I directed in my 2009 opinion, such as directing that emergency contraception be made available without a prescription

but with the current point-of-sale restrictions to women whom studies have demonstrated are capable of understanding the label and using the product appropriately. As I have previously observed, the obstructions in the path of those adolescents in obtaining levonorgestrel-based emergency contraceptives under the current behind-the-counter regime have the practical effect of making the contraceptives unavailable without a doctor's prescription. Consequently, the decision of the FDA denying the Citizen Petition is reversed, and the case is remanded to the FDA with the instruction to grant the Citizen Petition and make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale or age restrictions within thirty days. On remand, the FDA may determine whether any new labeling is reasonably necessary. Moreover, if the FDA actually believes there is any significant difference between the one- and two-pill products, it may limit its over-the-counter approval to the one-pill product.

I do not grant the application of the FDA to remand for the commencement of administrative rulemaking proceedings. In my previous opinion, I described the means by which the FDA may switch a drug to over-the-counter status. *Tummino*, 603 F. Supp. 2d at 525. I described two methods by which the FDA could change a drug's status: first, by promulgating a regulation through rulemaking initiated by either the Commissioner herself or a citizen petition, or by approving a drug sponsor's request for an over-the-counter switch. I observed, "[u]nlike the first mechanism, this process does not require rulemaking." *Id.* On further review, I believe that no statute or regulation requires the FDA to engage in administrative rulemaking upon approval of a citizen petition or *sua sponte* reconsideration of a drug's prescription-only status. The relevant statute, 21 U.S.C. § 353(b)(3), provides that "[t]he Secretary may by regulation remove . . . drugs from [prescription] requirements . . . when such requirements are not necessary

Add-181

for the protection of the public health." The statute does not require the agency to act by regulation, but provides only that it *may* do so.

Moreover, the regulations explicating over-the-counter switch procedures do not require rulemaking for changes initiated through a citizen petition or by the Commissioner herself; indeed, there is no suggestion that over-the-counter switches are treated differently based on the process by which they are initiated. 21 C.F.R. § 10.30, which deals with citizen petitions, specifically provides that the Commissioner "may grant or deny such a [citizen] petition, in whole or in part, and *may grant such other relief or take other action as the petition warrants*" (emphasis added). The section does not say that agency rulemaking is required prior to agency action on a citizen petition. Indeed, the Citizen Petition in this case does not seek rulemaking; it merely requests "that the [FDA] switch [Plan B and its generics] from prescription to over-the-counter (OTC) status." Citizen Petition at 1, Case No. 05-cv-366, Doc. No. 316-9. In addition, although the Citizen Petition requested a complete switch when it was filed twelve years ago, because Plan B was not yet available on a non-prescription basis to any consumer, this is not the case any longer. The relief sought by the Citizen Petition in light of present circumstances is limited to a partial over-the-counter switch for females under 17. No previous modifications of Plan B's over-the-counter status required rulemaking, including the expansion of over-the-counter access to 18-year-olds and, later, 17-year-olds as directed by my 2009 remand order.

Nor do the regulations distinguish between SNDAs, Commissioner-initiated agency action, and citizen petitions. 21 C.F.R. § 310.200, titled "Prescription-exemption procedure," states: "A proposal to exempt a drug from the prescription dispensing requirements of [the FDCA] may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemption, which petition may be pursuant to part 10 of

58

Add-182

this chapter [citizen petitions], or in the form of a supplement to an approved new drug application." The regulations do not say that these three means of initiating rulemaking require different responses from the FDA. And the defendants have not proffered any other support for the proposition that the grant of a Citizen Petition would merely result in the initiation of rulemaking other than the language from my previous decision.

Finally, even if the defendants' arguments would be sufficient to carry the day in the run-of-the-mill case, the bad faith that has permeated consideration of the Citizen Petition, not to speak of the Plan B sponsor's applications, should rule out such relief here. More than twelve years have passed since the Citizen Petition was filed and eight years since this lawsuit commenced. The FDA has engaged in intolerable delays in processing the petition. Indeed, it could accurately be described as an administrative agency filibuster. Moreover, one of the devices the FDA has employed to stall proceedings was to seek public comment on whether or not it needed to engage in rulemaking in order to adopt an age-restricted marketing regime. After eating up eleven months, 47,000 public comments, and hundreds of thousands, if not millions, of dollars, it decided that it did not need rulemaking after all. The plaintiffs should not be forced to endure, nor should the agency's misconduct be rewarded by, an exercise that permits the FDA to engage in further delay and obstruction.

REVERSED and REMANDED.

SO ORDERED.

Brooklyn, New York
April 4, 2013

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
ANNIE TUMMINO, *et al.,*                              JUDGMENT
                                                12-CV- 0763 (ERK)

                            Plaintiffs,

        -against-

MARGARET HAMBURG, *et al.,*

                            Defendants.
---------------------------------------------------X

           A Memorandum and Order of Honorable Edward R. Korman, United States

District Judge, having been filed April 5, 2013, granting Plaintiffs' motion for summary

judgment; denying Defendants' cross-motion for summary judgment; reversing the decision of

the Food and Drug Administration denying the Citizen Petition, and remanding the case to the

Food and Drug Administration with the instruction to grant the Citizen Petition and make

levonorgestrel-based emergency contraceptives available without a prescription and without

point-of-sale or age restrictions within thirty days; ordering that on remand, the Food and Drug

Administration determine whether any new labeling is reasonably necessary; and moreover, if the

Food and Drug Administration actually believes there is any significant differences between the

one- and two-pill products, it may limit its over-the-counter approval to the one-pill product; it is

           ORDERED and ADJUDGED that Plaintiffs' motion for summary judgment is

granted; that Defendants' cross-motion for summary judgment is denied; that the decision of the

Food and Drug Administration denying the Citizen Petition is reversed, and the case is remanded

to the Food and Drug Administration with the instruction to grant the Citizen Petition and make

JUDGMENT 12-CV-0763 (ERK)

levonorgestrel-based emergency contraceptives available without a prescription and without

point-of-sale or age restrictions within thirty days; that on remand, the Food and Drug

Administration may determine whether any new labeling is reasonably necessary; and that

moreover, if the Food and Drug Administration actually believes there is any significant

difference between the one-and two-pill products, may limit its over-the-counter approval to the

one-pill product.

Dated: Brooklyn, New York
     April 10, 2013

Douglas C. Palmer
Clerk of Court

by:

Michele Gapinski
Chief Deputy for
Court Operations

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Annie TUMMINO, *et al.*, | ) |
| | ) |
| | ) |
| *Plaintiffs*, | )  No. 12-CV-763 (ERK/VVP) |
| *v.* | ) |
| | )  (Korman, J.) |
| Dr. Margaret HAMBURG, Commissioner of | )  (Pohorelsky, M.J.) |
| Food and Drugs, *et al.*, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

<u>NOTICE OF APPEAL</u>

   **PLEASE TAKE NOTICE** that defendants Dr. Margaret Hamburg, Commissioner of Food and Drugs, and the Honorable Kathleen Sebelius, Secretary of Health and Human Services, hereby appeal to the United States Court of Appeals for the Second Circuit from the judgment of this Court entered on April 10, 2013 (ECF No. 87), and this Court's Memorandum and Order of April 5, 2013 (ECF No. 85).

Dated:    May 1, 2013                    Respectfully submitted,

          STUART F. DELERY                LORETTA E. LYNCH
          Acting Assistant Attorney General   United States Attorney
          Civil Division                 Eastern District of New York
                                         271 Cadman Plaza East
          IAN HEATH GERSHENGORN          Brooklyn, NY 11201-1820
          Deputy Assistant Attorney General


          SHEILA LIEBER          By:  /s/ {FILED ELECTRONICALLY}
          Deputy Director,             F. FRANKLIN AMANAT (FA6117)
          Federal Programs Branch      Assistant United States Attorney
                                       Eastern District of New York
          ERIC B. BECKENHAUER          (718) 254-6024
          Trial Attorney,              franklin.amanat@usdoj.gov
          Federal Programs Branch

          United States Department of Justice, Civil Division
          20 Massachusetts Avenue, N.W.
          Washington, DC 20530
          (202) 514-3338

*Of Counsel*:
    DAVID J. HOROWITZ, Deputy General Counsel
    ELIZABETH H. DICKINSON, Chief Counsel, Food and Drug Division
    ANNAMARIE KEMPIC, Deputy Chief Counsel, Litigation, Food and Drug Division
    SCOTT A. KAPLAN, Assistant Chief Counsel, Food and Drug Division
        United States Department of Health and Human Services
        Office of the General Counsel
        10903 New Hampshire Avenue
        Silver Spring, MD 20993-0002

*Of Counsel*:

DAVID J. HOROWITZ, Deputy General Counsel
ELIZABETH H. DICKINSON, Chief Counsel, Food and Drug Division
ANNAMARIE KEMPIC, Deputy Chief Counsel, Litigation, Food and Drug Division
SCOTT A. KAPLAN, Assistant Chief Counsel, Food and Drug Division
 United States Department of Health and Human Services
 Office of the General Counsel
 10903 New Hampshire Avenue
 Silver Spring, MD 20993-0002

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ANNIE TUMMINO, *et al.*,          )
                                  )
                                  )
        Plaintiffs,               )
                                  )
        v.                        )          Civil Action No. 12-CV-763
                                  )
MARGARET HAMBURG, Commissioner    )          (Korman, J.)
of Food and Drugs, *et al.*,      )          (Pohorelsky, M.J.)
                                  )
        Defendants.               )
                                  )

## <u>DECLARATION OF JANET WOODCOCK, M.D.</u>

On behalf of defendants Margaret Hamburg, Commissioner of Food and Drugs, and Kathleen Sebelius, Secretary of Health and Human Services, I, Janet Woodcock, M.D, declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

1.      I am the Director of the Center for Drug Evaluation and Research ("CDER"), United States Food and Drug Administration ("FDA"), United States Department of Health and Human Services ("HHS"). I joined FDA in 1986 and since then have been the CDER Director for a total of more than 15 years. I have also held the positions of Deputy Commissioner, Chief Medical Officer, and Director of the Office of Therapeutics Research and Review in FDA's Center for Biologics Evaluation and Research. I received my medical degree from Northwestern University Medical School,

Add-189

and my undergraduate degree from Bucknell University. I have held teaching appointments at Pennsylvania State University and the University of California at San Francisco.

2. In my capacity as CDER Director, I am familiar with CDER's evaluations of levonorgestrel-based contraceptive drug products, including Plan B and Plan B One-Step. This declaration is based on that familiarity, as well as on CDER's official records related to those evaluations prepared in the regular course of business. All such records were made at or near the time of the act, event, or condition described therein, by or from information transmitted by a person with knowledge of such act, event, or condition.

3. In connection with the above-captioned case, I understand that on April 5, 2013, the district court ordered FDA to "make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale or age restrictions within thirty days." I write this declaration on behalf of FDA and HHS to provide an update to the court regarding the current approval status of Plan B One-Step and in support of the government's motion for stay of that order pending appeal.

    a. With regard to the approval status of Plan B One-Step, on April 30, 2013, FDA approved an amended supplemental new drug application (SNDA) submitted by Teva Branded Pharmaceutical Products R&D, Inc. ("Teva") seeking to market Plan B One-Step with no prescription requirements for any consumer but with labeling that states that the drug is not intended for use by, or sale to, consumers under age 15. A copy of FDA's approval letter is attached. Teva submitted the amended SNDA on March 9, 2012. The application was not a matter of public

record prior to FDA's action; FDA does not generally disclose the existence of an application before approval absent permission from or disclosure by the sponsor. 21 C.F.R. § 314.430.

b. Prior to FDA's approval of the amended SNDA, Plan B One-Step was available only in a dual packaging configuration in which the prescription version and the non-prescription version were packaged in the same box. For that reason, the package could be dispensed only by a pharmacist even to customers who were not required to present a prescription. The newly approved Plan B One-Step no longer includes a prescription version for younger age groups and, therefore, no longer needs to be dispensed by a pharmacist.

c. Teva has indicated that Plan B One-Step will be distributed to retailers with an on-site pharmacy, and that it may be placed in the family planning, female health, or similar aisle. Thus, the product will be available for sale during the retailer's normal operating hours, whether the pharmacy is open or not.

d. Teva's amended SNDA that has now been approved by FDA proposed the following notice on the product label: "NOT FOR SALE TO THOSE UNDER 15 YEARS OF AGE | PROOF OF AGE REQUIRED | NOT FOR SALE WHERE AGE CANNOT BE VERIFIED." Teva plans to package its product with a UPC code that, when scanned, would prompt the cashier to request proof of age from the customer. If age verification cannot be performed, or if the customer does not meet the

age requirement for the product, the cashier would be instructed not to proceed with the sale.  Teva noted its willingness to conduct an audit of the age verification practices after the product is approved to ensure that the age restriction is being enforced.

e.  The amended SNDA indicated the sponsor's commitment to educate consumers, pharmacy staff, and healthcare professionals about the product's new status and about the fact that the product is not for sale to persons under age 15.

f.  In connection with its approval of Teva's amended SNDA, FDA granted Teva three years of marketing exclusivity on the basis of actual use studies Teva conducted in women age 15 and 16 that FDA found essential to its approval.  The approval does not affect the prescription or approval status of Plan B or its generic equivalents. The generic equivalents to Plan B remain available to those age 17 and older without a prescription and to those under age 17 with a prescription.  Generic equivalents to Plan B are kept behind the pharmacy counter for the prescription product to be lawfully dispensed.

4.  FDA recognizes that its approval of Teva's amended SNDA for-over-the counter sale of Plan B One-Step for ages 15 and above does not and was not intended to provide all of the relief set forth by the district court.  The approval reflects FDA's judgment that the application submitted by Teva was supported by appropriate scientific data showing that Plan B One-Step could be used safely and effectively as a nonprescription product by females ages 15 and up.

5. The public properly relies upon FDA classification of drugs as non-prescription as a reflection of the agency's judgment regarding the safety and proper use of a drug without a doctor's prescription. The public interest will not be served by reclassification of drugs as non-prescription by order of a court, without appropriate agency decision-making procedures being followed. A stay of the court's order will prevent public uncertainty regarding the status of the drugs at issue here pending the government's appeal to the Second Circuit. Moreover, if the status of these drugs is changed and later reversed, it can lead to situations in which women mistakenly believe that they can obtain the drug without a prescription or at certain locations where it used to be, but is no longer, available. The problem would be exacerbated because products with incorrect labeling will presumably remain on pharmacy shelves even after an appellate ruling reversing the injunction.

Executed on May 1, 2013.

Janet Woodcock, M.D.



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring MD 20993**

NDA 021998/S-002

**SUPPLEMENT APPROVAL**

Teva Branded Pharmaceutical Products R&D, Inc.
Attention: Amy Hummel, M.S.
Associate Director, Regulatory Affairs
41 Moores Road, P.O. Box 4011
Frazer, PA 19355

Dear Ms. Hummel:

Please refer to your supplemental new drug application dated and received February 7, 2011, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B One-Step® (levonorgestrel) tablet, 1.5 mg.

We also refer to your submissions dated March 9, 2012, June 11, 2012, June 27, 2012, March 13, 2013, April 4, 2013, and April 15, 2013. The March 9, 2012, submission constituted a complete response to our December 7, 2011 action letter. This "Prior Approval" supplemental new drug application provides for making Plan B One-Step available over the counter to women of childbearing potential aged 15 years and over who are in need of emergency contraception.

We note that the approved labeling contains the language "not for sale to those under 15 years of age * proof of age required * not for sale where age cannot be verified." Therefore, you must have appropriate mechanisms in place to ensure that the age of the purchaser is verified at the point of purchase.

We also note and agree with your plan to audit retail outlets, described in your submission dated March 13, 2013, that is designed to assure consumer compliance with the approved labeling. We request that you submit a report of your findings for review by the agency upon completion.

We have completed our review of this application, as amended. It is approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

**<u>LABELING</u>**

Submit final printed labeling, as soon as it is available, but no more than 30 days after it is printed. The final printed labeling (FPL) must be identical to the enclosed labeling:

Add-194

- immediate container labels (1-count blister) submitted on October 21, 2011,
- clinic and retail outer carton labels submitted on April 15, 2013,
- clamshell label front and back cards (Product identification cards) submitted on April 15, 2013, and
- consumer information leaflet submitted on December 7, 2011

and must be in the "Drug Facts" format (21 CFR 201.66), where applicable.

The final printed labeling should be submitted electronically according to the guidance for industry titled "Providing Regulatory Submissions in Electronic Format – Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications (June 2008)." Alternatively, you may submit 12 paper copies, with 6 of the copies individually mounted on heavy-weight paper or similar material. For administrative purposes, designate this submission "**Final Printed Labeling for approved NDA 021998/S-002**." Approval of this submission by FDA is not required before the labeling is used.

## DRUG REGISTRATION AND LISTING

All drug establishment registration and drug listing information is to be submitted to FDA electronically, via the FDA automated system for processing structured product labeling (SPL) files (eLIST). At the time that you submit your final printed labeling (FPL), the content of labeling (Drug Facts) should be submitted in SPL format as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm. Information on submitting SPL files using eLIST may be found in the guidance for industry titled "SPL Standard for Content of Labeling Technical Qs and As" at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf. In addition, representative container or carton labeling, whichever includes Drug Facts, (where differences exist only in the quantity of contents statement) should be submitted as a JPG file.

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of these criteria apply to your application, you are exempt from this requirement.

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Doris J. Bates, Ph.D., Senior Regulatory Project Manager, at (301) 796-1040.

Sincerely,

*{See appended electronic signature page}*

Shaw T. Chen, M.D., Ph.D.,
Director (Acting)
Division of Nonprescription Clinical Evaluation
Office of Drug Evaluation IV
Center for Drug Evaluation and Research

ENCLOSURE(S):
    Carton and Container Labeling
    Product Identification Cards
    Consumer Information Leaflet

Add-196



Reference ID: 3301801



TEAR HERE TO OPEN

NDC 51285-964-19

**FOR CLINIC USE ONLY. NOT FOR RESALE.**

For age 15 and older

**PlanB One-Step®**

levonorgestrel 1.5 mg

**emergency contraceptive**

One Tablet. One Step.

Reduces chance of pregnancy after unprotected sex.

Not for regular birth control.

Contains 1 Tablet 1.5mg

**PlanB One-Step®**

**emergency contraceptive**

One Tablet. One Step.

One Tablet. One Step.

The sooner you take it, the more effective it will be

Take as soon as possible within 72 hours (3 days) after unprotected sex

Will not harm an existing pregnancy

• not for sale to those under 15 years of age

• proof of age required

• not for sale where age cannot be verified

**Drug Facts**

**Active ingredient**
Levonorgestrel 1.5mg

**Purpose**
Emergency contraceptive

**Uses** reduces chance of pregnancy after unprotected sex

**Warnings**
**Allergy alert:** Do not use if you have ever had an allergic reaction to levonorgestrel

**Sexually transmitted diseases (STDs) alert:** This product does not protect against HIV/AIDS or other STDs

**Do not use**
• if you are already pregnant (because it will not work)
• for regular birth control

**When using this product** you may have
• menstrual changes • headache
• nausea • dizziness
• lower stomach (abdominal) pain • breast pain
• tiredness • vomiting

**Stop use and ask a doctor** if you have severe abdominal pain

**Directions**
• women 15 years of age and older: take one tablet as soon as possible within 72 hours (3 days) after unprotected sex. The sooner you take the tablet, the better it will work.
• women under 15 years of age: talk to a doctor

**Other information**
• read the instructions, warnings and enclosed product leaflet before use
• this product works mostly by preventing ovulation (egg release). It may also work by preventing fertilization of an egg (joining of sperm and egg) or by preventing attachment to the uterus (implantation).
• do not use if carton is open or blister seal is broken or missing
• store at 20-25°C (68-77°F)

**Inactive ingredients**
colloidal silicon dioxide, corn starch, lactose monohydrate, magnesium stearate, potato starch, talc

**Questions?**
Call 1-800-330-1271 or visit www.PlanBOneStep.com

Visit us at:
www.PlanBOneStep.com

**TEVA**

51285-964-19

Rev. 4/2013

799-26-100583

**PlanB One-Step®**

**emergency contraceptive**

One Tablet. One Step.

**PlanB One-Step®**

**emergency contraceptive** One Tablet. One Step.

• The sooner you take it, the more effective it will be
• Take as soon as possible within 72 hours (3 days) after unprotected sex
• Will not harm an existing pregnancy

**PlanB One-Step®**

**emergency contraceptive** One Tablet. One Step.

1 tablet Levonorgestrel 1.5mg

**PlanB One-Step®**

**emergency contraceptive** One Tablet. One Step.

Add-198

**NDC 51285-543-88**

For age 15 and older

**PlanB One-Step®**
levonorgestrel 1.5 mg
**emergency contraceptive**
One Tablet. One Step.

Reduces chance of pregnancy after unprotected sex. Not for regular birth control.

Contains 1 Tablet 1.5mg

**PlanB One-Step**
emergency contraceptive
One Tablet. One Step.

The sooner you take it, the more effective it will be

Take as soon as possible within 72 hours (3 days) after unprotected sex

Will not harm an existing pregnancy

• not for sale to those under 15 years of age
• proof of age required
• not for sale where age cannot be verified

**Drug Facts**

**Active ingredient**
Levonorgestrel 1.5mg

**Purpose**
Emergency contraceptive

Visit us at www.PlanBOneStep.com

Reference ID: 3301801

Add-199





Add-200



Reference ID: 3301801

Add-201

### What is Plan B One-Step®?
Plan B One-Step® is emergency contraception that helps prevent pregnancy after birth control failure or unprotected sex. It is a **backup** method of preventing pregnancy and should not be used as regular birth control.

### What Plan B One-Step® is not.
Plan B One-Step® will not work if you are already pregnant and will not affect an existing pregnancy. Plan B One-Step® will not protect you from HIV infection (the virus that causes AIDS) and other sexually transmitted diseases (STDs).

### When should I use Plan B One-Step®?
The sooner you take emergency contraception, the better it works. You should use Plan B One-Step® within 72 hours (3 days) <u>after you have had unprotected sex.</u>

Plan B One-Step® is a backup or emergency method of birth control you can use when:
- your regular birth control was used incorrectly or failed
- you did not use any birth control method

### When not to use Plan B One-Step®.
- as a regular birth control method; because it's not as effective as regular birth control.
- if you are already pregnant, because it will not work.
- if you are allergic to levonorgestrel or any other ingredients in Plan B One-Step®.

### How does Plan B One-Step® work?
Plan B One-Step® is one tablet with levonorgestrel, a hormone that has been used in many birth control pills for several decades. Plan B One-Step® contains a higher dose of levonorgestrel than birth control pills, but works in a similar way to prevent pregnancy. It works mainly by stopping the release of an egg from the ovary. It is possible that Plan B One-Step® may also work by preventing fertilization of an egg (the uniting of sperm with the egg) or by preventing attachment (implantation) to the uterus (womb).

### How can I get the best results from Plan B One-Step®?
You have 72 hours (3 days) to try to prevent pregnancy after birth control failure or unprotected sex. **The sooner you take Plan B One-Step®, the better it works.**

### How effective is Plan B One-Step®?
If Plan B One-Step® is taken as directed, it can significantly decrease the chance that you will get pregnant. About 7 out of every 8 women who would have gotten pregnant will not become pregnant.

### How will I know Plan B One-Step® worked?
You will know Plan B One-Step® has been effective when you get your next period, which should come at the expected time, or within a week of the expected time. If your period is delayed beyond 1 week, it is possible you may be pregnant. You should get a pregnancy test and follow up with your healthcare professional.

### Will I experience any side effects?
- some women may have changes in their period, such as a period that is heavier or lighter or a period that is early or late. **If your period is more than a week late, you may be pregnant.**
- if you have severe abdominal pain, you may have an ectopic pregnancy, and should get immediate medical attention.
- when used as directed, Plan B One-Step® is safe and effective. Side effects may include changes in your period, nausea, lower stomach (abdominal) pain, tiredness, headache, dizziness, and breast tenderness.
- if you vomit within 2 hours of taking the medication, call a healthcare professional to find out if you should repeat the dose.

### What if I still have questions about Plan B One-Step®?
If you have questions or need more information, call our toll-free number, 1-800-330-1271, or visit our website at www.PlanBOneStep.com.

### Other Information
### Keep out of reach of children:
In case of overdose, get medical help or contact a Poison Control Center right away at 1-800-222-1222.

### Do not use if the blister seal is opened.
Store at room temperature 20–25°C (68–77°F).

**Active ingredient:** levonorgestrel 1.5 mg

**Inactive ingredients:** colloidal silicon dioxide, potato starch, magnesium stearate, talc, corn starch, lactose monohydrate

**1-800-330-1271**
**www.PlanBOneStep.com**



Plan B One-Step®
levonorgestrel
**Emergency Contraceptive**
One Tablet. One Step.
*What You Need to Know*

799-33-100269

If you are sexually active, you should see a healthcare provider for routine checkups. Your healthcare provider will talk to you about and, if necessary, test you for sexually transmitted diseases, teach you about effective methods of routine birth control, and answer any other questions you may have.

©2011 Teva Women's Health, Inc.
Rev. A 12/2011

-------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------

/s/

---------------------------------------------------

SHAW T CHEN
04/30/2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANNIE TUMMINO, *et al.*,

                       Plaintiffs,

              - against -

MARGARET HAMBURG, Commissioner
of Food and Drugs, *et al.*

                   Defendants.

-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

No. 12-CV-763 (ERK)(VVP)

KORMAN, J.:

### INTRODUCTION

I assume familiarity with the underlying facts and circumstances of this case that are detailed in my memorandum of April 5, 2013. *Tummino v. Hamburg*, --- F. Supp. 2d ----, 2013 WL 1348656 (E.D.N.Y. Apr. 5, 2013). Nevertheless, some introductory words are appropriate. This case involved Plan B and Plan B One-Step, emergency contraceptives that can be taken to reduce the risk of pregnancy after unprotected intercourse. They must, however, be taken as soon as possible after unprotected intercourse. The longer the delay, the less effective they become. The effort to convert these levonorgestrel-based contraceptives from prescription to over-the-counter status has gone on for over twelve years, even though they would be among the safest drugs available to children and adults on any drugstore shelf.

The FDA, responding to unjustified political interference, delayed as long as it possibly could before it took even one incremental step in the process. Ultimately, on December 7, 2011, in response to an application filed by Teva Women's Health ("Teva"), the FDA concluded that Plan B One-Step—the one-pill version of the drug—could be sold over-the-counter and without

a prescription or age restriction.  The FDA was reversed by the Secretary of Health and Human Services on the same day in a decision that was politically motivated and that, even without regard to the Secretary's motives, was so unpersuasive as to call into question her good faith.  Some five days later, the FDA rejected a Citizen Petition that sought unrestricted over-the-counter status for Plan B—the original two-pill emergency contraceptive product—and all drugs that are "equivalent" to Plan B.  This decision was compelled by Secretary's reasoning in ordering the FDA to reject Teva's application.  Specifically, the Secretary found that information that she deemed essential was not provided by Teva.  The Citizen Petition lacked the same information.  The Citizen Petition Denial Letter, which came five days after the denial of Teva's Plan B One-Step application, was clearly prompted by the Secretary's action despite the FDA's fanciful effort to make it appear that it undertook an independent review of the Citizen Petition. *See Tummino v. Hamburg*, 2013 WL 1348656 at *26.

On April 5, 2013, I issued an order directing the defendants—the Commissioner of Food and Drugs and the Secretary of Health and Human Services—to grant the Citizen Petition filed by the plaintiffs and make levonorgestrel-based emergency contraceptives available over-the-counter and without point-of-sale or age restrictions.  I did so because the Secretary's action was politically motivated, scientifically unjustified, and contrary to agency precedent, and because it could not provide a basis to sustain the denial of the Citizen Petition.[1]  I did not order the defendants to make Plan B One-Step—the widely known brand name emergency contraceptive—available.  Teva had not appealed from the FDA's denial of its application, and, although it sought to intervene in this lawsuit, its intervention was not for the purpose of obtaining any relief related to its ability to market Plan B One-Step.

---

[1] The defendants do not suggest that they have any reasonable possibility of success in challenging this finding on appeal.

Plan B One-Step aside, the effect of my decision was to make levonorgestrel-based emergency contraceptives available without a prescription and without any point-of-sale or age restrictions. The only practical difference between my decision and the decision of the FDA that the Secretary reversed was that the FDA's decision was arguably directed towards the one-pill version of the drug, and my decision applied to both versions. Nevertheless, responding to far-fetched concerns ultimately voiced in response to the prospect of making the two-pill version available without a prescription, I advised the FDA that if it actually believed there was a significant difference between the one- and two-pill products, it was free to limit the relief on the Citizen Petition to the one-pill product. *Tummino v. Hamburg*, 2013 WL 1348656 at *31.

With this concession to the FDA's concerns, my decision was entirely consistent with the initial decision of the FDA. I adopted and completely agreed with Commissioner Hamburg's conclusion that "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential"—a conclusion that she reached after she had "reviewed and thoughtfully considered the data, clinical information, and analysis provided by" the FDA's Center for Drug Evaluation and Research. Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011). Notwithstanding my deference to the Commissioner and the scientists at the FDA, the defendants have filed a notice of appeal and a motion to stay my decision as they continue their administrative agency filibuster through the appellate process.

I pause here before proceeding to a discussion of the merits of the motion to comment on the defendants' analysis of the manner in which drug approval applications should be made. Thus, they tell me that "[a] drug approval decision involves scientific judgments as to whether

statutory and regulatory factors are met that warrant deference to those charged with the statutory responsibility to make those decisions. The agency alone has the necessary information and scientific expertise to assess the data and information required to make a determination that a drug is safe and effective." Defs.' Br. at 10. This salutary principle was flagrantly violated by Secretary Sebelius, who completely lacks the "necessary information and scientific expertise to assess the data and information required to make a determination that a drug is safe and effective," and whose role in the process has been circumscribed by Congress as well as by the delegation to the Commissioner of any authority that the Secretary may have—a clear recognition by Congress and the Secretary of her lack of competence in this area. *See Tummino v. Hamburg*, 2013 WL 1348656 at *21. Yet, in something out of an alternate reality, the defendants seek a stay to pursue an appeal that would vindicate the Secretary's disregard of the very principle they advocate.

## DISCUSSION

There are four factors to be considered before granting a stay pending appeal: (1) whether a party will suffer irreparable injury if a stay is issued, (2) whether the movant will suffer irreparable injury absent a stay, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected. *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170-71 (2d Cir. 2007). In *Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002), the Second Circuit surveyed how different courts have analyzed the prospect of success necessary for issuing a stay, ultimately agreeing with the District of Columbia Circuit's approach, whereby "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the Court's assessment of the other [stay] factors."

*Id.* at 101 (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). The court observed: "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed*, 309 F.3d at 101; *see also Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 36-38 & n.8 (2d Cir. 2010). Against this backdrop, I turn to a discussion of the relevant factors.

### Irreparable Injury to the Plaintiffs

The defendants' argument that the plaintiffs will not suffer any harm if a stay is granted is based solely on an agreement they reached with Teva the day before they filed their notice of appeal. This argument necessitates a discussion of the agreement and how it came to be made. On March 9, 2012, three months after the Secretary overruled the FDA and directed the denial of Teva's application to make Plan B One-Step available over-the-counter without a prescription to all women, Teva filed a letter with the FDA seeking to make Plan B One-Step available for sale to women 15 years of age and over without a prescription and to eliminate the sale of Plan B One-Step by prescription for women under 15 years of age. Under this proposal, the drug would be stocked on the shelves of any retail establishment with an on-site pharmacy, and customers would be required to prove their age by providing photo identification to the cashier of the retail establishment as opposed to the pharmacist.

Teva and the FDA exchanged correspondence regarding this proposal through June 2012. After an eight-month hiatus, they resumed communication in March 2013, shortly after I indicated my intention to rule on the plaintiffs' Citizen Petition by the end of March—a decision which the defendants had to have known from oral argument would strike down the order of the

Secretary and the FDA's action which was dictated by it. My decision was filed on April 5, 2013. Teva's application was approved on April 30, 2013, the day before defendants in this case filed their notice of appeal. The FDA has provided for no reason for the delay in ruling on Teva's application. Indeed, as I observed at oral argument, the approval—when it finally came—was intended to provide a sugarcoating for the FDA's appeal. May 7, 2013 Hr'g Tr. 28:2-5.

Nevertheless, there was something in it for Teva as well. The benefits the proposal would confer on Teva were not insignificant. Because, as the Assistant United States Attorney observed, 99% of Plan B One-Step consumers are aged 15 and above, Teva would lose next to nothing in the way of revenue by limiting sales to those women. May 7, 2013 Hr'g Tr. 68:7-11. On the other hand, Teva's proposal would enable it to have its product, and its product alone, displayed on the shelves in the family planning area of stores with an on-site pharmacy. Thus, a consumer looking for an emergency contraceptive would only find Plan B One-Step on the shelves, and if she came in after the pharmacy counter was closed, her only option would be Plan B One-Step. If she were under the age of 15, she would have no option, because she could only obtain levonorgestrel-based emergency contraceptives with a prescription.

Moreover, because the FDA claimed that one of the studies conducted by Teva—the so-called "actual use" study—was essential to the approval of Teva's proposal, Teva enjoys three years of marketing exclusivity to the 15 and 16 year old consumers. The pharmaceutical companies that sell "brand X" versions of Plan B One-Step as well as the two-pill package of the drug could not display their products on the shelf because the old marketing regime remains in effect for them, and their products can only be sold from behind the pharmacy counter. Anyone

under the age of 17 needs a prescription to obtain these products, and anyone over the age of 17 can only obtain them from the pharmacy by showing proof-of-age identification.

While this proposal was a boon to Teva, it did little to eliminate the practical obstructions in obtaining emergency contraception to women of child-bearing age whether over or under age 15. On the contrary, Teva will use its privileged marketing status and exclusivity to increase the cost of the drug. The price of Plan B One-Step under the new marketing regime is expected to be $60, significantly more than the one- or two-pill generic version, and could conceivably go higher, if only to accommodate the more expensive packing, age-verification tags, and anti-theft technology that the new marketing arrangement would require. May 7, 2013 Hr'g Tr. 29:9-15. The cost of all emergency contraception, particularly Plan B One-Step, which is the most expensive, is already an impediment to access for many women and adolescents.

Nevertheless, the Secretary of Health and Human Services and the Commissioner of Food and Drugs argue that a stay of my order to make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale and age restrictions "will not harm plaintiffs." Defs.' Br. at 11. This argument is based on the premise that the plaintiffs "are all over age 15 and therefore will soon be able to obtain at least one emergency contraceptive containing levonorgestrel . . . without a prescription at retail establishments that have a pharmacy counter." *Id.* Thus, the order that I entered and they seek to appeal "is not required to afford relief to any of the plaintiffs. They can purchase the product whenever the store is open (regardless of whether the pharmacy is open) by showing proof of age." *Id.*

Passing over the fact that the complaint alleges that one of the plaintiffs is suing on behalf of her two daughters, one of whom was 12 years old on May 23, 2012 (when the second amended supplemental complaint was filed), the defendants' argument ignores (1) the fact that

"showing proof of age," which means government-issued photo identification, constitutes a substantial impediment to obtaining emergency contraception, particularly for young women of reproductive age, and (2) that emergency contraception can only be obtained at retail establishments with on-site pharmacies. Moreover, while there are some retail establishments that are open for longer hours than their pharmacy counters, the unjustifiable point-of-sale restrictions left in place under the Teva-FDA agreement will continue to present barriers to all women. Many women do not live near a store with an on-site pharmacy, and even when the drugstore or comparable facility has an on-site pharmacy, the difference between the hours of the pharmacy and the store itself is often significant. Indeed, a research letter published in the journal of the American Medical Association found that "of the 943 pharmacies called" in a survey of emergency contraceptive availability in five geographically diverse cities, "only 4.7% were open 24 hours." Tracey A. Wilkinson et al., *Research Letter: Access to Emergency Contraception for Adolescents*, 307 J. Am. Med. Ass'n 362 (January 25, 2012).

Significantly, a study conducted by the Brennan Center for the purpose of showing the extent to which photo identification requirements throw roadblocks in the way of voters found that African-American citizens disproportionately lack photo identification. Specifically, "[t]wenty-five percent of African-American voting-age citizens have no current government-issued photo ID, compared to eight percent of white voting-age citizens." Brennan Center for Justice, *Citizens Without Proof* 3 (Nov. 2006), *available at* http://www.brennancenter.org/analysis/citizens-without-proof. Using 2000 census figures, the Brennan Center concluded that "this amounts to more than 5.5 million adult African-American citizens without photo identification." *Id.* Similarly, "[c]itizens earning less than $35,000 per year are more than twice as likely to lack current government-issued photo identification as those earning more than

$35,000. Indeed, the survey indicates that at least 15 percent of voting-age American citizens earning less than $35,000 per year do not have a valid government-issued photo ID." *Id.* Indeed, proposed findings of fact submitted by the Department of Justice in *South Carolina v. Holder*, No. 12-cv-203 (D.D.C.), are consistent with the Brennan Center study. One of those proposed findings is that "[m]inority voters in [South Carolina] are disproportionately less likely than white voters to possess any of the currently available, acceptable forms of [photographic voter identification] . . . . This conclusion holds true for black voters, Native American voters, and Hispanic voters, all of whom are significantly less likely than white voters to possess an allowable [photograph voter identification] . . . . These disparities are statistically significant."[2] United States' Proposed Findings of Fact and Conclusions of Law at 8, *South Carolina v. Holder*, No. 12-cv-203 (D.D.C.).

These statistics do not necessarily correlate with women of reproductive age. Nevertheless, they indicate the disproportionate burden that the Teva-FDA agreement places on African-American and poor adults over age 18. Moreover, it can reasonably be assumed that the proportion of women between 15 and 18 who lack government-issued photo identification is much higher, with a similar disparate impact on African-Americans and the poor. Nor does the nature of the age identification required under Teva's proposal make any concession to the difficulties they face. Thus, in response to a question posed by the FDA, Teva responded that "[t]he age verification system is based on federal and state guidelines for the sale of tobacco and alcohol and as such requires a government-issued photo ID (including driver's license, military card, immigration card, or passport) with date of birth." Letter from Valerie M. Mulligan, Senior

---

[2] The Brennan Center survey found that 16% of Hispanic voting age citizens have no current photo identification, but observed that the results did not achieve statistical significance due to a low sample size. The Department of Justice, which characterized its statistics as more robust, seems to confirm the validity of the Brennan Center's findings with respect to Hispanics.

Dir. of Reg. Affairs, Teva Women's Health, to Andrea Leonard-Segal, Center for Drug Evaluation and Research, FDA at 2 (June 27, 2012).[3]  Teva also observed that "a school-issued ID and birth certificate would not be considered acceptable age-verification."  And, "for consumers age 15, there are some states that issue a driver's permit at age 15, or a consumer may use one of the other types of ID listed above, *if available*."  *Id.* (emphasis added).

Moreover, the Teva-FDA agreement does nothing to relieve the burden on younger adolescents who still require a prescription from a physician in order to obtain an emergency contraceptive.  Indeed, because the Teva-FDA agreement provides that Teva will no longer market Plan B One-Step as a prescription product, younger adolescents receive no benefit from the new marketing agreement.  Instead, the requirement of a prescription only adds the additional cost of a doctor's visit and delay to obtaining a time-sensitive emergency contraceptive that is more effective the sooner it is taken after unprotected intercourse.  As the label on the Plan B One-Step box advises the consumer, the pill should be taken "as soon as possible . . . after unprotected sex."  I do not dwell on this aspect of the prejudice suffered by the population of the youngest adolescents, although it should not be ignored, because the number of these adolescents who actually use levonorgestrel-based emergency contraceptives is miniscule, and they have been invoked in the debate over access to these contraceptives mostly as a red herring to justify the continued burdens suffered by older women who seek access to the drug.

**Irreparable Injury to the Defendants and the Public Interest**

The defendants argue that they "and the public interest" will suffer irreparable harm absent a stay for a number of reasons.  Thus, they argue that the FDA and the public will be

---

[3] I recognize that I am quoting from a letter that has been filed under seal and the contents of which Teva objects to being made public.  The instance which I have quoted simply cannot be described as the equivalent of a confidential trade secret or other protected information that would justify keeping it a secret.  Indeed, as I understand the position of the FDA, it retains the discretion to release information from Teva's letters now that its application has been granted.  Letter from the United States Attorney at 1 (May 6, 2013).

irreparably and immediately harmed "if a drug product that purported to be 'FDA approved' were approved instead at the direction of a court." Defs.' Br. at 12. This is so because, they suggest, "[t]he public properly relies upon FDA classification of drugs as non-prescription as a reflection of the agency's judgment regarding the safety and proper use of a drug without a doctor's prescription. Thus, the public interest will not be served by reclassification of drugs as non-prescription without agency approval." *Id.* at 12-13. This argument ignores the fact that the FDA found that the drug was safe and could be used properly without a doctor's prescription, and was prepared to make it available over-the-counter for all ages. As Commissioner Hamburg observed, "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential." Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011). Thus, if a stay is denied, the public can have confidence that the FDA's judgment is being vindicated, and if a stay is granted, it will allow the bad-faith, politically motivated decision of Secretary Sebelius, who lacks any medical or scientific expertise, to prevail—thus justifiably undermining the public's confidence in the drug approval process.

Nor is there any merit to the related argument that a stay will "prevent public uncertainty regarding the status of the drugs at issue here pending the government's appeal to the Second Circuit." Defs.' Br. at 13. This silly argument ignores the fact it is the government's appeal from the order that sustained the judgment of the Commissioner of the FDA that is the cause of any uncertainty, and that that appeal is taken solely to vindicate the improper conduct of the Secretary and possibly for the purpose of further delaying greater access to emergency

contraceptives for purely political reasons. Whether my order is stayed or not will not resolve any uncertainty.

The defendants also argue that "if the status of these drugs is changed and later reversed, it can lead to situations in which women mistakenly believe that they can obtain the drug without a prescription or at certain locations where it used to be available, but is no longer." Defs.' Br. at 13. This argument assumes that defendants have a likelihood of success on the merits, an issue that I will shortly address, and is largely an insult to the intelligence of women. If women can no longer obtain Plan B without a prescription at certain locations, they will go to locations where it is available. On the other hand, if a stay is granted, the prejudice to those who need ready access to emergency contraceptives is a certainty, and is likely to continue until the resolution of the appeal—a period of time which is difficult to predict.

Moreover, this argument comes with ill grace from the defendants, who have added significant confusion by putting in place a convoluted triple-tiered marketing scheme that will only increase the confusion that already prevents women from obtaining timely access to emergency contraceptives. Specifically, women and retailers across the country will be forced to operate under the following set of nonsensical rules: (1) women 15 years of age or older with adequate proof of age will be permitted to purchase Plan B One-Step, which will only be available on the shelves in stores with on-site pharmacies; (2) other levonorgestrel-based products will remain behind the counter, but will be available without a prescription to women over 17 years of age who have government issued proof of age; and, (3) women who lack adequate proof of age or are under the age of 15 will not have access to Plan B One-Step and must obtain a prescription for another levonorgestrel-based contraceptive product. The confusion caused by this system, the only purpose of which is to sugarcoat the defendants'

appeal, is much greater than any potential confusion that could result from simply returning a product to prescription status.

The defendants' last argument is that the government interest in conferring marketing exclusivity will be irreparably harmed absent a stay. I do not question the validity of the policies underlying the statutes and regulations conferring marketing exclusivity on pharmaceutical companies that perform needed research to make drugs available and obtain approval to market drugs as a result. Nevertheless, at the time of my decision there was no issue of market exclusivity, because Teva's previous applications to expand access to Plan B One-Step had been denied, and it had not appealed. Indeed, for this reason, the prejudice that the defendants claim is the *implication* in my decision "that FDA cannot grant Teva marketing exclusivity for a change for [Plan B One-Step] from prescription to [over-the-counter] simply because FDA issued a complete response letter to Teva in December 2011 and Teva chose not to file a petition for review to the court of appeals." Defs.' Br. at 15. Their argument continues that "[t]his implication ignored the prospect that, instead of appealing, Teva could file an amended [supplemental application], which FDA could approve, leading to a grant of exclusivity." *Id.* It is not my understanding that any implication that could conceivably be drawn from an opinion provides a basis for an appeal, much less for a stay pending appeal.

Moreover, if I was operating in ignorance of the fact that Teva was negotiating a sweetheart agreement with the FDA, it was because nothing happened in this regard from December 2011 until April 30, 2013, 25 days after I issued my opinion in this case. Indeed, it would not have been unreasonable for me to assume that after 16 months of silence, the verdict of the quiescent years—to borrow a phrase from Brainerd Currie—was that nothing happened. Nevertheless, I acknowledge that I ordered the Citizen Petition be granted in part because it was

my view that the plaintiffs were entitled to the relief they sought even without the actual use study paid for by Teva. Indeed, the 2003 FDA advisory committee formed to consider the first application for over-the-counter access to levonorgestrel-based emergency contraceptives voted by the most overwhelming of margins to approve it, without the benefit of the actual use study that Teva submitted with its more recent application, and it was only the political interference by the Bush White House that prevented their recommendation from being adopted. *See Tummino v. Torti*, 603 F. Supp. 2d 519, 528 (E.D.N.Y. 2009). If Teva could somehow benefit from the relief sought by the Citizen Petition, it was simply because the relief it sought from the FDA overlapped to a degree with the Citizen Petition.

**Defendants' Likelihood of Success on the Merits**

The defendants offer two arguments in support of their claim that they have "a substantial likelihood of success on appeal." Defs.' Br. at 5. The first argument is that I was without subject matter jurisdiction to review the denial of Teva's petition. This argument is frivolous. I repeatedly recognized in my opinion, as the defendants acknowledged in their memorandum in support of their motion for a stay, that I did not have the authority to review the denial of Teva's petition for the purpose of granting relief. Defs.' Br. at 7. Nor did I direct the defendants to grant Teva's petition. I need not burden this opinion with a further discussion of this claim, because it is belied by what has actually happened since my opinion. Specifically, Teva is not making any effort to take advantage of my decision. Instead, it has entered into an agreement with the FDA, which I previously described. Since Teva has acquiesced in the denial of its petition, and entered into an agreement designed to "address the Secretary's stated concerns," there is nothing for the Court of Appeals to review, even if my decision had affected Teva's petition. Letter from Valerie M. Mulligan, Senior Dir. of Reg. Affairs, Teva Women's Health, to

Andrea Leonard-Segal, Center for Drug Evaluation and Research, FDA at 3 (Mar. 9, 2012). Indeed, this issue could be said to be moot.

The defendants' next argument in support of their claim that they have a substantial likelihood of success on appeal is that I exceeded my authority in ordering a change of Plan B for prescription to over-the-counter instead of remanding to the agency. Specifically, the defendants argue that "[r]ather than issuing a directive to the agency as to what specific action to take, the Court should have remanded to the agency for compliance with its legal ruling." Defs.' Br. at 9. Quoting from a decision of the Supreme Court, they argue that "the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation. The reviewing court is not *generally* empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphases added).

The defendants' own admission that they could not continue to reach the same decision on remand after remand and claim that the only remedy was yet another remand clearly establishes that the question is not whether I have authority to grant relief. *See* May 7, 2013 Hr'g Tr. 91:22-92:6. So too does a careful study of the language of the Supreme Court decision on which they rely, and which recognizes that there are "rare circumstances" in which remand is not necessary. This case presents the kind of "rare circumstances" where a remand to the agency is not only unnecessary but would constitute an abuse of discretion. First, the FDA is not the problem. The cause of the rejection of over-the-counter sale of levonorgestrel-based emergency contraceptives was the Secretary of Health and Human Services. She has not changed her position. *Id.* 17:14-20. A remand would thus be futile.

More significantly, I have been there and done that. In my 2009 opinion, after concluding that the administrative agency process was corrupted by political interference, I declined the plaintiffs' request to avoid a remand and simply direct that the FDA award them the relief that they sought. I did so for two reasons. First, it was my view that a decision on whether Plan B "may be used safely without a prescription by children as young as 11 or 12, is best left to the expertise of the FDA, to which Congress has entrusted this responsibility; it should not be made by a federal district court judge." *Tummino v. Torti*, 603 F. Supp. 2d at 549. Second, a new FDA Commissioner, Deputy Commissioner, and President had come into office since the agency's decision on Plan B had been made, who I thought could be "trusted to conduct a fair assessment of the scientific evidence." *Id.* Neither of these grounds is applicable here.

On remand, defendants engaged in the same bad faith that resulted in my initial remand. They delayed the decision for three years and, ultimately, improper political influence prevented the FDA from granting the petition. Nor do they claim a reasonable probability of success on appeal in challenging my analysis of their flagrant misconduct. Indeed, I traced the numerous departures from agency policy and defects in the proceedings for yet a second time. *Tummino v. Hamburg*, 2013 WL 1348656 at *6-19. Significantly, defendants do not take any issue with any of my substantive conclusions. Instead, they seek another remand, without any assurance that the result would be any different. On the contrary, the defendants assert that, even if the Secretary changed her mind and the FDA agreed that the Citizen Petition contained sufficient data to support an over-the-counter switch, the FDA would be obligated to conduct what could be described as a national referendum: "[A] rule making proceeding [in] which the public and all stakeholders would have an opportunity to participate and share their views including Teva, including plaintiffs, including the petitioners, including anybody else who has an interest in the

issue would be able to submit their views." May 7, 2013 Hr'g Tr. 22:13-24. I need not here deal with the argument that such a rulemaking procedure would be required in the ordinary case.[4] As I noted in my earlier opinion:

> [T]he bad faith that has permeated consideration of the Citizen Petition, not to speak of the Plan B sponsor's applications, should rule out such relief here. More than twelve years have passed since the Citizen Petition was filed and eight years since this lawsuit commenced. The FDA has engaged in intolerable delays in processing the petition. Indeed, it could accurately be described as an administrative agency filibuster. Moreover, one of the devices the FDA has employed to stall proceedings was to seek public comment on whether or not it needed to engage in rulemaking in order to adopt an age-restricted marketing regime. After eating up eleven months, 47,000 public comments, and hundreds of thousands, if not millions, of dollars, it decided that it did not need rulemaking after all. The plaintiffs should not be forced to endure, nor should the agency's misconduct be rewarded by, an exercise that permits the FDA to engage in further delay and obstruction.

*Tummino v. Hamburg*, 2013 WL 1348656 at *33.

### CONCLUSION

The motion for a stay pending the appeal is denied. Indeed, in my view, the defendants' appeal is frivolous and is taken for the purpose of delay. Nevertheless, as a courtesy to the Court of Appeals, and to enable it to schedule the motion in the ordinary course, I grant a stay pending the hearing or submission of the defendants' motion for a stay in the Court of Appeals on the condition that the motion for a stay be filed by noon on May 13, 2013.

SO ORDERED.

Brooklyn, New York
May 10, 2013

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

---

[4] I discuss this issue in some detail in my April 5th opinion. *Tummino v. Hamburg*, 2013 WL 1348656 at *32-33. One of the points I made was that the last time I remanded the Citizen Petition, it was with instructions to lower the age for non-prescription sale from 18 to 17. The agency accomplished this without rulemaking by inviting Teva to submit a tailored supplemental application for this change. *Id.* at *10.

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2013, I electronically filed the foregoing Addendum to the Motion for a Stay Pending Appeal with the Clerk of the Court by using the appellate CM/ECF system.

I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

*/s/ Adam Jed*
ADAM C. JED