# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1.  SEE NOTICE ON REVERSE.**          **2.  PLEASE TYPE OR PRINT.**          **3.  STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| | Date the Order or Judgment Appealed from was Entered on the Docket: | District Court Docket No.: |
| | Date the Notice of Appeal was Filed: | Is this a Cross Appeal? ☐ Yes  ☐ No |

| **Attorney(s) for Appellant(s):** ☐ Plaintiff ☐ Defendant | Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail: |
|---|---|
| **Attorney(s) for Appellee(s):** ☐ Plaintiff ☐ Defendant | Counsel's Name:   Address:   Telephone No.:   Fax No.:   E-mail: |

| Has Transcript Been Prepared? | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously?   ☐ Yes   ☐ No<br><br>If Yes, provide the following:<br><br>Case Name:<br><br>2d Cir. Docket No.:          Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

*ADDENDUM "A"*:  COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION;  (2) THE RESULT BELOW;  (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND  (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B"*:  COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A:  JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☐  U.S. a party         ☐  Diversity | ☐  Final Decision          ☐  Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b)) |
| ☐  Federal question (U.S. not a party)    ☐  Other (specify): _____ | ☐  Interlocutory Decision Appealable As of Right          ☐  Other (specify): _____ |

**IMPORTANT.  COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

**PART B:   DISTRICT  COURT DISPOSITION    (Check as many as apply)**

| 1. Stage of Proceedings | 2.  Type of Judgment/Order Appealed | | 3.  Relief | |
|---|---|---|---|---|
| ☐ Pre-trial<br>☐ During trial<br>☐ After trial | ☐ Default judgment<br>☐ Dismissal/FRCP 12(b)(1)<br>   lack of subj. matter juris.<br>☐ Dismissal/FRCP 12(b)(6)<br>   failure to state a claim<br>☐ Dismissal/28 U.S.C. § 1915(e)(2)<br>   frivolous complaint<br>☐ Dismissal/28 U.S.C. § 1915(e)(2)<br>   other dismissal | ☐ Dismissal/other jurisdiction<br>☐ Dismissal/merit<br>☐ Judgment / Decision of the Court<br>☐ Summary judgment<br>☐ Declaratory judgment<br>☐ Jury verdict<br>☐ Judgment NOV<br>☐ Directed verdict<br>☐ Other (specify): | ☐ Damages:<br><br>___ Sought: $ _____<br>___ Granted: $ _____<br>___ Denied: $ _____ | ☐ Injunctions:<br><br>☐ Preliminary<br>☐ Permanent<br>☐ Denied |

**PART C:  NATURE OF SUIT   (Check as many as apply)**

| 1. Federal Statutes | | | 2. Torts | 3. Contracts | 4. Prisoner Petitions |
|---|---|---|---|---|---|
| ☐ Antitrust<br>☐ Bankruptcy<br>☐ Banks/Banking<br>☐ Civil Rights<br>☐ Commerce,<br>☐ Energy<br>☐ Commodities<br>☐ Other (specify): _____ | ☐ Communications<br>☐ Consumer Protection<br>☐ Copyright / Patent<br>☐ Trademark<br>☐ Election<br>☐ Soc. Security<br>☐ Environmental | ☐ Freedom of Information Act<br>☐ Immigration<br>☐ Labor<br>☐ OSHA<br>☐ Securities<br>☐ Tax | ☐ Admiralty/<br>   Maritime<br>☐ Assault /<br>   Defamation<br>☐ FELA<br>☐ Products Liability<br>☐ Other (Specify): | ☐ Admiralty/<br>   Maritime<br>☐ Arbitration<br>☐ Commercial<br>☐ Employment<br>☐ Insurance<br>☐ Negotiable<br>   Instruments<br>☐ Other Specify | ☐ Civil Rights<br>   Habeas Corpus<br>☐ Mandamus<br>☐ Parole<br>☐ Vacate Sentence<br>☐ Other |

| 5. Other | 6. General | 7. Will appeal raise constitutional issue(s)? |
|---|---|---|
| ☐ Forfeiture/Penalty<br>☐ Real Property<br>☐ Treaty (specify): _____<br>☐ Other (specify): _____ | ☐ Arbitration<br>☐ Attorney Disqualification<br>☐ Class Action<br>☐ Counsel Fees<br>☐ Shareholder Derivative<br>☐ Transfer | ☐ Yes          ☐ No<br><br>Will appeal raise a matter of first impression?<br><br>☐ Yes       ☐ No |

1.   Is any matter relative to this appeal still pending below?   ☐ Yes, specify: _____   ☐ No

2.   To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

    (A)   Arises from substantially the same case or controversy as this appeal?          ☐ Yes          ☐ No

    (B)   Involves an issue that is substantially similar or related to an issue in this appeal?          ☐ Yes          ☐ No

If yes, state whether  ☐ "A," or  ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| Name of Appellant: | | | |

| Date: | Signature of Counsel of Record: |
|---|---|

# NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1.   Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2.   File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3.   Pay the$455 docketing fee to the United States District Court or the $450 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**<u>PLEASE NOTE:</u>  IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.  *SEE* LOCAL RULE 12.1.**

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

*Tummino v. Hamburg*, No. 13-1690

ADDENDUM A
Dated:  May 15, 2013

**(1)    A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION:**

This action was brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq*., to challenge the U.S. Food and Drug and Administration's (FDA) denial of a citizen petition filed in 2001 pursuant to 21 C.F.R. § 10.30.  The citizen petition asked FDA to allow Plan B, a levonorgestrel-based emergency contraceptive drug product, and its generic equivalents, to be sold without a prescription to consumers of all ages.  FDA denied the citizen petition in December 2011, after a 2009 decision in a previous case (No. 05-CV-366) in which the district court had remanded the petition to FDA for reconsideration of its 2006 denial.  Plaintiffs are 18 individuals and two organizations that generally seek expanded availability of emergency contraceptive drugs. Defendants are the Commissioner of Food and Drugs and the Secretary of Health and Human Services.  In February 2012, plaintiffs filed this suit (and reopened No. 05-CV-366) to seek judicial review of FDA's denial of the citizen petition; for relief, they sought an injunction compelling FDA to grant the citizen petition and to allow all levonorgestrel-based emergency contraceptive drug products, including products not covered by the citizen petition, to be sold without a prescription and without age or point-of-sale restrictions.  In defense, the government argued, *inter alia*, that plaintiffs lacked standing to challenge FDA's actions, that the court lacked jurisdiction to grant the relief plaintiffs sought, that the agency's actions were neither arbitrary nor capricious, and that the court should defer to the agency's discretion.

**(2)    THE RESULT BELOW**

Simultaneous with their motion to reopen No. 05-CV-366 and their initial filing in No. 12-CV-763, plaintiffs moved for preliminary and permanent injunction and for summary judgment.  Defendants thereafter moved to dismiss the first amended supplemental complaint (and the fifth amended complaint in No. 05-CV-366) for lack of subject matter jurisdiction.  The district court denied the motion on the record at a hearing on April 27, 2012, as well as in minute orders dated April 26 and May 1, 2012.  Plaintiffs subsequently filed a second amended supplemental complaint, which the government again moved to dismiss for lack of subject matter jurisdiction.  The district court summarily denied that

motion by minute order dated July 2, 2012. The government then cross-moved for summary judgment. In a decision entered on April 5, 2013, the district court granted the plaintiffs' motion for summary judgment and for permanent injunction and denied the government's cross-motion. *See Tummino v. Hamburg*, ___ F. Supp. 2d ___, 2013 WL 1348656 (E.D.N.Y. Apr. 5, 2013). As set forth in the opinion in pertinent part, "the decision of the FDA denying the Citizen Petition is reversed, and the case is remanded to the FDA with the instruction to grant the Citizen Petition and make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale or age restrictions within thirty days." *Id*., at \*31. Judgment to that effect was entered on April 10, 2013. The government moved for stay pending appeal, which the district court denied in a decision entered on May 10, 2013. *See Tummino v. Hamburg*, ___ F. Supp. 2d ___, 2013WL 1921414 (E.D.N.Y. May 10, 2013).

(3)    **A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET**

Both documents follow.

(4)    **A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS**

Attached are:

The April 5, 2013, Memorandum and Order granting summary judgment to plaintiffs, denying summary judgment to the government, and granting a mandatory permanent injunction

The April 10, 2013, Clerk's Judgment

The May 10, 2013, Memorandum and Order denying the government's motion for stay pending appeal

Transcript of hearing of April 27, 2012, in which the district court denied from the bench the government's motion to dismiss for lack of jurisdiction

Minute orders of April 26, May 1, and July 2, 2012

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
**CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)**

*Tummino v. Hamburg*, No. 13-1690

**ADDENDUM B**
**LIST OF ISSUES PROPOSED TO BE RAISED ON APPEAL**
**WITH APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH ISSUE**
**Dated: May 15, 2013**

**As of this date, the government proposes to raise the following two issues on appeal:**

**1.    Whether the district court exceeded its jurisdiction under the Federal Food, Drug, and Cosmetics Act (FDCA), 21 U.S.C. § 301 *et* seq., when it exercised judicial review over FDA's failure to approve a supplemental new drug application for Plan B One-Step (a drug that was not the subject of the citizen petition), and when it ordered FDA to make that drug and its generic equivalents available without a prescription and without age or point-of-sale restrictions.   Appellate standard of review is *de novo*, as this is an issue of law.**

**2.    Whether the district court exceeded its authority in issuing a mandatory injunction ordering FDA to make levonorgestrel-based emergency contraceptive drugs available without a prescription to women of all ages, which under the FDCA and FDA regulations can only be accomplished through the promulgation of a regulation.  Appellate standard of review is *de novo*, as this is an issue of law.**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Annie TUMMINO, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | No. 12-CV-763 (ERK/VVP) |
| *v.* ) | |
| ) | **(Korman, J.)** |
| Dr. Margaret HAMBURG, Commissioner of ) | **(Pohorelsky, M.J.)** |
| Food and Drugs, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

<u>NOTICE OF APPEAL</u>

**PLEASE TAKE NOTICE** that defendants Dr. Margaret Hamburg, Commissioner of Food

and Drugs, and the Honorable Kathleen Sebelius, Secretary of Health and Human Services,

hereby appeal to the United States Court of Appeals for the Second Circuit from the judgment of

this Court entered on April 10, 2013 (ECF No. 87), and this Court's Memorandum and Order of

April 5, 2013 (ECF No. 85).

Dated:    May 1, 2013                 Respectfully submitted,

STUART F. DELERY         LORETTA E. LYNCH
Acting Assistant Attorney General      United States Attorney
Civil Division              Eastern District of New York
                           271 Cadman Plaza East
IAN HEATH GERSHENGORN   Brooklyn, NY 11201-1820
Deputy Assistant Attorney General

SHEILA LIEBER           By: <u>/s/ {FILED ELECTRONICALLY}</u>
Deputy Director,           F. FRANKLIN AMANAT (FA6117)
Federal Programs Branch     Assistant United States Attorney
                           Eastern District of New York
ERIC B. BECKENHAUER      (718) 254-6024
Trial Attorney,            franklin.amanat@usdoj.gov
Federal Programs Branch

United States Department of Justice, Civil Division
20 Massachusetts Avenue, N.W.
Washington, DC 20530
(202) 514-3338

*Of Counsel*:

DAVID J. HOROWITZ, Deputy General Counsel
ELIZABETH H. DICKINSON, Chief Counsel, Food and Drug Division
ANNAMARIE KEMPIC, Deputy Chief Counsel, Litigation, Food and Drug Division
SCOTT A. KAPLAN, Assistant Chief Counsel, Food and Drug Division
United States Department of Health and Human Services
Office of the General Counsel
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

# U.S. District Court
## Eastern District of New York (Brooklyn)
## CIVIL DOCKET FOR CASE #: 1:12–cv–00763–ERK–VVP

Tummino et al v. Hamburg et al
Assigned to: Judge Edward R. Korman
Referred to: Magistrate Judge Viktor V. Pohorelsky
Cause: 28:1331 Fed. Question

Date Filed: 02/16/2012
Date Terminated: 04/10/2013
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Annie Tummino**
*in her individual capacity, as Vice–Chair of the Women's Liberation Birth Control Project as Coordinator of the Morning–After Pill Conspiracy, and on behalf of women who need Emergency Contraception*

represented by **Andrea H Costello**
Partnership for Civil Justice Fund
617 Florida Avenue, NW
Washington, DC 20001
202–232–1180
Fax: 202–747–7747
Email: ac@justiceonline.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
Center for Reproductive Rights
120 Wall Street
14th Floor
New York, NY 10005
917–637–3674
Fax: 917–637–3666
Email: jcrepps@reprorights.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
Center for Reproductive Rights
120 Wall Street
14th Floor
New York, NY 10005
917–637–3615
Fax: 917–637–3666
Email: snovak@reprorights.org
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainsville, FL 32601
352–271–8890
Fax: 352–271–8347
Email: kirsten.clanton@southernlegal.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Erin T. Mahoney**
*in her individual capacity, as Chair of the Women's Liberation Birth Control Project as Coordinator of the Morning–After Pill Conspiracy, and on behalf of women who*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

*need Emergency Contraception*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carol Giardina**
*in her individual capacity, as Coordinator of the Women's Liberation Birth Control Project as Coordinator of the Morning−After Pill Conspiracy, and on behalf of women who need Emergency Contraception*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kelly Mangan**
*in her individual capacity, as President of the University of Florida Campus Chapter of the National Organization for Women, as Coordinator of the Morning−After Pill Conspiracy, and on behalf of women who need*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stephanie Seguin**
*in her individual capacity, as Chair of the Florida National Organization for Women Young Feminist Task Force, as Coordinator of the Morning−After Pill Conspiracy, and on behalf of women who need Emergency Contraception*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lori Tinney**
*in her individual capacity, as President of the Gainesville Chapter of the National Organization for Women, as Coordinator of the Morning−After Pill Conspiracy, and on behalf of women who need Emergency Contraception*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Brown**
*in her individual capacity, as Coordinator of the Morning−After Pill Conspiracy, and on behalf of women who need Emergency Contraception*

represented by **Andrea H Costello**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Kirsten Clanton
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Candace Churchill**                   represented by   **Andrea H Costello**
*in her individual capacity, as Coordinator*                (See above for address)
*of the Morning−After Pill Conspiracy,*                     *LEAD ATTORNEY*
*and on behalf of women who need*                           *ATTORNEY TO BE NOTICED*
*Emergency Contraception*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Francie Hunt**                        represented by   **Andrea H Costello**
*in her individual capacity, as Coordinator*                (See above for address)
*of the Morning−After Pill Conspiracy,*                     *LEAD ATTORNEY*
*and on behalf of women who need*                           *ATTORNEY TO BE NOTICED*
*Emergency Contraception*

**Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Clanton**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Association of Reproductive Health**   represented by   **Janet Crepps**
**Professionals**                                          (See above for address)
*on its own behalf and on behalf of its*                    *LEAD ATTORNEY*
*members and women who need*                                *PRO HAC VICE*
*Emergency Contraception*                                   *ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Latina Institute for**
**Reproductive Health**
*on its own behalf and on behalf of women*
*who need Emergency Contraception*

represented by **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Jaffe**

represented by **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Aurora DeMarco**

represented by **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Angelica Jaffe**

represented by **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Catherine Lederer−Plaskett**          represented by   **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jonathan Marks**          represented by   **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gabrielle Marks**          represented by   **Janet Crepps**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Suzanne Ilene Novak**
(See above for address)
*TERMINATED: 10/18/2012*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea H Costello**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Margaret Hamburg**
*in her official capacity as Commissioner*
*of the Food and Drug Administration*

represented by **Farzin Franklin Amanat**
United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201–1820
(718) 254–6024
Fax: (718)254–6081
Email: franklin.amanat@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric B. Beckenhauer**
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave Nw
Washington, DC 20001
202–514–3338
Fax: 202–616–8470
Email: eric.beckenhauer@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kathleen Sebelius**
*in her official capacity as Secretary of the*
*Department of Health and Human*
*Services*

represented by **Eric B. Beckenhauer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Farzin Franklin Amanat**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Teva Women's Health, Inc.**

represented by **Michael Shumsky**
Kirkland &Ellis LLP
655 15th Street Nw
Suite 1200
Washington, DC 20005
202–879–5228
Fax: 202–654–9628
Email: michael.shumsky@kirkland.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Menashi**
Kirkland &Ellis LLP
601 Lexington Avenue
New York, NY 10022
212–446–4931
Fax: 212–446–6460
Email: steven.menashi@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/15/2012 | | ORDER re 1 MOTION *** The motion to Reopen Case and Supplement Complaint and Join Defendant is treated as a supplemental complaint challenging |

| | | the decision of the FDA denying plttfs application to permit the "Over the Counter" sale of Plan B. The Clerk is directed to open a new docket related to this action and copy DE#s 345 through this order onto the new docket. The parties are directed to file all further papers regarding this issue on the new docket number.. Ordered by Senior Judge Edward R. Korman on 2/15/2012. (Greene, Donna) (Entered: 02/21/2012) |
|---|---|---|
| 02/15/2012 | | CORRECTED ORDER ** ORDER. The defendants are directed to respond to the motion for a preliminary injunction and summary judgment within 60 days of the date of this order. The defendants are directed to show cause within 21* days of the date of this order why the FDA should not be directed to make Plan B available to those persons whom the studies submitted to the FDA demonstrate are capable of understanding when the use of Plan B is appropriate and the instructions for its use. Ordered by Senior Judge Edward R. Korman on 2/16/2012. (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 1 | MOTION to Reopen Case by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Attachments: # 1 Civil Cover Sheet) (Bowens, Priscilla) (Entered: 02/17/2012) |
| 02/16/2012 | 2 | MOTION for Preliminary Injunction *and Summary Judgment* by Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 3 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 4 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 5 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 6 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | 7 | CERTIFICATE OF SERVICE by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Greene, Donna) (Entered: 02/21/2012) |

| 02/16/2012 | 8 | RULE 56.1 STATEMENT re 2 MOTION for Preliminary Injunction *and Summary Judgment* filed by All Plaintiffs. (Greene, Donna) (Entered: 02/21/2012) |
|---|---|---|
| 02/16/2012 | 9 | NOTICE of Appearance by Eric B. Beckenhauer on behalf of Margaret Hamburg (aty to be noticed) (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | | ORDER granting Motion to Reopen Case and to add another defendant is granted. Ordered by Senior Judge Edward R. Korman on 2/15/2012. (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | | ORDER. The defendants are directed to respond to the motion for a preliminary injunction and summary judgment within 60 days of the date of this order. The defendants are directed to show cause within 15 days of the date of this order why the FDA should not be directed to make Plan B available to those persons whom the studies submitted to the FDA demonstrate are capable of understanding when the use of Plan B is appropriate and the instructions for its use. Ordered by Senior Judge Edward R. Korman on 2/15/2012. (Greene, Donna) (Entered: 02/21/2012) |
| 02/16/2012 | | Minute Entry for proceedings held before Senior Judge Edward R. Korman:Telephone Conference held on 2/16/2012. **Telephone conference took place 2/15/12** (Greene, Donna) (Entered: 02/21/2012) |
| 02/24/2012 | 10 | Notice of Related Case (Bowens, Priscilla) (Entered: 02/24/2012) |
| 02/24/2012 | 11 | NOTICE of Appearance by F. Franklin Amanat on behalf of All Defendants (aty to be noticed) (Amanat, F.) (Entered: 02/24/2012) |
| 02/29/2012 | 12 | MOTION to Amend/Correct/Supplement */Clarification of Order* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Novak, Suzanne) (Entered: 02/29/2012) |
| 02/29/2012 | 13 | AMENDED COMPLAINT *Plaintiffs' Fifth Amended Complaint* against Margaret Hamburg, Kathleen Sebelius, filed by National Latina Institute for Reproductive Health, Jennifer Brown, Gabrielle Marks, Erin T. Mahoney, Annie Tummino, Jonathan Marks, Aurora DeMarco, Lori Tinney, Carol Giardina, Francie Hunt, Robert Jaffe, Angelica Jaffe, Catherine Lederer–Plaskett, Candace Churchill, Kelly Mangan, Association of Reproductive Health Professionals, Stephanie Seguin. (Novak, Suzanne) (Entered: 02/29/2012) |
| 02/29/2012 | 14 | Supplemental COMPLAINT *Plaintiffs' First Amended Supplemental Complaint*, filed by National Latina Institute for Reproductive Health, Jennifer Brown, Gabrielle Marks, Erin T. Mahoney, Annie Tummino, Jonathan Marks, Aurora DeMarco, Lori Tinney, Carol Giardina, Francie Hunt, Robert Jaffe, Angelica Jaffe, Catherine Lederer–Plaskett, Candace Churchill, Kelly Mangan, Association of Reproductive Health Professionals, Stephanie Seguin. (Novak, Suzanne) (Entered: 02/29/2012) |
| 02/29/2012 | 15 | AFFIDAVIT/AFFIRMATION re 12 MOTION to Amend/Correct/Supplement */Clarification of Order*, 13 Amended Complaint, 14 Supplemental Complaint, *Certificate of Service* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 02/29/2012) |
| 03/01/2012 | 16 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 25, receipt number 0207–5337633. by Jennifer Brown, Candace Churchill, Carol Giardina, Francie Hunt, Erin T. Mahoney, Kelly Mangan, Stephanie Seguin, Lori Tinney, Annie Tummino. (Attachments: # 1 Affidavit of Kirsten Clanton, # 2 Proposed Order Admission Pro Hac Vice) (Clanton, Kirsten) (Entered: 03/01/2012) |
| 03/02/2012 | | ORDER granting 12 Motion to Amend/Correct/Supplement. I clarify (1) that my February 15, 2012 orders granted the plaintiffs motion to reopen Tummino v. Hamburg, No. 1:05–CV–366 and additionally ordered that the supplemental |

| | | complaint accompanying that motion be a supplement to the plaintiffs Fifth Amended Complaint in that case; and (2) that the operative complaints in this case are the plaintiffs Fifth Amended Complaint originally filed in Case No. 1:05−CV−366 and the plaintiffs First Amended Supplemental Complaint. Ordered by Senior Judge Edward R. Korman on 3/2/2012. (Bedoya, Natalie) (Entered: 03/02/2012) |
|---|---|---|
| 03/07/2012 | 17 | Consent MOTION for Extension of Time to File Response/Reply as to Order,, *requesting, on consent of the plaintiffs, a short extension of time, until Friday, March 9, 2012, to submit the government's response to the Court's February 16, 2012, Order to Show Cause. Submitted* by Margaret Hamburg, Kathleen Sebelius. (Amanat, F.) (Entered: 03/07/2012) |
| 03/07/2012 | 18 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 25, receipt number 0207−5350410. by Teva Women's Health, Inc.. (Attachments: #1 Affidavit in Support of Motion for the Pro Hac Vice admission of Steven Menashi) (Menashi, Steven) (Entered: 03/07/2012) |
| 03/08/2012 | | ORDER granting 18 Motion for Leave to Appear. Ordered by Senior Judge Edward R. Korman on 3/8/2012. (Susi, PaulaMarie) (Entered: 03/08/2012) |
| 03/08/2012 | | ORDER granting 16 Motion for Leave to Appear. Ordered by Senior Judge Edward R. Korman on 3/8/2012. (Susi, PaulaMarie) (Entered: 03/08/2012) |
| 03/08/2012 | | ORDER granting 17 Motion for Extension of Time to File Response/Reply until Friday, March 9, 2012, to submit the government's response to the Court's February 16 order. Responses due by 3/9/2012. Ordered by Senior Judge Edward R. Korman on 3/8/2012. (Susi, PaulaMarie) (Entered: 03/08/2012) |
| 03/08/2012 | 19 | NOTICE of Appearance by Kirsten Clanton on behalf of Jennifer Brown, Candace Churchill, Carol Giardina, Francie Hunt, Erin T. Mahoney, Kelly Mangan, Stephanie Seguin, Lori Tinney, Annie Tummino (notification declined or already on case) (Clanton, Kirsten) (Entered: 03/08/2012) |
| 03/09/2012 | 20 | MOTION for Leave to Appear Pro Hac Vice *of Michael D. Shumsky* Filing fee $ 25, receipt number 0207−5355784. by Teva Women's Health, Inc.. (Attachments: #1 Affidavit in Support) (Shumsky, Michael) (Entered: 03/09/2012) |
| 03/09/2012 | 21 | Corporate Disclosure Statement by Teva Women's Health, Inc. identifying Corporate Parent Teva Pharmaceutical Industries Ltd. for Teva Women's Health, Inc.. (Menashi, Steven) (Entered: 03/09/2012) |
| 03/09/2012 | 22 | MOTION to Intervene *for Limited Purposes in Support of Neither Party* by Teva Women's Health, Inc.. (Attachments: #1 Memorandum of Points and Authorities in Support, #2 Proposed Brief, #3 Proposed Order) (Menashi, Steven) (Entered: 03/09/2012) |
| 03/09/2012 | 23 | RESPONSE TO ORDER TO SHOW CAUSE by Margaret Hamburg, Kathleen Sebelius (Attachments: #1 Ex. A, #2 Ex. B, #3 Ex. C, #4 Ex. D, #5 Ex. E) (Beckenhauer, Eric) (Entered: 03/09/2012) |
| 03/12/2012 | | ORDER granting 20 Motion for Leave to Appear Pro Hac Vice. Ordered by Senior Judge Edward R. Korman on 3/12/2012. (Susi, PaulaMarie) (Entered: 03/12/2012) |
| 03/13/2012 | 24 | MOTION for Leave to File *Response to Defendants' Response to Order to Show Cause* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Novak, Suzanne) (Entered: 03/13/2012) |
| 03/16/2012 | | ORDER granting 24 Motion for Leave to File ** The proposed schedule is adopted. Ordered by Senior Judge Edward R. Korman on 3/16/2012. (Susi, PaulaMarie) (Entered: 03/16/2012) |
| 03/16/2012 | | NOTICE of Hearing on Court's order of 2/15/2012 and Motion 22 MOTION to Intervene *for Limited Purposes in Support of Neither Party* : Motion Hearing set |

| | | for 4/27/2012 02:30 PM in Courtroom 8A South before Senior Judge Edward R. Korman. Parties to confirm with each other (Susi, PaulaMarie) (Entered: 03/16/2012) |
|---|---|---|
| 03/22/2012 | 25 | RESPONSE in Opposition re 22 MOTION to Intervene *for Limited Purposes in Support of Neither Party* filed by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Attachments: # 1 Exhibit A) (Novak, Suzanne) (Entered: 03/22/2012) |
| 03/30/2012 | 26 | NOTICE by Margaret Hamburg, Kathleen Sebelius (Attachments: # 1 Exhibit) (Beckenhauer, Eric) (Entered: 03/30/2012) |
| 03/30/2012 | 27 | DECLARATION *of Suzanne Novak* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Attachments: # 1 Appendix One to Novak Declaration) (Novak, Suzanne) (Entered: 03/30/2012) |
| 03/30/2012 | 28 | DECLARATION *of Elizabeth G. Raymond, MD, MPH* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 03/30/2012) |
| 03/30/2012 | 29 | DECLARATION *of Miriam Cremer, MD, MPH* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 03/30/2012) |
| 03/30/2012 | 30 | MEMORANDUM in Opposition *to Defendants' Response to Order to Show Cause* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 03/30/2012) |
| 03/30/2012 | 31 | DECLARATION re 30 Sealed, Memorandum in Opposition *to Defendants' Response to Order to Show Cause* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Attachments: # 1 Appendix Two to Novak Declaration) (Novak, Suzanne) (Entered: 03/30/2012) |
| 03/30/2012 | 32 | CERTIFICATE OF SERVICE by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino re 27 Declaration, 30 Sealed, Memorandum in Opposition, 29 Declaration, 31 Sealed, Declaration,,,, 28 Declaration, (Novak, Suzanne) (Entered: 03/30/2012) |
| 04/02/2012 | 33 | REPLY in Support re 22 MOTION to Intervene *for Limited Purposes in Support of Neither Party* filed by Teva Women's Health, Inc.. (Shumsky, Michael) (Entered: 04/02/2012) |
| 04/12/2012 | 34 | Consent MOTION for Extension of Time to File *(1) Defendants' Memorandum in Opposition to 2 Plaintiffs' Post−Remand Motion for Preliminary Injunction and Summary Judgment, and (2) Defendants' Response (by way of answer or motion) to 14 Plaintiffs' First Amended Supplemental Complaint. With the consent of the plaintiffs, we respectfully request a one−week extension of time, until Monday,* |

| | | |
|---|---|---|
| | | *April 23, to complete and file our submissions. Plaintiffs have correspondingly asked that their deadline to file a reply brief in support of their post−remand motion for preliminary injunction and summary judgment, and a brief in opposition to any motion we file in response to their pleading, be extended to May 23, 2012. We have no objection to their request and ask the Court, on plaintiffs behalf, to extend their deadline as so indicated. Filed by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 04/12/2012)* |
| 04/18/2012 | 35 | Letter *re Plaintiffs' Corrected Response to Defendants' Response to Court Order to Show Cause* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 04/18/2012) |
| 04/18/2012 | 36 | MEMORANDUM in Opposition *Corrected Response to Defendants' Response to Order to Show Cause* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 04/18/2012) |
| 04/23/2012 | 37 | MEMORANDUM in Opposition re 2 MOTION for Preliminary Injunction *and Summary Judgment* filed by All Defendants. (Attachments: # 1 Exhibit Defendants' Exhibit F, # 2 Exhibit Defendants' Exhibit G, # 3 Exhibit Defendants' Exhibit H, # 4 Exhibit Defendants' Exhibit I, # 5 Exhibit Defendants' Exhibit J) (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 38 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction *and Summary Judgment : Defendants' Response to Plaintiffs' Rule 56.1 Statement of Material Facts,* filed by All Defendants. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 39 | MOTION to Strike 6 Declaration, 4 Declaration, 29 Declaration, 28 Declaration, 5 Declaration, 3 Declaration, by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 40 | MEMORANDUM in Support re 39 MOTION to Strike 6 Declaration, 4 Declaration, 29 Declaration, 28 Declaration, 5 Declaration, 3 Declaration, filed by All Defendants. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 41 | MOTION to Dismiss for Lack of Jurisdiction by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 42 | MEMORANDUM in Support re 41 MOTION to Dismiss for Lack of Jurisdiction filed by All Defendants. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 43 | MOTION to Dismiss for Lack of Jurisdiction *: CORRECTED NOTICE OF MOTION −− REPLACES 41 WHICH WAS FILED IN ERROR* by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | 44 | CERTIFICATE OF SERVICE by Margaret Hamburg, Kathleen Sebelius re 37 Memorandum in Opposition, 38 Response in Opposition to Motion (Amanat, Farzin) (Entered: 04/23/2012) |
| 04/23/2012 | | Motions terminated, docketed incorrectly: 41 MOTION to Dismiss for Lack of Jurisdiction filed by Margaret Hamburg, Kathleen Sebelius. Document 43 replaces document 41. (Greene, Donna) (Entered: 04/24/2012) |
| 04/24/2012 | 45 | MOTION to Unseal Document 36 Sealed, Memorandum in Opposition filed by Jonathan Marks, Catherine Lederer−Plaskett, Angelica Jaffe, Candace Churchill, Lori Tinney, Kelly Mangan, Gabrielle Marks, Annie Tummino, Erin T. Mahoney, National Latina Institute for Reproductive Health, Stephanie Seguin, Association of Reproductive Health Professionals, Aurora DeMarco, Jennifer Brown, Carol Giardina, Robert Jaffe, Francie Hunt, 35 Sealed, Letter,, filed by Jonathan Marks, Catherine Lederer−Plaskett, Angelica Jaffe, Candace Churchill, Lori Tinney, Kelly Mangan, Gabrielle Marks, Annie Tummino, Erin T. Mahoney, National Latina Institute for Reproductive Health, Stephanie Seguin, Association of Reproductive Health Professionals, Aurora DeMarco, Jennifer Brown, Carol Giardina, Robert Jaffe, Francie Hunt, 30 Sealed, Memorandum in Opposition filed by Jonathan Marks, Catherine Lederer−Plaskett, Angelica Jaffe, Candace Churchill, Lori |

| | | Tinney, Kelly Mangan, Gabrielle Marks, Annie Tummino, Erin T. Mahoney, National Latina Institute for Reproductive Health, Stephanie Seguin, Association of Reproductive Health Professionals, Aurora DeMarco, Jennifer Brown, Carol Giardina, Robert Jaffe, Francie Hunt. _31_ Sealed, Declaration,,,, filed by Jonathan Marks, Catherine Lederer–Plaskett, Angelica Jaffe, Candace Churchill, Lori Tinney, Kelly Mangan, Gabrielle Marks, Annie Tummino, Erin T. Mahoney, National Latina Institute for Reproductive Health, Stephanie Seguin, Association of Reproductive Health Professionals, Aurora DeMarco, Jennifer Brown, Carol Giardina, Robert Jaffe, Francie Hunt by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Attachments: #_1_ Exhibit A to Plaintiffs' Motion to Unseal Documents Filed Under Seal) (Novak, Suzanne) (Entered: 04/24/2012) |
| 04/24/2012 | _46_ | Letter *to Judge Korman transmitting courtesy chambers copies of _37_ , _38_ , _39_ , _40_ , _42_ , and _43_ . Submitted* by Margaret Hamburg, Kathleen Sebelius (Amanat, Farzin) (Entered: 04/24/2012) |
| 04/25/2012 | _47_ | Letter *from Defendants to Judge Korman providing the Court with recent supplemental authority that bears on _22_ the pending motion of Teva Women's Health, Inc. to intervene in this case and invites the Court to consider whether it is premature to hear Teva's motion to intervene at this time (it is scheduled for argument this Friday April 27) and whether the Court and the parties would be better served by deferring consideration of Teva's motion until after the government's motion to dismiss has been full briefed, argued, and decided. Defendants also respectfully invite the Court to determine whether consideration of the Court's Order to Show Cause of 02/16/12 may also be premature in view of defendants' motion to dismiss. Submitted* by Margaret Hamburg, Kathleen Sebelius (Attachments: #_1_ Judge Garaufis's Decision in NY v. US Army Corps of Engineers) (Amanat, Farzin) (Entered: 04/25/2012) |
| 04/25/2012 | _49_ | Minute Entry for proceedings held before Senior Judge Edward R. Korman:denying _43_ Motion to Dismiss for Lack of Jurisdiction; Motion Hearing held on 4/27/2012 re _22_ MOTION to Intervene *for Limited Purposes in Support of Neither Party* filed by Teva Women's Health, Inc., Reserved (Court Reporter Hong/Rocco.) (Greene, Donna) Modified on 4/5/2013 (Rocco, Christine). (Entered: 05/01/2012) |
| 04/26/2012 | _48_ | Letter *to Judge Korman from Michael D. Shumsky in response to the Government's April 25, 2012 supplemental authority letter* by Teva Women's Health, Inc. (Shumsky, Michael) (Entered: 04/26/2012) |
| 04/26/2012 | | ORDER granting _45_ Motion to Unseal Document. The motion is granted and the documents filed under ECF Nos. 30, 31, 31–1, 35, and 36 are unsealed. Ordered by Senior Judge Edward R. Korman on 4/26/2012. (Bedoya, Natalie) (Entered: 04/26/2012) |
| 04/26/2012 | | ORDER denying _39_ Motion to Strike. The motion to strike the declarations appended to plaintiffs' motion for preliminary injunction and summary judgment and to plaintiffs' response to order to show cause is DENIED. I will, during the course of ruling on the substantive motions, decide whether consideration of these declarations is appropriate. Ordered by Senior Judge Edward R. Korman on 4/26/2012. (Bedoya, Natalie) (Entered: 04/26/2012) |
| 04/26/2012 | | ORDER. In a letter dated April 25, 2012, the defendants argue that the threshold jurisdictional issues that they raise in their motion to dismiss implicate this Court's authority to adjudicate Teva's intervention motion. They also invite this Court to determine whether consideration of the Order to Show Cause may be premature. I reject both suggestions. The first suggestion, which relies on Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc., 2012 WL 1143588 (2d Cir. Apr. 6, 2012), is without merit for the reasons set out in the letter submitted by Teva Women's Health, Inc. on April 26, 2012. Moreover, I reject the second suggestion because I have already decided the issue of standing in my March 23, 2009 order. Indeed, the defendants' motion to dismiss asks me to |

| | | reconsider my ruling. See ECF No. 42 at 14. The defendants are free to re–argue any issue they choose. While I understand their argument with respect to the teenage plaintiffs who reached the age of 17 while the FDA interminably delayed consideration of the Citizen's Petition and compliance with my order remanding the case, I see no reason to delay consideration of the Order to Show Cause and related issues.. Ordered by Senior Judge Edward R. Korman on 4/26/2012. (Bedoya, Natalie) (Entered: 04/26/2012) |
|---|---|---|
| 05/01/2012 | 50 | NOTICE of Change of Firm, Address and Email by Andrea H Costello (Costello, Andrea) (Entered: 05/01/2012) |
| 05/02/2012 | | ORDER terminating 34 Motion for Extension of Time to File. Ordered by Senior Judge Edward R. Korman on 5/2/2012. (Susi, PaulaMarie) (Entered: 05/02/2012) |
| 05/15/2012 | 51 | MOTION for Extension of Time to File Answer re 14 Supplemental Complaint, *seeking a one–week extension, until May 22, 2012, to file Answer to the First Amended Supplemental Complaint,* by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 05/15/2012) |
| 05/16/2012 | 52 | RESPONSE in Opposition re 51 MOTION for Extension of Time to File Answer re 14 Supplemental Complaint, *seeking a one–week extension, until May 22, 2012, to file Answer to the First Amended Supplemental Complaint,* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 05/16/2012) |
| 05/17/2012 | | ORDER granting 51 Motion for Extension of Time to Answer, no further extensions will be granted. Ordered by Senior Judge Edward R. Korman on 5/17/2012. (Susi, PaulaMarie) (Entered: 05/17/2012) |
| 05/22/2012 | 53 | ANSWER to 14 Supplemental Complaint, by All Defendants. (Beckenhauer, Eric) (Entered: 05/22/2012) |
| 05/23/2012 | 54 | MOTION to Amend/Correct/Supplement *First Amended Supplemental Complaint* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Novak, Suzanne) (Entered: 05/23/2012) |
| 05/23/2012 | 55 | MEMORANDUM in Support re 54 MOTION to Amend/Correct/Supplement *First Amended Supplemental Complaint and to Add Plaintiffs* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 05/23/2012) |
| 05/23/2012 | 56 | DECLARATION re 55 Memorandum in Support, 54 MOTION to Amend/Correct/Supplement *First Amended Supplemental Complaint and Add Plaintiffs* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Novak, Suzanne) (Entered: 05/23/2012) |
| 05/23/2012 | 57 | REPLY in Support re 2 MOTION for Preliminary Injunction *and Summary Judgment* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 05/23/2012) |
| 05/23/2012 | 58 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 05/23/2012) |
| 05/23/2012 | 59 | DECLARATION re 2 MOTION for Preliminary Injunction *and Summary Judgment* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive |

| | | Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 05/23/2012) |
|---|---|---|
| 05/23/2012 | 60 | CERTIFICATE OF SERVICE by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino re 55 Memorandum in Support, 56 Declaration,, 57 Reply in Support, 54 MOTION to Amend/Correct/Supplement *First Amended Supplemental Complaint*, 59 Declaration, 58 Declaration, (Novak, Suzanne) (Entered: 05/23/2012) |
| 06/04/2012 | 61 | NOTICE by Margaret Hamburg, Kathleen Sebelius *of Non−Opposition to* 54 *Plaintiffs' Motion to Amend/Correct/Supplement First Amended Supplemental Complaint* (Beckenhauer, Eric) (Entered: 06/04/2012) |
| 06/05/2012 | | ORDER granting 54 Motion to Amend/Correct/Supplement First Amended Supplemental Complaint. Ordered by Senior Judge Edward R. Korman on 6/5/2012. (Bedoya, Natalie) (Entered: 06/05/2012) |
| 06/19/2012 | 62 | MOTION to Dismiss *Second Amended Supplemental Complaint* by Margaret Hamburg, Kathleen Sebelius. (Beckenhauer, Eric) (Entered: 06/19/2012) |
| 06/28/2012 | 63 | RESPONSE in Opposition re 62 MOTION to Dismiss *Second Amended Supplemental Complaint* filed by All Plaintiffs. (Novak, Suzanne) (Entered: 06/28/2012) |
| 07/02/2012 | | ORDER denying 62 Motion to Dismiss. Ordered by Judge Edward R. Korman on 7/2/2012. (Susi, PaulaMarie) (Entered: 07/02/2012) |
| 07/03/2012 | 64 | Letter *Request for Status Conference* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer−Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino (Novak, Suzanne) (Entered: 07/03/2012) |
| 07/05/2012 | | Status Conference 64 set for 7/6/2012 02:30 PM in Courtroom 8A South before Judge Edward R. Korman. Parties to confirm with each other. Ordered by Judge Edward R. Korman on 7/5/2012. (Susi, PaulaMarie) (Entered: 07/05/2012) |
| 07/05/2012 | 65 | Letter MOTION to Adjourn Conference *scheduled for 2:30 p.m. tomorrow, July 6, 2012. With the consent of the plaintiffs, we respectfully request that tomorrow's conference be adjourned in view of the unavailability of one or more of the attorneys for the government who would need to travel from Washington to attend the conference. Submitted* by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 07/05/2012) |
| 07/06/2012 | | ORDER granting 65 Motion to Adjourn Conference; ( Status Conference set for 7/13/2012 02:30 PM in Courtroom 8A South before Judge Edward R. Korman.) Parties to confirm with each other. Ordered by Judge Edward R. Korman on 7/6/2012. (Susi, PaulaMarie) (Entered: 07/06/2012) |
| 07/13/2012 | 67 | Minute Entry for proceedings held before Judge Edward R. Korman:Status Conference held on 7/13/2012. Administrative record to be filed 7/20/12. (Court Reporter Hong.) (Greene, Donna) (Entered: 07/18/2012) |
| 07/16/2012 | 66 | ANSWER to Complaint *re Second Amended Supplemental Complaint* by All Defendants. (Beckenhauer, Eric) (Entered: 07/16/2012) |
| 07/20/2012 | 68 | TRANSCRIPT of Proceedings held on July 13, 2012, before Judge Korman. Court Transcriber: Transcriptions Plus II, Telephone number 718−987−4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/10/2012. Redacted Transcript Deadline set for 8/20/2012. Release of Transcript Restriction set for 10/18/2012. (Rocco, Christine) (Entered: 07/20/2012) |

| 07/20/2012 | 69 | Letter *to Judge Korman: The government respectfully files the administrative record for the Food and Drug Administration's December 12, 2011, denial, on remand, of the February 14, 2001, Citizen Petition requesting that Plan B, Preven, and their generic equivalents be exempted from prescription dispensing requirements. The administrative record is being electronically filed in six parts, and we also submit an index of the record. Submitted* by Margaret Hamburg, Kathleen Sebelius (Attachments: # 1 Index to Administrative Record (AR), # 2 AR Part 1 of 6, # 3 AR Part 2 of 6, # 4 AR Part 3 of 6, # 5 AR Part 4 of 6, # 6 AR Part 5 of 6, # 7 AR Part 6 of 6) (Amanat, Farzin) (Entered: 07/20/2012) |
| --- | --- | --- |
| 07/20/2012 | 70 | Cross MOTION for Summary Judgment by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 07/20/2012) |
| 07/20/2012 | 71 | MEMORANDUM in Support re 70 Cross MOTION for Summary Judgment filed by Margaret Hamburg, Kathleen Sebelius. (Attachments: # 1 Exhibit A) (Amanat, Farzin) (Entered: 07/20/2012) |
| 07/20/2012 | 72 | RULE 56.1 STATEMENT re 70 Cross MOTION for Summary Judgment filed by Margaret Hamburg, Kathleen Sebelius. (Amanat, Farzin) (Entered: 07/20/2012) |
| 08/06/2012 | 73 | RESPONSE in Opposition re 70 Cross MOTION for Summary Judgment filed by All Plaintiffs. (Novak, Suzanne) (Entered: 08/06/2012) |
| 08/06/2012 | 74 | NOTICE by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino re 72 Rule 56.1 Statement *Plaintiffs' Response to Defendants' Statement Pursuant to Civil Rule 56.1 of Material Facts as to which No Genuine Issue Remains Disputed* (Novak, Suzanne) (Entered: 08/06/2012) |
| 08/16/2012 | 75 | REPLY in Support re 70 Cross MOTION for Summary Judgment filed by All Defendants. (Beckenhauer, Eric) (Entered: 08/16/2012) |
| 10/16/2012 | 76 | MOTION to Withdraw as Attorney *Suzanne Novak for Plaintiffs* by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Novak, Suzanne) (Entered: 10/16/2012) |
| 10/18/2012 | | ORDER granting 76 Motion to Withdraw as Attorney. Attorney Suzanne Ilene Novak terminated. Ordered by Judge Edward R. Korman on 10/18/2012. (Susi, PaulaMarie) (Entered: 10/18/2012) |
| 03/04/2013 | 77 | ORDER*** Defendants are directed to respond to the three questions contained in the attached order within 10 days. Ordered by Judge Edward R. Korman on 3/4/2013. (Casteel, Heather) (Entered: 03/04/2013) |
| 03/06/2013 | 78 | ORDER amending this Court's March 23, 2009 order in case 05–cv–366. Ordered by Judge Edward R. Korman on 3/6/2013. (Casteel, Heather) (Entered: 03/06/2013) |
| 03/08/2013 | | ORDER*** Defendants are directed to provide me, within seven days of the date of this order, the Division Director Summary Review of Regulatory Action referenced by Secretary Sebelius in her memorandum directing the FDA to issue a complete response letter denying Teva's SNDA. Ordered by Judge Edward R. Korman on 3/8/2013. (Casteel, Heather) (Entered: 03/08/2013) |
| 03/14/2013 | 79 | NOTICE by Margaret Hamburg, Kathleen Sebelius *re Response to 77 Order of March 4, 2013* (Beckenhauer, Eric) (Entered: 03/14/2013) |
| 03/14/2013 | 80 | Letter *to Judge Korman in response to minute Order dated 03/08/13 directing defendants to provide the Court by 03/15 with the Division Director Summary Review of Regulatory Action. The government will submit the document to the Court tomorrow for its in camera review but will not file it on the public docket or provide a copy to plaintiffs. Filed* by Margaret Hamburg, Kathleen Sebelius |

| | | (Amanat, Farzin) (Additional attachment(s) added on 3/18/2013: #1 Summary Review) (Lee, Tiffeny). (Additional attachment(s) added on 3/20/2013: #2 SEALING COVER SHEET) (Lee, Tiffeny). (Entered: 03/14/2013) |
|---|---|---|
| 03/15/2013 | 81 | ORDER*** Defendants are directed to respond as provided in the attached order within seven days. Ordered by Judge Edward R. Korman on 3/15/2013. (Casteel, Heather) (Entered: 03/15/2013) |
| 03/16/2013 | 82 | ORDER*** amended version of 81 Order. Defendants are directed to respond as detailed in the attached amended order. Entered by Judge Edward R. Korman on 3/16/2013. (Casteel, Heather) (Entered: 03/16/2013) |
| 03/22/2013 | 83 | Letter *to Judge Korman in response to 82 Amended Order of 03/16/13, attaching a redacted version of the Summary Review document, and answering the two questions posed in the Amended Order. Respectfully submitted* by Margaret Hamburg, Kathleen Sebelius (Attachments: #1 Redacted Summary Review Document) (Amanat, Farzin) (Entered: 03/22/2013) |
| 03/29/2013 | | Motions terminated, motion has been consolidated with DE#2. (Susi, PaulaMarie) (Entered: 03/29/2013) |
| 04/03/2013 | 84 | TRANSCRIPT of Proceedings held on 4/27/12, before Judge Korman. Court Reporter/Transcriber TRANSCRIPTION PLUS II, Telephone number 718–987–4285. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/24/2013. Redacted Transcript Deadline set for 5/6/2013. Release of Transcript Restriction set for 7/2/2013. (Hong, Loan) (Entered: 04/03/2013) |
| 04/04/2013 | | The parties are advised that my opinion in this case will be filed early tomorrow morning and will be posted on the court's website. Entered by Judge Edward R. Korman on 4/4/2013. (Casteel, Heather) (Entered: 04/04/2013) |
| 04/05/2013 | 85 | MEMORANDUM &ORDER granting Plaintiffs' 2 Motion for Summary Judgment and denying Defendants' 70 Cross Motion for Summary Judgment. So Ordered by Judge Edward R. Korman on 4/4/2013. (Lee, Tiffeny) (Entered: 04/05/2013) |
| 04/05/2013 | 86 | MEMORANDUM &ORDER granting in part and denying in part 22 Motion to Intervene. So Ordered by Judge Edward R. Korman on 4/4/2013. (Lee, Tiffeny) (Entered: 04/05/2013) |
| 04/10/2013 | 87 | CLERK'S JUDGMENT: ORDERED and ADJUDGED that Plaintiffs' motion for summary judgment is granted; that Defendants' cross–motion for summary judgment is denied; that the decision of the Food and Drug Administration denying the Citizen Petition is reversed, and the case is remanded to the Food and Drug Administration with the instruction to grant the Citizen Petition and make levonorgestrel–based emergency contraceptives available without a prescription and without point–of–sale or age restrictions within thirty days; that on remand, the Food and Drug Administration may determine whether any new labeling is reasonably necessary; and that moreover, if the Food and Drug Administration actually believes there is any significant difference between the one–and two–pill products, may limit its over–the–counter approval to the one–pill product. Ordered by Clerk of Court on 4/10/2013. (Chee, Alvin) (Entered: 04/10/2013) |
| 04/29/2013 | 88 | Undated letter from Dr. Jacob Johnson to Hon. Carol B. Amon, requesting that the Court stop the decision of Judge Korman regarding Plan B One Step Emergency Contraceptive. (Chee, Alvin) (Entered: 04/29/2013) |
| 04/29/2013 | 89 | Letter dated 4/23/13 from Chief Judge Carol B. Amon to Dr. Jacob Johnson, acknowledging receipt of his letter and providing notice that the Court is without authority to act in a case assigned to another judge. (Chee, Alvin) (Entered: 04/29/2013) |
| 05/01/2013 | 90 | NOTICE OF APPEAL as to 85 Order on Motion for Summary Judgment, 87 Clerk's Judgment by Margaret Hamburg, Kathleen Sebelius. No fee – Federal Agencies. Service done electronically. (Amanat, Farzin) Modified on 5/2/2013 (McGee, Mary Ann). (Entered: 05/01/2013) |

| 05/01/2013 | 91 | MOTION to Stay re 85 Order on Motion for Summary Judgment, 87 Clerk's Judgment,,, : *MOTION FOR STAY PENDING APPEAL. If the Court is not inclined to grant our motion for a stay pending appeal, the government moves for a temporary administrative stay of the Court's order and judgment pending resolution by the Court of Appeals of any motion defendants might make to that court under FRAP 8(a)(2). In view of the short time before the government is required to take steps to comply with the Court's order, which is effective on May 6, we respectfully request a ruling on the stay motion by the end of the day on Thursday, May 2, so that, if necessary, we may seek an emergency stay from the Court of Appeals. Filed* by Margaret Hamburg, Kathleen Sebelius. (Attachments: # 1 Memorandum in Support, # 2 Affidavit in Support Declaration of Janet Woodcock, M.D., # 3 Exhibit Approval Letter for Amended SNDA for Plan B One–Step) (Amanat, Farzin) (Entered: 05/01/2013) |
| 05/01/2013 | 92 | Letter *to Honorable Edward R. Korman, transmitting courtesy copies of 90 Notice of Appeal and 91 Motion for Stay Pending Appeal, and respectfully asking the Court, if it is not inclined to grant the motion for stay pending appeal, to grant a temporary administrative stay of the Court's 85 order and 87 judgment, pending resolution by the court of appeals of any motion defendants might make to that court under FRAP 8(a)(2). Respectfully submitted* by Margaret Hamburg, Kathleen Sebelius (Amanat, Farzin) (Entered: 05/01/2013) |
| 05/01/2013 | 93 | REPLY in Opposition re 91 MOTION to Stay re 85 Order on Motion for Summary Judgment, 87 Clerk's Judgment,,, : *MOTION FOR STAY PENDING APPEAL. If the Court is not inclined to grant our motion for a stay pending appeal, the government moves for a temporary administ Letter from Plaintiffs to the Court Opposing Defendants' Request for a "Temporary Administrative Stay" and Requesting Until Close of Business on May 3, 2013, to File Plaintiffs' Opposition to Defendants' Motion for a Stay Pending Appeal filed by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Robert Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Costello, Andrea) (Entered: 05/01/2013)* |
| 05/02/2013 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 90 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 05/02/2013) |
| 05/02/2013 | 94 | ORDER*** see attached document. (Evidentiary Hearing set for 5/7/2013 11:00 AM in Courtroom 8A South before Judge Edward R. Korman.) Ordered by Judge Edward R. Korman on 5/2/2013. (Casteel, Heather) (Entered: 05/02/2013) |
| 05/06/2013 | 95 | MEMORANDUM in Opposition re 91 MOTION to Stay re 85 Order on Motion for Summary Judgment, 87 Clerk's Judgment,,, : *MOTION FOR STAY PENDING APPEAL. If the Court is not inclined to grant our motion for a stay pending appeal, the government moves for a temporary administ filed by Association of Reproductive Health Professionals, Jennifer Brown, Candace Churchill, Carol Giardina, Francie Hunt, Angelica Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Costello, Andrea) (Entered: 05/06/2013)* |
| 05/06/2013 | | ORDER*** The defendants are directed to provide me with Teva's submissions referred to in the second paragraph of the supplement approval letter annexed to the Woodcock declaration. The submission may be under seal if the submissions are subject to one of the many "confidentiality" objections that the defendants have invoked. The documents are to be submitted by the close of business today, 5/6/2013. Ordered by Judge Edward R. Korman on 5/6/2013. (Casteel, Heather) (Entered: 05/06/2013) |
| 05/06/2013 | 96 | Letter *to Judge Korman in response to minute order of earlier this afternoon directing the government to provide the Court by close of business today with Teva's submissions referred to in the second paragraph of the supplement approval letter annexed to the Woodcock declaration. On the basis of Teva's authorization,* |

| | | |
|---|---|---|
| | | *and subject to the objections and points set forth in the governments letters to the Court dated March 14 and 22, 2013, we respectfully provide the requested materials ex parte and under seal. EXHIBITS PROVIDED BY HAND DELIVERY TO THE JUDGE UNDER SEAL FOR IN CAMERA REVIEW; NOT ATTACHED TO ECF FILING. Respectfully submitted* by Margaret Hamburg, Kathleen Sebelius (Amanat, Farzin) (Entered: 05/06/2013) |
| 05/09/2013 | <u>97</u> | MOTION for Attorney Fees *and Costs, and for Enlargement of Time to File Petition or, Alternatively, to Stay This Motion Until Resolution of All Post–Judgment Requests for Relief* by Jennifer Brown, Candace Churchill, Aurora DeMarco, Carol Giardina, Francie Hunt, Angelica Jaffe, Catherine Lederer–Plaskett, Erin T. Mahoney, Kelly Mangan, Gabrielle Marks, Jonathan Marks, National Latina Institute for Reproductive Health, Stephanie Seguin, Lori Tinney, Annie Tummino. (Costello, Andrea) (Entered: 05/09/2013) |
| 05/10/2013 | <u>98</u> | ORDER denying <u>91</u> Motion to Stay. A temporary stay is granted pending the hearing or submission of the defendants' motion for a stay in the Court of Appeals. Ordered by Judge Edward R. Korman on 5/10/2013. (Casteel, Heather) (Entered: 05/10/2013) |
| 05/13/2013 | <u>99</u> | ORDER of USCA as to <u>90</u> Notice of Appeal filed by Margaret Hamburg, Kathleen Sebelius. IT IS ORDERED that the motion by Appellants for a stay pending appeal will be submitted to a motions panel on Tuesday, May 28, 2013. In the interim, the temporary stay remains in place. Certified copy issued 5/13/13. (McGee, Mary Ann) (Entered: 05/13/2013) |
| 05/14/2013 | <u>100</u> | SECOND AMENDED ORDER of USCA as to <u>90</u> Notice of Appeal filed by Margaret Hamburg, Kathleen Sebelius. IT IS HEREBY ORDERED that the motion by Appellants for a stay pending appeal will be submitted to a motions panel on Tuesday, May 28, 2013. In the interim, the temporary stay issued by the District Court remains in place. Appellees objection to the motion must be filed on or before close of business on Monday May 20, 2013. A reply may be filed on or before May 24. Certified copy issued: 5/14/12. (McGee, Mary Ann) (Entered: 05/14/2013) |
| 05/14/2013 | <u>101</u> | TRANSCRIPT of Proceedings held on May 7, 2013, before Judge Korman. Court Transcriber: Transcriptions Plus II, Telephone number 718–987–4285. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/4/2013. Redacted Transcript Deadline set for 6/14/2013. Release of Transcript Restriction set for 8/12/2013. (Rocco, Christine) (Entered: 05/14/2013) |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANNIE TUMMINO, *et al.*,

                Plaintiffs,                      **MEMORANDUM & ORDER**

           - against -                    No. 12-CV-763 (ERK)(VVP)

MARGARET HAMBURG, Commissioner
of Food and Drugs, *et al.*

                Defendants.

-----------------------------------------------------------------X

KORMAN, J.:

## I.  OVERVIEW

      Plan B and Plan B One-Step are emergency contraceptives that can be taken to reduce the risk of pregnancy after unprotected intercourse.  In 1999, Plan B became the first emergency contraceptive drug approved for prescription-only use in the United States.  In 2006, the Food and Drug Administration ("FDA") approved non-prescription access to Plan B for women 18 and older, and with a prescription to adolescents under the age of 18.  Subsequently, the FDA was ordered to make it available without a prescription to adolescents aged 17.  *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009).  Even for women 17 and older, Plan B can only be purchased at a pharmacy and requires government-issued proof of age.  Plan B One-Step was approved by the FDA in 2009 and is available without a prescription subject to the same restrictions.  Though Plan B itself is no longer marketed, generic versions are available.

      Both contraceptives contain the same total dose of levonorgestrel, a synthetic hormone similar to the naturally occurring hormone progesterone; Plan B consists of two pills containing 0.75 mg each of levonorgestrel that are to be taken 12 hours apart, while Plan B One-Step

1

consists of one pill containing 1.5 mg of levonorgestrel. Studies have shown that combining the two 0.75 mg doses of the hormone into one pill does not decrease its effectiveness; indeed, the two Plan B pills may be taken simultaneously, fewer than 12 hours apart, or up to 24 hours apart, without any adverse consequences. Both Plan B and Plan B One-Step are most effective when taken immediately after intercourse and preferably no later than 24 hours later, though they may retain some effectiveness if taken within 72 hours. Neither drug has any known serious or long-term side effects, though they may have some mild short-term side effects, such as nausea, fatigue, and headache.

Levonorgestrel-based emergency contraception "interferes with prefertilization events. It reduces the number of sperm cells in the uterine cavity, immobilizes sperm, and impedes further passage of sperm cells into the uterine cavity. In addition, levonorgestrel has the capacity to delay or prevent ovulation from occurring." U.S. Gov't Accountability Office, GAO-06-109, *Food and Drug Administration: Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual* at 12 (November 2005), Case No. 05-cv-366, Doc. No. 68-2 (hereinafter "GAO Report").[1] These contraceptives "have not been shown to cause a postfertilization event—a change in the uterus that could interfere with implantation of a fertilized egg." *Id.* at 13. Indeed, Diana Blithe, the biochemist who supervises research on contraception at the National Institutes of Health ("NIH"), opined that the possibility of levonorgestrel-based emergency contraceptives having an effect on implantation of fertilized eggs should "definitely" be taken off the labels for those drugs. Pam

---

[1] Citing H.B. Croxatto et al., *Mechanism of Action of Hormonal Preparations Used for Emergency Contraception: A Review of the Literature*, 63 Contraception, 111 (2001); H.B. Croxatto et al., *Pituitary-Ovarian Function Following the Standard Levonorgestrel Emergency Contraceptive Dose or a Single 0.75-mg Dose Given on the Days Preceding Ovulation*, 70 Contraception 442 (2004); A.L. Muller et al., *Postcoital Treatment with Levonorgestrel Does Not Disrupt Postfertilization Events in the Rat*, 67 Contraception 415 (2003); H.B. Croxatto et al., *Mechanisms of Action of Emergency Contraception*, 68 Steroids 1095 (2003).

Belluck, *Abortion Qualms on Morning-After Pill May Be Unfounded*, N.Y. Times, June 6, 2012, at A1. Consistent with this position, the NIH removed statements regarding emergency contraception's possible effect on implantation from its website. *Id.* Nevertheless, because it would be "unethical and logistically difficult to conduct the necessary research" to conclusively establish that levonorgestrel-based contraceptives do not interfere with implantation, "the possibility of a postfertilization event cannot be ruled out." GAO Report at 13. Presumably for this reason, the FDA-approved label for Plan B and its generic equivalents still suggests, without affirmative evidence, that "Plan B may also work by preventing fertilization of an egg . . . or by preventing attachment (implantation) to the uterus (womb)."

Plaintiffs in this case—organizations and individuals concerned with women's health, as well as minors and their parents—seek to expand the availability of Plan B and all emergency contraceptives. This action was originally brought in January 2005 to challenge the FDA's denial of a Citizen Petition seeking over-the-counter ("OTC") access to Plan B for women of all ages. The complaint asserted that the FDA's denial of the Citizen Petition, which it considered along with a number of proposals regarding over-the-counter access to emergency contraception submitted by Plan B's sponsor,[2] was arbitrary and capricious because it was not the result of reasoned and good faith agency decision-making. In a prior opinion, I concluded that the plaintiffs were right. *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009).[3] In light of the overwhelming evidence of political pressure underlying the agency's actions, I vacated the

---

[2] Plan B was originally manufactured by Women's Capital Corporation, who later sold its right to market Plan B to Barr Pharmaceuticals, Inc. Barr was acquired by Teva Pharmaceuticals in 2008; Teva then took over the marketing of Plan B and developed the marketing for Plan B One-Step, which was approved by the FDA in 2009. For clarity I refer to these companies collectively as "Plan B's manufacturer," "the Plan B sponsor," or "the Plan B One-Step sponsor" although, as noted above, Plan B itself is no longer marketed.

[3] I also addressed and rejected the argument of the defendants that plaintiffs lacked standing. *Tummino*, 603 F. Supp. 2d at 539-542. I rejected this argument again when I denied the defendants' motion to dismiss in a hearing on April 27, 2012. Subsequently, the plaintiffs filed the current amended complaint, which adds as parties adolescents who are currently under 17 in place of those who aged out while the FDA dragged its heels in deciding the petition. I have nothing to add to my earlier discussion of this issue.

FDA's denial of the Citizen Petition and remanded for the agency to exercise its discretion without impermissible political intrusion. I also directed the FDA to make Plan B available to 17-year-old women without a prescription, because the same evidence relied on by the agency to support over-the-counter access to the drug by 18-year-olds applied equally to 17-year-olds—a holding which the FDA ultimately conceded was "consistent with the scientific findings [the FDA] made in 2005." FDA Statement, *Updated FDA Action on Plan B (levonorgestrel) Tablets* (Apr. 22, 2009).

The plaintiffs argued that the ultimate relief they sought—over-the-counter access regardless of age—should have been granted without a remand because "the agency has acted so improperly and in such bad faith that it cannot be trusted to conduct a fair assessment of the scientific evidence." Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 9, Case No. 05-cv-366, Doc. No. 257. I rejected this argument, although I agreed with the plaintiffs that the FDA bowed to political pressure emanating from the White House and departed from agency policy. I declined to grant the relief plaintiffs requested for two principal reasons. First, the Commissioner of the FDA had resigned and his replacement, as well as a new Deputy Commissioner, had been nominated by the newly elected President. This change in leadership suggested that the FDA could be "trusted to conduct a fair assessment of the scientific evidence." *Id.* Second, it was my view that the decision whether to make Plan B available without a prescription regardless of age was one that should be made by the FDA, to which Congress had entrusted the responsibility, and not by a federal district judge.

The FDA did not rule on the remanded Citizen Petition for almost three years. During this time, the agency again considered a proposal—referred to as a supplemental new drug application ("SNDA")—from Plan B's manufacturer; this proposal would have allowed over-

the-counter access to Plan B One-Step, the one-pill emergency contraceptive product, for all ages. The FDA agreed to approve this SNDA. FDA Commissioner Margaret Hamburg explained the process by which the FDA had reached its conclusion, with particular emphasis on the scientific evidence:

> The Center for Drug Evaluation and Research (CDER) completed its review of the Plan B One-Step application and laid out its scientific determination. CDER carefully considered whether younger females were able to understand how to use Plan B One-Step. Based on the information submitted to the agency, CDER determined that the product was safe and effective in adolescent females, that adolescent females understood the product was not for routine use, and that the product would not protect them against sexually transmitted diseases. Additionally, the data supported a finding that adolescent females could use Plan B One-Step properly without the intervention of a healthcare provider.

> It is our responsibility at FDA to approve drugs that are safe and effective for their intended use based on the scientific evidence. The review process used by CDER to analyze the data applied a risk/benefit assessment consistent with its standard drug review process. Our decision-making reflects a body of scientific findings, input from external scientific advisory committees, and data contained in the application that included studies designed specifically to address the regulatory standards for nonprescription drugs. CDER experts, including obstetrician/gynecologists and pediatricians, reviewed the totality of the data and agreed that it met the regulatory standard for a nonprescription drug and that Plan B One-Step should be approved for all females of child-bearing potential.

Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-2. Commissioner Hamburg then observed that she had "reviewed and thoughtfully considered the data, clinical information, and analysis provided by CDER," and she expressly agreed that "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential." *Id.*

Nevertheless, she explained that Kathleen Sebelius, the Secretary of Health and Human Services, "invoking her authority under the Federal Food, Drug, and Cosmetic Act to execute its provisions," disagreed with the agency's decision "to allow the marketing of Plan B One-Step

nonprescription for all females of child-bearing potential" and ordered Commissioner Hamburg to deny the Plan B One-Step SNDA. Secretary Sebelius explained that she had concluded "that the data submitted for this product do not establish that prescription dispensing requirements should be eliminated for all ages." Memorandum from Kathleen Sebelius, Sec'y Health and Human Servs., to Margaret Hamburg, Comm'r of Food and Drugs (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-1 (hereinafter "Sebelius Mem."). More specifically, she observed:

> The label comprehension and actual use studies submitted to FDA do not include data on all ages for which the drug would be approved and available over-the-counter. Yet, it is commonly understood that there are significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age, which I believe are relevant to making this determination as to non-prescription availability of this product for all ages. Although the average age of the onset of menses for girls in the United States is 12.4 years of age, about ten percent of girls reach menarche by 11.1 years of age. If the application is approved, the product would be available, without a prescription or other point-of-sale restrictions, even to the youngest girls of reproductive age.

*Id.* (citation omitted). The President endorsed this decision, explaining that "the reason [Secretary Sebelius] made this decision was she could not be confident that a 10-year-old or an 11-year-old go into a drugstore, should be able—alongside bubble gum or batteries—be able to buy a medication that potentially, if not used properly, could end up having an adverse effect." Statement by the President (Dec. 8, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/12/08/statement-president. The reader will observe that Secretary Sebelius did not say that, "if not used properly," levonorgestrel-based emergency contraception could have an "adverse effect" on the youngest girls of reproductive age, nor did she include within that group girls as young as 10. Indeed, the drug is currently available to the youngest girls of reproductive age with a prescription.

This case is not about the potential misuse of Plan B by 11-year-olds. These emergency contraceptives would be among the safest drugs sold over-the-counter, the number of 11-year-

olds using these drugs is likely to be miniscule, the FDA permits drugs that it has found to be unsafe for the pediatric population to be sold over-the-counter subject only to labeling restrictions, and its point-of-sale restriction on this safe drug is likewise inconsistent with its policy and the Food, Drug, and Cosmetic Act as it has been construed. Instead, the invocation of the adverse effect of Plan B on 11-year-olds is an excuse to deprive the overwhelming majority of women of their right to obtain contraceptives without unjustified and burdensome restrictions.

Some of those burdens are detailed in a research letter published in the Journal of the American Medical Association in January 2012, which described the results of a study that investigated the ability of 17-year-old women to access emergency contraception. Tracey A. Wilkinson et al., *Research Letter: Access to Emergency Contraception for Adolescents*, 307 J. Am. Med. Ass'n 362 (January 25, 2012). In Dr. Wilkinson's study, "female research assistants posing as [17-year-old] adolescents who recently had unprotected intercourse were randomly assigned to call every commercial pharmacy" in five geographically diverse cities and ask about emergency contraception. *Id.* "The study revealed that approximately 20% of pharmacies did not have emergency contraception available on the same day that the patient called the pharmacy." Wilkinson Decl. ¶ 7, Case No. 12-cv-763, Doc. No. 6. In addition, "in 19% of the calls, the caller was incorrectly told she could not access emergency contraception at all because of her age, despite the fact that the FDA regime allows over-the-counter access by 17-year-olds." *Id.* ¶ 8. Dr. Wilkinson expressed her shock that "close to 1 in 5 calls made by adolescents resulted in them being told they could not access emergency contraception at all." *Id.* "[T]he rate of misinformation," Dr. Wilkinson explained, "was statistically significantly worse in low-income neighborhoods." *Id.* In addition, Dr. Wilkinson's study showed that "of the 943 pharmacies called, only 4.7% of them were open 24 hours." *Id.* ¶ 9.

7

All of these barriers, not to speak of the need for adolescents under 17 to find a doctor and obtain a prescription, "are created or exacerbated by the FDA's unusual treatment of emergency contraception [and] can have the cumulative effect of preventing some women from accessing the drug within the short time frame during which it will be effective, thereby exposing them to increased risk of unwanted pregnancy and making the product's limited OTC status useless. Unfortunately, this risk is especially great for young women and low-income women, two groups that could significantly benefit from timely access to and use of the product." *Id.* ¶ 10.

I pause to add these brief words before I begin the discussion of the legal issues. This case has proven to be particularly controversial because it involves access to emergency contraception for adolescents who should not be engaging in conduct that necessitates the use of such drugs and because of the scientifically unsupported speculation that the drug could interfere with implantation of fertilized eggs. Nevertheless, the issue in this case involves the interpretation of a general statutory and regulatory scheme relating to the approval of drugs for over-the-counter sale. The standards are the same for aspirin and for contraceptives. While the FDA properly recognizes that cognitive and behavioral differences undermine "the ability of adolescents to make reasoned decisions about engaging in sexual intercourse," the standard for determining whether contraceptives or any other drug should be available over-the-counter turns solely on the ability of the consumer to understand how to use the particular drug "safely and effectively." Ex. A-4 to Pls.' 2007 Mot. for Summ. J. at T-31097, Case No. 05-cv-366, Doc. No. 235-5. I decide this case based only on my understanding of the applicable standard.

## II. DISCUSSION

### A. *Procedural Posture*

Secretary Sebelius's directive to the FDA to reject the Plan B One-Step SNDA forced the agency to ride roughshod over the policies and practices that it has consistently applied in considering applications for switches in drug status to over-the-counter availability. Before reviewing these unexplained and unjustified departures, a brief discussion of the procedural posture of the case is necessary, although I pass over much of its complicated history. The directive of the Secretary did not directly apply to the Citizen Petition, the denial of which I have subject matter jurisdiction to review. Nevertheless, the denial of the Citizen Petition was inevitable after the Secretary ordered the FDA to reject the SNDA for Plan B One-Step because the Secretary concluded that the sponsor's "label comprehension and actual use studies . . . do not include data on all ages for which the drug would be approved and available over-the-counter." Sebelius Mem. This pronouncement made it impossible as a practical matter for the FDA to approve the Citizen Petition, because it likewise did not include such data. Indeed, the Citizen Petition denial came only five days later, although the FDA had sat on the Citizen Petition for three years.

The plaintiffs have moved for a preliminary injunction and summary judgment. In essence, they ask that the Citizen Petition be granted and that FDA be required to make all levonorgestrel-based emergency contraception, including Plan B, available for over-the-counter sales without age or point of sale restrictions. The defendants have cross-moved for summary judgment. While they incorporate, in one sentence, arguments that they made earlier in this proceeding, their motion centers on the argument that the FDA has no set policy of extrapolating data from adults to pediatric populations.

## B.  Deviations from Policy

In *INS v. Yang*, 519 U.S. 26 (1996), the Supreme Court held: "Though the agency's decision is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the Administrative Procedure Act."  *Id.* at 32; *see also Office of Commc'n of the Church of Christ v. FCC*, 560 F.2d 529, 532 (2d Cir. 1977) ("Here the Commission is seeking to change its policy, and . . . such changes in policy must be rationally and explicitly justified in order to assure that the standard is being changed and not ignored, and . . . that (the agency) is faithful and not indifferent to the rule of law.  Although an agency must be given flexibility to reexamine and reinterpret its previous holdings, it must clearly indicate and explain its action so as to enable completion of the task of judicial review.") (internal quotation omitted).  The denial of the SNDA and the Citizen Petition was accomplished by unexplained departures from a number of established policies and practices followed by the FDA.

### 1.  The Unprecedented Intervention of the Secretary

Perhaps the most significant departure from agency practice was the intervention of the Secretary of Health and Human Services.  She overruled the FDA in an area which Congress entrusted primarily to the FDA, 21 U.S.C. § 393(d)(2), and which fell within the scope of the authority that the Secretary expressly delegated to the Commissioner.  *See* Delegations of Authority to the Commissioner of Food and Drugs, *republished in* FDA Staff Manual Guide § 1410.10.  In doing so, she failed to take cognizance of a host of FDA policies that the agency would be forced to override in order to comply with her directive.

10

In my 2009 opinion, I traced the evidence demonstrating that the conduct of the FDA was influenced by the Bush White House, acting through the Office of the Commissioner of the FDA, and I held that this kind of political interference called into serious question the legitimacy of the FDA's decision. In the present circumstances, the political interference came directly from the Secretary of Health and Human Services, a member of the President's Cabinet. Of course, the Secretary herself is the best source of information on her state of mind, and she has not seen fit to file an affidavit in this case, even though her motives are in issue. *See, e.g.*, First Am. Supp. Compl. ¶ 38, Case No. 12-cv-763, Doc. No. 14; *cf. Campbell v. United States*, 365 U.S. 85, 96 (1961) ("[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.")

Nevertheless, we have been cautioned that, as judges, we "cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men [and women]." *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879) (No. 6546); *see also Watts v. Indiana*, 338 U.S. 49, 52 (1949) (Frankfurter, J.) ("[T]here comes a point where this Court should not be ignorant as judges of what we know as men [and women]."). The motivation for the Secretary's action was obviously political. "It was the first time a cabinet member had ever publicly countermanded a determination by the F.D.A., the agency charged with ensuring the safety of foods and medicines." Gardiner Harris, *White House and the FDA Often at Odds*, N.Y. Times, Apr. 3, 2012 at A1. And it was an election-year decision that "many public health experts saw as a politically motivated effort to avoid riling religious groups and others opposed to making birth control available to girls." *Id.* Thus, three distinguished scientists, including the Editor-in-Chief of the New England Journal of Medicine, wrote:

> In our opinion, the secretary's decision to retain behind-the-counter status for Plan B One-Step was based on politics rather than science. It cannot be based on issues of safety, since a 12-year-old can purchase a lethal dose of acetaminophen in any pharmacy for about $11, no questions asked. The only documented adverse effects of a $50 dose of levonorgestrel are nausea and delay of menses by several days. Any objective review makes it clear that Plan B is more dangerous to politicians than to adolescent girls.

*The Politics of Emergency Contraception*, 366 New Eng. J. Med. 101, 102 (Jan 12, 2012).

Nevertheless, even with eyes shut to the motivation for the Secretary's decision, the reasons she provided are so unpersuasive as to call into question her good faith. While the Secretary has strung together three factual statements in her memorandum to Commissioner Hamburg, she has failed to offer a coherent justification for denying the over-the-counter sale of levonorgestrel-based emergency contraceptives to the overwhelming majority of women of all ages who may have need for those drugs and who are capable of understanding their correct use. I proceed to deconstruct her explanation sentence by sentence.

a. The First Sentence

The Secretary says that "[t]he label comprehension and actual use studies submitted to FDA do not include data on all ages for which the drug would be approved and available over-the-counter." Sebelius Mem. This statement ignores the fact that the FDA waived the requirement that included a minimum number of enrollees between the ages of 11 and 13 in the drug sponsor's studies. Defs.' Resp. to Mar. 4, 2013 Order at 2, Case No. 12-cv-763, Doc. No. 79; *see also* Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 775 (2012), Case No. 12-cv-762, Doc. No. 26-1. In effect, the Secretary ordered the FDA to deny the application of the Plan B One-Step sponsor because it lacked data that the FDA itself had told the sponsor it did not have to provide. This the Secretary does not deny. The excuse offered by

12

the minyan of attorneys representing her is that the Secretary was "not present" at the meeting where the FDA agreed to waive this data and that she disagreed. Defs.' Resp. to March 4, 2013 Order at 2, Case No. 12-cv-763, Doc. No. 79. They are careful to avoid saying she did not have knowledge of the waiver. Moreover, as discussed below, the Secretary may not issue administrative edicts simply because she disagrees with the decisions of the FDA.

      b.  <u>The Second Sentence</u>

The Secretary also observed that there are "significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age," which she believes "are relevant to making this determination as to non-prescription availability of this product for all ages." Sebelius Mem. She fails to explain why. The issue of the cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age to which the Secretary alluded was raised in the FDA's review of the first SNDA for Plan B. In response, Dr. John Jenkins, Director of the Office of New Drugs at the FDA, explained that such concerns are beyond the scope of the FDA's review because they are "more applicable to the ability of adolescents to make reasoned decisions about engaging in sexual intercourse, not their ability to understand how to use Plan B safely and effectively as an emergency contraceptive should they engage in unprotected sexual intercourse." Ex. A-4 to Pls.' 2007 Mot. for Summ. J. at T-31097, Case No. 05-cv-366, Doc. No. 235-5. While recognizing that "OTC access to Plan B for adolescents may be controversial from a societal perspective," Dr. Jenkins could not "think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." *Id.* at T-31098. Indeed, slightly over half of teenage mothers obtain a high school diploma by age 22, compared to 89 percent of women who didn't have a teen birth. The National Campaign to Prevent Teen and Unplanned Pregnancy, *Why it Matters:*

*Teen Childbearing, Education, and Economic Wellbeing* at 1 (July 2012). "Another study found that less than two percent of young teen mothers attain a college degree by age 30 . . . . Between 2009 and 2010, roughly 48 percent of all mothers age 15 to 19 lived below the poverty line . . . . As their children grow older, their likelihood of living in poverty increases." [4] *Id.* at 1-3.

On the other hand, as seems clear from the Secretary's explanation, if the "cognitive differences" to which she referred affected the ability of the youngest adolescents to understand the label and use the drug appropriately, then it would be impossible for any drug to be approved for over-the-counter sales without a prescription. This would thwart the intent of Congress to "relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician." S. Rep. No. 82-946 (1951), *reprinted in* 1951 U.S.C.C.A.N. 2454, 2454.

Specifically, census statistics demonstrate that there are fewer than two million 11-year-old girls in the United States. U.S. Census Bureau, *Age and Sex Composition in the United States: 2011*, *available at* http://www.census.gov/population/age/data/2011comp.html. As the Secretary noted, "about ten percent of girls reach menarche by 11.1 years of age"; thus, there are fewer than 200,000 11-year-old girls of reproductive age in the country. Moreover, fewer than 3% of girls under the age of 13 are sexually active. Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 779 (2012), Case No. 12-cv-762, Doc. No. 26-1. Thus, the potential population about whom the Secretary is concerned is infinitesimal, even if all of these young adolescents are unable to read a relatively simple emergency contraception label and use the drug

---

[4] These disturbing statistics underscore the President's own concern with the problems caused by teen pregnancy. As one commentator has observed, the President "has invested many millions of dollars to battle teenage pregnancy and fought to include contraception in his health plan. Contraception, study after study shows, plays a central and inescapable role in pushing down the number of pregnant teenagers." Michael Powell, *Bloomberg's Shame-and-Blame Tactic on Teenage Pregnancy*, N.Y. Times, Mar. 12, 2013, at A17.

appropriately.  By contrast, 12% of the total population of the United States over the age of 16 are deemed to have "below basic" document literacy, a term defined by the National Center for Education Statistics as "the knowledge and skills . . . needed to search, comprehend, and use information from noncontinuous texts in various formats, such as . . . prescription labels." National Center for Education Statistics, *Fast Facts: Adult Literacy*, *available at* http://nces.ed.gov/fastfacts/display.asp?id=69.  Obviously, if consumers cannot read and understand a drug label, they are likely to use the drug incorrectly without medical supervision, yet the Secretary has never demanded "data . . . [that] conclusively establish" that 100% of the potential users of a drug can understand the label.[5]  Nor has she or the FDA precluded the over-the-counter sale of drugs for that reason.

   c.   The Third Sentence

   The Secretary finally observed that, if the SNDA were granted, Plan B One-Step would be available "without a prescription or other point-of-sale restrictions, even to the youngest girls of reproductive age," including the ten percent of girls who "reach menarche by 11.1 years of age."  Sebelius Mem.  Nevertheless, the Secretary does not define any harm that could result from the use of levonorgestrel-based emergency contraceptives by this population.  Again, levonorgestrel-based contraceptives would be probably among the safest drugs approved for over-the-counter sale for the pediatric population.  Indeed, the FDA approves drugs for over-the-counter sale which have either not been shown to be safe for use by the pediatric population or have been shown to be unsafe for such use.  The policy of the FDA is to rely on labeling.  As Dr. Jenkins testified, age-based labeling restrictions have "been [the FDA's] long-standing way of [] instructing consumers whether they should or should not use a product in a young age group, and

---

[5] This quote is not from Secretary Sebelius's memorandum to Commissioner Hamburg, but her news release of the same date. *A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius* (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-1.

[the Plan B marketing regime is] a substantial deviation from that practice." Jenkins Dep. at 113:7-16, Case No. 05-cv-366, Doc. No. 235-9. Indeed, as Dr. Andrea Leonard-Segal, Director of the FDA's Division of Nonprescription Clinical Evaluation, wrote, "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review for Regulatory Action at 28 (Nov. 30, 2011), Case No. 12-cv-763, Doc. No. 83-1 (hereinafter "Summary Review").

Thus, a diet drug, Alli, "was approved [for over-the-counter sales] for weight loss in 2007 only for adults 18 and older," although it could be purchased by teenagers—a group that may still be "in an active growth phase with continued bone and other organ, maturation and where nutritional requirements are different from those of adults." Defs.' Mem. in Support of Mot. for Summ. J. at 5, Case No. 12-cv-763, Doc. No. 71 (quoting NDA 21-887, Office Director's Decisional Memorandum at 3-4 (Feb. 6, 2007)). The FDA observed that "the balance between active weight loss, while still continuing to have adequate nutritional requirements, would best be achieved [] with active health care provider interaction." *Id.* Consequently, the FDA decided to make the drug available for over-the-counter sales with a warning that it was not intended for use by the pediatric population. The Secretary's edict to the FDA simply reflects the fact of her lack of familiarity with, or her willingness to ignore, the policy of the FDA in dealing with these concerns.

Moreover, the likelihood of unsafe use or misuse with respect to levonorgestrel-based emergency contraceptives is extremely low, and much lower than the dangers of misuse of common over-the-counter medications that are known to be abused by minors and adults, even

though these drugs cause hundreds of deaths every year in the United States. In an internal FDA memorandum regarding the first Plan B SNDA in 2004, Dr. Curtis Rosebraugh, FDA Deputy Director of the Division of OTC Drugs, explained the significant inconsistency between the agency's proposed treatment of Plan B and its treatment of other over-the-counter drugs: "A decision by the Agency to withhold OTC marketing of Plan B for reasons of theoretical abuse by a very small segment of the population despite the great benefit that could be derived from easier access could have ramifications for how we regulate other OTC drugs . . . a natural progression of this line of regulatory reasoning *would require that the Agency remove OTC marketing status for many drugs with known abuses* including dextromethorphan because of reports of adolescent abuse, laxatives because of abuse by people suffering from bulimia, analgesics because of abuse with subsequent health ramifications, or acetaminophen because of its use in suicides." Ex. A to Pls.' 2007 Mot. for Summ. J. at T-30757-58, Case No. 05-cv-366, Doc No. 235-3 (emphasis added). Dextromethorphan, to which Dr. Rosebraugh referred, is a cough suppressant contained in cold medicines that are widely abused by teenagers and sold over-the-counter. An overdose of dextromethorphan can cause "inebriation . . . [a]n altered state of consciousness [and] [m]ind and body dissociation or an 'out-of-body' experience," as well as "blurred vision, body itching, rash, sweating, fever, hypertension, shallow respiration, diarrhea, toxic psychosis, [and] coma." National Drug Intelligence Center, *Intelligence Bulletin: DXM (Dextromethorphan)*, October 2004, *available at* http://www.justice.gov/archive/ndic/pubs11/11563/index.htm. Dextromethorphan abusers "can obtain the drug at almost any pharmacy or supermarket" for only a few dollars. *Id.*

### 2. *The Failure to Make Plan B Available to Older Adolescents*

The Secretary did not question the adequacy of the evidence regarding the ability of older adolescents, between the ages of 13 and 16, to understand Plan B One-Step's label and use the drug correctly. Indeed, despite the ample evidence that this age group was able to do so, the Secretary never explained why Plan B One-Step should not be made available to them, nor was the Assistant U.S. Attorney representing the FDA willing to answer the specific question that I posed to him at an early stage in this proceeding of "whether the actual use and labeling comprehension studies conducted by Teva with respect to Plan B One-Step are inadequate with respect to all women under the age of 17 or whether they are inadequate only with respect to those under the age of twelve." Dec. 13, 2011 Order, Case No. 05-cv-366. "[T]he Commissioner of the FDA isn't in a position to be able to answer the question," he said, because the decision to deny the SNDA was made by Secretary Sebelius, not the Commissioner. Dec. 13, 2011 Hr'g Tr. at 5:1-8, Case No. 05-cv-366, Doc. No. 342. The Secretary's lawyers have now come up with the excuse that the Plan B One-Step SNDA "did not seek OTC availability for a specific subset of younger women." Defs.' Resp. to Mar. 4, 2013 Order at 3, Case No. 12-cv-763, Doc. No. 79. Instead, it sought to eliminate all point-of-sale and age restrictions.

The Food, Drug, and Cosmetic Act ("FDCA") does not preclude the Secretary or the Commissioner from granting relief less extensive than that sought by an applicant. Nor does it preclude the Commissioner of the FDA, who clearly had the authority, from doing so. Indeed, 21 C.F.R. § 310.200(b) expressly provides that the Commissioner may initiate, *sua sponte*, a proposal to exempt a drug from prescription-dispensing requirements "when the Commissioner finds such requirements are not necessary for the protection of the public health." Thus, when it became clear in the earlier Plan B process that the FDA would not allow over-the-counter sales

without age restriction, the FDA invited the Plan B sponsor to submit a revised SNDA seeking over-the-counter access only for women over 18. Ex. 2 to Defs.' 2007 Mot. to Dismiss at T-11094-95, Case No. 05-cv-366, Doc. No. 248-4. Moreover, in response to my 2009 order in which the FDA acquiesced, it similarly invited the Plan B sponsor to submit a new application revising the age limit downwards to 17, although such relief had not been requested in the Citizen Petition or by the Plan B sponsor. Thus, it is clear that the FDA's options in responding to over-the-counter switch applications are not as limited as they represent.

The Secretary's failure to limit the scope of her decision to girls under the age of 13 suffers from the same defect as the FDA's original order approving over-the-counter access to Plan B for women over the age of 18, notwithstanding the fact that the same evidence that supported over-the-counter access for 18-year-olds applied equally to 17-year-olds. Nevertheless, I make this point only to highlight the arbitrariness of the Secretary's action and not to suggest that a comparable remedy, which would lower the age of availability to adolescents 14 and over, is a viable or appropriate one. The obstructions in the path of those adolescents in obtaining levonorgestrel-based emergency contraceptives under the current behind-the-counter regime have the practical effect of making the contraceptives unavailable without a doctor's prescription. The basic fact is that most younger adolescents, including "many poor or disadvantaged women," "will be denied access because they do not have a driver's license, passport, or other form of identification with which to verify their age." *The Politics of Emergency Contraception*, 366 New Eng. J. Med. 101-02 (Jan. 12, 2012).

    *3. Extrapolation*

Extrapolation is the use of studies in one age group to support approval of a drug in another age group. The FDA's failure to extrapolate involves the next and perhaps the most

significant unexplained deviation from FDA practice ordered by the Secretary.  Adopting the strategy that the best defense is a good offense, the defendants have cross-moved for summary judgment focusing on this issue.  The problem is that their offense is not very good.  The defendants have not submitted any affidavits or other competent evidence regarding the policy of the FDA in support of their motion for summary judgment.  Instead, they rely solely on a 2011 article in which they claim "FDA scientists reviewed the use of extrapolation in 166 drug products submitted for pediatric approval between 1998 and 2008.  The authors concluded that FDA did *not* extrapolate efficacy data for 29 products (17.5%), partially extrapolated for 113 products (68%), and fully extrapolated for 24 products (14.5%)."  Defs.' Mot. for Summ. J. at 3, Case No.12-cv-763, Doc. No. 71; Julia Dunne et al., *Extrapolation of Adult Data and Other Data in Pediatric Drug-Development Programs*, 128 Pediatrics e1242, e1245 tbl. 1 (Nov. 1, 2011).

The foregoing study addressed only the issue of extrapolation as it related to the efficacy of a particular drug.  "Efficacy" within the meaning of the FDCA is established when an applicant proves that a particular drug "will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested."  21 U.S.C. § 355(d).  There is no dispute in this case related to the efficacy or safety of levonorgestrel-based emergency contraceptives.  *See* Apr. 27, 2012 Hr'g Tr. at 84:24-85:2, Case No. 12-cv-763, Doc. No. 84. Indeed, the FDA observed in its Citizen Petition Denial Letter that Plan B "is already approved as a prescription product, and thus the safety and efficacy in the pediatric population have been established."  Letter from Janet Woodcock, Center for Drug Evaluation and Research, FDA, to Bonnie Scott Jones, Center for Reproductive Rights at 9 (Dec. 12, 2011), Case No. 05-cv-366, Doc. No. 341-1 (hereinafter "Citizen Petition Denial Letter").  Moreover, as the authors of the

extrapolation study explained, "[e]xtrapolation of efficacy from adult data occurred in 82.5% of the drug products," and it concluded that "[e]xtrapolating efficacy from adult data or other data to the pediatric population can streamline pediatric drug development and help to increase the number of approvals for pediatric use." Dunne et al. at e1242.

The most striking feature of the defendants' motion for summary judgment is its failure to discuss any of the evidence of extrapolation contained in the record. This evidence is discussed at length in my 2009 opinion, and I briefly summarize it here. As early as April 2002, the FDA informed the Plan B sponsor that results from trials in the adult population could be extrapolated to the postmenarcheal pediatric population. Ex. F–1 to Pls.' 2007 Mot. for Summ. J. at T–30100, Case No. 05-cv-366, Doc. No. 239. Indeed, the FDA assured the Plan B manufacturer that the actual use study it was planning to submit with its anticipated SNDA "appear[ed] to be adequate for filing," even though the study would not include data on all ages to which the drug would be made available over-the-counter. Ex. 3 to Defs.' 2007 Mot. to Dismiss at T-30254, Case No. 05-cv-366, Doc. No. 248-5. In addition, FDA review staff observed that "the body of evidence available" to the FDA in its consideration of adolescent use of emergency contraception was "tremendously augmented" by other behavioral studies involving adult use of emergency contraception; these studies were considered by FDA reviewers in their internal conclusions that Plan B should be available over-the-counter. Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T-30868, Case No. 05-cv-366, Doc. No. 235-4.

On December 16, 2003, the Advisory Committee of outside experts, empaneled by the FDA Center for Drug Evaluation and Research to provide a recommendation on the Plan B SNDA, voted 23 to 4 in favor of the recommendation to approve Plan B for over-the-counter status without age or point-of-sale restrictions; it voted unanimously that Plan B is safe for use in

a non-prescription setting, and *voted 27 to 1 that the actual use study data submitted by the Plan B sponsor could be generalized to the overall population of potential non-prescription users of Plan B, i.e., data from older age groups could be extrapolated to younger ones.*  Ex. 2 to Defs.' 2007 Mot. to Dismiss at T-10749, T–10754, Case No. 05-cv-366, Doc. No. 248-3.[6]

Moreover, responding directly to concerns that the label comprehension and actual use studies enrolled too few young adolescents, the Director of the Office of New Drugs, Dr. John K. Jenkins, noted:

> While it is true that the number of adolescents enrolled in the sponsor's studies was relatively small, these studies did not exclude adolescent women from enrollment and were *conducted in settings that would be expected to capture a representative population of women who currently seek emergency contraception. Therefore, it is likely that the percentage of patients enrolled in these studies is an accurate reflection of the potential users of Plan B in an OTC setting*.

Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T–30897–98, Case No. 05-cv-366, Doc. No. 235-4 (emphasis added); *see also* Ex. A–1 at T–10949 (Acting Director of the Division of Pediatric Drug Development concurring that number of adolescents enrolled in study reflected their actual use of Plan B and waiving pediatric study because of the minimal number of individuals of that age using Plan B).  Indeed, Dr. Jenkins wrote, "the Agency has a long history of extrapolating findings from clinical trials in older patients to adolescents in both prescription and non-prescription approvals, and this practice was recently incorporated into the Pediatric Research and Equity Act (PREA)." Ex. A–3 to Pls.' 2007 Mot. for Summ. J. at T–30898; *see also* 21 U.S.C. § 355c(a)(2)(B)(ii) ("A study may not be needed in each pediatric age group if data from one age group can be extrapolated to another age group.").

---

[6] The politically motivated rejection of this recommendation was the first time in ten years that the FDA had failed to follow an advisory committee recommendation regarding over-the-counter switch applications.  *See* GAO Report at 29.  This time around, the FDA found it unnecessary to convene an advisory committee because "Plan B and Plan B One-Step are exceedingly similar drug products and no controversial data emerged" from the Plan B One-Step SNDA "to generate the need for another advisory committee meeting."  Summary Review at 26.

There was other evidence in the record that the FDA routinely extrapolated such data when considering new drug applications or switch applications seeking over-the-counter status for contraceptives. The draft minutes from an internal FDA meeting held in May 2004 contain the following comment regarding the decision not to extrapolate for Plan B: The failure of the FDA "to extrapolate adolescent safety and effectiveness for <14 year old females is not consistent with how CDER handles approval and distribution of prescription oral contraceptives, OTC male contraceptives such as condoms and spermacides or OTC female contraceptives such as gels and sponges." T–1213. This was contained in an initial draft of the minutes, although it was subsequently deleted for reasons which are unclear. Nevertheless, it was an accurate reflection of FDA policy. Indeed, the Government Accountability Office ("GAO"), which conducted an investigation into the FDA's Plan B decision at the behest of several members of Congress, stated that the FDA personnel that it interviewed "noted that the agency has not considered behavioral implications due to differences in cognitive development in prior OTC switch decisions and that the agency has considered it scientifically appropriate to extrapolate data from older to younger adolescents." GAO Report at 5.

More significantly, the FDA did engage in extrapolation in considering the Plan B One-Step SNDA; otherwise, it would not have announced its intention to approve that SNDA and expand access to Plan B One-Step to all women of childbearing age. As Dr. Cynthia Harper, who was one of the investigators on the Plan B One-Step actual use study, submitted by the Plan B One-Step sponsor in support of its SNDA, and the leading author on the related publication, explained:

> An actual use study considers the way that *the target population* of a particular product will use that product. Since only rare 11 year olds might need to use emergency contraception, we would be hard-pressed to find them and include them in the actual use study.

23

> Moreover, even if it were possible, using herculean and unprecedented efforts to find the very rare 11 year olds seeking emergency contraception and include them in the study, the information gathered would not be particularly useful. No conclusions about 11 year olds as a group could be drawn given the incredibly small number of 11 year olds who are users of emergency contraception.

Harper Decl. ¶¶ 13-14, Case No. 12-cv-763, Doc. No. 3. The FDA agreed.

In an April 2012 article on the Plan B One-Step actual use study, Dr. Harper and others explained that: "Considering that approximately 3% of teens initiate sexual activity before age 13 years, and that only a fraction (fewer than 3%) of visits for any reason to the study clinics during the study period were by teens 13 years and younger, the ages of those who ultimately participated in this study represent the population at risk who might need emergency contraception." Tina R. Raine et al., *An Over-the-Counter Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics & Gynecology 772, 779 (2012), Case No. 12-cv-762, Doc. No. 26-1. As Dr. Lisa Mathis, Associate Director of the Office of New Drugs at the FDA, commented in her review of the data submitted in support of the Plan B One-Step SNDA, the low number of adolescents between the ages of 11 to 13 is consistent with the known use of these products in that age group. Summary Review at 15. Specifically, she observed that "[t]he condition and the response to therapy in patients in this age group is expected to be sufficiently similar to patients in the 14-year-old age group and thus data from that age group can be used to support the ability of younger patients to use the medication appropriately." *Id.* Thus, the FDA advised the Plan B One-Step sponsor that "it appears that you have provided adequate information to justify removing the quota for enrollment of 11 to 13-

year-olds as currently specified in your actual use study protocol."[7]  Defs.' Resp. to Mar. 4, 2013

Order at 2, Case No. 12-cv-763, Doc. No. 79 (quoting Admin. R. 595).

A similar conclusion to that of Dr. Harper was reached in the label comprehension study

conducted by Dr. Elizabeth Raymond.  While that study included 54 to 59 subjects between the

ages of 12 and 17, Dr. Raymond observed that "[p]eople aged 11 and younger are not the target

population for this drug, and indeed I believe that the number of users who are that young is

miniscule."  Raymond Decl. ¶ 37, Case No. 12-cv-763, Doc. No. 5.  This is borne out by the

actual use "study experience over the course of a 2-year period and information from published

literature showing that very low numbers of females aged 11-13 years present to reproductive

health clinics requesting emergency contraception."  Tina R. Raine et al., *An Over-the-Counter

Simulation Study of a Single-Tablet Emergency Contraceptive in Young Females*, 119 Obstetrics

& Gynecology 772, 775 (2012), Case No. 12-cv-762, Doc. No. 26-1.

Moreover, the label comprehension study, half of whose participants were between the

ages of 12 and 14, demonstrated "that female adolescents 17 years old and younger can obtain

sufficient information from the prototype label to enable safe and effective use of emergency

contraception over the counter."  Raymond Decl. ¶ 35.  So too did a label comprehension study

in the same adolescent age group focusing on a two-pill emergency contraception product.  M.

Cremer et al., *Adolescent Comprehension of Emergency Contraception in New York City*, 113

Obstetrics and Gynecology 840 (2009).

In sum, the defendants' motion for summary judgment does not provide any evidence to

contradict a record which shows that the FDA has engaged in extrapolation at the very least from

---

[7] The FDA's waiver of study data for this age group is also consistent with the authority delegated to the
Commissioner to waive pediatric studies if "the necessary studies are impossible or highly impracticable (because,
for example, the number of patients is so small or the patients are geographically dispersed)."  21 U.S.C.
§ 355c(a)(4)(A)(i) & 355c(a)(4)(B)(i); Delegations of Authority to the Commissioner of Food and Drugs,
*republished in* FDA Staff Manual Guide § 1410.10.

older to younger adolescents with respect to the issues of actual use and label comprehension. Under these circumstances, the defendants' motion for summary judgment with respect to the issue of extrapolation is denied.

### 4. *Deviations Where Extrapolation Is Not Possible Because Safety Not Established*

In the course of their motion for summary judgment, the defendants themselves identified a significant related departure from agency practice. Specifically, when the FDA has declined to extrapolate because of safety concerns, it used labeling to indicate that the drug was not to be made available to children. Again, as Dr. Jenkins testified, age-based labeling restrictions have "been [the FDA's] long-standing way of handling instructing consumers whether they should or should not use a product in a young age group, and [the Plan B marketing regime is] a substantial deviation from that practice." Jenkins Dep. at 113:7-16, Case No. 05-cv-366, Doc. No. 235-9; *see also* Julia Dunne et al., *Extrapolation of Adult Data and Other Data in Pediatric Drug-Development Programs*, 128 Pediatrics e1242, e1246 (Nov. 1, 2011) (observing that, when safety in the pediatric population could not be established, "the pediatric safety data were included in the product label"). Indeed, in the Summary Review for Regulatory Action, Dr. Leonard-Segal wrote that "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review at 28.

Consistent with this "tenet," the *defendants* expressly cite two examples in which the FDA allowed drugs to be sold over-the-counter that it *did not consider safe* for use in the pediatric population. Defs.' Mem. in Support of Mot. for Summ. J. at 4-5, Case No. 12-cv-763, Doc. No. 71. Thus, they observe:

26

Prilosec OTC was approved for frequent heartburn in 2003 for adults 18 and older.  It was not approved for use by those under 18," and they include the following explanation from their internal records: "There are 2% of total prescriptions in the 11 to 20y old age group and children have—in general—not been included in clinical trials; [Prilosec] is not approved for prescription use in adolescents (patients under 18y of age). There were only 100 OTC study subjects under age 18 (17% of whom exceeded the 10-day limit) and a total of 39 cases in SafeTNet. From this information, the Medical Officer concluded that *safety in adolescents has not been established* because: a) age-related responses have not been studied; and b) age-related toxicities cannot be ruled out.

*Id.* at 5 (emphasis added).  Nevertheless, the FDA permitted Prilosec OTC to be sold over-the-counter and without point of sale restrictions with simply a warning on the label that it was not approved for use by children or adolescents.

Similarly, as earlier observed, "Alli was approved [for over-the-counter sales] for weight loss in 2007 only for adults 18 and older."  *Id.*  The defendants quote the following relevant language from the FDA review:

Treatment of obesity with the intent of weight loss in 12 to 17 year olds is complicated by the factor that this age group includes individuals that may still be in an active growth phase with continued bone and other organ, maturation and where nutritional requirements are different from those of adults. Therefore, the balance between active weight loss, while still continuing to have adequate nutritional requirements, would best be achieved in my judgment with active health care provider interaction. *As such, I do not feel that this age group should be included in an over-the-counter label.*

*Id.* (emphasis added).

While some over-the-counter drugs, such as Prilosec OTC, probably would not be purchased by adolescent consumers without the advice of a doctor, the same cannot be said for drugs such as Alli, a weight-loss drug that is likely to attract teenage purchasers concerned about their physical appearance rather than medical necessity.  Nor can it be said of cough syrup containing dextromethorphan, which is regularly abused by teenagers.  The FDA's willingness to rely on labeling to make these drugs available for sale over-the-counter without any age or point-

27

of-sale restrictions, even though they are unsafe for unsupervised use by young adolescents, stands in stark contrast to its refusal to make equally available concededly safe and time-sensitive levonorgestrel-based emergency contraceptives.

    5.  *Point-of-Sale Departure from Policy*

While I have focused on the numerous policy departures as they relate to the age-based restriction to the over-the-counter sale of levonorgestrel-based emergency contraception, an equally significant part of the current regime is its restriction on where these products can be purchased.  The validity of this restriction was not addressed in my 2009 opinion.  The regime, which the Secretary forced the FDA to retain, requires that the product be sold only at pharmacies and health clinics and that it be kept behind the counter at pharmacies.  This point-of-sale restriction not only limits young adolescents' access to Plan B, it limits the access of individuals 17 and older to the product.

In their memorandum of law in support of their motion for summary judgment that preceded my 2009 opinion, plaintiffs invoked *Am. Pharm. Ass'n. v. Weinberger*, 377 F. Supp. 824 (D.D.C. 1974), *aff'd on the opinion below sub nom. Am. Pharm. Ass'n v. Mathews*, 530 F.2d 1054 (D.C. Cir. 1976) (per curiam), for the proposition that the FDCA does not authorize the FDA to limit the sale of approved drugs to particular businesses, such as certain pharmacies and health care clinics.  Pls.' Mem. in Supp. of 2007 Mot. for Summ. J. at 110-11, Case 05-cv-663, Doc. No. 236.

Pursuant to 21 U.S.C. § 355(d), the FDA may refuse new drug application approval where the data submitted does not show that the "drug is *safe* for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof."  *Am. Pharm. Ass'n*, 377 F. Supp. at 828 (emphasis added).  Because the FDA "conclud[ed] that [methadone was]

inappropriate for regular [new drug application] approval," it permitted its dispensation only at "certain specified outlets," such as approved hospital pharmacies. *Id.* at 825, 827. In so doing, it created "a unique classification for methadone" that was more restrictive than the regular prescription drug dispensing regime. *Id.* at 827.

In *American Pharmaceutical Ass'n*, the FDA interpreted "safe" to mean that the drug is "secure from possible misuse," and justified the challenged regulation on the grounds that methadone had a high risk of misuse and abuse. *Id.* at 828. The District Court for the District of Columbia, whose opinion was adopted by the D.C. Circuit, rejected this interpretation and held that "safe" within the meaning of the FDCA "was intended to include *only the inherent safety of the drug when used in the manner intended.*" *Id.* (emphasis added). Consequently, the FDA did not have the authority under the FDCA to further limit sales of methadone to specific pharmacies once it had been found safe for its intended use as a prescription drug.[8]

The FDA argued in the earlier proceedings before the 2009 remand that *American Pharmaceutical Ass'n* was distinguishable because the FDA did not mandate marketing limitations for Plan B; instead, it approved marketing limitations that were proposed by the Plan B sponsor. *See* Defs.' Reply Mem. at 42, Case No. 05-cv-366, Doc. No. 265. The Plan B sponsor was clearly allowed to regulate its own point of sale, the FDA argued, and if the sponsor disagreed with the FDA's advice, it had options, such as pursuing administrative and judicial review of the agency's rejection of its original SNDA. *Id.*

Although it is technically true that the Plan B sponsor submitted a revised SNDA asking for this "intermediate class" of drug distribution, it is clear that the sponsor revised its SNDA

---

[8] Since *Am. Pharm. Ass'n* was decided, it took an act of Congress (rather than FDA regulation) to impose a controlled marketing regime on cold medicines containing pseudoephedrine. Combat Methamphetamine Epidemic Act of 2005, Pub. L. No. 109-177, Title VII, 120 Stat. 192, 256. The legislation required those medicines to be kept in a secure location and required consumers to present photo identification before purchasing them.

only after the FDA informed it that upper management had raised concerns which made it highly

unlikely that the OTC switch would be approved for all ages. Indeed, the revised SNDA, filed in

March 2004, noted that:

> Although [the sponsor] believes and maintains that Plan B is safe and effective for
> true OTC use and should be approved as such, we understand that FDA is
> concerned about adolescent use. Therefore [we are] willing to consider
> circumstances in which Plan B would be approved for OTC use by women age
> sixteen and older, while maintaining prescription status for women under age
> sixteen.

Letter from Barr Research, Inc. to Daniel Shames, M.D., Center for Drug Evaluation and

Research, FDA at 1 (Mar. 11, 2004), Case No. 05-cv-366, Doc. No. 248-8. The sponsor

recognized that adoption of "such an age restriction" would require, "as a practical matter, [that]

the product [] be sold only in stores that have a licensed pharmacy and thus would be available

only when the pharmacy is open . . . [and that] the product must be stored behind the counter."

*Id*. at 4.

These restrictions, which were adopted by the Plan B sponsor and which were crucial to

the FDA's ultimate approval of nonprescription access for women 18 and older, were not

adopted voluntarily by the drug company. Thus, the FDA's attempt to distinguish *American

Pharmaceutical Ass'n* on this ground fails. The central holding of *American Pharmaceutical

Ass'n* is that the FDA's authority over nonprescription drugs does not extend to restricting the

point-of-sale distribution of drugs that have been found to be safe "when used in the manner

intended." *Am. Pharm. Ass'n,* 377 F. Supp. at 828. The FDA did not challenge, much less

address, this holding. Indeed, rather than rely on § 355(d), it argued that FDA regulations,

specifically 21 C.F.R. § 314.520, expressly authorized it to restrict distribution of Plan B to

select pharmacies and health clinics. Defs.' Reply Mem. at 42-45, Case 05-cv-366, Doc. No.

265.  In support of this authority, the FDA lists several drugs that are available only under restricted marketing regimes for safety reasons.  *Id.*

This argument is unconvincing.  As an initial matter, the FDA admitted that it did not rely on 21 C.F.R. § 314.520 in approving the Plan B SNDA even though it was promulgated in 1992, more than 10 years before the first Plan B SNDA was submitted.  *Id.* at 42.  Moreover, 21 C.F.R. § 314.520 applies only to drugs "treating serious or life-threatening illnesses."  21 C.F.R. § 314.500.  The FDA amended 21 C.F.R. § 314, in part, to permit approval of such drugs "at the earliest possible point at which safety and efficacy can reasonably be established under existing law."  57 Fed. Reg. 13234, 13234 (Apr. 15, 1992).  To obtain accelerated approval the drug manufacturer or sponsor is required to conduct "postmarketing stud[ies] to elaborate on the evidence of effectiveness."  *Id.*  The FDA also adopted procedures for approving, with restrictions on distribution, certain "highly toxic drugs" which could "not [be] shown to be safe under" 21 U.S.C. § 355 "[w]ithout the restriction specified in the approval."  57 Fed. Reg. at 13237.  The FDA "emphasized that these restrictions will be considered necessary only rarely and in extraordinary cases.  FDA believes that the safe use of most prescription drugs will continue to be ensured through traditional patient management by health professionals and through necessary safety warnings on the drug's labeling."  *Id.*

The FDA did not attempt to reconcile the underlying purpose of § 314—to achieve the expedited or accelerated approval of certain drugs—with the long and tortured approval process of the Plan B dual marketing regime.  Nor did it argue that Plan B is "highly toxic" or that it is used to treat "a serious or life-threatening illness."  Whether an illness is "serious or life-threatening" "is based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more

31

serious one." 57 Fed. Reg. at 13235; *see also* 52 Fed. Reg. 19466, 19467 (May 22, 1987) (listing examples of serious or life-threatening diseases).

Plan B does not fit within the class of drugs § 314.520 was designed to restrict. This is made clear by the examples the FDA offered of "several other FDA-approved drugs that are distributed under restricting marketing plans pursuant to 21 C.F.R. § 314.520." Defs.' Reply Mem. at 44, Case No. 05-cv-366, Doc. No. 265. Each of the drugs the FDA mentioned is highly toxic and/or has serious health risks associated with its use: Accutane, which is used to treat severe acne, "may cause birth defects if ingested while pregnant"; Trovan, which treats infections, "can cause serious liver disease"; Xyrem, which treats narcolepsy, "had serious side effects [including some events that resulted in death] and had been [designated a Schedule III Controlled Substance because it was] abused as a recreational drug"; and Mifeprex (known as RU-486 in Europe), which is used to end early pregnancy, causes vaginal bleeding which, in some cases, can only be stopped by surgical procedure. *Id.* at 44-45. There is no serious health risk associated with use of Plan B as prescribed and intended, much less one that would make "restrictions on distribution . . . necessary for [its] safe use." 57 Fed. Reg. 58942, 58942 (Dec. 11, 1992). Indeed, the FDA did not identify any health concerns associated with adult or pediatric use of Plan B, and has admitted that Plan B's "safety and efficacy in the pediatric population have been established." Citizen Petition Denial Letter at 9.

Perhaps more significant is the FDA's consideration of its authority to require post-marketing restrictions on nonprescription drugs which it had found safe. In 1984, more than 20 years before the Plan B sponsor submitted the initial SNDA, the FDA denied a citizen petition urging it to establish a class of non-prescription drugs products to be sold only by a pharmacist. Relying in part on *American Pharmaceutical Ass'n*, the FDA Commissioner at the time wrote:

> [T]he agency believes it is questionable whether the distribution of lawfully marketed OTC drugs can be restricted [to a pharmacist-only class] under current statutory provisions. *Under the [FDCA] there is no provision for an intermediate class of drugs between OTC and prescription products.* The statutory requirement that a drug either be limited to prescription dispensing or available OTC with adequate directions for use seems to preclude the agency from establishing a class of drugs whose labeling would need to be supplemented by a pharmacist's instructions.

Ex. E to Pls.' 2007 Mot. for Summ. J. at E-022, Case No. 05-cv-366, Doc. No. 235-10 (emphasis added).

Consistent with this policy, the FDA has voiced concerns in this proceeding about its authority to impose an age-restricted marketing regime on an approved drug. Thus, in 2005, it decided to ask for public comments on whether it needed to resort to rulemaking to impose such a dual marketing regime. *See Tummino*, 603 F. Supp. 2d at 535. The FDA received approximately 47,000 public comments and hired an outside company to review and summarize them. *Id.* That review was completed six months later, at which point the FDA ultimately concluded that it was not necessary to engage in rulemaking before instituting an age-restricted point-of-sale marketing regime. *Id.* While this was going on, the FDA's attorney stated at a 2006 hearing that the FDCA "does not provide the agency—at least it does not clearly provide the agency with the statutory authority to make that kind of age based distinction." July 26, 2006 Hr'g Tr. at 19:11-14, Case No. 05-cv-366, Doc. No. 185. He further explained that "[t]here is no behind the counter option available under federal law," because "*[u]nder the [FDCA], a product is either Rx only or non-prescription.*" *Id.* at 20:14-20. Nevertheless, consistent with its practice of applying its policies based on political expediency, the FDA announced a few days later that over-the-counter sales could be approved for women 18 and older "in a matter of weeks." Stephanie Saul, *F.D.A. Shifts View on Next-Day Pill*, N.Y. Times, Aug. 1, 2006, at A1. This announcement was made one day before the Senate committee hearing on Dr. Andrew von

33

Eschenbach's confirmation as Commissioner of the FDA, when it was obvious that he would not otherwise be confirmed.  *See Tummino*, 603 F. Supp. 2d at 535-36.  No other explanation was offered for the departure from the policy unequivocally articulated by the United States Attorney that "[u]nder the [FDCA], a product is either Rx only or non-prescription."

I agree that the FDA did not have the authority to mandate point-of-sale restrictions on drugs approved for nonprescription sale that it found to be safe and effective for all women of childbearing age.  Nevertheless, even if it had such authority, it clearly deviated from the policy here.  This is demonstrated not only by the drugs that were either not shown to be safe or were unsafe for the pediatric population such as Prilosec and Alli, which were dealt with through labeling, not point-of-sale restrictions, but also by the recent express acquiescence of the FDA in a college's provision of Plan B One-Step to its students through a vending machine.  *FDA OK with college's Plan B contraceptive vending machine*, MSN News, Jan. 29, 2013, *available at* http://news.msn.com/us/fda-ok-with-colleges-plan-b-contraceptive-vending-machine.   The only condition on access to the vending machine was that students swipe their college ID; the school had previously verified that all of its students were age 17 or over.  *Vending machine dispenses emergency contraception*, CNN News, Feb. 8, 2012, *available at* http://www.cnn.com/2012/02/08/us/plan-b-vending-machine.

## C.  Standard of Review

I have discussed at some length the Secretary's ukase to the FDA to deny the application to make Plan B One-Step available over-the-counter.  The Plan B One-Step sponsor has not taken an appeal to the Court of Appeals for the District of Columbia, which would have jurisdiction to review it.  *See* 21 U.S.C. § 355(h).  The only decision subject to review here is the denial of the Citizen Petition; I do not have any authority to review the denial of the Plan B One-

Step SNDA for the purpose of granting relief. Nevertheless, as observed earlier, the two were clearly linked together for two reasons. First, once the Secretary directed the FDA to deny the Plan B One-Step SNDA, the FDA had no possible basis on which to approve the Citizen Petition. The same lack of data that the Secretary said caused her to deny the Plan B One-Step SNDA also doomed the Citizen Petition because it lacked the same data, which were, as the FDA acknowledged, impossible to provide. I discuss this issue in full below. Second, it is not possible to exercise meaningful judicial review over the denial of the Citizen Petition without considering the propriety of the Secretary's actions regarding the Plan B One-Step SNDA. Indeed, the FDA's own justification for its Citizen Petition action indicates a substantial reliance on the Plan B One-Step SNDA process. The FDA spent a considerable portion of the Citizen Petition Denial Letter discussing the Plan B One-Step SNDA and the various studies submitted in its support. More significantly, the very reason the FDA claimed it denied the Citizen Petition was the lack of age-specific data, *as compared to* that submitted with the Plan B One-Step SNDA.

The applicable standard of review is prescribed by the Administrative Procedure Act ("APA"), which provides that a district court may set aside an agency's findings, conclusions of law or action only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be deemed arbitrary and capricious:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006). Moreover, as I have previously observed, if an agency adopts a general policy by which its discretion is exercised, "an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the [APA]." *INS v. Yang*, 519 U.S. 26, 32 (1996). Similarly, "proof of subjective bad faith by [agency decision-makers], depriving a [petitioner] of fair and honest consideration of its proposal, generally constitutes arbitrary and capricious action." *Latecoere Int'l, Inc. v. U.S. Dept. of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (Bad faith is "material to determining whether the Government acted arbitrarily."). Moreover, the standard of review is somewhat less deferential when considering an agency order "that arrives at substantially the same conclusion as an order previously remanded by the same court." *Greyhound Corp. v. Interstate Commerce Comm'n*, 668 F.2d 1354, 1358 (D.C. Cir. 1981).

Because the arbitrary and capricious standard of review is deferential, the defendants have sought to recast the Secretary's decision as that of the FDA in order to confer upon the Secretary the deference to which the FDA is due as a result of its specialized experience and judgment. This argument fails for a number of reasons. First, there was only one "ultimate decision-maker on the SNDA," and that was the Secretary. Letter from the United States Attorney at 2 (Mar. 14, 2013), Case No. 12-cv-763, Doc. No. 80. Second, the Secretary was obviously unaware of the policies followed by the FDA in deciding applications to switch a drug's prescription status, or she consciously ignored them. Third, while the rationale for deferring to an agency's decision-making is "particularly strong when the [agency] is evaluating

scientific data within its technical expertise," *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992), normally the Secretary of Health and Human Services has no specialized technical expertise in this area. Indeed, it is safe to say that most of those who hold that position are not qualified to serve as Commissioner of the FDA.

This explains why Congress expressly delegated to the FDA, among other responsibilities, the decision whether to allow drugs to be sold without a prescription. Indeed, the language of the FDCA specifically provides that "the Secretary, *through the Commissioner*, shall be responsible for executing" the FDCA—language which deprived the Secretary of the authority to deny either the SNDA or the Citizen Petition on her own. 21 U.S.C. § 393(d)(2) (emphasis added). Just as the Secretary could not, on her own, deny either of the two petitions at issue here, she should not be able to overrule the decision of the FDA without good reason.

> The FDA is an expert scientific agency charged with making scientific and medical decisions within the boundaries set by the FDCA. Nothing in that statute suggests that scientific decisions may bend to political winds. There are more than a dozen scientific areas of expertise that are brought into account when making a decision on a NDA or Supplemental NDA—e.g., clinical medicine (here obstetrics and gynecology), pediatrics, toxicology, clinical pharmacology, and statistics, among many others. NDAs and Supplemental NDAs are lengthy, complex, highly sophisticated applications that must comply with a myriad of FDA regulations which in turn are concordant with international standards.

Pendergast Decl. ¶ 33, Case No. 12-cv-763; Doc. No. 4. *See also* Hamburg Statement, Case No. 05-cv-366, Doc. No. 339-2 ("Our decision-making reflects a body of scientific findings, input from external scientific advisory committees, and data contained in the application that included studies designed specifically to address the regulatory standards for nonprescription drugs.").

In apparent recognition of the complexity of this process, the Secretary has delegated to the Commissioner of Food and Drugs, with the authority to re-delegate, "[f]unctions vested in the Secretary under the [FDCA (21 U.S.C. 301 et seq.)]." Delegations of Authority to the

Commissioner of Food and Drugs, *republished in* FDA Staff Manual Guide § 1410.10. This necessarily includes the authority, if any, of the Secretary to make decisions on drug approvals pursuant to 21 U.S.C. § 355.[9] This delegation is consistent with language Congress used in the legislation that made the Commissioner of the FDA a presidential appointee subject to Senate confirmation.

The change in the status of the Commissioner was based on a finding that "the independence and integrity of the Food and Drug Administration need to be enhanced in order to ensure the continuing protection of the public health." Food and Drug Administration Act of 1988, Pub. L. No. 100-607, § 502, 102 Stat. 3048, 3120. One consequence of this change was that the Commissioner was no longer a subordinate of the Secretary. She does not serve at the pleasure of the Secretary, and she cannot be removed from office by the Secretary. Only the President has the power to do so. In this case, if Commissioner Hamburg had refused to follow the directive of Secretary Sebelius, the President would have been faced with the unpalatable choice of either dismissing the Commissioner or overruling the Secretary.

Moreover, even in the run-of-the-mill case under the APA, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" *Nat'l Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)). Thus, even if the Secretary is entitled to the benefit of the same deference to which the FDA would be entitled, that deference does not entitle her opinion to a judicial rubber-stamp. If anything, the unprecedented nature of her interference with the administration of Chapter 9 of the FDCA, her lack of scientific expertise, and her failure to

---

[9] The Delegation of Authority includes a reservation of the Secretary's right to approve FDA regulations in some circumstances. *Id.* § 2(A). There is, however, no reservation of any right to intervene in over-the-counter product approvals. See Decl. of Mary Pendergast, J.D., L.L.M., ¶ 34, which I treat as the equivalent of an amicus brief.

acknowledge, much less explain, the deviations from FDA policy occasioned by her order to the FDA suggest that an even more careful examination of her action is warranted. So too does the fact that this case involves the constitutional right to obtain and use contraceptives. The restriction on the sale of time-sensitive levonorgestrel-based contraceptives to pharmacies and health clinics, which affects all women, implicates this right. Indeed, in considering a challenge to a New York statute that prohibited the sale of any form of contraceptive to a minor under the age of 16 and prohibited anyone other than a licensed pharmacist from distributing contraceptives to persons 16 or over, the Supreme Court framed the right in question as the right to make one's own decision in matters of childbearing—including the right of access to contraception—rather than the right of individuals to obtain contraceptives from individuals other than licensed pharmacists. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 685-689 (1977); *see also Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 69 (1983) (striking down restrictions on advertising for contraceptives not only because such advertising implicates public interest in the free flow of commercial information, but also "relates to activity which is protected from unwarranted state interference").

While the FDA complied with Secretary Sebelius's order, it is clear that the decision to deny the SNDA was not that of an agency to which "Congress has entrusted the responsibility of making the necessary scientific assessment . . . [and which] must have the latitude to make that decision properly." Letter from United States Attorney at 2 (Aug. 13, 2010), Case No. 05-cv-366, Doc. No. 307-4. The decision that the agency was forced to make, contrary to its own policies and judgment, is not entitled to any deference. Indeed, it is hardly clear that the Secretary had the power to issue the order, and if she did have that authority, her decision was arbitrary, capricious, and unreasonable.

39

### D. *Citizen Petition Denial*

The FDA denied the Citizen Petition almost immediately after it rejected the Plan B One-Step SNDA in December 2011. The FDA's decision was compelled by the reason underlying the Secretary's order to reject the Plan B One-Step SNDA. Again, the Secretary concluded that "[t]he label comprehension and actual use studies submitted to FDA [by the Plan B One-Step sponsor] do not include data on all ages for which the drug would be approved and available over-the-counter." Sebelius Mem., Case No. 05-cv-366, Doc. No. 339-1. The Citizen Petition had to be denied because it suffered from exactly the same defect. Thus, there was no way in which the FDA could have approved the Citizen Petition. Indeed, the United States Attorney's most recent letter does not dispute the fact that the Secretary's denial precluded the FDA from granting the Citizen Petition to the extent that it sought a complete over-the-counter switch for all ages. Letter from the United States Attorney at 4 (March 22, 2013), Case No. 12-cv-763, Doc. No. 83. Instead, she suggests that "if the data in the Citizen Petition docket hypothetically supported lowering the age cut-off for non-prescription sales of that drug from the current 17 to some intermediate age, then FDA could theoretically have initiated a notice-and-comment rulemaking proceeding to consider lowering the cut-off age for Plan B . . . notwithstanding the Secretary's determination with respect to the all-or-nothing SNDA for Plan B One-Step." *Id.* This is not the relief that the Citizen Petition requests and, for the reasons already stated, it would be a pointless remedy.

The fact that the Secretary's order mandated the denial of the Citizen Petition as well as the SNDA could have been explained in one page, if not one sentence. Instead, the FDA produced a ten page document composed mainly of filler that was designed to create the illusion

that it was engaging in some independent exercise of agency discretion. The bizarre nature of the Citizen Petition denial letter is highlighted by the following paragraph:

> Actual use and labeling comprehension data would be needed to determine, among other things, whether women under 17 can understand that they would need to take two pills twelve hours apart, and whether they actually would do so correctly. *The data submitted by Teva in its SNDA for Plan B One-Step included a labeling comprehension study and an actual use study that CDER scientists concluded were necessary and addressed the deficiencies in the original data that led to the earlier bifurcated approval status.* This type of data, i.e., actual use and labeling comprehension studies conducted with adequate numbers of younger subjects, has not been presented to the agency with respect to Plan B. Thus, FDA reconfirms its conclusion that neither the information contained in the administrative record for the citizen petition, nor the data and information in the Plan B SNDAs, were adequate to support OTC use in women under age 17.
>
> Therefore, upon reconsideration and following a re-analysis, we conclude that FDA needs additional data to support a switch of Plan B for women younger than 17 years of age.

Citizen Petition Denial Letter at 10 (emphasis added).

In essence, the FDA was telling the plaintiffs that the Plan B One-Step sponsor had submitted adequate labeling and actual use studies sufficient to support an over-the-counter switch with no age or point-of-sale restrictions and that the Citizen Petition could not be approved unless they submitted the same data. Of course, had they been able to provide such data, the FDA would still have been forced to deny their petition on the grounds articulated by the Secretary. Thus, the suggestion that the plaintiffs need to provide "additional data" comparable to that in the Plan B One-Step application "to support a switch of Plan B for women younger than 17 years of age" is simply a complete pretext—another example of the bad faith that has permeated the FDA's consideration of the Citizen Petition from beginning to end.

Moreover, even considered on its own terms, the Citizen Petition Denial Letter is unsound. Perhaps most significantly, it failed to offer any explanation as to why Plan B should be treated differently from other drugs so as to require numerous deviations from agency policies

41

and practices. The most significant example is its failure to acknowledge the FDA's own policy and precedent in extrapolating data from older adolescents to younger, particularly with respect to contraceptives, much less explain why the FDA failed to adhere to that precedent. The flawed and failed summary judgment motion on this issue, unaccompanied by any affidavit containing such an explanation, is insufficient.

Even if the failure to extrapolate could somehow be justified, the Citizen Petition Denial Letter also failed to acknowledge the FDA's own policy and precedent of approving drugs for over-the-counter sale even where there is real concern about their safety. No explanation is given as to why, if the data regarding the proper use of Plan B by young adolescents were indeed insufficient, that could not be addressed through a labeling restriction rather than age and point-of-sale restrictions. Nor does the FDA justify the creation and maintenance of a new and unprecedented point-of-sale marketing program—the behind-the-counter regime restricting emergency contraceptives to pharmacies and health clinics—for a drug whose safety and efficacy is unquestioned, and which certainly poses a lesser risk to health than many other drugs sold over-the-counter.

While these unexplained departures from precedent alone render the denial arbitrary, capricious, and unreasonable, they are not the only reasons for reversing the denial of the Citizen Petition. The Citizen Petition Denial Letter claimed that no new data had been submitted by the plaintiffs or any other sources "to satisfy the statutory requirements for FDA to remove the Rx requirements for Plan B for women under the age of 17" since the 2009 remand. Citizen Petition Denial Letter at 10. In addition, the FDA wrote that it did "not have any data from other sources that would be sufficient to support such a switch." *Id.* The latter statement was untrue because the agency did have data from at least two sources.

42

First, the FDA had available the actual use and label comprehension studies submitted by the Plan B sponsor in support of its SNDAs seeking expanded over-the-counter access to Plan B and Plan B One-Step. Specifically, the label comprehension study submitted with the Plan B One-Step SNDA tested participants' understanding of six key concepts, developed with the FDA's input:

(1) The product is used to prevent pregnancy after unprotected sex;
(2) It should be taken as soon as possible after sex;
(3) It does not prevent sexually transmitted disease or HIV/AIDS;
(4) It should not be used instead of regular contraception;
(5) It should be taken within 72 hours after sex; and
(6) It should not be used by women who are already pregnant.

Raymond Decl. ¶ 33, Case No. 12-cv-763, Doc. No. 5. These six key concepts were understood by 83-96% of all subjects. Raymond et al., *Comprehension of a prototype emergency contraception package label by female adolescents*, 79 Contraception 199, 203 (2009), Case No. 12-cv-763, Doc. No. 27-1. As the article publishing the study states:

Lower literacy was significantly associated with lower likelihood of understanding of each of the six key concepts. . . . Younger subjects were significantly less likely than older subjects to understand four of the key concepts, although the difference in understanding between 12- to 14-year-olds and 15- to 17-year-olds was no more than 10 percentage points for any one concept.

*Id.* at 203.

While the label comprehension study submitted with the Plan B One-Step SNDA tested instructions for a one-pill product, "[a]ll six key concepts that were tested in [the] second label comprehension study apply equally well to both one-pill and two-pill products." Raymond Decl. ¶ 36. The Plan B One-Step study "did not test the instruction that in two-pill products, the two pills should be taken 12 hours apart." *Id.* Nevertheless, "substantial data indicate that this interval is irrelevant to efficacy, which is the same whether the two pills are taken 0, 12, or 24 hours apart," and is also irrelevant to safety, as "the pills are equally safe no matter what the

interval." *Id.*; *see also* Medical Officer's Safety Rev. of SNDA at T-30799 (March 25, 2004),

Case No. 05-cv-366, Doc. No. 235-3. As the published article on the study states, "[t]he

prototype label that we tested was similar in format and content to that of the currently marketed

Plan B product." Raymond et al. at 199.[10]

Second, the FDA concedes that, in its independent literature review, it considered the

label comprehension study conducted by Dr. Miriam Cremer. Defs.' Resp. to Mar. 4, 2013

Order at 1-2, Case No. 12-cv-763, Doc. No. 79; *see also* M. Cremer et al., *Adolescent*

*Comprehension of Emergency Contraception in New York City*, 113 Obstetrics and Gynecology

840 (2009); Cremer Decl., Case No. 12-cv-763, Doc. No. 29. Dr. Cremer and her team tested

the comprehension of over 1,000 adolescents between the ages of 12 and 17 who were provided

with "a six-page copy of an actual two-pill levonorgestrel-based package insert that individuals

receive when purchasing [emergency contraception]." Cremer Decl. ¶ 4. The results of the

study indicated that adolescents "understood the concepts necessary for safe and effective use"

of emergency contraception "as well as adults do." *Id.* ¶ 5. "Overall, adolescents demonstrated

high comprehension of the key points of EC: 1) that it is a method of preventing pregnancy after

unprotected sex (92%); 2) that it has to be taken within the first seventy-two hours after

unprotected intercourse (83%); 3) that if you are already pregnant EC will not be effective

(87%); 4) that EC will not protect against HIV/AIDS (95%); and 5) that EC should not be used

as a method of long-term birth control (85%)." *Id.*

Indeed, the FDA itself acknowledged the "overlapping elements of labeling between Plan

B One-Step and the other levonorgestrel [emergency contraception] products. Examples of these

---

[10] The Plan B sponsor had submitted a similar label comprehension study with its initial SNDA. That study
included "656 subjects from 12 to 50 years old, of whom 580 were 17 years and older." Summary Review at 12.
"The 2001 study was of similar design" to the Plan B One-Step label comprehension study, "and 13 questions in
both studies overlapped. The proportions of subjects who answered correctly were similar for 11 of 13 questions."
*Id.*

elements include the indication for the product, the appropriate time to take the product (as soon as possible but within 72 hours), and the warnings that the product should not be used as regular birth control and will not protect from sexually transmitted diseases. In addition, safety data generated by these trials for levonorgestrel used as emergency contraception may be applicable to both products. Therefore, some data generated by these studies may be applicable to the other levonorgestrel [emergency contraceptives]." Letter from Andrea Leonard-Segal, M.D., Center for Drug Evaluation and Research, FDA, to Duramed Pharmaceuticals at 2 (Dec. 17, 2010), Case No. 12-cv-763, Doc. No. 23-3.

In its letter explaining its reasons for rejecting the Citizen Petition, the FDA provided additional insight into the process by which it found Plan B One-Step to be appropriate for over-the-counter access by all ages. The letter observed that, because "[t]his product is already approved as a prescription product . . . the safety and efficacy in the pediatric population have been established." Citizen Petition Denial Letter at 9 (quoting a memorandum of Lisa Mathis, Associate Director of the Office of New Drugs at the FDA). Under these circumstances, additional data were needed only to show "that the benefits and risks would be the same if the product was available OTC without a learned intermediary." *Id.* The FDA official quoted in the letter goes to conclude that "[t]he studies provide data to demonstrate that women of child bearing potential of all ages can appropriately self-diagnose and administer Plan B One-Step in an OTC setting . . . The safety and efficacy of OTC Plan B One-Step in this application is supported by the totality of the data submitted to support the application." *Id.*

Nevertheless, the FDA insisted that the Plan B One-Step actual use study could not be used to support over-the-counter access to Plan B because Plan B involves two pills taken 12 hours apart instead of one pill. Specifically, the FDA said:

45

> [T]he two drugs are not the same product, and all of the data supporting one
> application cannot automatically be used for the other.  In particular, because Plan
> B One-Step consists of a single tablet, the dosing data for Plan B One-Step could
> not provide support for an OTC switch of Plan B as that data would not
> adequately address the ability of subjects to correctly follow the directions related
> to the timing of a second dose that is required for proper use of Plan B.
>
> Thus, as a scientific matter, if additional data regarding the OTC use by younger
> women were needed for Plan B One-Step, that type of data would also be needed
> for Plan B, but those Plan B One-Step studies would not be transferable to Plan B.
> Instead, there would need to be new studies conducted using Plan B and its
> labeling, because it has more complicated directions for use, raising additional
> questions as to label comprehension and actual use.

*Id.* at 2.

The approval of Plan B One-Step by the FDA demonstrates its recognition that there would be no adverse consequences or decrease in effectiveness if the two pills were taken at the same time or less than 12 hours apart.  The only consequence that the defendants were able to identify from a failure to follow the label instructions is that "if you miss the timing of the second dose, it reduces effectiveness and that can have unfortunate consequences for someone who is taking the drug to avoid becoming pregnant."  Apr. 27, 2012 Hr'g Tr. at 84:9-12, Case No. 12-cv-763, Doc. No. 84.  This is the argument of a lawyer, not a scientist.  Scientific evidence in the record establishes that "[t]he most important factor concerning timing of dosing and effectiveness is the interval between the first dose and unprotected intercourse," and that "[i]t is [] unlikely that the effectiveness of Plan B will be reduced if the second tablet is taken 6 to 18 hours, instead of exactly 12 hours, after the first dose."  Medical Officer's Safety Rev. of SNDA at T-30799 (March 25, 2004), Case No. 05-cv-366, Doc. No. 235-3; *see also* Raymond Decl. ¶ 36.  Yet the regime currently in place affects the most significant factor in terms of effectiveness of the product because it increases the delay between sexual intercourse and the first dose (the only dose in the case of Plan B One-Step).

Moreover, the two-pill actual use study submitted with the original Plan B SNDA demonstrated that "[t]here was excellent compliance with the labeled dosing regimen among subjects < 18 yr. of age. Compliance was at least as good as that in the subjects 18 yr. and older." Medical Officer's Safety Rev. of SNDA at T-30800 (March 25, 2004), Case No. 05-cv-366, Doc. No. 235-3. Although it is clear that the second pill need not be taken exactly 12 hours after the first in order for the drug to remain effective, compliance with this direction was nonetheless high. "Evaluation of the adolescents who did not take their second dose at exactly 12 hours revealed that nearly all took it within minutes of the 12 hour time point. There was one outlier that took the second dose 2 hours late." Deputy Div. Dir. Summ. Rev. of New Drug Application at T-30840, Case No. 05-cv-366, Doc. No. 235-4. Indeed, an FDA medical reviewer, in describing the results of the Plan B actual use study, concluded that "the timing of 1st and 2nd dose in the [actual use study] did not vary based on age." Addendum to Div. Dir. Memo at T-30749, Case No. 05-cv-366, Doc. No. 235-3. Nor did the actual use study support the argument that intervention by a health care provider, such as a pharmacist or doctor, impacts the timing of the second dose. Deputy Div. Dir. Summ. Rev. at T-30840-41, Case No. 05-cv-366, Doc. No. 235-4.[11]

In sum, the Citizen Petition denial was inevitable after the Secretary ordered Commissioner Hamburg to deny the Plan B One-Step SNDA. Because the Secretary's action was politically motivated, scientifically unjustified, and contrary to agency precedent, it cannot provide a basis to sustain the denial of the Citizen Petition. The Citizen Petition Denial Letter, which came five days after the denial of the Plan B One-Step SNDA, was clearly prompted by

---

[11] The results of these studies are not surprising, since, as Dr. Leonard-Segal observed, "[r]eliance upon the product label to result in appropriate use is consistent with the tenet that the Agency has applied in the past and continues to apply when determining whether or not a product can be over-the-counter. It is an approach consistent with the regulations." Summary Review at 28.

the Secretary's action, despite the FDA's fanciful effort to make it appear that it undertook an independent review of the Citizen Petition. Nevertheless, even considering the Citizen Petition Denial Letter in isolation, the agency's decision cannot withstand any degree of scrutiny, not only because of its unexplained failure to follow the FDA policies discussed above but also because of its disregard for the scientific evidence that the FDA had before it. Because the defendants argue that I cannot rely on the studies discussed above in reviewing the denial of the Citizen Petition, I now turn to that issue.

### E. Proper Record on Review

#### 1. The Actual Use and Label Comprehension Studies

The defendants argue that the actual use and label comprehension studies submitted with the Plan B One-Step switch application could not have been considered by the FDA in its review of the Citizen Petition and may not be considered here in my review of the Citizen Petition denial. They make this argument even though the very reason the FDA gave for denying the Citizen Petition was the lack of age-specific data, *as compared to* that submitted with the Plan B One-Step SNDA. Indeed, the FDA expressly acknowledged that it delayed consideration of the Citizen Petition for three years because it anticipated that the Plan B One-Step studies would be relevant to its reconsideration of the Citizen Petition. Thus, it wrote that "[w]hether actual use and label comprehension data were needed for approval of the nonprescription use of Plan B One-Step is *directly relevant* to whether those data were needed for the same approval for Plan B *because of the similarities between the products* and [because of] the data that the sponsor had developed to support the OTC approval of the products." Citizen Petition Denial Letter at 2 (emphasis added).

While it is difficult to understand why the Citizen Petition was not judged on the basis of the materials submitted in support of it instead of being compared to those materials submitted in support of a separate application by the Plan B One-Step sponsor that was denied, the FDA's consideration of these studies in evaluating the Citizen Petition is the beginning and the end of the argument that those studies cannot be considered. An even more significant fact, which the defendants ignore, is that the Administrative Record filed in this case does in fact contain a detailed PowerPoint summary of the most compelling details on the actual use study submitted in support of the Plan B One-Step application. Admin. R. at 598-619.

This leaves the FDA with an argument that the use of the studies submitted by the Plan B One-Step sponsor, Teva Women's Health, Inc. ("Teva"), would deprive Teva of the right to three years of exclusive marketing of Plan B One-Step, to which it would have been entitled under the FDCA. *See* 21 U.S.C. § 355(c)(3)(E)(iv) & 355(j)(5)(F)(iv). This exclusivity could only have followed if Teva's application for over-the-counter access had been granted by the FDA based on a finding by the FDA that those studies were "essential" to the approval. Defs.' Resp. to Order to Show Cause at 24, Case No. 12-cv-763, Doc. No. 23. The purpose underlying this exclusivity provision, according to both the FDA and Teva, is "to encourage and reward drug manufacturers who devote the time and expense to clinical trials necessary to approve changes to a drug product." *Id.*; Teva's Proposed Mem. Of Law in Resp. to Order to Show Cause at 11, Case No. 12-cv-763, Doc. No. 22-2.

The FDA conceded that the actual use and label studies submitted by Teva were sufficient to justify a complete over-the-counter switch, although it suggested that the label comprehension study was not essential. Thus, the Citizen Petition Denial Letter stated that, "[a]s part of the anticipated approval, FDA was prepared to determine that the clinical [actual use]

49

study that Teva submitted for Plan B One-Step was essential to any approval of non-prescription marketing of the product and thus grant 3-years of exclusivity." Citizen Petition Denial Letter at 9. Nevertheless, Teva was not granted exclusivity because, as the Citizen Petition Denial Letter explained, the "FDA's final determination on exclusivity was not made because FDA determines whether to grant exclusivity *after product approval*." *Id.* at 9 n.4 (emphasis added). Because Teva's application was denied, it does not enjoy any exclusivity. Thus, the policy justification underlying the exclusivity provisions of the FDCA does not apply here. Teva has chosen not to appeal the denial of the Plan B One-Step SNDA; rather, it claims to be involved in "active dialogue with the FDA right now," and it has acquiesced in the suggestion that it could still appeal if the FDA should adhere to its position. Apr. 27, 2012 Hr'g Tr. at 22:9-10, Case No. 12-cv-763, Doc. No. 84. Nor is Teva currently marketing Plan B One-Step for universal over-the-counter access. Under these circumstances, Teva's position will not be affected whether the case is decided in favor of the FDA or the plaintiffs—in either case, it will not enjoy exclusivity. There is simply no reason in law or policy why the studies submitted by Teva should not be considered in my review of the Citizen Petition denial.

The defendants' final arrow in their effort to invoke Teva's commercial interests to prevent reliance on the Plan B One-Step studies turns on the fact that Teva has never given its permission for the Citizen Petition proponents to use its studies. Specifically, the defendants argue that "a sponsor's clinical studies cannot be applied to support the approval of another manufacturer's drug product unless the drug sponsor grants a 'right of reference' to those studies." Defs.' Mem. in Opp. to Summ. J. at 34 n.9, Case No. 12-cv-763, Doc. No. 37. They cite one statute, 21 U.S.C. § 355, and one regulation, 21 C.F.R. § 314.3. I decline to consider this argument, upon which even Teva itself does not rely, because it was advanced in a single

50

footnote, it relied on a 20,000+ word statutory section with numerous parts and subparts without any pincite to the relevant language, and the footnote did not in any way develop the legal argument to which the defendants allude. Nor did the regulation on which they rely. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). It is not my job, in a case in which numerous briefs and motions have been filed, to "scour[] through footnotes in search of some possibly meritorious point that counsel did not consider of sufficient importance to [develop or] include as part of the argument." *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993).

   2.  *The Declarations Submitted in Support of Plaintiffs' Summary Judgment Motion*

   In an effort to restrict my consideration of declarations submitted by the plaintiffs in the current proceeding, the defendants invoke a rule which they claim precluded their own consideration of materials that were not part of the Citizen Petition docket. The only regulation cited by the defendants is 21 C.F.R. § 10.20(c), which provides that "[i]nformation referred to or relied upon in a submission is to be included in full and may not be incorporated by reference, unless previously submitted in the same proceeding." This is no more than a stylistic rule which says that any material explicitly relied on in a submission must be included in full. It does not address the issue of what information may be considered by the agency. Indeed, in the Citizen Petition Denial Letter, the FDA itself considered the studies submitted in support of the Plan B One-Step SNDA, although they were not part of the Citizen Petition docket. Moreover, after advising the Citizen Petition proponents that "[n]either your petition nor any of the public comments to the docket contain sufficient data to satisfy the statutory requirements for FDA to remove the Rx requirements for Plan B for women under the age of 17," it observed that, "[i]n addition, FDA does not have any data from other sources that would be sufficient to support such

a switch." Citizen Petition Denial Letter at 10. This clearly indicates that the FDA did have the discretion to consider evidence outside the Citizen Petition docket.

A brief discussion of the declarations demonstrates the extent to which the FDA abused its discretion when it failed to consider evidence to which it had access even though it was not in the Citizen Petition docket. The plaintiffs submitted five declarations. Of these, two were by scientists who participated in the studies submitted in support of the Plan B One-Step SNDA. These declarations contain summaries of the studies of which the FDA was aware and which the FDA concluded were sufficient to support "the safe and effective [over-the-counter] use of Plan B One-Step in women under age 17," the details of one of which were included in the Administrative Record. Citizen Petition Denial Letter at 9-10. This consideration aside, at least one of the declarations exposed evidence of the agency's bad faith. Specifically, those declarations disclosed the fact that the FDA itself had excused the necessity for study data on women under the age of 13. Notwithstanding the lengthy discussion of the SNDA review process contained in the Citizen Petition Denial Letter, neither I nor the petitioners would have known that the Secretary had, in effect, directed the FDA to deny the Plan B One-Step SNDA because it lacked information that the FDA told the sponsor did not have to be included.

The third declaration was by Dr. Miriam Cremer. The declaration called my attention to a highly significant label comprehension study involving girls between the ages of 12 and 17 and a prototype two-pill emergency contraceptive label. Moreover, it too disclosed evidence of bad faith. Specifically, the declaration alleged that the FDA had asked for a copy of Dr. Cremer's study and that she had provided it. It was only after I asked whether that statement was true that the defendants admitted that the FDA had itself discovered that study as part of a literature review and had considered it during the SNDA review process. Again, although the Citizen

52

Petition Denial Letter discussed the studies submitted with the Plan B One-Step SNDA, it omitted any mention of Dr. Cremer's study, which was as compelling as the label comprehension study submitted with the Plan B One-Step SNDA.

The fourth declaration is that of Mary Pendergast, a lawyer who was formerly employed as an FDA official and who was intimately familiar with the manner in which the agency operated. Only because of that declaration did I learn that the Secretary of Health and Human Services had delegated all of her authority to the Commissioner of the FDA under 21 U.S.C. § 301 *et seq.*, which includes the relevant statutes relating to new drug applications and switch applications to over-the-counter status, subject to two minor exceptions not relevant here. This delegation of authority is highly relevant to the discussion of the power of the Secretary and the scope of review. Nevertheless, the defendants failed to disclose it. Moreover, although Ms. Pendergast's submission is in the form of a declaration, it is more easily characterized as an amicus brief, and I treat it as such; I rely on it only for the information to which it drew my attention and of which I could take judicial notice in any event.

The fifth declaration is that of Dr. Tracey Wilkinson, who described the practical difficulties faced by adolescents seeking contraceptives from pharmacies. The declaration does not affect my decision in this case. I merely discuss her research to illustrate the obstructions to obtaining emergency contraception under the current regime. My decision, however, would be the same even without reference to the real-life consequences of the Secretary's conduct. Her decision with respect to the Plan B One-Step SNDA, which dictated the denial of the Citizen Petition, was arbitrary, capricious, and unreasonable for the reasons I have already outlined and do not repeat.

### 3. Administrative Record Rule

The last rule the FDA relies on to preclude consideration of documents unhelpful to its position is the rule that a reviewing court must judge the propriety of administrative agency action "by the grounds invoked by the agency." *Secs. Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Fla. Power*, 470 U.S. at 743-44). The rationale behind the "record rule" is that a reviewing court, "in dealing with a determination or judgment which an administrative agency alone is authorized to make," *Chenery*, 332 U.S. at 196, should not conduct a *de novo* trial, review materials not before the agency when the decision was made, or substitute its opinion for that of the agency.

Nevertheless, the law is clear that a reviewing court may consider extra-record materials in certain circumstances. *See Nat'l Audubon*, 132 F.3d at 14-15. Indeed, "a strong showing of bad faith or improper behavior" may justify supplementing the record. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). Thus, when the agency action cannot be adequately explained in the record it compiled, the court's consideration of evidence outside the agency's "administrative record" is not only warranted, *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), but necessary to a meaningful judicial review of the agency's action. *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) (Agency record may be supplemented when

additional information "fully explicate[s] . . . [the agency']s course of conduct or grounds of decision.").

When this issue arose in prior proceedings in this case, I observed in my 2009 opinion that:

> None of the dangers the record rule is designed to prevent are implicated by consideration of the materials in the administrative record for the SNDAs submitted by the Plan B sponsor because these materials were "before the agency when the decision was made" and because the FDA itself relied on those materials when it denied the Citizen Petition. Indeed, from the very beginning, FDA staff acknowledged that the Plan B sponsor would work with the FDA to address any concerns raised by the Citizen Petition. Def.'s Ex. 3, Case No. 05-cv-366, Doc. No. 248-5 at T-30023. Moreover, no meaningful review of the denial of the Citizen Petition would be possible without a review of the administrative record for the SNDAs because the FDA understood the issues presented by the SNDAs and Citizen Petition to be one and the same.

*Tummino*, 603 F. Supp. 2d at 543.

In sum, I held in 2009 that the complete "record" for the FDA's decision regarding the Citizen Petition included its own administrative record for both the Citizen Petition and the SNDAs. Moreover, to the extent that this was not by itself a sufficient basis to do so, I also concluded that there was a "showing of bad faith or improper behavior" that justified supplementing the record, and that consideration of evidence outside the agency's administrative record was necessary to meaningful judicial review of the agency's actions. Then, based on the entire record before me, I vacated the FDA's denial of the Citizen Petition and ordered it to make Plan B available to 17-year-olds because the same evidence relied on by the agency to make the drug available to 18-year-olds applied equally to 17-year-olds, and I remanded for reconsideration the denial of the application to make Plan B available to younger adolescents. The FDA acquiesced in that ruling.

The same reasons that justified my consideration of materials outside the administrative record in 2009 apply equally here, including a strong showing of bad faith and improper political influence. I have already discussed the declarations and the studies in the preceding sections, and I do not repeat that discussion here. Thus, even absent a showing of bad faith, the materials were relevant for the limited reasons I relied on them and because they came within the exceptions to the record rule I have already discussed. Indeed, the defendants have included documents from the Plan B One-Step SNDA review process in the Administrative Record for the Citizen Petition, conceding to some extent the relevance of the SNDA proceeding. Again, one of the most significant of those documents was a presentation containing details of the actual use study submitted in support of the SDNA.

The only document I have not yet discussed is the Summary Review for Regulatory Action, which Secretary Sebelius said she reviewed prior to issuing her directive to the FDA to reject the Plan B One-Step SNDA. This document is properly considered here because the Secretary's decision dictated the denial of the Citizen Petition, notwithstanding the smoke and mirrors in the Citizen Petition Denial Letter, and I cannot effectively review the Citizen Petition denial without reviewing the Secretary's decision. In any event, I have only relied on the parts of this document that describe the policies and practices of the FDA, which are necessary to a meaningful judicial review of the agency's action.

### III. CONCLUSION

The decisions of the Secretary with respect to Plan B One-Step and that of the FDA with respect to the Citizen Petition, which it had no choice but to deny, were arbitrary, capricious, and unreasonable. I decline to direct a remedy comparable to that which I directed in my 2009 opinion, such as directing that emergency contraception be made available without a prescription

but with the current point-of-sale restrictions to women whom studies have demonstrated are capable of understanding the label and using the product appropriately. As I have previously observed, the obstructions in the path of those adolescents in obtaining levonorgestrel-based emergency contraceptives under the current behind-the-counter regime have the practical effect of making the contraceptives unavailable without a doctor's prescription. Consequently, the decision of the FDA denying the Citizen Petition is reversed, and the case is remanded to the FDA with the instruction to grant the Citizen Petition and make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale or age restrictions within thirty days. On remand, the FDA may determine whether any new labeling is reasonably necessary. Moreover, if the FDA actually believes there is any significant difference between the one- and two-pill products, it may limit its over-the-counter approval to the one-pill product.

I do not grant the application of the FDA to remand for the commencement of administrative rulemaking proceedings. In my previous opinion, I described the means by which the FDA may switch a drug to over-the-counter status. *Tummino*, 603 F. Supp. 2d at 525. I described two methods by which the FDA could change a drug's status: first, by promulgating a regulation through rulemaking initiated by either the Commissioner herself or a citizen petition, or by approving a drug sponsor's request for an over-the-counter switch. I observed, "[u]nlike the first mechanism, this process does not require rulemaking." *Id.* On further review, I believe that no statute or regulation requires the FDA to engage in administrative rulemaking upon approval of a citizen petition or *sua sponte* reconsideration of a drug's prescription-only status. The relevant statute, 21 U.S.C. § 353(b)(3), provides that "[t]he Secretary may by regulation remove . . . drugs from [prescription] requirements . . . when such requirements are not necessary

for the protection of the public health." The statute does not require the agency to act by regulation, but provides only that it *may* do so.

Moreover, the regulations explicating over-the-counter switch procedures do not require rulemaking for changes initiated through a citizen petition or by the Commissioner herself; indeed, there is no suggestion that over-the-counter switches are treated differently based on the process by which they are initiated. 21 C.F.R. § 10.30, which deals with citizen petitions, specifically provides that the Commissioner "may grant or deny such a [citizen] petition, in whole or in part, and *may grant such other relief or take other action as the petition warrants*" (emphasis added). The section does not say that agency rulemaking is required prior to agency action on a citizen petition. Indeed, the Citizen Petition in this case does not seek rulemaking; it merely requests "that the [FDA] switch [Plan B and its generics] from prescription to over-the-counter (OTC) status." Citizen Petition at 1, Case No. 05-cv-366, Doc. No. 316-9. In addition, although the Citizen Petition requested a complete switch when it was filed twelve years ago, because Plan B was not yet available on a non-prescription basis to any consumer, this is not the case any longer. The relief sought by the Citizen Petition in light of present circumstances is limited to a partial over-the-counter switch for females under 17. No previous modifications of Plan B's over-the-counter status required rulemaking, including the expansion of over-the-counter access to 18-year-olds and, later, 17-year-olds as directed by my 2009 remand order.

Nor do the regulations distinguish between SNDAs, Commissioner-initiated agency action, and citizen petitions. 21 C.F.R. § 310.200, titled "Prescription-exemption procedure," states: "A proposal to exempt a drug from the prescription dispensing requirements of [the FDCA] may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemption, which petition may be pursuant to part 10 of

58

this chapter [citizen petitions], or in the form of a supplement to an approved new drug application." The regulations do not say that these three means of initiating rulemaking require different responses from the FDA. And the defendants have not proffered any other support for the proposition that the grant of a Citizen Petition would merely result in the initiation of rulemaking other than the language from my previous decision.

Finally, even if the defendants' arguments would be sufficient to carry the day in the run-of-the-mill case, the bad faith that has permeated consideration of the Citizen Petition, not to speak of the Plan B sponsor's applications, should rule out such relief here. More than twelve years have passed since the Citizen Petition was filed and eight years since this lawsuit commenced. The FDA has engaged in intolerable delays in processing the petition. Indeed, it could accurately be described as an administrative agency filibuster. Moreover, one of the devices the FDA has employed to stall proceedings was to seek public comment on whether or not it needed to engage in rulemaking in order to adopt an age-restricted marketing regime. After eating up eleven months, 47,000 public comments, and hundreds of thousands, if not millions, of dollars, it decided that it did not need rulemaking after all. The plaintiffs should not be forced to endure, nor should the agency's misconduct be rewarded by, an exercise that permits the FDA to engage in further delay and obstruction.

REVERSED and REMANDED.

SO ORDERED.

Brooklyn, New York
April 4, 2013

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ANNIE TUMMINO, *et al.,*                                       JUDGMENT
                                                              12-CV- 0763 (ERK)
                          Plaintiffs,

        -against-

MARGARET HAMBURG, *et al.,*

                          Defendants.
-----------------------------------------------------X

     A Memorandum and Order of Honorable Edward R. Korman, United States

District Judge, having been filed April 5, 2013, granting Plaintiffs' motion for summary

judgment; denying Defendants' cross-motion for summary judgment; reversing the decision of

the Food and Drug Administration denying the Citizen Petition, and remanding the case to the

Food and Drug Administration with the instruction to grant the Citizen Petition and make

levonorgestrel-based emergency contraceptives available without a prescription and without

point-of-sale or age restrictions within thirty days; ordering that on remand, the Food and Drug

Administration determine whether any new labeling is reasonably necessary; and moreover, if the

Food and Drug Administration actually believes there is any significant differences between the

one- and two-pill products, it may limit its over-the-counter approval to the one-pill product; it is

     ORDERED and ADJUDGED that Plaintiffs' motion for summary judgment is

granted; that Defendants' cross-motion for summary judgment is denied; that the decision of the

Food and Drug Administration denying the Citizen Petition is reversed, and the case is remanded

to the Food and Drug Administration with the instruction to grant the Citizen Petition and make

JUDGMENT 12-CV-0763 (ERK)

levonorgestrel-based emergency contraceptives available without a prescription and without

point-of-sale or age restrictions within thirty days; that on remand, the Food and Drug

Administration may determine whether any new labeling is reasonably necessary; and that

moreover, if the Food and Drug Administration actually believes there is any significant

difference between the one-and two-pill products, may limit its over-the-counter approval to the

one-pill product.

Dated: Brooklyn, New York
      April 10, 2013

Douglas C. Palmer
Clerk of Court

by:

Michele Gapinski
Chief Deputy for
Court Operations

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANNIE TUMMINO, *et al.*,

                        Plaintiffs,                           **MEMORANDUM & ORDER**

                - against -                      No. 12-CV-763 (ERK)(VVP)

MARGARET HAMBURG, Commissioner
of Food and Drugs, *et al.*

                         Defendants.

-----------------------------------------------------------------X

KORMAN, J.:

## INTRODUCTION

I assume familiarity with the underlying facts and circumstances of this case that are detailed in my memorandum of April 5, 2013. *Tummino v. Hamburg*, --- F. Supp. 2d ----, 2013 WL 1348656 (E.D.N.Y. Apr. 5, 2013). Nevertheless, some introductory words are appropriate. This case involved Plan B and Plan B One-Step, emergency contraceptives that can be taken to reduce the risk of pregnancy after unprotected intercourse. They must, however, be taken as soon as possible after unprotected intercourse. The longer the delay, the less effective they become. The effort to convert these levonorgestrel-based contraceptives from prescription to over-the-counter status has gone on for over twelve years, even though they would be among the safest drugs available to children and adults on any drugstore shelf.

The FDA, responding to unjustified political interference, delayed as long as it possibly could before it took even one incremental step in the process. Ultimately, on December 7, 2011, in response to an application filed by Teva Women's Health ("Teva"), the FDA concluded that Plan B One-Step—the one-pill version of the drug—could be sold over-the-counter and without

1

a prescription or age restriction.  The FDA was reversed by the Secretary of Health and Human Services on the same day in a decision that was politically motivated and that, even without regard to the Secretary's motives, was so unpersuasive as to call into question her good faith. Some five days later, the FDA rejected a Citizen Petition that sought unrestricted over-the-counter status for Plan B—the original two-pill emergency contraceptive product—and all drugs that are "equivalent" to Plan B.  This decision was compelled by Secretary's reasoning in ordering the FDA to reject Teva's application.  Specifically, the Secretary found that information that she deemed essential was not provided by Teva.  The Citizen Petition lacked the same information.  The Citizen Petition Denial Letter, which came five days after the denial of Teva's Plan B One-Step application, was clearly prompted by the Secretary's action despite the FDA's fanciful effort to make it appear that it undertook an independent review of the Citizen Petition. *See Tummino v. Hamburg*, 2013 WL 1348656 at *26.

On April 5, 2013, I issued an order directing the defendants—the Commissioner of Food and Drugs and the Secretary of Health and Human Services—to grant the Citizen Petition filed by the plaintiffs and make levonorgestrel-based emergency contraceptives available over-the-counter and without point-of-sale or age restrictions.  I did so because the Secretary's action was politically motivated, scientifically unjustified, and contrary to agency precedent, and because it could not provide a basis to sustain the denial of the Citizen Petition.[1]  I did not order the defendants to make Plan B One-Step—the widely known brand name emergency contraceptive—available.  Teva had not appealed from the FDA's denial of its application, and, although it sought to intervene in this lawsuit, its intervention was not for the purpose of obtaining any relief related to its ability to market Plan B One-Step.

---

[1] The defendants do not suggest that they have any reasonable possibility of success in challenging this finding on appeal.

Plan B One-Step aside, the effect of my decision was to make levonorgestrel-based emergency contraceptives available without a prescription and without any point-of-sale or age restrictions. The only practical difference between my decision and the decision of the FDA that the Secretary reversed was that the FDA's decision was arguably directed towards the one-pill version of the drug, and my decision applied to both versions. Nevertheless, responding to far-fetched concerns ultimately voiced in response to the prospect of making the two-pill version available without a prescription, I advised the FDA that if it actually believed there was a significant difference between the one- and two-pill products, it was free to limit the relief on the Citizen Petition to the one-pill product. *Tummino v. Hamburg*, 2013 WL 1348656 at *31.

With this concession to the FDA's concerns, my decision was entirely consistent with the initial decision of the FDA. I adopted and completely agreed with Commissioner Hamburg's conclusion that "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential"—a conclusion that she reached after she had "reviewed and thoughtfully considered the data, clinical information, and analysis provided by" the FDA's Center for Drug Evaluation and Research. Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011). Notwithstanding my deference to the Commissioner and the scientists at the FDA, the defendants have filed a notice of appeal and a motion to stay my decision as they continue their administrative agency filibuster through the appellate process.

I pause here before proceeding to a discussion of the merits of the motion to comment on the defendants' analysis of the manner in which drug approval applications should be made. Thus, they tell me that "[a] drug approval decision involves scientific judgments as to whether

statutory and regulatory factors are met that warrant deference to those charged with the statutory responsibility to make those decisions. The agency alone has the necessary information and scientific expertise to assess the data and information required to make a determination that a drug is safe and effective." Defs.' Br. at 10. This salutary principle was flagrantly violated by Secretary Sebelius, who completely lacks the "necessary information and scientific expertise to assess the data and information required to make a determination that a drug is safe and effective," and whose role in the process has been circumscribed by Congress as well as by the delegation to the Commissioner of any authority that the Secretary may have—a clear recognition by Congress and the Secretary of her lack of competence in this area. *See Tummino v. Hamburg*, 2013 WL 1348656 at *21. Yet, in something out of an alternate reality, the defendants seek a stay to pursue an appeal that would vindicate the Secretary's disregard of the very principle they advocate.

## DISCUSSION

There are four factors to be considered before granting a stay pending appeal: (1) whether a party will suffer irreparable injury if a stay is issued, (2) whether the movant will suffer irreparable injury absent a stay, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected. *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2d Cir. 1993); *see also In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170-71 (2d Cir. 2007). In *Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002), the Second Circuit surveyed how different courts have analyzed the prospect of success necessary for issuing a stay, ultimately agreeing with the District of Columbia Circuit's approach, whereby "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the Court's assessment of the other [stay] factors."

4

*Id.* at 101 (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). The court observed: "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed*, 309 F.3d at 101; *see also Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 36-38 & n.8 (2d Cir. 2010). Against this backdrop, I turn to a discussion of the relevant factors.

### Irreparable Injury to the Plaintiffs

The defendants' argument that the plaintiffs will not suffer any harm if a stay is granted is based solely on an agreement they reached with Teva the day before they filed their notice of appeal. This argument necessitates a discussion of the agreement and how it came to be made. On March 9, 2012, three months after the Secretary overruled the FDA and directed the denial of Teva's application to make Plan B One-Step available over-the-counter without a prescription to all women, Teva filed a letter with the FDA seeking to make Plan B One-Step available for sale to women 15 years of age and over without a prescription and to eliminate the sale of Plan B One-Step by prescription for women under 15 years of age. Under this proposal, the drug would be stocked on the shelves of any retail establishment with an on-site pharmacy, and customers would be required to prove their age by providing photo identification to the cashier of the retail establishment as opposed to the pharmacist.

Teva and the FDA exchanged correspondence regarding this proposal through June 2012. After an eight-month hiatus, they resumed communication in March 2013, shortly after I indicated my intention to rule on the plaintiffs' Citizen Petition by the end of March—a decision which the defendants had to have known from oral argument would strike down the order of the

Secretary and the FDA's action which was dictated by it. My decision was filed on April 5, 2013. Teva's application was approved on April 30, 2013, the day before defendants in this case filed their notice of appeal. The FDA has provided for no reason for the delay in ruling on Teva's application. Indeed, as I observed at oral argument, the approval—when it finally came—was intended to provide a sugarcoating for the FDA's appeal. May 7, 2013 Hr'g Tr. 28:2-5.

Nevertheless, there was something in it for Teva as well. The benefits the proposal would confer on Teva were not insignificant. Because, as the Assistant United States Attorney observed, 99% of Plan B One-Step consumers are aged 15 and above, Teva would lose next to nothing in the way of revenue by limiting sales to those women. May 7, 2013 Hr'g Tr. 68:7-11. On the other hand, Teva's proposal would enable it to have its product, and its product alone, displayed on the shelves in the family planning area of stores with an on-site pharmacy. Thus, a consumer looking for an emergency contraceptive would only find Plan B One-Step on the shelves, and if she came in after the pharmacy counter was closed, her only option would be Plan B One-Step. If she were under the age of 15, she would have no option, because she could only obtain levonorgestrel-based emergency contraceptives with a prescription.

Moreover, because the FDA claimed that one of the studies conducted by Teva—the so-called "actual use" study—was essential to the approval of Teva's proposal, Teva enjoys three years of marketing exclusivity to the 15 and 16 year old consumers. The pharmaceutical companies that sell "brand X" versions of Plan B One-Step as well as the two-pill package of the drug could not display their products on the shelf because the old marketing regime remains in effect for them, and their products can only be sold from behind the pharmacy counter. Anyone

under the age of 17 needs a prescription to obtain these products, and anyone over the age of 17 can only obtain them from the pharmacy by showing proof-of-age identification.

While this proposal was a boon to Teva, it did little to eliminate the practical obstructions in obtaining emergency contraception to women of child-bearing age whether over or under age 15. On the contrary, Teva will use its privileged marketing status and exclusivity to increase the cost of the drug. The price of Plan B One-Step under the new marketing regime is expected to be $60, significantly more than the one- or two-pill generic version, and could conceivably go higher, if only to accommodate the more expensive packing, age-verification tags, and anti-theft technology that the new marketing arrangement would require.  May 7, 2013 Hr'g Tr. 29:9-15. The cost of all emergency contraception, particularly Plan B One-Step, which is the most expensive, is already an impediment to access for many women and adolescents.

Nevertheless, the Secretary of Health and Human Services and the Commissioner of Food and Drugs argue that a stay of my order to make levonorgestrel-based emergency contraceptives available without a prescription and without point-of-sale and age restrictions "will not harm plaintiffs." Defs.' Br. at 11. This argument is based on the premise that the plaintiffs "are all over age 15 and therefore will soon be able to obtain at least one emergency contraceptive containing levonorgestrel . . . without a prescription at retail establishments that have a pharmacy counter." *Id.* Thus, the order that I entered and they seek to appeal "is not required to afford relief to any of the plaintiffs. They can purchase the product whenever the store is open (regardless of whether the pharmacy is open) by showing proof of age." *Id.*

Passing over the fact that the complaint alleges that one of the plaintiffs is suing on behalf of her two daughters, one of whom was 12 years old on May 23, 2012 (when the second amended supplemental complaint was filed), the defendants' argument ignores (1) the fact that

"showing proof of age," which means government-issued photo identification, constitutes a substantial impediment to obtaining emergency contraception, particularly for young women of reproductive age, and (2) that emergency contraception can only be obtained at retail establishments with on-site pharmacies. Moreover, while there are some retail establishments that are open for longer hours than their pharmacy counters, the unjustifiable point-of-sale restrictions left in place under the Teva-FDA agreement will continue to present barriers to all women. Many women do not live near a store with an on-site pharmacy, and even when the drugstore or comparable facility has an on-site pharmacy, the difference between the hours of the pharmacy and the store itself is often significant. Indeed, a research letter published in the journal of the American Medical Association found that "of the 943 pharmacies called" in a survey of emergency contraceptive availability in five geographically diverse cities, "only 4.7% were open 24 hours." Tracey A. Wilkinson et al., *Research Letter: Access to Emergency Contraception for Adolescents*, 307 J. Am. Med. Ass'n 362 (January 25, 2012).

Significantly, a study conducted by the Brennan Center for the purpose of showing the extent to which photo identification requirements throw roadblocks in the way of voters found that African-American citizens disproportionately lack photo identification. Specifically, "[t]wenty-five percent of African-American voting-age citizens have no current government-issued photo ID, compared to eight percent of white voting-age citizens." Brennan Center for Justice, *Citizens Without Proof* 3 (Nov. 2006), *available at* http://www.brennancenter.org/analysis/citizens-without-proof. Using 2000 census figures, the Brennan Center concluded that "this amounts to more than 5.5 million adult African-American citizens without photo identification." *Id.* Similarly, "[c]itizens earning less than $35,000 per year are more than twice as likely to lack current government-issued photo identification as those earning more than

$35,000. Indeed, the survey indicates that at least 15 percent of voting-age American citizens earning less than $35,000 per year do not have a valid government-issued photo ID." *Id.* Indeed, proposed findings of fact submitted by the Department of Justice in *South Carolina v. Holder*, No. 12-cv-203 (D.D.C.), are consistent with the Brennan Center study. One of those proposed findings is that "[m]inority voters in [South Carolina] are disproportionately less likely than white voters to possess any of the currently available, acceptable forms of [photographic voter identification] . . . . This conclusion holds true for black voters, Native American voters, and Hispanic voters, all of whom are significantly less likely than white voters to possess an allowable [photograph voter identification] . . . . These disparities are statistically significant."[2] United States' Proposed Findings of Fact and Conclusions of Law at 8, *South Carolina v. Holder*, No. 12-cv-203 (D.D.C.).

These statistics do not necessarily correlate with women of reproductive age. Nevertheless, they indicate the disproportionate burden that the Teva-FDA agreement places on African-American and poor adults over age 18. Moreover, it can reasonably be assumed that the proportion of women between 15 and 18 who lack government-issued photo identification is much higher, with a similar disparate impact on African-Americans and the poor. Nor does the nature of the age identification required under Teva's proposal make any concession to the difficulties they face. Thus, in response to a question posed by the FDA, Teva responded that "[t]he age verification system is based on federal and state guidelines for the sale of tobacco and alcohol and as such requires a government-issued photo ID (including driver's license, military card, immigration card, or passport) with date of birth." Letter from Valerie M. Mulligan, Senior

---

[2] The Brennan Center survey found that 16% of Hispanic voting age citizens have no current photo identification, but observed that the results did not achieve statistical significance due to a low sample size. The Department of Justice, which characterized its statistics as more robust, seems to confirm the validity of the Brennan Center's findings with respect to Hispanics.

Dir. of Reg. Affairs, Teva Women's Health, to Andrea Leonard-Segal, Center for Drug Evaluation and Research, FDA at 2 (June 27, 2012).[3] Teva also observed that "a school-issued ID and birth certificate would not be considered acceptable age-verification." And, "for consumers age 15, there are some states that issue a driver's permit at age 15, or a consumer may use one of the other types of ID listed above, *if available*." *Id.* (emphasis added).

Moreover, the Teva-FDA agreement does nothing to relieve the burden on younger adolescents who still require a prescription from a physician in order to obtain an emergency contraceptive. Indeed, because the Teva-FDA agreement provides that Teva will no longer market Plan B One-Step as a prescription product, younger adolescents receive no benefit from the new marketing agreement. Instead, the requirement of a prescription only adds the additional cost of a doctor's visit and delay to obtaining a time-sensitive emergency contraceptive that is more effective the sooner it is taken after unprotected intercourse. As the label on the Plan B One-Step box advises the consumer, the pill should be taken "as soon as possible . . . after unprotected sex." I do not dwell on this aspect of the prejudice suffered by the population of the youngest adolescents, although it should not be ignored, because the number of these adolescents who actually use levonorgestrel-based emergency contraceptives is miniscule, and they have been invoked in the debate over access to these contraceptives mostly as a red herring to justify the continued burdens suffered by older women who seek access to the drug.

**Irreparable Injury to the Defendants and the Public Interest**

The defendants argue that they "and the public interest" will suffer irreparable harm absent a stay for a number of reasons. Thus, they argue that the FDA and the public will be

---

[3] I recognize that I am quoting from a letter that has been filed under seal and the contents of which Teva objects to being made public. The instance which I have quoted simply cannot be described as the equivalent of a confidential trade secret or other protected information that would justify keeping it a secret. Indeed, as I understand the position of the FDA, it retains the discretion to release information from Teva's letters now that its application has been granted. Letter from the United States Attorney at 1 (May 6, 2013).

irreparably and immediately harmed "if a drug product that purported to be 'FDA approved' were approved instead at the direction of a court." Defs.' Br. at 12. This is so because, they suggest, "[t]he public properly relies upon FDA classification of drugs as non-prescription as a reflection of the agency's judgment regarding the safety and proper use of a drug without a doctor's prescription. Thus, the public interest will not be served by reclassification of drugs as non-prescription without agency approval." *Id.* at 12-13. This argument ignores the fact that the FDA found that the drug was safe and could be used properly without a doctor's prescription, and was prepared to make it available over-the-counter for all ages. As Commissioner Hamburg observed, "there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential." Statement from FDA Commissioner Margaret Hamburg, M.D., on Plan B One-Step (Dec. 7, 2011). Thus, if a stay is denied, the public can have confidence that the FDA's judgment is being vindicated, and if a stay is granted, it will allow the bad-faith, politically motivated decision of Secretary Sebelius, who lacks any medical or scientific expertise, to prevail—thus justifiably undermining the public's confidence in the drug approval process.

Nor is there any merit to the related argument that a stay will "prevent public uncertainty regarding the status of the drugs at issue here pending the government's appeal to the Second Circuit." Defs.' Br. at 13. This silly argument ignores the fact it is the government's appeal from the order that sustained the judgment of the Commissioner of the FDA that is the cause of any uncertainty, and that that appeal is taken solely to vindicate the improper conduct of the Secretary and possibly for the purpose of further delaying greater access to emergency

contraceptives for purely political reasons.  Whether my order is stayed or not will not resolve any uncertainty.

The defendants also argue that "if the status of these drugs is changed and later reversed, it can lead to situations in which women mistakenly believe that they can obtain the drug without a prescription or at certain locations where it used to be available, but is no longer."  Defs.' Br. at 13.  This argument assumes that defendants have a likelihood of success on the merits, an issue that I will shortly address, and is largely an insult to the intelligence of women.  If women can no longer obtain Plan B without a prescription at certain locations, they will go to locations where it is available.  On the other hand, if a stay is granted, the prejudice to those who need ready access to emergency contraceptives is a certainty, and is likely to continue until the resolution of the appeal—a period of time which is difficult to predict.

Moreover, this argument comes with ill grace from the defendants, who have added significant confusion by putting in place a convoluted triple-tiered marketing scheme that will only increase the confusion that already prevents women from obtaining timely access to emergency contraceptives.  Specifically, women and retailers across the country will be forced to operate under the following set of nonsensical rules: (1) women 15 years of age or older with adequate proof of age will be permitted to purchase Plan B One-Step, which will only be available on the shelves in stores with on-site pharmacies; (2) other levonorgestrel-based products will remain behind the counter, but will be available without a prescription to women over 17 years of age who have government issued proof of age; and, (3) women who lack adequate proof of age or are under the age of 15 will not have access to Plan B One-Step and must obtain a prescription for another levonorgestrel-based contraceptive product.  The confusion caused by this system, the only purpose of which is to sugarcoat the defendants'

appeal, is much greater than any potential confusion that could result from simply returning a product to prescription status.

The defendants' last argument is that the government interest in conferring marketing exclusivity will be irreparably harmed absent a stay. I do not question the validity of the policies underlying the statutes and regulations conferring marketing exclusivity on pharmaceutical companies that perform needed research to make drugs available and obtain approval to market drugs as a result. Nevertheless, at the time of my decision there was no issue of market exclusivity, because Teva's previous applications to expand access to Plan B One-Step had been denied, and it had not appealed. Indeed, for this reason, the prejudice that the defendants claim is the *implication* in my decision "that FDA cannot grant Teva marketing exclusivity for a change for [Plan B One-Step] from prescription to [over-the-counter] simply because FDA issued a complete response letter to Teva in December 2011 and Teva chose not to file a petition for review to the court of appeals." Defs.' Br. at 15. Their argument continues that "[t]his implication ignored the prospect that, instead of appealing, Teva could file an amended [supplemental application], which FDA could approve, leading to a grant of exclusivity." *Id.* It is not my understanding that any implication that could conceivably be drawn from an opinion provides a basis for an appeal, much less for a stay pending appeal.

Moreover, if I was operating in ignorance of the fact that Teva was negotiating a sweetheart agreement with the FDA, it was because nothing happened in this regard from December 2011 until April 30, 2013, 25 days after I issued my opinion in this case. Indeed, it would not have been unreasonable for me to assume that after 16 months of silence, the verdict of the quiescent years—to borrow a phrase from Brainerd Currie—was that nothing happened. Nevertheless, I acknowledge that I ordered the Citizen Petition be granted in part because it was

my view that the plaintiffs were entitled to the relief they sought even without the actual use study paid for by Teva. Indeed, the 2003 FDA advisory committee formed to consider the first application for over-the-counter access to levonorgestrel-based emergency contraceptives voted by the most overwhelming of margins to approve it, without the benefit of the actual use study that Teva submitted with its more recent application, and it was only the political interference by the Bush White House that prevented their recommendation from being adopted. *See Tummino v. Torti*, 603 F. Supp. 2d 519, 528 (E.D.N.Y. 2009). If Teva could somehow benefit from the relief sought by the Citizen Petition, it was simply because the relief it sought from the FDA overlapped to a degree with the Citizen Petition.

**Defendants' Likelihood of Success on the Merits**

The defendants offer two arguments in support of their claim that they have "a substantial likelihood of success on appeal." Defs.' Br. at 5. The first argument is that I was without subject matter jurisdiction to review the denial of Teva's petition. This argument is frivolous. I repeatedly recognized in my opinion, as the defendants acknowledged in their memorandum in support of their motion for a stay, that I did not have the authority to review the denial of Teva's petition for the purpose of granting relief. Defs.' Br. at 7. Nor did I direct the defendants to grant Teva's petition. I need not burden this opinion with a further discussion of this claim, because it is belied by what has actually happened since my opinion. Specifically, Teva is not making any effort to take advantage of my decision. Instead, it has entered into an agreement with the FDA, which I previously described. Since Teva has acquiesced in the denial of its petition, and entered into an agreement designed to "address the Secretary's stated concerns," there is nothing for the Court of Appeals to review, even if my decision had affected Teva's petition. Letter from Valerie M. Mulligan, Senior Dir. of Reg. Affairs, Teva Women's Health, to

Andrea Leonard-Segal, Center for Drug Evaluation and Research, FDA at 3 (Mar. 9, 2012). Indeed, this issue could be said to be moot.

The defendants' next argument in support of their claim that they have a substantial likelihood of success on appeal is that I exceeded my authority in ordering a change of Plan B for prescription to over-the-counter instead of remanding to the agency. Specifically, the defendants argue that "[r]ather than issuing a directive to the agency as to what specific action to take, the Court should have remanded to the agency for compliance with its legal ruling." Defs.' Br. at 9. Quoting from a decision of the Supreme Court, they argue that "the proper course, *except in rare circumstances*, is to remand to the agency for additional investigation or explanation. The reviewing court is not *generally* empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (emphases added).

The defendants' own admission that they could not continue to reach the same decision on remand after remand and claim that the only remedy was yet another remand clearly establishes that the question is not whether I have authority to grant relief. *See* May 7, 2013 Hr'g Tr. 91:22-92:6. So too does a careful study of the language of the Supreme Court decision on which they rely, and which recognizes that there are "rare circumstances" in which remand is not necessary. This case presents the kind of "rare circumstances" where a remand to the agency is not only unnecessary but would constitute an abuse of discretion. First, the FDA is not the problem. The cause of the rejection of over-the-counter sale of levonorgestrel-based emergency contraceptives was the Secretary of Health and Human Services. She has not changed her position. *Id.* 17:14-20. A remand would thus be futile.

15

More significantly, I have been there and done that. In my 2009 opinion, after concluding that the administrative agency process was corrupted by political interference, I declined the plaintiffs' request to avoid a remand and simply direct that the FDA award them the relief that they sought. I did so for two reasons. First, it was my view that a decision on whether Plan B "may be used safely without a prescription by children as young as 11 or 12, is best left to the expertise of the FDA, to which Congress has entrusted this responsibility; it should not be made by a federal district court judge." *Tummino v. Torti*, 603 F. Supp. 2d at 549. Second, a new FDA Commissioner, Deputy Commissioner, and President had come into office since the agency's decision on Plan B had been made, who I thought could be "trusted to conduct a fair assessment of the scientific evidence." *Id.* Neither of these grounds is applicable here.

On remand, defendants engaged in the same bad faith that resulted in my initial remand. They delayed the decision for three years and, ultimately, improper political influence prevented the FDA from granting the petition. Nor do they claim a reasonable probability of success on appeal in challenging my analysis of their flagrant misconduct. Indeed, I traced the numerous departures from agency policy and defects in the proceedings for yet a second time. *Tummino v. Hamburg*, 2013 WL 1348656 at *6-19. Significantly, defendants do not take any issue with any of my substantive conclusions. Instead, they seek another remand, without any assurance that the result would be any different. On the contrary, the defendants assert that, even if the Secretary changed her mind and the FDA agreed that the Citizen Petition contained sufficient data to support an over-the-counter switch, the FDA would be obligated to conduct what could be described as a national referendum: "[A] rule making proceeding [in] which the public and all stakeholders would have an opportunity to participate and share their views including Teva, including plaintiffs, including the petitioners, including anybody else who has an interest in the

16

issue would be able to submit their views." May 7, 2013 Hr'g Tr. 22:13-24. I need not here deal

with the argument that such a rulemaking procedure would be required in the ordinary case.[4] As

I noted in my earlier opinion:

> [T]he bad faith that has permeated consideration of the Citizen Petition, not to speak of the Plan B sponsor's applications, should rule out such relief here. More than twelve years have passed since the Citizen Petition was filed and eight years since this lawsuit commenced. The FDA has engaged in intolerable delays in processing the petition. Indeed, it could accurately be described as an administrative agency filibuster. Moreover, one of the devices the FDA has employed to stall proceedings was to seek public comment on whether or not it needed to engage in rulemaking in order to adopt an age-restricted marketing regime. After eating up eleven months, 47,000 public comments, and hundreds of thousands, if not millions, of dollars, it decided that it did not need rulemaking after all. The plaintiffs should not be forced to endure, nor should the agency's misconduct be rewarded by, an exercise that permits the FDA to engage in further delay and obstruction.

*Tummino v. Hamburg*, 2013 WL 1348656 at *33.

## CONCLUSION

The motion for a stay pending the appeal is denied. Indeed, in my view, the defendants'

appeal is frivolous and is taken for the purpose of delay. Nevertheless, as a courtesy to the Court

of Appeals, and to enable it to schedule the motion in the ordinary course, I grant a stay pending

the hearing or submission of the defendants' motion for a stay in the Court of Appeals on the

condition that the motion for a stay be filed by noon on May 13, 2013.

SO ORDERED.

Brooklyn, New York
May 10, 2013

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge

---

[4] I discuss this issue in some detail in my April 5th opinion. *Tummino v. Hamburg*, 2013 WL 1348656 at *32-33. One of the points I made was that the last time I remanded the Citizen Petition, it was with instructions to lower the age for non-prescription sale from 18 to 17. The agency accomplished this without rulemaking by inviting Teva to submit a tailored supplemental application for this change. *Id.* at *10.

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
TUMMINO, et al.            : 12-cv-763(ERK)(VVP)
            Plaintiff,     :
                           :
    - versus -             : U.S. Courthouse
                           : Brooklyn, New York
HAMBURG, et al,,           :
            Defendant      : April 27, 2012
------------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES SENIOR DISTRICT JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

**For the Plaintiff:**         **Suzanne Ilene Novak, Esq.**
                              **Kara Lowentheil, Esq.**
                              **Julie Rikelman, Esq.**
                              Center for Reproductive Rights
                              120 Wall Street
                              New York, NY 10005


**For the Defendant:**         **Franklin Amanat, Esq.**
                              United States Attorneys Office
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, NY 11201-1820


                              **Eric B. Beckenhauer, Esq.**
                              **Sheila Lieber, Esq.**
                              U.S. Department of Justice
                              20 Massachusetts Ave NW
                              Washington, DC 20001


**For the Intervener:**        **Michael Shumsky, Esq.**
                              **Steven Menashi, Esq.**
                              Kirkland & Ellis LLP
                              655 15th Street Nw
                              Washington, DC 20005


**Transcription Service:**     **Transcriptions Plus II, Inc.**
                              3589 Tiana Street
                              Seaford, N.Y.  11783
                              Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

1          THE CLERK:  Tummino v. Hamburg.  Your

2     appearances, counsel, starting from this side of the

3     table.

4          MR. MENASHI:  Steven Menashi for Teva Women's

5     Health.

6          MR. SHUMSKY:  Mike Shumsky for Teva Women's

7     Health.

8          MR. BECKENHAUER:  Eric Beckenhauer from the

9     Department of Justice on behalf of the defendants.

10          MR. AMANAT:  Frank Amanat, Assistant United

11     States Attorney on behalf of the defendant.

12          MS. LIEBER:  Sheila Lieber (indiscernible).

13          MS. RIKELMAN:  Julie Rikelman (indiscernible).

14          MS. LOWENTHEIL:  Tara Lowentheil

15     (indiscernible).

16          MS. NOVAK:  Suzanne Novak, Center for

17     Reproductive Rights on behalf of plaintiffs.

18          THE CLERK:  Counsel, I would just add that you

19     all keep your voices up and until the court reporter can

20     figure out who you are, just identify yourselves before

21     you speak.  Thank you.

22          THE COURT:  First of all, this isn't -- my case

23     manager may have misinformed you, this is not just on for

24     the motion to intervene, so I didn't mean to have her sit

25     you in the back, although I have --

Proceedings                                3

1          MR. AMANAT:  Oh, no, we've only --

2          THE COURT:  -- never had any trouble hearing

3    you.  Why don't we start with the motion to intervene,

4    only because it will help answer some questions I have

5    about what an appropriate remedy might be here.

6          MR. SHUMSKY:  Good afternoon, your Honor.  I'm

7    Mike Shumsky for proposed Intervener Teva Women's Health,

8    Inc.  Teva seeks to assert a very narrow interest in this

9    case.  As you know from our papers, Teva submitted two

10   clinical studies with its supplemental new drug

11   application for the Plan B One-Step product.

12          One of those studies is a labeling

13   comprehension study which gauged adolescent women's

14   ability to understand instructions for use associated

15   with that product and the other is an actual use study

16   which gauged whether adolescent women can actually use

17   that product safely, in accordance with its instructions

18   in real life.

19          Until Secretary Sebelius intervened to overrule

20   FDA's expert scientific determination that those studies

21   justified the removal of any limits on the OTC

22   availability of the Plan B One-Step product, FDA was

23   prepared to award my clients a three-year period of "new

24   product exclusivity" for having sponsored that research

25   and submitted it with its SNDA.

Proceedings                                    4

1          As we interpreted your February 5 --

2          THE COURT:  So, if she hadn't been overruled,

3     the Secretary, what would have happened is you would had

4     have the exclusive right to over-the-counter.

5          MR. SHUMSKY:  That's correct, your Honor.

6          THE COURT:  And the makers of what I will call

7     Plan B, the generic Plan B, would have continued under

8     the current system.

9          MR. SHUMSKY:  That is correct, the age

10    restriction applicable to the Two-Step product would have

11    been seventeen and above or sixteen and below.

12         THE COURT:  And what is, by the way, the cost

13    of the generic?

14         MR. SHUMSKY:  I have no idea, your Honor.

15         THE COURT:  You don't?

16         MR. SHUMSKY:  No, I really don't.  Teva no

17    longer markets --

18         THE ESR OPERATOR:  I'm sorry, can you move the

19    mic closer to you.

20         MR. SHUMSKY:  I'm sorry.  Teva no longer

21    markets the generic product and I haven't reviewed the

22    pricing data, so I couldn't tell you what the difference

23    in the price between the brand name One-Step product is

24    and the generic Two-Step product.

25         THE COURT:  Well, what was the price when Teva

```
                    Proceedings                    5
```

1  sold it?

2          MR. SHUMSKY:  I don't know, your Honor.  I'm

3  sorry.  I can obtain --

4          THE COURT:  Do you know?

5          MS. NOVAK:  Yes, your Honor.  This is Suzanne

6  Novak.

7          I believe the price differential is $10 or $15.

8  The brand name, I believe, varies between $50 and $70 and

9  the generic is usually about $10 or $15 lower than that.

10          THE COURT:  We're talking about the generic

11  Plan B.

12          MS. NOVAK:  The generic two pill product --

13          THE COURT:  Right.

14          MS. NOVAK:  -- versus the one pill.

15          THE COURT:  Okay.

16          MR. SHUMSKY:  And to be clear, your Honor, it's

17  not really a generic product.  They're two different

18  products and the two pill product is not a generic

19  equivalent of the one pill product.  It's a generic

20  version of Teva's old two pill product.  The abbreviated

21  new drug applications or ANDAs, for those two pill

22  products were based on the two pill product that Teva

23  used to make.  The one pill product doesn't have a

24  generic equivalent.  No competitor has obtained FDA

25  approval to market a generic version of that one pill

Proceedings                                6

1  product.

2            But to go back for a second, what the FDA would

3  have done if Secretary Sebelius had not overruled its

4  decision, was allowed the One-Step product to be sold

5  over-the-counter without any age restrictions whereas the

6  old Two-Step product would have remained behind the

7  counter.

8            As we understood your show cause order, whether

9  it's February 15 or February 16, I know there was a

10 slight change, the question that you're considering today

11 at this hearing is whether the Court should order the FDA

12 to lower the age limit for all products to twelve or

13 thirteen based in part --

14           THE COURT:  I didn't give any age.

15           MR. SHUMSKY:  I understand.  I understand that

16 and I will say I just interpreted it -- I sat in the back

17 of your courtroom at the December hearing --

18           THE COURT:  Okay.

19           MR. SHUMSKY:  -- and heard the questions that

20 you had about Secretary Sebelius' December 7 statement.

21 So, we interpreted that to be the focus of your order and

22 your questions.

23           But as we understood the show cause order, the

24 question is in essence whether or not the age can be

25 lowered to the level supported by the studies that Teva

Proceedings                                          7

1   submitted with its Plan B One-Step SNDA and we thought

2   that was the case based on your questions at that oral

3   argument, as well as the subsequent docket entries and

4   minute entries that you made on the record of this case

5   which specifically referenced the data and the studies

6   that Teva submitted with its Plan B One-Step SNDA.

7          To be perfectly clear about my client's

8   position, we stand by the research that we submitted to

9   the FDA.  We believe that the research that we submitted

10  to the FDA justifies eliminating the age restrictions

11  applicable to our product.

12         But the key point for present purposes and the

13  narrow interest that my clients want to assert in this

14  case is that if you agree with us and with the plaintiffs

15  and with the FDA, that those studies warranted

16  eliminating the age restrictions on OTC access.

17         The Hatch-Waxman Act would bar you from

18  approving or at least ordering the FDA to approve our

19  competitor's products based on the data that we

20  submitted.

21         As our proposed intervention brief makes clear,

22  the Hatch-Waxman Act entitles a sponsor of a supplemental

23  new drug application or SNDA, to a three-year period of

24  exclusivity where they conduct essential clinical

25  research and the statute thereby prevents competitors

1   from piggybacking on that research until the innovator

2   has had an opportunity to recoup its investment in those

3   studies and profit from them.  And we view that as really

4   being an essential component of the Hatch-Waxman bargain

5   between the interests of brands and generics.

6           THE COURT:  I understand that but let me just

7   ask a couple of questions.  First, your adversaries argue

8   that if the government prevails here, in this proceeding,

9   you would be no worse off than you are now and if they do

10  prevail, you may be incrementally better off because

11  you'll at least be able to sell this product over-the-

12  counter to a larger cohort of potential customers whereas

13  you do not have that right right now, under the

14  Secretary's ruling.

15          So, how are you potentially harmed?  I mean, I

16  don't know -- I have never understood why -- well, first

17  of all, I tried to get Barr Pharmaceuticals to come in

18  here the last time and they refused, for reasons that I

19  can only speculate about and -- but in any event, I don't

20  see how you're -- the outcome here has any adverse

21  effect.

22          My question is, I don't understand why you

23  didn't appeal.  I mean, maybe it's because you know, I've

24  always -- I may be cynical.  I thought Barr didn't want

25  to get involved because, you know, they have a lot of

Proceedings                                  9

1   business before the FDA.  There was obvious political

2   motivations behind what the FDA did the last time and

3   they didn't want to aggravate them because they may have

4   had, you know, other occasions to deal with the agency

5   and it wasn't worth it to them.  I don't understand why

6   you didn't appeal.

7            So, you don't appeal and you're claiming that

8   somebody else can't use -- part of it is, there are

9   documents in the public record of what you submitted,

10  maybe not the raw data but they're already documents that

11  they can't and I couldn't rely on it, even though you got

12  nothing from the FDA and even though you didn't appeal

13  from a ruling that I think by the Secretary that appears

14  to me to be totally arbitrary and capricious.

15           MR. SHUMSKY:  Your Honor, there are a lot of

16  questions that you just asked.  Let me try to tackle each

17  of them and I'll try to do it in the most logical order

18  that I can.  Your first question was what do we stand to

19  lose.

20           THE COURT:  Right.

21           MR. SHUMSKY:  And it's pretty clear; the

22  plaintiffs have brought a complaint that asks you to

23  approve all of our competitor's products and not just our

24  product.  You've entered a show cause order which asks,

25  at least as we interpret it, whether or not our data can

Proceedings                          10

1  be used to support the approval of our competitor's

2  products.

3          In some sense, you're right.  If the plaintiffs

4  prevail in this case, we will have access to a broader

5  market than we do today.

6          THE COURT:  Exactly.

7          MR. SHUMSKY:  That doesn't change the fact that

8  that ruling would vitiate my client's statutory

9  exclusivity right, the right to be the only company

10 marketing under --

11         THE COURT:  Yes.

12         MR. SHUMSKY:  -- those terms to that

13 population.

14         THE COURT:  But she didn't give you that right.

15         MR. SHUMSKY:  I under --

16         THE COURT:  So you don't have it.  So, they

17 can't deprive you of it.

18         MR. SHUMSKY:  I understand.  But of course,

19 your Honor, the show cause order contemplates ordering

20 the FDA to approve our competitor's product.  I think as

21 you phrased it, it was that the government was directed

22 to show cause why you should not order the FDA to approve

23 those products.

24         Our position is that the statute bars the FDA

25 from doing that and at the point where you were to take

Proceedings                    11

1   the contemplated --

2           THE COURT:  Even though they've entered a final

3   order which prohibits you from selling Plan B One-Step

4   and therefore from making any use of your proprietary

5   material, that still can't be done.

6           MR. SHUMSKY:  I think that's exactly right,

7   your Honor.  Again, at the point where you conclude that

8   the FDA was obligated to approve our product based on our

9   studies, we're entitled to an exclusivity for that.  And

10  again, to step back for a minute --

11          THE COURT:  What does our product mean?  I

12  mean, suppose I limited it to -- or your product, Plan B,

13  and I am using it generically, is still being sold, I

14  mean, by other -- by generic manufacturers.  It's still

15  on the market.

16          MR. SHUMSKY:  Correct.  That's absolutely

17  right, your Honor.

18          THE COURT:  And --

19          MR. SHUMSKY:  But --

20          THE COURT:  And it's a two-step process.

21  Theoretically, I could say make this Plan B available to

22  people under the age of seventeen and over the age --

23  let's assume I give the Secretary the benefit of the

24  doubt here in terms of eleven-year-olds.  I mean,

25  essentially what she is saying if you read through the

 1   lines is because eleven-year-olds can't understand the

 2   label, that means fifteen-year-olds can't, which is

 3   totally ludicrous.  So, that's really what she is saying

 4   and that's what sort of motivated my order.

 5            And so, I could say that what stops me from

 6   saying that it can't be made available to -- this would

 7   be giving the Secretary completely the benefit of the

 8   doubt, which is the way my order is formulated, is okay,

 9   you say that there aren't studies that show that eleven-

10   year-olds are capable of understanding, assuming that you

11   could even conduct such studies, assuming you can't

12   extrapolate from fifteen or fourteen-year-olds down to

13   eleven-year-olds in terms of the ability to understand a

14   very simple instruction that's less complicated than what

15   you'll find on a bottle of aspirins.  So, that wouldn't

16   be your product.

17            MR. SHUMSKY:  Sure, your Honor --

18            THE COURT:  In fact, it would be the old

19   product.  It would be the two-step product.

20            MR. SHUMSKY:  Sure, your Honor.  You're

21   absolutely right about that.  But I guess what's really

22   critical to us and to make this very clear, it really

23   matters what your rationale for that decision is.  If

24   your rationale is that no new studies were required in

25   order to justify reducing the age limit, if that's what

1  you hold, if that decision which I would imagine the

2  government appeal stands up on appeal --

3          THE COURT:  If they appeal.

4          MR. SHUMSKY:  -- if they appeal, fair point --

5  but at that point, my clients wouldn't have an

6  exclusivity right.  There will be a lawful decision

7  saying that the studies we conducted weren't essential.

8  But if your order says I'm ordering the secretary to

9  lower the age limit, and I'll just say to X, whether

10 that's twelve, based on your interpretation of what

11 Secretary Sebelius said in December, whether it's

12 thirteen or some age, we'll call it X, based on the

13 studies that Teva submitted, that's what creates the

14 problem.

15         And again, Hatch-Waxman sets up a balance

16 between the interest in getting competing products on the

17 market, and encouraging innovators like my client to

18 conduct the research that's necessary to justify a change

19 like this.

20         THE COURT:  Well, you know, that's a separate

21 question that hasn't been briefed.  I don't want to get

22 into it.  I don't know what the great innovation was

23 here, other than you figured out a way to take two pills

24 and -- I forget the strength, but let's say X and X, and

25 you -- instead of putting it in two pills, you moved it

Proceedings                              14

1  into one pill.

2        MR. SHUMSKY:  Well, let me --

3        THE COURT:  And I don't quite see what this

4  great innovation was other than -- please forgive my

5  cynicism.  I am actually an admirer of the pharmaceutical

6  industry.  But it seems to me that the whole purpose of

7  this exercise was not to make any great new innovation in

8  a product but simply to find a way to give you a period

9  of exclusivity which is --

10       MR. SHUMSKY:  Let me --

11       THE COURT:  -- valuable to you because I don't

12 see what this great -- my real question, which has not

13 really been briefed, is whether this is even the kind of

14 innovation that was contemplated when they wrote it to

15 begin with.

16       MR. SHUMSKY:  Your Honor, let me --

17       THE COURT:  And the second part of this is that

18 you are not being deprived of anything because she didn't

19 -- the Secretary didn't give you what you wanted.  You

20 have no exclusivity and essentially, you're treating this

21 sort of like a patent in which -- as opposed to a

22 copyright.  You could stop people from using it even

23 though you're not using it yourself.

24       MR. SHUMSKY:  Your Honor, let me try to address

25 both parts of that. The first is, I think you and I are

1   talking about two different innovations right now.  The

2   issue in front of the Court today that we're asking you

3   to consider is not whether or not the single pill

4   formulation is a great innovation over the two pill

5   formulation --

6           THE COURT:  I was being sarcastic.

7           MR. SHUMSKY:  All right.  And I take your

8   sarcasm with a grain of salt, even if it comes from a

9   federal judge.

10          THE COURT:  That's okay.  I don't mind.

11          MR. SHUMSKY:  The innovation that I am talking

12  about is a very different kind of innovation.  It's an

13  innovation where the state of the law today is that women

14  under the age of seventeen can't get access to this

15  product because the FDA rightly or wrongly decided that

16  it can't be safely dispensed to adolescent women.

17          What the FDA said to my clients in 2007, again

18  throughout the period leading up to that was, if you want

19  to be able to sell your product or a product like this to

20  women of that age, you have to do the research that's

21  necessary to justify that.

22          My client spent four years and a small fortune

23  trying to find twelve and thirteen and fourteen-year-old

24  women designing study protocols, coming up with informed

25  consent papers, recruiting women at various study sites,

1   working with the FDA to develop questions that would get

2   the answers that the FDA needed.  That's the innovation

3   that we're talking about protecting and that's exactly

4   what the statute rewards, your Honor.  It recognizes that

5   there is an advantage.

6           THE COURT:  No, that's -- the innovation is the

7   goal of all of that.  I assume that what Waxman and

8   others wanted to do was to encourage drug companies to

9   manufacture new products which could operate to

10  everyone's advantage.  And I could understand the period

11  of -- in this instance -- exclusivity that you're given

12  for three years.  I understand it.

13          But what I find to almost lead to a kind of an

14  absurd result is that you haven't gotten it.  It would be

15  one thing if you -- I mean this would be a different

16  case, I mean in terms of your position, if you had gotten

17  the -- what you wanted and somebody else wanted to come

18  in and manufacture it based on all of the work that you

19  did to get the approval but in effect, you didn't get it.

20  You don't have it.  Your money, as far as I could see, is

21  down the drain at least until I don't know when, but your

22  money is down the drain until somebody in the FDA comes

23  along and a Secretary of Health & Human Services comes

24  along and is willing to change it and given what's

25  happened here under two administrations on different ends

Proceedings                          17

1   of the spectrum, I don't know whether you would ever hope

2   for such a day.

3            MR. SHUMSKY:  But, your Honor, I think the

4   point that I am trying to make is the someone's who has

5   been asked to come along is you.  The plaintiffs in this

6   case -- and your show cause order, I don't want to use

7   this word -- take it for what it's worth but --

8            THE COURT:  I'm not sensitive.

9            MR. SHUMSKY:  -- but you've --

10           THE COURT:  I have this around the table, so we

11  can have a --

12           MR. SHUMSKY:  Sure.

13           THE COURT:  -- conversation.  I don't like

14  stilted --

15           MR. SHUMSKY:  I get it.

16           THE COURT:  One of the things I learned from

17  Jack Weinstein.

18           MR. SHUMSKY:  And what I am trying to say is

19  you've kind of volunteered to be that guy.  You're

20  considering and the plaintiffs have asked you to overturn

21  the Secretary's decision --

22           THE COURT:  Right.

23           MR. SHUMSKY:  -- and have FDA do what FDA said

24  it was prepared to do.  The fact that you're going to

25  take that first step and essentially unwind the

1  secretary's decision, doesn't mean that everything that

2  comes from that can be ignored.  At the point where the

3  FDA approves us -- and again, this comes down to your

4  rational for acting, if your rational for acting is no

5  data was necessary and no data was -- there's no

6  exclusivity right.  But if your rational for taking

7  action is the data was necessary, what was provided was

8  sufficient, the Secretary's decision was arbitrary and

9  capricious, I'm going to order the FDA to act, then under

10  the Hatch-Waxman Act, we've earned the three-year

11  exclusivity period.  And it doesn't matter that you're

12  toppling that first domino in the chain, as opposed to

13  the FDA doing it without the Secretary's involvement.

14         In essence, what you will be doing by that

15  decision is just removing the Secretary from it and

16  restoring us to the position that we would have been in

17  but for that unprecedented historical involvement.

18         THE COURT:  That would be -- I take your point.

19         MR. SHUMSKY:  And that's why --

20         THE COURT:  But --

21         MR. SHUMSKY:  And that's why we have an

22  interest in this case.  And I would just like to point

23  out, these exclusivity rights often are litigated in

24  court, not as much this three-year new product

25  exclusivity right but there are a variety of other rights

Proceedings                                    19

1  that are provided by the Hatch-Waxman Act, one of which

2  is the first generic applicant who challenges a brand

3  manufacturer's patent and removes that variable of

4  competition; gets 180 days of marketing exclusivity.

5           There's a series of cases in the federal

6  district court in Washington and in the DC Circuit that

7  say when that right is vitiated, when other applicants

8  are allowed to launch during that marketing exclusivity

9  period, it's not just a harm that's sufficient to confer

10 standing on the applicant who has that entitlement, it's

11 an irreparable harm that's sufficient to warrant

12 injunctive relief.

13          And so what we're talking about today is the

14 loss of a statutory right to marketing exclusivity in the

15 event that the Secretary's decision is set aside and the

16 studies that we produced are used to approve our

17 competitor's products.

18          THE COURT:  So, let me be sure I understand

19 your argument.  So, if I granted them everything they

20 wanted, in effect, I would be giving them what you asked

21 for from the Secretary and I would be giving everybody

22 else that relief and therefore, I would de facto,

23 essentially be depriving you of the benefit of the three

24 years.

25          MR. SHUMSKY:  That's exactly right, your Honor.

Proceedings                    20

1  And I want to address a couple of the other questions

2  that you asked before --

3            THE COURT:  No, no, no, I want to ask you one

4  more question.  I don't want to stop you.  I don't have

5  any red lights here.  Suppose then the only thing I did

6  was change the order that's already in place which says

7  make it available to seventeen-year-olds, to the same

8  extent that you make it available to eighteen-year-olds.

9  I crossed out the seventeen-year-olds and I said Plan B

10 One-Step --

11           MR. SHUMSKY:  Your Honor, in those

12 circumstances, you wouldn't be vitiating our exclusivity

13 right.

14           THE COURT:  But I am just saying --

15           MR. SHUMSKY:  And my clients would have no

16 objection to that, your Honor.  And that would accomplish

17 part of what the plaintiffs are seeking in this case,

18 while respecting my client's intellectual property

19 rights.

20           THE COURT:  Well, I mean what I am -- you know,

21 there are two steps to this process of resolving this

22 case; one is the ultimate what I do at the end.

23           MR. SHUMSKY:  You bet.

24           THE COURT:  And the other is what I do in the

25 interim.  And I felt that there should be this interim

Proceedings                              21

1    step because it seemed to me that based on everything

2    that I've read, that you cannot justify depriving

3    teenagers who are perfectly capable of understanding

4    everything they're supposed to understand, of their right

5    to get this without -- or right to get this period for

6    the moment, just because younger people don't understand

7    it.  It just doesn't make sense and it seems to me to be

8    totally arbitrary.

9              And to be frank, that's actually what I had in

10   mind.  I wasn't, you know, quite attuned to the arguments

11   that you're making now.  I don't purport to be an expert

12   in the field but what I was thinking about was simply

13   amending the order in the way that I said and simply

14   instead of Plan B say Plan B One.  And I assume you don't

15   have any objection to that.

16             MR. SHUMSKY:  No, we don't have an objection to

17   that, your Honor.  Let me --

18             THE COURT:  In fact, you would file an amicus

19   brief in support of.

20             MR. SHUMSKY:  We might.  But let me try to

21   address a few of the other questions just very quickly.

22   You asked why Teva didn't appeal that decision.

23             THE COURT:  Right.

24             MR. SHUMSKY:  The answer to that question is we

25   have other options available to us under the statute and

Transcriptions Plus II, Inc.

Proceedings                      22

1   the regulations.

2          THE COURT:  I know that.  You say that quickly

3   in your papers.  You say you have a statutory right to an

4   appeal.  I don't know what that means.  I mean, I assume

5   that's what you didn't do.  Was there a different

6   statutory right to appeal from the Secretary to whom?

7          MR. SHUMSKY:  I will say, your Honor, there are

8   internal administrative proceedings at the agency and my

9   clients are actually engaged in an active dialogue with

10  the FDA right now, arising out of the complete response

11  letter which is the denial of the Plan B One-Step SNDA.

12         THE COURT:  I'm not sure what active dialogue

13  means.  I don't know what that means.  You're talking to

14  them.  I mean, when the secretary spoke as she did, I

15  don't know who in that agency as a practical matter, is

16  going to take a different position.

17         MR. SHUMSKY:  Sure.  Your Honor, let me --

18         THE COURT:  So it struck me that this statement

19  in your brief, it was sort of --

20         MR. SHUMSKY:  Your Honor, let me say this.

21         THE COURT:  -- totally unrealistic and

22  speculative.

23         MR. SHUMSKY:  Your Honor, I have two responses

24  to that.  The first is, I would rather not talk about

25  this information in open court.  I would be happy to talk

Proceedings                23

1   about it with you ex parte.  What I do want to say to you

2   and I think this will be echoed by the government, so

3   take this as the truth as somebody who practices in this

4   field, a complete response letter is not a denial for all

5   time.  It is a statement by the agency that at this time

6   based on the data in light of the request that you've

7   made, we can't act on it without additional information.

8            THE COURT:  Right.

9            MR. SHUMSKY:  We have an opportunity to go back

10  to the FDA to ask them to reconsider that, to provide

11  additional information or --

12           THE COURT:  It strikes me as --

13           MR. SHUMSKY:  -- or to request a different form

14  of relief that may be more palatable.

15           THE COURT:  It strikes me as theoretical.  I

16  mean, I think everybody agrees and, you know, I can't

17  keep all these studies in my head.  Basically, the --

18  it's almost impossible with eleven-year-olds, for

19  example, to provide that kind of information other than

20  by extrapolating, not from adults, but from other

21  teenagers who may be somewhat older and after all, as far

22  as I could see, the only thing we're talking about is --

23  in terms of the label, is the ability to understand that

24  you have to take it once every -- on Plan B, it's once

25  every twelve hours, on Plan B One, it's once every hour

Proceedings                          24

1   -- it's one pill and that's it.

2            But I don't know how you're going to -- look, I

3   know anything that's theoretically possible but I don't

4   know given the fact that it's impossible to satisfy the

5   Secretary about eleven-year-olds with studies, as opposed

6   to extrapolation, which is a normal way the agency

7   operates when it's operating on the level, I don't know

8   what --

9            MR. SHUMSKY:  Sure.  Your Honor, let me

10  respond.  I certainly recognize the validity of your

11  perspective.  You asked the question earlier, why didn't

12  my clients take an appeal to the Federal Court of

13  Appeals.  My clients have taken a second run at the

14  agency and we're having a discussion with them.  That's

15  the answer to that question.

16           THE COURT:  And would the --

17           MR. SHUMSKY:  Whether or not --

18           THE COURT:  -- Court of Appeals have precluded

19  that?  First of all, I don't know, I believe you would

20  have won.  But would have an appeal -- would have, you

21  know, an unsuccessful appeal have precluded that?

22           MR. SHUMSKY:  Well --

23           THE COURT:  Look, I don't want to badger you

24  about it because you didn't appeal.  It's sort of moot

25  and maybe we ought to --

Proceedings                    25

1          MR. SHUMSKY:  Sure.  I guess what I would say

2     is we have future appellate rights and if we get to

3     another point in our discussions with the agency where

4     we're unable to obtain relief as you've forecast, we'll

5     be unable to, then we can make a decision at that point

6     in time what we're going to do.

7          But I am answering the backwards looking

8     questions which is why in December didn't we race up to

9     the D.C. circuit or the Second Circuit, that's the

10    answer.

11         I want to address -- sorry.

12         THE COURT:  Go ahead.

13         MR. SHUMSKY:  No, I wanted to address one of

14    the other questions that you raised earlier which is what

15    is the basis for our exclusivity right, given that these

16    studies or at least summaries of them have been

17    published?  That's not the test under the statute.  The

18    test is whether you've performed the studies and

19    submitted them to the agency as part of your SNDA.  It's

20    not whether or not you've secretly conducted studies that

21    you've told nobody about and not disclosed to the public

22    that only you're allowed to use.  The reward is for

23    having done the work, whether it's published or not.

24         And I just want to say from my client's

25    perspective, from my perspective, it would be very

Proceedings                          26

dangerous to say that if you published the results of

these studies, do you lose the exclusivity right.

Science and medicine advanced by having that information

in the public domain and if the consequence of putting

that information out there for people to see is that you

lose the exclusivity reward and the incentive that drives

that information --

          THE COURT:  It was published -- the principal

one that the government just sent me was published after

the denial.

          MR. SHUMSKY:  Sure, but regardless of whether

it's entered the public domain or not, that doesn't

change the fact that under the plain language of the

statute and the regulations, you obtain the exclusivity

for having sponsored or performed the studies and

submitted them as part of the SNDA and it doesn't

evaporate because a write-up that has been published in

the public domain and I said, it would be very dangerous

to have a situation where a sponsor study or it publishes

a study report about a clinical trial but then loses the

incentive that drove them to do that work.

          But let me try and talk a little bit about the

intervention motion itself, now that I think we're clear

on what the interest is and how it's implicated and as I

read the plaintiff's brief in opposition, the principal

Proceedings                    27

1   argument they make is that our intervention is untimely.

2          THE COURT:  I don't have to deal with that.  I

3   don't think it's untimely.

4          MR. SHUMSKY:  Then why don't we leave it there,

5   your Honor, unless you have any further questions for me

6   and --

7          THE COURT:  No.  So, this was very helpful.

8   The plaintiffs, of course, say that they're not relying

9   on any of your stuff, that they could prevail based on

10  what was before the agency the last time around.

11         MR. SHUMSKY:  Sure, that's certainly their

12  position, your Honor, and I'm prepared to address the

13  merits of that because that really gets into the question

14  of whether or not we're entitled to exclusivity.  It also

15  gets into the merits, the real heart, of the broader case

16  that's in front of you.  And as I see it, those two

17  issues are really flip sides of a single coin.  The test

18  for exclusivity, and again, this is beyond intervention,

19  this is the merits of our exclusivity right, but the test

20  for exclusivity is were the studies essential?

21         The test for the bigger case in front of you is

22  did FDA act arbitrarily and capriciously by saying that

23  studies were necessary and studies were essential.  So,

24  as I said, the two issues are really inseparable and the

25  merits of our right to exclusivity are really

1   inextricably bound with the merits of the case that's in

2   front of you.

3            I would be happy to talk about our position on

4   that, although obviously it's the government's response

5   to the show cause order and I'm prepared to address those

6   issues but I would defer to the government at least as to

7   that and add anything that's necessary at the end but so

8   that we're very clear, this is all part of the case

9   that's in front of you and our exclusivity right and the

10  underlying merits are very much bound up.

11           THE COURT:  Could you read me the language in

12  the statute that supports your position?

13           MR. SHUMSKY:  Sure, I can, your Honor.  I'm

14  going to read you --

15           THE COURT:  I'm going to get my copy.

16           MR. SHUMSKY:  Sure.  I am going to read you

17  from two statutory provisions.  They're in different

18  sections of the Hatch-Waxman Act.  They apply to two

19  different kinds of products that the FDA approves.  The

20  first provision that I am going to read to you is 21

21  U.S.C. 355(j)(5)(F)(iv).

22           THE COURT:  Let me see if I could find this.

23  Yes, go ahead.

24           MR. SHUMSKY:  And what that section says is "If

25  a supplement to an application approved under subsection

1   (b) of this section is approved after September 24, 1984,

2   and the supplement contains reports of new clinical

3   investigations, other than bio-availability studies,

4   essential the approval of the supplement and conducted or

5   sponsored by the person submitting the supplement, the

6   Secretary may not make the approval of an application

7   submitted under this subsection for a change approved in

8   the supplement effective before the expiration of three

9   years from the date of the approval of the supplement

10  under subsection (b) of this section."

11          Let me translate that for you.  A supplement to

12  an application approved under subsection (b), subsection

13  (b) is 21 U.S.C. 355(b).  That is the provision that

14  governs the submission of a new drug application, an

15  innovative product.  And a supplement to that is what you

16  submit after the initial approval that the FDA gives you,

17  if you want to make a change to the conditions under

18  which it's approved.

19          In other words, a supplement to an application

20  approved under subsection (b) is the SNDA that Teva filed

21  to the Plan B One-Step product.  The supplement contains

22  reports of new clinical investigations, other than bio-

23  availability studies.  New clinical investigations are

24  scientific research about the product.  They include the

25  actual use study that we conducted and the labeling

1  comprehension study that we conducted.

2       The reference to bio-availability studies is

3  something different.  When a generic manufacturer submits

4  an application to copy a new drug, it has to essentially

5  -- two requirements under the statute.  The first is it

6  has to prove that the active ingredient in its product is

7  chemically identical to the brand manufacturer's product.

8  And what you do is you essentially subject it to mass

9  spectrometry -- sorry, mass spectro-analysis and other

10  scientific tests to gauge whether or not it has the same

11  chemical structure as the branded product.

12       But the second test is you have to demonstrate

13  that you've been able to put that same active ingredient

14  into the body in a manner that it works the same way as

15  the branded equivalent.  In other words, when the

16  finished product, the tablet is shallowed by somebody, it

17  might have the same chemical ingredient in it but because

18  of some process by which its manufactured, because of

19  some inactive ingredient or excipient that it's packaged

20  with, it might not dissolve at the same rate and

21  therefore be absorbed into the patient's bloodstream at

22  the same rate.  So, even though the two products are

23  chemically identical, they have biological disparities or

24  differences which implicate the safety or efficacy of the

25  product in humans.

Proceedings                    31

1       So, the other than bio-availability studies, a

2  bio-availability study is somebody takes the branded

3  product and the bloodstream levels of that product are

4  measured, somebody takes the generic product and the

5  bloodstream levels are measured and they have to be

6  equivalent and the reason why there's this carve-out is

7  because if there wasn't a carve-out there, then generics

8  would be entitled to three years of new product

9  exclusivity and this is oriented to brands.

10       The next requirement is us --

11       THE COURT:  I want to go to the -- it says, "if

12  a supplement to an application approved under subsection

13  (b)" tell me what that supplement is again.

14       MR. SHUMSKY:  That is the supplemental new drug

15  application or SNDA that Teva submitted for the Plan B

16  One-Step product.  The original approved application was

17  Plan B One-Step but with age restrictions.  The

18  supplement that we said asked the FDA to change those age

19  restrictions and we included new clinical investigations,

20  the actual use study and the labeling comprehension study

21  with the SNDA that we submitted to the agency.  And they

22  don't fall within that exception for bio-availability

23  studies.  That's not what we were doing.

24       The next test is essential to the approval of

25  the supplement and that's really as I said, part of the

1   heart of this case, which is were the studies necessary

2   or not.  The FDA has taken the position that they were.

3   We think that was a reasonable determination, well within

4   the bounds and range of respectable, scientific opinion.

5   The plaintiffs have a different perspective on that.  But

6   again, we're talking for intervention purposes about our

7   interests and our position is that it was essential that

8   we do those studies.

9          The next test is conducted or sponsored by the

10  person submitting the supplement and here things get a

11  little bit messy because as you know, there's been a

12  series of transactions over the years but these studies

13  were put together by Duramed Research and its partner,

14  Duramed Pharmaceuticals, those companies were connected

15  to Barr, Teva Pharmaceutical Industries, Ltd., the

16  ultimate Israeli parent company purchased Barr.  That

17  transferred Duramed and Barr into the Teva ownership

18  structure and those companies were then renamed,

19  reincorporated, as Teva Women's Health, Inc.

20         And so, as the FDA recognized throughout this

21  long process, the innovator, that's for present purposes,

22  Teva Women's Health, was sponsoring and conducting those

23  studies.  And so all of those tests are met.  The only

24  one that the plaintiffs dispute in this case is the

25  essential to approval and as I said, that's really bound

Proceedings                    33

1   up with the merits of the case.

2          THE COURT:  Help me translate the last part of

3   it.

4          MR. SHUMSKY:  The last part of it says "The

5   Secretary may not make the approval of an application

6   submitted under this section."  So, an application

7   submitted under this subsection refers to these

8   provisions of the statute.  That's 355(j) and as I

9   mentioned a moment ago, and I'm sorry for jumping around

10  but --

11         THE COURT:  So it's -- may not make the

12  approval of the S --

13         MR. SHUMSKY:  No.

14         THE COURT:  Of what?

15         MR. SHUMSKY:  So, it's of a generic application

16  that's approved under Section 505(j) and I will just jump

17  around for a second if you'll indulge me, your Honor.  I

18  mentioned there is a companion provision to this one that

19  we just read.  It has the very same language, your Honor,

20  but the citation there is 21 U.S.C. 355(c)(3)(E)(iv) and

21  that provision of the statute covers a different kind of

22  generic application.  It covers an application under a

23  provision of the statute that is known in the business as

24  Section 505(b)(2).  That's a form of a generic

25  application where it's not a complete replica or copy of

Proceedings                                    34

1   the previously approved brand name product.  It's largely
2   the same.  It has some tweaks and some differences that
3   require that manufacturer to provide some additional data
4   but it's understood to be a generic application.

5           And so together, what these two provisions are
6   saying is if those tests that we just walked through
7   before are met with respect to an SNDA, sponsored by an
8   innovator, then no generic application, whether it's a
9   generic under 355(j), which is Section 505(j) of the
10  Food, Drug and Cosmetic Act, or 355(b)(2), which is
11  505(b)(2) of the FDCA, can be approved by the secretary
12  for three years after the date on which the SNDA is
13  approved.

14          And so to put this all together and make this
15  very clear, our position would be that at the point where
16  you direct the secretary or direct the FDA to make the
17  approval of our SNDA effective and available over-the-
18  counter, either without age restrictions or at age X, as
19  we talked about before, at the point where that becomes
20  legally effective and the application is approved, we
21  would claim a three-year period of exclusivity that based
22  on those studies, as the only company that's entitled to
23  market its product without the age -- sorry, without the
24  OTC age distribution restrictions that currently apply to
25  the Plan B product.

Proceedings                    35

1        And again, that's what the FDA was prepared to

2   do before Secretary Sebelius intervened. It made that

3   very clear in its decision on this which you have in

4   front of you and they said, we made the determination

5   that the studies were essential, that they were conducted

6   by the right people, that they warranted lowering the age

7   restriction and we're going to reward Teva Women's Health

8   by giving them the exclusivity incentive that the statute

9   created that Congress gave them for having spent four

10  years and a small fortune generating the data that made

11  it possible to expand the availability of this product to

12  those consumers.

13        THE COURT:  Okay.  Do you want to go down the

14  line first and then respond to every one or do you want

15  to --

16        MS. NOVAK:  I would like to respond.  It was my

17  understanding that defendants weren't going to be

18  participating in this argument.

19        THE COURT:  I'm sorry?

20        MS. NOVAK:  Defendants had said they were not

21  taking a position on --

22        THE COURT:  Yes, on this but not -- I assume

23  you're not taking a position.

24        MR. BECKENHAUER:  Your Honor, this is Eric

25  Beckenhauer on behalf of defendants.

1          THE COURT:  I thought you were taking a

2     position and you were supporting their position.

3          MR. BECKENHAUER:  Your Honor, defendants --

4          THE COURT:  Half of your opposition to this --

5     the proceeding here today is based on this argument that

6     they're making.

7          MR. BECKENHAUER:  Your Honor, defendants have

8     not taken a position on Teva's motion for intervention.

9          THE COURT:  Oh.

10         MR. BECKENHAUER:  I think there's some points

11    that Mr. Shumsky addressed that I might like to clarify.

12    I could that now or I could do that after hearing from --

13         THE COURT:  Well, why don't you clarify?

14         MR. BECKENHAUER:  Well, I think as an initial

15    matter, from the government's perspective, it's important

16    to step back for a moment and recognize that we're before

17    the Court on the denial of a citizen petition.  We've

18    been speaking a lot about the various SNDAs that have

19    been discussed in this case but we're here on denial of a

20    citizen petition.

21         As the government has made clear in its various

22    motions, when -- if -- there are two -- as the Court is

23    well aware, there are two ways under FDA regulations to

24    accomplish an OTC switch; one is by regulation and that

25    can be triggered by either granting the notice and

Proceedings                           37

1  comment rule-making that could possibly end in a

2  regulation, can be triggered either by the FDA acting sua

3  sponte or by granting a citizen petition.  And the second

4  is to grant an application for a new drug approval.

5          I think the critical point to recognize here is

6  that the Court's jurisdiction is limited to -- if

7  plaintiffs do establish standing, the Court's

8  jurisdiction is limited to consideration of the citizen

9  petition and it begins and ends with the citizen

10 petition.

11         Now even if it were appropriate in the past for

12 the Court and I know the Court has addressed this, even

13 if it were appropriate for the Court to have expanded the

14 scope of the record to look at some of the documents that

15 were involved in the FDA's decisions on the SNDA, so that

16 the Court could better understand the FDA's reasoning

17 process, it's certainly not appropriate and not justified

18 to take the step beyond that to apply the data that the

19 sponsors submitted to support an OTC switch and to

20 support the citizen petition for generic competitors.

21         And beyond that, as we've elaborated in our

22 papers, you know, the Court is -- the Court firmly lacks

23 jurisdiction to take any action with respect to the

24 SNDAs, even if it has jurisdiction to grant the citizen

25 petition.

Proceedings                                    38

1          So, I want to make that point very clear at the

2    outset.  I imagine it's something that we would like to

3    return to when we're done discussing the intervention

4    motion.  But beyond that, with specific respect to the

5    intervention motion, I think the government agrees on the

6    merits with much of what Teva said.  There's two points I

7    would like to touch on in particular.

8              The first is that the Court intimated in its

9    initial comments that the Secretary's action on the Plan

10   B One-Step SNDA amounted to final agency action.  And we

11   don't think that's true and I think you heard from Teva

12   that they don't think that's true either.

13             The Secretary's decision to direct FDA to issue

14   a complete response letter is not in our view, final

15   agency action.  A complete response letter doesn't spell

16   -- doesn't grant or deny an SNDA.  It just initiates

17   another round in the view process.  It's another

18   opportunity for a dialogue to occur in a collaborative

19   process between the agency and a drug sponsor.

20             And after receiving a complete response letter,

21   a drug sponsor --

22             THE COURT:  What was the letter that Teva got?

23             MR. BECKENHAUER:  We attached the complete

24   response that Teva received --

25             THE COURT:  No, no, I am not -- I believe I

Transcriptions Plus II, Inc.

Proceedings                              39

1   have the letter here but I don't know what you're

2   characterizing it as.  Which letter are we talking about?

3   The letter from --

4            MR. BECKENHAUER:  This is -- I'm referring in

5   particular to the Secretary's memorandum to the FDA

6   Commissioner.

7            THE COURT:  Right.

8            MR. BECKENHAUER:  And the FDA's letter to Teva,

9   which the FDA's letter has not been submitted to the

10  record because it's part of the confidential proceedings

11  on the SNDA.

12           THE COURT:  But she says, "I direct the FDA to

13  issue a complete response letter."

14           MR. BECKENHAUER:  Correct.

15           THE COURT:  What are you saying, that that's an

16  interlocutory order?

17           MR. BECKENHAUER:  Exactly, your Honor.

18           THE COURT:  Because she's directing them to

19  issue a complete response letter because the data

20  submitted for the product are inadequate to support

21  approval in that they do not establish that prescriptions

22  dispensing requirement should be eliminated for all ages,

23  that that's not a final order?

24           MR. BECKENHAUER:  That's correct, your Honor,

25  and I think you heard that from Teva.

Proceedings                    40

1         THE COURT:  I think I heard it.  I heard that

2   they could go back and start talking with the agency.

3         MR. BECKENHAUER:  And as they have explained,

4   that's what they have done in response to that.

5         THE COURT:  Well, I know, but I don't know what

6   any of that means.  It's all -- I mean, it strikes me as

7   blowing smoke.

8         MR. BECKENHAUER:  Well, let me try to unpack

9   it, your Honor, and I would direct your attention to the

10  Care to Live case that's cited in our opposition to

11  plaintiff's motion for summary judgment.  But I think it

12  explains well.  It's a case out of the Southern District

13  of Ohio that explains well, FDA's position that a

14  complete response letter doesn't spell the end for an

15  SNDA, it just begins another cycle of review and it's an

16  established mechanism to request more information from a

17  drug sponsor to continue the approval process.  And under

18  FDA --

19        THE COURT:  Does it ever end?  Is there ever a

20  final?

21        MR. BECKENHAUER:  It does and let me explain.

22  So, under FDA regulations, a drug sponsor has three

23  options after receiving a complete response letter.  It

24  can withdraw the application.  It can revise and resubmit

25  the application or it can seek an agency hearing which is

Proceedings                    41

1  a prerequisite to judicial review.

2           And as you've heard from Teva today, they've

3  decided to take another run at the agency and so they've

4  -- I think Teva's position is consistent with ours and

5  they understand that the Secretary's decision to direct

6  FDA to issue a complete response letter isn't final

7  agency action.

8           THE COURT:  So they could -- could they have

9  appealed from a non-final agency decision?

10           MR. BECKENHAUER:  Under the regulations, they

11  have appeal rights and they have ample --

12           THE COURT:  No, no, could they have appealed to

13  the D.C. circuit from a non-final order of the agency, as

14  you characterize it.

15           MR. BECKENHAUER:  Well, I think under FDA

16  regulations, generally they would seek an agency hearing

17  and that would -- and the agency hearing would result in

18  a final order and that's the final order that would be

19  appealable.

20           THE COURT:  So they could not have appealed to

21  the D.C. circuit.

22           MR. BECKENHAUER:  Generally, under FDA

23  regulations, they do have --

24           THE COURT:  FDA regulations are beside the

25  point here for the moment.  I am asking you something

Proceedings                    42

1   that calls for a yes or a no answer.  Could they have

2   taken an appeal to the Court of Appeals from the action

3   that was taken by the FDA in response to the directive of

4   the Secretary?

5            MR. BECKENHAUER:  No, because it wasn't

6   finally --

7            THE COURT:  They could not have?

8            MR. BECKENHAUER:  Generally, no, that's not

9   final agency action.  They would seek an administrative

10  hearing to obtain a final order.

11           In any event, your Honor, I think the --

12           THE COURT:  Do you agree with that?

13           MR. SHUMSKY:  Your Honor, that question hasn't

14  definitively been resolved and I will just say as a

15  general matter, my clients have a broader view of the

16  availability of federal judicial review than the agency

17  does.

18           MR. BECKENHAUER:  Your Honor, that may or may

19  not -- well, I think the key point --

20           THE COURT:  It's inconsistent with stuff that's

21  in your papers?

22           MR. BECKENHAUER:  No, not at all.  I think

23  the --

24           THE COURT:  You said they should have -- I

25  can't do anything about this because the appropriate

Proceedings                              43

1  forum was the D.C. circuit.

2          MR. BECKENHAUER:  Your Honor, I think the key

3  point is that they do have an -- whether or not they need

4  to exhaust administrative remedies, they do have an

5  appeal right but the appeal goes to the D.C. circuit or

6  to the appropriate Court of Appeals.  It doesn't come

7  here and I think that's the key point for the Court to

8  recognize and I don't think that's something that --

9          THE COURT:  Well, the key point according to

10 you, is there's no judicial review at this point because

11 there's no final agency action, even though the ground

12 given by the Secretary and the reasons why that wasn't --

13 the ground given by the Secretary essentially cannot be

14 overcome if I believe what's been said by everybody else,

15 that you just can't -- there aren't enough -- let's take

16 eleven-year-olds who are in -- who first of all are

17 capable of needing this and using this, and so it's

18 impossible, for example, to provide her with the

19 satisfactory proof.

20          Now, I don't have to be blind to the fact that

21 if you take down a bottle of aspirin, you'll find that

22 the label contains much more complicated instructions and

23 information about side effects, and appropriate use, than

24 you'll find on the Plan B label.  And an eleven-year-old

25 can walk into a drug store and buy a bottle of aspirin,

Proceedings                                    44

1    notwithstanding the fact that an overdose could kill her.

2           And so, I'm supposed to -- you know, am I

3    supposed to accept the fact that this order was entered

4    in good faith and that -- and I'll accept it for the

5    moment, and that the deficiencies she's found is not

6    curable but I should assume that somehow this is going to

7    be resolved inside -- by informal or formal discussions

8    within the FDA.

9           MR. BECKENHAUER:  Your Honor, there are a

10   couple of issues there,  Let me try to unpack them.  I

11   think the first and most important one is that even if

12   you're right that this is the final agency action, that

13   the Secretary's decision was the final agency action,

14   then the review still goes directly to the Court of

15   Appeals.  It doesn't come here.

16          And the second key point in your remarks, I

17   would like to address is that if instead the drug sponsor

18   decides not to appeal but to take another run at the

19   agency as they said, then that's their election and it

20   doesn't foreclose the opportunity for judicial review

21   later.  Judicial review is at the sponsor's option and if

22   they have elected to forego it at this point, they have

23   elected to forego it at this point.  But it's at their

24   option and when they decide to invoke that option, the

25   option of judicial review, then it goes to the Court of

Proceedings                               45

1  Appeals.  It doesn't come here.

2          THE COURT:  I agree with that.

3          MR. BECKENHAUER:  And one last point if I could

4  directly on the exclusivity issue, I think the government

5  generally agrees with what Mr. Shumsky's position on --

6  on Mr. Shumsky's position on exclusivity, particularly

7  that the Court's rational matters.  If the Court does

8  decide not to remand, and of course of principal

9  submission is that the Court should remand, if it

10 disagrees with the FDA's position, but if the Court

11 decides not --

12         THE COURT:  What purpose would I remand.  I

13 mean, it strikes me that you're saying that I was wrong

14 to begin with in suggesting that the initial decision was

15 undertaken in bad faith for political reasons because

16 you're relying basically on a document -- on the old

17 record and particularly on the statements made by

18 Mr. Goldstein (ph.), which were under severe political

19 pressure.

20         I assume you are now of the view that the

21 agency was right all along on the merits, that they

22 didn't put politics over science.

23         MR. BECKENHAUER:  I think that's essentially

24 right, your Honor, and I do want to address that.

25         THE COURT:  What's right?

Transcriptions Plus II, Inc.

```
                  Proceedings                        46
```

1          MR. BECKENHAUER:  But --

2          THE COURT:  That they --

3          MR. BECKENHAUER:  Well, that the agency has

4   reaffirmed its initial scientific determinations.

5          THE COURT:  So that it was really -- it was

6   basically, a -- you're basically saying I was wrong, that

7   I owe an apology.

8          MR. BECKENHAUER:  No, not at all, your Honor.

9   The Court interprets -- pardon me, the government

10  interprets the Court's remand order to essentially have

11  said that the FDA's initial decision on the citizen

12  petition wasn't the result of reasoned decision-making

13  and essentially couldn't be trusted because the process

14  was tainted by impermissible political considerations.

15         THE COURT:  Right.

16         MR. BECKENHAUER:  But we don't see the Court's

17  remand order as invaliding those scientific

18  determinations on the merits or as invalidating the

19  rational that supported those scientific determinations.

20  In fact, when the Court directed a remand, it

21  specifically said the FDA was free to exercise its

22  discretion with regard to the proper disposition of the

23  citizen petition on remand.

24         So, from the government's view, surely the FDA

25  was permitted to reach the same substantive result o

Proceedings                                   47

1    remand.  But specifically, your Honor, with respect to

2    exclusivity, I think the content of your Honor's order

3    would matter.  I think its rational would matter.  If the

4    Court did not rely on either the plan -- let me step

5    back.  If the Court were to revise the order that it gave

6    last time around, and instead said okay, instead of

7    saying the cutoff at seventeen, I'll set it at sixteen or

8    fifteen or what have you, if the Court did that an did

9    not rely on the Plan B or Plan B sponsor's clinical data

10   that didn't rely on the sponsor's intellectual property,

11   then that would be one thing and exclusivity wouldn't be

12   at issue.

13           THE COURT:  But he said he wouldn't object if

14   it were --

15           MR. BECKENHAUER:  But --

16           THE COURT:  -- if I limited that to Plan B One-

17   Step.  He said he would have no objection to it, if I

18   understood -- am I correctly stating your position?

19           MR. SHUMSKY:  That's correct, your Honor.

20           MR. BECKENHAUER:  And so my understanding of

21   why Teva says that if your Honor relied not on Plan B

22   One-Step studies but on Plan B studies, Teva would have

23   no objection based on exclusivity because it no longer

24   markets Plan B.

25           THE COURT:  No, no.

Proceedings                    48

1      MR. BECKENHAUER:  Therefore it doesn't have an
2 exclusivity right.
3      THE COURT:  What I said was, just to be clear,
4 I asked -- if I took the last order that I entered and I
5 said make it available -- make Plan B One-Step available
6 to X-year-olds, seventeen minus, on the same way that
7 it's made available to eighteen-year-olds -- seventeen-
8 year-olds and over, I asked him if he had any problem
9 with that and said he no.
10      MR. BECKENHAUER:  Right, your Honor, but at
11 that time, Plan B was still being marketed.
12      THE COURT:  Well, it's still being marketed --
13 I don't know -- no, no, the generic version of it is
14 being marketed.
15      MR. BECKENHAUER:  Right.  And so, the -- what I
16 am saying is that the -- Teva no longer has an
17 exclusivity interest in Plan B because Plan B is no
18 longer being marketed.
19      THE COURT:  No, no, I asked him about Plan B
20 One, if I chanted it from the words Plan B to Plant B
21 One.
22      MR. BECKENHAUER:  Then perhaps I misunderstood.
23      MR. SHUMSKY:  Let me --
24      MR. BECKENHAUER:  And I appreciate the
25 opportunity to clarify, so that we can all be on the same

                              Proceedings                    49

 1  page.

 2          MR. SHUMSKY:  Sure, if you want me to make this

 3  very clear, so that everybody understands it.  As I said

 4  at the outset, our interest in this case is very narrow.

 5  We're focused on the company's exclusivity right.  To the

 6  extent that the Court enters an order saying I hereby

 7  order the Secretary of Health and Human Services to lower

 8  the age restriction on Plan B One-Step to age X, we would

 9  have no objection to that because it doesn't compromise

10  the exclusivity right which is the narrow interest we're

11  asserting.

12          If by contrast, the Court were to say I hereby

13  order the Secretary of Health and Human Services to lower

14  the age limit on OTC distribution of Plan B equivalents,

15  so not Plan B One-Step, then we've got a big problem with

16  it because that vitiates the exclusivity right.

17          THE COURT:  I understand.

18          MR. BECKENHAUER:  Fair enough.  I appreciate

19  the clarification.  I think the over arching point that

20  the government wants to make --

21          THE COURT:  That would be exactly comparable to

22  what I did the last time.  I said make Plan B available.

23  They had exclusivity at that point, I think.

24          MR. BECKENHAUER:  It would be in some ways

25  comparable, in other ways not at all comparable and I

Proceedings                          50

1   think the critical point is that the citizen petition --

2   even putting aside the jurisdictional issues I just

3   mentioned and the government's view that the Court simply

4   doesn't have the authority to order relief with respect

5   to an SNDA, I think it's important to recognize that the

6   citizen petition doesn't cover Plan B One-Step.  We're

7   here on the denial of a citizen petition.  The citizen

8   petition asks for an OTC switch with respect to Plan B

9   and its generic competitors.  Since the remand in 2009,

10  plaintiffs had two and a half years to submit a new

11  citizen petition with respect to Plan B One-Step, to

12  amend their citizen petition, to add Plan B One-Step and

13  they didn't.

14          THE COURT:  Nor did you deny it until after you

15  denied their petition.

16          MR. BECKENHAUER:  The government's point --

17          THE COURT:  Nor did you undertake for ten years

18  or something like nine or ten years, this rule making

19  that you're threatening and told -- then told them that

20  that was one of the possibilities if they insisted on a

21  decision promptly.

22          MR. BECKENHAUER:  Your Honor, I think the

23  critical point is that the citizen petition doesn't cover

24  Plan B One-Step.

25          THE COURT:  Why didn't you deny it two-and-a-

Proceedings                                    51

1  half years ago?

2          MR. BECKENHAUER:  Well, we couldn't have denied

3  it two-and-a-half years ago on the basis of Plan B One-

4  Step because it didn't request an OTC switch with respect

5  to Plan B One-Step.

6          THE COURT:  No, I understand that but as you --

7  why didn't you deny it on remand within months?  It seems

8  to me, the reasons that you're giving is that you

9  basically -- look, I can't comment on whether this is all

10 being done in good faith or people in the agency are

11 acting under pressure from the Secretary, but you're

12 basically saying this is what Gallston (ph.) said, he's

13 right. It happens that what he said is consistent with

14 what the Secretary said and what he said under political

15 pressure essentially supports what the Secretary said, so

16 you found a way to use that tainted opinion to justify

17 your action.

18         MR. BECKENHAUER:  There are two key points

19 there that I would like to address; one was the issue of

20 delay.  Your Honor, I think that as a legal matter, the

21 issue of delay is plainly moot now.  We've --

22         THE COURT:  It may be moot --

23         MR. BECKENHAUER:  That's essentially --

24         THE COURT:  It may be moot in the sense of my

25 holding anybody in contempt, that's the last thing I was

1    anxious to do, but it's not moot in terms of judging the

2    good faith of the agency.

3              MR. BECKENHAUER:  But, your Honor, it's simply

4    not the case that after remand the agency simply sat on

5    its hands and did nothing.

6              THE COURT:  Well, it did.  It sat on its hands

7    with respect to this.  It told them that the Plan B

8    sponsor was submitting a new, whatever you call it, SNDR

9    (sic) or whatever it is, and somehow it would be easier

10   for -- it would be the most efficacious way to deal with

11   their application first.

12             MR. BECKENHAUER:  Your Honor, that's more or

13   less true but your Honor's remand order stated -- your

14   Honor's remand order vacated denial of the citizen

15   petition and remanded for reconsideration of the decision

16   surrounding the switch to Plan B to -- surrounding the

17   Plan B switch to OTC use.

18             I think the case law pretty clearly

19   demonstrates that in general and specifically with

20   respect to a petition for rule making, which the citizen

21   petition is, an agency has very broad discretion to

22   choose the timing and structure of its inquiry, given its

23   limited resources, competing demands on its time, and I

24   think what the agency did here on remand is it recognized

25   -- look, the key question on remand is whether or not

Proceedings                           53

1   these additional age-related, age-specific studies will

2   be required.  That's really the key question.

3           And at the time of remand, it had been in

4   discussions with the Plan B sponsor.  It knew the Plan B

5   sponsor was already developing additional information and

6   it had actually -- the actual -- the labeling

7   comprehension study had already been completed.  The

8   actual use study was in progress and it determined that

9   given that there was a key overlapping scientific

10  question, quantum of age-specific data that would be

11  required, it made sense to resolve that question in the

12  context of the SNDA proceeding --

13          THE COURT:  You take the position that there is

14  -- there's no -- you know, in this letter that was

15  written by Jeanette Woodcock, she says that "actual use

16  and labeling comprehension" -- dated December 12, "The

17  data submitted by Teva in its SNDA for Plan B One-Step

18  included labeling comprehension in an actual use study

19  that CDR scientists concluded were necessary and

20  addressed the deficiencies in the original data that led

21  to" -- I'm sorry, I skipped what I wanted to read --

22  "actual use and labeling comprehension data would be

23  needed to determine among other things, whether women

24  under seventeen could understand they would need to take

25  two pills twelve hours apart and whether they would

Proceedings                                54

1  actually do so correctly."

2          And that's the basis -- that's what this whole

3  issue turns on.

4          MR. BECKENHAUER:  I think it turns --

5          THE COURT:  You knew from day one that they

6  were contemplating a one pill, not a two pill and

7  presumably even if you approved Teva's application, you

8  would still have had to have denied theirs under the

9  theory that if you accept what is the notion that somehow

10 it's more complicated to understand the two-step process

11 than a one-step process, and by the way, that any harm

12 comes from a misunderstanding of the two-step process

13 because if you can take the same dose all at once and

14 somebody takes on a two-step process, takes it once --

15 one pill and then takes it six hours after, no harm is

16 going to come or if they take it eight hours after or if

17 they take it twelve hours after; it's not going to cause

18 any harm to that particular individual.

19         So, the whole notion that this is -- I mean,

20 this whole thing is an artificial construct at odds with

21 common sense.  It's one thing when you -- when, you know,

22 you take aspirins too often or not far enough apart where

23 you could get a hemorrhage, but here the double dose is

24 taken all at once in a single pill.

25         So, when you're dealing with one pill twelve

1   hours apart, even if there's a small percentage of people

2   who can't understand that instruction, they're not going

3   to do themselves any harm by their lack of understanding.

4   So, this whole argument is just -- you know, I don't even

5   know how it could be made with a straight face.

6           But you had an opportunity, if you were -- I

7   would bet -- I don't have to bet because it's almost

8   conceded, that you didn't act on this application of the

9   plaintiffs until after you decided to deny Teva's

10  application.  And now you take the position that they're

11  like two separate drugs that require separate studies.  I

12  just don't understand that.  Do you know how long this

13  agency -- your agency has done nothing and then you have

14  the chutzpah to come in here and say that thirteen-year-

15  olds who started the case are of age now.

16          MR. BECKENHAUER:  Your Honor, I am certainly

17  aware of the long history of this case in your Honor's

18  courtroom but I do disagree with your Honor's

19  characterization of the FDA's plan of action on remand

20  and I also disagree with your Honor's characterization of

21  the (indiscernible).

22          THE COURT:  Well, you can disagree with it but

23  the facts are what they are.  It seems to me that if you

24  were -- if they were truly being regarded as separate,

25  then they should have been denied quite quickly.  This

Proceedings                        56

1  wasn't a complicated -- it wasn't complicated to decide

2  -- look how quickly the secretary acted.  As far as I

3  could see, she may have acted within twenty-four hours to

4  decide than an eleven-year-old couldn't -- she needed

5  studies to show that an eleven-year-old could understand

6  the label.

7              MR. BECKENHAUER:  Your Honor, let me --

8              THE COURT:  How long did it take her?

9              MR. BECKENHAUER:  Your Honor, let me first

10 address the FDA's plan of action on remand and then I

11 would like to address FDA's exercise of scientific

12 judgment if I might.  But specifically, with respect to

13 the plan of action on remand, as I said earlier, FDA

14 identified the key question on remand as to whether or

15 not this additional age-specific data was needed.

16             If, in fact, it ultimately had determined that

17 the additional age-specific data wasn't needed, then it

18 would have been possible to grant the relief in the

19 citizen petition.  So that's one reason why it would have

20 been reasonable for the FDA to not have immediately

21 denied the citizen petition on remand.

22             THE COURT:  Well, when did they decide that it

23 was needed?

24             MR. BECKENHAUER:  The --

25             THE COURT:  From what I understand, it was

1   pretty early, if not before the remand process.

2           MR. BECKENHAUER:  I don't think that's right,

3   your Honor.  It's certainly true that at the time of

4   remand, FDA already knew that the Plan B One-Step

5   sponsored, then conducting these additional studies, but

6   under FDA practice, the determination whether or not

7   additional clinical data are, in fact, essential to

8   approval of a drug application is considered a review

9   issue and that final determination isn't made until the

10  point of approval.

11          And, so that's why it wasn't until December

12  2011, when the FDA was prepared to approve the Plan B

13  One-Step SNDA, did it ultimately --

14          THE COURT:  And you would have -- after that,

15  you would have still denied their application.

16          MR. BECKENHAUER:  That's right, your Honor.

17          THE COURT:  So you waited essentially,

18  notwithstanding the possibility that you would get all of

19  the information that you thought was necessary, you

20  delayed acting on their application.  And put -- you

21  know, in effect, you -- well, I will stop there.

22          MR. BECKENHAUER:  Your Honor, FDA's rational in

23  December of last year when it was prepared to approve the

24  Plan B One-Step SNDA was that the additional age-specific

25  clinical data submitted by the drug sponsor were

Proceedings                           58

1   essential to approval.  And it's a necessary corollary of

2   that that the data with respect to Plan B were

3   insufficient.

4              And so it makes sense that the timing was tied

5   together because one was a logical outgrowth of the

6   other.

7              THE COURT:  No, the flaw in your argument is

8   the agency's assumption that a pill that has to be taken

9   twice -- that studies that show that are addressed to

10  Step One, which is a pill that has to be taken once, is

11  different from a pill that has to be taken or is --

12  doesn't have to be actually, the two pills could be taken

13  at once, too, but from a label that says take the pill

14  once -- one every twelve hours, take these two pills

15  twelve hours apart, that you claim that that requires

16  separate studies, so the assumption is that this was --

17  whatever they did would be inadequate if you really

18  believed it.

19             MR. BECKENHAUER:  Well, your Honor, I think

20  that's a question that goes to the ultimate reasonability

21  of FDA scientific judgment and I think it's probably a

22  good point to step back again and recognize that, you

23  know, I think plaintiff's argument seems to assume that

24  the Court is empowered to conduct a de novo review of the

25  sufficiency of the scientific studies.

1          And again, we're here on administrative

2   procedure act review of the denial of a citizen petition.

3   You know, the cases establish that the agency's

4   scientific determinations merits substantial deference.

5   They establish that on a petition for rule making, that

6   deference is so great as to approach non-reviewability

7   and I don't think that standard changes just because

8   we're here on an order to show cause.

9          Plaintiff's submission is essentially that you

10  can simply gather the studies that have addressed or

11  touched on Plan B and you can set them in a chart and you

12  can total up the number of subjects by age and then it

13  just becomes self-evident that the data are sufficient to

14  establish that it's safe and effective for use in that

15  population.

16         And I don't think that approach withstands

17  scrutiny.  I don't think that's how the scientific

18  process works.  Not all studies are created equal.  All

19  studies have limitations.  And these are things that FDA

20  considers in its scientific review process.

21         You know, I think this is pretty well-

22  illustrated if you look at one of the plaintiff's charts.

23  I'm not sure if you have their response to the order to

24  show cause in front of you but you may recall seeing a

25  chart on page 6 of that response.

```
                    Proceedings                    60
 1          THE COURT:  I'm looking at yours.

 2          MR. BECKENHAUER:  So if your Honor has found

 3   page 6 of --

 4          THE COURT:  I have.

 5          MR. BECKENHAUER:  -- plaintiff's show cause

 6   response.  So in that chart -- and this I take to be

 7   plaintiff's principal submission, they list six studies

 8   with various emergency contraceptives but I think if you

 9   drill into this chart, it becomes clear that of those six

10   studies, only two of them are actual use studies.  Four

11   of them are what they call other behavioral studies.  And

12   of those two actual use studies, only one of them is with

13   respect to Plan B.

14          If you take a look at the other four studies,

15   they're not actual use studies at all.  They're various

16   behavioral studies that test very different things.  One

17   of them, the dial east -- the Dial EC (ph.) study, that's

18   basically a telephone prescription service.  If a woman

19   wanted emergency contraception, she would call in and so

20   long as there was no evidence that she was currently

21   pregnant, the telephone operators would obtain a

22   prescription for her and direct her to a pharmacy.

23   There's no apparent follow-up about how the pill was

24   actually used and if the directions were followed.

25          The other three studies, the Jackson, Gold and
```

Proceedings                                      61

1   Reign (ph.) studies, those are all advanced provision

2   studies that basically were to test the effect of giving

3   a subject a box of emergency contraception in advance and

4   seeing how that affected their behavior.

5          These aren't actual use studies.  They don't

6   attempt to mimic actual OTC access.  And a critical point

7   is that in all four of those other behavioral studies,

8   there was additional patient information given to a

9   person.  In the Jackson study, there was a five minute

10  educational session.  In the Gold study, they were

11  explained the indications for use.  They were

12  specifically told by people that emergency contraception

13  isn't for routine contraception.  They were given

14  additional educational pamphlets.

15         In the Dial study, they spoke with a trained

16  emergency contraception specialist, you know?  And I

17  think this pattern is repeated in these four other

18  studies.  The critical point is that they don't mimic OTC

19  access and to be sure, it's true that they may provide

20  some other information about emergency contraception and

21  that may be relevant to the FDA's eventual scientific

22  judgment.

23         But the best evidence is an actual use study

24  with the studied drug and that's why, and the record

25  demonstrates this, FDA generally when considering an OTC

Proceedings                        62

1   switch requires actual use and labeling comprehension

2   studies with particular study drug.  And --

3           THE COURT:  Well they provided it initially.

4   The defect that was found was that it didn't go far

5   enough down the age range.  They found it initially that

6   it was satisfactory with respect to both -- as low as

7   seventeen-year-olds, although again, arbitrarily cut off

8   seventeen-year-olds but it was good enough for seventeen-

9   year-olds and the agency ultimately sort of -- let me put

10  it this way, they acquiesced in my order saying that it

11  -- essentially agreeing with it, if I recall the explicit

12  language of the press release that they issued.

13          So now you have adequate data with respect to

14  eighteen and seventeen-year-olds and you have an agency

15  practice of engaging in extrapolation and we're not

16  talking about extrapolating thirty-year-olds or forty-

17  year-olds, we're saying that if fifteen-year-olds could

18  understand it -- rather, if seventeen-year-olds can

19  understand it, say fifteen-year--olds could understand

20  it.  This is not -- they're not being required to

21  understand anything of any great complexity here.  I mean

22  if it -- let me ask you a question that I suppose could

23  be answered yes or not.  If you had approved -- if the

24  Secretary hadn't intervened here, and you had approved

25  their application, subject to giving them three years of

Proceedings                           63

1   exclusivity, would you have approved the citizen's

2   petition?

3           MR. BECKENHAUER:  No, and I think the record --

4   I mean, this isn't my position, this is the --

5           THE COURT:  You would not have --

6           MR. BECKENHAUER:  -- FDA's position and I think

7   it's made clear --

8           THE COURT:  No, I just want to be clear.

9           MR. BECKENHAUER:  Sure.

10          THE COURT:  You approve -- I'm just trying to

11  gauge the good faith of the FDA's delay here.  You don't

12  act on their petition consciously because of the pendency

13  of Teva's petition and because you think that that would,

14  you know, provide a basis for satisfactorily resolving

15  this problem.

16          I would assume that if you would have --

17  subject to their right of three-year exclusivity, there

18  would have been no basis to deny their application.  Are

19  you telling me there's a -- that you really believe that

20  -- well, that a fifteen-year-old couldn't understand the

21  label?

22          MR. BECKENHAUER:  Your Honor, I think it's the

23  FDA's expert scientific judgment that there's not

24  sufficient --

25          THE COURT:  There's no -- you have to

Proceedings                    64

1  understand here, that you are before me representing an

2  agency that's made a decision by someone whose expertise

3  is in political science and not on expertise.  And the

4  agency that has the expertise was overruled and then you

5  scurry to get letters together to make a justification

6  for it.  You basically, as far as I could see, you did

7  not act on a remand for two-and-a-half years for no

8  reason.  It would be one thing if you told me that if you

9  had granted Teva's application after reserving their

10 three-year right of exclusivity, you would have granted

11 theirs.  But you're saying no, you would not have.  I

12 mean, I don't understand that.

13            MR. BECKENHAUER:  Your Honor, I think -- I

14 don't think it's a fair inference, with respect, that

15 just because the Secretary exercised her authority on the

16 -- to direct the FDA to act on the Plan B One-Step

17 application, that necessarily this process is somehow

18 tainted or took place in bad faith.  I think there are a

19 number of critical distinctions --

20            THE COURT:  I understand -- I mean, I don't

21 understand.  She didn't give any reasons.  This is not a

22 -- you know, there was -- this is not a reasoned

23 decision.  It's even worded in a manner that's totally

24 disingenuous.

25            MR. BECKENHAUER:  Your Honor, regardless of

Proceedings                    65

1  whether or not your Honor may or may not agree with the

2  Secretary's decision on the merits --

3          THE COURT:  It's not whether I agree with it or

4  not, I'm not -- the question is that basically, you know,

5  what we have here is an agency's -- the agency with

6  expertise has been acting under the direction of a

7  political appointee of the president who has no

8  particular expertise.  And I don't know why I shouldn't

9  assume something similar to what I assumed in the last

10 case.

11         MR. BECKENHAUER:  Let me try to explain why.

12 It's the government's understanding that last time around

13 one of the Court's principal concerns was that

14 Dr. Gallston, who as we know, was put forth much of the

15 agency's rational for the denial of the citizen petition,

16 wasn't able to reach his own scientific conclusions

17 because he was pressured by political superiors and

18 wasn't able to exercise his own scientific judgment as he

19 might have if had been left to his own devices.

20         THE COURT:  And neither was Margaret Hamburg.

21         MR. BECKENHAUER:  But I think there's a

22 critical difference here because last time your Honor

23 specifically noted that the problem was that political

24 appointees transferred down the chain of command, their

25 views and they preterminated the scientific review

1   process.  That process wasn't allowed to be completed.

2   Your Honor wasn't sure that Dr. Gallston's conclusions

3   could be trusted.  That's not what happened here.  What

4   happened here is different in significant ways.  The

5   process --

6            THE COURT:  I mean how is the Secretary's

7   intervention here different from the pressure that the

8   White House put on Gallston?

9            MR. BECKENHAUER:  This time, your Honor --

10           THE COURT:  I mean, if anything, it's -- you

11   know, it's just there.  They didn't even attempt to hide

12   it.

13           MR. BECKENHAUER:  That's --

14           THE COURT:  At least they were embarrassed

15   enough about it to try and do it by putting pressure on

16   people within the agency.

17           MR. BECKENHAUER:  Your Honor, the key point is

18   that this time the agencies -- the full scientific review

19   process was allowed to be completed.

20           THE COURT:  Right.

21           MR. BECKENHAUER:  The agency was able to make

22   its views known.  And, you know, there was a public

23   disagreement about the quantum of age-specific data that

24   should be required.  I think those are significant

25   differences.  And, you know, plaintiffs haven't made much

1   of what they term procedural irregularities.  In this

2   case, I don't think those are indicative of bad faith.  I

3   think rather they're just indications of a substantive

4   disagreement that was very transparent and was publicly

5   aired, regardless as I've mentioned, your Honor doesn't

6   have jurisdiction to act on the SNDA and the FDA's -- and

7   the Secretary's decision on the SNDA didn't compel any

8   decision with respect to the citizen petition.  When

9   Dr. --

10           THE COURT:  We're going around in a circle

11  because, you know, you basically held off acting on it

12  for two and a half years under some assumption that the

13  two are related and now you're basically saying that they

14  really weren't related and it didn't matter what happened

15  on the Teva application.  This was doomed to denial --

16           MR. BECKENHAUER:  Your Honor, again, I --

17           THE COURT:  -- from day one.

18           MR. BECKENHAUER:  Your Honor, again, I don't

19  think that's right.  The essential question on a remand

20  that was shared between the SNDA and the citizen petition

21  was whether additional age-specific data would be

22  required.

23           THE COURT:  And you determined that it was.

24           MR. BECKENHAUER:  Your Honor, the FDA -- yes,

25  the FDA did determine that it was but --

Proceedings                68

1          THE COURT:  I know, but --

2          MR. BECKENHAUER:  -- if the FDA had determined

3   that it wasn't, then the citizen petition could have come

4   out differently.  I think that's a key point.

5          THE COURT:  Say that agin.

6          MR. BECKENHAUER:  If on remand the FDA had come

7   out the other way on the essential question, in other

8   words, if the FDA determined that we'd changed our mind,

9   we don't reaffirm our previous decision, additional age-

10  specific data isn't necessary, then it's possible that

11  the citizen petition could have come out very

12  differently.  I think that's the key point.

13          But because on remand, FDA determined that this

14  additional age-specific data were essential, it's a

15  logical consequence that the lesser data provided for

16  Plan B were not sufficient.  And so, the Secretary's

17  involvement is really irrelevant to that key underlying

18  scientific question and that's really the point I want to

19  make.

20          MS. NOVAK:  Good afternoon, your Honor.  Where

21  to begin?  First, just to direct the point that the

22  government was just speaking about is that in order to

23  determine whether it needed more data or whether

24  adolescent specific data was needed, it had to wait for

25  this application just doesn't make any sense because what

Proceedings                                    69

1   if Teva was never going to file another application?

2   They could never have gone back and looked at the

3   evidence to determine whether or not adolescent specific

4   data was needed.

5          In addition, soon after remand, the FDA sent a

6   letter to Teva letting them know that the new studies

7   that they were conducting better take into account the

8   concerns that Dr. Gallston had raised about meeting

9   adolescent specific data.  So if it new that it was going

10  to require such data, then it could have denied the

11  citizen petition at that point.  That's what we have said

12  all along and indeed, in their contempt papers, they did

13  say well the first step to review in the citizen petition

14  would be to determine whether or not new data was needed.

15  You go back and you look at the complete file which is

16  voluminous and you determine whether new data was needed.

17         And the government keeps saying the key

18  question is whether new age specific studies were

19  required as if they can just say they're required and

20  that makes it so.  The real question is why they were

21  required.  Your Honor last time around, found that

22  requiring such studies was a significant departure from

23  agency procedure and was part of the arbitrary and

24  capricious decision making.

25         And in order for an agency to rebut a departure

Proceedings                     70

 1   from agency -- normal agency procedure, they have to

 2   explain why.  They don't always have to follow the same

 3   procedure but they have to explain why.

 4          Here, all they were going to do and all they

 5   have done in the citizen petition denial is say well

 6   those adolescent specific studies that data was essential

 7   and that's the end of the story because it's essential,

 8   then we're going to deny the citizen petition.  Why was

 9   it essential?  It's a departure from all other agency

10   actions.  And when your Honor asked the government well,

11   I don't understand or why couldn't you have granted

12   exclusivity and then granted the citizen petition, they

13   can't do it because the only way that they could grant

14   exclusivity was if they determined that such data was

15   essential and therefore, then they would have to deny the

16   citizen petition.

17          But, you know, I think it's clear what really

18   is going on here, especially in light of history of the

19   case and the bad faith which is the government did not

20   accept this court's findings and wanted political cover,

21   did not want to go back and look at the evidence and say

22   you're right, we have an abundance of evidence here as

23   the scientists found; more evidence maybe than we've ever

24   had for a product and we behaved in bad faith.

25          So instead, we are going to insist with a

Proceedings                          71

company that is willing to do it, that they give us

adolescent specific data and in exchange, we will

indicate to them that we will determine it essential and

that they will get exclusivity.  Now, we empathize with

Teva.

          THE COURT:  Do I know that this happened or is

this speculation?

          MS. NOVAK:  Well, I -- you know, I think that

the documents show that they said you need to address

these concerns.  I think it's implicit in Teva's argument

that the fact that they think that they have a right to

market exclusivity, unless they were told that, how could

they even make that argument.  You do studies.  You take

a chance, whether or not the government is going to deem

them essential and it's only afterwards that you can

claim such a right.

          Here they're saying they have a right and

they're understandably mad.  They engaged in a lot of

negotiations with the FDA.  They designed the studies.

The FDA indicated what type of data it wanted and it was

insisting on the adolescent specific data all along,

which if it was going to insist on this data, then it

should have denied the citizen petition earlier.

          But again, the key point is why would this data

be essential?  Why after seeing it would it be essential

1   because all it did was confirm the findings of the

2   earlier studies.  So even just saying it so doesn't make

3   it so, that it's essential.  There has to be some

4   rational to support the facts there.

5           And both the government and Teva are trying to

6   turn this into something that it is not.  What plaintiffs

7   are seeking into something different, so they can make

8   the argument that the Court doesn't have the authority to

9   act.

10          The plaintiffs are not asking the Court to

11  review the denial of the Plan B One-Step SNDA.  The Court

12  didn't review the denial of the Plan B, those denials of

13  those applications earlier but it's able to order its

14  relief because the FDA acted arbitrary and capriciously

15  on remand with respect to the treatment of emergency

16  contraception.  And plaintiffs didn't bring Plan B One-

17  Step into this.  The FDA did.  And all along, I mean what

18  would Teva had said or what would the government have

19  said if this court granted our motion for contempt before

20  they had finished reviewing their application?  It cannot

21  be that just because the FDA has dragged its feet for

22  twelve years here that all of the sudden, that plaintiffs

23  can't get the relief that they seek because another

24  company has been convinced to do studies that the FDA

25  initially indicated that they would find to be essential.

1          The government sits here and acts as if it's

2    hands are tied and the only way that it can possibly act

3    is by the filing of an SNDA but the Commissioner may

4    initiate a proposal to make a drug over-the-counter.

5    It's 21 CFR 310.200.  A Commissioner may grant or deny a

6    citizen petition in whole or part and may grant such

7    other relief or take other action as the petition

8    warrants.  That's 21 CFR 10.30.

9          And in this -- for this very drug, it's been

10   exemplified that you don't need an SNDA in order to get

11   the relief that plaintiffs seeks.  For example, in 1999,

12   when the FDA was in a different posture, had a different

13   view of this drug, they actually posted in the Federal

14   Register and invited companies to sit -- to submit

15   applications to allow oral contraception to be used post-

16   coitally as emergency contraception.

17         In addition, after this court ruled three years

18   ago about the seventeen-year-old issue, the government

19   was able to send out a letter, invite applications and

20   that's how the drugs were made over-the-counter.

21         So, Teva and the government is arguing that

22   well, Teva says that what we're asking for is this court

23   to overrule the Secretary's determination.  We're not

24   asking that.  We're -- the Secretary's determination is

25   just evidence -- more evidence of all the arbitrary and

Proceedings                          74

1    capricious behavior that's happened on remand and the

2    government in their continued effort to delay this for,

3    you know, record setting decades, said -- wants to turn

4    it into that this is just about granting the citizen

5    petition and we want the Court to grant the citizen

6    petition, so that they could then take ten years to

7    initiate rule making.

8            But the Court can do just what it did the last

9    time around with respect to seventeen-year-olds and

10   direct the FDA to allow sponsors to submit applications

11   or labeling to make the drug available over-the-counter

12   for women of all ages without restriction.

13           And what your Honor started off with in this

14   hearing was about this asserted interest by Teva that

15   they have a statutory right to exclusivity.  There is no

16   right.  They have a desire and they were hoping that they

17   would get it and they have an option and had an option

18   for appealing it and they decided not to.  That would be

19   a separate proceeding but that is not something that

20   should be allowed to sidetrack this case.  They had a

21   forum for that.  They do not --

22           THE COURT:  Your argument is that if I granted

23   you the relief that we -- where there are two forms of

24   relief we're talking about; one is the ultimate relief,

25   one is what I may do in the interim.

Proceedings                                          75

1          MS. NOVAK:  Yes.

2          THE COURT:  But their argument is if I grant

3    you the ultimate relief, in effect, and I rely on their

4    studies, in effect, I will be depriving them of the three

5    year -- I will, in effect, be in place of the Secretary

6    giving what the agency would have given, which is the

7    right to sell with a three year period of exclusivity and

8    that I essentially would be depriving them of it, if I

9    understand their argument.

10         MS. NOVAK:  Right, but your Honor, you wouldn't

11   be depriving them of anything.  They have no right.  They

12   roll the dice.  I mean, we empathize with this, you know,

13   what goes on here, this roller coaster ride with the FDA

14   with respect to this product but all your Honor would be

15   doing would be exercising your authority when the FDA has

16   behaved as they have which is in bad faith and arbitrary

17   and capricious behavior.  It's been shown already that

18   remand serves no purpose and you would be effectuating

19   relief that the FDA could do on its own and should have

20   done.  And we need to keep in mind that by allowing this

21   assertion that there's some sort of right to exclusivity

22   would be to rule that those studies were essential, those

23   additional studies were essential, which would be

24   contrary to your Honor's previous ruling where your Honor

25   rightfully found that this is a sharp departure from

Proceedings                                76

1    agency procedure to require such studies in the first

2    place and if the FDA is going to require them, they need

3    to explain why.

4           THE COURT:  Not all such studies, some of them

5    are reasonable but you know, there's a question of

6    extrapolating as I indicated from let's say seventeen-

7    year-olds to fifteen-year-olds.  It's not -- that was

8    clearly -- you know, the agency had clearly -- they've

9    done more than that but they've clearly engaged in

10   extrapolation.

11          MS. NOVAK:  Right, of course.  And I mean, you

12   know, our position is that really sitting here today,

13   there's -- the FDA's position is so nonsensical and

14   arbitrary and capricious.  For example, they are saying

15   that you can't extrapolate -- at least the FDA before the

16   Secretary intervened, that you can't extrapolate from the

17   studies about the two pill products but they were saying

18   you can extrapolate with the one pill products because

19   they were prepared to make that over-the-counter for all

20   ages.  I mean, it just -- it defies all reason.

21          And the government has said that we're asking

22   the Court to do some sort of de novo review.  We're not

23   at all.  I mean, I -- you know, we put a lot of effort

24   into this, combing through the whole record and your

25   Honor found in your previous order that there was almost

Proceedings                    77

1   uniform agreement among the scientists that there was

2   enough evidence originally to make you see over-the-

3   counter without restriction for all ages.  It was only

4   the political actors that overruled it.

5          these charts are not something that we have put

6   together for your Honor to consider.  These charts are

7   what the FDA considered and we have many cites and quotes

8   to all the scientific reviewers who found that this

9   overwhelmingly shows that EC is safe and effective for

10  women of all ages.

11         THE COURT:  How do I know the FDA considered

12  those?  I mean, you said I think that --

13         MS. NOVAK:  They did consider them.  They're

14  all -- there are many cites in here to the administrative

15  record.  The reviewer's considered it and again, the FDA

16  acts as if they're constrained that when they are

17  considering a citizen petition, that they can only

18  consider actual use and label comprehension studies.  And

19  that's not true at all.

20         When they consider a new drug application, they

21  are constrained to just reviewing what was submitted with

22  that application.  I don't think that they'll deny that

23  with the citizen petition, they're allowed to consider

24  anything outside -- anything they want in the world.

25         But in addition, many of these studies, these

Proceedings                    78

1   behavioral studies, they were submitted by the applicant,

2   by the -- in the supplemental new drug application, it

3   was supplemented time and time again, and the reviewers

4   found them very relevant.  Now, of course, Dr. Gallston

5   and the other -- you know, those that were tainted by

6   political pressure said oh, no, these studies, they're

7   not relevant but all -- uniformly, many, many other

8   scientific reviewers found that these are relevant.  They

9   don't have to be a certain type of study.  They found

10  that the behavioral studies were very relevant and

11  simulated a lot of the characteristics of an actual use

12  and over-the-counter -- and labeling comprehension

13  studies.

14          But as your Honor pointed out, you know, we

15  start with, which even the FDA admits, that the default

16  status is over-the-counter and it's only if they show

17  there's toxicity or a reason that you need intervention

18  by a clinician that you should keep a prescription.  And

19  on your order to show cause, they have not made that

20  showing whatsoever.

21          The evidence overwhelmingly shows that women of

22  all ages can understand it and use it safely and

23  effectively but the evidence also shows that clinicians

24  do not make a difference.  So, there's no -- that don't

25  make a difference with compliance with the instructions.

Proceedings                              79

1   So, why except for political reasons, or trying to

2   restore credibility for what happened last time would you

3   ever insist on keeping it behind the counter.

4           THE COURT:  Can I ask you, I just -- look,

5   maybe there's an answer that is lost somewhere in the

6   history of all this.  How do you deal with the fact that

7   there are drugs sold over-the-counter that have fairly

8   complex labeling requirements and potential adverse

9   effects that are -- seem to me to be much more

10  complicated in terms of the instructions and more serious

11  in terms of the complications?  How do you deal with

12  that?  I mean, I assume the FDA permitted it or could

13  pull it off, if they thought there was a problem.

14          MR. BECKENHAUER:  Your Honor, under FDA

15  practice, it's certainly the case that each new drug

16  application is unique and presents a unique balance of

17  risks and benefits and FDA's general practice in

18  reviewing drug applications is to review them on a case-

19  by-case basis that considers the drug, it considers the

20  indication or the underlying disease and it consider the

21  population for which OTC use is requested.  And so,

22  because it's a case-by-case evaluation, it's just not as

23  simple as comparing this drug to that drug.

24          THE COURT:  Well, it may not be but in terms of

25  whether the -- what kind of studies you need, let's say,

Proceedings                                    80

1   in terms of label comprehension, it would seem to me that
2   you could take a drug -- you could take a bottle of
3   aspirin and look at the label and it's a very complex
4   label.  And I know that aspirin's old, maybe it was
5   grandfathered in somewhere but there are -- you know, I
6   am sure if you went and looked, there are more recent
7   ones that are much more complicated and it just seems to
8   me that there's something not right about that.
9          I mean is there an explanation other than
10  you're telling me that aspirin is different from Plan B,
11  I mean, in terms of label comprehension?
12          MR. BECKENHAUER:  Your Honor, I think some of
13  these decisions may not seem perfectly clear to lay
14  people like you and I but I think that FDA -- you know,
15  this is where FDA's scientific judgment comes in because
16  the risks and benefits do vary on a case-by-case basis.
17  So, I think really the key question we're after is -- and
18  this is how plaintiff's put it is why in this case did
19  the FDA decline to extrapolate?  I tink that's really one
20  of the key questions.
21          Your Honor, as an initial matter, we certainly
22  dispute that it's FDA policy just to extrapolate.  I
23  don't think that's -- although the FDA certainly has
24  extrapolated in some cases, there's no --
25          THE COURT:  For the moment, I don't want to

1  reargue the extrapolation.  I just want to understand in

2  terms of this business about label comprehension and

3  particularly, the difference between one pill and two

4  pills.  I looked at a bottle of aspirin I have in my

5  house last night, and it was a very, very complicated

6  label.  There were instructions about, you know, don't

7  take it after you've had the flu or chicken pox or if you

8  have certain symptoms, you could be at risk of having

9  Reyes syndrome.  It had how many times you should take

10 it, how many pills, how many hours apart, various --

11 there was an actual note that children -- it almost

12 looked like to me it was addressed to children under

13 twelve about certain facts.

14         I mean, so if this is available, how does --

15 and this is available for an eleven-year-old or twelve-

16 year-old and going up, not younger, could walk into a

17 drug store and purchase this over-the-counter.  How am I

18 supposed to put or anybody supposed to put any stock in

19 the argument that there's somehow this label require all

20 of this -- this drug requires all of this study, at least

21 with respect to label comprehension?

22         MR. BECKENHAUER:  Your Honor, I think it's

23 generally true that when the kids or young adolescents

24 are using drugs like aspirin or Tylenol, they're doing

25 that under the supervision of a parent and I'm not sure

1  that that assumption is safe here with respect to Plan B.

2  I think this -- I know you don't want to talk about

3  extrapolation right now, but I think it's hard to discuss

4  this issue because the two concepts are tied together.

5          You know, FDA certainly recognized that in the

6  past, it has extrapolated when there's no relevant

7  physiological difference between the two age groups but

8  it also specifically explained here why that wasn't

9  appropriate.  So, it's simply not the case as plaintiff's

10  have submitted that there's no explanation.  To the

11  contrary there is an explanation and I think under the

12  standards of review here, it's certainly adequate.  You

13  know --

14          THE COURT:  What is the explanation?

15          MR. BECKENHAUER:  The explanation is that the

16  relevant difference here in the age groups isn't

17  physiological, it's cognitive and that cognitive

18  difference can have a real impact on at least this is the

19  concern, that it can have an impact on how the drug -- if

20  whether the drug is actually understood and used

21  properly.  And here, it --

22          THE COURT:  What do you mean by cognitive?

23          MR. BECKENHAUER:  Cognitive -- whether, you

24  know, I think -- adolescent's reasoning skills is

25  essentially what cognitive means.  So I think --

Proceedings                    83

1          THE COURT:  What is reasoning skills exactly

2    have to do with the ability to read a label and

3    understand a label?

4          MR. BECKENHAUER:  Well, I think you know, we're

5    talking -- when we're talking about younger adolescents,

6    let's put it in context.  We're talking about kids that

7    are eleven, twelve, thirteen-years-old.  They're in

8    junior high school.  And I think when kids that old are

9    taking medications, it's often the case that they're

10   taking the medications under the direction of a doctor or

11   a parent or someone who is making sure that they're

12   following through with, you know, the course of

13   medication that's required.

14          When you get a prescription for antibiotics,

15   you know, it's a seven-day course, you take it three

16   times a day, your mom or your dad reminds you, did you

17   take your pill.  And so here, there's a unique --

18          THE COURT:  Plus the studies have shown that

19   most adults don't take --

20          MR. BECKENHAUER:  Well, I think --

21          THE COURT:  -- the full regimen of pills as

22   they're prescribed by doctors.

23          MR. BECKENHAUER:  That may be, your Honor, but

24   here --

25          THE COURT:  They don't suffer from any

Transcriptions Plus II, Inc.

1  cognitive disabilities.

2          MR. BECKENHAUER:  But here your Honor, there's

3  also a unique dosing mechanism at play and under --

4          THE COURT:  What's unique?

5          MR. BECKENHAUER:  It's that you take one pill

6  and then you take the second pill twelve hours

7  afterwards.

8          THE COURT:  So what?

9          MR. BECKENHAUER:  Well if you miss the timing

10 of the second dose, it reduces effectiveness and that can

11 have unfortunate consequences for someone who is taking

12 the drug to avoid becoming pregnant.  And I think that's

13 a critical distinction.  And, you know, this --

14         THE COURT:  So it's not the concern about

15 toxicity.

16         MR. BECKENHAUER:  I think it --

17         THE COURT:  It's a concern about --

18         MR. BECKENHAUER:  No, because your Honor --

19         THE COURT:  It's a concern about the fact that

20 they might become pregnant.

21         MR. BECKENHAUER:  Your Honor, it's a concern

22 about safe and effective use without supervision.  You

23 know, this drug -- it's a false choice that it's OTC or

24 nothing.  The choice or OTC or RX.  And the safety and

25 effectiveness as a physiological matter has been

Proceedings                                    85

1   established for women and girls of all child bearing

2   ages.

3          So, the particular issue here is whether

4   there's enough evidence to establish that young girls

5   who, I don't think it's disputed, have differences in

6   cognitive ability can sufficiently understand --

7          THE COURT:  Well, there's no question --

8          MR. BECKENHAUER:  -- to follow the directions

9   and take the second --

10          THE COURT:  There's no question that cognitive

11   disability is concerned with making judgments about how

12   the conduct in which one engages in, that there are

13   differences.  But we're talking about the ability to

14   understand a relatively simple label.

15          MR. BECKENHAUER:  Well, your Honor, I think

16   that these concerns -- these are invented concerns.

17   These are concerns that are supported in the record.  The

18   Plan B labeling comprehension study as FDA noted, in that

19   study younger adolescents, those aged twelve to sixteen

20   were less likely to understand key concepts.  And in

21   particular, twenty-three percent of kids age twelve to

22   sixteen didn't understand that the second pill needed to

23   be taken twelve hours after the first.

24          THE COURT:  And the older ones?

25          MR. BECKENHAUER:  The older ones understood

Proceedings                          86

1    that concept better.

2              THE COURT:  How much better?

3              MR. BECKENHAUER:  Uhm.

4              THE COURT:  I thought -- unless I am trying to

5    think of this in my head, I thought that the best one you

6    had was 83 percent as opposed to 77 percent.

7              MR. BECKENHAUER:  So, now I want to be clear

8    that the age group of twelve to sixteen-year-olds, I mean

9    there were only -- in this study, there were only 29.

10   This was a study of 585 subjects.  Only 29 of these

11   subjects --

12             THE COURT:  Which study are we talking about?

13             MR. BECKENHAUER:  This is the Plan -- I'm

14   sorry.  I've mixed them up myself, your Honor.  Let me

15   backtrack.  We're talking about the Plan B labeling

16   comprehension study and in that study, I believe there

17   were 79 kids of this age group.  The younger adolescents

18   understood -- 23 percent of younger adolescents didn't

19   understand that the second pill should be taken within

20   twelve hours.

21             THE COURT:  First of all, the 22 (sic) percent,

22   as opposed to how much -- I thought when I read the

23   statistics, I don't know whether it was in the summary

24   motion to dismiss or in one of the briefs, that there was

25   a difference, let's say between 77 and 82 percent going

Proceedings                           87

1  through these three age groups --

2          MR. BECKENHAUER:  Yes, Judge.

3          THE COURT:  -- which didn't strike me as being

4  that significant.

5          MR. BECKENHAUER:  It goes from 77 to 90 between

6  seventeen and twenty-five-year olds and then you're

7  right, it goes down to --

8          THE COURT:  Well, but seventeen and twenty-

9  five-year olds is different.  We're not talking -- I

10 mean, if you want to skewer the cohort, so that you get

11 statistics that you want to, that's a different story but

12 I don't know why --

13         MR. BECKENHAUER:  Your Honor, I am just trying

14 to --

15         THE COURT:  -- you're doing seventeen to

16 twenty-five-year olds.  If you want to compare it, then

17 you're talking about extrapolation.  You should

18 extrapolate from seventeen-year-olds to let's say

19 fifteen-year-olds.

20         MR. BECKENHAUER:  Your Honor, my point is just

21 this, that these concerns do have support in the record.

22 They're not, you know, invented out of thin air.  The

23 record demonstrates that, you know, the scientific

24 literature establishes that there are cognitive

25 differences and the data in the studies suggests that

1 those cognitive differences can be relevant particularly

2 with respect to understanding when the second dose should

3 be taken.

4         At a minimum, this suggests that FDA's concerns

5 were reasonable and that it was appropriate to look for

6 more data in this age group and that's really the key

7 problem is that there just wasn't sufficient data in this

8 age group with respect to Plan B.

9         THE COURT:  And what distinguishes this from

10 aspirin is that you're assuming that a twelve-year-old or

11 a thirteen-year-old or a fifteen-year-old who had a

12 headache and went into a drugstore to buy aspirins would

13 be taking it under parental supervision.

14         MR. BECKENHAUER:  That's part of it.  Another

15 part of it is --

16         THE COURT:  I don't know, I'm just trying to

17 understand that was what you told me.  Is there another

18 part?

19         MR. BECKENHAUER:  Well, another part of it is,

20 your Honor, if you take -- if a twelve or thirteen-year-

21 old did buy a bottle of aspirin and took one or two,

22 there's no, like -- there's no unique dosing mechanism

23 where the treatment fails or becomes less effective if

24 you don't take the second dose on time.  And in fact,

25 with respect to a headache, if your headache comes back,

Proceedings                                    89

1   there's a physiological reminder oh, now's the time to

2   take another aspirin.  You know, there's no reminder like

3   that for Plan B.

4           And so, you know, I think it's reasonable for

5   FDA to look at this issue, the data in the record with

6   respect to Plan B --

7           THE COURT:  If that was what you were worried

8   about, why did you even -- when they came up with Plan B

9   One, that was only one pill, so why did you require

10  anything more than you would for aspirin?

11          MR. BECKENHAUER:  I'm not sure I entirely

12  follow the question but --

13          THE COURT:  No, what you're telling me is now

14  your concern is not that because they have trouble

15  understanding the label, that they'll take one every six

16  hours instead of once every twelve hours because we know

17  that that wouldn't make any difference.  And so, what

18  you're worried about is that they'll pay for the drug and

19  they won't be able -- they won't take it twelve hours

20  after, they'll just take one pill instead of two and

21  therefore, it will affect the efficacy of the drug.

22          Well, they come along and say we've solved your

23  problem.  If that's what you're worried about, it's only

24  one pill.

25          MR. BECKENHAUER:  Fair enough, your Honor.


Transcriptions Plus II, Inc.

Proceedings                    90

1          THE COURT:  And you still require -- you still

2     decide that they have to go through all of these hoops

3     and the Secretary, of course, decides that it just

4     doesn't do it.

5          MR. BECKENHAUER:  Your Honor, in my comments a

6     moment ago, I was focusing specifically on Plan B because

7     Plan B is the only drug at issue in the citizen petition.

8          THE COURT:  I'm trying to understand --

9          MR. BECKENHAUER:  But there are --

10         THE COURT:  I'm just trying to understand, you

11    know, the logic here and you give me an argument and I'm

12    saying to you you're saying you need -- you can't be sure

13    that younger teenagers will understand that they should

14    take the second one within twelve hours and that's the

15    real problem that requires the study and then so the

16    manufacturer comes along and says I've solved your

17    problem, there's only one pill.  And so why -- what are

18    you worried about now?

19         MR. BECKENHAUER:  Your Honor, there -- to back

20    up, the timing of the second dose isn't the only --

21    wasn't the only concern and wasn't the only reason that

22    additional age specific data were required.  It wasn't

23    the only reason the FDA thought it was inappropriate to

24    extrapolate in this instance for this drug.  It does go

25    back to the same cognitive differences and the impact of

Proceedings                                    91

1  those cognitive differences can have on younger

2  adolescents but some of the other concerns were that

3  because younger adolescents have these cognitive

4  differences, have, you know, less developed reasoning

5  skills, they might end up substituting emergency

6  contraception for regular contraception which would raise

7  the risk of pregnancy.  They might substitute emergency

8  contraception for other STD preventative methods which

9  could raise the risk for STDs.

10          And again, these aren't invented concerns.

11  These are concerns that are based in the record.  These

12  are the same concerns that the Plan B sponsor raised with

13  FDA when it first brought the issue of an OTC switch to

14  FDA and they were the same concerns that lower level FDA

15  review staff aired at the beginning of the review

16  process.

17          Ultimately, of course, as the review process

18  went on, as the Court's well aware, there was vigorous

19  disagreement about the amount of age-specific data that

20  should be required but the FDA's ultimate -- the decision

21  is well supported in the record and I think one of the

22  best points in support of that is that many of its

23  sharpest critics within the FDA, in fact, have said that

24  FDA's initial denial of the citizen petition and its

25  decision to require more age-specific data was a

1  reasonable exercise of scientific judgment.  We've heard

2  that from Dr. Jenkins.  We've heard that from Dr.

3  Rosebrah (ph.).  We've heard that from Dr. Hull (ph.).

4          And under the standards applicable on APA

5  review of an agency's scientific determinations and

6  particularly on the denial of a petition for rule making

7  which again, is what this is, that should resolve the

8  issue.  This is a matter -- the FDA's decision clearly

9  fell within the bounds of reasonable scientific judgment

10  as even critics of that decision within the FDA conceded.

11          MS. NOVAK:  Your Honor, if I may?  Basically,

12  what the government is doing is rearguing and taking the

13  position with your earlier order and saying that the

14  record supports its earlier decisions.  And as a side

15  note, the government just said the reason additional

16  studies were required and if additional studies were

17  required, that just shows that the citizen's petition

18  should have been denied years ago.

19          With respect to the fact that the government

20  says that the cognitive differences are a basis and it's

21  in the record and that that is a substantial and

22  reasonable basis for not extrapolating, the place it is

23  in the record is that that was the rationalization that

24  Dr. Gallston came up with and one of the areas that the

25  GAO report found was not novel and that Dr. Gallston

Proceedings                                         93

1  admitted was not applied to any other drug.

2          And again, I was quite surprised but that was

3  again the reasoning that the Secretary put out about

4  cognitive differences and, you know, just saying it

5  doesn't make it so.  And it doesn't explain why there

6  would be cognitive differences for this drug and not for

7  any other except for the argument that the government

8  just put forth about how all other drugs are under

9  parental supervision where EC -- emergency contraception

10  would not be.  I don't know where the evidence for that

11  is.

12          And the government talks about how they -- the

13  23 percent of the sixteen and under group had difficulty

14  understanding the label about when to take the second

15  dose.  But as the FDA, I think in its guidance itself

16  explains, label comprehension studies, the main purpose

17  of them is to determine whether the label should be

18  changed to make it more clear.  The actual use and other

19  behavioral studies are really the crux of how to people

20  behave in actuality.

21          And the actual use studies that were submitted

22  with Plan B showed that the age group that performed the

23  best in taking the second pill was the sixteen and under

24  group, better than the seventeen-year-olds, better than

25  anyone older than them.

Proceedings                                    94

1          But again, we have to remember that the

2    evidence also showed that even if they didn't understand

3    when to take the second pill, involving a clinician

4    doesn't change that.  So, there's just no basis for

5    saying oh, well, because they don't understand when to

6    take the pill, we should make them go get a prescription.

7    It doesn't change the timing of the second pill.

8          And in addition, it just sets up a barrier, the

9    government says they're concern about whether or not they

10   would take the second pill and whether or not it would

11   prevent pregnancy.

12         But if you set up all these barriers that have

13   been set up, you're getting rid of the time frame within

14   which it could be effective at all.

15         And as your Honor had pointed out, there are no

16   adverse effects from the pill and the very existence of

17   Plan B One-Step shows that even if you don't take it

18   exactly twelve hours apart, it's still pretty effective

19   -- I mean, it's still effective.

20         In addition, I just wanted to return to two

21   points from earlier about the proprietary studies and,

22   you know, Teva was well aware about the concern that

23   these studies could be used for the two pill product and

24   they sent a letter to the FDA asking earlier on, and this

25   is Exhibit C to defendant's response to the order to show

1   cause, there's a letter from the FDA telling Teva we

2   don't agree with you that your studies aren't applicable

3   to the two pill products.  There might be some aspects of

4   it that aren't applicable but you should know -- be

5   aware, that these are applicable to the two pill

6   products.  And here --

7           THE COURT:  Where do they say this?

8           MS. NOVAK:  This is in a letter from Dr. Andrea

9   Leonard Siegel (ph.) and I believe it's Exhibit C to

10  defendant's response to the order to show cause.  There

11  were -- they responded to two questions that Teva had

12  submitted.  I can show it to your Honor if you would

13  like.

14          THE COURT:  I have the response.

15          MS. NOVAK:  Okay.

16          THE COURT:  But it's a printout rather than

17  the --

18          MS. NOVAK:  Yes, okay.

19          THE COURT:  Just show me what it looks like.

20          MS. NOVAK:  Sure.  Here's the letter.  It's

21  document 23-3, the ECF number.  Do you have it,

22  your Honor?

23          THE COURT:  23-3; yes.

24          MS. NOVAK:  Yes.  So, question 2 on the second

25  page, it says, "Does the division agree that Plan B One-

Proceedings                          96

1   Step is clinically different in a significant manner from

2   other Levonorgestrel emergency contraceptives and (b)

3   that the data generated by these trials is specific to

4   the unique attributes of Plan B One-Step and (c), these

5   only provide support for an OTC switch for Plan B One-

6   Step."

7          The FDA response as your Honor can see, that

8   "We do not agree that all of the data generated from the

9   actual use trial would be specific to Plan B One-Step.

10  There are overlapping elements of labeling between the

11  Plan B One-Step and other Levonorgestrel EC products."

12         And it goes on to explain the indication for

13  the product, the appropriate time, the warnings.  As your

14  Honor has pointed out, all of the findings, all of the

15  key concepts that the FDA said that they found that the

16  newer studies showed, applied to the two full products

17  except for the dosing but --

18         And these studies, they're results are public.

19  They're not proprietary but we urge the Court that there

20  is no reason to focus on just these studies.  There are

21  numerous studies and more than enough information already

22  in the record with respect to the two pill products.

23  They all support an over-the-counter switch for EC

24  without restrictions.

25         And the government says the standard here is

Proceedings                                    97

1    deference to the point of almost no review and I would

2    fundamentally disagree.  I think a very instructive case

3    is actually Greyhound v. Interstate Commerce Commission,

4    which is cited in our brief, in our motion for summary

5    judgment preliminary injunction.  The cite is 668 F.2d

6    1354 and it's a D.C. circuit case in which very similar

7    circumstances occurred.  And the Court said that they

8    give an even greater degree of scrutiny to an order that

9    arrives at the very same conclusion that the Court had

10   previously found arbitrary and capricious.  And the Court

11   said, I quote, "We must recognize the danger that an

12   agency having reached a particular result may become so

13   committed to that result as to resist engaging in any

14   genuine reconsideration of the issues.

15          And the Court, because it had been eight years

16   that Greyhound had been trying to get the relief or at

17   least get an explanation of why it was being put in a

18   certain category, the Court said we've given you enough

19   time. You've had eight years.  There would be no useful

20   purpose in giving you another shot at it and it ordered

21   the relief that Greyhound was asking on the spot.

22          Those circumstances are right here.  The

23   government tries to argue that this is a run of the mill

24   case whereas we're up to the second time, the reasoning,

25   you know, uncannily mirrors the reasoning the first time

Proceedings                                    98

1   around.  There were previous findings of bad faith and

2   arbitrary and capricious behavior.  So it certainly

3   shouldn't be a review of deference.  It should actually

4   be close scrutiny.

5           And the other thing I wanted to address, I was

6   really glad that both Teva and the government brought it

7   up because otherwise, I thought I would be accused of

8   engaging in conspiracy theories which I was accused of at

9   the last hearing, but -- is this internal agency

10  discussion that is going on that they -- both parties

11  have talked about here and in their briefs.

12          And it doesn't -- it's not even reading tea

13  leaves.  If you look at what happened previously and the

14  consideration of emergency contraception and you look at

15  Teva's understandable interest in exclusivity here, what

16  happened last time was the FDA denied the application for

17  full OTC availability and kept going back to the company

18  and said revise your application, revise your

19  application.

20          The FDA wants to seek political cover.  They

21  don't want this court to rule.  They don't want to have

22  it to appeal and be found to be arbitrary and capricious

23  and so they want to find some middle ground.

24          And Teva wants exclusivity.  I also believe

25  Teva originally and initially also wanted the this to be

1  available to all women over-the-counter but it's

2  important to Teva for it to get its exclusivity.

3          And what seems likely that is going on and we

4  have all the parties here and they can dispute this

5  notion if they want, is that they will come up with in

6  their discussions that the age limit will be lowered

7  somewhat and won't be lowered completely.  And if that

8  happens and I think that they've indicated they're trying

9  to do something on a four month time frame which is why

10  they are racing here and why the continuous efforts to

11  delay this court's ruling is if that happens, Teva will

12  get exclusivity.  The government might get some

13  restoration of their credibility but the plaintiffs and

14  the public will lose because what will happen is if the

15  age limit isn't lifted completely, younger women will

16  still have to get a prescription for no scientific reason

17  but also importantly, that all women regardless of their

18  age, will still be subject to these burdensome,

19  unnecessary and unprecedented restrictions that it will

20  be behind the counter and they have to show ID and they

21  have to find a pharmacy that is open.

22          And again, these efforts to try to come to

23  these compromises to deny the relief that plaintiffs have

24  been seeking for ten years, would just be extraordinary

25  and their position is that you must defer to this race to

Proceedings                                    100

1  deny the public what the FDA is supposed to do which is

2  do something that's in the best interest of the public

3  health, rather than the fact that they're the ones that

4  are interfering with what should have been a

5  straightforward process, OTC should have been granted

6  without restriction back a decade ago and at the very

7  least when this court remanded it, they should have been

8  able to look at the record and decide just like the

9  Secretary did, within a week that all the evidence was

10 there and like their scientists determined, there -- it's

11 impossible to consider what more evidence they could

12 need.  It's a standard that cannot be met.  They are

13 constantly moving the goal posts, so -- that they can

14 avoid any perceived political repercussions of granting

15 this.

16          And it would be quite unfortunate for women to

17 lose out to this delay in this extraordinary chess game

18 that they have engaged in.

19          MR. BECKENHAUER:  Judge, I know the hour is

20 getting late.  Can I just respond to two things?

21          THE COURT:  The sun doesn't set until much

22 later this time of year.

23          MR. BECKENHAUER:  I won't justify the

24 conspiracy theory with a response but there are two

25 things that I anted to --

1       THE COURT:  Let me ask you this.  You know, I

2   don't -- I know that when you get into areas like this,

3   talking about rational compromise. it's almost impossible

4   because everything is a matter of --

5       MR. AMANAT:  We can't hear you, Judge.

6       THE COURT:  I said I know when you're in an

7   area like this, talking about compromise, it's very

8   difficult because we're talking about, you know, on those

9   principles that are difficult to compromise, but given

10  the fact that once you get down to really young women,

11  we're talking about eleven and twelve-year-olds, that

12  you're dealing with such a small percentage of the people

13  who would really be affected by this, and given the

14  realities of -- you know, we've gone through Bush and

15  Obama, so the realities are that there's tremendous

16  political sensitivity about this, why isn't it possible

17  to reach some sort of compromise?

18      I know that it's -- having people go to find a

19  pharmacy that's opened and available, you know, creates

20  some burden, enough in my judgment to give you standing,

21  but there's still seventy-two hours when its effective

22  and even if you find -- it takes a -- well, New York is

23  not the country (sic) where you can find a pharmacy

24  that's open, you know, fifteen hours a day, let's say,

25  sometimes twenty-four hours, why isn't this sort of

Proceedings                          102

 1  amenable to some sort of a compromise which covers ninety

 2  eight percent, let's say, of the people who are affected

 3  by this?

 4           MS. NOVAK:  Your Honor, I --

 5           THE COURT:  And you don't have to answer on the

 6  record.  If you want, we can go off the record.

 7           MS. NOVAK:  I can answer.

 8           THE COURT:  No, I mean when I raise settlement,

 9  I generally go off the record.

10           MS. NOVAK:  Right.  I would just put forth, I

11  agree with your Honor as we've said in the papers, the

12  number of eleven and twelve-year-olds, is minuscule, if

13  even existent at all.  However, the behind-the-counter

14  regime is a real barrier and really burdensome.  There's

15  evidence in the record.  There are studies.  We have

16  declarations from the author of the study.  It is very

17  confusing for women and it's confusing for pharmacists

18  and pharmacists give out wrong information to women.  And

19  they're unable to get the product in a timely manner.

20           In addition, there are many people who don't

21  have ID and there are pharmacies that aren't opened.

22  It's a question of, you know, on a Friday night you need

23  it and you can't get it until Monday.  But the -- you

24  know, I understand the purposes of settlement but there

25  needs to be a good reason on the other side.  It's not

Proceedings                                    103

 1  like the government has come forth and said look, there

 2  are political considerations or there are considerations

 3  outside of the evidence that we need to consider here.

 4  All they've said is the data is insufficient.

 5          THE COURT:  Well, we don't know that they're

 6  never going to say that but we don't have to --

 7          MS. NOVAK:  Well, they could have.  The first

 8  time around, in the administrative record there were

 9  scientists who raised concerns but then they were

10  addressed; oh, is this going to lead to sex cults and

11  things like that.

12          But here, they're just saying that the evidence

13  is insufficient and again, the default status is OTC and

14  it shouldn't be that women have to suffer these harms

15  just because they're unwilling to say the Court found

16  these decisions to be arbitrary and capricious and we

17  haven't come up with a reason to say why it wasn't.

18  That's what I was going to say there.

19          The other thing is that the compromise -- there

20  is a compromise out there and ti's what always happens --

21          THE COURT:  Well --

22          MS. NOVAK:  -- it's that there are warnings on

23  packaging.

24          THE COURT:  No, no.  Before you get to that, I

25  know that but there is a compromise even in terms of

Proceedings                                        104

where it's made available from.  In other words, you can

go in depending on what part of the country you're in,

but you could go purchase -- there are things you can

purchase by showing what you're required to show I.D.s

for, cigarettes, alcohol, which could be purchased almost

anywhere and people ask for I.D.  So there's a potential

for compromise based on --

        MS. NOVAK:  Right.

        THE COURT:  -- this point of sale which

addresses, I think, you know, a fairly substantial

argument about the difficulties with the having to go to

a drugstore, as opposed to just being able to go to any

other place which normally would require -- normally

requires identification for the sale of other products

which are deemed to be, you know, for one reason or

another, to require proof of age.

        MS. NOVAK:  Yes.

        THE COURT:  Again, you don't have to answer

this on the record. I mean, I don't find that it helps

resolves cases by speaking on the record but --

        MS. NOVAK:  Right, I just -- I do want to

address something on the record -- two things on the

record, which is those -- the examples you raised like

cigarettes and alcohol, those are for people who

generally do have state I.D. but if you're talking about

1   thirteen or fourteen or fifteen-year-old girls, they

2   probably do not have state I.D.  And the consequence here

3   is that you would then have a thirteen, fourteen or

4   fifteen-year-old woman getting pregnant.

5           And as was discussed in prior briefs in summary

6   judgment, you know, cigarettes and alcohol, those are

7   potentially toxic substances.

8           THE COURT:  No, no, I'm not talking about --

9           MS. NOVAK:  Right.

10          THE COURT:  I'm not saying they're comparable.

11  All I am saying is that you could presumably have a

12  broader site availability --

13          MS. NOVAK:  Right.

14          THE COURT:  -- and I only cite those instances

15  is that it's not being --

16          MS. NOVAK:  Yes.

17          THE COURT:  -- you know, there's nothing new in

18  that sense.

19          MS. NOVAK:  Yes.

20          THE COURT:  So then now the problem is the

21  government I.D., I take it.

22          MS. NOVAK:  Right.  And there are a lot of --

23  right, there are problems with -- and there's also the

24  personal interest in having to go to a counter, having to

25  announce in front of everybody there that you need

1   contraception.  It's just these are invasions of people's

2   personal privacy.  These are issues that have been found

3   to be constitutionally protected in their privacy in not

4   having to announce to the world about your sexual

5   activity.  And, you know, so that is another matter of

6   concern.

7           But what I wanted to raise about the internal

8   discussions is -- you know, I was very pleased that your

9   Honor issued this order to show cause and we urge you to

10  -- that there's, you know, significant evidence and urge

11  you to please rule soon if the Court is prepared to,

12  because I think it is very possible that there will be

13  actions taken by the government that will -- then they

14  will argue will make it harder for you to overrule any

15  sort of exclusivity grant.  That should not trump the

16  relief that has been sought here for ten years.

17          THE COURT:  Well, we have a schedule for -- is

18  there anything more that has to be briefed?

19          MS. NOVAK:  Well, your Honor, I actually now

20  that you've given me the opportunity, about the motion to

21  dismiss, we plan to, are not happy to respond but as your

22  Honor raised in your order of last night, this is really

23  a motion for reconsideration three years after your

24  order.  The government had an opportunity to appeal or to

25  move for reconsideration under the rule within a

Proceedings                                    107

1  reasonable time period and I certainly can't find any

2  case law that three years would be considered a

3  reasonable time period.  We would urge the Court to --

4           THE COURT:  Well, I either have jurisdiction or

5  I don't.

6           MS. NOVAK:  Right.

7           THE COURT:  That's the problem so --

8           MR. AMANAT:  That's right.

9           MS. NOVAK:  Right.  And I would --

10          MR. AMANAT:  Judge, can I be heard on that?

11  Our motion is categorically not a motion for a

12  reconsideration.  It is a motion to dismiss for lack of

13  jurisdiction.  Whenever any --

14          THE COURT:  You practically say it is.

15          MR. AMANAT:  Well, the --

16          THE COURT:  You say the plaintiffs have given

17  me an opportunity to reconsider by filing this

18  supplemental complaint.

19          MR. AMANAT:  What I meant by that is whenever

20  any plaintiff requests any form of relief in a case, the

21  Court is obliged --

22          THE COURT:  All right.  We don't have to

23  (indiscernible).

24          MR. AMANAT:  -- consider anew, whether it has

25  jurisdiction in the case or not.

Proceedings                                                      108

1        THE COURT:  I'm always obliged to consider

2   jurisdiction.  I didn't say I wasn't.

3        MR. AMANAT:  At --

4        THE COURT:  I mean, I just said that I had

5   decided the issue.  You want me to put off -- first of

6   all, I think your discussion of the Disability Rights

7   Advocate case was completely wrong but I always have to

8   consider whether I have jurisdiction.  I decided that I

9   had jurisdiction that there was standing for two reasons;

10  one, we had plaintiffs in the case who were younger than

11  seventeen at the time this case started.  And also, there

12  is the issue of the -- I forget what it was called, the

13  MAP (ph.) conspiracy?

14        MS. NOVAK:  Yes, they're now the Women's

15  Liberation Network.

16        THE COURT:  The Women's Liberation Network, the

17  fact that they have to go through this -- they have to go

18  to -- they have to find a drugstore that's open.  They

19  have to have this I.D. -- government issued I.D.  I mean

20  it's a joke that when I showed my credentials at the

21  airport which is a government issued I.D., my judicial

22  credentials, they didn't want to accept it.  I don't

23  drive, so I didn't have a driver's license.

24        MR. AMANAT:  But, your Honor --

25        MR. BECKENHAUER:  But, Judge, let --

Proceedings                           109

1          THE COURT:  But so that these are significant

2    burdens and, you know, basically just to take an analogy

3    from outside this context, there was a time maybe when

4    you were very young, but the time that I remember when

5    there were no ATM machines and if you wanted cash, you

6    really had to wait until the bank opened at 9 o'clock in

7    the morning and it was very difficult to find somebody,

8    you know, to do you a favor and cash a check. And now,

9    ATMs are all over the place and you could get it quite

10   readily.

11          And so, it's -- the burden here is analogous.

12   You have to -- it's sort of like the bank being opened

13   from 9:00 to 3:00 now.  I know New York is not the rest

14   of the -- I'm dealing with the rest of the country here,

15   not just New York, there are pharmacies that are opened

16   -- you know, that open at 8 o'clock in the morning and

17   may not close until 9:00 in the evening but it is -- to

18   my mind, it's -- each of these things are a sufficient

19   burden to provide a basis for standing.

20          MR. AMANAT:  But these plaintiffs have to show

21   it, your Honor.  This is not a class action --

22          THE COURT:  I think you argue in your brief

23   they have to show that they don't live near a drugstore.

24   I mean, that's ridiculous.

25          MR. AMANAT:  Well, they have to show --

Transcriptions Plus II, Inc.

Proceedings                              110

1        THE COURT:  They might find a need for it if
2   they're in, you know, some other place where they're not
3   -- you know, where they don't live next to a drugstore.
4   I don't think that showing is required.

5        MR. AMANAT:  But no plaintiff has made any
6   evidentiary showing that she personally has encountered
7   any actual meaningful difficulty getting access to the
8   drug.  In fact, they have worked to the contrary in the
9   complaint, where they say that they have access to Plan
10  B.

11       THE COURT:  Well, they have access and they
12  have -- you know, they have access but the access is
13  limited by the circumstances under which -- by the
14  restrictions under which Plan B can be sold.

15       MS. NOVAK:  Your Honor, I just wanted to
16  address your question when you asked what else needed to
17  be briefed.  There are a couple of motions that need to
18  be briefed but you had issued an order to show cause.
19  That briefing is done.

20       THE COURT:  So is there anything left that you
21  need a brief in terms of just my deciding the whole
22  case --

23       MS. NOVAK:  We --

24       THE COURT:  -- as opposed to some interim --

25       MR. AMANAT:  Well, we have moved to dismiss.

1   If the Court denies that motion to dismiss, as we

2   indicated in our brief --

3           THE COURT:  They move to dismiss on the ground

4   of standing.

5           MR. AMANAT:  On the ground of standing.  And if

6   the Court --

7           THE COURT:  What else?

8           MR. AMANAT:  I'm sorry?

9           THE COURT:  That's it.

10          MR. AMANAT:  On the ground of standing and on

11  the ground that the Court has no jurisdiction to review

12  any aspect of the SNDA proceeding.

13          THE COURT:  Yes, I understand that.  I'm not

14  going to review any aspect of the SNDA proceeding.  It

15  doesn't mean I can't look at what went on there.

16          MR. AMANAT:  But as we indicated in our brief,

17  if the Court denies our motion to dismiss --

18          THE COURT:  I'm not going to review it in the

19  sense that I am not going to -- I have no intention of

20  ordering the FDA to grant the SNDA application.  That's

21  what I agree with you but, you know, that I have to close

22  my eyes to what the agency said, for example, and what

23  was done and how it was handled, and whether it's

24  relevant or not relevant to whether things were being

25  done in good faith, I can do that.  And if I can't,

Proceedings                         112

1  somebody will tell me.

2         So, I'm not -- I don't propose to take any

3  action to order them to grant Teva's application to make

4  this product available over the market.

5         MR. SHUMSKY:  Sure, your Honor.  And if I can

6  just respond to that quickly, I fully accept --

7         THE CLERK:  Microphone, counsel.

8         MR. SHUMSKY:  I'm sorry.  I fully accept that

9  limitation on what you're prepared to do and would just

10  underscore that we would ask you to be mindful of our

11  entitlement to exclusivity or at least what you think our

12  entitlement to exclusivity would be if the Secretary

13  hadn't intervened and you weren't inclined to overrule

14  that --

15         THE COURT:  No, I am -- no, you --

16         MR. SHUMSKY:  -- in addressing whether or

17  not --

18         THE COURT:  You've made a reasonable argument.

19  I understand that argument and, of course, it would be

20  completely avoided I suppose, if I just said that what

21  they submitted before was enough and that to the extent

22  that it was found to be not enough this time, it was

23  based not on a good faith evaluation of their

24  application.

25         MR. SHUMSKY:  Sure, your Honor.  And, you know,

Proceedings                                    113

1    just a couple of very brief responses to that.  The first

2    one kind of gets at something that Ms. Novak said very

3    early when she started arguing, which was she urged you

4    not to award Teva exclusivity here because that would

5    essentially to be hold that the studies were essential

6    and therefore, that they aren't entitled to relief

7    ultimately at the end of the day and the action at large.

8          I would urge you to keep in mind that same

9    principle works the other direction which is that

10   whatever you decide here, if you're going to take the

11   position at this point in time in terms of the order to

12   show cause, that the data wasn't essential is in essence

13   to resolve this entire case independent of the summary

14   judgment briefing that's pending in front of you and

15   independent of the other issues and what you had

16   indicated at the very outset today was you view this

17   process as one that's going to unfold in two stages.

18         THE COURT:  Yes, but --

19         MR. SHUMSKY:  And to the extent that the

20   plaintiffs have urged you not to resolve the ultimate

21   merits at stage one, I think it's worth noting that that

22   really works in both directions.

23         THE COURT:  She just wants me to do it all in

24   one piece now.

25         MS. NOVAK:  That's true.  I would like you to

Proceedings                        114

1   do it today in one piece please.

2           THE COURT:  But if I were inclined to do it in

3   two -- I don't know.  I asked -- that's why I asked

4   what's left to be briefed here.

5           MR. AMANAT:  Well, Judge, in regards to these

6   two pieces, I mean, I understand that your Honor's

7   talking about some form of preliminary relief in the

8   context of the Court's order to show cause.  But it's

9   essentially -- I mean, the relief that the Court's

10  thinking about is essentially preliminary injunction of

11  some kind.  And we've argued in our opposition to the

12  plaintiff's brief that there are a number of reasons why

13  that kind of preliminary relief is not appropriate in

14  this case and why there's no basis for any form of

15  emergent relief under the facts of this case and the

16  plaintiffs have not refuted --

17          THE COURT:  When she's asking me to -- I'm

18  sorry to refer to you as she and he --

19          MS. NOVAK:  Ms. Novak.

20          THE COURT:  -- but I am terrible at remembering

21  names.

22          MS. NOVAK:  It's okay.

23          THE COURT:  But I'm sorry, go ahead.

24          MR. AMANAT:  That was my point.

25          THE COURT:  I just lost my train of thought.

Proceedings                    115

1          MR. AMANAT:  My point was that the
2    considerations that the Court ought to consider in
3    deciding whether it ought to grant some form of
4    preliminary or kind of stage one relief --
5          THE COURT:  I'm sorry.  What I started to say
6    is that she doesn't want preliminary relief, as much as
7    she would like final relief.
8          MR. AMANAT:  Well, I understand that and their
9    motion for preliminary injunction seeks the same relief
10   that their motion for permanent injunction does.
11         THE COURT:  Right.
12         MR. AMANAT:  You know, but what -- I understand
13   that your Honor's contemplating in the context of the
14   order to show cause, potentially granting some form or
15   ordering some form of relief --
16         THE COURT:  But I --
17         MR. AMANAT:  -- that is potentially short of or
18   less than what it might ultimately grant on the merits
19   and my response to that is --
20         THE COURT:  That's what --
21         MR. AMANAT:  -- that the considerations as to
22   whether such a course of action is appropriate for the
23   Court to take is essentially the same as a consideration
24   as to whether preliminary injunction of the type that
25   plaintiffs are seeking --

Proceedings                                    116

1          THE COURT:  I understand that.

2          MR. AMANAT:  -- is appropriate and I urge the

3     Court to consider the reasons that we set forth in our

4     brief on Monday as to why that form of preliminary relief

5     is not appropriate in the context of this --

6          THE COURT:  Or permanent relief.  You take --

7     that I can't grant any relief other -- if I have the

8     authority to do anything, it's another remand.  That's

9     basically what I understand you to be saying.

10         MR. BECKENHAUER:  Your Honor, that would be our

11    principal submission but even if the Court weren't to

12    remand at this point, I think it's pretty clear that at

13    most it would be authorized to grant the citizen

14    petition.  We're here again on the denial of the citizen

15    petition.  A citizen petition is a petition for rule

16    making.

17         THE COURT:  Let's assume I agree with that.  I

18    am not -- I don't think that I have the authority to

19    order that the Secretary grant Teva's application.

20         MR. BECKENHAUER:  Okay.

21         THE COURT:  I agree with that but as I

22    explained, I don't agree that I can't consider the

23    process that went on here as a further example of the bad

24    faith in which this whole issue has been handled.  And,

25    you know, I don't purport to be an expert on

Proceedings                                          117

1   administrative law.  I'm embarrassed to say that my

2   principal experience has been in dealing with Social

3   Security Disability cases.

4           But there comes a point even in those cases

5   where you stop remanding and you say you've had enough.

6   You say to the Secretary, this is enough.  I've sent it

7   -- you know, I made a finding.  I sent it back.  I said

8   that I -- one of the reasons for remanding and not giving

9   them what they wanted was that I expected that the people

10  who were involved in making the decision were no longer

11  with the FDA and that the decision on remand would be

12  handled in good faith.

13          But I am not precluded from taking into account

14  everything that's happened in the last three years,

15  including the way their application was handled.

16          MR. AMANAT:  Well, with due respect, Judge, in

17  the context of a Social Security case, you're talking

18  about the judicial review of an agency adjudication under

19  42 U.S.C. 405(g) --

20          THE COURT:  Right.

21          MR. AMANAT:  -- which is an entirely different

22  process --

23          THE COURT:  I know.

24          MR. AMANAT:  -- than a judicial review of a

25  denial of rule making under 5 U.S.C. 7062.  It's an

Transcriptions Plus II, Inc.

1  apples to oranges comparison, your Honor.

2          MR. BECKENHAUER:  Your Honor, if I could step

3  back just to make a broader point, you know, I think the

4  government has -- we've done our best to explain and try

5  to disentangle the two processes and although there was

6  certainly an underlying scientific --

7          THE COURT:  By the way, you keep talking about

8  this rule making, you know, you went through the rule

9  making charade the last time, too, during the stall --

10  during what I call the first stall in this case and you

11  do not have to go through rule making in order to grant

12  them relief.  It's only because you would decide that you

13  want to do this and keep this thing going for another few

14  years.

15          MR. BECKENHAUER:  Your Honor, I don't think

16  that's right.  You know, what happened last time, I

17  think, was unique in a couple of different and

18  significant respects.  After the remand and after a

19  change in administration, FDA considered your Honor's

20  order but it independently revisited the appropriate age

21  cutoff and it ultimately revised its decision on the

22  SNDA.  And importantly, at that time, there was an FDA

23  determination on the scientific merits that the safety

24  and efficacy of Plan B for seventeen-year-olds had been

25  established.  That's certainly not the case here.  So, I

1   think what happened last time in stage one, as you

2   referred to it, is very unique.

3          Where we are now is that the Court has

4   recognized that there are only two ways to accomplish an

5   OTC switch.  The only one of them that's applicable here

6   is by rule making which can be initiated by granting a

7   citizen petition.  And the agency couldn't circumvent

8   those requirements and certainly the Court can't either.

9          So, you know, by statute --

10          THE COURT:  Well, but you've had the

11   opportunity to do it.  I mean, we're here -- this is not

12   -- you haven't just come here and the case is just a, you

13   know, few months old.  Look how long the petition has

14   been pending.  They were pleading -- virtually it took,

15   you know -- they were pleading for action and on the

16   remand they were pleading for action and I don't find

17   persuasive, any of the reasons that you've given me for

18   why you didn't act on it quickly.

19          MR. BECKENHAUER:  Your Honor, that -- even if

20   the Court isn't persuaded by our argument on the merits,

21   that doesn't change the fact that under the operating

22   statute and regulations, the only possible relief would

23   be to grant the citizen petition and the only effect that

24   would flow from that is to commence notice and comment

25   rule making.  The statute itself says the Secretary may

Proceedings                                    120

 1  by regulation, remove drugs from prescription dispensing

 2  requirements that requires notice and comment rule

 3  making.

 4          And if the Court's order is attempting to get

 5  around that requirement --

 6          THE COURT:  But haven't you made that --

 7          MR. BECKENHAUER:  -- then the Court is

 8  effective --

 9          THE COURT:  I don't understand.  You have that

10  already.

11          MR. BECKENHAUER:  I'm sorry?

12          THE COURT:  You've had -- you gave notice.

13  There was 47,000 people commented and then you went ahead

14  and resolve the case and decided you didn't need rule

15  making all together.

16          MR. BECKENHAUER:  I think you may be referring

17  to whether or not a dual marketing regime could be

18  permitted.  I think that's a different question than

19  whether or not a full OTC switch can be effectuated.

20          MR. AMANAT:  That was an advanced notice of

21  proposed rule making, your Honor.  It's a -- an advanced

22  notice of rule making is a different administrative

23  animal from a notice of proposed rule making.  An

24  advanced notice of proposed rule making is simply an

25  inquiry undertaken by federal agency to collect

Proceedings                                    121

1   information that is potentially relevant to a policy

2   decision that its considering making.

3          It is true that the agency has had a number of

4   years to initiate a rule making proceeding in this front.

5   However, part of that process, there has to be a policy

6   decision made to commence such a rule making and the

7   agency to date has not, as a matter of policy and

8   scientific judgment, determined that commencing such a

9   notice of comment and rule making proceeding in this

10  context was appropriate.

11         MS. NOVAK:  Your Honor, this is just a red

12  herring.  This is their attempt at further delay.

13  Obviously, this is what they said in the contempt

14  proceeding, we'd have to start a rule making.  Of course,

15  they've had three years, they could do it.  And the

16  government continues to argue that the only relief this

17  court could order is to grant the -- to order the FDA to

18  grant the citizen petition which would then prompt rule

19  making.

20         But that's just not true.  The Court can do

21  what it did last time and order them to enable sponsors

22  to submit labeling changes, to have it available OTC to

23  women of all ages without restriction.  And like your

24  Honor said, they've had a lot of opportunities.  As the

25  case law says, at some point the Court needs to lean

Proceedings                                           122

1   forward and say enough is enough.  One of my favorite

2   quotes is from the Supreme Court case, NLRB v. Wyman

3   Gordon, which says "Supreme Court present does not

4   require that we convert judicial review of agency action

5   into a ping-pong game."

6           At some point, enough is enough and based on

7   the fact that there were arbitrary and capricious

8   actions, if they took the same actions, they were

9   required to explain the reason that they did and explain

10  the significant departures from normal agency procedure.

11  They have failed to do so and we believe that it's

12  certainly within this court's authority to grant the

13  relief that plaintiffs seek which is not a granting of

14  the citizen petition to start rule making which is to

15  direct the FDA to allow companies to immediately market

16  all Levonorgestrel based emergency contraception to

17  consumers over-the-counter without any other

18  restrictions.

19          MR. BECKENHAUER:  Your Honor, that option is

20  the essentially telling the FDA that it has to grant an

21  SNDA and the Court isn't able to do that anymore than the

22  Court is able to direct an OTC switch on its own.  Either

23  way, under either of those options, the Court would

24  essentially be stepping into the shoes of the FDA in

25  directing its scientific judgments.

Proceedings                    123

1          I think it's very clear that under -- let me

2    step back.  In the citizen's --

3          THE COURT:  Understand -- the FDA has made a

4    scientific judgment here.  The real question is how long

5    -- for how many years and how many remands we're supposed

6    to go through here.  The FDA in this context is not the

7    Secretary.  The Secretary may have authority to do what

8    she did but the expert agency has made clear what its

9    view is.  All I would be doing is essentially carrying

10   out the views of the FDA.

11         MR. BECKENHAUER:  Your Honor, not with respect

12   to the citizen petition.  You know, be that as it may

13   with respect to the Plan B One-Step SNDA, it is firmly

14   the scientific judgment of the FDA with respect to Plan B

15   and generic alternatives in the citizen petition that the

16   available data are not sufficient to support an OTC

17   switch for the under seventeen population.

18         MS. NOVAK:  And the plaintiffs would say that's

19   not the scientific determination.  Those were the

20   political determinations.  The scientific determinations

21   are there.  They're in the administrative record that the

22   scientists believed the data supported OTC access to

23   women of all ages without restriction for the two pill

24   product.

25         And basically what the government is saying is

1   that what your Honor did last time with ordering them to

2   make the product available to seventeen-year-olds, that

3   that was illegal, that the Court doesn't have the

4   authority to do what it did.  But they didn't appeal that

5   and --

6              THE COURT:  That still doesn't give me the

7   authority.

8              MS. NOVAK:  Well, like I said, there -- it's in

9   our briefs and it will be in our forthcoming briefs that

10  there is -- especially with these egregious facts, there

11  is certainly precedent for this court ordering the relief

12  without again, engaging in a ping-pong game and allowing

13  them further delay and to kick the can down the road.

14             MR. BECKENHAUER:  Your Honor, can I just a --

15             MS. LIEBER:  Your Honor, If I could just say

16  one thing.

17             THE CLERK:  Your appearance, counsel?

18             MS. LIEBER:  Sheila Lieber.  On the citizen's

19  petition, I mean there has been nothing brought before

20  the Court to indicate that the letter that went out from

21  Dr. Woodcock was anything but the scientific judgment of

22  the FDA.

23             THE COURT:  Sure there has.

24             MS. LIEBER:  No, not with regard on remand.

25  The Court said -- your Honor, the court said --

1       THE COURT:  The fact is, why did they take two

2  and a half years to write that letter?

3       MS. LIEBER:  Because they were trying to

4  determine whether additional -- first they wanted to

5  determine whether there, in fact, was a need for

6  additional age-specific data.

7       THE COURT:  We're going around in a circle.

8  They made that determination when they entered into the

9  understanding with Teva.  So, once they decided that Teva

10  had to provide this, that was the end of the ball game.

11       MS. LIEBER:  Your Honor, they understood --

12       THE COURT:  I can't assume that what they did

13  here in December was done in good faith.

14       MS. LIEBER:  Your Honor?

15       MR. BECKENHAUER:  Your Honor, I think it would

16  be -- to the contrary, I think it would be quite

17  extraordinary to assume that it was made in bad faith,

18  particularly simply because the FDA exercised her

19  statutory authority to act on the Plan B One-Step SNDA.

20       THE COURT:  Well, it's not that.  It's the

21  reasons that were given and the manner in which the

22  decision was reached.  You know, it was --

23       MR. BECKENHAUER:  Your Honor may disagree --

24       THE COURT:  They were decided virtually

25  simultaneously.

Proceedings                                126

1          MR. BECKENHAUER:  But they were decided

2    virtually simultaneously because the FDA's conclusion on

3    the citizen petition was a logical outgrowth of its

4    recommendation on the Plan B One-Step SNDA and the timing

5    was what the timing was because FDA made its

6    recommendation on the Plan B One-Step SNDA on the PDUFA

7    goal date.

8          THE COURT:  On the what?

9          MR. BECKENHAUER:  On the PDUFA goal date.  You

10   may recall --

11         THE COURT:  I don't know what that --

12         MR. AMANAT:  The Prescription Drug User Fee Act

13   is PDUFA.

14         MR. BECKENHAUER:  So, Congress has directed the

15   FDA to respond to applications submitted by drug sponsors

16   by certain goal dates and the applicable goal date for

17   Teva's One-Step SNDA was the date that the Secretary

18   directed the FDA to issue a complete response letter.

19         THE COURT:  No, I know.  Well, the agency was

20   prepared to respond by that date.

21         MR. BECKENHAUER:  Right.

22         THE COURT:  But my point is just that there's

23   nothing suspicious about the timing.  The sponsor

24   submitted an application.  FDA responded by the deadline

25   and then a couple of days later, it denied the citizen

Proceedings                                           127

1   petition because that conclusion followed logically,

2   indeed, necessarily from its resolution or at least

3   recommendation on the Plan B One-Step SNDA.

4           The fact that there was a substantive

5   disagreement between the FDA and the Secretary on the

6   Plan B One-Step SNDA, it would be extraordinary for that

7   fact alone to lend itself to a finding of bad faith,

8   particularly where the Secretary is exercising statutory

9   authority that's vested in her by Congress.

10          MR. AMANAT:  There's no evidence on the record

11  before the Court of bad faith in connection with the

12  denial of the citizen petition on remand.  The Court has

13  referred to --

14          THE COURT:  Well, if your argument is that the

15  denial of their petition, the citizen's petition, follows

16  and was required as a result of the Secretary's

17  decision --

18          MR. BECKENHAUER:  No.

19          THE COURT:  That's what you just said, look the

20  record will say that.

21          MR. BECKENHAUER:  The FDA --

22          THE COURT:  the record will say what you just

23  said.

24          MR. BECKENHAUER:  Let me try one more time to

25  clarify.  The FDA's decision on the citizen petition

1  followed necessarily from the FDA's recommendation on the

2  One-Step decision.  The FDA decided -- the FDA was

3  prepared to approve the One-Step SNDA because it thought

4  that the new studies were essential.  That meant for the

5  citizen petition on Plan B, the existing studies were

6  inadequate.  That's the link between the two and that's

7  the timing link.  It has nothing to do with the

8  Secretary.

9          MS. NOVAK:  Your Honor, the government says

10 that there's no evidence of bad faith but I believe your

11 order and significant case law says if you act arbitrary

12 and capriciously, and act in a departure from agency

13 norms and you don't explain why, then it's by definition

14 arbitrary and capricious.

15         So they keep saying that well, this makes

16 certain -- this makes sense and there's no evidence of

17 bad faith because we determined that the new studies were

18 essential.  Why did they determine that these new studies

19 were essential?  It just doesn't make sense at all.  It

20 would be one thing that if the studies showed something

21 different than the earlier studies, they could say oh,

22 these are essential because it showed that those earlier

23 results were wrong.  But when they just confirm an

24 earlier result, how do you say that they're essential?

25 Why are they essential?

1          And again, they say they needed to wait for --

2   to rule on this application.  What if this application

3   was never filed?  They couldn't go back and determine

4   whether the studies were necessary years before?  There's

5   significant evidence of bad faith, particularly when you

6   consider the backdrop of their actions over the past

7   twelve years.

8          MR. BECKENHAUER:  Your Honor, we can go around

9   and around about the sufficiency of the evidence.  I

10  think the sufficiency of the evidence is really the key

11  question.  We seem to be going around and around on that

12  question.

13         THE COURT:  Yes, so it should stop.  That means

14  we've reached the point of stopping.

15         MR. BECKENHAUER:  I'll find the point that --

16  even the sharpest critics within the FDA who firmly

17  advocated for a full OTC switch of Plan B agreed that the

18  FDA's initial decision, initial denial of the citizen

19  petition fell within the range of reasonable scientific

20  judgment.  That conclusion still holds.

21         MS. NOVAK:  And, your Honor, I would like to

22  end on as you stated in your previous order, if the

23  reasoning were reasonable, if it has been tainted by

24  political factors, it's arbitrary and capricious.  So,

25  even if the FDA had reached the conclusions it did

Proceedings                                    130

1  otherwise, the fact that it reached them after political

2  pressure makes them arbitrary and capricious and

3  unreliable.

4          MS. LIEBER:  I think, your Honor, by

5  (indiscernible) we didn't always --

6          THE CLERK:  Microphone, counsel.

7          MS. LIEBER:  Sorry.  Under their theory, there

8  would have been no basis for any remand ever because what

9  the Court allowed the agency to do was to look at this

10 question again free of any sort of political influence

11 and that's precisely what the FDA did.  If what the Court

12 were saying was that the FDA now has to conclude that

13 this age-specific data is not necessary, then there was

14 no point of the Court ever remanding it.  It was for the

15 agency to take another look at this and that's what

16 happened.  That's what represented in Dr. Woodcock's

17 letter.

18         THE COURT:  I remanded it because of the

19 reasons that I said.  I'm not -- you know, I took the

20 most conservative possible course when I acted the last

21 time.  I mean, I could have gone way beyond.  You should

22 have seen what my law clerk wanted me to do.  But I took

23 the most conservative course.  I'm basically trying to do

24 that here.

25         I think the only reason that it got as much

Proceedings                    131

1   attention as it did was probably because of my criticism
2   of the administration rather than for significance of
3   changing it from eighteen to seventeen, which was hardly
4   a major decision.  And nor would it be a major decision
5   if I entered an order now changing it from seventeen to
6   fifteen.
7           MR. BECKENHAUER:  Your Honor, we --
8           THE COURT:  After all, the agency said it was
9   enough even though that -- you know, to make it available
10  over-the-counter, even though there wasn't adequate data
11  with respect to eleven-year-olds and twelve-year-olds.
12          MR. BECKENHAUER:  Your Honor, that was the
13  agency's recommendation --
14          THE COURT:  Yes.
15          MR. BECKENHAUER:  -- with respect to Plan B
16  One-Step.
17          THE COURT:  That was also here in this case.
18          MR. BECKENHAUER:  No, that's incorrect,
19  your Honor.
20          THE COURT:  I think it was --
21          MR. BECKENHAUER:  That was not the agency's
22  recommendation with respect to Plan B.  With respect
23  to --
24          THE COURT:  You're talking Plan B One-Step.
25          MR. BECKENHAUER:  The Plan B One-Step, yes, the

Proceedings                                          132

1   agency advocated for a full OTC switch.

2            THE COURT:  Right, without --

3            MR. BECKENHAUER:  For Plan B, the subject of

4   the citizen petition, the FDA's scientific conclusion was

5   that the data are inadequate.

6            THE COURT:  Yes, but that was totally tainted.

7            MR. BECKENHAUER:  Your Honor previously found

8   that the FDA's decision was tainted by political

9   influence but it never expressed a view on the merits or

10  the reasoning of the scientific judgments underlying that

11  decision.  In fact, it said in its remand order that the

12  FDA was free to exercise its discretion with respect to

13  the citizen petition on remand.  That's what it did.  It

14  set forth its scientific judgments in the record and we

15  think those judgments are supported, particularly under

16  the standard of review applicable to an agency's

17  scientific judgments.

18           Your Honor, with respect to where we go from

19  here, there's been some talk about further briefing.  I

20  would respectfully suggest that it would be quite

21  inappropriate for the Court to order the type of

22  preliminary relief it seems to be contemplating without

23  first assuring itself that the demanding standards for

24  preliminary relief are met.  And it certainly should

25  decline to find that stage two of the case, as we might

Proceedings                                    133

1   call it, has been infected by bad faith in some manner

2   without fist the agency having the opportunity to file

3   the administrative record.  The agency should be able to

4   file the administrative record.  It should be given the

5   opportunity to fully brief the issues before the Court

6   comes to a conclusion about that --

7           THE COURT:  There was a schedule that was fixed

8   for briefing of the final remedy.  Nobody's stopping you

9   from filing the administrative record.

10          MR. BECKENHAUER:  My point is that it would be

11  extraordinary for the Court to determine that the record

12  was inadequate or that there was bad faith here before

13  seeing the record itself.

14          THE COURT:  Okay.  File the record.  When are

15  you going to do that?

16          MR. BECKENHAUER:  I think we could do that in

17  due course.  I would have to consult with agency counsel

18  to see what an appropriate time line would be.

19          THE COURT:  Okay.

20          MS. NOVAK:  Your Honor, I would just like to

21  add that's fine if they want to do that or if they want

22  to open up discovery and I'm sure we'll, you know, find

23  some things that are supportive like we did last time but

24  that shouldn't hinder this court from ruling or acting on

25  its order to show cause or plaintiff's preliminary

Proceedings                                    134

1  injunction.

2       MR. BECKENHAUER:  Your Honor, the government

3  would certainly oppose any discovery as you might expect.

4  We don't think that that's warranted.  We don't think

5  that there's been a showing sufficient to invite

6  discovery in this case, certainly not before the record

7  has been produced.

8       THE COURT:  One last question, given the

9  wording of the order, which was why I shouldn't issue an

10 order to make it available to women as to whom the

11 studies show are capable of understanding, what age would

12 I -- if I were substituting for seventeen, what would I

13 substitute?

14      MS. NOVAK:  Your Honor, we read that order

15 based upon the discussion in the December hearing as that

16 you wanted to know what ages on the face of the studies

17 without having to extrapolate and we have gathered the

18 data from that and indicated that at a minimum, it would

19 be ages thirteen and up.

20      And that is based upon all the studies that the

21 scientist who agreed that the product should be over-the-

22 counter to women of all ages, all those studies there's

23 evidence from thirteen-year-olds, fourteen-year-olds,

24 fifteen-year-olds, sixteen-year-olds and those are the

25 charts that we made.  Again, those charts were not

1   conducted by our review of the studies.  It was all --

2           THE COURT:  The charts also relied on their

3   study.

4           MS. NOVAK:  Yes, right.  But it's indicated

5   which studies.  Most of the -- there's only two studies

6   that were submitted with Plan B One-Step.  The remaining

7   were all about the two pill product and those were the

8   studies that were considered by the scientific review

9   staff at the FDA, again, that they showed -- determined,

10  showed overwhelming evidence that it should be available

11  to women of all ages.

12          But as your Honor knows, our position is that

13  it should and could be made available to women of all

14  ages, but we believe the studies on their face show that

15  it should be immediately made available to women and

16  young women, thirteen and up.

17          THE COURT:  What about -- I mean it seemed to

18  me that -- I can't find the document.

19          MS. NOVAK:  Are you looking at our brief,

20  your Honor?

21          THE COURT:  No.

22          (Pause.)

23          THE COURT:  This is the document that the

24  government just submitted and I was looking at that

25  particular document which is, I guess the Teva study.

1          MS. NOVAK:  The actual use study regarding the

2   one pill product, it's also the ages are delineated in

3   plaintiff's response to the order to show cause in the

4   charts which are on pages 6 and 7.  If you're looking for

5   the numbers, the actual use study for the one pill

6   product had 279 participants sixteen-year-olds and the

7   label comp included 171 sixteen-year-olds and under.

8          THE COURT:  Well, why isn't fifteen a more

9   reasonable basis for interim relief?

10          MS. NOVAK:  Well, your Honor, the study show --

11   I mean there's plenty of data for ages certainly fourteen

12   and also for thirteen.  Your Honor needs to keep in mind,

13   these actual use studies are -- simulate who actually

14   uses the product.  So, you have thirteen-year-olds who

15   were included in these studies and as the reviewers

16   showed, these -- the younger adolescents showed

17   significant understanding for -- and actual use for safe

18   and effective use without a clinician involvement.

19          And for example, on the label comprehension

20   studies, you know, you even have twelve-year-olds, at

21   least 90 twelve-year-olds and for thirteen-year-olds, you

22   have at least 116.  So there's significant data of those

23   ages and the fourteen-year-olds, at least 231

24   participants in label comprehension studies, and at least

25   67 in the actual use and other behavioral studies.

Proceedings                    137

1          So that's why we broke it out all for the Court

2     because -- you know, to make it easier for your Honor to

3     find the numbers.  But, you know, given what the studies

4     show on their face, certainly it should be reduced to

5     fifteen-year-olds, that would be helpful for fifteen and

6     sixteen-year-olds but there's no reason to put the cutoff

7     at fifteen.

8          MR. BECKENHAUER:  Your Honor, if the Court were

9     inclined to issue an order along that rational, I just --

10    I want to be perfectly clear that the Court understands

11    that in that table, the only one of those studies that's

12    an actual use study with respect to Plan B is the first

13    one, that's the Raymond study in 2003.

14         So, plaintiff's counsel is suggesting that you,

15    your Honor, say that because there are 28 fifteen and

16    sixteen-year-olds in that study, that's sufficient to

17    extrapolate and generalize to the entire --

18         THE COURT:  I don't have it in front of me.

19    No, I was going to use Teva's, taking into --

20         MR. BECKENHAUER:  Well, then we get back at --

21         MR. SHUMSKY:  Your Honor, that gets right into

22    the exclusivity issue which is --

23         THE COURT:  No, it doesn't get into the

24    exclusivity issue if I -- if I limited it to Plan B One-

25    Step.

1          MR. SHUMSKY:  But if you limit the relief that

2    you enter as part of the show cause to direct the

3    Secretary to take action only with respect to Plan B One-

4    Step, it doesn't vitiate the exclusivity.

5          But to the extent that the order you're

6    contemplating entering extends to the two step product,

7    will just make it clear, you can't use the data from our

8    study to justify it and at least if that's the

9    constraint, the government is correct that the decision

10   would be predicated on the original Plan B study.

11         THE COURT:  Well, it's the same as what I did

12   the last time.  The last time I did it for -- it said

13   Plan B.  But otherwise, it was exactly the same.

14         MR. BECKENHAUER:  And the last time the agency

15   had concluded that the data were sufficient to establish

16   safety and efficacy for seventeen-year-olds with respect

17   to the Plan B data, it has concluded to the contrary now

18   with respect to the under sixteen population.

19         THE COURT:  I don't understand what you're

20   talking about.  When you say the agency, the agency was

21   ready to make it available to everybody over-the-counter

22   and you keep --

23         MR. SHUMSKY:  Not --

24         MS. NOVAK:  Exactly.

25         THE COURT:  You keep saying the agency --

1          MR. BECKENHAUER:  That's not exactly right.

2          THE COURT:  You keep saying the agency.

3          MR. BECKENHAUER:  You know, I  --

4          THE COURT:  The agency is acting under the

5   direction of the Secretary.

6          MR. BECKENHAUER:  But, your Honor --

7          MR. AMANAT:  With regard to Plan B One-Step,

8   not with regard to Plan B.

9          THE COURT:  I understand that.  Okay.

10         MR. AMANAT:  Judge, if I just may be heard on

11  one last point here with regard to this notion of

12  reducing the age cutoff, I appreciate that the Court is

13  skeptical of the government's arguments with regard to

14  the standing of the adult plaintiffs and with regard to

15  the question of whether the point of sale restrictions or

16  the limited distribution of Plan B -- the causes of

17  injury and fact for standing purposes that may have to be

18  an issue as to which we agree to disagree, however, it is

19  undisputed that there is no plaintiff currently in this

20  case who is fifteen-years-old or sixteen-years-old or

21  fourteen-years-old or thirteen --

22         THE COURT:  Well, that's partially your fault.

23         MR. AMANAT:  No, it is -- with due respect, it

24  is not.

25         THE COURT:  Well --

Proceedings                          140

1          MR. AMANAT:  The plaintiffs have had three

2   years also to recruit new plaintiffs -- new adolescent

3   plaintiffs.  They have not done that.  My point,

4   your Honor, is that with regard -- that the relief that

5   the --

6          THE COURT:  They should have recruited new

7   adolescent plaintiffs while you were diddling them around

8   in the administrative proceeding.

9          MR. AMANAT:  Well, your Honor, any relief that

10  your Honor enters in this case has to be tied to specific

11  injuries that these plaintiffs can demonstrate.

12         THE COURT:  As far as -- this is where you

13  almost sort of try to push me into almost a broader

14  ruling than I might otherwise make.  All women have

15  standing with respect to the fact that they have to go to

16  a drugstore, they have to show identification --

17  government-issued identification, the kind that you need

18  to get on an airplane --

19         MR. AMANAT:  Well, even if that were true --

20         THE COURT:  -- and that these are restrictions

21  on their ability to obtain the drug.  And fundamentally,

22  to the extent that there were people there -- here in

23  this lawsuit that actually had standing, you've dragged

24  this out in such a way that the people who had standing

25  have aged out.  So, in terms of the standing based on

Proceedings                                    141

1   age, you've aged them out by the extraordinary delay

2   that's been engaged in here but I nevertheless believe

3   that the restrictions that remain are sufficient to give

4   them standing.

5           MR. AMANAT:  Judge, with due respect, the case

6   ended in March of 2009 when this court entered final

7   judgment.

8           THE COURT:  And it --

9           MR. AMANAT:  After that point --

10          THE COURT:  -- ended with a remand, just like a

11  Social Security case ends with a remand when I remand it

12  for further consideration and when it comes back, it gets

13  a new docket number only because for administrative

14  convenience.

15          MR. AMANAT:  But the --

16          THE COURT:  The case didn't end --

17          MR. AMANAT:  -- plaintiffs did not have to wait

18  until February of 2012 to bring a new case or to bring a

19  motion asking for --

20          THE COURT:  They brought a motion to hold you

21  in contempt.  You know, the whole -- most of the time

22  that we've been litigating has been over the agency's

23  delay.  Part of the relief they were asking for the last

24  time was for you guys to make a decision.

25          MR. BECKENHAUER:  Your Honor, I understand.  I

Proceedings                                    142

1  certainly understand.

2        THE COURT:  And then they were engaged in

3  letters with you over the last three years about making a

4  decision.

5        MR. BECKENHAUER:  I certainly understand the

6  Court's concern about the timing.  I think our only point

7  here is that if the Court is contemplating ordering a

8  partial OTC switch with respect to fifteen and sixteen-

9  year-olds, there are no fifteen and sixteen-year-olds

10  before the Court.  So that wouldn't redress any injury

11  and it certainly wouldn't provide --

12        THE COURT:  No.

13        MR. BECKENHAUER:  -- a basis for a finding of

14  irreparable harm.

15        THE COURT:  This is what I meant what you're

16  basically arguing for is essentially that I just simply

17  make it available to everybody because they're all harmed

18  -- I'm trying to do it in a more conservative way.

19  They're all harmed by the restrictions on where the

20  identification and the site.

21        MR. AMANAT:  But even if that were true --

22        THE COURT:  All women are --

23        MR. AMANAT:  Not all women are parties to the

24  case, your Honor.  Not all women --

25        THE COURT:  But there are enough women who are

1   parties to the case to give them standing.

2          MS. NOVAK:  In addition, as your Honor

3   indicated previously --

4          THE COURT:  I don't know why this -- you know,

5   I haven't even thought about it but in many ways, this

6   would be analogous to a class action where --

7          MS. NOVAK:  Yes.

8          THE COURT:  -- when the plaintiff ages out, it

9   doesn't necessarily moot the case.

10         MS. NOVAK:  And actually --

11         THE COURT:  So it's very analogous to it except

12  that we're dealing with -- you know, we're not dealing

13  with technically a class action.

14         MS. NOVAK:  Your Honor, did make other

15  analogies earlier in the case in the December 22, 2005

16  hearing, talking about which plaintiffs have argued that

17  they have third-party standing and you made analogy to

18  the Batson case, whereas the plaintiffs also represent

19  the interests of their patients and other women that

20  they're involved with and women out there who have no

21  particular interest in bringing a case on their own.

22         Indeed, in that hearing when I went back and

23  read the transcript, the FDA admitted that at least one

24  plaintiff had standing.  That was at page 30 of that

25  transcript.  And as your Honor has ruled and as we know,

Proceedings                                    144

1   you only need one plaintiff with standing but I didn't

2   know that we were going to argue the motion to dismiss

3   here today.  But again, these are just -- the government

4   would like you not to rule and to make as many motions as

5   it can to try to hinder you from ruling in a prompt

6   manner and plaintiffs believe that your Honor has the

7   authority and certainly --

8           THE COURT:  Well, what's left to be filed?  You

9   want to file the administrative record and --

10          MR. AMANAT:  File the administrative record and

11  if your Honor's denying the motion to dismiss, then we

12  would move for summary judgment on the merits.

13          THE COURT:  Well, who stopped you?

14          MR. AMANAT:  Well, we as a --

15          THE COURT:  It seems to me, you're awfully

16  presumptuous considering that I have already ruled on the

17  issue of standing and nothing with respect to MAP

18  conspiracy, whatever it was.  Nothing has changed with

19  respect to part of my standing ruling.  I don't know why

20  you just didn't move for summary judgment  to begin with,

21  why you filed a separate motion to dismiss.

22          You know, I was saying to my law clerks, I feel

23  like, you know -- I'm dealing with the government, I feel

24  like I'm dealing with a large law firm here.  I'm getting

25  papered with motions on every little thing.

Proceedings                        145

```
 1          MS. NOVAK:  We feel similarly, your Honor.

 2          MR. AMANAT:  We don't consider the Court's

 3   jurisdiction (indiscernible).

 4          THE COURT:  Don't take offense.

 5          (Cross-talk).

 6          THE COURT:  But eery minute I'm getting

 7   documents from you.  He's trying to paper the case here.

 8          MS. NOVAK:  Well, it is, we believe, a tactic

 9   for delay because now we have to respond to all them and

10   it's going to -- they're trying to delay, your Honor --

11          THE COURT:  Your theory is that they're

12   actually trying to settle the case and that's why they

13   want to delay it?

14          MS. NOVAK:  Well, it's not actually settling

15   the case because we do not believe resolution --

16          THE COURT:  I don't mean your --

17          MS. NOVAK:  Right, they are trying to settle. I

18   think that's what they said here.  There's nothing wrong

19   with them trying to settle except for the fact that they

20   are trying to cut off the relief that we have been

21   seeking for ten years and I, you know --

22          THE COURT:  How could they cut -- I don't

23   understand.

24          MS. NOVAK:  They are going to --

25          THE COURT:  I always believed that settlement
```

Proceedings                                    146

1   was better than my deciding.

2          MS. NOVAK:  Yes, I don't think that would be

3   the case here because like we said, Teva

4   understandably --

5          THE COURT:  I don't see how they could settle

6   you out of this case.

7          MS. NOVAK:  Well, because they are going to I

8   believe, get a grant of exclusivity and then they are

9   going to argue that your Honor can't overrule it and I

10  think the middle ground will keep in place the behind-

11  the-counter regime and they will say that your hands are

12  tied and just like they've argued today, that you cannot

13  overrule them.

14         THE COURT:  But at what age do they predict

15  that they're going to settle?

16         MS. NOVAK:  You know, I don't have those kind

17  of skills but it might be something like sixteen or

18  fifteen.  Like we've said before, it's a minuscule number

19  of teens that eleven or twelve-year-olds that would use

20  emergency contraception which shouldn't diminish the fact

21  that for every individual woman having an unwanted

22  pregnancy, especially at eleven or twelve, is a big deal.

23         But on top of that, the problem with them

24  coming up with some sort of happy medium that -- because

25  that provide political cover and give Teva exclusivity is

Proceedings                          147

 1   that it would keep in place the behind-the-counter

 2   regime.  And that is harmful for, like your Honor said,

 3   every woman out there.  That's a lot of people.

 4           MR. BECKENHAUER:  Your Honor, if I could

 5   respond to that.  I don't intend to respond to

 6   plaintiff's conspiracy theory but I think suffice it to

 7   say that the government in closing would urge the Court

 8   to deny or to not act on its show cause order and if the

 9   Court is inclined to deny the motion to dismiss, then the

10   government will prepare to move -- to cross-move for

11   summary judgment and briefing on the merits could

12   commence or conclude.

13           THE COURT:  So you would have presumably

14   responded to the motion to dismiss.

15           MS. NOVAK:  They just filed that -- I don't

16   know when it was -- Monday or -- on Monday and we're

17   working diligently and we're going to respond as soon as

18   possible, especially because of what the government has

19   deemed my conspiracy theory but we'll just see how that

20   plays out.

21           But the briefing on the order to show cause,

22   that's fully briefed and the government has responded to

23   our motion for a preliminary injunction and summary

24   judgment.  They filed that on Monday, as well and we're

25   also diligently working to reply to that and then we hope

1   that your Honor in the interim will grant its order to

2   show cause and then grant a preliminary injunction.

3           And if they want to drag out the summary

4   judgment proceedings, then we can go on for years as they

5   like to litigate but in the interim, it's important to

6   stop the imminent harm that has gone on for over a decade

7   now.

8           THE COURT:  Well, I am going to deny the motion

9   to dismiss.  If you want to file a motion for summary

10  judgment, go ahead but -- because I think there's

11  standing and if you're telling me if I give a more narrow

12  remedy as an interim order, it's somehow defective

13  because I don't have plaintiffs before me within that

14  particular age group, when I think all women have

15  standing, all women who would normally -- not all women,

16  women of child-bearing years, would have standing that,

17  you know, I'll have to take that into account.

18          If you object on that ground -- if you insist

19  that in order for me to give a more moderate interim

20  remedy like fifteen-year-olds, I can't do that because I

21  don't have a fifteen-year-old plaintiff, then I

22  understand that.

23          MR. BECKENHAUER:  Your Honor, that's not my

24  objection.  I think that's Article III's objection.  The

25  Court to order any form of relief is required to assure

                    Proceedings                    149

 1  itself --

 2          THE COURT:  I agree that I have standing.  I

 3  have assured myself that I have standing, that they have

 4  standing but you seem to be -- I think they have standing

 5  because of the restrictions on site and identification

 6  that we've discussed.  I've decided that.

 7          MR. BECKENHAUER:  So just so we could be clear

 8  on the record, you're denying the motion to dismiss

 9  without hearing plaintiff's response?

10          THE COURT:  Well --

11          MR. BECKENHAUER:  And --

12          THE COURT:  Yes, I don't know -- do you  have

13  anything more to say than what you've already said?

14          MS. NOVAK:  I made the arguments that we're

15  certainly perfectly fine with you denying it without us

16  having a written opposition but we agree that

17  plaintiffs --

18          THE COURT:  No, not you; I've already decided

19  it.

20          MS. NOVAK:  Yes.

21          THE COURT:  This is not --

22          MS. NOVAK:  It's a motion for reconsideration;

23  yes.

24          THE COURT:  This is not something I haven't

25  decided.  I've already decided it.

Proceedings                                           150

1            MR. AMANAT:  Is the Court --

2            MR. BECKENHAUER:  And it's the --

3            MR. AMANAT:  I'm sorry.  Is the Court going to

4    issue an order on the motion to dismiss or is the oral

5    order that you're --

6            THE COURT:  Well, you know, I will issue an

7    order.

8            MS. NOVAK:  I also, just because your Honor

9    asked, I highlighted for the Court what the Court had

10   addressed years ago, <u>Batson</u>, but I also would like to

11   draw the Court's attention to <u>Einstad v. Beard</u> (ph.).  I

12   don't know if I have the cite on me but it's a Supreme

13   Court case, as well that relates to the standing and is

14   analogous for the same lack of interest and actually

15   maybe perhaps lack of ability for minors to bring a case

16   necessarily on their own behalf because they're not the

17   ones that are going to be prosecuted.  It would be adults

18   that would be prosecuted for distributing prescriptions

19   drugs to them illegally.

20           And we believe that National Women's

21   Liberation, that organization and NARHP --

22           THE COURT:  You want to put in a memo?

23           MS. NOVAK:  No, I don't.  They all have

24   organization on this -- associational standing.  So,

25   we're happy with your Honor issuing it orally.

Proceedings                                151

1          THE COURT:  I don't remember that I dealt with

2    the issue of organizational standing in my opinion.   I

3    don't think I did.

4          MR. AMANAT:  You did not.

5          THE COURT:  Okay.  Thank you.

6          MS. NOVAK:  Thank you, your Honor.

7          MR. SHUMSKY:  Thank you, your Honor.

8              (Matter concluded)

9                    -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

152

# C  E  R  T  I  F  I  C  A  T  E

I, LINDA FERRARA, hereby certify that the
foregoing transcript of the said proceedings is a true
and accurate transcript from the electronic sound-
recording of the proceedings reduced to typewriting in
the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or
employee or attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
or financially interested directly or indirectly in this
action.

IN WITNESS WHEREOF, I hereunto set my hand this
**30th** Day of **April**, 2012.

*Linda Ferrara*

Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:12-cv-00763-ERK-VVP Tummino et al v. Hamburg et al Order |
| **Date:** | Tuesday, May 29, 2012 7:49:33 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered on 4/26/2012 at 7:23 PM EDT and filed on 4/26/2012

**Case Name:**      Tummino et al v. Hamburg et al

**Case Number:**   1:12-cv-00763-ERK-VVP

**Filer:**

**Document Number:** No document attached

**Docket Text:**

**ORDER. In a letter dated April 25, 2012, the defendants argue that the threshold jurisdictional issues that they raise in their motion to dismiss implicate this Court's authority to adjudicate Teva's intervention motion. They also invite this Court to determine whether consideration of the Order to Show Cause may be premature. I reject both suggestions. The first suggestion, which relies on Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc., 2012 WL 1143588 (2d Cir. Apr. 6, 2012), is without merit for the reasons set out in the letter submitted by Teva Women's Health, Inc. on April 26, 2012. Moreover, I reject the second suggestion because I have already decided the issue of standing in my March 23, 2009 order. Indeed, the defendants' motion to dismiss asks me to reconsider my ruling. See ECF No. 42 at 14. The defendants are free to re-argue any issue they choose. While I understand their argument with respect to the teenage plaintiffs who reached the age of 17 while the FDA interminably delayed consideration of the Citizen's Petition and compliance with my order remanding the case, I see no reason to delay consideration of the Order to Show Cause and related issues.. Ordered by Senior Judge Edward R. Korman on 4/26/2012. (Bedoya, Natalie)**

**1:12-cv-00763-ERK-VVP Notice has been electronically mailed to:**

Farzin Franklin Amanat franklin.amanat@usdoj.gov, civil.usanye@usdoj.gov

Andrea H Costello acostello@filsinc.org

Eric B. Beckenhauer eric.beckenhauer@usdoj.gov

Janet Crepps jcrepps@reprorights.org

Suzanne Ilene Novak snovak@reprorights.org, ccooper@reprorights.org

Kirsten Clanton kirsten.clanton@southernlegal.org, greisy.armas@southernlegal.org

Steven Menashi steven.menashi@kirkland.com

Michael Shumsky michael.shumsky@kirkland.com

**1:12-cv-00763-ERK-VVP Notice will not be electronically mailed to:**

**CIVIL CAUSE FOR**      **MOTION TO INTERVENE** / **OSC**

BEFORE JUDGE KORMAN      April 25, 2012    /   TIME: 3 /40

CV-  12-763

TITLE:       TUMMINO  -vs-  HAMBURG, et al

PLTFFS ATTY:    **SUZANNE NOVAK**
     ✓ present     ___ not present

      Julie Rikelman
     ✓ present     ___ not present

      Kara Lowentheil
     ✓ present     ___ not present

DEFTS ATTY:    **FARZIN FRANKLIN AMANAT, AUSA** / Eric Beckenhauer
     ✓ present     ___ not present    / Sheila Leiber

     ___ present     ___ not present

INTERVENOR    **MICHAEL SHUMSKY / STEVEN MENASHI**
     ✓ present     ___ not present

ESR:   Hong /Rocco      COURTROOM DEPUTY: PaulaMarie Susi

OTHER: _____

✓ CASE CALLED.  CONF / (HELD) / ADJ'D / CONT'D TO_____)

✓ ARGUMENT HEARD / CONT'D TO_____.

✓ DECISION:  ORDER(S) SIGNED / ENTERED ON THE RECORD / RESERVED.
                        OSC

**OTHER:** _____

Motion to dismiss denied for the reasons stated.

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:12-cv-00763-ERK-VVP Tummino et al v. Hamburg et al Order on Motion to Dismiss |
| **Date:** | Monday, July 02, 2012 4:22:51 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

**Notice of Electronic Filing**

The following transaction was entered on 7/2/2012 at 4:22 PM EDT and filed on 7/2/2012
**Case Name:**        Tummino et al v. Hamburg et al
**Case Number:**     1:12-cv-00763-ERK-VVP
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORDER denying [62] Motion to Dismiss. Ordered by Judge Edward R. Korman on 7/2/2012. (Susi, PaulaMarie)**


**1:12-cv-00763-ERK-VVP Notice has been electronically mailed to:**

Farzin Franklin Amanat franklin.amanat@usdoj.gov, civil.usanye@usdoj.gov

Andrea H Costello ac@justiceonline.org

Eric B. Beckenhauer eric.beckenhauer@usdoj.gov

Janet Crepps jcrepps@reprorights.org

Suzanne Ilene Novak snovak@reprorights.org, ccooper@reprorights.org

Kirsten Clanton kirsten.clanton@southernlegal.org, greisy.armas@southernlegal.org

Steven Menashi steven.menashi@kirkland.com

Michael Shumsky michael.shumsky@kirkland.com

**1:12-cv-00763-ERK-VVP Notice will not be electronically mailed to:**