No. 13-1690

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

ANNIE TUMMINO, et al.,
Plaintiffs-Appellees,

v.

MARGARET HAMBURG, Commissioner of Food and Drugs, et al.,
Defendants-Appellants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————————

## PLAINTIFFS-APPELLEES' ADDENDUM TO OPPOSITION
## TO DEFENDANTS-APPELLANTS' MOTION FOR A STAY
## PENDING APPEAL

———————————

JANET CREPPS
  *Center for Reproductive Rights*
  *120 Wall Street, 14th Floor*
  *New York, NY 10005*

ANDREA COSTELLO
MARA VERHEYDEN-HILLIARD
  *Partnership for Civil Justice Fund*
  *617 Florida Avenue, NW*
  *Washington, D.C. 20001*

KIRSTEN CLANTON
  *Southern Legal Counsel, Inc.*
  *1229 NW 12th Ave.*
  *Gainesville, FL 32601*

# ADDENDUM TABLE OF CONTENTS

**Statutes**                                                                                    **Page**

*Tummino v. Torti,* 603 F.Supp.2d 519 (Mar. 23, 2009) ("*Tummino I*")……….. Pls-Add-1

Order Amending *Tummino I* (Mar. 6, 2013)…………………………………. Pls-Add-31

Letter from Frank Amanat to Suzanne Novak (Aug. 13, 2010)…………... Pls-Add-33

Statement by Margaret Hamburg (Dec. 11, 2011)………………………... Pls-Add-36

Letter and Statement by Kathleen Sebelius (Dec. 11, 2011)……………… Pls-Add-37

Letter from Scott Landau to Judge Korman (Dec. 12, 2011)……………... Pls-Add-40

Letter from Janet Woodcock to Bonnie Scott Jones (Dec. 12, 2011)……... Pls-Add-41

Declaration of Mary K. Pendergast (Feb. 7, 2012)………………………... Pls-Add-51

Declaration of Cynthia Harper, Ph.D. (Feb. 3, 2012)…………………….. Pls-Add-69

Westlaw.

Page 1

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**



United States District Court,
E.D. New York.
Annie TUMMINO et al., Plaintiffs,
v.
Frank M. TORTI,[FN*] Acting Commissioner of the
Food and Drug Administration, Defendant.

> FN* Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Frank M. Torti has been substituted for former Commissioner Andrew C. von Eschenbach as defendant in this case. Earlier in this litigation, Commissioner von Eschenbach was substituted for former Commissioner Lester M. Crawford, the original named defendant.

No. 05-CV-366 (ERK)(VVP).
March 23, 2009.

**Background:** Challenge was brought against Food and Drug Administration's (FDA) denial of citizen petition that sought nonprescription availability for women of all ages of "Plan B" synthetic hormone-based emergency contraceptive.

**Holdings:** The District Court, Korman, J., held that:
(1) adolescent girls who challenged denial of citizen petition satisfied injury-in-fact criterion for constitutional standing;
(2) girls also satisfied prudential standing;
(3) District Court in reviewing denial of citizen petition could consider administrative record for related supplemental new drug applications (SNDAs);
(4) sufficient evidence supported finding that improper political influence had borne upon denial of citizen petition;
(5) FDA's departures from normal procedures also

weighed in favor of finding of bad faith; and
(6) remand was appropriate remedy except as to 17-year-olds, for whom contraceptive's safe use was conceded.

Vacated and remanded.

West Headnotes

**[1] Health 198H** ⚷323

198H Health
    198HI Regulation in General
        198HI(E) Drugs; Medical Devices and Instruments
            198Hk323 k. Judicial Review or Intervention. Most Cited Cases

Food and Drug Administration's (FDA) denial of citizen petition seeking approval of switch from prescription to over-the-counter (OTC) status for particular drug was reviewable by federal district court, i.e. was not allocated to Court of Appeals in first instance. Federal Food, Drug, and Cosmetic Act, § 503(b)(3), 21 U.S.C.A. § 353(b)(3); 21 C.F.R. §§ 10.25(a), 10.45(g).

**[2] Federal Civil Procedure 170A** ⚷103.5

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.5 k. Pleading. Most Cited Cases

On motion to dismiss for lack of standing, allegations in complaint must be accepted as true for purposes of standing.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

[3] **Federal Civil Procedure 170A** ☞103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

**Federal Civil Procedure 170A** ☞103.3

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
           170Ak103.3 k. Causation; Redressabil-
ity. Most Cited Cases

Constitutional standing requires plaintiff to show:
(1) injury in fact; (2) which is fairly traceable to de-
fendant's conduct; and (3) which is likely to be re-
dressed by requested relief. U.S.C.A. Const. Art. 3, §
2, cl. 1.

[4] **Federal Civil Procedure 170A** ☞103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

"Injury in fact," for purposes of constitutional
standing requirements, is defined as invasion of le-
gally protected interest which is: (1) concrete and
particularized, and (2) actual or imminent, not con-
jectural or hypothetical. U.S.C.A. Const. Art. 3, § 2,
cl. 1.

[5] **Federal Civil Procedure 170A** ☞103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
           170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

Plaintiff bears the burden of establishing each
element of constitutional standing. U.S.C.A. Const.
Art. 3, § 2, cl. 1.

[6] **Health 198H** ☞323

198H Health
   198HI Regulation in General
      198HI(E) Drugs; Medical Devices and In-
struments
         198Hk323 k. Judicial Review or Interven-
tion. Most Cited Cases

Adolescent girls satisfied injury-in-fact criterion
for constitutional standing in their challenge to Food
and Drug Administration's (FDA) denial of nonpre-
scription availability for women of all ages of "Plan
B" emergency contraceptive; delay occasioned by
having to obtain prescription prior to purchasing con-
traceptive could increase chance of unwanted preg-
nancy, given its effectiveness duration of 72 hours,
and parents' obtaining Plan B on behalf of their
daughters absent prescription for daughters' use would
violate FDCA. U.S.C.A. Const. Art. 3, § 2, cl. 1;
Federal Food, Drug, and Cosmetic Act, §§ 301(k),
303(a)(1), 503(b)(3), 21 U.S.C.A. §§ 331(k),
333(a)(1), 353(b)(3); 21 C.F.R. § 10.25(a).

[7] **Health 198H** ☞323

198H Health
   198HI Regulation in General
      198HI(E) Drugs; Medical Devices and In-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

struments

198Hk323 k. Judicial Review or Intervention. Most Cited Cases

Advocacy organization and its members satisfied injury-in-fact criterion for constitutional standing in their challenge to Food and Drug Administration's (FDA) point-of-sale restriction on availability of "Plan B" emergency contraceptive, which required that contraceptive be kept behind pharmacy counter; burden imposed by restriction might delay woman's ability to obtain Plan B quickly, and thereby reduce its efficacy. U.S.C.A. Const. Art. 3, § 2, cl. 1; Federal Food, Drug, and Cosmetic Act, § 503(b)(3), 21 U.S.C.A. § 353(b)(3); 21 C.F.R. § 10.25(a).

**[8] Health 198H ⚷323**

198H Health
198HI Regulation in General
198HI(E) Drugs; Medical Devices and Instruments
198Hk323 k. Judicial Review or Intervention. Most Cited Cases

Adolescent girls satisfied prudential standing in their challenge to Food and Drug Administration's (FDA) denial of nonprescription availability for women of all ages of "Plan B" emergency contraceptive; girls were within zone of interests of FDCA since they were among class of individuals whom FDCA was instead to protect by providing non-prescription access to a drug when prescription would be burdensome and unnecessary. Federal Food, Drug, and Cosmetic Act, § 503(b)(1, 3), 21 U.S.C.A. § 353(b)(1, 3); 21 C.F.R. § 10.25(a).

**[9] Health 198H ⚷323**

198H Health
198HI Regulation in General
198HI(E) Drugs; Medical Devices and In-

struments

198Hk323 k. Judicial Review or Intervention. Most Cited Cases

On challenge against Food and Drug Administration's (FDA) denial of citizen petition that sought over-the-counter (OTC) availability for women of all ages of "Plan B" emergency contraceptive, federal district court was not limited to consideration of administrative record compiled for petition alone, but could also consider administrative record for supplemental new drug applications (SNDAs) submitted by drug's sponsor; SNDA materials were before FDA when it acted on citizen petition, and issues presented by citizen petition and SNDAs were identical. Federal Food, Drug, and Cosmetic Act, § 503(b)(3), 21 U.S.C.A. § 353(b)(3); 21 C.F.R. § 10.25(a).

**[10] Administrative Law and Procedure 15A ⚷314**

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
15AIV(A) In General
15Ak314 k. Bias, Prejudice or Other Disqualification to Exercise Powers. Most Cited Cases

To support claim of improper political influence on federal administrative agency, warranting finding of bad faith and consequent abuse of discretion under Administrative Procedure Act (APA), there must be some showing that political pressure was intended to and did cause agency's action to be influenced by factors not relevant under controlling statute. 5 U.S.C.A. § 706(2)(A).

**[11] Administrative Law and Procedure 15A ⚷314**

15A Administrative Law and Procedure
15AIV Powers and Proceedings of Administrative

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Agencies, Officers and Agents

 15AIV(A) In General

  15Ak314 k. Bias, Prejudice or Other Disqualification to Exercise Powers. Most Cited Cases

 In event of improper political influence on federal administrative agency, agency's consideration of some relevant factors does not "immunize" agency's decision, i.e. does not preclude finding of bad faith and consequent abuse of discretion under Administrative Procedure Act (APA). 5 U.S.C.A § 706(2)(A).

**[12]** Health 198H &#128273;305

198H Health

 198HI Regulation in General

  198HI(E) Drugs; Medical Devices and Instruments

   198Hk305 k. Prescription Requirement; Ethical Drugs. Most Cited Cases

 Sufficient evidence supported finding that improper political influence had borne upon Food and Drug Administration's (FDA) denial of citizen petition seeking over-the-counter (OTC) availability for women of all ages of "Plan B" emergency contraceptive, as required to support determination of bad faith and abuse of discretion by FDA; denial went against recommendations of FDA's advisory committee and its scientific review staff, there was evidence of White House pressure upon FDA commissioner, and decision to permit OTC sales to women over 18 appeared timed to facilitate commissioner's confirmation. 5 U.S.C.A. § 706(2)(A); Federal Food, Drug, and Cosmetic Act, § 503(b)(3), 21 U.S.C.A. § 353(b)(3); 21 C.F.R. § 10.25(a).

**[13]** Health 198H &#128273;305

198H Health

 198HI Regulation in General

  198HI(E) Drugs; Medical Devices and In-

struments

   198Hk305 k. Prescription Requirement; Ethical Drugs. Most Cited Cases

 Food and Drug Administration's (FDA) departures from normal procedures weighed in favor of finding of bad faith, and abuse of discretion, in agency's denial of citizen petition seeking over-the-counter (OTC) availability for women of all ages of "Plan B" emergency contraceptive; agency departed by acting against its advisory committee's recommendation, by placing additional members on advisory committee to achieve ideological balance, by apparently making decision before scientific reviews were complete, and by refusing to extrapolate actual-use study data from older age group to 16-and-under group. 5 U.S.C.A. § 706(2)(A); Federal Food, Drug, and Cosmetic Act, § 503(b)(1, 3), 21 U.S.C.A. § 353(b)(1, 3); 21 C.F.R. § 10.25(a).

**[14]** Health 198H &#128273;323

198H Health

 198HI Regulation in General

  198HI(E) Drugs; Medical Devices and Instruments

   198Hk323 k. Judicial Review or Intervention. Most Cited Cases

 On district court's finding that Food and Drug Administration (FDA) had acted in bad faith and abused its discretion by denying citizen petition seeking over-the-counter (OTC) availability for women of all ages of "Plan B" emergency contraceptive, remand to FDA was appropriate remedy, except as to 17-year-olds for whom drug's safe use was conceded; agency had new commissioner, so that remand was not necessarily futile, and district court was in no position to determine whether synthetic hormone-based drug was safe without prescription for girls of very young ages. Federal Food, Drug, and Cosmetic Act, § 503(b)(3), 21 U.S.C.A. § 353(b)(3);

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

21 C.F.R. § 10.25(a).

**\*522** Andrea H. Costello, Newberry, FL, Suzanne Ilene Novak, Janet Crepps, Sanford Cohen, Bonnie Scott Jones, New York, NY, Natalie N. Maxwell, Southern Legal Counsel, Inc., Gainesville, FL, for Plaintiffs.

F. Franklin Amanat, United States Attorneys Office, Eastern District of New York, Brooklyn, NY, for Defendant.

### MEMORANDUM & ORDER

KORMAN, District Judge:

Plan B is an emergency contraceptive that can be used to reduce the risk of unwanted pregnancy after sexual intercourse. When used as directed, it can reduce the risk of pregnancy by up to 89 percent. Plan B acts mainly by stopping the release of an egg from an ovary. It may also prevent sperm from fertilizing an egg that has been released or, if fertilization has already occurred, block implantation of the resulting embryo in the uterus. Plan B does not have any known serious or long-term side effects, though it may have some mild and short-term side effects, such as nausea or abdominal pain, in some users. The approved dosage of Plan B is two pills taken 12 hours apart, each containing 0.75 mg of levonorgestrel, a synthetic hormone similar to the naturally occurring hormone progesterone. Because the drug works best when taken within 24 hours of sexual intercourse, it is commonly referred to as a "morning-after pill." Nevertheless, the drug is effective if the first dose is taken within 72 hours of sexual intercourse. Studies have shown that Plan B is equally effective if the two doses of levonorgestrel are taken less than 12 hours apart or at the same time.

Plan B was approved for prescription-only use in the United States in 1999 and is the only emergency contraceptive drug currently available in the United States. Plan B and other emergency contraceptives with the same active ingredient are available without a prescription or age restriction in much of the world, including virtually all major industrialized nations. Plaintiffs—individuals and organizations advocating wider distribution of and access to emergency contraceptives, as well as parents and their minor children seeking access to the same—brought this action challenging the denial of a Citizen Petition, **\*523** which requested that the Food and Drug Administration ("FDA") make Plan B available without a prescription to women of all ages.

The FDA considered the Citizen Petition in tandem with a number of proposals-referred to as supplemental new drug applications ("SNDA")-submitted by Women's Capital Corporation, the drug's original manufacturer. Women's Capital Corporation sold its right to market Plan B to Barr Pharmaceuticals, Inc. during the course of the proceedings described below. I refer to them collectively as the "Plan B sponsor." The first SNDA, like the Citizen Petition, sought non-prescription access to Plan B for women of all ages. After the FDA denied such access, the Plan B sponsor submitted a second SNDA, seeking non-prescription access for women 16 and older. The FDA rejected that application too despite nearly uniform agreement among FDA scientific review staff that women of all ages could use Plan B without a prescription safely and effectively. The Plan B sponsor then submitted a third SNDA, which proposed making Plan B available without a prescription to women 17 and older. While FDA scientists and senior officials found that 17 year olds could use Plan B safely without a prescription, the FDA Commissioner determined that, because of "enforcement" concerns, Plan B would be available without a prescription only to women 18 and older. Putting aside for the moment the specifics of the many claims brought by plaintiffs and the details of each of the FDA's decisions, the gravamen of plaintiffs' claims is that the FDA's decisions regarding Plan B-on the Citizen Petition and the SNDAs-were arbitrary and capricious because they were not the result of rea-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

soned and good faith agency decision-making.

Plaintiffs are right. The FDA repeatedly and unreasonably delayed issuing a decision on Plan B for suspect reasons and, on two occasions, only took action on Plan B to facilitate confirmation of Acting FDA Commissioners, whose confirmation hearings had been held up due to these repeated delays. The first occasion involved the confirmation of then-Acting FDA Commissioner Lester M. Crawford, who froze the review process for seven months in 2005. In order to overcome a hold that had been placed on his nomination by two Senators, the Secretary of Health and Human Services promised that the FDA would act on Plan B by September 2005. After Dr. Crawford was confirmed by the Senate in July 2005, however, he reneged on the promise and, instead, delayed action another eleven months to pursue, and then abandon, a rulemaking with respect to Plan B. There is also evidence that when the FDA finally decided to approve non-prescription use of Plan B for women 18 and older, it did so to facilitate the confirmation of Commissioner Crawford's successor, then-Acting FDA Commissioner Andrew C. von Eschenbach, whose confirmation certain Senators had vowed to block because of the continued delays on Plan B.

These political considerations, delays, and implausible justifications for decision-making are not the only evidence of a lack of good faith and reasoned agency decision-making. Indeed, the record is clear that the FDA's course of conduct regarding Plan B departed in significant ways from the agency's normal procedures regarding similar applications to switch a drug product from prescription to non-prescription use, referred to as a "switch application" or an "over-the-counter switch." For example, FDA upper management, including the Commissioner, wrested control over the decision-making on Plan B from staff that normally would issue the final decision on an over-the-counter switch application; the FDA's denial**524** of non-prescription access without age re-

striction went against the recommendation of a committee of experts it had empaneled to advise it on Plan B; and the Commissioner-at the behest of political actors-decided to deny non-prescription access to women 16 and younger before FDA scientific review staff had completed their reviews.

In light of this evidence, the FDA's denial of the Citizen Petition is vacated and the matter is remanded to the FDA for reconsideration of whether to approve Plan B for over-the-counter status without age or point-of-sale restrictions. While the FDA is free, on remand, to exercise its expertise and discretion regarding the proper disposition of the Citizen Petition, no useful purpose would be served by continuing to deprive 17 year olds access to Plan B without a prescription. Indeed, the record shows that FDA officials and staff both agreed that 17 years olds can use Plan B safely without a prescription. The FDA's justification for this age restriction, that pharmacists would be unable to enforce the prescription requirement if the cutoff were age 17, rather than 18, lacks all credibility.

I now proceed to outline the statutory and regulatory framework for the FDA's consideration of over-the-counter switch applications in general, detail the FDA's evaluations of and decisions regarding Plan B, and recount the procedural history of this action. I then turn to the merits of plaintiffs' claim that the FDA's denial of the Citizen Petition was arbitrary and capricious.

# I. Background
## A. *Statutory and Regulatory Background*

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.,* no new drug product may be sold in the United States unless the Secretary of Health and Human Services ("Secretary") first approves a new drug application ("NDA") submitted by the drug's sponsor. *Id.* § 355. The Secretary delegated primary responsibility over drug regulation to the Commissioner of the FDA ("Commissioner"). *Id.* § 393(d). As part of the NDA, the drug sponsor

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

must submit, *inter alia,* "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use" to the FDA. *Id.* § 355(b)(1)(A). An NDA will be denied if "the investigations ... do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof," "the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions," or there is "insufficient information to determine whether such drug is safe for use under such conditions." *Id.* §§ 355(d)(1), (2), (4).

A drug must be dispensed by prescription if, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [it] is not safe for use except under the supervision of a practitioner licensed by law to administer such drug." *Id.* § 353(b)(1)(A). A drug may be moved from prescription-only to non-prescription status when the Secretary deems that the prescription requirement is not necessary for the protection of the public health. *Id.* § 353(b)(3). Specifically, the applicable regulation provides that:

> Any drug limited to prescription use ... shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful *525 effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling.

21 C.F.R. § 310.200(b). Many new drugs are initially approved for prescription-only status and then later considered for non-prescription status, i.e., an over-the-counter or OTC switch. A drug is suitable for

OTC use when found to be safe and effective for self-administration and when its labeling clearly provides directions for safe use and warnings regarding unsafe use, side effects, and adverse reactions. *See id.* § 330.10(a)(4). These regulations were promulgated following the adoption of the Durham-Humphrey Amendment to the FDCA in 1951. The amendment was intended, in part, "to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician." S.Rep. No. 82-946 (1951), *as reprinted in* 1951 U.S.C.C.A.N. 2454, 2454; H.R.Rep. No. 82-700 at 2454 (1951).

There are two means by which the FDA can switch a prescription-only drug to non-prescription status. First, it can promulgate a regulation changing the drug's status. *See* 21 U.S.C. § 353(b)(3). This rulemaking process may be initiated by the Commissioner, 21 C.F.R. § 310.200(b), or by any interested person who files a citizen petition. *Id.* § 10.25(a). Within 180 days of receipt of the petition, the Commissioner must either approve or deny the petition or provide "a tentative response [to the petitioner], indicating why the agency has been unable to reach a decision on the petition." *Id.* § 10.30(e)(2)(iii). Alternatively, a drug sponsor may request an over-the-counter switch. *Id.* § 310.200(b). Unlike the first mechanism, this process does not require rulemaking. *See* 21 U.S.C. §§ 355(c), (d); 21 C.F.R. § 314.71. Nevertheless, only the drug sponsor can supplement its initial new drug application. 21 C.F.R. § 314.71(a). All of the rules and procedures applicable to new drug applications, discussed above, apply to supplemental new drug applications (SNDAs). *Id.* § 314.71(c).

The Commissioner delegated authority over OTC switch applications to the FDA's Center for Drug Evaluation and Research ("CDER"). FDA Staff Manual Guidelines ("SMG") 1410.30(1), 1410.104(1). OTC switch applications are reviewed by two offices within CDER: the Office of Drug

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Evaluation ("ODE") V, which reviews all OTC switch applications, and, in this case, the ODE III, which includes the Division of Reproductive and Urologic Drug Products ("DRUDP"). CDER may seek scientific advice from outside experts by empanelling an advisory committee to provide a recommendation on an application. After reviewing the OTC switch application and the advice of the advisory committee, the directors of the two ODEs make a decision. If the Director of CDER disagrees with that decision, the Director may change the decision. Pls.' Ex. B at 9 (General Accountability Office, *Food and Drug Administration: Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual,* GAO Doc. No. GAO-06-109 (November 2005), hereinafter "GAO Report").

**B. *Factual Background***

In February 1997, the FDA announced that certain combined oral contraceptives are safe and effective for emergency use, and requested sponsors to submit new drug applications for that use. On July 28, 1999, the FDA approved an NDA for Plan B submitted by the Plan B sponsor. Plan B then became available to consumers in the United States on a prescription-only basis.

***526 1. *Filing of the Citizen Petition and First OTC Switch Application***

On February 14, 2001, one of the named plaintiffs, the Association of Reproductive Health Professionals ("ARHP"), and sixty-five other organizations (together the "petitioners") filed a Citizen Petition, asking the FDA to switch Plan B, and all emergency contraceptives like it, from prescription-only to over-the-counter status without age or point-of-sale restrictions. The petition included affidavits from Dr. David Grimes, the chair of the World Health Organization task force that had conducted the largest and most definitive trials on Plan B to date, and Dr. Elizabeth Raymond, who conducted the label comprehension and actual use studies which the Plan B

sponsor would ultimately submit in support of its SNDA. Numerous national organizations, including the American Medical Association, the American College of Obstetricians and Gynecologists, and the American Public Health Association, endorsed the petition. Def.'s Ex. 1 at CP020-28.

Upon receipt of the Citizen Petition in February 2001, the FDA noted that (1) "[t]he petition clearly outlines how ... Plan B[ ] meet[s] all the criteria for OTC availability," (2) the statements in the petition "are supported by scientific data and the cited literature," and (3) "DRUDP [Division of Reproductive and Urologic Drug Products] agrees with much of the scientific information presented in the supporting statements." Def.'s Ex. 3 at T-30004. Nevertheless, Dr. Andrea Leonard-Segal of the Division of the Over-the-Counter Drug Products ("DOTCDP"), who reviewed the Citizen Petition in April 2001, identified a number of safety concerns which needed evaluation through an actual use study. *Id.* at Tummino ("T") 30023. Among these concerns were whether consumers would use emergency contraception instead of more effective forms of birth control, whether adolescent girls could comprehend and use emergency contraception, and whether the availability of emergency contraception would dissuade consumers from being tested for sexually transmitted diseases. Dr. Segal noted that the sponsor of Plan B "expressed a willingness to work with the Agency to address the[ ] concerns" raised by the petition. *Id.*

On September 6, 2001, the FDA advised the petitioners that it had not yet resolved the issues raised in the Citizen Petition, but that it would respond "as soon as we have reached a decision on your request." Def.'s Ex. 1 at CP029. The FDA did not respond for nearly five more years, when it announced, on June 9, 2006, that it had denied the petition. *Id.* at CP001-19. During this period, however, the FDA communicated regularly with the Plan B sponsor about its anticipated SNDA. Indeed, in February 2001, shortly before the Citizen Petition had been filed, FDA staff met with the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Plan B sponsor to discuss a development plan for an over-the-counter switch application, including the details for a proposed actual use study and label comprehension study. Def.'s Ex. 3. at T-30005-17. Specifically, the FDA made a number of recommendations regarding the age composition of participants in a proposed actual use study and the importance of enrolling young adolescents. The sponsor indicated that it would seek to enroll at least 50 participants aged 17 years of age or younger. *Id.* at T-30047. The FDA did not disapprove of this figure or recommend a larger number. *See id.* at T-30254. Indeed, in subsequent meetings prior to the filing of the SNDA, FDA staff assured the sponsor that the actual use study, the study the FDA considered "pivotal" to the application, "appear[ed] to be adequate for filing." *Id.* Moreover, as early as April 2002, the FDA informed the Plan B sponsor that results from trials in **\*527** the adult population could be extrapolated to the postmenarcheal pediatric population. Pls.' Ex. F-1 at T-30100. The Director of the Office of New Drugs ("OND"), Dr. John K. Jenkins, noted that "the Agency has a long history of extrapolating findings from clinical trials in older patients to adolescents." Pls.' Ex. A-3 at T-30898.

On April 21, 2003, over two years after it had begun discussions with the FDA, the Plan B sponsor submitted an SNDA formally requesting that Plan B be switched from prescription-only to OTC status without age or point-of-sale restriction. On June 9, 2003, the FDA accepted the SNDA for review and set a goal date of February 20, 2004 to render a decision on the application. Def.'s Ex. 3 at T-30284.

**2.** *Review of First OTC Switch Application: OTC Access Without Age Restriction*

As discussed above, while the Plan B sponsor did not formally submit the SNDA until April 2003, the FDA was aware of and anticipated the application well in advance. Indeed, at an Office of the Commissioner's meeting in June 2002, FDA officials-including then Deputy Commissioner Dr. Lester Crawford-and re-view staff discussed the "political sensitivity" of a potential switch to OTC status for Plan B. Pls.' Ex. A-1 at T-30167. These discussions regarding the political implications of the switch applications were not limited to intra-agency meetings: On the very same day that the Plan B sponsor first formally requested OTC status, then-FDA Commissioner Dr. Mark McClellan discussed the pending application with Jay Lefkowitz, the Deputy Assistant to the President for Domestic Policy at the White House. *Id.* at T-509. Commissioner McClellan testified that he had provided several updates on the Plan B application to relevant policy staff at the White House. Pls.' Ex. D-2 at McClellan Dep. 140:19-141:13.

Moreover, deposition testimony of several FDA senior staff members reveals that political and ideological factors played a determinative role in the nomination and selection process for membership on the Advisory Committee for Reproductive Health Drugs, which, along with the Advisory Committee for Non-prescription Drugs (together the "Advisory Committee"), was empaneled by the FDA to make recommendations as to how the FDA should respond to the OTC switch applications. *See* 68 Fed. Reg. 66113 (Nov. 25, 2003).

The common procedure for selecting members of such committees was for the offices and divisions within CDER to "put together a panel of nominees and send those up [to the Office of the Commissioner] for clearance. [However, i]n this case names were sent down." Pls.' Ex. D-1 at Houn Dep. 30:16-18; Pls.' Ex. D-2 at Kweder Dep. 37:16-20. According to Dr. Jenkins, "[i]t wasn't as if names were being floated for internal vetting. These names were being sent down as these are new people who will be on the Committee." Pls.' Ex. D-2 at Jenkins Dep. 258:12-15. The Deputy Director of the Office of New Drugs (OND), Dr. Sandra Kweder, who had been involved in the formation of many advisory committees, *id.* at Kweder Dep. 37:12-15, testified that the Office of the Commissioner appointed several individuals to the com-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

mittee "who would [not] normally [be] considered as the kind of people we would be looking for to be on the panel." *Id.* at 35:3-5. These people had "very limited experience in product development, clinical trials. They were not well-published." *Id.* at 35:8-10; Pls.' Ex. D-1 at Houn Dep. 31:13-15, 39:13-40:4. Dr. Florence Houn, Director of the ODE III, testified that the individuals appointed by the Office of the Commissioner did not have "[e]xpertise recognized on a regional or national level or specialty field **\*528** that would help our deliberations." Pls.' Ex. D-1 at Houn Dep. 39:1-3.

The Office of the Commissioner appointed members to the Advisory Committee not for their expertise, but to achieve what the Office of the Commissioner called a "balance of opinion" on the panel. Pls.' Ex. D-2 at Kweder Dep. 30:2-22. Indeed, Dr. Kweder testified that the Commissioner's office rejected many qualified nominees proposed by CDER in favor of individuals who shared a common ideological viewpoint. *Id.* at 30:4-21, 28:16-29:3. Specifically, "the backgrounds of many of the candidates that were forwarded [by the Commissioner's office] ... had an ideological commonality.... They were ... people who were very active in the Right to Life antiabortion world." *Id.* at 37:4-6, 8-10. According to Dr. Kweder, the CDER is "not ... looking for people who have an opinion coming in [to their participation on the committee]. That's exactly what we don't want. We want people who can look at what's before them and render an assessment and recommendation on the basis of that." *Id.* at 30:13-18.

In preparation for the Advisory Committee meeting, which would consider whether to recommend approval of the Plan B sponsor's switch applications, review staff met with and informed Commissioner McClellan that "[t]he results of the AUS [actual use study] demonstrated that the frequency of unprotected sex did not increase, condom use did not decrease, and the overall use of effective contraception did not decrease [with use of Plan B]." Def.'s Ex. 3 at

T-30394. Staff noted that while only 5 percent of subjects recruited for the actual use study were in the 16 and younger age group, the Plan B sponsor supplemented the actual use study data with reports and behavioral studies from the medical literature. *Id.* These studies enrolled more than 1,000 subjects ages 16 and younger, Pls.' Ex. A-3 at T-30868; Pls.' A-2 at T-30809, and lent further support to a finding that young adolescents can use Plan B safely in an OTC setting.

On December 16, 2003, the Advisory Committee voted 23 to 4 in favor of the recommendation to approve Plan B for over-the-counter status without age or point-of-sale restrictions. Def.'s Ex. 2 at T-10792; it voted unanimously that Plan B is safe for use in a non-prescription setting, and voted 27 to 1 that the actual use study data submitted by the Plan B sponsor could be generalized to the overall population of potential non-prescription users of Plan B, i.e., data from older age groups could be extrapolated to younger ones. *Id.* at T-10754. Only a few panel members raised questions concerning the quality of the supporting data regarding young adolescent use and possible substitution of Plan B for other forms of contraception. *See id.* at T-10753-56, 10763-67, 10776-78, 10789, 10792. And, significantly, at least two of those raising such concerns appear to have been appointed by the Commissioner's office to achieve ideological balance on the panel. *See* Pls.' Ex. D-1 at Houn Dep. 33:19-35:20.

While the Advisory Committee does not have the final say regarding the OTC switch applications, the FDA has followed advisory committee recommendations in every OTC switch application in the last decade: Of the 23 OTC switch applications reviewed by advisory committees from 1994 to 2004, the Plan B over-the-counter switch application was the only one that was not approved after the joint committee voted to recommend its approval. *See* Pls.' Ex. B, GAO Report at 1-4, 34-35. A meeting in late December 2003 or early January 2004 sheds light on the reasons

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

for this departure from the FDA's decision-making process.

**\*529** During that meeting, Dr. Woodcock, Acting Deputy Commissioner, and Dr. Steven Galson, Acting Director for the Center for Drug Evaluation and Research (CDER), told their subordinates, Drs. Jenkins and Kweder, "that Plan B could not be approved on this round," Pls.' Ex. D-2 at Kweder Dep. 45:6-7, and that the decision was to be made at the level of CDER Director or at the Commissioner's level. Pls.' Ex. D-1 at Jenkins Dep. 17:9-11, 18:16-17. This was a departure from usual FDA procedures because under its "normal schema" a switch to OTC of a first in class drug, such as Plan B, would be handled at the Office Director level and would not require approval or sign off by the Commissioner's office. Id. at 16:9-21. Moreover, they were told that the White House had been involved in the decision on Plan B. Dr. Kweder testified that Dr. Woodcock had told her at that meeting that:

> Dr. McClellan had [not] made [the decision] on his own but ... the White House was involved ... we were told, and that it was made very clear that there were a lot of constituents who would be very unhappy with ... an over-the-counter Plan B, and ... [there] was part of the public that needed to have the message that we were taking adolescents and reproductive issues seriously.

Pls.' Ex. D-2 at Kweder Dep. 56:18-57:4; Pls.' Reply Ex. 4 at Kweder Dep. 72:20-73:4. Moreover, the pressure coming from the White House appears to have been transmitted down by the Commissioner's office in such a way as to significantly affect Dr. Galson's position on the over-the-counter switch application. While Dr. Galson would ultimately concur with Commissioner McClellan's decision and sign the Not-Approvable letter in May 2004, Dr. Jenkins testified

> that during the time that we were reviewing the Application before we went to the Advisory Com-

mittee, I never had any indication from either Dr. Woodcock or Dr. Galson that they felt that the product should not be available over the counter without age restriction, so nothing in their communications with me ever led me to think that they were thinking that this should not be approved or should not be available.

Pls.' Reply Ex. 4 at Jenkins Dep. 231:18-232:4. Dr. Jenkins further testified that "[o]ver the course of the time after [this] lunch meeting" and subsequent meetings with review staff and the Commissioner "there were occasions where ... Dr. Galson ... told me that he felt that he didn't have a choice, and ... that he wasn't sure that he would be allowed to remain as Center Director if he didn't agree with the [Not-Approvable] Action." Id. at 232:5-17; see also Pls.' Ex. D-1 at Jenkins Dep. 51:2-8. Dr. Jenkins' testimony is corroborated by the deposition testimony of Dr. Susan Wood, then-Assistant Commissioner for Women's Health and Director of the FDA Office of Women's Health. Dr. Wood testified that Dr. Galson conveyed that "he felt that he would not be able to work with the leadership of the Agency in an effective manner if [the Not-Approvable] letter ... did not go through." Pls.' Reply Ex. 4 at Wood Dep. 24:13-16.

Nevertheless, FDA review staff continued their "first review cycle" for the OTC switch application submitted by the Plan B sponsor. On January 9, 2004, Dr. Curtis Rosebraugh, Deputy Director of the Division of OTC Drugs, recommended approval of the application submitted by the Plan B sponsor, concluding that Plan B has a "low misuse and abuse potential" and is "safe and effective." Pls.' Ex. F-1 at T-30454. Moreover, he suggested that Plan B could decrease unwanted teen pregnancy by up to 70 percent and reduce teen abortions. Id. at T-30455.

**\*530** On January 15, 2004, less than a week after Rosebraugh circulated his memorandum, and before other FDA offices had completed their respective reviews, Dr. Galson met with and informed members

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

of the ODE III, ODE V and OND that the Commissioner's office had decided that the FDA would issue a Not-Approvable letter because of a lack of adequate data to support appropriate use of Plan B by adolescents under 16. Def.'s Ex. 3 at T-30666-70; Pls.' Ex. D-1 at Houn Dep. 21:7-12. There is evidence that Commissioner McClellan made this decision *before* FDA staff had completed their scientific reviews of that data. *See* Pls.' Ex. B, GAO Report at 21-22. Indeed, Dr. Houn testified that it was "very unusual" that Dr. Galson had informed review staff at the January 15, 2004 meeting that the data was insufficient because

> we had not finished the evaluation process, and we were in the middle of getting data on the question of adolescent use of emergency contraception. So if we were to continue an evidence-based approach, we would hope to have all of the evidence in hand before an evaluation and decision was made.

Pls.' Ex. D-1 at Houn Dep. 22:3-9. This testimony is corroborated by Dr. Jenkins' deposition testimony:

> [F]or the Commissioner to convey through Dr. Galson a definitive opinion on the Application and an Action before the reviews were completed and before it had gone up through the subsequent levels of the organization is something I've never encountered before.

*Id.* at Jenkins Dep. 33:12-17; *see also id.* at 29:7-19. The timing of the Commissioner's decision is particularly striking in light of Dr. Galson's acknowledgment, at the January 15 meeting, that additional data, which Dr. Galson and the Commissioner were not familiar with, existed on the use of Plan B in adolescent girls in that age group. Def.'s Ex. 3 at T-30666-70. Indeed, as part of its OTC switch application, the Plan B sponsor submitted eight behavioral studies on the use of emergency contraceptives. *See* Pls.' Ex. F-1 at T-30448-50.

Dr. Woodcock called Dr. Houn a day or two after the January 15 meeting at which the decision not to approve the Plan B sponsor's OTC switch application was announced to find out the "reaction [of] the team. [Dr. Woodcock] conveyed to [Dr. Houn] ... that this was the only way to go to issue a non-approval letter to appease the [present] administration's constituents." Pls.' Ex. D-1 at Houn Dep. 59:16-20; *id.* at 59:21-60:6; Pls.' Ex. D-2 at Kweder Dep. 55:14-56:7. Nevertheless, a week after the January meeting, Dr. Jonca Bull, Director of ODE V, circulated a memorandum which concurred with the favorable reviews submitted by a number of other FDA staff reviewers, *supra.* Dr. Bull wrote

> *There is no basis on which to assume that young women of child bearing potential would suddenly become promiscuous because of this product.* Indeed, the data submitted evidenced a decrease in sexual activity short term.... I am unable to identify evidence in the medical literature to support the assertion that the availability of contraception directly increases high risk sexual behavior.

Pls.' Ex. F-1 at T-30649-50 (emphasis added). Dr. Bull concluded that the Plan B sponsor "adequately demonstrated that women of reproductive potential across relevant age subgroups can use the product appropriately." *Id.* at T-30651.

In mid-February, FDA staff attempted to address Commissioner McClellan's expressed concerns regarding the impact of non-prescription access to Plan B on young adolescents. They presented him with an **\*531** analysis of additional data available on the OTC use of Plan B by adolescents. Def.'s Ex. 3 at T-30720-21. Staff concluded that "the benefits of timely access outweighed any risk for all women, including adolescents," and supported OTC availability without any age restriction. *Id.* at T-30720. Commissioner McClellan, however, was "not convinced the studies had enough power to determine if there were behavioral differences between adults and ado-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

lescents" and directed CDER to work with the drug's sponsor on a marketing plan to restrict Plan B access to appropriate age groups. *Id.* at T-30721.

Responding to these concerns, the Plan B sponsor indicated its willingness to modify its original proposal that would have made Plan B available over-the-counter without any age restriction. Instead, the Plan B sponsor submitted an informal proposal to market Plan B OTC to consumers age 16 and over, while maintaining the product's prescription status for consumers under age 16. Def.'s Ex. 4 at SNDA 001-004. Under this proposal, both prescription and OTC Plan B would be marketed in the same package and would be distributed from behind pharmacy counters with proof-of-age required. *Id.* Notwithstanding this revised proposal, FDA scientific review staff uniformly and strongly supported approval of Plan B for OTC sales without age or point-of-sale restrictions. Numerous scientists submitted memoranda to this effect in March and April 2004. Significantly, the memoranda squarely addressed upper management concerns that there was insufficient data on young adolescent use. Reviewers analyzed the actual use data as well as data from five other studies that were submitted with the initial SNDA. Of the more than 11,000 enrollees in those studies, just over 1,000 were under 16, nearly 2,000 were 17 or younger, and at least 200 of the subjects in one study were aged 13 to 15. Pls.' Ex. A-3 at T-30868; Pls.' Ex. A-2 at T-30809 & n. 5.

In reviewing the available data, Dr. Daniel Davis, Division of Reproductive and Urologic Drug Products (DRUDP) Medical Officer, squarely addressed "concern [s] over the OTC availability of emergency contraception and the effect that this might have on adolescent behavior (e.g., increasing sexual promiscuity)." Pls.' Ex. A-2 at T-30810. Dr. Davis found that the data did not support these concerns, rather it "suggest[ed] that ready access to OTC Plan B ... would have little impact on sexual behavior and contraceptive practices in younger adolescents." *Id.* at

T-30812. Dr. Rosebraugh concluded similarly:

> The data ... is quite compelling to dispel any potential concerns regarding adolescent use or changes in sexual[ ] behaviors associated with plan B use.... In terms of OTC switch applications, this drug has more information available to allow us to predict consumer behaviors than any drug the Divisions ha[ve] approved for switch in recent memory. *If this is not enough data upon which to base a decision, it is unclear what would constitute enough data or even if that is an obtainable goal.*

> *Id.* at T-30757 (emphasis added).

The positive reviews from staff in favor of the OTC switch without age restriction continued: In April 2004, Dr. Donna Griebel, Deputy Director of Division of Reproductive and Urologic Drug Products (DRUDP), concluded that the risk-benefit ratio of non-prescription access to Plan B supported its approval for OTC status. Pls.' Ex. A-3 at T-30829-79. She concluded that there was no justification for "restrict[ing] access to the benefit of this product on the basis of age." *Id.* at T-30877. Dr. Julie Beitz, Deputy Director of ODE III, also found sufficient data on the **\*532** safe and effective use of Plan B to approve use at all age levels. *Id.* at T-30881-90. With respect to the younger adolescent group, Dr. Beitz noted not only that "[o]ver a thousand adolescents aged <=16 years have been evaluated" but that the "[f]indings regarding the use of EC [emergency contraception], frequency of unprotected sex, and frequency of pregnancy and STDs are remarkably consistent across studies, clinical settings, and age strata." *Id.* at T-30888.

Later in April 2004, Dr. Jenkins, Director of the Office of new Drugs, issued his review concurring with the recommendations of ODE III and ODE V. *Id.* at T-30897-99. He concluded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

that increased access for adolescents to emergency contraception *did not* result in inappropriate use of Plan B as a routine form of contraception, an increase in the number of sexual partners, an increase in the frequency of unprotected intercourse, or an increase in the frequency of sexually transmitted diseases.

*Id.* at T-30898 (emphasis added). Responding directly to concerns that the label comprehension and actual use studies enrolled too few young adolescents, Dr. Jenkins noted:

While it is true that the number of adolescents enrolled in the sponsor's studies was relatively small, these studies did not exclude adolescent women from enrollment and were *conducted in settings that would be expected to capture a representative population of women who currently seek emergency contraception. Therefore, it is likely that the percentage of patients enrolled in these studies is an accurate reflection of the potential users of Plan B in an OTC setting.*

*Id.* at T-30897-98 (emphasis added); *see also* Pls.' Ex. A-1 at T-10949 (Acting Director of the Division of Pediatric Drug Development concurring that number of adolescents enrolled in study reflected their actual use of Plan B and waiving pediatric study because of the minimal number of individuals of that age using Plan B).

Moreover, Dr. Jenkins concluded that the data "do[es] not suggest that adolescent women are significantly different from older women in their comprehension of the labeling or appropriate use of the product in the OTC setting." Pls.' Ex. A-3 at T-30898. He found no "compelling scientific reason" to "distinguish[ ] the safety and efficacy of Plan B ... among different ages of women of childbearing potential." *Id.* To the contrary, Dr. Jenkins wrote, "the Agency has a long history of extrapolating findings from clinical trials in older patients to adolescents in both prescription and non-prescription approvals and this practice

was recently incorporated into the Pediatric Research and Equity Act (PREA)." *Id.*; *see* 21 U.S.C. § 355c(a)(2)(B)(ii) ("A study may not be needed in each pediatric age group if data from one age group can be extrapolated to another age group.").

Nevertheless, on May 6, 2004, Dr. Galson, Acting Director of the Center for Drug Evaluation and Research, sent the Plan B sponsor a Not-Approvable letter on the initial SNDA. Pls.' Ex. A-3 at T-30904. Dr. Galson told the sponsor that before the OTC switch could be approved it needed to provide more information on safe use by women under 16, or more information in support of a dual marketing plan that would sell Plan B as a prescription-only product to women under 16. *Id.* at T-30904. Central to this decision, was Dr. Galson's refusal to extrapolate the findings from the actual use study in the 17 and older age group (with 518 enrollees) to the 16 and younger age group (with 22 enrollees). *Id.* at T-30913; *see also id.* at **533 T-30868. Dr. Galson reasoned that it is "very difficult to extrapolate data on behavior from older ages to younger ages" because of the diminished capacity of adolescents to make rational decisions and the "large developmental differences" between early-and mid-adolescence. *Id.* at T-30901. This conclusion was a departure from the FDA's "long history" of extrapolating data for other contraceptives, including prescription oral contraceptives. *See* T-1212-14; Pls.' Ex. B, GAO Report at 5.

Dr. Galson also rejected the view held by review staff (discussed above) that the behavioral studies the Plan B sponsor had submitted "approximate actual OTC use sufficiently to support approval." Pls.' Ex. A-3 at T-30902. Because some of the studies provided "product education assistance beyond what adolescents would receive in an OTC situation," their results could not properly be analogized to OTC use. *Id.* This conclusion, however, was contradicted by the review staff's detailed analysis of the educational component of two of these studies: the first enrolled 2,090 women, 254 of whom were 16 and younger; the se-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

cond enrolled 7,756 women, where 613 were 16 and younger, and 202 were 13 to 15 years of age. Pls.' Ex. A-2 at T-30809; Pls.' Ex. A-3 at T-30861-62. Review staff found that "the information provided at study entry" in these two studies was nothing more than "a summary of the label points from the Plan B patient package insert," information which would be available to all OTC users of Plan B. Pls.' Ex. A-3 at T-30862; *see also* Pls.' Ex. F-2 at Rosebraugh Dep. 191:11-192:13. Moreover, contrary to Dr. Galson's concern that the studies had limited relevance because they were "not conducted in the general population," Pls.' Ex. A-3 at T-30902, review staff found that "several of the studies would have recruited a similar population as that used in the actual use study. Also subjects received advanced provisions to have at home for use as necessary which may simulate how consumers would use the products in an OTC environment." Pls.' Ex. F-1 at T-30449.

3. *Review of Second OTC Switch Application: OTC Access for 16 and Older*

After it received the May 6, 2004 Not-Approvable letter, the Plan B sponsor submitted an amended SNDA in July 2004, formally proposing a dual marketing plan for Plan B that would allow non-prescription sales to persons age 16 and over who presented a valid identification to a pharmacist, and prescription-only sales to women 15 years and younger. The amended SNDA proposed that Plan B be kept behind-the-counter ("BTC") at pharmacies so as to enforce the age restriction on non-prescription use. This marketing approach is referred to as the behind-the-counter or "BTC regime." Nevertheless, a number of FDA scientists concluded that an age restriction limiting OTC use of Plan B was not appropriate. Dr. Davis concluded that Plan B was safe for OTC use by all ages and that prescription-only status for women under 16 was not "warranted or desirable." Pls.' Ex. A-3 at T-31020. Similarly, Dr. Rosebraugh stated that "[a]ny system placing barriers to access would defeat the purpose of the drug and lessen its public health potential." *Id.* at T-31026. Dr. Griebel

expressed concern that the BTC regime would set a dangerous precedent that might have negative consequences for other non-prescription drugs, such as condoms and spermicides. Pls.' Ex. A-4 at T-31031. And Dr. Beitz questioned why Plan B had been singled out for BTC status when misuse of some other OTC products carries more safety risks than misuse of Plan B. *Id.* at T-31085-87.

Dr. Jenkins, Director of the Office of New Drugs, reiterated his view that FDA **\*534** precedent supported extrapolating data from older to younger adolescent age groups, concluding that there is no unique safety concern for the drug in women under age 16. *Id.* at T-31096. He responded to upper management's concerns regarding the "developmental differences between adolescents and older women," characterizing them as beyond the scope of the FDA's authority because such concerns are "more applicable to the ability of adolescents to make reasoned decisions about engaging in sexual intercourse, not their ability to understand how to use Plan B safely and effectively as an emergency contraceptive should they engage in unprotected sexual intercourse." *Id.* at T-31097. While recognizing that "OTC access to Plan B for adolescents may be controversial from a societal perspective," Dr. Jenkins could not "think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." *Id.* at T-31098.

In January 2005, notwithstanding review staff's continued view that OTC access should be approved without age restriction, Dr. Galson, Acting Director of the Center for Drug Evaluation and Research, asked Dr. Jenkins to draft an approvable letter for the Plan B OTC switch application approving OTC status for women age 17 and over. Pls.' Ex. D-2 at Jenkins Dep. 145:18-147:15. Dr. Galson had concluded and informed Acting Commissioner Crawford that he was "comfortable with the science" and that OTC use of Plan B "should be approved over the counter for 17 and up." Pls.' Ex. D-1 at Crawford Dep. 140:14-15,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

140:22. Acting Commissioner Crawford testified at his deposition that he concurred with Dr. Galson's recommendation. *Id.* at Crawford Dep. 46:13-14, 49:12-20. Nevertheless, in January or February 2005, before Dr. Galson could issue the letter he had instructed Dr. Jenkins to draft, Acting Commissioner Crawford removed Dr. Galson's authority to make a decision on the OTC switch application. This was the only time Dr. Galson had had his authority to make such a decision removed and the only time he is aware of it happening to any Center of Drug Evaluation and Research Director. *Id.* at Galson Dep. 186:20-187:13.

Acting Commissioner Crawford's decision to remove Dr. Galson's authority effectively froze the review process for more than seven months-no further scientific reviews were conducted between January 2005 (the date of Dr. Jenkins' memorandum) and Acting Commissioner Crawford's first communication with the Plan B sponsor in August of 2005. As a result, the FDA failed, as required by law, to respond to the SNDA filed by the Plan B sponsor within 180 days of its filing. *See* 21 U.S.C. § 355(c); 21 C.F.R. § 314.100(a). Moreover, during this seven month period-during which time no FDA staff appear to have worked on the Plan B matter-neither Acting Deputy Commissioner Woodcock nor Acting CDER Director Galson knew what Acting Commissioner Crawford was doing on the Plan B SNDA. Pls.' Ex. D-2 at Woodcock Dep. 68:16-22; Pls.' Ex. D-1 at Galson Dep. 202:4-9. Despite repeated inquiries from members of the Senate, Acting Commissioner Crawford failed to provide an answer as to when a decision on the Plan B switch application could be expected. This continued inaction moved Senators Patty Murray and Hillary Clinton to place a hold on his confirmation as Commissioner. To remove the hold, Michael Leavitt, the Secretary of Health and Human Services, sent a letter on July 13, 2005 to Senator Michael Enzi, Chairman of the Senate Committee on Health, Education, Labor and Pensions, assuring him that action would be taken on the Plan B application by September 1, 2005. *See* Def.'s Ltr., dated July 25, 2005.

On July **\*535** 18, 2005, Crawford was confirmed by the Senate as FDA Commissioner.

Notwithstanding assurances that the FDA would act by September 1, 2005, Commissioner Crawford announced in late August 2005 that he would put off the decision yet again. In a letter dated August 26, 2005, Commissioner Crawford stated that, although the "scientific data [is] sufficient to support the safe use of Plan B as an OTC product ... for women who are 17 years of age and older," the FDA is unable to reach a decision on the approvability of the application-even as to women 17 and older-because of "unresolved issues" related to the FDA's authority to approve the BTC regime of Plan B and the logistics of enforcing the age based and point-of-sale restrictions. Def.'s Ex. 2 at T-10813-14. That same day, the FDA announced its intention to issue an advance notice of a 60-day public comment period on whether rulemaking procedures were necessary to resolve and clarify these unresolved issues. This decision presented a new obstacle to the Senate deadline of September 1, 2005 for a decision on Plan B, which had been a condition of the Senate's confirmation of Commissioner Crawford.

In August 2005, days after Commissioner Crawford's decision to further delay the decision-making on Plan B, Dr. Wood, Assistant Commissioner and Director of the FDA Office of Women's Health, resigned over the FDA's handling of the Plan B OTC switch application. Pls.' Ex. E at E006; Pls.' Ex. D-2 at Wood Dep. 13:17-14:17. In her resignation letter to Commissioner Crawford, Dr. Wood wrote:

Sadly, your recent decision to not approve Plan B emergency contraception, overturning the clear scientific and clinical evidence, contradicts both the FDA mission and my commitment to women's health. The rationale offered is not convincing, and is in fact a denial of access to a product clearly established as safe and effective for all women who need it.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Pls.' Ex. E at E006. When Dr. Wood met with Dr. Woodcock to discuss her resignation, Dr. Woodcock expressed concern that the FDA's handling of Plan B could damage her own credibility. Pls.' Ex. D-2 at Wood Dep. 40:2-19. On October 7, 2005, Dr. Frank Davidoff, a member of the FDA's Non-prescription Drug Advisory Committee, also resigned because of the FDA's delayed action on the Plan B switch application. Pls.' Ex. A-1 at T-7509-10; Pls.' Ex. D2 at Jenkins Dep. 258:20-260:11.

The 60-day period for public comment on whether rulemaking procedures were necessary closed on November 1, 2005. The FDA received approximately 47,000 public comments and hired an outside company to review and summarize those comments. Def.'s Ex. 2 at T-11094. That review was completed six months later on May 19, 2006. *Id.* After reviewing these materials, the FDA finally concluded-more than eleven months after halting its review of the OTC switch application to seek public comment-that it was not necessary after all to engage in agency rulemaking before deciding the Plan B sponsor's OTC switch application. *Id.* Instead, on July 31, 2006, the FDA announced that "[n]on-prescription sales of [Plan B] could be approved for women 18 and older within weeks," Stephanie Saul, *F.D.A. Shifts View on Next-Day Pill,* N.Y. Times, Aug. 1, 2006, at A1, although it requested more information regarding the Plan B sponsor's plan to enforce the age and point-of-sale restrictions, which required that Plan B be kept behind the pharmacy counter. Def.'s Ex. 2 at T-11095. By this point in time, Commissioner Crawford had resigned and Dr. von Eschenbach had been made Acting Commissioner and nominated to replace him. This change in policy was announced a day before Dr. von Eschenbach's confirmation hearing.

**\*536** In response to the FDA's request, the Plan B sponsor submitted yet another switch application in August 2006, this time asking the FDA to approve OTC use by women 18 and over instead of 16 and over. At the FDA's insistence, the sponsor agreed to take primary responsibility for enforcing compliance with the age restriction, to distribute the product only to licensed pharmacists, and to direct pharmacies to keep Plan B behind-the-counter. *Id.* at T-10921. Moreover, the Plan B sponsor agreed to collect data and conduct post-market research to determine the effectiveness of the Plan B dual marketing regime. *Id.* at T-10871-74, T-10915-25.

The Plan B sponsor's revised switch application conformed to the FDA's expressed willingness to entertain an application to make Plan B available without a prescription to women over the age of 18. Notwithstanding the conclusion of his immediate predecessor, Dr. Crawford, that the "scientific data [is] sufficient to support the safe use of Plan B as an OTC product ... for women who are 17 years of age and older," *id.* at T-10813-14, Commissioner von Eschenbach had decided that 18, rather than age 17, is the "more appropriate cutoff point" for OTC use of Plan B because of "well-established state and private-sector infrastructures [which] restrict certain products to consumers 18 and older." *Id.* at T-10866-67. He concluded "that to best protect and promote the public health," perceived regulatory efficiencies should outweigh the substantial health benefit 17 year old women would gain through OTC access to a drug product that-experts agreed-they could use safely and effectively. *Id.* at T-10867. The following day, Dr. Galson issued a memorandum stating that "although [he had] previously concluded that OTC use would be restricted to women 17 or older, I have now determined that for the reasons Dr. von Eschenbach outlines," OTC use of Plan B should be restricted to women age 18 and over. *Id.* at T-10870. Finally, on August 24, 2006, the FDA approved non-prescription use of Plan B for consumers 18 and older. *Id.* at T-at 10880-10925.

**4.** *Denial of Citizen Petition*

In June 2006, less than two months before the FDA announced that it would approve

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

non-prescription use of Plan B only for women over the age of 18, the FDA issued a final agency decision denying the Citizen Petition-which had requested non-prescription access to Plan B for women of all ages-finding that petitioners had failed to provide sufficient data or information to meet the statutory and regulatory requirements for an OTC switch for any age group, much less the under 16 age group. Def.'s Ex. 1 at CP001-19. The parties dispute what led the FDA to issue the denial of the Citizen Petition when it did. Plaintiffs claim the FDA's action was a litigation tactic: that the FDA used the denial as a means of bringing discovery to a halt, particularly plaintiffs' discovery requests seeking documents describing the White House's role in the FDA's handling of the Plan B switch applications. The FDA asserted that it responded when it did, in part, because of the public interest in the petition and plaintiffs' amendment of their complaint to allege that the FDA had unreasonably delayed responding to the petition. *Id.* at CP003 & n. 2.

Nevertheless, the record is clear that the FDA took more than five years to respond to the petition after it provided its tentative response in September 2001. Moreover, even though the May 6, 2004 Not-Approvable Action letter on the Plan B sponsor's SNDA effectively rejected the full relief sought by the Citizen Petition-unrestricted OTC access to Plan B-the FDA waited more than two years from **\*537** that date to formally deny the petition. Perhaps more significantly, the FDA acknowledged that the issues presented by the SNDAs and the Citizen Petition were one and the same. Indeed, in the denial letter the FDA informed petitioner that "we had intended to defer our response to your petition until we could issue a response contemporaneously with our issuance of a final decision on [the Plan B sponsor]'s SNDA," *id.* at CP017, because "we expected that some or all of the issues you raised in your petition would be resolved in the ... anticipated SNDA proceeding." *Id.* at CP013.

**C. *GAO Investigation***

At the request of members of Congress, including 19 Senators and 29 Representatives, the Government Accountability Office ("GAO") initiated an investigation into the process which led to the issuance of the May 6, 2004, Not-Approvable letter, denying the initial supplemental new drug application filed by the Plan B sponsor. *See* Pls.' Ex. B, GAO Report. The Congressional request emanated from concern that "the not-approvable decision for the initial Plan B OTC switch application was contrary to the recommendations of the joint advisory committee and the FDA review staff." *Id.* at 3. For this reason, the GAO Report examined,

> (1) how the decision was made to not approve the switch of Plan B from prescription to OTC, (2) how the Plan B decision compares to the [67] decisions for other proposed prescription-to-OTC switches from 1994 through 2004, and (3) whether there are age-related marketing restrictions for prescription Plan B and other prescription and OTC contraceptives.

*Id.* at 3-4. The investigation was limited in scope to the FDA's actions leading up to the May 6, 2004 Not-Approvable letter for the initial SNDA, *id.* at 4, and did not take into consideration the Citizen Petition or later SNDAs. Nevertheless, the findings of a congressional agency provide relevant background to this litigation and confirm conclusions that are compelled by the record here.

In reviewing the FDA's decision regarding the OTC switch application, the GAO concluded that four aspects of the FDA's review process were "unusual" and departed from the typical FDA review procedures. *Id.* at 5. First, it noted that "the Directors of the Offices of Drug Evaluation III and V, who would normally have been responsible for signing the Plan B action letter, disagreed with the decision and did not sign the not-approvable letter for Plan B." *Id.* For the same reasons, the Director of the Office of New Drugs, Dr. Jenkins, also did not sign the letter. *Id.* Second, the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

GAO found that the FDA's senior leadership was more heavily involved in Plan B than it was in other OTC switch applications. Specifically, GAO investigators wrote that "FDA review staff told us that they were told early in the review process that the decision would be made by high-level management." *Id.* Third, the GAO noted that "there are conflicting accounts of whether the decision to not approve the application was made before the reviews were completed." *Id.* The Director and Deputy Director of OND and Directors of ODE III and V told GAO "that they were told by high-level management that the Plan B OTC switch application would be denied months before staff had completed their reviews of the application." *Id.* at 21. Dr. Galson, however, told GAO that while he was " '90 percent sure' as early as January 2004, that the decision would be not-approvable," he did not make his final decision until shortly before the action letter was sent out in May 2004. *Id.* at 22. Finally, the GAO concluded that "the rationale for [Dr. Galson's] decision was novel and did not follow FDA's traditional practices." *Id.* at 5. **\*538** Specifically, it noted that he was "concerned about the potential impact that the OTC marketing of Plan B would have on the propensity for younger adolescents to engage in unsafe sexual behaviors because of their lack of cognitive maturity compared to older adolescents" even though "the agency has not considered behavioral implications due to differences in cognitive development in prior OTC switch decisions." *Id.* In addition, Dr. Galson "stated that it was invalid to extrapolate data from older to younger adolescents in this case" even though "the agency has considered it scientifically appropriate" to do so. *Id.*

With respect to how the Plan B decision compared to that for other proposed OTC switches, the GAO found that "the Plan B OTC switch application was the only 1 of th[e] 23 [switch applications reviewed by the joint advisory committee from 1994 to 2004] that was not approved after the joint committee voted to recommend approval of the application." *Id.* The GAO also pointed out that "the Plan B action

letter was the only one signed by the Director of CDER ... instead of the directors of the offices or divisions that reviewed the application, who would normally sign an action letter." *Id.*

In its final area of examination, the GAO concluded that "there are no age-related marketing restrictions for safety reasons for any of the prescription or OTC contraceptives that FDA has approved, and FDA has not required pediatric studies for them." *Id.* at 6. In particular, it noted, "[a]ll FDA-approved OTC contraceptives are available to anyone, and all FDA-approved prescription contraceptives are available to anyone with a prescription." *Id.* at 6. Finally, the GAO noted that the "FDA did not identify any issues that would require age-related restrictions in its review of the original application for prescription Plan B, and prescription Plan B is available to women of any age." *Id.*

**D.** *Litigation History*

**1.** *The Complaints*

Plaintiffs brought this action in January 2005 against Lester M. Crawford, then Commissioner of the FDA, pursuant to the Administrative Procedure Act ("APA"), and the Constitution. Plaintiffs challenge the FDA's denial of the Citizen Petition seeking to make Plan B available on an over-the-counter basis without age or point-of-sale restriction.

In their most recent amended complaint, plaintiffs allege that the denial of the over-the-counter switch for women of all ages and the imposition of the BTC regime (1) is arbitrary, capricious, and otherwise contrary to law, Compl. ¶ 163; (2) exceeds the FDA's statutory authority, *id.* ¶ 165; (3) violates women's rights to privacy, *id.* ¶ 167; (4) discriminates against women and those persons wishing to exercise their right to privacy in violation of the Fifth Amendment's Equal Protection Clause, *id.* ¶¶ 169-70; and (5) vio-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

lates women's rights to informational privacy. *Id.* ¶ 172. Plaintiffs seek an injunction requiring the FDA to approve the OTC switch without age or point-of-sale restrictions and a declaratory judgment that the FDA's actions violate the APA and the Constitution. *Id.* ¶ 1.

Underlying all of these claims is plaintiffs' allegation that the FDA's decisions were made in bad faith because they were improperly influenced by political considerations wholly outside the scope of the FDA's statutory authority. Specifically, plaintiffs allege that, in refusing to approve over-the-counter access without age or point-of-sale restriction, the FDA bowed to political pressure from the White House and anti-abortion constituents despite the uniform recommendation of the FDA's scientific review staff to approve over-the-counter access to Plan B without limitation.

***539** 2. *Dispositive Motions*

[1] Plaintiffs have moved for summary judgment on all of their claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. The FDA has cross-moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) or, in the alternative, for summary judgment pursuant to Rule 56. The FDA had argued earlier in this litigation (though not in the present motions) that jurisdiction lies exclusively in the Court of Appeals. Before discussing the issues raised by the present dispositive motions I briefly address this issue here.

The FDCA contains no overarching section on judicial review, but makes specific allocations of jurisdiction over specific types of cases to the Court of Appeals. Thus, while the FDCA grants jurisdiction to the Court of Appeals over a sponsor's challenge to the denial of a new drug application, *see* 21 U.S.C. § 355(h), it contains no provision applicable to a petitioner's challenge of the denial of its citizen petition. The D.C. Circuit has held that "[a]gency action taken under sections silent in this respect are directly reviewable in a district court under some appropriate

head of its jurisdiction, for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler v. Hayes,* 818 F.2d 879, 887 n. 61 (D.C.Cir.1987). Moreover, FDA regulations make clear that petitions for judicial review of a citizen petition may be filed in district court. *See* 21 C.F.R. § 10.45(g).

## II. Discussion

### A. *Standing*

[2] Article III of the Constitution limits the role of the judiciary to the resolution of "cases" and "controversies." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The question of standing is "whether the plaintiff is the proper party to bring [the] suit." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Moreover, the conclusion that an individual has standing to bring an action occurs before addressing the merits of that individual's claim. *Id.* at 820, 117 S.Ct. 2312. Standing means that the individual bringing the claim has "establish[ed] that [his or her] claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id.* In order for a case to be properly before a court, plaintiffs must establish constitutional and prudential standing. Here, plaintiffs are responding to a motion to dismiss, so their allegations in the complaint must be accepted as true for purposes of standing. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (when plaintiffs respond to a motion to dismiss for lack of standing, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

### 1. *Constitutional Standing*

[3][4][5] Constitutional standing requires a plaintiff to show (1) an "injury in fact" which is (2) "fairly traceable" to the defendant's conduct and (3) likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

2130, 119 L.Ed.2d 351 (1992). An "injury in fact" is defined as "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 560, 112 S.Ct. 2130 (citations omitted). The plaintiff bears the burden of establishing each element of standing. *Id.* at 561, 112 S.Ct. 2130.

[6] Plan B is most effective when taken within 24 hours of sexual intercourse and loses its effectiveness if taken later than 72 hours after intercourse. Thus, the **\*540** delay occasioned by having to obtain a prescription from a licensed physician prior to purchasing Plan B may increase the chance of unwanted pregnancy. As approved, Plan B is a behind-the-counter (BTC) drug for which the adolescent plaintiffs, who are all under the age of 16, must obtain a prescription. The prescription requirement presents substantial obstacles to the adolescent plaintiffs' quick access to Plan B. For Plan B to be effective, an adolescent plaintiff must locate and visit a doctor before locating and obtaining Plan B at a pharmacy, all within 72 hours of sexual intercourse. *See, e.g.,* Pls.' Reply Ex. 1 at Angelica Jaffe Dec. ¶¶ 6, 10. Any delay encountered during this process may render access to Plan B useless. Moreover, the fear and anxiety that delayed access to Plan B may cause the adolescent plaintiffs is sufficient to meet the injury in fact requirement. Indeed, the Second Circuit has held that "[i]njury in fact is a low threshold, which ... 'need not be capable of sustaining a valid cause of action,' but 'may simply be the fear or anxiety of future harm.' " *Ross v. Bank of Am., N.A. (U.S.A.),* 524 F.3d 217, 222 (2d Cir.2008). Because of the burden imposed by the prescription requirement and the fear and anxiety it causes, the adolescent plaintiffs have alleged sufficient injury from the FDA's denial of the Citizen Petition.

The FDA argues that the adolescent plaintiffs have suffered no injury because their parents may obtain Plan B on behalf of their daughters without having to obtain a prescription. Passing over the validity of the assumption that parents would in fact obtain Plan B for their adolescent daughters in advance, this argument ignores statutory provisions which prohibit the dispensing of a prescription drug other than upon the "written prescription of a practitioner licensed by law to administer the drug." 21 U.S.C. § 353(b). Parents who obtain Plan B to provide it to their daughters, absent a prescription for their daughters' use, would be engaged in a prohibited act under the FDCA, *id.* § 331(k), for which they may be "imprisoned for not more than one year or fined not more than $1,000, or both." *Id.* § 333(a)(1). The FDA argues that there is no evidence a parent who provided Plan B to his or her own child would be prosecuted. The suggestion that it would be appropriate for parents to violate the FDCA misses the point. That the threat of prosecution is unlikely does not sufficiently reduce the injury to the adolescent plaintiffs. See *Abbott Labs. v. Gardner,* 387 U.S. 136, 154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

[7] The MAP Conspiracy plaintiffs, individual members of the Morning-After Pill Conspiracy who bring suit as individuals and in their organizational capacity, adequately allege injury with respect to their own use of Plan B. Compl. ¶¶ 4-14; *see* Pls.' Ex. C-1 at Jenny Brown Dec. The burden imposed by the point-of-sale restriction may so delay a woman's ability to obtain Plan B quickly that it would reduce the efficacy of the drug and increase the chance of unwanted pregnancy. Brown Dec. ¶¶ 4, 5, 9. For some women, it may be nearly impossible to find an open pharmacy or health clinic quickly enough after engaging in unprotected sex for Plan B to be effective. *Id.* at ¶ 3.

While the FDA challenges only the injury component of the standing inquiry, it is necessary to evaluate the remaining two elements: causation and redressability. Here, the claimed injuries are clearly traceable to the FDA's actions. Each plaintiff claims a specific injury resulting from the FDA's denial of OTC access without restriction and implementation of the BTC regime for Plan B. The FDA's action prevents

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

the adolescent plaintiffs from obtaining Plan B without a prescription. It also limits its availability to the MAP Conspiracy**541** plaintiffs because they must produce government identification to obtain the drug, and may only do so at a pharmacy or health clinic. There is no question that the FDA has directly affected these plaintiffs' access to Plan B. Moreover, these plaintiffs have also shown that their injuries would be redressed if the FDA was ordered to approve OTC use of Plan B without age or point-of-sale restrictions or if on remand the FDA reconsidered and removed these restrictions.

**2.** *Prudential Standing and the Zone of Interests*

The FDA argues that even if plaintiffs have constitutional standing, they lack prudential standing because they do not fall within the zone of interests of the FDCA. Prudential standing requires that "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth,* 422 U.S. at 500, 95 S.Ct. 2197. In other words, to establish prudential standing, "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The prudential standing test denies review if the plaintiff's interests are only "marginally related" to the statute's purpose, but prudential standing is not intended to be a harsh barrier to the courts. *Clarke v. Secs. Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Indeed, the zone of interests encompasses "parties whose interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests." *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir.1989).

[8] Both the adolescent plaintiffs and the MAP Conspiracy plaintiffs meet prudential standing requirements. The FDA argues that the FDCA was not intended to provide anonymous access to emergency contraception. Plaintiffs, however, do not argue this to be the FDCA's purpose. Instead, they argue that the FDCA's purpose goes beyond simply protecting consumers from dangerous or harmful drugs. Plaintiffs rely on *DeFreese v. United States,* 270 F.2d 730, 735 (5th Cir.1959), in which the Fifth Circuit held that section 353(b)(1) of the FDCA was intended, in part, to relieve pharmacists and the public from burdensome restrictions regulating the dispensing of drugs that are sold without a physician's supervision. *Id.* (citing H.R.Rep. No. 82-700 at 2454 (1951)); *see also* S.Rep. No. 82-946 (1951), *as reprinted in* 1951 U.S.C.C.A.N. 2454, 2454. The adolescent plaintiffs fall within the zone of interests of the FDCA because they are among the class of individuals whom the statute was intended to protect by providing non-prescription access to a drug when a prescription would be "burdensome and unnecessary." *Id.* Plaintiffs have alleged that the prescription requirement is unnecessary because young adolescents can use Plan B safely without a prescription. Whether it is, in fact, unnecessary goes to the merits of plaintiffs' claims, not to standing. *See Ross,* 524 F.3d at 222 ("the fact that the injury may be outweighed by other benefits ... does not negate standing."). The MAP Conspiracy plaintiffs also fall within the zone of interests of the FDCA because they can claim they should not be subjected to the burdensome restriction of having to locate a pharmacy that sells Plan B and produce valid identification in order to obtain it.

**B.** *Review of Agency Action under the Arbitrary and Capricious Standard*

The APA provides that a district court may set aside an agency's findings, conclusions**542** of law or action only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision may be deemed arbitrary and capricious:

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *accord Yale-New Haven Hosp. v. Leavitt,* 470 F.3d 71, 79 (2d Cir.2006). Moreover, "proof of subjective bad faith by [agency decision-makers], depriving a [petitioner] of fair and honest consideration of its proposal, generally constitutes arbitrary and capricious action." *Latecoere Int'l, Inc. v. U.S. Dept. of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994); *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1096 (D.C.Cir.1996) (bad faith is "material to determining whether the Government acted arbitrarily").

While this standard of review is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.' " *Nat'l Res. Def. Council v. Daley,* 209 F.3d 747, 755 (D.C.Cir.2000) (quoting *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1491 (D.C.Cir.1995)). On the contrary, to be upheld upon judicial review, the agency must have articulated "a rational connection between the facts found and the choice made." *Henley v. Food and Drug Admin.,* 77 F.3d 616, 620 (2d Cir.1996) (quotations marks omitted).

### C. *The Proper Record on Review*

[9] Before applying the foregoing standard, it is necessary to consider the threshold issue of the proper record on review. Throughout this litigation, the FDA has attempted to sever the relationship between its review of the supplemental new drug applications (SNDAs) submitted by the Plan B sponsor and the Citizen Petition, arguing that judicial review of its denial of the Citizen Petition must be limited to the administrative record compiled for the Citizen Petition alone. Consistent with this position, the FDA moved to strike from plaintiffs' motion all references to, and attachments of, materials not contained in the administrative record for the Citizen Petition, including all materials contained in the administrative record for the SNDA and all declarations, deposition transcripts, and documents obtained in discovery.

The FDA relies on the rule that a reviewing court must judge the propriety of administrative agency action "by the grounds invoked by the agency." *Secs. Exch. Comm'n v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). "[T]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman,* 132 F.3d 7, 14 (2d Cir.1997) (citing *Fla. Power,* 470 U.S. at 743-44, 105 S.Ct. 1598). The rationale behind the "record rule" is that a reviewing court, "in dealing with a determination or judgment which an administrative agency alone is authorized to make," **\*543***Chenery,* 332 U.S. at 196, 67 S.Ct. 1575, should not conduct a *de novo* trial, review materials not before the agency when the decision was made, or substitute its opinion for that of the agency.

None of the dangers the record rule is designed to prevent are implicated by consideration of the materials in the administrative record for the SNDAs submitted by the Plan B sponsor because these materials were "before the agency when the decision was made" and because the FDA itself relied on those materials when it denied the Citizen Petition. Indeed, from the very beginning, FDA staff acknowledged that the Plan B sponsor would work with the FDA to address any concerns raised by the Citizen Petition.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Def.'s Ex. 3 at T-30023. Moreover, no meaningful review of the denial of the Citizen Petition would be possible without a review of the administrative record for the SNDAs because the FDA understood the issues presented by the SNDAs and Citizen Petition to be one and the same. The FDA conceded as much when, in its denial of the Citizen Petition, it wrote that it "expected that some or all of the issues ... raised in [the] petition would be resolved in the then-anticipated SNDA proceeding; in fact, they might still be resolved in that proceeding," Def.'s Ex. 1 at C013.

The FDA's actions and decisions with respect to the initial SNDA were inextricably tied to its decision-making on the Citizen Petition. And the later decisions, which occurred after the denial of the Citizen Petition, are relevant to a review of the decision on the Citizen Petition because, by the FDA's own admission, those later decisions "resolved" some of the issues raised in the Citizen Petition. In short, the complete "record" for the FDA's decision regarding the Citizen Petition includes its own administrative record for both the Citizen Petition and the SNDAs.

Moreover, the law is clear that, despite the "record rule," a reviewing court may consider extra-record materials in certain circumstances. See *Nat'l Audubon, 132 F.3d at 14.* Indeed, "a strong showing of bad faith or improper behavior" may justify supplementing the record. *Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).* Thus, when the agency action cannot be adequately explained in the record it compiled, the court's consideration of evidence outside the agency's "administrative record" is not only warranted, *Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989),* but necessary to a meaningful judicial review of the agency's action. See *Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir.1980)* (agency record may be supplemented when additional information "fully explicate[s] ... [the agency']s course of conduct" in reaching its decision.).

U.S. Magistrate Judge Pohorelsky, who presided

over various discovery disputes, and I both have found that plaintiffs have made a strong showing that the FDA acted in bad faith with respect to the Plan B switch applications. *See, e.g., Tummino v. von Eschenbach, 427 F.Supp.2d 212, 231-34 (E.D.N.Y.2006);* Oct. 11, 2006 Hr'g Tr. 20; July 26, 2006 Hr'g Tr. 9:1; Dec. 22, 2005 Hr'g. Tr. 95. The FDA argues that U.S. Magistrate Judge Pohorelsky's finding of bad faith was limited to its failure at the time to make a final decision with regard to either the Citizen Petition or the initial SNDA. Thus, it argues that finding is now irrelevant because it has made a final decision and plaintiffs have abandoned their unreasonable delay claim as moot. This argument might have some plausibility if this was the only evidence of bad faith. Instead, it was merely the tip of the iceberg.

Thus, U.S. Magistrate Judge Pohorelsky observed that there was a "real" concern **\*544** about the general "integrity of the FDA's decisionmaking in connection with OTC access to Plan B." *Tummino, 427 F.Supp.2d at 234.* He noted the unusual involvement of FDA upper management in the review process; evidence that FDA officials were motivated by "improper concerns about the morality of adolescent sexual activity;" evidence that the decision not to approve the OTC switch was made before review staff had completed their reviews; the refusal to adopt the recommendations of professional review staff and the Advisory Committee; the resignations of Drs. Wood and Davidoff; and the GAO's findings of procedural irregularities in the FDA's consideration of the Plan B OTC switch. *Id. at 231-34.* Indeed, the FDA's conduct and the chain of events leading up to the decision on the Citizen Petition cannot be fully understood without reviewing the administrative record the FDA compiled with respect to the Plan B sponsor's OTC switch applications, the deposition testimony of key FDA decision-makers and other materials illuminating these decision-making processes and the extent to which impermissible political and ideological considerations influenced the FDA's decisions on the Plan B switch applications.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

**D. *The FDA's Decision Was Not the Result of Good Faith and Reasoned Agency Decision-Making***

Plaintiffs have presented unrebutted evidence of the FDA's lack of good faith regarding its decisions on the Plan B switch applications. This lack of good faith is evidenced by, among other things, (1) repeated and unreasonable delays, pressure emanating from the White House, and the obvious connection between the confirmation process of two FDA Commissioners and the timing of the FDA's decisions; and (2) significant departures from the FDA's normal procedures and policies in the review of the Plan B switch applications as compared to the review of other switch applications in the past 10 years. I address each in turn.

**1. *Improper Political Influence***

[10][11] "To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to and did cause the agency's action to be influenced by factors not relevant under the controlling statute." *Town of Orangetown v. Ruckelshaus,* 740 F.2d 185, 188 (2d Cir.1984). An agency's consideration of some relevant factors does not "immunize" the decision; it would still "be invalid if based in whole or in part on the pressures emanating from [political actors]." *D.C. Fed'n of Civic Assocs. v. Volpe,* 459 F.2d 1231, 1246, 1248 (D.C.Cir.1971).

The D.C. Circuit's decision in *D.C. Fed'n* is instructive. *D.C. Fed'n* involved the approval of a bridge construction project over the Potomac River by the Secretary of Transportation. While the agency decision was pending, an influential Congressman made public statements that he would do everything in his power to block appropriations for the D.C. subway system until the bridge project was approved. *Id.* at 1236. The D.C. Circuit found the Congressman's statements had improperly influenced the Secretary's decision to approve the bridge project. Although the lack of a sufficient administrative record for the decision troubled the court, it held that "[e]ven if the

Secretary had taken every formal step required by every applicable statutory provision, reversal would be required ... because extraneous pressure intruded into the calculus of considerations on which the Secretary's decision was based." *Id.* at 1245-46. Thus, while the FDA may have considered certain relevant factors in deciding to restrict OTC access to Plan B, *D.C. Fed'n* suggests that **\*545** the mere existence of "extraneous pressure" from the White House or other political quarters would render its decision invalid.

Another case, *Latecoere Int'l, Inc. v. U.S. Dep't of Navy,* 19 F.3d 1342 (11th Cir.1994), whose facts are analogous to those here, also supplies compelling support for plaintiffs' position that the FDA's bad faith renders its decision arbitrary and capricious. There, a disappointed bidder on a Navy contract, Latecoere, challenged the Navy's decision to award a pilot training system contract to a competitor, ETC. Specifically, Latecoere argued that no rational basis existed for awarding the contract to ETC and that the award was motivated by bias for ETC, an American company, and against Latecoere, a French company. *Id.* at 1344. Under a Memorandum of Understanding between the United States and France, the Navy was required to treat all French firms as it would an American firm. *Id.* at 1346-47. In the initial review of proposals for the contract, the experts charged with assisting in the decision "all agreed that Latecoere's proposal was acceptable and ETC's was not." *Id.* at 1347. Despite this recommendation, however, the officials within the Office of the Secretary of the Navy decided to award the contract to ETC. *Id.* at 1351. Notwithstanding evidence that the decision was based on the "potential political consequences of ... awarding the contract to a foreign company," *id.* at 1350-51, the Navy justified the decision on the basis of cost. *Id.* at 1352. The Eleventh Circuit held that "by the simple expedient of denying bias, a government official can [not] wipe away all evidence of it." *Id.* at 1365. Referring to the actions of the official charged with overseeing the contract award decision, the court wrote:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

Assistant Director Ford['s] ... actions evidencing bias speak louder than his words denying it. When the matter came to him, the forty or so experts of the Evaluation Board, after carefully studying all of the proposals, had found that ... Latecoere ... [was] capable of satisfying the requirements for constructing the system; ETC was not. The Advisory Council, composed of the senior officials of the Training Center, had agreed with that finding and recommended that the contract be awarded to Latecoere. The original Selection Authority ... had chosen Latecoere, warning in a selection decision document that the proposals of ETC and two other domestic corporations were "unacceptable" and that awarding the project to an unacceptable offeror, such as ETC, would risk the loss of human lives. In the face of all of those uniform recommendations-and in spite of the warnings about human lives being at stake-Ford refused to sign off on the decision to award the contract to Latecoere. Instead, after his senior procurement analyst raised "Buy American" considerations and political ramifications, Ford demanded that negotiations be conducted with all the companies no matter how "unacceptable" their offers were. Furthermore, Ford did so only after expressing his own concern about the political problems of awarding the contract to a French company when American companies had been found to be outside the competitive range. Whatever Ford may have said later when pinned down and speaking "on the record," the evidence strongly supports the inference that his actions manifested bias. Those actions sent a message that was heard and responded to-during the remainder of the ... procurement process.

*Id.* at 1365.

[12] Just as in *Latecoere,* the Advisory Committee *and* FDA scientific review staff strongly recommended approving Plan B OTC without age restriction, finding that **\*546** restricting access to young adolescents would present greater health risks that making Plan B freely available. And just as in *Latecoere,* despite this recommendation, the FDA refused to approve the Citizen Petition and first SNDA submitted by the Plan B sponsor. Instead, before the scientific reviews were complete, the Commissioner decided that unrestricted OTC access could not be approved, because of his concern about the inadequacy of data available for young adolescents. Plaintiffs have proffered evidence that the Commissioner did not make the decision on his own, but was pressured by the White House and "constituents who would be very unhappy with ... an over-the-counter Plan B." Pls.' Ex. D-2 at Kweder Dep. 56:21-22. There is also evidence that the Commissioner transmitted this pressure down the chain of command at the FDA: pressuring Dr. Galson not to approve over-the-counter use of Plan B without age restriction, *see* Pls.' Reply Ex. 4 at Jenkins Dep. 232:5-17; *id.* at Wood Dep. 24:9-22; and removing Dr. Galson's authority to make any decision on Plan B after he told the Commissioner that he believed Plan B could be used safely OTC by adolescents 17 and older. Pls.' Ex. D-1 at Galson Dep. 186:20-187:18. Moreover, despite the overwhelming evidence that Plan B could be used safely and effectively by 17 year olds without a prescription, the FDA, citing fanciful and wholly unsubstantiated "enforcement" concerns, arbitrarily and capriciously limited that age groups access to Plan B.

Indeed, the evidence strongly suggests that even the decision to permit the OTC sale of Plan B to women over the age of 18 was made solely to facilitate the confirmation of Dr. von Eschenbach as Commissioner of the FDA. This change of policy came one day before Dr. von Eschenbach's confirmation hearing before a Senate committee. *See* Stephanie Saul, *F.D.A. Shifts View on Next-Day Pill,* N.Y. Times, Aug. 1, 2006 at A1. Dr. von Eschenbach had become Acting Commissioner after the resignation of his predecessor, Dr. Crawford, and he was subsequently nominated to be Commissioner. Significantly, Senators Hillary Clinton and Patty Murray had previously vowed to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

block any vote on Dr. von Eschenbach's nomination until the FDA decided whether to allow over-the-counter sales of Plan B. *Id.*; Gardiner Harris, *Bush Picks F.D.A. Chief, but Vote is Unlikely Soon*, N.Y. Times, Mar. 16, 2006 at A18. Since the FDA had already reneged on its earlier promise to promptly reach a final decision on Plan B in order to obtain former-Commissioner Crawford's confirmation, it must have been apparent to the FDA that a mere promise to decide would no longer suffice to secure Dr. von Eschenbach's confirmation.

This inference, that the timing of the FDA's decision was linked to Dr. von Eschenbach's confirmation hearings, is buttressed by representations made by the attorneys representing the FDA during this litigation. At a hearing in this proceeding only one week before the FDA decided to act on Plan B, I inquired why, if the FDA had determined that women 17 and older could use Plan B safely, it had not yet approved over-the-counter use for that age group. July 26, 2006 Hr'g Tr. 17:9-14. The attorneys representing the FDA-an Assistant United States Attorney with an FDA attorney at his side-responded that "the [FDCA] does not provide the agency-at least it does not clearly provide the agency with the statutory authority to make that kind of age based distinction." *Id.* at 19:11-14. Under the FDCA, he continued, "a product is either Rx only or non-prescription," *id.* at 20:19-20, "[t]here is no behind the counter option available under federal law." *Id.* at 20:14-15. "Congress, [he said,] has not given [the FDA] an enforcement mechanism that would provide it with an ability to enforce that kind of age restriction." *Id.* at 22:7-9. **\*547** Nevertheless, within a month of this representation, the gap in the FDA's authority had somehow been filled and Dr. von Eschenbach confirmed.

### 2. *Departures from Its Own Policies*

[13] The evidence of lack of good faith is also confirmed by the manner in which the FDA departed from its normal procedures for evaluating OTC switch applications when it considered the Plan B applica-

tions. The most glaring procedural departure was the decision to act against the Advisory Committee's recommendation to approve the Plan B OTC switch application without age restriction. Pls.' Ex. B, GAO Report at 29. While advisory committees do not have the final say on OTC switch applications, the fact remains that in every such application in the last decade, the FDA has followed committee recommendations.

The FDA's decision regarding Plan B departed from its general policies and practices in at least four other respects. The first is the placement of additional members on the Reproductive Health Drugs Advisory Committee for the purpose of achieving ideological balance. *See, e.g.,* Pls.' Ex. D-2 at Kweder Dep. 36:12-21; 37:8-10. This goal of ideological diversity does not aid the FDA in its obligation to examine the safety and effectiveness of a drug's use in self-medication. 21 U.S.C. §§ 353(b)(1), 355(d).

The second departure was the unusual involvement of the White House in the Plan B decision-making process. *See* Pls.' Ex. D-2 at McClellan Dep. 127-132,140:19-141:13; *id.* at Kweder Dep. 56:8-58:19. Whether or not it was permissible for the FDA to discuss such questions with the White House, these discussions were not the norm for the FDA with respect to this type of decision.

The third departure concerns the timing of the decision to deny OTC use without age restriction. Plaintiffs presented evidence and the GAO made findings which indicate that the decision regarding the OTC status of Plan B may have been made before the scientific reviews of the OTC switch application were complete, and without consultation with FDA scientists. Pls.' Ex. B, GAO Report at 21-22. If the decision was made prior to the completion of the scientific reviews, this would certainly be evidence of a departure from the typical FDA decision-making process. Moreover, such a premature decision would lend further support to plaintiffs' theory that FDA upper

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

management were pressured by the White House to deny young adolescents OTC access to Plan B regardless of whether the scientific evidence supported a finding that they could use Plan B safely and effectively. *See* *D.C. Fed'n*, 459 F.2d at 1245 (finding evidence that "the Secretary [of Transportations'] determinations-in particular, his effort to make the determinations before plans for the bridge were complete-lend color to plaintiffs' contention that [political pressure] did have an impact on the Secretary's decisions.").

The fourth departure was the FDA's refusal to extrapolate actual use study data from the older age group to the 16 and younger age group. There is evidence in the record that the FDA routinely extrapolated such data when reviewing the safety and effectiveness of various other contraceptives. Indeed, the draft minutes from an internal FDA meeting held in May 2004, contain the following comment regarding the decision not to extrapolate for Plan B:

The inability to extrapolate adolescent safety and effectiveness for < 14 year old females is not consistent with how CDER handles approval and distribution of prescription oral contraceptives, OTC male contraceptives such as condoms and spermacides or OTC female contraceptives such as gels and sponges. **\*548** In addition, CDER routinely denies sponsors requests to issues Written Requests for Pediatric Studies for oral contraceptives as the responses to these drugs are considered the same for all menstruating females and additional studies are not necessary.

T-1213. This was contained in an initial draft of the minutes, although it was subsequently deleted for reasons which are unclear. Nevertheless, it accurately reflected the FDA's policy of extrapolating data from older to younger populations. *See* Pls.' Ex. A-3 at T-30898 (referring to the FDA's "long history" of extrapolating data). Indeed, not only did review staff find it appropriate to extrapolate findings in this case,

but, in one of its first communications with the Plan B sponsor concerning the anticipated OTC switch application, the FDA indicated that the "proposed trials [i.e., the actual use study] could be conducted in the adult population and the results extrapolated to the postmenarcheal pediatric population." Pls.' Ex. F-1 at T-30100.

Plaintiffs point to other FDA actions that they claim were departures from standard FDA practices. For example, this was the only OTC switch application decided at the level of CDER Director or higher in the past 10 years-the decision is typically made by the Office Director. Pls.' Ex. B, GAO Report at 30. Indeed, at the guidance meeting held with the Plan B sponsor on January 23, 2004, FDA staff informed the sponsor that the "Divisions were ready to negotiate labeling with you today, but on January 15, 2004 we were informed by ... Dr. Steven Galson, that the regulatory decision for the action on your application would be made by CDER [Center for Drug Evaluation and Research] upper management (above the ODE level). *This is not the usual or typical CDER process for determining approvability of an NDA.*" Pls.' Ex. A-2 at T-30686 (emphasis added); *see also* Pls.' Ex. D-1 at Jenkins Dep. 33:8-12 ("I think it's important to explain that for most applications the Commissioner's not directly involved in the decision-making of the Application").

Plaintiffs also argue that Plan B is the first drug for which the FDA sought additional data for adolescents, and that it is the only drug for which the FDA based its decision on adolescent cognitive development. Pls.' Ex. B, GAO Report at 5-6; Pls.' Ex. A-4 at T-31098. The FDA argues that Plan B is different from other drugs because it is preventive rather than reactive. While it may have been rational for the FDA to consider adolescent cognitive development in its evaluation of Plan B as an OTC drug, plaintiffs have presented unrebutted evidence that the FDA's focus on these behavioral concerns stemmed from political pressure rather than permissible health and safety

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

concerns.

Notwithstanding all of these departures, the FDA argues that there is no customary agency practice and "[e]very drug presents a unique collection of issues, and no two reviews will be identical." *See* Mem. in Opp'n to Pls.' Mot. for Summ. J. at 32. Plaintiffs do not argue, however, that the scientific review or risk benefit assessment of all proposed OTC drugs must be evaluated in the same manner. They question why the review of Plan B differed in so many significant ways from the review of other switch applications in the last 10 years. The FDA simply has not come forward with an adequate explanation, nor has it presented any evidence to rebut plaintiffs' showing that it acted in bad faith and in response to political pressure.

Instead, the FDA has pursued a litigation strategy dependent on the assertion of the deliberative process privilege to prevent plaintiffs from obtaining conclusive evidence as to the merits of its claim. The **\*549** FDA claims that it acted in good faith but has consistently sought to prevent plaintiffs from obtaining discovery to show otherwise. This claim of good faith fails in the face of the showing plaintiffs have made here. *See Latecoere Int'l, 19 F.3d at 1365* (the simple denial of bias, or bad faith cannot "wipe away all evidence of it.").

**E. *The Appropriate Remedy***

When a court reviewing an agency decision rules in favor of the plaintiff, it generally remands to the agency rather than granting affirmative relief. *Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).* Certain circumstances, however, warrant exception to this general remand rule. *Fla. Power, 470 U.S. at 744, 105 S.Ct. 1598.* Where a court has found that an agency decision is not supported by the record, but "'the record has been fully developed,'" remand would fail to "'serve a useful purpose.'" *Sierra Club v. EPA, 346 F.3d 955, 963 (9th Cir.2003)* (quoting *Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir.1996)*). *Sierra Club* is instructive.

There, the Ninth Circuit found erroneous the EPA's conclusion that, but for transborder emissions coming from Mexico, Imperial Valley, CA, would have satisfied the standards for air quality emissions required by the Clean Air Act. *Id. at 958.* Instead of remanding for the EPA to reconsider its decision, the Ninth Circuit remanded with instructions that the EPA classify Imperial Valley as a "'serious' nonattainment area"-i.e., noncompliant with applicable air quality standards-because it "fail[ed] to see how further administrative proceedings would serve a useful purpose; the record here has been fully developed, and *the conclusions that must follow from it are clear.*" *Id. at 963* (emphasis added).

[14] Plaintiffs argue that remand here is unnecessary because no further agency investigation or explanation would be of any value. Remand would be fruitless, they argue, because "the agency is set on a course to treat Plan B as a *sui generis* drug that demands unprecedented restrictions." Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 8-9. Additionally, plaintiffs argue that "the agency has acted so improperly and in such bad faith that it cannot be trusted to conduct a fair assessment of the scientific evidence." *Id.* at 9. Nevertheless, remand to the FDA for it to reconsider its denial of the Citizen Petition is the appropriate remedy for two reasons. First, the circumstances have changed since these words were written. Commissioner von Eschenbach has resigned and his replacement, as well as a new Deputy Commissioner, has been nominated by the President. This change in the leadership suggests that, in plaintiffs' words, it can be "trusted to conduct a fair assessment of the scientific evidence." Second, a decision whether Plan B, a systemic hormonal contraceptive drug, may be used safely without a prescription by children as young as 11 or 12, is best left to the expertise of the FDA, to which Congress has entrusted this responsibility; it should not be made by a federal district court judge.

A remand would serve no purpose with respect to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

603 F.Supp.2d 519
**(Cite as: 603 F.Supp.2d 519)**

one aspect of the FDA's decision-requiring that 17 year olds obtain a prescription for Plan B. The record is clear: the FDA's justification for the denial of OTC access to Plan B for women over the age of 17-rather than 18-"runs counter to the evidence" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, the sole justification for limiting access based on age was that the Commissioner had decided that there was a lack of adequate data to support a finding that women age 16 and **\*550** younger could use Plan B safely without a prescription. Def.'s Ex. 3 at T-30666-70. But as to 17 year olds, the "scientific data [is] sufficient to support the safe use of Plan B as an OTC product ... for women who are 17 years of age and older." Def.'s Ex. 2 at T-10813. The scientific data notwithstanding, Commissioner von Eschenbach decided that because of "the difficulty of enforcing an age-based restriction on the availability of this oral hormonal contraceptive, ... 18 (rather than 17) is the more appropriate cutoff point to best promote and protect the public health." Def.'s Ex. 2 at T-10866. The notion that those selling Plan B would not be able to determine whether an individual was 17, as opposed to 18, based on government issued identification is simply untenable.

Plan B is a time sensitive drug and is most effective if taken within 24 hours of sexual intercourse and loses effectiveness if not taken within 72 hours. Thus, barriers like a prescription requirement, which delay access to Plan B, may needlessly increase the chances that 17 year olds will suffer unwanted pregnancies. The hypothetical enforcement issue is an implausible explanation for the decision to deprive 17 year olds, whom the FDA has concluded can use Plan B OTC safely, of the much enhanced ease of obtaining Plan B without a prescription. The FDA simply has offered no evidence that the age restriction would be unenforceable at 17 rather than 18. With respect to this issue, it is difficult "to see how further administrative

proceedings would serve a useful purpose; the record [on this issue] has been fully developed, and the conclusions that follow from it are clear." *Sierra Club,* 346 F.3d at 963.

**Conclusion**

The denial of the Citizen Petition is vacated and the matter is remanded to the FDA to reconsider its decisions regarding the Plan B switch to OTC use. The FDA is also ordered to permit Barr Pharmaceuticals, Inc., the Plan B drug sponsor, to make Plan B available to 17 year olds without a prescription, under the same conditions as Plan B is now available to women over the age of 18. The latter order should be complied with within thirty days. Because of the foregoing, it is unnecessary to rule on plaintiffs various substantive challenges to the FDA's decisions regarding Plan B. Similarly, it would be premature to reach the merits of plaintiffs' various constitutional challenges to the FDA's decisions regarding Plan B. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

SO ORDERED.

E.D.N.Y.,2009.
Tummino v. Torti
603 F.Supp.2d 519

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ANNIE TUMMINO, *et al.*,

      Plaintiffs,         **<u>ORDER</u>**

    - against -        No. 05-CV-366 (ERK)(VVP)
              No. 12-CV-763 (ERK)(VVP)
MARGARET HAMBURG, Commissioner
of Food and Drugs, *et al.*

      Defendants.

----------------------------------------------------------------X

KORMAN, J.:

  My opinion of March 23, 2009, *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009)

is amended as follows.

  First, a sentence on page 524 currently reads: "The Secretary delegated primary

responsibility over drug regulation to the Commissioner of the FDA ('Commissioner'). *Id.*

§ 393(d)." The sentence is amended to read as follows: "Congress delegated primary

responsibility over drug regulation to the Commissioner of the FDA ('Commissioner'). *Id.*

§ 393(d) (The Secretary, through the Commissioner, shall be responsible for executing this

chapter…)."

  Second, a paragraph on page 525 currently reads:

There are two means by which the FDA can switch a prescription-only drug to
non-prescription status. First, it can promulgate a regulation changing the drug's
status. See 21 U.S.C. § 353(b)(3). This rulemaking process may be initiated by the
Commissioner, 21 C.F.R. § 310.200(b), or by any interested person who files a
citizen petition. Id. § 10.25(a). Within 180 days of receipt of the petition, the
Commissioner must either approve or deny the petition or provide "a tentative
response [to the petitioner], indicating why the agency has been unable to reach a
decision on the petition." Id. § 10.30(e)(2)(iii). Alternatively, a drug sponsor may
request an over-the-counter switch. Id. § 310.200(b). Unlike the first mechanism,
this process does not require rulemaking. See 21 U.S.C. §§ 355(c), (d); 21 C.F.R.

§ 314.71. Nevertheless, only the drug sponsor can supplement its initial new drug application. 21 C.F.R. § 314.71(a). All of the rules and procedures applicable to new drug applications, discussed above, apply to supplemental new drug applications (SNDAs). Id. § 314.71(c).

It is amended to read as follows:

There are various means by which the FDA can switch a prescription-only drug to non-prescription status. *See* 21 U.S.C. § 353(b)(3). Such a switch can be initiated by the Commissioner, 21 C.F.R. § 310.200(b), by any interested person who files a citizen petition, *id.* § 10.25(a), or by the request of a drug sponsor, *id.* § 310.200(b). Within 180 days of receipt of a citizen petition, the Commissioner must either approve or deny the petition or provide "a tentative response [to the petitioner], indicating why the agency has been unable to reach a decision on the petition." *Id.* § 10.30(e)(2)(iii). If a drug sponsor seeks a switch in prescription status, it must file a supplemental new drug application (SNDA). All of the rules and procedures applicable to new drug applications, discussed above, apply to SNDAs. *Id.* § 314.71(c).

**SO ORDERED:**

Brooklyn, New York
March 6, 2013

*Edward R. Korman*

Edward R. Korman
Senior United States District Judge

2

Pls-Add-32



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*

*Brooklyn, New York 11201-1820*

August 13, 2010

**BY EMAIL ONLY (PDF ATTACHMENT)**

Suzanne Novak, Esq.
Center for Reproductive Rights
120 Wall Street
New York, NY 10005

> Re:  *Tummino v. Hamburg*, No. 05-CV-366 (ERK/VVP) (E.D.N.Y.)

Dear Ms. Novak:

We write in response to your letter dated July 23, 2010, in which you seek further information, following earlier correspondence on the subject, regarding FDA's regulatory actions and plans with respect to Plan B. You assert that FDA has failed to comply with the District Court's order of March 23, 2009, and has failed to inform you of any concrete steps to comply with that order. We disagree on both counts, and firmly reject any suggestion that there is a basis for a contempt motion. However, although we do not accept your characterizations of the court's order or of the agency actions it purports to require, and while we neither waive nor concede any jurisdictional or substantive defenses which FDA may have asserted in this case, we will use this occasion to update you on recent developments in the hope of avoiding further litigation in this matter.

In response to your renewed inquiry regarding FDA's reconsideration of the Citizen Petition on remand from the District Court, we remind you that even if the Citizen Petition were to be granted on remand, that would merely lead to the commencement of rulemaking proceedings, not to the resolution of the issues you raise. For this and other reasons, FDA believes that, at this time, the best way for FDA to comply with the court's order is to review a supplemental new drug application expected to be submitted by the sponsor of Plan B One Step® that contains data on the safety and effectiveness of nonprescription use of emergency contraception. A drug can be offered for sale without a prescription if FDA determines that dispensing it by prescription is "not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use,

Suzanne Novak, Esq.
*Tummino v. Hamburg*, No. 05-CV-366 (ERK/VVP) (E.D.N.Y.)
August 13, 2010
Page 2

or the collateral measures necessary to its use, and [the agency] finds that the drug is safe and effective for use in self-medication as directed in proposed labeling." 21 C.F.R. § 310.200(b).

FDA's ongoing internal deliberations and communications with respect to the status of drug applications involve privileged deliberative processes and confidential commercial information that FDA is not permitted to fully disclose to you or to the general public. Nevertheless, the drug sponsor has given us permission to provide you with information about its future plans that is relevant to your inquiry. Subsequent to the Court's decision and order, the drug sponsor consulted FDA about what data would be required to support a supplemental application for the nonprescription approval of their product for females under the age of 17 and has stated that it plans to file an application when it has gathered sufficient data to support it. FDA has not yet received such an application.

Although your letter appears to suggest that FDA does not have the discretion to collect and evaluate new data and evidence on remand from the district court, or to select the best administrative process for reconsidering the prescription status of Plan B for younger age groups, we disagree. In remanding the matter to the agency for reconsideration, the district court properly did not direct the agency in terms of the process it should employ or the evidence it should consider. *See Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (in directing a remand to the agency, court should not dictate "the methods, procedures, and time dimension of the needed inquiry"). Nor must the agency confine its reconsideration to the record that was in existence prior to the remand. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (when a court in an APA case determines that the agency's decision is not properly supported by the record, the court should remand the matter to the agency for "additional investigation or explanation.")(emphasis added); *Sierra Club v. EPA*, 325 F.3d 374, 382 (D.C. Cir. 2003) (noting general rule that, on remand, an agency has discretion to determine whether to gather additional facts); *see also* 21 C.F.R. § 10.45(i) (on remand of a decision on a citizen petition, agency may "reopen" the administrative record). As the district court explained, Congress has entrusted the responsibility of making the necessary scientific assessment to FDA, *Tummino v. Torti*, 603. F. Supp. 2d 519, 549 (E.D.N.Y. 2009), and FDA must have the latitude to make that decision properly.

Suzanne Novak, Esq.
*Tummino v. Hamburg*, No. 05-CV-366 (ERK/VVP) (E.D.N.Y.)
August 13, 2010
Page 3

      We trust that this information fully responds to the inquiries in your July 23 letter and will obviate the need for any court intervention.

                Sincerely yours,

                LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York

                /s/ {TRANSMITTED ELECTRONICALLY}
                F. FRANKLIN AMANAT
                Assistant United States Attorney
                (718) 254-6024
                franklin.amanat@usdoj.gov



## FDA U.S. Food and Drug Administration

## News & Events

### Statement from FDA Commissioner Margaret Hamburg, M.D. on Plan B One-Step

**Date: December 7, 2011**

The U.S. Food and Drug Administration (FDA) has been carefully evaluating for over a decade whether emergency contraceptives containing levonorgestrel, such as Plan B One-Step, are safe and effective for nonprescription use to reduce the chance of pregnancy after unprotected sexual intercourse.

Plan B One-Step is a single-dose pill (1.5 mg levonorgestrel tablet) which is effective in decreasing the chance of pregnancy if taken within 3 days after unprotected sexual intercourse. The product contains higher levels of a hormone found in some types of daily use oral hormonal contraceptive pills and works in a similar way to birth control pills.

Plan B One-Step was originally approved in July 2009 for use without a prescription for females age 17 and older and as a prescription-only option for females younger than age 17. In February 2011, Teva Women's Health Inc. submitted a supplemental application seeking to remove the prescription-only status for females younger than age 17 and to make Plan B One-Step nonprescription for all females of child-bearing potential.

The Center for Drug Evaluation and Research (CDER) completed its review of the Plan B One-Step application and laid out its scientific determination. CDER carefully considered whether younger females were able to understand how to use Plan B One-Step. Based on the information submitted to the agency, CDER determined that the product was safe and effective in adolescent females, that adolescent females understood the product was not for routine use, and that the product would not protect them against sexually transmitted diseases. Additionally, the data supported a finding that adolescent females could use Plan B One-Step properly without the intervention of a healthcare provider.

It is our responsibility at FDA to approve drugs that are safe and effective for their intended use based on the scientific evidence. The review process used by CDER to analyze the data applied a risk/benefit assessment consistent with its standard drug review process. Our decision-making reflects a body of scientific findings, input from external scientific advisory committees, and data contained in the application that included studies designed specifically to address the regulatory standards for nonprescription drugs. CDER experts, including obstetrician/gynecologists and pediatricians, reviewed the totality of the data and agreed that it met the regulatory standard for a nonprescription drug and that Plan B One-Step should be approved for all females of child-bearing potential.

I reviewed and thoughtfully considered the data, clinical information, and analysis provided by CDER, and I agree with the Center that there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential.

However, this morning I received a memorandum from the Secretary of Health and Human Services invoking her authority under the Federal Food, Drug, and Cosmetic Act to execute its provisions and stating that she does not agree with the Agency's decision to allow the marketing of Plan B One-Step nonprescription for all females of child-bearing potential. Because of her disagreement with FDA's determination, the Secretary has directed me to issue a complete response letter, which means that the supplement for nonprescription use in females under the age of 17 is not approved. Following Secretary Sebelius's direction, FDA sent the complete response letter to Teva today. Plan B One-Step will remain on the market and will remain available for all ages, but a prescription will continue to be required for females under the age of 17.

More Information:

- A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius [1]

---

Links on this page:

1. http://www.hhs.gov/news/press/2011pres/12/20111207a.html



THE SECRETARY OF HEALTH AND HUMAN SERVICES

WASHINGTON, D.C. 20201

## MEMORANDUM

TO:      Margaret A. Hamburg, M.D.
              Commissioner of Food and Drugs

FROM:    Kathleen Sebelius

SUBJECT:  Supplemental New Drug Application (NDA 21-998/S002)

DATE:    December 7, 2011


On February 7, 2011, Teva Women's Health Inc. submitted to the Food and Drug Administration (FDA) a supplemental new drug application (NDA 21-998/S002) for Plan B One-Step (levonorgestrel 1.5 mg), an emergency contraceptive that can prevent pregnancy if taken within 72 hours of sexual intercourse. The application seeks FDA approval to market Plan B One-Step as a non-prescription drug product without any age restriction. Currently, this drug product, like other FDA-approved (levonorgestrel) emergency contraception drug products, is sold exclusively from behind the pharmacy counter and is available without a prescription only for women ages 17 years and older; women 16 and younger can obtain this drug product only by prescription.

I have carefully considered FDA's Division Director Summary Review of Regulatory Action, dated November 30, 2011, for the supplemental application, which represents the position of the FDA and recommended approval of the application. Based on my review, I have concluded that the data submitted for this product do not establish that prescription dispensing requirements should be eliminated for all ages.[1]

The label comprehension and actual use studies submitted to FDA do not include data on all ages for which the drug would be approved and available over-the-counter. Yet, it is commonly understood that there are significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age, which I believe are relevant to making this determination as to non-prescription availability of this product for all ages. Although the average age of the onset of menses for girls in the United States is 12.4 years of age, about ten percent of girls reach menarche by 11.1 years of age.[2] If the application is approved, the product would be available, without a prescription or other point-of-sale restrictions, even to the youngest girls of reproductive age.

---

[1] *See* 21 C.F.R. § 310.200(b).
[2] Chumlea WC, Schubert CM, Roche AF, Kulin HE, Lee PA, Himes JH, Sun SS: Age at Menarche and Racial Comparisons in U.S. Girls. Pediatrics 2003;111(1): 110-113.

The Federal Food, Drug, and Cosmetic Act provides that "[t]he Secretary [of Health and Human Services], through the Commissioner, shall be responsible for executing" its provisions.[3] As such, I direct FDA to issue a complete response letter because the data submitted for this product are inadequate to support approval in that they do not establish that prescription dispensing requirements should be eliminated for all ages.

---

[3] 21 U.S.C. § 393(d)(2).

 

U.S. Department of Health & Human Services
HHS.gov

Frequent Questions | A-Z Index

Search _____ Search
◉ This Site ◯ All HHS Sites

Email Updates ✉ | Font Size − + | Print 🖨 | Download Reader ⬇

| Home | About Us | HHS Secretary | News | Jobs | Grants/Funding | Families | Prevention | Diseases | Regulations | Preparedness |

HHS Home > Newsroom

Newsroom
Speeches
Testimony
Reports
Freedom of Information
Act (FOIA)
Audio / Video / Photo
E-mail Updates/RSS
Feeds
New Media
Contacts

# News Release

FOR IMMEDIATE RELEASE
December 7, 2011

Contact: HHS Press Office
(202) 690-6343

### A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius

Plan B One-Step is an emergency contraceptive, sometimes referred to as the "morning after pill." Plan B One-Step is currently labeled over the counter to women ages 17 years and older, but is sold behind the pharmacy counter. It is available by prescription only to women 16 years and younger. My decision does not change any current availability of the drug for all women.

In February 2011, Teva Women's Health Inc. submitted to the FDA a supplemental new drug application for Plan B One-Step. This application sought to make Plan B One-Step available over the counter for all girls of reproductive age. The science has confirmed the drug to be safe and effective with appropriate use. However, the switch from prescription to over the counter for this product requires that we have enough evidence to show that those who use this medicine can understand the label and use the product appropriately. I do not believe that Teva's application met that standard. The label comprehension and actual use studies did not contain data for all ages for which this product would be available for use.

FDA has recommended approval of this application in its Summary Review for Regulatory Action on Plan B One-Step. After careful consideration of the FDA Summary Review, I have concluded that the data, submitted by Teva, do not conclusively establish that Plan B One-Step should be made available over the counter for all girls of reproductive age.

The average age of the onset of menstruation for girls in the United States is 12.4 years. However, about ten percent of girls are physically capable of bearing children by 11.1 years of age. It is common knowledge that there are significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age. If the application were approved, the product would be available, without prescription, for all girls of reproductive age.

The Secretary of the Department of Health and Human Services is responsible, acting through the FDA Commissioner, for executing the Federal Food, Drug, and Cosmetic Act. Today's action reflects my conclusion that the data provided as part of the actual use study and the label comprehension study are not sufficient to support making Plan B One-Step available to all girls 16 and younger, without talking to a health care professional. Plan B One-Step will still be available over the counter to women ages 17 and older.

Because I do not believe enough data were presented to support the application to make Plan B One-Step available over the counter for all girls of reproductive age, I have directed FDA to issue a complete response letter denying the supplemental new drug application (SNDA) by Teva Women's Health, Inc..

Letter to FDA Commissioner.

### #

Note: All HHS press releases, fact sheets and other press materials are available at _http://www.hhs.gov/news_.

Last revised: December 7, 2011

HHS Home | Questions? | Contacting HHS | Accessibility | Privacy Policy | FOIA | Disclaimers | Plain Writing Act | No FEAR Act | Viewers & Players
The White House | USA.gov | Inspector General | PaymentAccuracy.gov | HHS Archive | Environmental Justice

U.S. Department of Health & Human Services - 200 Independence Avenue, S.W. - Washington, D.C. 20201

http://www.hhs.gov/news/press/2011pres/12/20111207a.html                    12/7/2011

PH-Add 730



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SR: CMM: SRL                                              *271 Cadman Plaza East-7ᵗʰ Floor*
*Brooklyn, N.Y. 11201*

December 12, 2011

**VIA ECF W/ COURTESY COPY**

The Honorable Edward R. Korman
Senior United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *Tummino, et al. v. Hamburg*
           No. 1:05-cv-366 (ERK) (VVP)

Dear Judge Korman:

      In connection with the above-referenced matter, the undersigned Assistant U.S. Attorney writes to inform the Court that the Food and Drug Administration's ("FDA") reconsideration of its decision regarding the "switch to OTC use" (*Tummino v. Torti*, 603 F. Supp. 2d 519, 550 (E.D.N.Y. 2009)) has been completed, and also to advise that today, FDA issued a letter reaffirming its denial of the February 14, 2001 Citizen Petition.[1] Accordingly, plaintiffs' Motion for Civil Contempt is moot, and for these reasons and the reasons set forth in defendant's prior submissions to the Court, it should be denied.

      Thank you for Your Honor's time and consideration regarding this matter.

                        Respectfully submitted,

                        LORETTA E. LYNCH
                        United States Attorney

      By:     /s/ {Filed Electronically}
                  Scott R. Landau
                  Assistant U.S. Attorney
                  (718) 254-7035
                  Scott.Landau@usdoj.gov

cc:    Suzanne Novak, Esq. (via ECF)
       Center for Reproductive Rights
       120 Wall Street, 14ᵗʰ Floor
       New York, NY 10005

---

[1]     A copy of the FDA's December 12, 2011 letter is annexed hereto as Exhibit A.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

December 12, 2011

Bonnie Scott Jones, Esq.
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005

Re: Docket No. 2001P-0075/CP1

Dear Ms. Jones:

This letter further responds to your citizen petition dated February 14, 2001, with supplements submitted on August 7, 2001 and February 13, 2002, which you submitted on behalf of more than 60 family planning and health organizations (Citizen Petition). You had requested that the Food and Drug Administration (FDA or we) exempt from prescription dispensing requirements two emergency contraceptive drug products, Preven and Plan B, as well as any generic versions of these products. Plan B (levonorgestrel) tablets (0.75 mg) is approved for prescription (Rx) distribution to women under 17 years of age, and nonprescription distribution to women 17 and older. Teva Pharmaceutical Industries, Ltd. (Teva) is currently the sponsor of Plan B, but no longer markets the drug. There are two approved generic versions of Plan B, Watson Laboratories, Inc. (Watson)'s "Next Choice" and Perrigo's "Levonorgestrel Tablets, 0.75 mg," and those products are being marketed. Preven, formerly marketed by Gynetics, Inc., is no longer marketed, and there are no generic equivalent products to Preven. Hereafter, we discuss your petition requests only as they relate to Plan B (although not currently marketed, but marketing could be resumed) and its marketed generics (collectively referred to below as Plan B).

Your petition contended that the prescription dispensing requirements for these products were not necessary to protect the public health and that a prescription-only (Rx) to over-the-counter (OTC) switch for consumers of all ages is authorized under 21 U.S.C. 353(b)(3) and 21 CFR 310.200. On June 9, 2006, FDA denied the Citizen Petition on the ground that it was not adequately supported by scientific evidence; neither the petitioners nor the members of the public who had commented on the Citizen Petition provided FDA with sufficient data to meet the statutory and regulatory requirements for initiating rulemaking to switch Plan B to nonprescription status. Two months after the Citizen Petition response issued, in August 2006, FDA approved a supplemental new drug application (SNDA) submitted by the Plan B drug sponsor to allow the distribution of Plan B without a prescription to adults 18 years or older (while it remained prescription-only for women younger than 18). That bifurcated approval status was the result of FDA's determination that the available data were insufficient to support approval of nonprescription use for younger women.

The June 2006 denial of the Citizen Petition was later vacated by the court in a lawsuit brought by a group of individuals and reproductive health groups, including one of the petitioners,

Pls-Add-41

represented by your organization and seeking FDA approval of OTC availability of Plan B for all age groups. *See Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009). The court ordered, among other things, that "[t]he denial of the Citizen Petition is vacated and the matter is remanded to the FDA to reconsider its decisions regarding the Plan B switch to OTC use." *Id*. at 550. The court explained that remand on this issue "[wa]s the appropriate remedy" because "a decision whether Plan B, a systemic hormonal contraceptive drug, may be safely used without a prescription" by women younger than 17 years of age "is best left to the expertise of the FDA, to which Congress has entrusted this responsibility; it should not be made by a federal district court judge." *Id*. at 549.

Pursuant to the court's order, FDA has reconsidered its decisions regarding the "switch to OTC use," taking into account the record before the Agency and the relevant developments since the June 2006 denial of the Citizen Petition. The essential question at issue is whether there were sufficient data in the record to establish the safety and effectiveness of OTC use by younger women, or whether additional data in the form of the results of actual use and label comprehension studies performed using younger women as subjects would be required. FDA was aware, even at the time of the remand, that the Plan B sponsor intended to conduct actual use and label comprehension studies. FDA concluded, as a matter of science and administrative efficiency, that it would be best to review the results of these studies before resolving the essential question on remand.

The sponsor conducted its studies using Plan B One-Step instead of Plan B. Plan B One-Step is an emergency contraceptive product with a different dosing regimen but with the same active ingredient and indication as Plan B. More specifically, Plan B uses a two dose regimen with 0.75 mg of levonorgestrel in each tablet to be taken 12 hours apart, while Plan B One-Step is a single dose tablet that contains 1.5 mg of levonorgestrel.

Whether actual use and label comprehension data were needed for approval of the nonprescription use of Plan B One-Step is directly relevant to whether those data were needed for the same approval for Plan B because of the similarities between the products and the data that the sponsor had developed to support the OTC approval of the products. Nevertheless, the two drugs are not the same product, and all of the data supporting one application cannot automatically be used for the other. In particular, because Plan B One-Step consists of a single tablet, the dosing data for Plan B One-Step could not provide support for an OTC switch of Plan B as that data would not adequately address the ability of subjects to correctly follow the directions related to the timing of a second dose that is required for proper use of Plan B.

Thus, as a scientific matter, if additional data regarding the OTC use by younger women were needed for Plan B One-Step, that type of data would also be needed for Plan B, but those Plan B One-Step studies would not be transferable to Plan B. Instead, there would need to be new studies conducted using Plan B and its labeling, because it has more complicated directions for use, raising additional questions as to label comprehension and actual use.

FDA received the results of the studies on Plan B One-Step in February 2011 when Teva submitted an SNDA requesting full nonprescription status for Plan B One-Step without an age

restriction, and concluded its review of the data on December 6, 2011. As a result of that review and further consideration by the Agency, and as discussed in greater detail below, FDA has determined that the actual use and label comprehension studies were necessary for approval of OTC use for younger women for both Plan B and Plan B One-Step. Because these data have not been presented to FDA for Plan B, the drug product that is the subject of this petition, FDA again denies your petition.

## BACKGROUND

I.  <u>Legal Framework</u>

FDA's authority to exempt a drug from Rx requirements is based on section 503(b) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 353(b)). Under section 503(b)(1) of the Act, we restrict a drug to Rx status when we determine that the drug is not safe for use except under the supervision of a practitioner licensed by law to administer the drug. A drug will be restricted to Rx status when FDA finds that "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [it] is not safe for use except under the supervision of a practitioner licensed by law to administer such drug" (21 U.S.C. 353(b)(1)). In addition, section 503(b)(3) of the Act provides that a drug subject to section 505 of the Act (21 U.S.C. 355, governing approval of new drugs) may be removed by regulation from Rx status when such requirements are deemed not necessary for the protection of the public health. For a drug to be legally marketed (whether Rx or OTC), the safety and efficacy standards set forth in section 505 of the Act must be met.

FDA regulations recognize three different ways to initiate FDA consideration of whether a drug approved only for prescription dispensing should be switched to OTC status. First, the Commissioner may, on her own accord, initiate a rulemaking proceeding (see 21 U.S.C. 353(b)(3); 21 CFR 310.200(b)). Second, a drug sponsor may submit a supplement to an approved drug application (21 CFR 310.200(b) ("A proposal to exempt a drug from the prescription-dispensing requirements . . . may be initiated by . . . any interested person . . . in the form of a supplement to an approved new drug application."); 21 CFR 314.71(a)). Third, an "interested person" may petition FDA under FDA's citizen petition procedures (see 21 CFR 310.200(b) ("A proposal to exempt a drug from the prescription-dispensing requirements . . . may be initiated by . . . any interested person . . . [by filing ] a petition . . . pursuant to part 10 of this chapter [21 CFR Part 10, FDA's citizen petition procedures]")).

FDA recognizes two mechanisms for FDA to make an Rx to OTC switch: (1) to issue a regulation changing the status of an Rx-only drug product to an OTC drug when the Rx requirements of section 503(b)(1) are not necessary for the protection of the public health (see 21 U.S.C. 353(b)(3)); and (2) to approve a drug application (see 21 U.S.C. 355(c), (d)), or supplemental drug application (see 21 CFR 314.71(c)), requesting a switch.

Regardless of who initiates a request for an OTC switch or which mechanism is applicable, FDA can approve the switch only where the evidence demonstrates that the Rx dispensing requirements are no longer necessary to protect the public health by reason of the drug's toxicity or other potentiality for harmful effect, or by reason of the method of the drug's use, or the

3

collateral measures necessary to its use, and that the drug is safe and effective for use in self-medication as directed in proposed labeling (see 21 U.S.C. 353(b)(1) & (3); 21 CFR 310.200(b)).

II.    Factual Background[1]

FDA's June 2006 response to the Citizen Petition explained that drug approval decisions must be based on data that demonstrate that the statutory approval requirements have been satisfied. Data to support an Rx-to-OTC switch generally may include:  safety and efficacy data in an original NDA for the prescription drug; safety and efficacy data from well-controlled trials conducted to support the OTC use; other available safety data; consumer data such as actual use data, self-selection data, and label comprehension data.[2]  Actual use and label comprehension data are usually required when relevant safety data are not otherwise available because the drug: 1) is not the subject of an OTC monograph that includes OTC labeling; or 2) has not been previously approved by FDA for OTC use.

There are no applicable OTC monographs for Plan B and, as of June 2006, no levonorgestrel emergency contraceptive had been approved for OTC use.  FDA found that the Citizen Petition did not contain the type of data that FDA requires to satisfy the statutory standard before granting a switch from Rx-only to OTC status, and, therefore, you had failed to meet your burden of establishing a basis to grant your petition.

In the Citizen Petition response, FDA also described the agency's evaluation of the data submitted with the sponsor's 2003 SNDA to switch Plan B OTC for women of all ages.  Unlike the petitioners, the Plan B sponsor had conducted and submitted the results of label comprehension and actual use studies.  However, most of the subjects of those studies were 17 years of age or older.  The response to the Citizen Petition referenced an August 26, 2005 memorandum by Dr. Steven Galson, then the Director of FDA's Center for Drug Evaluation and Research (CDER), evaluating the data.  In that memo, the CDER Director explained the need for scientific data to satisfy the statutory standards for the Rx-OTC switch.  He concluded that the sponsor demonstrated, through the label comprehension and actual use studies submitted with the SNDA, that women 17 and older could use Plan B safely and effectively for emergency contraception in the OTC setting.  However, the sponsor had not made that showing for women 16 and younger.   Dr. Galson explained that, while the actual use and labeling comprehension studies for Plan B that were submitted with the sponsor's application were well designed, there were too few women under age 17 represented in those studies.  In addition, he believed that what little data there were in this age group raised questions about their ability to use the product safely and effectively.  He also explained his view that extrapolation from the adult data showing safe and effective OTC use to younger women was inappropriate.  The CDER Director explained

---

[1] FDA's June 2006 response to the Citizen Petition discussed in detail the regulatory history of Plan B from the time FDA approved the new drug application for prescription use of Plan B in July 1999, through the date of the Citizen Petition response.  We will not repeat that history here.

[2] Actual use studies are trials designed to assess how consumers actually use the product in an OTC setting.  These trials are usually open-label and are designed specifically to assess consumer use, but they may also provide information about safety.  Self-selection studies assess whether consumers can properly discern whether it would be appropriate for them to use the drug based upon their ability to self-diagnose the condition for which the drug is indicated and based upon the warnings on the product label.  Label comprehension studies are designed to assess consumer understanding of proposed OTC labeling.

4

that he would be prepared to reevaluate his conclusions if additional data on the younger age group were provided.

As noted, in August 2006, FDA approved the SNDA submitted by the Plan B drug sponsor to allow the distribution of Plan B without a prescription to adults 18 years or older (while it remained prescription-only for women younger than 18). That approval was based in large part on Dr. Steven Galson's August 2005 evaluation. Although the CDER Director found in August 2005 that the data on label comprehension and actual use were sufficient to support approval of nonprescription use by women 17 years of age and older, the August 2006 SNDA approval permitted nonprescription distribution to women 18 years of age and older. The change from 17 to 18 was based on enforcement concerns related to underage purchases documented in a July 2006 memorandum by then Acting Commissioner Andrew von Eschenbach.

On March 23, 2009, the *Tummino* court ordered FDA to permit the drug sponsor to make Plan B available to 17-year-olds without a prescription, after finding FDA's "hypothetical" enforcement concerns "implausible" and "untenable." 603 F. Supp. 2d at 550. The court, however, declined plaintiffs' request that the court order the OTC approval for the younger age groups, recognizing that the court lacked the scientific expertise to make that decision. *Id.* at 549. Instead, the court remanded that issue to FDA to reconsider. Moreover, the court did not reject FDA's explanation that an approval of an Rx-OTC switch must be supported by adequate scientific data demonstrating that the statutory standards were satisfied for all relevant age groups, or FDA's determination that neither the Citizen Petition nor the Plan B SNDA contained such data for women under the age of 17.

After receipt of the court's March 23, 2009 order, FDA informed the drug sponsor, in an April 21, 2009 letter, that the CDER Director had already concluded in August 2005 (as discussed above) that the available scientific data were sufficient to support the safe use of Plan B as a nonprescription product for women who are 17 years or older. The only reason that Plan B was not made available to 17-year-olds at the time of FDA's August 2006 approval decision was the concern expressed by the Commissioner about the ability of pharmacies (and their professional staffs) to enforce the age restriction with respect to purchases by women under age 17 without a prescription. In the April 2009 letter to the drug sponsor, FDA explained that it had reevaluated the enforceability concerns expressed by the Commissioner and found that they were not supported by the available data. Thus, FDA concluded, based on the 2005 findings of the CDER Director, that Plan B may be made available to women 17 years and older without a prescription.

The April 2009 letter further explained that, if the sponsor wanted to make this change from 18 to 17, it needed to submit revised labeling with the age change to FDA for the agency's approval. On June 11, 2009, the sponsor submitted a supplemental application requesting a labeling change to market Plan B without a prescription to women 17 years of age and older, and to make it available by prescription only to women 16 years of age and younger. FDA approved the supplemental application on July 10, 2009.

Because of the court's remand order, on July 17, 2009, FDA also re-opened the docket for your Citizen Petition for additional comments. The docket was re-opened to provide a vehicle for the petitioners, the other plaintiffs in the *Tummino* case, and any other member of the public or scientific community, to submit any comments, evidence, and information regarding your

5

Pls-Add-45

request that FDA approve Plan B and its generics for distribution to women of all ages without restriction. To date, no new data or information has been submitted to the docket by you or any other interested member of the public regarding the approvability of Plan B for nonprescription use by women under the age of 17.

There have been other regulatory developments regarding levonorgestrel-containing emergency contraceptives in the last several years. On June 24, 2009, FDA approved "Next Choice," a generic version of Plan B manufactured by Watson. This initial approval of Next Choice was for prescription use only, because, at that time, the Plan B drug sponsor retained marketing exclusivity for Plan B for nonprescription use until August 24, 2009. On August 28, 2009, four days after expiration of the sponsor's marketing exclusivity for Plan B for nonprescription use, FDA approved Next Choice for nonprescription use by women 17 years of age and older. In late 2010, FDA approved a second generic version of Plan B, Perrigo's "Levonorgestrel Tablets, 0.75 mg" for nonprescription use by women 17 years of age and older.

In 2006, the Plan B sponsor also submitted an application to market another emergency contraceptive product, Plan B One-Step, which has the same active ingredient and indication as Plan B. However, Plan B and Plan B One-Step are not the same drug product; they differ in their dose and directions for use. Specifically, as noted, Plan B uses a two dose regimen with 0.75 mg of levonorgestrel in each tablet to be taken 12 hours apart, while Plan B One-Step is a single dose emergency contraceptive that contains 1.5 mg of levonorgestrel in a single tablet.

On July 10, 2009, FDA approved the application to market Plan B One-Step as a nonprescription product for women ages 17 and over, and as a prescription product for women under age 17.

On February 7, 2011, Teva submitted an SNDA for Plan B One-Step seeking to remove the prescription-only status for women younger than age 17 and to make Plan B One-Step nonprescription for all women of child-bearing potential. On December 7, 2011, FDA issued a complete response letter to Teva informing Teva that its application was not approved. On the same date, two statements were issued regarding that decision. In one statement, FDA Commissioner Margaret Hamburg stated that "I agree with the [FDA's Center for Drug Evaluation and Research] that there is adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential." See Statement from FDA Commissioner Margaret Hamburg, M.D. on Plan B One-Step (available at http://www.fda.gov/NewsEvents/Newsroom/ucm282805.htm) (Hamburg Statement). However, the Secretary of Health and Human Services did not agree that the application should be approved and directed FDA to issue a complete response letter. In her statement, Secretary Kathleen Sebelius stated that "I have concluded that the data, submitted by Teva, do not conclusively establish that Plan B One-Step should be made available over the counter for all girls of reproductive age." See Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (available at http://www.hhs.gov/news/press/2011pres/12/20111207a.html).

6

**ANALYSIS**

As discussed above and recognized by the *Tummino* court, "[t]here are two means by which the FDA can switch a prescription-only drug to nonprescription status" – promulgating a rule through notice and comment rulemaking, or approving a drug application submitted by the drug sponsor seeking a switch. *Tummino*, 603 F. Supp. 2d at 525 (citing 21 U.S.C. 353(b)(3); 21 CFR 310.200(b)). Petitioners are not sponsors of a drug application, nor are they permitted to submit a supplement to another party's drug application. See 21 CFR 314.71(a). Accordingly, under the regulatory framework discussed above, because petitioners have not submitted and cannot submit an application for drug approval, the only option available to them is to request that the agency initiate rulemaking pursuant to 21 U.S.C. 353(b)(3).

In the June 9, 2006 denial of your Citizen Petition, FDA determined that the petition and its supporting information did not provide sufficient data to satisfy the statutory requirements to approve an OTC switch for emergency contraceptives. Although your petition contained two expert declarations and citations to medical literature, and information about emergency contraceptive use in other countries, it did not contain labeling comprehension or actual use studies. FDA typically requires an evaluation of such data before switching an Rx product to OTC. Reviewers in CDER determined that actual use and labeling comprehension studies were lacking from your citizen petition and would be needed to support an OTC switch of Plan B (see Docket No. 2001P-0075/Reference #4 and #7). In addition, officials at FDA, including the Director of CDER at the time, found that the Plan B SNDA did not contain adequate data to satisfy the statutory requirements for a switch with respect to women under 17 years of age.

FDA made these findings regarding the inadequacy of the data for the younger age groups public, both in June 2006 when issuing its original response to the Citizen Petition, and in August 2006 when approving the Plan B SNDA. The Plan B sponsor then conferred with FDA regarding the data that FDA would require to approve nonprescription marketing to younger women. In the course of those communications, the sponsor informed FDA that it intended to conduct the required studies using Plan B One-Step, not Plan B, as the sponsor was no longer planning to market Plan B. Those communications continued as the sponsor conducted clinical trials/studies to develop data regarding whether women younger than 17 years of age can use Plan B One-Step safely and effectively, without counseling from a physician or other medical professional.

Whether actual use and label comprehension data were needed for approval of the non-prescription use of Plan B One-Step is directly relevant to whether those data were needed for the same approval for Plan B. The sponsor of the new drug applications for both products is the same and the applications originally contained similar data (with the same lack of robust actual use and label comprehension data for the younger age groups). Plan B One-Step was approved on July 10, 2009 as OTC for women 17 years of age and older, and Rx for women younger than 17 years of age. This bifurcated approval of Plan B One-Step was, like the decision on Plan B, based on the differences in the quantum of available labeling comprehension and actual use data for women 17 and older as compared to women younger than 17. As a scientific matter, if additional data were needed for OTC approval for younger women for Plan B One-Step, then

7

additional data would be needed for Plan B, which has more complicated directions for use, raising additional questions as to label comprehension and actual use.

After the original Citizen Petition denial in 2006, multiple CDER memoranda, meeting minutes, and communications to the sponsor on the design and execution of the requisite actual use and labeling comprehension studies reflect FDA's continuing consideration regarding the data that would be necessary to establish the safety and effectiveness of nonprescription use by a younger population of women. For example, FDA met with the sponsor on May 22, 2007 to discuss the design and conduct of the actual use and labeling comprehension studies necessary to support approval of Plan B One-Step as an OTC product without an age restriction. During that meeting, FDA scientists provided guidance on matters related to study design, including the types of questions young girls should be asked to assess comprehension, the labeling of the product, and the number of study subjects needed in the younger age groups.

The sponsor notified the agency about its difficulty in recruiting younger women for its actual use study. An internal CDER memorandum from a medical officer in the Division of Reproductive and Urologic Drugs, dated September 20, 2007, discussed the ages and numbers of patients he believed would be adequate to support approval of OTC use in the younger population of women. In that memo, the medical officer concluded that "[a]ccess to OTC emergency contraception to adolescents of all ages would provide a significant public health benefit, and data are needed to determine if this adolescent subpopulation can appropriately self-select and use this product as labeled in a safe and effective manner."

CDER and Teva met again on June 1, 2009 and April 28, 2010 to further assess the type and amount of data necessary to support OTC approval without age restrictions. At the 2009 meeting, FDA again reiterated what information would need to be provided to support a full OTC switch of either Plan B or Plan B One-Step. The meeting minutes state "if you intend to pursue an OTC switch for adolescents 17 years and younger, you would need to submit an efficacy supplement containing the information and/or data to address the concerns regarding nonprescription use of Plan B by women 16 years of age and younger…." At the 2010 meeting, the agency discussed its view of the data needed in terms of adequate enrollment in the various younger age groups for OTC approval of Plan B One-Step.

On February 7, 2011, Teva submitted an SNDA for Plan B One-Step seeking approval of the product OTC for all women of child bearing potential. The supplement included the results of Teva's studies regarding the safe and efficacious use of Plan B One-Step by women under 17. Teva included the results of its labeling comprehension study that was designed to assess several important aspects of younger women's understanding of the product itself and how it is intended to be used.[3] For example, it evaluated women's comprehension of the following key elements of the Plan B One-Step label:

1. Plan B One-Step is indicated for prevention of pregnancy after unprotected sex;
2. Plan B One-Step should be taken as soon as possible after sex;

---

[3] The result of the labeling comprehension study were published in 2009. *See* Raymond EG, L'Engle KL, Tolley EE, Rocciotti N, Arnold MV et al, "Comprehension of a Prototype Emergency Contraception Package Label by Female Adolescents. Contraception 2009; 79: 199-205.

8

3. Plan B One-Step does not prevent sexually transmitted diseases or HIV/AIDS;
4. Plan B One-Step should  not be used in place of regular contraception;
5. Plan B One-Step should be taken within 72 hours after sex; and
6. Plan B One-Step should not be used by women who are already pregnant.

Teva also included the results of its actual use study.  That study was an open-label, single-arm, naturalistic study to determine the percentage of subjects who correctly self-select and use Plan B One-Step under simulated OTC conditions.  The two primary objectives of the study were:

1. to determine the percentage of subjects who appropriately self-selected; and
2. to determine the proportion of subjects who correctly used Plan B One-Step under simulated OTC conditions.

Correct self-selection was defined as wanting to use the product for its indication and not having an allergy to levonorgestrel, a positive pregnancy test, or a known pregnancy.  Correct use was defined as taking Plan B One-Step within 72 hours following unprotected sex.  The secondary objectives were to estimate the incidence of adverse events and repeat use of emergency contraception during the 8-week follow-up period.

Pursuant to the procedures set forth in 21 CFR 314.101-314.170, FDA proceeded to determine whether the SNDA met the standards for approval set forth in the Act, 21 U.S.C. 353(b)(3), 355, and in FDA regulation 21 CFR 310.200.  In a memorandum reviewing that application, dated October 4, 2011, an Associate Director in CDER's Office of New Drugs from the Pediatric and Maternal Health Staff states, "This product is already approved as a prescription product, and thus the safety and efficacy in the pediatric population have been established.  Additional data were needed to support that the benefits and risks would be the same if the product was available OTC without a learned intermediary."  The author further discusses the importance of having such data when she states, "The studies provide data to demonstrate that women of child bearing potential of all ages can appropriately self-diagnose and administer Plan B One-Step in an OTC setting…The safety and efficacy of OTC Plan B One-Step in this application is supported by the totality of the data submitted to support the application."

As noted, FDA ultimately concluded that the application, including the data from the new studies, provided "adequate and reasonable, well-supported, and science-based evidence that Plan B One-Step is safe and effective and should be approved for nonprescription use for all females of child-bearing potential."  *See* Hamburg Statement.  As part of the anticipated approval, FDA was prepared to determine that the clinical study that Teva submitted for Plan B One-Step was essential to any approval of non-prescription marketing of the product and thus grant 3-years of exclusivity.[4]  As explained above, this SNDA included data in the form of both a clinical actual use study and a labeling comprehension study that FDA concluded in its scientific review memoranda supported the safe and effective OTC use of Plan B One-Step in women

---

[4]  The statutory requirements for granting this exclusivity (see 505(c)(3)(E)(iv) and 505(j)(5)(F)(iv) of the Act, and 21 CFR 108(b)(5)) are that the clinical studies be, among other things, essential to the approval of the supplement.  FDA's final determination on exclusivity was not made because FDA determines whether to grant exclusivity after product approval.

under age 17. FDA believed that the clinical study submitted met the requirements to support exclusivity, that is, that these data were essential to approval.

In contrast to the new data presented in the 2011 SNDA for Plan B One-Step, no new data have been presented to the agency on Plan B. After the remand by the *Tummino* court, FDA reopened the docket for your Citizen Petition to accept new data and information. Despite FDA's statements regarding the insufficiency of the data and the opportunity to supplement the record, neither you nor any other interested party has submitted any new data or information regarding the approvability of Plan B for nonprescription use by women under the age of 17.

At the *Tummino* court's direction, we have reevaluated whether actual use and labeling comprehension data would be needed to support a switch with respect to Plan B. Our review of the data submitted in support of the application for Plan B One-Step provides the final confirmation, and we now reaffirm our earlier conclusion that additional data would be needed to support safe and effective OTC use of the product by women under age 17. Actual use and labeling comprehension data would be needed to determine, among other things, whether women under 17 can understand that they would need to take two pills twelve hours apart, and whether they actually would do so correctly. The data submitted by Teva in its SNDA for Plan B One-Step included a labeling comprehension study and an actual use study that CDER scientists concluded were necessary and addressed the deficiencies in the original data that led to the earlier bifurcated approval status. This type of data, i.e., actual use and labeling comprehension studies conducted with adequate numbers of younger subjects, has not been presented to the agency with respect to Plan B. Thus, FDA reconfirms its conclusion that neither the information contained in the administrative record for the citizen petition, nor the data and information in the Plan B SNDAs, were adequate to support OTC use in women under age 17.

Therefore, upon reconsideration and following a re-analysis, we conclude that FDA needs additional data to support a switch of Plan B for women younger than 17 years of age. Neither your petition nor any of the public comments to the docket contain sufficient data to satisfy the statutory requirements for FDA to remove the Rx requirements for Plan B for women under the age of 17. In addition, FDA does not have any data from other sources that would be sufficient to support such a switch. In the absence of such data, FDA declines to initiate a rulemaking to switch Plan B from Rx to OTC for women under the age of 17.

In conclusion, for the reasons discussed above, after a careful reconsideration, your petition is denied.

Sincerely,

Janet Woodcock, M.D.
Director, Center for Drug Evaluation and Research

Pls-Add-50

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

ANNIE TUMMINO, *et al*.,

      Plaintiffs,

                CV-05-0366 (ERK/VVP)

v.

MARGARET HAMBURG, *et al*.,

      Defendants.

----------------------------------------------------------------------X

## DECLARATION OF MARY K. PENDERGAST , J.D., LL.M.
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND SUMMARY JUDGMENT

I, MARY K. PENDERGAST, declare under penalty of perjury that the following statements are true and correct:

**Education and Experience**

  1.  I am over 18 years old and make this declaration based on my personal knowledge. I submit this declaration as an expert in pharmaceutical regulation, including the Food and Drug Administration's ("FDA's" or "Agency's") standards, policies, and practices related to the approval of new drug applications ("NDAs"), supplements to NDAs ("SNDAs"), Citizen Petitions, and the standards for prescription and non-prescription ("Over-The-Counter," or "OTC") drugs. I have a particular interest, and extensive history, in the FDA's development of policies for drugs relating to reproduction and women's health. For example, I helped start and staff the FDA's first Office of Women's Health, I led efforts to get more women into clinical trials, and I worked on other reproductive health issues both within the FDA and with the

1

National Institutes of Health.  And as discussed below, I spearheaded the FDA's efforts to bring emergency contraception to the U.S. market.

    2.      I have been working in the field of pharmaceutical regulation for almost 35 years. I spent 20 years in the U.S. Department of Health and Human Services, 18 of those at the FDA. Since leaving FDA, I have continued to work in the field of pharmaceutical regulation, first in industry and then on my own as a lawyer and regulatory consultant.  I earned my B.A. from Northwestern University, a J.D. from the University of Iowa College of Law, and an LL.M. from Yale Law School.  I have taught food and drug law at several law schools.

    3.      After finishing a graduate law program at Yale Law School, I went to work as a lawyer for the then U.S. Department of Health, Education, and Welfare.  In 1979 I went to work as a lawyer for the FDA's Office of the General Counsel, where I litigated both enforcement and defensive cases on FDA's behalf, and gave legal advice across the Agency, including to the Center for Drug Evaluation and Research ("CDER").  I also routinely trained new FDA employees on the Federal Food, Drug, and Cosmetic Act ("FDCA"), was one of the Agency's ethics trainers, and conducted numerous cross-FDA training sessions.  I also reviewed Citizen Petition requests and drafted the responses to those requests, which were usually issued by Center Directors.

    4.      In 1990, I became Deputy Commissioner and Senior Advisor to the Commissioner of Food and Drugs, a position I held for seven years, until December 31, 1997.  In that capacity I was a non-political official and provided leadership across the Agency on a wide variety of issues, including issues pertaining to drug approvals, prescription and non-prescription drugs, Citizen Petitions, and reproductive health issues.  A copy of my resume is attached as hereto as Exhibit A.

5.      I have deep respect for FDA employees, who have very difficult jobs assessing whether pharmaceuticals and other medical products should be approved for sale.  Nothing I say in this Declaration should be construed to attack their integrity.  Many FDA employees have expressed their dismay over how post-coital contraception has been handled over the years, several left the Agency over the decisions, and I believe most will be relieved if political interference in their decision-making was ended.

**FDA's First Efforts to Bring Post-Coital Contraception to the United States**

6.      In 1996, while Deputy Commissioner, I was approached by physicians in CDER about the use of birth control pills as post-coital contraception.  They educated me and others in my Office about the safety and effectiveness of this method of avoiding pregnancy.  After receiving advice from others I spearheaded an effort to let the relevant parties know that the FDA would consider approval of post-coital contraception.  After determining that no company then currently making birth control pills was interested in filing a supplemental NDA to permit that new indication for use on the label of an existing product, we decided to advise the greater community of pharmaceutical companies, physicians, and women's groups that the FDA would review such an application.

7.      Following existing FDA precedent, we prepared and then published on February 24, 1997 a Federal Register notice, 62 Fed. Reg. 8610 (Feb. 25, 1997) , concluding that certain combined oral contraceptives were safe and effective for use as post-coital contraception (also known as the "morning after pill" or "emergency contraception") and requesting submission of new drug applications for such use.  Subsequently NDAs were filed and approved for prescription use of post-coital contraception.

3

Pls-Add-53

8.      As a practical matter, and from my experience at FDA, when considering whether a drug first approved as a prescription drug under an NDA can be switched to OTC status, FDA staff ask themselves the following questions:

- Can the person self-diagnose the condition?  Stated another way, can the person know that s/he should take a drug to treat or cure the condition?

- Is the drug safe for OTC use?  FDA staff know that consumers often take more than the suggested amount of an OTC drug, so FDA makes certain that the drug would still be safe if two  or more times the suggested amount were taken.

- Is it easy to administer the drug?  Some drugs are easy to take – for example, pills, liquids, capsules, sprinkling powder on applesauce; but other drugs have to be administered through needles – intravenously, intramuscularly, or subcutaneously, while others require special breathing apparatus. The easier the drug is to administer, the more suitable it is for classification as OTC.

- Are the directions for use easy to follow?  Some drugs again are simple to use, such as pills, liquids, capsules, but other drugs must be "reconstituted" before use, e.g., when a powder or a solution is added to a syringe.

- Is the drug likely to be effective for its intended use?

- Are there safety concerns that might arise in an OTC setting?

9.      At the time FDA issued the Federal Register notice inviting the submission of NDAs for post-coital contraception in 1997, there were internal FDA discussions about whether the product should go directly to OTC status.   Given the long history and safety of the use of oral contraceptives taken on a daily basis, the FDA medical staff working on the matter had little concern about the safety of post-coital contraception, which for all intents and purposes did not involve much more than taking a double-dose of a daily birth control pill.  By 1997, hundreds of thousands of women had taken birth control pills, and it was likely that some had made a mistake and taken two on the same day without serious adverse effects.  Moreover, early birth control pills intended for daily dosing contained far higher concentrations of hormones than would be in any post-coital contraception dose.  In addition, there had been extensive studies on the safety

4

and effectiveness of post-coital contraception by various groups. At the time of the Federal

Register notice in 1997, this was the FDA's internal thinking:

- Self-diagnosis: FDA thought OTC use of post-coital contraception met this criterion because the consumer would know whether she had just had unprotected sex. This was not a hard analysis, and women did not need to take other collateral measures (e.g., blood pressure readings, insulin measurements) in order to determine whether therapy was appropriate.

- Safety: Birth control pills used to have far higher levels of hormones in them; so many women had been exposed for long periods of time to doses as high as or higher than what a woman would be exposed to using post-coital contraception.

- Administration: The drug would be two pills taken with water. There were thousands of OTC drugs in pill form taken the same way.

- Directions for use: The directions boil down to: "Take a pill (or two). Wait. Take another pill (or two)." There were thousands of OTC drugs that required or permitted two pills. Many OTC drugs instruct a consumer to take a pill, and then take another one later.

- Effectiveness: There had been multiple studies on emergency contraception, and CDER was able to write the label for the drug's use as part of the Federal Register notice.

Notwithstanding our understanding that post-coital contraception would have been appropriate

for OTC use from the very beginning, FDA decided to follow the standard FDA approach and

leave the drug on the market under prescription status for two years before moving it to OTC

use. I left the Agency before any company or other entity sought OTC status for a post-coital

contraceptive.

**Initial Approvals of Post-Coital Contraception**

10. The first post-coital contraceptive was approved on September 1, 1998 (Preven:

ethinyl extradiol and levonorgestrel; two pills then two pills); and the second was approved on

July 28, 1999 (Plan B: levonorgestrel; one pill then one more pill). Both were approved through

NDAs.

5

**Original Requests to Make Levonorgestrel-Based Emergency Contraception Available OTC**

11.     Between 2001 and 2003, there were several efforts to make post-coital contraception non-prescription.  There were SNDAs and a Citizen Petition that sought non-prescription or OTC use for emergency contraception.  The Citizen Petition included such a request for Plan B and for generic equivalents of Plan B.

12.     On December 16, 2003, the FDA held a meeting of its Advisory Committee for Reproductive Health.  The specific question at the meeting was a request to switch Plan B to OTC use, and there was a public review and discussion of the safety and effectiveness of that product, along with label comprehension studies and an actual use study of Plan B.  This Advisory Committee meeting record demonstrates that there was information not just about Plan B discussed at the meeting, but there was also testimony about other post-coital contraceptives sold in dozens of countries around the world without a prescription, and the evidence presented demonstrated broad safety and effectiveness for OTC post-coital contraception regardless of the particular hormonal product or pill regimen (two plus two, one plus one, etc.)  This is important because the FDA is arguing in this case that there is not sufficient data outside of the Plan B One-Step SNDA to support OTC use of post-coital contraception.  That assertion is wrong and belied by the testimony before FDA in 2003.

13.     For example, Dr. Andre Ullman, of HRA Pharma, testified that Norlevo, his company's levonorgestrel-only emergency contraceptive is used in 50 countries world-wide, including 27 countries (including the majority of Western  European countries) where Norlevo can be purchased in a pharmacy without a prescription.  His colleague, Dr. Erin Gainer, also testified.  Dr. Gainer is in charge of research and development at HRA Pharma.  Dr. Gainer testified about the consistently positive benefit-risk profile seen in over four years of non-

6

prescription access to Norlevo emergency contraception. HRA Pharma had studied the process and outcomes of the switch from prescription to non-prescription use, and confirmed that their levonorgestrel-only emergency contraceptive was safe and effective in real word use, and that in their study participants were able to diagnose their need for emergency contraception, understand how to use it, and comfortably manage the side effects.

14. At that meeting, others also testified about their considerable experience using non-prescription emergency contraception. Dr. Gould, an Associate Professor in Adolescent Medicine in the Department of Pediatrics at the University of Pittsburgh, presented the results of his study that demonstrated positive outcomes (proper emergency contraceptive use) and lack of negative outcomes (more unprotected sex, stopping use of hormonal contraception or condoms) when adolescents were given access to emergency contraception without first needing to obtain a prescription from a physician. Dr. Vanessa Cuillins, Vice President for Planned Parenthood of America, testified about the ways in which Planned Parenthood had sped access to emergency contraception, including advance provision of the pills, without serious problems in 850 clinical sites providing two million emergency contraception kits. Thus there is scientific support for OTC use for a variety of post-coital contraceptives. And as this Court has recognized, the Advisory Committee voted overwhelmingly to support OTC use – without any age restrictions -- for Plan B. http://www.fda.gov/ohrms/dockets/ac/03/transcripts/4015T1.htm

15. In a very unusual action, the FDA ignored the Advisory Committee's overwhelmingly positive support for OTC post-coital contraception for all ages, and denied both the Citizen Petition and several SNDAs, claiming that the evidence in the file was insufficient because it did not contain a significant enough number of adolescents in the studies accompanying the requests. As has been documented repeatedly, including by the Court, these

7

Pls-Add-57

denials and the reasoning behind them were scientifically unfounded, a sharp departure from FDA standards, and were indeed based on political considerations that are not germane to the FDA's statutorily-prescribed approval criteria.  The FDA had a long history of extrapolating data from adults to adolescents, particularly in the area of contraception.   In an unprecedented move, the FDA eventually granted limited OTC status for Plan B only for certain ages and only if certain point-of-sale conditions were met.

**FDA Actions Following Court Remand**

16.     I have read this Court's March 30, 2009 decision and understand that the Court found the FDA's actions with respect to the Citizen Petition and Plan B to be arbitrary and capricious, vacated the denial of the Citizen Petition, and ordered the FDA to reconsider the Citizen Petition. Based on my review of the Agency's actions since the Court's order, it is my opinion that despite having voluminous files containing scientific reviews of Plan B and Plan B One-Step, as well as expert testimony about similar drugs sold around the world, the FDA did not follow the Court's order to review the OTC status of Plan B.  Rather, FDA disregarded the views of its medical and scientific staff, ignored the Court's order to review Plan B, and stated it was going to first wait for a drug sponsor to file an application for OTC status for Plan B One-Step, a product that contained the same amount of levonorgestrel as Plan B, but in a one-pill form rather than a two-pill form.  Based on my experience, there is no reason why FDA could not have simply revisited the OTC status of Plan B as the Court directed.  The FDA has ample authority to switch prescription products to OTC status when the considerations discussed above warrant the switch.

17.     The FDA eventually denied the Citizen Petition for a second time after reviewing the Plan B One-Step SNDA.  I have read the second Citizen Petition denial, and think that the

FDA's reasoning makes no sense. First, FDA complained of insufficient data on Plan B, repeating and relying on its prior, unsupported, and politically motivated determination that the data in the FDA files were insufficient to grant OTC status for Plan B for teens. Second, FDA argued that because it deemed large, adolescent-only studies submitted with the Plan B One-Step SNDA to be necessary for that application, such studies must also be necessary to grant the Citizen Petition. Finally, FDA argued that the data from the Plan B One-Step SNDA cannot possibly be applied to the Plan B two-pill product because the differences between the two are so vast. The FDA's actions and reasoning make sense only if one takes into account the political unwillingness of the Department to let FDA permit post-coital contraception go OTC.

18. But even leaving politics aside, there is no reasonable explanation for why the FDA did not review the Citizen Petition/Plan B files to comply with the Court's March 24, 2009 summary judgment decision that ordered them to do precisely that. Those files have been complete and sufficient for almost a decade, and but for the first set of political interference, the Agency would have approved both in 2004-2005.

19. Second, it was irrational, and a significant departure from agency procedure, for the FDA  wait for and then consider the Plan B One-Step SNDA file when trying to decide whether the Plan B two-step product meets the requirements for OTC availability. The FDA ignored this Court's order to review its decision on Plan B. Had the FDA been able to exercise its judgment unhampered by political interference, it is my opinion, based on my years at the Agency, that the Agency would have reverted back to the scientific and medical decisions that had been made by FDA staff in 2004 (before the political interference effectuated by Dr. Galson) and approved Plan B for OTC use.

9

Pls-Add-59

20. FDA's review of only Plan B One-Step in order to arrive at an answer on Plan B also makes no sense because the FDA had concluded that data regarding the Plan B One-Step was inapplicable to the Plan two-step product. FDA contends, quite implausibly, that even if unrestricted OTC availability is warranted for Plan B One-Step, that it would need more information by means of studies to make the same assessment for Plan B and its equivalents because the two-pill version of Plan B is so significantly different from the one-pill version. I can think of no FDA precedent for this reasoning.

21. Hundreds of drugs are available OTC – without any age restriction – in a wide variety of dosage forms, strengths, and routes of administration. Consumers of all ages are already understood to be able to discriminate between "take one pill" and "take two pills" and to understand when a drug should be taken. For example, acetaminophen (the active ingredient in Tylenol) comes in a wide variety of dosage forms: as a tablet, chewable tablet, capsule, suspension or solution (liquid), drops (concentrated liquid), powder, extended-release (long-acting) tablet, and orally disintegrating tablet (tablet that dissolves quickly in the mouth), to take by mouth, with or without food. Acetaminophen also comes as a suppository to use rectally. Each of these forms of Tylenol requires different dosing instructions. This variety of dosage forms, and the myriad of instructions included on thousands of OTC drugs already on the market, underscore the insubstantiality of the FDA's claim that a new study would have been required for Plan B. Remember, the FDA is asking for a study to analyze an instruction that is "take one pill, wait 12 hours, take another pill."

22. FDA's claim that Plan B One-Step data is irrelevant to a decision on Plan B is also highly suspect because by its claim that the Plan B One-Step study was "required" it handed Teva a three-year period of market exclusivity, where only Plan B One-Step could be sold OTC.

*See* December 12, 2011 Citizen Petition denial, p. 9 and fn 4.  This three-year period would prevent the generic versions of Plan B from being sold OTC for another three years, forcing women to pay monopoly prices for OTC convenience.

**OTC Status Can Be Conferred In A Variety of Ways**

23.     When reading the FDA's Citizen Petition responses and documents filed with this Court, I am struck by how the FDA is making arguments that claim limited Agency ability to act in a variety of ways that are lawful.  For example, contrary to the FDA's arguments, there are no regulations that demand particular data that must be submitted before a drug can move from prescription to OTC status.  The FDA can decide that a drug can be moved to OTC status when the Agency finds that the prescription requirements are not necessary for the protection of the public health.  21 CFR § 310.200(b).  The general rule of thumb for FDA is that it is helpful to have a drug be sold under a prescription for two years before deciding to move the drug to OTC use.  That way, if there are any serious side-effects that were not expected at the time of approval but that were discovered after many people had taken the drug, the Agency would know not to move the drug to OTC use.  But some drugs have not even had to wait the two years before going OTC, and, in any event, post-coital contraception has been on the market in the United States since 1998—13 years.  FDA is not arguing that post-coital contraception is dangerous because there would be no support for such an assertion.

24.     When considering whether a drug should be available only by prescription or OTC, the FDA may consider label comprehension studies, actual use studies, and other written information.  Notably, however, the FDA also can and regularly does (or at least used to) use common sense and the experience of other OTC drugs.  As noted above, new studies are not required and are not always submitted with an application for an OTC switch.  Label

comprehension studies and actual use studies in particular are a relatively new phenomenon and started during an era where companies were trying to obtain OTC status for drugs that treated relatively complicated medical conditions. FDA acknowledges the fact that label comprehension studies and actual use studies are not always required in its second Citizen Petition response, p. 4. As the discussion of Tylenol demonstrates, there are a wide variety of instructions for use already approved for OTC use, and FDA did not need to reinvent the wheel to approve a product as simple as Plan B or Plan B One-Step.

25.     In addition, the FDA has never explained how forcing young women to get a prescription from a physician helps them understand how to take post-coital contraception. Even if a teenager asked a physician for a prescription, and the patient picked up the prescription at a drug store, the teen would still have to go home and read the instructions for use and follow them – in either event, the teen would still have to count out 12 hours between pills for Plan B. In our current health care system, there is no guarantee that a physician or pharmacist would actually see the patient and explain carefully and comprehensively how to take the drug.

26.     In addition, again, contrary to the FDA's arguments, there is no FDA law or regulation that directs that a Commissioner cannot act to make a drug OTC until and unless the Commissioner has received a Supplemental NDA for the drug or goes through rulemaking, notwithstanding FDA's contrary suggestion to this Court. While it is true that § 503(b)(3) of the FDCA, 12 U.S.C. § 353(b)(3) states that the Commissioner "may by regulation" remove drugs from prescription status, that provision does not prohibit the Commissioner from taking other actions to achieve the same goal. The Commissioner has the power to determine that a prescription drug can become OTC without any application or rulemaking. Section 310.200(b) of 21 C.F.R. specifically states that "A proposal to exempt a drug from the prescription-

12

dispensing requirements of section 503(b)(1)(B) of the act may be initiated by the Commissioner…." The Commissioner can make the switch to OTC status on her own accord whenever she decides that there is sufficient evidence that the OTC switch will not harm the public health. There is good reason for this. FDA's goal is to protect and promote the public health. OTC status for a drug is good for the public where there is no serious risk and the drug is effective. Making effective therapies more available to consumers – especially those who do not have personal physicians – increases accessibility and drives down health care costs. It makes no sense to argue, as does the FDA, that the Agency has to wait for drug companies to ask for OTC status, or, as FDA has argued in its Citizen Petition responses, that the burden of proving OTC rulemaking is needed is placed on the petitioner.

27.     Thus the FDA could, if it chose to do so, gather the information itself and then publish a Federal Register notice announcing that henceforth all emergency contraceptive drugs are considered safe and effective for OTC use and invite all sponsors of all emergency contraceptive products to submit revised labeling allowing OTC use. This would be just like the FDA's 1997 unilateral announcement that post-coital contraception was safe and effective. Or, the FDA could decide to not do all the work itself but rather enlist information from others and announce a decision that a drug was safe and effective for OTC use after convening an advisory committee meeting, or obtaining data from a public docket, or in response to a Citizen Petition. (But here, of course, those actions were taken, there was widespread support for OTC use, FDA staff agreed to OTC use, but political interference stopped the move to OTC approval for all ages.) Or the FDA could use its unfettered enforcement discretion and announce that it would take no enforcement action against any post-coital contraception that was sold OTC, either indefinitely or while the Agency reviewed the issue or waited for SNDAs to be submitted. Cf.

13

Pls-Add-63

*Heckler v. Chaney*, 470 U.S. 821 (1985). FDA has been using enforcement discretion lately to alleviate drug shortages, going so far as to permit completely unapproved drugs to be sold on the US market, and it has exercised enforcement discretion for decades with respect to some unapproved medical devices.

28. Similarly, there is also no requirement, as suggested by FDA, that the only action FDA could have taken in response to the Citizen Petition was to initiate rulemaking to switch Plan B to OTC status. The Citizen Petition regulations state quite clearly that the Commissioner may resolve the Citizen Petition by taking any action that the Citizen Petition warrants. 21 CFR § 10.30(e)(3) ("The Commissioner may grant or deny such a petition, in whole or in part, and may grant such other relief or take other action as the petition warrants."). There is no limitation on what type of administrative action the FDA can take in response to a Citizen Petition. Therefore, FDA could have announced that all emergency contraceptives on the market were safe and effective for OTC use and invited labeling amendments had it chosen to do so in response to the Citizen Petition.

29. The FDA has also suggested to this Court that it was bound, when making its decisions on the Citizen Petition, to look only at the record that was made in that particular Citizen Petition process. For example, in the Agency's December 12, 2011 denial of the Citizen Petition, the Agency reminded the petitioners that in the June 9, 2006 denial of the same Citizen Petition, the Agency had taken the position that:

> [n]either the petitioners nor the members of the public had commented on the Citizen Petition provided FDA with sufficient data to meet the statutory and regulatory requirements for initiating rulemaking to switch Plan B to nonprescription status.

This FDA position is wrong on several levels. First, as discussed above, there is no statutory or regulatory requirement that there be rulemaking before an OTC switch can be approved.

14

Second, while the Agency may not consider trade secret or confidential commercial information contained in a particular company's NDA or SNDA, there is no law, regulation, or reason that forbids the Agency from supplementing a Citizen Petition record with information from the public domain if the Agency finds the record deficient for decision-making purposes. Thus, for example, the Agency could have looked at published scientific studies, the experience of the same or similar drugs when used in other countries, the testimony of persons educated in the field, and the like, in making its citizen petition decision. All the Agency would have had to do was to include any additional information it thought important in the administrative record. In addition, this FDA argument is profoundly disingenuous. Every time FDA argues that the Citizen Petition record is incomplete, it knows that the Agency's own physicians and scientists have already determined that post-coital contraception is safe and effective for OTC use and have explained their decision in Agency and Court documents. The FDA's continued demands that the Citizen Petition provide more and more data are simply a restatement of the politically-determined position that OTC status for all ages will not be allowed, no matter how compelling the science. Finally, there is no specific "quantum" of evidence needed before FDA initiates rulemaking. Even if rulemaking was required before an OTC switch (which I dispute), FDA could have instituted rulemaking on an OTC switch for all emergency contraception products at any time.

**Political Interference – Not Once But Twice**

30.     The path towards OTC status for post-coital contraception has been unnecessarily complicated by political interference. The statutory and regulatory standards for OTC use are well-described in this Court's March 23, 2009 memorandum and I will not repeat them here. What is important about this situation is that not once, but twice, there has been political

15

Pls-Add-65

interference with the medical and scientific decisions normally made within CDER.  The first time, in 2004-2006, FDA, succumbing to political pressure, refused to approve Plan B for OTC use for women of all ages, both in denying a supplemental NDA and in refusing to approve the Citizen Petition filed in 2001.  This Court correctly determined that these decisions could not stand because of political interference and remanded the decisions to the FDA.

31.     The second time there was political interference was in December 2011, where Secretary Sebelius overruled the FDA's scientific and medical decision that Plan B One Step had met the standards for OTC use for all ages and ordered the FDA Commissioner, Dr. Margaret Hamburg, to reverse the FDA decision finding Plan B One-Step to be safe and effective for OTC use.  The Secretary's action resulted in the FDA's denial of full OTC status for Plan B One-Step and a second denial of the Citizen Petition regarding Plan B and similar drugs.

32.     During the first bout of political interference with the FDA's medical and scientific decision making, the preferred outcome was transmitted to the CDER Director and he acted accordingly.  The interference occurred behind closed doors, and was intended to be kept secret.    Secretary Sebelius's action to reverse FDA's decision on OTC emergency contraception is bolder – Secretary Sebelius specifically and publicly ordered the FDA Commissioner to reverse her decision.  The Commissioner chose not to defy the Secretary and approve Plan B One-Step for full OTC use.

33.     Secretary Sebelius's action is without precedent.  No DHHS (or predecessor agency) Secretary has ever reversed a FDA product approval decision – and for good reason.  The FDA is an expert scientific agency charged with making scientific and medical decisions within the boundaries set by the FDCA.  Nothing in that statute suggests that scientific decisions may bend to political winds.  There are more than a dozen scientific areas of expertise that are

16

brought into account when making a decision on a NDA or Supplemental NDA – e.g., clinical medicine (here obstetrics and gynecology), pediatrics, toxicology, clinical pharmacology, and statistics, among many others. NDAs and Supplemental NDAs are lengthy, complex, highly sophisticated applications that must comply with a myriad of FDA regulations which in turn are concordant with international standards. A Secretary who has no medical or scientific training[1] would have no expertise to review and understand, much less review and decide on, these applications.

34. This bright line between areas where a Secretary might have competence or a legitimate role in weighing in on FDA decisions, and areas where the Secretary does not have such competence or role, is reflected in the Delegation of Authority between the Department and the FDA, which has been in place for decades[2] and was in place when Secretary Sebelius overruled the FDA's Plan B One Step product decision in December 2011. The Delegation of Authority, republished in FDA Staff Manual Guide 1410.10, located at

http://www.fda.gov/AboutFDA/ReportsManualsForms/StaffManualGuides/ucm080711.htm

states that the Secretary has delegated to the Commissioner of Food and Drugs, with the authority to re-delegate, "Functions vested in the Secretary under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 et seq.)" which includes the ability of the Commissioner to make decisions on drug approvals under § 505 of the FDCA, 21 U.S.C. § 355. *See* section 1(A)(1) of the Delegation. The Delegation of Authority specifically reserves the right of the Secretary to approve FDA <u>regulations</u> in some circumstances. *See* § 2(A) of the Delegation. But there is no reservation of rights with respect to product approvals. Because there are no regulations at issue

---

[1] According to the DHHS web site, Secretary Sebelius has a Bachelor of Arts degree from Trinity Washington University and a Masters in Public Administration from the University of Kansas.

[2] Although the current version of the Delegation has been in place since May 18, 2005, it is substantively identical to earlier delegations of authority on product approval decisions.

here, the Secretary should have had no role in the FDA's decisions on post-coital contraception. To the best of my knowledge, the Secretary did not revoke or amend the Delegation of Authority prior to issuing her December 7, 2011 order to the Commissioner.

35.     The Secretary's action, if allowed to stand, will harm the FDA. First, it introduces non-statutory standards into the approval equation, which are dictated by the FDCA. Second, it undermines the integrity of the Agency approval process. If allowed to stand, any sponsor unhappy with an FDA denial of approval could appeal – without regard to the scientific and medical merits – to the Secretary for a reversal of the FDA's decision. Third, it will cause FDA reviewers to constantly look over their shoulders to consider which way the political winds are blowing in Washington, DC. Is there a Senator who does not like this type of product? Will DHHS be upset about approval of this product because it is likely to be expensive or increase health care costs for the Centers for Medicare and Medicaid? In my view, the Secretary's decision was <u>ultra vires</u>, completely inappropriate and will result in long-term damage to the FDA and its ability to promote and protect the public health through sound approval decisions.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February ___7___, 2012
            Washington, DC USA


_MARY K. PENDERGAST, J.D., LL.M._
MARY K. PENDERGAST, J.D., LL.M.

18

Pls-Add-68

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ANNIE TUMMINO, *et al*.,

                Plaintiffs,

                                           CV-05-0366 (ERK/VVP)

v.

MARGARET HAMBURG, *et al*.,

                Defendants.

-----------------------------------------------------------------------X

## DECLARATION OF CYNTHIA C. HARPER, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

I, CYNTHIA C. HARPER, PH.D., declare under penalty of perjury that the following statements are true and correct:

1. I am a medical researcher, trained in the discipline of demography, with a special focus on adolescents and reproductive health. I earned a Master's degree from Columbia University in 1987 and a Ph.D. from Princeton University in 1996, and I completed a post-doctoral fellowship at the University of Pennsylvania in 1998. The focus of my research has been teenagers, young women, contraception, and teen pregnancy. My research into teenagers and emergency contraception includes a recent study regarding the ability of teenagers to use emergency contraception without a prescription; pharmacokinetic studies (studies about how the body absorbs, distributes and interacts with drugs) of Plan B in young teenagers (published 2004-2006); and a study on emergency contraception and teenage sexual risk behaviors in (published 2005).

2.  I am currently an Associate Professor in the Department of Obstetrics, Gynecology and Reproductive Sciences at the University of California, San Francisco School of Medicine.  In this position, I conduct multidisciplinary research on women's health in collaboration with clinician-scientists, epidemiologists, and social scientists.  I also teach and mentor junior faculty, post-doctoral fellows, residents and graduate students. A copy of my curriculum vitae, which includes a list of my publications, is attached as Exhibit A.

3.  I submit this declaration as a medical researcher with expertise in reproductive health and, in particular, research regarding teenagers and contraception, in support of Plaintiffs' Motion for Preliminary Injunction and Summary Judgment.  My views do not in any way represent the views of my employer (University of California, San Francisco).

4.  I was an investigator of the self-selection and actual use study of emergency contraception in an adolescent population considered by the United States Food and Drug Administration ("FDA") in its evaluation of a supplemental new drug application submitted by Teva Women's Health Inc. ("Teva") to make Plan B One-Step, an emergency contraceptive product, available over the counter without age restrictions.  I am senior author on the publication from the study.  The study was conducted at the University of California San Francisco with my collaborator, Tina Raine-Bennett, M.D., M.P.H. and the sponsor Teva Women's Health Research, Division of Teva Branded Pharmaceutical Products R&D Incorporated, from October 2008, when recruitment began, until November 2010.  A paper based on that study has been accepted for publication in the journal of Obstetrics and Gynecology and is in press for April 2012.

5.  "Self-selection" studies determine if a consumer can, after reading the product label, make a correct decision about whether or not the product is appropriate for him/her to

2

use based upon the indications and warnings. Self-selection studies should assess the ability of a consumer to correctly self-diagnose the condition for which a product is indicated and determine whether the product is appropriate for them to use. The target population of the self-selection study should be potential users of the product -some of whom could use the product and some of whom should not use the product. The purpose of an actual use study is to simulate the OTC use of a product and predict if a drug will be used correctly, safely, and effectively in the OTC setting. In an actual use study, participants actually take the study drug home and ingest it. The purpose of the study we conducted of Plan B One-Step was to assess whether adolescents aged 17 years and younger could appropriately self-select and correctly and safely use the drug without provider guidance as necessary in an over-the-counter environment. The vast and overwhelming majority of participants in our study were able to do so.

6. I am very familiar with the actual use study conducted for emergency contraception in 2001-2002 by Elizabeth Raymond, M.D., MPH and others. *See,*Raymond *et al.,* "Actual Use" Study of Emergency Contraceptive Pills Provided in a Simulated Over-the-Counter Manner. Obstetrics and Gynecology. 2003; 102: 17-23. The study concluded that the vast majority of participants used the product appropriately and safely. It also demonstrated that minors in the study were not substantially more likely than others to use the product in a contraindicated or incorrect manner, and they did not have notably higher risks of adverse events or pregnancy. In that study, only a small proportion (5%) of women were younger than 17 years old. Our study extended the work of Dr. Raymond by examining only women who were age 17 and under (81% were less than 17 years old) and demonstrating similar results in this age group.

7.   Teen pregnancy is a significant health problem.  Research, including studies I have conducted, demonstrates that teenagers are more likely to use emergency contraception when needed if they can obtain it easily within the short time frame necessary for it to work.  My research has also shown that easier access to emergency contraception has no impact on sexual risk behaviors of teenagers, including sexual activity, unprotected intercourse, sexually transmissible infections, number of partners, or pressure for sex.  A large body of medical and behavioral research on teenagers and emergency contraception shows that improved access to emergency contraception serves to increase use only when needed for pregnancy prevention.

**The 2008-2010 Actual Use Study for Plan B One-Step**

8.   I became involved with the actual use study in 2007 when Duramed Research, Inc a subsidiary of Barr Pharmaceuticals Inc., the manufacturer of Plan B, approached our research group at UCSF.  (Barr Pharmaceutical was later acquired by Teva Branded Pharmaceutical Products R&D Incorporated ). The manufacturer wanted to eliminate the need for the dual-label marketing as a behind-the counter product so that it would be available over the counter without restriction to consumers of all ages.  Although, as mentioned above, an actual use study of emergency contraception had already been completed by Raymond *et al*., the FDA indicated that additional data was needed demonstrating that young women aged 17 years and younger understand the key concepts needed for safe and effective use.

9.   My understanding is that generally the FDA extrapolates data from adult populations on safety to adolescents and it is extremely unusual for the FDA to require a drug manufacturer to collect data specific to adolescents.

10. The drug manufacturer worked with the FDA to create a draft protocol for the actual use study in adolescents by the time I became involved in 2007. The initial draft of the protocol mirrored the adult actual use study by Raymond *et al*. except that our study participants would include only teenage consumers aged 17 and under. In short, once interested participants were screened for eligibility and necessary consents were obtained, enrolled participants were not allowed to discuss emergency contraception with a clinic provider and were given the emergency contraception product to take home to ingest. Follow up calls were then made to gather information on use from the enrolled participants.

11. The FDA reviewed the draft protocol. In May 2007, my colleague, Dr. Tina Raine-Bennett, attended a meeting with the study sponsor and the FDA's Division of Reproductive and Urologic Products and the Division of Nonprescription Clinical Evaluation to discuss the proposed study protocol. The FDA instructed the sponsor to make several modifications to the design because of the young age of the study participants.

12. One of the modifications that the FDA requested was to implement a process to monitor the self-selection process and avoid giving the drug to study participants who requested it for non-indicated reasons, and instead refer them to clinic staff for assistance. Research staff compared participants' responses on a written questionnaire to strict criteria based on the package labeling. Those participants (who were not allowed to discuss emergency contraception with clinic staff) who were deemed to have appropriately self-selected to use emergency contraception by the pre-defined criteria

were given product to take home and ingest. The majority (91.5%) of the teenagers who

enrolled in the study appropriately self-selected to use the product.

13. Additionally, the FDA instructed us to establish eligibility criteria for people

between 11 and 17 years old.  We advised the FDA that it was not reasonable or possible

to include 11 year olds in the study. Fewer than 3% of teens under the age of 13 have

ever had sex, and the average age of onset of sexual activity is 16.5.  Very few 11 year

olds are sexually active.  Even fewer seek emergency contraception.  An actual use study

considers the way that *the target population* of a particular product will use that product.

Since only rare 11 year olds might need to use emergency contraception, we would be

hard-pressed to find them and include them in the actual use study.

14. Moreover, even if it were possible, using herculean and unprecedented efforts

to find the very rare 11 year olds seeking emergency contraception and include them in

the study, the information gathered would not be particularly useful.  No conclusions

about 11 year olds as a group could be drawn given the incredibly small number of 11

year olds who are users of emergency contraception.

15. When we advised the FDA that it was unreasonable and impossible to acquire

data on 11, 12, and 13  year olds, the FDA's original response was to instruct us to

attempt to  include 25 people at each age from 11-17 inclusive.  Although we did not

believe that it would be possible to find 25 study participants who were 11 years old, nor

25 study participants who were 12 years old, we included 11-17 year olds in our

eligibility criteria, and we made our best attempts to find such actual users for the study.

16. For example, we contacted the directors of two urban children's hospitals to

talk about whether their children's clinics were seeing patients in these extremely young

age ranges for emergency contraception. They did not believe it would be fruitful to try to screen extremely young patients in their clinics for participation in the study because of the extremely small numbers and the nature of their situations. Accordingly, we decided to screen 11-17 year old patients at teen clinics for participation in the study. While not ideal, teen family planning clinics are the best place to find significant numbers of target actual users of emergency contraception. It would not have been logistically feasible or ethical to advertise or shop around in malls for adolescents who plan to or might have unprotected sex in the future as is typically done for label comprehension studies or for products for medical conditions that are chronic like H2 blockers for heartburn suffers.

17. In April 2010, the study sponsor and our UCSF clinician-scientist, Dr. Raine-Bennett, met with the FDA and presented data from an interim analysis of participants enrolled from October 2008 to December 2009. This included 217 of the 345 subjects who were eventually enrolled in the study. By that point, only 3 participants age 13 had been screened and enrolled and no participants under the age of 13 had been screened or enrolled and we brought this to the FDA's attention. In response, the FDA instructed us to include 25 people total within the age range 11-13 years old, rather than seeking 25 people at each age in that range.

18. We ended the study in November 2010, after more than two years of study recruitment. The study eventually included six clinics in 3 states though 92% of 345 teens enrolled were from 3 clinics in Northern California. The average age of the study participants was 15.5. Only three of the study participants were younger than 14 years old; they were each 13 years old. One of those three 13 year olds was lost to follow up.

During the entire duration of the study, we did not have the opportunity to screen any 11 or 12 year olds for participation.

19. Of the 345 females enrolled, 279 were under 17 years old. As noted above 91.5% participants appropriately selected to use or not use product. Among the 298 participants who used product, 92.9% correctly used it as labeled. **Self-selection and correct use was not associated with age; younger teens were not more likely to have inappropriate self-selection or incorrect use.**

20. Our study combined with data from the actual use study by Raymond *et al.* provide a very high level of support for the ability of the target population of women in the appropriate age range to appropriately select and correctly use emergency contraception in a manner consistent with over-the-counter access. This age-specific data, which to my knowledge has not been required of any other over-the-counter product, was submitted to the FDA and was included in the review of the FDA's Division Director (which represents the position of the FDA) that recommended approval of the application to market Plan B One-Step as a non-prescription product without any age restriction.

21. In my opinion, the unprecedented action of the Secretary of Health and Human Services, Kathleen Sebelius, to overrule the decision of the FDA is without scientific basis. Because the dual-label status is linked to the requirement that emergency contraception be kept behind pharmacy counters, the prescription requirement for women under 17 years old is a barrier to effective use of emergency contraception for not only women under 17, but *all* women. The Food and Drug Administration should not allow politics to cloud rational decision-making; the FDA should act based on evidence

and in the best interest of women and eliminate the prescription requirement for women under 17 years of age on Plan B One-Step.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February __3__, 2012

_____
CYNTHIA C. HARPER, PH.D.

January 2012

### University of California, San Francisco

#### CURRICULUM VITAE

Name:       **Cynthia C. Harper, Ph.D.**

Position:   Associate Professor in Residence
            Department of Obstetrics, Gynecology & Reproductive Sciences
            School of Medicine

Address:    Laurel Heights, Suite 335, Box 0744
            3333 California Street
            University of California, San Francisco
            San Francisco, CA 94143-0744
            Tel: (415) 502-4092
            Fax: (415) 502-8479
            Email: harperc@obgyn.ucsf.edu

#### EDUCATION

| | | | |
|---|---|---|---|
| 1984 | **Middlebury College** | Bachelor of Arts | Political Science |
| 1985 | | Master of Arts   (in Madrid, Spain) | Spanish |
| 1987 | **Columbia University** | *School of International and Public Affairs* | |
| | | Master in International Affairs | International Political Economy |
| 1996 | **Princeton University** | *Woodrow Wilson School of Public and International Affairs* | |
| | | *Office of Population Research* | |
| | | Doctor of Philosophy in Public Affairs | Demography and Health Policy |
| 1998 | **University of Pennsylvania** | *Sociology Department* | |
| | | *Population Studies Center* | |
| | | Post Doctoral Fellow | |

#### PRINCIPAL POSITIONS HELD

| | | |
|---|---|---|
| 1999-02 | **University of California, San Francisco** | Assistant Research Demographer |
| | School of Medicine | |
| | Obstetrics, Gynecology & Reproductive Sciences | |
| | Bixby Center for Global Reproductive Health | |
| 2003-2008 | | Assistant Professor |
| 2009-present | | Associate Professor in Residence |

#### CONCURRENT POSITIONS

| | | |
|---|---|---|
| 2006-2011 | Ellertson Social Science Postdoctoral Fellowship in Reproductive Health | UCSF Fellowship Director |

Cynthia C. Harper, PhD

**OTHER POSITIONS HELD**

| 1990-91 | **United Nations, International Labour Organization**, Chile. | Researcher |

| 1992-95 | **Princeton University** | Research Assistant |

Kristin Luker
*Dubious conceptions: the politics of teenage pregnancy*
Cambridge, MA: Harvard University Press, 1996
Irwin Garfinkel, Jennifer Hochschild, Sara McLanahan (Eds)
*Social Policies for Children*
Washington, DC: Brookings Institution, 1996.

Introduction to Population Problems (Economics 351)    Teaching Assistant
Comparative Family Systems (Sociology 302)
Women, Gender and Politics (Politics 321)

| 1996-99 | **Population Council** | Consultant |

**HONORS AND AWARDS**

*Cum Laude*, Dean's List, Middlebury College, 1980-84.

Ford Foundation Human Rights Fellow, Columbia University, 1986.

National Institutes of Health Traineeship in Demography, NICHD, Princeton Univ, 1992-93.

Center of Domestic and Comparative Policy Studies Fellow, Princeton University, 1993.

Charles F. Westoff Dissertation Prize in Demography, Princeton University, 1996.

Roy M. Pitkin Award, American College of Obstetricians and Gynecologists, Co-author, Outstanding article award in *Obstetrics & Gynecology*, 2000.

American College of Obstetricians and Gynecologists Annual Meeting, Co-author, Blue Ribbon Prize poster, 2005.

Roy M. Pitkin Award, American College of Obstetricians and Gynecologists, First author, Outstanding article award in *Obstetrics & Gynecology*, 2005.

Nominated for Postdoctoral Scholar's Association Outstanding Mentor Award, UCSF, 2006.

Nominated for Academic Senate Distinction in Mentoring Award, UCSF, 2011.

**KEYWORDS/AREAS OF INTEREST**

Contraception, Emergency contraception, Long-acting reversible contraception (LARC), Adolescent contraception, Adolescent risk behavior, HIV prevention, STI prevention, Access to family planning services, Provider prevention practices

**PROFESSIONAL ORGANIZATIONS AND ACTIVITIES**

| 1992-present | Population Association of America, Member |
| 1994-present | American Public Health Association, Member |
| 2003-present | Association for Reproductive Health Professionals, Member |

2

Cynthia C. Harper, PhD

| | |
|---|---|
| 2006-present | International Union for the Scientific Study of Population, Member |
| 2007-present | Society of Family Planning, Member |
| 1998-2004 | Network for Family Life Education, Rutgers University, National Advisory Board |
| 2003-present | Charlotte Ellertson Social Science Postdoctoral Fellowship, Advisory Board |

## SERVICE TO PROFESSIONAL PUBLICATIONS AND SOCIETIES

| | |
|---|---|
| 1998-present | American Journal of Public Health, ad hoc referee (1 paper in past year) |
| 1998-present | International Family Planning Perspectives, ad hoc referee (1 in past 2 years) |
| 1999-present | Journal of the American Medical Women's Assoc, ad hoc referee (3 in past 5 years) |
| 2000-present | Perspectives on Sexual and Reproductive Health, ad hoc referee (2 in past 5 years) |
| 2005-present | Obstetrics & Gynecology, ad hoc referee (1 in past year) |
| 2005-present | Studies in Family Planning, ad hoc referee (1 in past year) |
| 2005-present | Journal of Adolescent Health, ad hoc referee (1 in past 2 years) |
| 2006-present | Journal of Women's Health, ad hoc referee (2 in past year) |
| 2006-present | Archives of Pediatrics and Adolescent Medicine, ad hoc referee (1 in past year) |
| 2006-present | The Lancet, ad hoc referee (1 in past year) |
| 2007-present | Bio Med Central Public Health, ad hoc referee (1 in past year) |
| 2010-2011 | North American Forum on Family Planning, Abstract Review Committee |
| 2009-present | Fellowship in Family Planning, Peer reviewer (3 in past year) |
| 2012 | Society of Family Planning, Grant Review Committee |

## INVITED PRESENTATIONS

Pharmacy Access Partnership, Oakland, 2005 (invited talk)

Planned Parenthood Golden Gate, San Francisco, 2005 (invited talk)

California Department of Health Services, Maternal and Child Health and Office of Family Planning Branch meeting, Sacramento, 2006 (invited talk)

The California Wellness Foundation, Conference on Women's Health, San Francisco, 2007 (invited talk)

National Medical Committee of Planned Parenthood Federation of America, Association of Reproductive Health Professionals Annual Meeting, Washington, DC, 2008 (invited talk)

Funder's Network on Population, Reproductive Health and Rights, Annual Meeting, Santa Cruz, 2008 (invited talk)

UCSF Bixby Center for Global Reproductive Health Research Symposium, SF, (invited talk)

Society of Family Planning Annual Meeting Career Development Seminar, Designing and Performing Studies Using Survey Data, Los Angeles, 2009 (invited talk)

Private Foundation (Anonymous), IUD Summit, Omaha, 2009 (invited talk)

Psychosocial Workshop, sponsored by NICHD and Population Association of America, Washington, DC, 2011 (invited talk)

Private Foundation, (Anonymous) IUD Summit for researchers, funders, and government, 1) Provider knowledge, beliefs and attitudes about IUDs; 2) Patient education on IUDs, Omaha, 2011 (invited talks)

UCSF Bixby Center for Global Reproductive Health Research Symposium, SF, 2011

3

Cynthia C. Harper, PhD

La Trobe University, Unintended pregnancy prevention and reduction research, Presented through web-based technology, Melbourne Australia, 2011 (invited talk)

## UNIVERSITY SERVICE

| | |
|---|---|
| 2003-present | Bixby Center for Global Reproductive Health, Executive Committee |
| 2005-present | Department Ob-Gyn, Ad hoc Faculty Search Committees, Chair, Member |
| 2007-present | Department Ob-Gyn, Training and Mentoring Committee, Clinical Research Committee |
| 2008-present | Department Ob-Gyn, Clinical & Translational Researcher CAP Guidelines Committee |
| 2009-present | Department Ob-Gyn, SFGH Division Research Data User Committee, Chair |
| 2010-present | Women's Health and Empowerment Center of Expertise, UCSF and UCLA, Research Committee |
| 2011-present | Department Ob-Gyn, Clinical & Translational Researcher Faculty Series Committee |
| 2011-present | Bixby Center for Global Reproductive Health, Internal Communications Committee |

## PUBLIC SERVICE

| | |
|---|---|
| 2002-2006 | Calvary Presbyterian Nursery School, Parent volunteer |
| 2004-2006 | St. Mary of the Virgin Episcopal Church, Parish Council |
| 2004-present | Convent Elementary School, Parent volunteer |
| 2007-present | Princeton University, Regional Alumni Schools Committee, Alumni interviewer |

## TEACHING AND MENTORING

**Seminars and courses at UCSF** (last 5 years)

| Qtr | Academic Year | Course Number & Title | Teaching Contribution | Class size |
|---|---|---|---|---|
| Winter | 2005 | Vietnam Curriculum Reform and Reproductive Health Care Course (for visiting professors from medical schools in Vietnam), OBGYN | Lecturer | 16 |
| Winter | 2008 | Curriculum Reform to Advance Reproductive Health for Georgian Medical Faculty (visiting OBGYN professors from Eastern Europe), OBGYN | Lecturer | 8 |
| Fall | 2009 | Society of Family Planning's Career Development Seminar: Designing and Performing Studies using Survey Data (for Fellows) | Lecturer | 40 |
| Winter | 2010 | CTSI Mentoring Development seminar for Mentors in Training | Lecturer | 15 |
| Winter | 2010 | OBGYN Grand Rounds (Feb 2nd) | Lecturer | 40 |
| Winter | 2010 | CTSI Mentoring Development Program seminar | Leader/lecturer | 15 |
| Winter | 2011 | CTSI Mentoring Development Program seminar | Leader/lecturer | 15 |
| Winter | 2012 | CTSI Mentoring Development Program seminar | Leader/lecturer | 10 |

**Pre-Doctoral Students Supervised**

| Dates | Name | Program or School | Role | Current Position |
|---|---|---|---|---|
| 2001 | Erin Ford-Dirks, | UCSF School of Medicine, | Mentored | Residency, Pediatrics, |

4

Cynthia C. Harper, PhD

| | MD | medical student | summer research project | UCSF |
|---|---|---|---|---|
| 2001-02 | Jennifer Kerns, MD | UCSF-UC Berkeley Joint Medical Program, medical student | Thesis committee member | Asst. Prof, Ob-Gyn UCSF |
| 2002 | Jennifer McIntosh, PharmD | UCSF School of Pharmacy, PharmD student | Research mentoring on thesis | MHS candidate, Johns Hopkins School of Public Health |
| 2003-07 | Lisa Callegari, MD | UCSF School of Medicine, Chief Resident, OB/GYN | Mentor, research residency project | Associate physician, Kaiser Permanente |
| 2005-06 | Shira Rutman, MPH | Univ. of Washington, School of Public Health, MPH student | Thesis advisor | Staff at public health non-profit organization |
| 2006 | Chelsea Polis, PhD | Johns Hopkins School of Public Health, PhD student | Research mentor | Post-doctoral fellow |
| 2004- | Corinne Rocca, MPH | UC Berkeley School of Public Health, PhD student in Epidemiology | Research and career mentor | Research Epidemiologist, UCSF |
| 2007- | Asal Sadatrafiei | UCSF School of Pharmacy | Research mentor | Pharmacist, UCSD Health System |
| 2007- | Megan Haycock | UCSF School of Pharmacy | Research mentor | PharmD resident |
| 2008- | Erin Saleeby, MD, MPH | UCSF School of Medicine | Research mentor | Fellow, UCLA |
| 2008- | Wendy Sheldon | Princeton University | Research mentor | PhD student |
| 2010- | Sarah J Holcombe | UC Berkeley | Research mentor | PhD student |

**Post-Doctoral Fellows Mentored**

| Dates | Name | Fellow | Faculty Role | Current Position |
|---|---|---|---|---|
| 2003-06 | Amy Schalet, PhD | Postdoc Researcher | Career mentor | Assistant Professor UMass-Amherst |
| 2008- | Davida Becker, PhD | Postdoc Researcher | Lead mentor | Postdoc, UCSF |
| 2008- | Julia Steinberg, PhD | Postdoc Researcher | Research, career mentor | Postdoc, UCSF |
| 2008- | Lori Freedman, PhD | Postdoc Researcher | Research, career mentor | Research Sociologist, UCSF |
| 2008- | Jessica Morse, MD, MPH | UCSF School of Medicine | Research mentor | Fellow, UCSF |

**Faculty Mentoring***

| Dates | Name | Position while Mentored | Mentoring Role | Current Position |
|---|---|---|---|---|
| 2003- | Jillian Henderson, PhD, MPH | Postdoc, Assistant Professor | Lead mentor | Assistant Prof, ObGyn, UCSF |
| 2006- | Naomi Stotland, MD | Clinical Instructor | Research advisor | Assistant Adj Prof Ob-Gyn, UCSF |
| 2006- | Shareen El-Ibiary, | Assistant Professor | Research advisor | Associate Prof, |

5

Cynthia C. Harper, PhD

| | | | | |
|---|---|---|---|---|
| | PharmD, BCPS | | | Clinical Pharmacy, UCSF |
| 2008- | Sara Newmann, MD, MPH | Fellow, Assistant Clinical Professor | Research, career advisor | Assistant Clinical Prof, Ob-Gyn, UCSF |
| 2008- | Norma Jo Waxman, MD | Associate Clinical Professor | Research advisor | Associate Clinical Prof, Family & Community, UCSF |
| 2011- | Tessa Madden, MD, MPH | Washington University School of Medicine | Research advisor | Assistant Professor, ObGyn |

**Summary of teaching/mentoring hours**

| | |
|---|---|
| 2005-06: | 150 hours |
| 2006-07 | 165 hours |
| 2007-08 | 165 hours |
| 2008-09 | 180 hours |
| 2009-10 | 180 hours ANTICIPATED HOURS 2010-11 180 hours |

**Summary of teaching/mentoring activities**

I graduated from the **Mentoring Development Program** of the NIH-funded **Clinical and Translational Science Institute** in 2009. The principal way that I have taught is through mentoring. I helped to establish a postdoctoral program, the Charlotte Ellertson Social Science Postdoctoral Fellowship in Reproductive Health, as a pilot at UCSF in 2003. The pilot was extended to a total of 5 sites in 2006, including Columbia University and Johns Hopkins University. I am on the Advisory Board for this program, and since 2006 have served as the UCSF Site Director and PI. I am the mentor of Dr. Jillian Henderson, a fellow in the pilot cohort who was then appointed to the UCSF faculty; I am the principal mentor on her K01 grant. The other fellow from that cohort was appointed Assistant Professor in a Sociology Department at UMass-Amherst. The vision of the fellowship program is to prepare a national network of academics dedicated to the prevention of unintended pregnancy and the safe provision of abortion services.

As a PhD in demography in an Ob-Gyn department, my mentoring has been multi-disciplinary in nature. In additional to post-doctoral fellows, I mentored medical students, residents, MPH students, PhD students and junior faculty. I have served as a mentor for clinician-academics in training, as well as social scientists. In my mentoring, I have focused on teaching research design, scientific methods, high-quality data collection, data analysis, clinical practice implications, and manuscript preparation. I have tried to impart skills that span disciplines, including an awareness of the policy context surrounding scientific inquiry, and the value of focusing on career-building activities including proposal submissions and research collaborations.

I have also taught to a variety of group audiences, from UCSF faculty and medical students to health professionals from developing countries. I taught seminars in contraception and in mentoring to visiting Deans and scholars from medical schools in Vietnam, as part of a Curriculum Reform and Reproductive Health course. I also participated in developing a course and teaching family planning to leaders from Latin America.

6

Cynthia C. Harper, PhD

**RESEARCH AND CREATIVE ACTIVITIES**

**Research Awards and Grants**
<u>CURRENT</u>

1.(PI  UCSF; Raine PI Kaiser)
5K24HD057086                                                        2011-2015
NIH/National Institutes of Health and Child Development
**Contextualizing contraceptive and condom use**
Mid-career investigator award in patient-oriented research

2.  (**PI**)                                                              2007-2012
The William and Flora Hewlett Foundation                   $2,850,000
**Reducing Unintended Pregnancy in the U.S. through Long-acting Reversible Contraception**
This project is a series of efforts, including several research studies and a national cluster
randomized trail, provider training and updating of provider practices, to support practice and
policy changes in the provision of long-acting reversible contraception in the U.S.

3.(**PI**)                                                               2009-2010
National Campaign to Prevent Teen and Unplanned Pregnancy       $55,000
**Addressing the knowledge gap:  Increasing young women's familiarity with LARC using
digital video**
This project draws upon a series of our research studies on LARC to produce educational material
for young women on intra-uterine contraception and implants.

4.  (**PI**)                                                              2008-2011
Anonymous Funder                                               $767,000
**Charlotte Ellertson Social Science Post-doctoral Fellowship Grant**
This grant supports a research and leadership fellowship on abortion and reproductive health for
postdoctoral social science researchers.

5.  (**PI**)                                                              2010-2011
Lucile and David Packard Foundation                          $55,000
**Charlotte Ellertson Social Science Post-doctoral Fellowship Grant**

6.  (**PI**)                                                              2010-2011
Ibis Reproductive Health                                        $30,000
**Charlotte Ellertson Social Science Post-doctoral Fellowship Grant**

7.  (**PI**)                                                              2010-2012
Society for Family Planning                                   $120,000
**The role of depression, anxiety and negative emotions in post-abortion contraceptive decision-
making**   This study seeks to understand how women's mental health affects contraceptive choices .

8.  (**Co-PI**)      **Rocca (PI)**                                        2010-2011
National Campaign to Prevent Teen and Unplanned Pregnancy       $40,000
**Have we missed important attitudinal factors for addressing disparities in unintended
pregnancy in the US?** This study analyzes a new national data on contraceptive use in the US.

7

Cynthia C. Harper, PhD

9. (**Co-PI**)    Raine (PI)                                    2007-2010
Duramed Research, Inc.
**Actual Use Study of Teens and Emergency Contraception**
This study is to measure the actual use of Plan B® emergency contraception among females under
age 18 years in support of an application to the FDA for over-the-counter status for this age group.


10. (**Investigator**)    Henderson (PI)                       2006-2010                5%
Anonymous Funder                                               $727,120
**Effects of Legalized Abortion in Nepal**
This study measures the changes in maternal mortality and morbidity due to abortion before and
after legalization.


<u>PAST</u>

1. 444932-81303 (**PI**)                                       2001-2003
Compton Foundation                                             $100,000
**Pharmacy Access to Emergency Contraception**
Randomized, clinical trial on increased access to emergency contraception.


2. 444932-80298 (**PI**)                                       2001-2002
Wallace Alexander Gerbode Foundation                           $25,000
**Pharmacy Access to Emergency Contraception**
Randomized, clinical trial on increased access to emergency contraception.


3. 444932-80474 (**PI**)                                       2002-2003
Women's Capital Corporation                                    $35,000
**Pharmacokinetics of Plan B Emergency Contraception among a Post-Menarchal Pediatric
Population**
Open-label pharmacokinetic study of Plan B emergency contraception among young adolescents.


4. H 10857-17410 (**Co-Investigator**)                         2002-2006
National Institutes of Health – NICHD                          $810,094
**Advance Provision of Emergency Contraception**.
This study compares the impact of different levels of access to emergency contraception on
contraceptive behavior, pregnancy, and STIs.


5. 404932-81857 (**Mentor/PI**)                                2003-2006    $234,570
Anonymous Funder                                               2006-2008    $377,803
**Social Science Post-doctoral Fellowship Grant**
This grant supports a research and leadership postdoctoral fellowship
on abortion and reproductive health for social science researchers.


6. 404932-32713 (**Co-Investigator**)    Maternowska (PI)      2001-2003
U.S. Office of Population Affairs
**Family Planning Use among Mexican Immigrants in California**.   Study to examine gender and culture
barriers to family planning use among Mexican immigrants in California.

8

Cynthia C. Harper, PhD

7. 1 R01 HD046027-01 (**PI**)                                    2003-2008
National Institutes of Health - NICHD                      $1,141,700
**Providers' Perceptions of the Diaphragm in Southern Africa and the U.S.**
This study assesses provider practices in pregnancy and HIV prevention in both low and high resource
settings, with a focus on provider adoption of new prevention methods for women.

8. 1 R01 HD045480-01 (**Co-Investigator**)   Raine (PI)      2004-2009                20%
National Institutes of Health - NICHD                      $1,868,973
**Combined Hormonal Contraceptive Use in High-Risk Women**
This study assesses contraceptive use of oral contraceptive pills, the patch and the vaginal ring
among a group of young women at high risk of unintended pregnancy.

9. K12 HD045480-01                                          1998-2009                10%
National Institutes of Health – NICHD       Giudice (PI)
**Women's Reproductive Health Research Career Development (WRHR)**
This project is to provide mentored training of obstetrician-gynecologists in the field of women's
reproductive health.
Role: Train OB-GYNs in methodology and study design

10. 05-45122 (**Investigator**)              Darney (PI)      2000-2008                10%
California Department of Health Services                   $11,581,641
**Family PACT Evaluation**
Measure effect of program on unintended pregnancy rates and program cost effectiveness.

9

Cynthia C. Harper, PhD

**PUBLICATIONS**
**Peer reviewed articles**

1. **Harper C**, Ellertson C. Knowledge and Perceptions of Emergency Contraceptive Pills among a College-age Population: A Qualitative Approach. *Family Planning Perspectives* 27(4):149-154, 1995.

2. **Harper CC**, Ellertson CE. The Emergency Contraceptive Pill: A Survey of Knowledge and Attitudes Among Students at Princeton University. *American Journal of Obstetrics and Gynecology* 173(5):1438-1445, 1995.

3. **Harper C**, Winikoff B, Ellertson C, Coayji K. Blood loss with mifepristone-misoprostol abortion: Measures from a trial in China, Cuba and India. *International Journal of Gynecology and Obstetrics* 63:39-49, 1998.

4. Langer A, **Harper C**, Garcia-Barrios C, Schiavon R, Heimburger A, Elul B, Reynoso Delgado S, Ellertson C. Emergency Contraception in Mexico City: What do health care providers and potential users know and think about it? *Contraception* 60:233-241, 1999.

5. Raine T, **Harper C**, Leon K, Darney P. Emergency Contraception: Advance provision in a young, high-risk clinic population. *Obstetrics and Gynecology* 96 (1):1-7, 2000.**\*\*\***

6. Sawaya GF, **Harper C**, Balistreri E, Boggess J, Darney P. Cervical neoplasia risk in women provided hormonal contraception without a Pap smear. *Contraception* 63(2):57-60, 2001.

7. **Harper C**, Balistreri E, Boggess J, Leon K, Darney P. Provision of hormonal contraception without a mandatory pelvic exam: "First Stop," a California demonstration project. *Family Planning Perspectives* 33(1):13-18, 2001.

8. Stewart FH, **Harper CC**, Ellertson CE, Grimes DA, Sawaya GF, Trussell J. Are pelvic exams necessary for providing hormonal contraception? *JAMA* 285(17):2232-2239, 2001.

9. Raine T, **Harper C**, Paukku M, Darney P. Race, Adolescent Contraceptive Choice, and Pregnancy at Presentation to a Family Planning Clinic. *Obstetrics and Gynecology* 99(2):241-247, 2002.

10. **Harper C**, Ellertson C, Winikoff B. Could American women use mifepristone-misoprostol pills safely with less medical supervision? *Contraception* 65(2):133-142, 2002.

11. Raine T, Marcel AV, Rocca CH, **Harper CC**. The other half of the equation: Serving young males within a young women's reproductive health clinic. *Perspectives on Sexual and Reproductive Health* 35(5):208-214, 2003.

12. **Harper CC**, Minnis AM, Padian NS. Male sexual partners and use of emergency contraception. *American Journal of Obstetrics and Gynecology* 189(4): 1093-1099, 2003.

**\*\*\***Roy M. Pitkin Award, ACOG, Outstanding article, 2000.

10

Cynthia C. Harper, PhD

**Peer reviewed articles,** continued.

13.  **Harper C**, Callegari L, Raine T, Blum M, Darney P.  Adolescent clinic visits for contraception:  Social support from mothers, male partners, and friends. *Perspectives on Sexual and Reproductive Health* 36(1):20-26, 2004.

14.  Foster DG, **Harper CC**, Bley JJ, Mikanda JJ, Induni M, Saviano EC, Stewart FH. Knowledge of emergency contraception among women in California. *American Journal of Obstetrics and Gynecology* 191:150-156, 2004.

15.  **Harper CC,** McLanahan SS.  Father absence and youth incarceration. *Journal of Research on Adolescence* 14(3):369-397, 2004.

16.  **Harper CC**, Rocca CH, Darney PD, von Hertzen H, Raine TR.  The tolerability of levonorgestrel emergency contraception in adolescents. *American Journal of Obstetrics and Gynecology* 191:1158-63, 2004.

17.  Raine TR, **Harper CC**, Rocca CH, Fisher R, Padian N, Klausner JD, Darney PD.  Direct access to emergency contraception through pharmacies and effect on unintended pregnancy and STIs:  A randomized, controlled trial.  *JAMA* 293:54-62, 2005.

18.  Raine TR, **Harper CC**.  In Reply to "Direct access to emergency contraception." (letter)  *JAMA* 293:1856-57, 2005.

19.  Henderson JT, Hwang AC, **Harper CC**, Stewart FH.  Safety of mifepristone abortions in clinical use.  *Contraception* 72:175-178, 2005.

20.  **Harper CC**, Cheong M, Rocca CH, Darney PD, Raine TR.  The effect of increased access to emergency contraception among young adolescents. *Obstetrics & Gynecology* 106:483-491, 2005. **\*\*\***

21.  Sambol N, **Harper CC**, Kim L, Liu CY, Darney P, Raine TR.  Pharmacokinetics of single-dose levonorgestrel in adolescents.  *Contraception* 74:104-109, 2006.

22.  Rocca CH, Schwarz EB, Stewart FH, Darney PD, Raine TR, **Harper CC.**  Beyond access: acceptability, use and non-use of emergency contraception among young women. *American Journal of Obstetrics & Gynecology* 196:29.e1-29.e6, 2007.

23.  Foster DG, Ralph L, Arons A, Brindis C, **Harper CC**.  Trends in knowledge of emergency contraception among women in California, 1999-2004. *Women's Health Issues* 17:22-28, 2007.

24.  El-Ibiary SY, Raine T, McIntosh J, Darney PD, **Harper CC**.  Pharmacy access to emergency contraception:  the perspective of pharmacists at a chain pharmacy in San Francisco, California.  *Journal of the American Pharmacists Association* 47:702-710, 2007.

**\*\*\***Roy M. Pitkin Award, ACOG, Outstanding article, 2005.

11

Cynthia C. Harper, PhD

**Peer reviewed articles,** continued.

25. a) Polis CB, Schaffer K, Blanchard K, Glasier A, **Harper CC**, Grimes DA. Advance provision of emergency contraception for pregnancy prevention (full review). *Cochrane Database of Systematic Reviews*, 2007, Issue 2. Art. No.: CD005497. DOI: 10.1002/14651858. CD005497.pub2.
    b) Polis CB, Schaffer K, Blanchard K, Glasier A, **Harper CC**, Grimes DA. Advance provision of emergency contraception for pregnancy prevention: a meta analysis. *Obstetrics & Gynecology* 110:1379-88, 2007.

26. **Harper CC**, Blanchard K, Grossman D, Henderson J, Darney PD. Reducing maternal mortality due to elective abortion: Potential impact of misoprostol in low-resource settings. *International Journal of Gynecology and Obstetrics* 98:66-69, 2007.\*

27. Stewart FH, Brown BA, Raine TR, Weitz TA, **Harper CC**. Adolescent and young women's experience with the vaginal ring and oral contraceptive pills. *Journal of Pediatric and Adolescent Gynecology* 20:345-351, 2007.\*\*

28. Moss NJ, **Harper CC**, Ahrens K, Scott K, Kao S, Padian N, Raine T, Klausner JD. Predictors of incident herpes simplex virus type 2 infections in young women at risk for unintended pregnancy in San Francisco. *BioMed Central Infectious Diseases* 7:113, 2007.

29. **Harper CC**, Weiss DC, Speidel JJ, Raine-Bennett T. Over the counter access to emergency contraception for teens. *Contraception* 77:230-233, 2008.\*\*\*

30. Callegari L, **Harper CC**, van der Straten A, Kamba M, Chipato T, Padian N. Consistent condom use in married Zimbabwean women after a condom intervention. *Sexually Transmitted Diseases* 35:624-630, 2008.

31. **Harper CC**, Blum M, Thiel de Bocanegra H, Darney PD, Speidel JJ, Policar M, Drey E. Challenges in translating evidence to practice: the provision of intrauterine contraception. *Obstetrics & Gynecology* 111:1359-1369, 2008.

32. Speidel JJ, **Harper CC**, Shields W. The potential of long-acting reversible contraception to decrease unintended pregnancy. (Editorial) *Contraception* 78:197-200, 2008.

33. Raine, TR, Epstein LB, **Harper CC**, Brown BA, Boyer CB. Attitudes towards the vaginal ring and transdermal patch among adolescents and young women. *Journal of Adolescent Health* 45:262-267, 2009.

34. Stotland NE, Gilbert P, Bogetz A, **Harper CC**, Abrams B, Gerbert B. Preventing excessive weight gain in pregnancy: How do prenatal care providers approach counseling? *Journal of Women's Health* 19:807-814, 2010.

\* Editor's Selection for noteworthy article in *IJGO*, 2007.
\*\*Blue Ribbon Prize, ACOG Annual Meeting, 2005.
\*\*\*Second most frequently downloaded article in 2008-09 for the journal. Inaugural article for new journal series we proposed, "Quarterly series: controversies in reproductive health: an evidence-based approach."

12

Cynthia C. Harper, PhD

**Peer reviewed articles,** continued.

35. **Harper CC**, Henderson JT, Schalet A, Becker D, Stratton L, Raine TR. Abstinence and teens: Prevention counseling practices of health care providers serving high-risk patients in the United States. *Perspectives on Sexual and Reproductive Health* 42:125-132, 2010.

36. Raine TR, Gard J, Boyer CB, Haider S, Brown BA, Hernandez FAH, **Harper CC**. Contraceptive decision-making in sexual relationships: Young men's experiences, attitudes and values. *Culture, Health and Sexuality* 12:373-386, 2010.

37. **Harper CC**, Brown BA, Foster-Rosales A, Raine TR. Hormonal contraceptive method choice among young, low-income women: How important is the provider? *Patient Educ Couns* 81:349-354, 2010.

38. Henderson JT, Sawaya GF, Blum M, Stratton L, **Harper CC**. Pelvic examinations and access to oral hormonal contraception: Results from a national survey. *Obstetrics & Gynecology* 116:1257-64, 2010.

39. Henderson JT, Raine T, Schalet A, Blum M, **Harper CC**. "I wouldn't be this firm if I didn't care": Preventive clinical counseling for reproductive health. *Patient Educ Couns* 82:254-9, 2011.

40. Thompson KMJ, Speidel JJ, Saporta V, Waxman NJ, **Harper CC**. Contraceptive policies affect post-abortion provision of long-acting reversible contraception. *Contraception* 83:41-47, 2011.

41. Raine TR, Foster-Rosales A, Upadhyay U, Boyer CB, Brown BA, Sokoloff A, **Harper CC**. One-year contraceptive continuation and pregnancy in adolescent and young women initiating hormonal contraceptives. *Obstetrics & Gynecology* 117:363-71, 2011.

42. Lamichhane P, Harken T, Puri M, Darney PD, Blum M, **Harper CC**, Henderson JT. Sex-selective abortion in Nepal: A qualitative study of health workers' perspectives. *Women's Health Issues* 21:S37-41, 2011.

43. Becker D, Diaz-Olavarrieta C, Juarez C, Garcia SG, Sanhueza P, **Harper CC**. Socio-demographic factors associated with obstacles to abortion care: Findings from a survey with abortion patients in Mexico City. *Women's Health Issues* 21:S16-20, 2011.

44. Thompson KMJ, Foster Green D, **Harper CC**. Increased use of intrauterine contraception in California, 1997-2007. *Women's Health Issues* 21:425-30, 2011.

45. Becker D, Diaz-Olavarrieta C, Juarez C, Garcia SG, Sanhueza P, **Harper CC.** Clients' perceptions of the quality of care in Mexico City's public sector legal abortion program. *International Perspectives on Sexual and Reproductive Health* 37:191-201, 2011.

46. Belden P, **Harper CC**, Speidel JJ. The copper IUD for emergency contraception, a neglected option. *Contraception* (in press), 2011.

13

Cynthia C. Harper, PhD

**Peer reviewed articles,** continued.

47. **Harper CC**, Speidel JJ, Drey EA, Trussell J, Blum M, Darney PD. "Copper intrauterine device for emergency contraception: Clinical practice among contraceptive providers." *Obstetrics & Gynecology* 119:220-6, 2012.

48. Morse J, Freedman L, Speidel JJ, Thompson KMJ, Stratton L, **Harper CC**. Post-abortion contraception: Qualitative interviews on counseling and provision of long-acting reversible contraceptive methods. *Perspectives on Sexual and Reproductive Health* (in press), 2012.

49. **Harper CC**, Henderson JT, Raine TR, Goodman S, Darney PD, Thompson KM, Dehlendorf C, Speidel JJ. Evidence-based IUD practice: family physicians and obstetrician-gynecologists. *Family Medicine* (in press), 2012.

50. **Harper CC**, Holt K, Nhemachena T, Chipato T, Ramjee G, Stratton L, Blum M, McCulloch CE, Mgweba S, Blanchard K. Willingness of clinicians to integrate microbicides into HIV prevention practices in Southern Africa. *AIDS and Behavior* DOI 10.1007/s10461-011-0109-6, 2012.

51. Rocca CH, **Harper CC**. Racial and ethnic differences in contraceptive attitudes and knowledge: Do they explain disparities in contraceptive method use. *Perspectives on Sexual and Reproductive Health* (in press), 2012.

52. Raine TR, Ricciotti N, Sokoloff A, Brown BA, Hummel A, **Harper CC**. An over-the-counter simulation study of a single tablet emergency contraceptive in young females. *Obstetrics & Gynecology* (in press), 2012.


**Published commentaries on peer reviewed articles**

1. Couzin J. "Plan B: A Collision of Science and Politics" *Science* 310:38-39, 2005. News Focus section cites Cynthia Harper and discusses results from emergency contraception studies.

2. Harper *et al*. 2005: Abstract and commentary in *Evidence-Based Medicine:* "Improved access to emergency contraception did not increase risky sexual behaviour in adolescents" Bradley C, June 2006;11;80. Digest published in *Perspectives on Sexual and Reproductive Health*: "Easy access to EC increased teenagers' use, but does not lead to risky behavior", 38(1), March 2006.

3. Raine *et al*. 2005: Abstract and commentary in *Evidence-based Obstetrics and Gynecology:* "Direct access to emergency contraception did not impact contraceptive use or increase high-risk sexual behavior." Simonds WS, 2006;8:100-101.

4. Rocca *et al.* 2007: Piepert JF, Stamilio DM, Allsworth J, Jungheim E, Tepe M. Discussion: "Acceptability of Emergency Contraception" Journal Club Roundtable. *American Journal of Obstetrics & Gynecology* 196:90.e1-90.e5, 2007

14

Cynthia C. Harper, PhD

5. Polis *et al.* 2007. Abstract and commentary in *Evidence-Based Nursing*. "Review: advance provision of emergency contraception increases its use but does not reduce unplanned pregnancy rate." Quinn S, 2007;10-106-doi:10.1136/ebn.10.4.106.

## Non-Peer reviewed Publications

1. **Harper C**. "Fertility and Women's Employment in Latin America," in C. Lopez, M. Pollack, M. Villareal (eds), *Gender and the Labor Market in Latin America*. Santiago, Chile: International Labour Organization. 1992.

2. **Harper C**. "Incarceration and Life Opportunities among Baltimore Minority Youths: Pathways in and out of Trouble." Report prepared for the MacArthur Research Network on Adolescent Development and Juvenile Justice, the John D. and Catherine T. MacArthur Foundation. 2000.

3. Weitz T, **Harper C**, Mohllajee A. Teen Pregnancy among Asians and Pacific Islanders in California: Final Report. UCSF Center for Reproductive Health Research & Policy: San Francisco, California, 2001.

4. **Harper, CC**, Henderson JT, Darney PD. "Abortion in the United States." *Annual Review of Public Health* **26**:501-12, 2005.

## PEER REVIEWED ABSTRACTS PRESENTED (past 5 years)

Gard J, Boyer C, Harper C, Brown B, Raine T. Role of men in contraceptive decision-making. American Public Health Annual Meeting, Philadelphia, November 2006.

Harper CC, Nhemachena T, Blanchard K, Ramjee G, Henderson JT, Chipato T, Chirenje M, Chimbwete C, Blum M. Dual use of diaphragms and microbicides: comparative perspectives of providers in Sub-Saharan Africa and the United States." Microbicides 2006. Cape Town, South Africa, April 2006.

Harper CC, Blum M. Thiel de Bocanegra H, Darney PD, Speidel JJ, Policar M, Drey E. Challenges in translating evidence to clinical practice: the provision of intrauterine contraception in California. American Public Health Association Annual Meetings, Washington, DC, November 2007.

Henderson JT, Raine-Bennett T, Padian N, Blum M, Harper CC. Counseling conundrums: A qualitative study of providers serving women at increased risk of HIV infection. Annual meetings of the Health Service Researchers, Florida, June 2007.

Speidel JJ, Thompson K, Harper CC. Long-acting contraception (LARC) can decrease unintended pregnancy and repeat abortion. International Federation of Professional Abortion and Contraception Associates (FIAPAC), Berlin, Germany, October 2008.

Harper CC, Becker D, Henderson J, Stratton L, Raine T. Abstinence and teens: Prevention counseling practices of health care providers in the United States. American Public Health Association Annual Meeting, San Diego, October 2008.

Harper CC, Blanchard K, Grossman D, Newmann S, Morar N, Ramjee G. Contraceptive counseling

15

Cynthia C. Harper, PhD

and care for HIV-infected and at-risk women in South Africa. American Public Health Association Annual Meeting, San Diego, October 2008.

Harper CC, Thompson K, Waxman NJ, Goodman S, Speidel JJ. Barriers to immediate post-abortion provision of long-acting reversible contraception. Annual Meetings of the National Abortion Federation, Portland, April 2009.

Brown B, Sokoloff A, Foster-Rosales A, Harper CC, Raine T. Young women's hormonal contraceptive use post-abortion: A longitudinal perspective. Annual meeting of the National Abortion Federation, Portland, OR, April 2009.

Harper CC, Thompson K, Waxman, NJ, Speidel JJ. Provision of long-acting reversible contraception (LARC) at US abortion facilities and barriers to immediate post-abortion insertion. Annual Meeting of the American Reproductive Health Association, Los Angeles, September 2009.

Deidrich J, Benson L, Drey E, Harper CC, Steinauer J. The post-abortion contraception study: which demographic factors predict choice of long-acting reversible contraception? Annual Meeting of the American Reproductive Health Association, Los Angeles, September 2009.

Harper CC, Brown B, Foster-Rosales A, Raine T. Hormonal contraceptive method choice among young low-income women: how strong is the provider effect? Annual meeting of the Association of Reproductive Health Professionals, Los Angeles, September 2009.

Harper CC, Nhemachena T, Saleeby E, Padian N, McCulloch C, Blum M, Chiyaka T, Chipato T. Long-acting reversible contraception in Zimbabwe: Provider practices. International Federation of Gynecology and Obstetrics (FIGO) Annual Meeting, Cape Town, South Africa, October 2009.

Harper CC, Blanchard K, Morar N, McCulloch C, Ramjee G. Provider HIV and pregnancy prevention in South Africa: the female condom. International Federation of Gynecology and Obstetrics (FIGO) Annual Meeting, Cape Town, South Africa, October 2009.

Harper CC, Raine TR, Henderson JT, Blum M, Thompson K, Speidel JJ. Long-acting reversible contraception (LARC) in the US: are contraceptive providers adequately trained? American Public Health Association Annual Meeting, Philadelphia, November 2009.

Henderson J, C Rocca, C Harper. "Health care access in the transition from adolescence to adulthood and implications for contraception and unintended pregnancy." Oral presentation, Add Health Users Conference, Bethesda, MD. July 2010.

Rafie S, Ghaffarian S, Gray E, Haycock M, Yen S, Harper C. Provider opinions on expanding access to hormonal contraception. Association of Reproductive Health Professionals, Atlanta, September 2010.

Harper CC, Chipato T, Nhemachena T, Blum M, Morar N, McCulloch C, Ramjee G, Blanchard K. Provider HIV and pregnancy prevention practices in southern Africa: the female condom. American Public Health Association annual meeting, Denver, November 2010.

16

Cynthia C. Harper, PhD

Blanchard K, Mtetwa S, Nhemachena T, Chipato T, Ramjee G, Stratton L, Otis K, Harper C.  Nurses' and doctors' knowledge and opinions about microbicides in Southern Africa.  International Microbicides Conference 2010, Pittsburgh, May 2010.

Sheldon W, Chipato T, Nhemachena T, Chiyaka T, Mtetwa S, Nyambo V, Trussell J, Harper CC Male Circumcision for HIV Prevention: Factors Associated with Provision of Counseling, Services and Desire for Training Among Medical Clinicians in Zimbabwe.  AIDS 2010, July, 2010, Vienna, Austria.

Harper CC, Raine TR, Thompson K, Stratton L, Speidel JJ.  Long-acting reversible contraception in the US:  National survey of advanced practice nurses.  North American Forum on Family Planning, Washington, DC, October 2011.

Rocca CH, Harper CC. Racial and ethnic differences in contraceptive knowledge, skepticism, fatalism, and pregnancy attitudes: Do they explain disparities in contraceptive use?  North American Forum on Family Planning, Washington, DC, October 2011.

Lamichhane P, Puri M, Harken T, Blum M, Harper C, Darney P, Henderson J. Health care workers' perceptions of abortion legalization in Nepal. The 6th Asia-Pacific Conference on Reproductive & Sexual Health & Rights. Yogyakarta, Indonesia. October 19, 2011.

Hemmerling, Anke, Harper CC, Stratton L, Cohen CR.  Acceptability and expectations of a vaginally administered live biotherapeutic product among women with bacterial vaginosis.  International Microbicides Conference 2012, Sydney, Australia, April 2012.

17

Pls-Add-94

Cynthia C. Harper, PhD

## CURRENT RESEARCH PROGRAM

Cynthia C. Harper, PhD, Associate Professor in the Department of Obstetrics, Gynecology and Reproductive Sciences, is a faculty member of the Bixby Center for Global Reproductive Health and a member of its Executive Committee. She is a Demographer by training and her research focuses on the impact of health policies, as well as provider practices and patient behaviors, on reproductive health outcomes, specifically in the areas of contraception and sexually transmitted infections (STIs), including HIV. While contraception and STI/HIV prevention have traditionally been treated separately in research, Dr. Harper is investigating new approaches to integrate efforts in the two areas.

Dr. Harper conducted an NIH-funded R01 to investigate clinician practices in pregnancy and HIV prevention in Sub-Saharan Africa (Zimbabwe and South Africa) and the US. The multi-country study assessed clinicians' willingness to integrate new technologies and approaches into their practices in varying epidemiological and socio-economic contexts. Qualitative and quantitative methods were used for data collection: in-depth interviews (n=91) were followed by national probability surveys (n=3,600). While designing and administering a national probability survey was extremely challenging in Zimbabwe and S. Africa, strong collaborations with African scientists led to high response rates and generalizable findings. Study results should facilitate the integration of new female-controlled HIV prevention methods, including microbicides, into clinical practice, as they become available.

Dr. Harper conducted a series of studies on emergency contraception, the results of which addressed national concerns related to both unintended pregnancy and STI risks, particularly among adolescents. The studies covered steps in the translational research process, from a PK evaluation of levonorgestrel to a large randomized clinical trial, and finally policy. Data from the studies was provided to the FDA for its evaluation of over-the-counter application of Plan B emergency contraception. The scientific advisory panel, which reviewed the data, voted overwhelmingly to allow OTC status, but after a delay, the FDA cited concerns about teen sexual behavior. However, the studies provided to the FDA included data on young adolescents, showing no increase in risk-taking or STIs. Dr. Harper had included biological measures of STIs in the clinical trial, although no other emergency contraception trial had previously measured them, in anticipation that it would be pertinent to the FDA decision. Numerous scientific articles resulted from the studies, including a *JAMA* article. An article that Dr. Harper wrote on adolescents was named an outstanding article of the year by the journal *Obstetrics & Gynecology*, resulting in an award of $5,000 to the UCSF ObGyn Department.

The research had an impact in both the scientific and policy communities, as many other journals, including *Science* ("Plan B: A Collision of Science and Politics"), cited Dr. Harper and her work. Commentaries of the published data were written in academic journals and Dr. Harper was interviewed by the national media. In policy-making, the FDA finally approved OTC status, under continued efforts of the medical and scientific communities to adhere to evidence-based decision-making. On the international level, the data was presented to the regulatory body of Canada, which approved behind-the-counter use.

For future directions, Dr. Harper is building on these efforts to reduce unintended pregnancy through improved access to long-acting reversible contraception (LARC). Her current work, the translation of evidence to clinical practice of LARC methods, supports provider training and updated practices to expand these highly effective contraceptives to post-abortion or nulliparous women, who are rarely offered these method due to provider fears of infection, STIs, or other medical concerns that are no longer consistent with evidence-based medicine. She is launching a cluster randomized trial, with a provider contraceptive intervention, in collaboration with community clinics throughout the U.S.

18

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2013, I electronically filed the foregoing

Plaintiffs-Appellees' Addendum with the Clerk of the Court by using the appellate

CM/ECF system.

I certify that the participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system



**/s/ Janet Crepps**
JANET CREPPS